Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3       --------------------------X

4       VANESSA A. McFADDEN,           :

5               Plaintiff,             :

6          v.                          : Civil Case No.

7       BALLARD SPAHR ANDREWS &,       :   05cv2401 (RJL)

8       INGERSOLL, LLP, et al.,        :

9               Defendants.            :

10      --------------------------X

11

12                              Silver Spring, MD

13                              October 31, 2006

14

15          Deposition of MARGARET RILEY-JAMISON, a

16      witness herein, called for examination by counsel

17      for Plaintiff in the above-entitled matter, taken

18      at The Law Offices of T. W. Murray, 1111 Bonifant

19      Street, Silver Spring, Maryland 20910, at 10:12

20      a.m., on Tuesday, October 31, 2006, reported by

21      Ray Heer III and transcribed under his direction.

22

ORIGINAL



EXHIBIT

A

ALL-STATE LEGAL®

Margaret Riley - Jamison                                    October 31, 2006

Silver Spring, MD

Page 25

```
 1    secretaries would have remained approximately the

 2    same.

 3              BY MS. MURRAY:

 4         Q    As best as you can recall, who were the

 5    other legal secretaries in 2002, besides Ms.

 6    McFadden?

 7         A    If you're asking me to guess, I will

 8    guess, but I would not know dates for sure until I

 9    saw a list of employees.  Should I list the names

10    for you?

11         Q    Yes.

12         A    Kathy Hannah -- Kathy, Vanessa -- I

13    think we had Marti Hall and Kathy Hannah job-

14    sharing.  2002?

15         Q    Correct.

16         A    I'm sorry.  The office configuration was

17    different.  I'm trying to go around the office.  I

18    don't remember who worked -- who else worked in

19    tax at the time.

20              Then I would go to real estate.  We had

21    Judy Mintz, Pam Mitchell, Tina Green, Wanda

22    Bridgett.  Pam Curry may have started that year;
```

Margaret Riley - Jamison                                          October 31, 2006
Silver Spring, MD

Page 26

1    I'm not sure.  Sevonne Parker would have been

2    there.  Rhea Maher, Lois Swanson.  I've already

3    listed Lorraine Hegi.  Pam Higgins, Mary Ann

4    Meagher.

5              And then, in litigation we would have

6    had Elaine Wilbur, Janie -- I don't remember her

7    name -- probably.  And I don't remember Jeff's

8    secretary.  I don't remember if it would have been

9    Kim DeHaut or if there was someone before Kim;

10   perhaps it was Kim DeHaut.

11        Q    In 2003, were there any additional legal

12   secretaries, besides the ones we've discussed?

13        A    In 2003, we probably hired -- I mean,

14   there were probably -- attrition at that point --

15   I'm trying to remember who it would be.  Perhaps

16   -- I think Ketonia Goode came in 2003.  Honestly,

17   I'm trying to think.  Oh, did we hire Jeanine

18   Winley in 2003?  Elizabeth Holbrooke may have been

19   in 2003.  I'm very fuzzy, at this point.  I mean,

20   I'm really trying to think about the list of names

21   I gave you who may have come in.  Oh, Claire Levin

22   probably came in, in 2003.  I'm trying to look

Margaret Riley - Jamison                                                October 31, 2006

Silver Spring, MD

Page 27

```
 1    back at your list.  I don't remember.  Many of

 2    those names are still there.

 3        Q    If you recall any others, please let me

 4    know.

 5             What I would like to do at this point is

 6    go down the list and ask that you tell me the race

 7    of the individuals and whether you're aware of any

 8    disabling conditions that they have.

 9             MR. DiMURO:  Objection to form.

10    "Disabling conditions," could you define that a

11    little better?

12             BY MS. MURRAY:

13        Q    Had any medical conditions that at least

14    you believed or understood to limit the

15    individual's ability to perform everyday

16    activities.

17        A    Everyday activities or work activities?

18        Q    Either.  Either.  Okay?

19             Kathy Hannah.

20        A    Kathy Hannah is -- I'm sorry, what did

21    you ask me?

22        Q    We're looking for race and whether
```

Page 28

1    you're aware that the individual had --

2        A    I believe --

3        Q    -- a disabling condition.

4             MR. DiMURO:  And I'm going to maintain a

5    form objection to the definitions we're working

6    with, but she can answer as best she can.

7             Go ahead.

8             THE WITNESS:  I believe Kathy would say

9    she's white.  And Kathy Hannah would -- has

10   difficulty.  She would be classified as disabled.

11            BY MS. MURRAY:

12       Q    Marti Hall?

13       A    Marti Hall, I believe, declared white.

14   I have no idea about disability.

15       Q    Judy Mintz?

16       A    White.  I do not know.

17       Q    Pam Mitchell?

18       A    White.  I do not know.

19       Q    Tina Green?

20       A    White.  I do not -- would not be aware.

21       Q    Wanda Bridgett?

22       A    White.  I would not be aware.

Margaret Riley - Jamison                                                    October 31, 2006

Silver Spring, MD

Page 29

 1         Q     Pam Curry?

 2         A     Black.  I am not aware.  You're asking

 3     me -- I just want to clarify timeframe here -- in

 4     2002, the list of names -- some of those people

 5     are currently employed, and I just want to ask --

 6         Q     The time period is between 2002 and

 7     2004.  Okay.

 8         A     I do not know.

 9         Q     Sevonne Parker?

10         A     Sevonne Parker.

11         Q     Sevonne, thank you.

12         A     I do not know.  I believe Sevonne

13     declares she's black.

14         Q     Rhea Maher?

15         A     I believe she would declare white.  And

16     Rhea didn't have trouble performing her work.

17         Q     Are you aware of any medical conditions

18     that she had for which she may have taken leave?

19         A     Yeah.  Rhea was -- I believe, worked 4

20     days a week.

21         Q     Was that due to a medical condition,

22     that you're aware of?

Margaret Riley - Jamison                                           October 31, 2006
Silver Spring, MD

Page 30

```
 1        A     I believe Rhea had cancer.

 2        Q     How did you come to know that?

 3        A     I believe Rhea told me that.

 4        Q     When did she tell you?

 5        A     I met with each one of the staff

 6    members.  I don't believe she told me that in the

 7    initial meetings, but I believe, at one point, she

 8    came to me and said that she would be working --

 9    or she could not work a full schedule, and gave me

10    doctor's -- she might have given me a doctor's

11    note.  Honestly, without looking at the record, I

12    would need to know whether that situation was in

13    place when I got there.  I don't know.

14        Q     Once you came onboard, she maintained

15    the 4-day-a-week schedule.

16        A     I don't know when it started.  I would

17    have to see.  I don't know.

18        Q     My question is not when it started, but,

19    When you joined the firm, in March of 2002, and

20    thereafter, did Ms. Maher work a 4-day-week

21    schedule?

22        A     I don't know when it started.  I don't.
```

Page 31

1      Q     At some point during your tenure, it did

2   start.

3      A     Yes.

4            MR. DiMURO:  Objection.  I think she's

5   saying she didn't recall if it was in place when

6   she started or thereafter.  Your question assumes

7   one of those options.

8            MS. MURRAY:  Thanks for testifying.

9            MR. DiMURO:  Well, no, I wasn't

10  testifying.  But she's already said that, three

11  times, she doesn't recall.

12           MS. MURRAY:  That's fine.  I'm trying to

13  get an understanding of whether or not -- sometime

14  during your tenure -- she worked a 4-day-week

15  schedule.

16           THE WITNESS:  I said she did.  Yes.  I

17  said she did, at sometime.

18           MS. MURRAY:  Thank you.

19           BY MS. MURRAY:

20     Q     Was Ms. Maher on FMLA leave?

21     A     I believe so.

22     Q     What period of time was she on FMLA

Margaret Riley - Jamison                                          October 31, 2006
Silver Spring, MD

Page 32

1    leave?

2        A    I do not recall.

3        Q    If you had to find that out, where would

4    you look?

5        A    Probably Philadelphia.

6        Q    Can you be more specific what exactly

7    you would look for in Philadelphia to obtain that

8    information?

9        A    Probably her benefits file, administered

10   out of Philadelphia.

11       Q    Is that where support staff FMLA records

12   are maintained, in Philadelphia?

13       A    That is where the records are

14   maintained.

15       Q    Who's the custodian of those records?

16       A    The benefits administrator and the

17   national director of human resources.

18       Q    Who is the benefits administrator?

19       A    The current benefits administrator is

20   Shari Stern.

21       Q    And Ms. Fern Forman was the prior

22   benefits administrator?

Margaret Riley - Jamison

Silver Spring, MD

October 31, 2006

Page 33

1        A    I think her title was benefits manager.

2        Q    When did Ms. Stern begin working for the

3    firm?

4        A    2005.

5        Q    Did Ms. Forman work as benefits manager

6    up until that time?

7        A    I don't know Fern's exit date from the

8    firm.

9        Q    What year did Ms. Forman stop working

10   for the firm?

11       A    I don't know.  I mean, I would guess

12   2004.

13       Q    Do you keep in contact with Ms. Forman

14   since she's left the firm?

15       A    No.

16       Q    Are you aware of any contact information

17   for Ms. Forman?

18       A    No.

19       Q    Do you have any records pertaining to

20   Rhea Maher and her part-time schedule for medical

21   condition?

22       A    When an employee exits, I send

Page 34

 1    everything to Philadelphia.

 2        Q    I take it from your answer that Ms.

 3    Maher has exited the firm?

 4        A    Uh-huh.

 5        Q    When did that happen?

 6        A    I would have to see -- you're asking me

 7    to guess.  I don't know for sure, but I would say

 8    it was 2003.

 9        Q    All of my questions are not asking

10    guesses; they're asking for your best

11    recollection.  If you don't remember, that's your

12    answer.  Whatever you do remember, please state

13    that.

14             Louise Swanson, race and disability, if

15    known?

16        A    Lois Swanson  --

17        Q    Lois.

18        A    -- declares white.  I do not know of a

19    disability.

20        Q    Lorraine Hegi?

21        A    I believe Lorraine declares white.  I do

22    not know of a disability.

Margaret Riley - Jamison                                                    October 31, 2006
Silver Spring, MD

Page 35

```
 1        Q    Pam Higgins?

 2        A    White.  I do not know of a disability.

 3        Q    Mary Ann Meagher?

 4        A    White.  I do not know of a disability.

 5        Q    Is the related to Rhea?

 6        A    No, they're different spellings.

 7        Q    Can you spell Rhea's last name, and Mary

 8   Ann's, please?

 9        A    Rhea's was M-a-h-e-r, and Mary Ann's was

10   M-e-a-g-h-e-r, pronounced "Mawer."

11        Q    Elaine Wilbur?

12        A    I believe she declares white.  I do not

13   know of a disability.

14        Q    Janie, whose last name you could not

15   recall?

16        A    I do believe she declares white.  I'm

17   still trying to think of her last name.  I do not

18   know of a disability.

19        Q    Kim DeHaut?

20        A    DeHaut.

21        Q    DeHaut.

22        A    I believe she's white.  I do not know
```

Margaret Riley - Jamison
Silver Spring, MD
October 31, 2006

Page 36

1    of a disability.

2        Q    Ketonia Goode?

3        A    Ketonia Goode, I believe, declared

4    black.  I do not know of a disability.

5        Q    Jeanine Winley?

6        A    Black.  She didn't have a disability.

7        Q    Elizabeth Holbrooke?

8        A    White.  I do not know of a disability.

9        Q    Claire Levin?

10       A    White.  I do not know of a disability.

11       Q    What are the essential functions of the

12   legal secretary job?

13       A    Administrative work.

14       Q    What kind of administrative work is

15   essential to that position?

16       A    Word-processing, keeping calendars,

17   travel arrangements, scheduling meetings.

18       Q    Are there any other essential functions

19   of the job?

20       A    You asked me a general question, I gave

21   you a general answer.  Each one -- it depends upon

22   the practice group that people work for, and they

Margaret Riley - Jamison                                          October 31, 2006

Silver Spring, MD

Page 37

```
1    would be required to do other things.  If you work

2    for a partner, you need to do billing, but not all

3    legal secretaries are required to do billing.

4        Q    Let's talk specifically about Ms.

5    McFadden's position.  Were there any additional

6    essential functions for her job?

7        A    She worked for a partner.  She handled

8    Charlie's billing.  I wouldn't be aware of any

9    others.

10       Q    When you joined the firm, were you aware

11   of how long Ms. McFadden had worked for Ballard

12   Spahr?

13       A    I believe Vanessa had probably been

14   there 10 years, something like that.

15       Q    In 2002, was Ms. McFadden a full-time

16   employee?

17       A    Yes.

18       Q    She worked over 35 hours a week?

19       A    I'm sorry, but we work a 35-hour work

20   week.

21       Q    Who makes the hiring --

22            MR. DiMURO:  Excuse me.  Could I ask,
```

Margaret Riley - Jamison                                      October 31, 2006
Silver Spring, MD

Page 58

```
 1    office since 2002, on the support staff?

 2         A    Jeanine Winley, Pam Curry -- support

 3    staff, meaning who?

 4         Q    Any nonlawyers in the firm.

 5         A    Myself, Emily Naftzger, Emily Murray,

 6    Casey Briscoe, Betty Ann Hahn, Sevonne Parker,

 7    Melissa Ngaruri -- N-g-a-r-u-r-i -- Karen Sykes.

 8    That's off the top of my head.  There may be

 9    others.

10         Q    Can you state Emily Naftzger's race and

11    whether you're aware of any disability she has?

12         A    She's white, and I don't know of any

13    disabilities.

14         Q    The same for Emily Murray.

15         A    I believe she declares white.  I don't

16    know of any disabilities.

17         Q    Melissa N-g-a-r-u-r-i?

18         A    I believe she's white.  I don't know of

19    any disabilities.

20         Q    Karen Sykes?

21         A    I believe she's white.  I don't know of

22    any disabilities.
```

Margaret Riley - Jamison

Silver Spring, MD

October 31, 2006

Page 59

1      Q    I'm going to go down the list, and

2   please tell me if you know the reasons why the

3   FMLA leave was requested by the employee.  Jeanine

4   Winley?

5      A    Personal medical.

6      Q    What condition?

7      A    I don't recall.

8      Q    Pam Curry?

9      A    Personal medical.

10      Q    Condition?

11      A    Knee.

12      Q    Was it ailment, surgery?

13      A    Yes.

14      Q    Which one?  Both?

15      A    I think she did have both done, yes.

16      Q    Yourself?

17      A    Maternity.

18      Q    Ms. Naftzger?

19      A    Maternity.

20      Q    Ms. Murray?

21      A    Maternity.

22      Q    Ms. Briscoe?

Margaret Riley - Jamison                                      October 31, 2006

Silver Spring, MD

Page 60

```
 1       A     What was the question you asked me?

 2       Q     The reason why the --

 3       A     The reason why?

 4       Q     -- employee requested leave.

 5       A     Personal medical.  I don't know the

 6    reason.

 7       Q     Betty Ann Hahn?

 8       A     Personal medical.

 9       Q     What condition?

10       A     I believe it was cancer.

11       Q     Ms. Parker?

12       A     I believe Sevonne's used it twice, once

13    for maternity and once for surgery.

14       Q     Melissa N-g-a-r-u-r-i?

15       A     Maternity.

16       Q     Karen Sykes?

17       A     Personal medical.  I believe it was

18    surgery.

19       Q     Of the list -- we can go down, if we

20    need to -- were any of the employees terminated by

21    Ballard Spahr:  Jeanine Winley?

22            MR. DiMURO:  You say "terminated," you
```

Silver Spring, MD

Page 61

```
 1    mean fired, resigned --
 2              MS. MURRAY:  Terminated, fired.
 3              THE WITNESS:  Involuntary termination.
 4              BY MS. MURRAY:
 5      Q    Involuntary cease of employment.
 6      A    I'm sorry, did you say "involuntary"?
 7      Q    Involuntary cessation of employment by
 8    the choice of Ballard Spahr.
 9              Jeanine Winley?
10      A    She resigned.
11      Q    Pam Curry.
12      A    She's with the firm.
13      Q    She's still employed there.
14      A    Yes.
15      Q    Ms. Naftzger?
16      A    She relocated, resigned.
17      Q    Emily Murray?
18      A    Still with the firm.
19      Q    Ms. Briscoe?
20      A    I believe she didn't return from long-
21    term disability.  She was terminated.
22      Q    Ms. Hahn?
```

Margaret Riley - Jamison                                              October 31, 2006

Silver Spring, MD

Page 66

```
 1        Q     What were those conversations, as best

 2   you can recall?

 3        A     I wouldn't remember specifics.  I can

 4   tell you that Vanessa would come to my office

 5   frequently, or would stop me frequently, to

 6   discuss her husband's health.

 7        Q     Did that irritate you?

 8        A     No.  I felt awful for her.

 9        Q     Did you recommend that she put her

10   husband in hospice care?

11        A     No.

12        Q     Did you ask her to get family or church

13   members to help take care of him?

14        A     No.

15        Q     Did you have any discussions with any

16   partner in the firm regarding Ms. McFadden's

17   request for leave due to her husband's condition?

18        A     Probably Charlie Henck.

19        Q     What discussions did you have with Mr.

20   Henck?

21        A     I don't remember particulars, absolutely

22   not, but I would say that Charlie was very
```

Margaret Riley - Jamison                                    October 31, 2006

Silver Spring, MD

Page 67

```
 1    supportive of anything Vanessa needed to do to
 2    take care of her husband.  And we -- my job was to
 3    help get his work done in the interim, and that
 4    was fine.
 5         Q    Did you discuss, with any partner, Mr.
 6    McFadden's medical condition and treatment?
 7         A    I don't recall.
 8         Q    Did you discuss, with any firm employee,
 9    Mr. McFadden's medical condition?
10         A    Probably Wendy Iversen.
11         Q    What did you and Ms. Iversen discuss?
12         A    I don't remember particulars.  I can
13    tell you Vanessa sought both of us out frequently
14    to talk about her situation.
15         Q    How much time did Ms. McFadden take off
16    from work due to her husband's condition?
17              MR. DiMURO:  Can you give me a timeframe
18    -- or the witness a timeframe?
19              MS. MURRAY:  Between 2002 and 2003.
20              THE WITNESS:  I don't have the exact
21    dates -- number of dates, but there was an awful
22    lot of time off of work.
```

Page 121

1           When you had the conference call with

2      Ms. McFadden on May 13th, 2004, who was working as

3      the firm's receptionist?

4      A    I don't know if -- I believe we had a

5      temp in place.

6      Q    Who was the incumbent -- the permanent

7      employee?

8      A    Betty Ann Hahn was also out on long-term

9      disability.  We filled her position with a temp

10     until we knew whether she could return to work or

11     not.

12     Q    When did Ms. Hahn go out on disability?

13     A    I don't recall exact dates.  I believe

14     she went out when I was on maternity leave.  She

15     went back, so -- I don't remember.  She was out

16     twice.  She went out, then, when -- after I went

17     back.  And then she went back out again.  I don't

18     remember.

19     Q    What are the essential functions of the

20     receptionist job?

21     A    Greet visitors, answer phones, keep

22     track of courier, visitors, sign-in sheets for

Page 122

```
 1    staff, which -- I guess that's it.  That's the

 2    essential.

 3                    [Whereupon, a document was marked

 4                    as Jamison Exhibit Number 10 for

 5                    purposes of identification.]

 6              BY MS. MURRAY:

 7         Q    I'm handing you a document that is

 8    marked as Jamison Exhibit 10.  Can you identify

 9    that document for the record, please?

10         A    It's a job description for the

11    receptionist position.

12         Q    Was this the job description that was in

13    place in 2004?

14         A    I would have to say it probably is.

15         Q    What department was Ms. McFadden working

16    in prior to her departure in October 2003?

17         A    Tax.

18                    [Whereupon, a document was marked

19                    as Jamison Exhibit Number 11 for

20                    purposes of identification.]

21              BY MS. MURRAY:

22         Q    The court reporter has handed you a
```