**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Vanessa A. McFadden,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   Civil Action No. 1:05CV02401 |
| | )   **Judge Richard J. Leon** |
| **Ballard Spahr Andrews and** | ) |
| **Ingersoll, LLP,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

In this case, plaintiff Vanessa McFadden ("McFadden"), a former legal secretary at Ballard Spahr Andrews and Ingersoll, LLP ("Ballard Spahr"), has brought suit against Ballard Spahr and Margaret Riley-Jamison ("Riley-Jamison"), the Human Resources Manager of Ballard Spahr's Washington, D.C.'s office.

Ballard Spahr employed McFadden as a legal secretary for over ten years. During the course of her employment, Ballard Spahr sought to provide assistance to McFadden in numerous ways. When McFadden's husband became seriously ill in the fall of 2002, the firm modified her schedule to allow her to care for him. Ballard Spahr attorneys also provided legal representation to have her husband's life insurance benefits reinstated. When McFadden herself became ill beginning in 2003 and was diagnosed with numerous disorders, Ballard Spahr provided her with all the leave that she requested. The firm also advanced her salary, vacation days, convinced the firm's disability insurance carrier to advance benefits before McFadden's claim for disability benefits was approved, and added a new insurance policy retroactively for McFadden's benefit.

1

McFadden's symptoms grew progressively worse over the course of 2003, and she went on disability leave in mid-October. McFadden remained on leave, using FMLA and non-FMLA leave, for seven months before Ballard Spahr finally terminated her employment. At the time of her termination, McFadden was receiving disability benefits from the firm's disability insurance carrier and the Social Security Administration, and she informed Ballard Spahr that she was unable to return to work as a legal secretary. Following her termination, McFadden never applied for a single position, and she has continued to receive disability benefits for being totally unable to work.

Despite all of Ballard Spahr's efforts to assist McFadden, she has sued Ballard Spahr and Riley-Jamison for disability and race discrimination, FMLA violations, and retaliation. Her Complaint specifically asserts four separate causes of action:

Count I:    race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and the D.C. Human Rights Act, D.C. Code Ann. §§ 2-1401.01, *et seq.* ("DCHRA");

Count II:   disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA") and the DCHRA;

Count III:  violations of the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"); and

Count IV:   retaliation in violation of Title VII, the FMLA, the ADA, the DCHRA, and § 1981.

As set forth below, summary judgment should be granted as to each of McFadden's

2

claims.  Far from discriminating or retaliating against McFadden, the undisputed facts confirm

that Ballard Spahr treated her in a fair and responsible fashion and that McFadden's lawsuit

should be dismissed because (1) McFadden has no evidence of disability discrimination, (2) she

received more leave than she was entitled to receive under the FMLA, (3) McFadden has no

evidence that she was discriminated against because of her race, and (4) she was not retaliated

against in any fashion.

## I.    SUMMARY OF FACTS

### A.    McFadden's Position as a Legal Secretary

McFadden was hired as a legal secretary by Defendant Ballard Spahr in 1989 and worked

in the firm's Washington, D.C. office.  During the relevant time period, Defendant Margaret

Riley-Jamison ("Riley-Jamison") was the office human resources manager.  McFadden worked

primarily for Charles Henck, a partner in the firm's tax department, who evaluated her

performance and qualifications and oversaw her schedule. (SOF, ¶¶3-5).

### B.    McFadden Takes Leave to Care for Her Husband

In October, 2002, McFadden's husband was diagnosed with terminal cancer. (SOF, ¶6).

In order to care for her husband, McFadden requested and received a modified work schedule,

working three to four days a week on alternating weeks. (SOF, ¶¶8).  Henck approved the

schedule change. Over the course of 2002, McFadden received 34 days of paid time off. (SOF,

¶12). By November, McFadden had exhausted her paid leave and the firm advanced her ten days

of paid time off from the paid leave she would be entitled to receive in 2003. This was the first

time Ballard Spahr had ever offered an employee such an accommodation.  (SOF, ¶13).

### C.    McFadden Takes Leaves for Her Illnesses

In 2002 and 2003, McFadden began to experience her own medical problems and complained to co-workers about her declining health. She reported to work while she obviously was ill, and she experienced difficulties walking and typing. In 2003, McFadden's medical condition worsened. She was diagnosed with Graves' disease, fibromyalgia, depression, thyroid problems, bronchial asthma, and other chronic illnesses which continue to this day. (SOF, ¶¶14-16). For example, McFadden experiences headache clusters, which can last for two to three days and during which time she cannot see. (SOF, ¶17). McFadden also needs an oxygen tank to breathe, cannot stand without assistance, cannot stand with assistance for more than a few minutes, cannot lift anything, requires assistance getting out of bed, and experiences incontinence. *Id.* Given these medical problems, McFadden's daughter helps her maintain personal hygiene. *Id.*

In 2003, McFadden again exceeded her number of days of paid leave and was advanced ten days from 2004. These two occasions are the only times that Ballard Spahr's D.C. office has ever advanced such a substantial amount of leave. (SOF, ¶18).

On October 15, 2003, McFadden left the firm on disability leave. (SOF, ¶19). The paperwork for disability leave was provided to Riley-Jamison, who forwarded it to the firm's benefits department for approval. Riley-Jamison had no role in the approval of FMLA and disability leave other than handling the paperwork. (SOF, ¶20). Even though McFadden already had used most of her available FMLA leave, Ballard Spahr decided to restart the clock and provide McFadden sixteen weeks of medical leave under the D.C. FMLA starting October 15, 2003. (SOF, ¶21).

Ballard Spahr volunteered other assistance to McFadden without legal obligation. It paid

McFadden's portion of her insurance premium and paid her as a full-time employee even though she worked part-time. Ballard Spahr advanced salary and leave, which McFadden was not asked to repay and has not repaid. Ballard Spahr obtained a new insurance policy retroactively in order to give McFadden an accelerated death benefit for her husband's life insurance and provided legal representation, without charge, to McFadden's husband in a dispute over his employer's insurance plan. Henck also gave McFadden two personal loans without interest, which McFadden repaid.  (SOF, ¶¶77-88).

### D.     McFadden's Leave Expires and She is Terminated

McFadden's FMLA leave expired on February 4, 2004.  She then was offered an additional three months of non-FMLA leave by Ballard Spahr. When McFadden accepted the offer of non-FMLA leave, she wrote that her disability would continue "indefinitely." McFadden's non-FMLA leave expired on May 4, 2004.  (SOF, ¶¶22-25).

After the expiration of her leave, McFadden telephoned Riley-Jamison on May 14, 2004 to inquire about her status. Riley-Jamison said that she would have to get back to McFadden. (SOF, ¶26).  Later that afternoon, Riley-Jamison, Wendy Iverson, the Washington, D.C. office manager, Fern Forman, the firm's benefits administrator, and John DiBattista, the firm's director of human resources, telephoned McFadden. During the telephone call, McFadden was informed that if she were unable to return as a legal secretary or to work full-time, there was a position available in the administrative department ("ARC"), where she could work intermittently . (SOF, ¶¶29).  McFadden stated that she could not work as a legal secretary or in the ARC. McFadden claims that she then asked whether a receptionist position was available and was told that it was

not.[1]  Following the telephone call, McFadden was terminated by Ballard Spahr due to her inability to return to work in an available position.  (SOF, ¶¶29-32).

###    E.    McFadden's Receipt of Disability Benefits for Being Unable to Work

McFadden was eligible for long term disability benefits from Ballard Spahr's insurer UnumProvident, and McFadden applied for these benefits in 2003.  The standard for long-term disability insurance coverage is "that because of injury or sickness: (1) the insured cannot perform each of the material duties of his regular occupation; and (2) after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience."  (SOF, ¶57). On March 15, 2004, at the request of Ballard Spahr, UnumProvident paid McFadden the full amount of benefits under a reservation of rights.  UnumProvident continued to pay McFadden the maximum benefit under a reservation of rights.  (SOF, ¶¶52-55).  Subsequently, McFadden was approved for long term benefits as satisfying the standard of not being able to perform each of the material duties of any gainful occupation for which she is reasonably qualified. McFadden has been receiving benefits for over three years.  (SOF, ¶¶58-59).

McFadden has also received Social Security Disability Insurance ("SSDI"). She applied for benefits in November, 2003 and was approved on or about March 16, 2004.  (SOF, ¶60).  The standard to be approved of SSDI benefits is the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can reasonably be expected to result in death or which has lasted or can be expected to last for a

---

[1]     Riley-Jamison, Iverson, and DiBattista recall McFadden stating that she was unable to work in any position and do not recall McFadden inquiring about a receptionist position.  For the purposes of this motion, however, the Defendants will accept McFadden's version of what transpired during the telephone call.

continuous period of time of not less than 12 months. (SOF, ¶61).  McFadden continues to

receive disability insurance and SSDI benefits to this day under standards that require her to be

unable to work any position. Following the termination of her employment with Ballard Spahr,

McFadden has not applied for or sought any other employment. (SOF, ¶62).

## II.    ARGUMENT

### A.    Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that a moving party is entitled to

summary judgment if the "pleadings, depositions, answers to interrogatories . . . together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

In order to successfully oppose a defendant's motion for summary judgment, a plaintiff

must demonstrate, by reference to affidavits, depositions, answers to interrogatories, or

admissions, that a triable issue of fact exists.  Consequently, to survive summary judgment, a

plaintiff must show evidence that would allow a reasonable jury to find in his or her favor.

*Laningham v. U.S. Navy*, 813 F. 2d 1236 (D.C. Cir. 1987).

The Supreme Court has stated that summary judgment should be granted where the non-

moving party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A

"mere scintilla" of evidence is not enough. To the contrary, when viewed in the light most

favorable to the non-moving party, the evidence must be sufficient for a reasonable jury to find

in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505,

2510-11, 91 L.Ed.2d 202 (1986).  If the plaintiff cannot bring forward significantly probative evidence, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); *Charleston Area Medical Ctr., Inc. v. Blue Cross & Blue Shield Mut. of Ohio, Inc.*, 6 F.3d 243, 247 (4th Cir. 1993).

### B.    Defendants Are Entitled to Summary Judgment to Plaintiff's Claims of Disability Discrimination

In order to state a *prima facie* case of disability discrimination under both the federal ADA and D.C. Human Rights Act,[2] a plaintiff must establish that (1) she meets the statutory definition of disabled; (2) she was qualified for her position, with or without reasonable accommodation; and (3) the employer took an adverse employment action against her because of the disability.  *Carroll v. England*, 321 F. Supp. 2d 58, 69 n7 (D.D.C. 2004).

### 1.    McFadden Admits She Could Not Perform Her Secretarial Job

Even if McFadden could establish the first and third elements of a *prima facie* case of disability discrimination, i.e., that she is disabled and she was terminated because of her disability, she cannot satisfy the second element.[3]  In order to establish a *prima facie* case of disability discrimination, McFadden must prove that she was qualified with or without reasonable accommodation to perform the essential functions of the position from which she was

---

[2]    The D.C. Human Rights Act ("DCHRA") follows the same analysis as federal antidiscrimination laws. *Whitbeck v. Vital Signs, Inc*., 333 U.S.App.D.C. 56 (D.C. App. 1998). Hence, decisions construing the ADA are persuasive in construing the DCHRA. *Grant v. May Department Stores*, 786 A.2d 580 (D.C. App. 2001); see also *Howard University v. Green*, 652 A.2d 41 (D.C. 1994).

[3]    With respect to the third element of a *prima facie* case, the undisputed facts confirm that Ballard Spahr terminated McFadden because she could not return to work following her disability leave, not because of her disability. However, for the purposes of summary judgment only, Ballard Spahr will assume that it terminated McFadden due to her medical condition.

terminated. *Stella v. Mineta*, 284 F.3d. 135, 145 (D.C. Cir. 2002). She cannot do so. The undisputed facts confirm that McFadden was not qualified for her secretarial position, with or without reasonable accommodation, and could not work at all.

### 2. McFadden's Sworn Statements to SSA and UnumProvident that She Cannot Work

In her own representations in support of her claims for disability insurance, McFadden has affirmed to the Social Security Administration ("SSA") and UnumProvident that she is unable to work. Both the SSA and UnumProvident have accepted McFadden's representations and the certifications of her physicians, and consequently, they have determined that McFadden cannot work and is entitled to receive disability insurance payments.

UnumProvident's standard for long-term disability insurance coverage is "that because of injury or sickness: (1) the insured cannot perform each of the material duties of his regular occupation; and (2) after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience." [4] The SSA also requires total disability to receive benefits. In order to receive Social Security Disability Insurance ("SSDI") benefits, an applicant must establish that he or she is disabled under the Social Security Act and is "not only unable to do [his or her] previous work, but cannot. . . engage in any other king of substantial gainful work." 42 U.S.C. § 423(d)(2)(a).

---

[4] McFadden initially was approved for long term benefits under the first clause of the disability insurance standard. (SOF, ¶58). On September 22, 2005, UnumProvident informed McFadden she had been approved under the standard of not being able to perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience. (SOF, ¶59).

Since 2003, McFadden has received disability payments from SSA and/or UnumProvident based upon the determination that she qualifies for benefits. Moreover, McFadden has retained all of the payments she has received from SSA and UnumProvident and has not sought to return any amounts based upon any change in her medical condition that would allow her to work. Nonetheless, McFadden asserts in this lawsuit that she could work and was qualified to do so. This assertion is directly contrary to (1) McFadden's representations to the Social Security Administration and UnumProvident that she cannot work, (2) SSA's certification that she has not been able to perform gainful employment since 2003, (3) UnumProvident's determination that McFadden cannot perform her regular occupation nor any gainful employment, and (4) her receipt of substantial wage replacement benefits from both SSA and UnumProvident based upon these representations and certifications.

### 3. McFadden Cannot Explain the Inconsistency Between Her Sworn Statements and Her Allegations in This Case

In *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999), the Supreme Court ruled that a plaintiff bringing an ADA lawsuit who previously has sought SSDI benefits is bound by the representations to the SSA that he or she is too disabled to work. Indeed, the *Cleveland* Court made clear that in order to survive summary judgment, an ADA plaintiff must sufficiently explain any apparent inconsistency between statements in an SSDI application that the individual cannot work and assertions in an ADA lawsuit that he or she is a qualified individual. Where a plaintiff is unable to provide a sufficient explanation for the inconsistency, the plaintiff cannot establish that he or she is a qualified

individual and summary judgment must be granted for the defendant.[5]

### a.    McFadden Admits She Could Not Perform Her Job

In this case, McFadden has offered no explanation for the contradiction between her affirmations under oath to the SSA and UnumProvident that she was unable to engage in any substantial, gainful employment and her assertions in this lawsuit that she could have worked. McFadden admitted in her deposition testimony that she could not perform her job as a legal secretary at the time of her termination. (SOF, ¶¶30, 73).  Moreover, neither during her employment with Ballard Spahr, nor during the course of this litigation, has McFadden ever suggested that she could have performed her legal secretary position with a reasonable accommodation.  This is not a situation, for example, where a disabled employee asserts that he or she could have performed the job had the employer provided an accommodation, such as an ergonomic chair or ergonomically designed computer. It is McFadden's responsibility to suggest a reasonable accommodation that would have allowed her to work as a legal secretary. See, e.g. *Mole v. Buckhorn Rubber Products, Inc*., 165 F.3d 1212 (8th Cir. 1989) (employer cannot be expected to read the employee's mind and expectations of a reasonable accommodation).  She did not and has not during the course of litigation.

### b.    McFadden Rejected Reassignment to a Vacant Position

Not only could McFadden not perform her job as a legal secretary, she could not perform

---

[5]    See, e.g., *Johnson v. ExxonMobil, Corp*., 426 F. 3d 887 (7th Cir. 2005) (ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim, but must proffer a sufficient explanation); *McClaren v. Morrison Management Specialists, Inc*., 420 F. 3d 457 (5th Cir. 2005) (employee could not establish prima facie case of discrimination where he could not explain inconsistency between statement to SSA that he could not work in order to obtain benefits and his allegation that he could work in order to bring discrimination lawsuit).

the vacant position in the ARC that was offered to her.  Prior to her termination, Ballard Spahr

sought to locate a vacant job that she could perform and offered McFadden a vacant position in

the ARC, where she could work intermittently.  McFadden, however, rejected the offer, saying

that she could not do the ARC job either. (SOF, ¶30).

**c.    The Receptionist Position Was Not Vacant and McFadden Cannot Show She Could Have Performed the Job**

McFadden alleges that she asked to be reassigned to a receptionist position at Ballard

Spahr.  Defendants deny that McFadden made such a request, but even if she did, there was no

vacant receptionist position available. A receptionist position did not become available until

August 9, 2004, almost three months after McFadden was terminated. (SOF, ¶37).[6]

Moreover, even if the receptionist position had been vacant, the job required consistent,

regular attendance (SOF, ¶34), and there is no evidence that McFadden could have performed

that position any more than she could have performed her legal secretary job or the vacant

position in the ARC, which she has admitted she could not do.  One of the most fundamental

requirements of any position is reporting for work. "It is not plausible or feasible for an

employer to excuse chronic absenteeism and tardiness by an employee who cannot give timely

notice sufficient to enable the employer to ensure adequate staffing." *Rosell v. Kelliher*, 468

F.Supp.2d 39 (D.D.C. 2006). An employee who cannot meet the attendance requirements of the

job is not a "qualified individual" under the ADA. *Id*., citing *Sampson v. Citibank*, 53 F.Supp.2d

13, 18 (D. D.C. 1999).

---

[6]      The ADA does not require that an employer bump a current employee in order to provide a position for a disabled employee, nor does an employer have to create a position for a disabled employee.  *Soone v. Kyo-Ya Company, Ltd.*, 353 F.Supp.2d 1107 (D. Ha. 2005); *Aka v. Washington Hospital Center*, 332 U.S. App. D.C. 256, 156 F.3d 1284 (D.C. Cir. 1998).

12

McFadden's illnesses were erratic and forced her to miss work frequently. McFadden testified at her deposition that her various illnesses in the 2003-2004 time frame that caused her to be absent from work were difficult to predict. Often, she would not know until the time that she woke up in the morning whether she would be able to leave bed that day. (SOF, ¶17).  At the time McFadden was terminated, she was unable to work consistently, if at all. She had no way of predicting whether her illnesses would allow her to attend work that day until the time she woke up that morning. McFadden was frequently confined to bed, unable to move.(SOF, ¶35). Moreover, her physicians informed McFadden that she was disabled and could not work starting in April, 2003. (SOF, ¶36). Indeed, following her termination, McFadden did not and has not applied for a single position for any type of employment.

Although McFadden may now believe she could have worked as a receptionist in May, 2004,  an employee's own subjective belief and wish to return to a position not medically recommended does not render the employee a qualified individual with a disability or even create a material issue of fact on the issue. See *Koshinski v. Decatur Foundry, Inc*., 177 F.3d 599 (7th Cir. 1999) (an employee who asked to return to a position not recommended by his physicians was not a qualified individual even though he believed that he could perform the essential functions of the position).

### 4.    McFadden Cannot Establish that She Was Qualified

Consistent with her certifications to the SSA and disability insurance carrier, McFadden has admitted that she could not perform her own position or the position offered her. She claims to have requested transfer to a position that was not vacant, although she certified that she was unable to work at all to the SSA. Even if the position had been open, McFadden's intermittent

13

and unpredictable attendance meant that she was not qualified for the position. Accordingly, McFadden cannot make the *prima facie* showing that she was a qualified individual with a disability. Therefore, summary judgment should be granted for Defendants as to her claim of disability discrimination.[7]

C.    **Defendants Are Entitled to Summary Judgment on Plaintiff's FMLA Claims**

In her complaint and answers to interrogatories, McFadden asserts that Defendants violated the federal and D.C. FMLA by denying her intermittent leave and misrepresenting what days counted towards her FMLA entitlement.[8] As a result, McFadden contends that the Defendants interfered with her FMLA rights. (Complaint ¶ 94.) Despite making these wide-ranging allegations in her complaint, McFadden has failed to specify in discovery any facts to support her bald assertion that Defendants violated the FMLA. McFadden simply claims that she was denied the full amount of leave to which she was entitled. She is wrong.

1.    **Requirements of the Federal and D.C. FMLA**

The federal FMLA grants employees twelve weeks of leave within a twelve month period for any serious health condition that makes an employee unable to perform the functions of his

---

[7]    McFadden's Complaint also alleges violations of the confidentiality requirements of the ADA (Complaint ¶ 94). McFadden, however, can point to no evidence that medical information she provided to Ballard Spahr was not kept private. McFadden simply surmises that this occurred because co-workers expressed sympathy to her about her husband's condition even though she had not specifically informed these employees as to the nature of her husband's illness. Except for McFadden's subjective belief, she has no evidence that Defendant Riley-Jamison told others about her husband's condition. In fact, McFadden at her deposition admitted that she often spoke with her friends and co-workers about the situation. (SOF, ¶14).

[8]    McFadden's Complaint asserts violations only of the federal FMLA, but McFadden's interrogatory answers and deposition testimony reference the D.C. FMLA, not the federal statute. See, e.g. Plaintiff's Third Supplemental Interrogatory Answers, No. 16. In moving for summary judgment, Defendants seek dismissal of McFadden's FMLA claim, whether or not brought under the federal or the D.C. statute.

or her position. 29 U.S.C. § 2612 (a)(1). Under the D.C. FMLA, an employee with a serious health condition is entitled to sixteen weeks of leave within a twenty-four month period. D.C. Code § 32-503.  At the end of the leave period, the employee is entitled to return to his or her job, or an equivalent position.  If the employee cannot return to work, however, the employer may terminate the employee and fill the position permanently. 29 CFR § 825.214(b); see, e.g., *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775 (6th Cir. 1998), *Demar v. PA Consulting Group, Inc*., 2006 U.S. Dist. LEXIS 44726 (D. D.C. June 30, 2006).

> **2.    McFadden Received All the Leave to Which She Was Entitled Under the FMLA**

The undisputed facts confirm that McFadden received more than sixteen weeks of leave during the relevant time period, which fully satisfies Ballard Spahr's legal obligations under both the federal FMLA and the D.C. FMLA. McFadden was absent from work approximately 59 days in 2002 and approximately 67 days in 2003 (before taking disability leave on October 15, 2003). (SOF, ¶21).  Nevertheless, she received a full sixteen weeks of leave for her medical conditions beginning October 15, 2003, and three additional months of leave before she was terminated on May 14, 2004. (SOF, ¶21).

| Date | Event | Days Off |
|---|---|---|
| October 15, 2003 | McFadden leaves on disability | 67 days off in 2003 prior to October 15, 2003 (SOF, ¶18). |
| February 4, 2004 | Expiration of 16 weeks FMLA | 16 weeks = 80 work days |
| May 4, 2004 | Expiration of non-FMLA leave | 3 months = 12 weeks = 60 work days |
| May 14, 2004 | McFadden Terminated | 8 work days |
| **Total Days Off in 2003 and 2004** | | 67 + 80 + 60 + 8 = **215 work days** |

Over 2003 and 2004, McFadden was absent 215 work days. In short, McFadden received all of the FMLA leave to which she was entitled, and then some.

Moreover, at the time her leave ended, McFadden acknowledges that she could not return to work in her former position as a legal secretary. Therefore, consistent with the legal requirements of both the federal and D.C. FMLA, Ballard Spahr terminated her employment.

### 3.     Purported Misinformation About the FMLA Is Not Actionable

Even though McFadden contends that she was misinformed by the Defendants as to her available federal and D.C. FMLA leave (Complaint, ¶¶ 23, 93), none of these actions resulted in her failing to receive all of the leave to which she was entitled.[9] Accordingly, any purported "misinformation," or other purported wrongful conduct of Ballard Spahr, does not give rise to a legal claim by McFadden against the Defendants. See *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002) (where employer granted 30 weeks of unpaid leave, but failed to notify employee that twelve weeks counted against her FMLA entitlement, employee was not entitled to additional leave and FMLA was satisfied); see also *Coleman v. Potomac Electric Power Co.*, 281 F.Supp.2d 250 (D. D.C. 2003) (where the employee suffered no monetary loss as a result of FMLA violations, no lawsuit could be maintained); *Roberson v. Cendant Travel Services*, 252 F.Supp.2d 573 (M.D. Tenn. 2002) (no violation of the FMLA when the employee misinformed of the end date for her FMLA leave where there was no difference in the employee's health between the purported and actual end dates and employee could not return to work after either date).

---

[9]     McFadden asserts that she allegedly was misinformed that the FMLA did not apply to intermittent leave (Complaint at 91). However, in discovery McFadden could not identify any intermittent leave that she sought, but was denied taking. Indeed, she admitted at her deposition that she received all of the leave that she requested. (SOF, ¶ 21).

4.     **McFadden's FMLA Claims Are Barred by the Statute of Limitations**

Even if McFadden had viable claims under the D.C. FMLA, those claims are completely time barred. The District of Columbia Code provides that "no civil action may be commenced more than 1 year after the occurrence or discovery of the alleged violation [of the D.C. FMLA]." *D.C. Code § 32-510(b)* (2001); see also *Simmons v. District of Columbia,* 977 F. Supp. 62, 64 (D.D.C. 1997). McFadden's Complaint was filed on December 14, 2005. Hence, any claims she may be seeking under the D.C. FMLA for alleged wrongful conduct that occurred prior to December 14, 2004 are time barred. Since McFadden was terminated on May 14, 2004, all of her D.C. FMLA claims are untimely.

McFadden's allegations of violations of the federal FMLA contained in her Complaint are time barred as well. An action for violations of the FMLA must be brought within two years after the date of the event. 29 U.S.C. § 2617(c)(1).[10] McFadden's Complaint was filed on December 14, 2005. All of the violations she alleges in her Complaint occurred more than two years before the complaint was filed: (1) violating the FMLA during her husband's series of chemotherapy from January 6, 2003 to May 12, 2003 (Complaint, ¶ 89); (2) denying intermittent leave between January, 2003 and May 2003 (Complaint, ¶ 91); (3) providing false information regarding FMLA leave in October 2002 (Complaint, ¶ 93); and (4) restraining McFadden's use of the FMLA at various times between November 2002 and May 2003 (Complaint, ¶ 95). Therefore, all of McFadden's federal FMLA claims are time-barred as well.

D.     **Defendants Are Entitled to Summary Judgment as to McFadden's Race Discrimination Claim**

---

[10]     If an employer's wrongful conduct is willful, the limitations period is extended to three years. 29 U.S.C. § 2617(c), *Sampson v. Citibank*, FSB, 53 F.Supp.2d 13 (D. D.C. 1999). However, there is no evidence that any alleged conduct of the Defendants that purportedly violated the FMLA was willful. Hence, the two year limitations period applies.

McFadden asserts that she was discriminated against on the basis of her being African-American because (1) she was harassed on account of her race; (2) defendants denied her leave and schedule modifications and treated her disparately with regard to leave procedures and job protection; and (3) Ballard Spahr terminated her employment. (Complaint, ¶53).[11] As discussed below, McFadden cannot establish any of the elements of her race discrimination claim.

### 1.     Plaintiff Cannot Prove Her Claim of Racial Harassment

McFadden claims that she was harassed by Riley-Jamison due to her race. The elements of such a claim include: (1) the harassment was because of race, (2) the harassment was unwelcome, (3) the harassment was sufficiently severe or pervasive to create an abusive working environment, and (4) some basis exists for imputing liability to the employer. *Reeves v. Carrollsburg Condominium Unit Owners*, 1997 U.S. Dist. LEXIS 21762 (D.D.C. Dec. 18, 1997); *EEOC v. R&R Ventures*, 244 F.3d 344, 338 (4th Cir. 2001). Importantly, the Supreme Court has explained that "not all workplace conduct that may be described as 'harassment' affects 'a term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). A plaintiff must prove that the conduct was so extreme that it constructively altered the terms or conditions of continued employment. See *Clark County Sch. Dist v. Breeden*, 532 U.S. 268, 270 (2001); *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75 (1998) (Title VII does not set forth a general civility code for the American workforce).

The analysis of the objective severity of workplace harassment involves a totality of the

---

[11]     Proof of claims under Title VII, the D.C. Human Rights Act, and Section 1981 for race discrimination all follow the same standard. *Carney v. American University*, 151 F.3d 1090, 331 U.S.App.D.C. 416 (D.C. Cir. 1998).

circumstances approach, in which the court considers a number of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). Mere utterances of epithets engendering offensive feelings in an employee are not sufficient.  Instead, the conduct must be severe enough to create an environment that a reasonable person in the plaintiff's position, considering all the circumstances, would find hostile or abusive. 510 U.S. at 22, see also *Roof v. Howard University*, 2007 U.S. Dist. LEXIS 60762 (D. D.C. August 17, 2007) (a workplace is considered hostile only when it is permeated with discriminatory intimidation, ridicule, and insult).

### a.    The Conduct of Which McFadden Complains Does Not Constitute Illegal Racial Harassment

McFadden alleges that various comments made to her by her co-workers, Riley-Jamison and Charles Henck were harassing or evidence of race discrimination, but a review of the comments establishes that they are not. The alleged harassing comments of which McFadden complains are as follows: (1) the receptionist asking McFadden about her modified schedule and whether she was receiving paid time off; (2) an employee asking if McFadden were putting her husband in hospice care; (3) Riley-Jamison asking McFadden if her daughters could assist with her husband's care; (4) Riley-Jamison stating that Ballard Spahr was doing McFadden a favor; (5) Riley-Jamison commenting that Ballard Spahr needed to hire more healthy people; (6) Riley-Jamison requiring McFadden to call in on her days off if she were sick; (7) Charles Henck asking if McFadden wanted to put her husband in hospice care; (8) Henck suggesting that McFadden sell her rental property instead of falling behind on the mortgage; and (9) other

employees discussing the possibility of hospice care with McFadden.[12] (SOF, ¶ 42, see generally, Ex. 17, Plaintiff's Third Supplemental Interrogatory Answers, No. 8).

These alleged comments and statements, even if true, do not refer to McFadden's race, nor do they bear any relationship to her being African-American.[13]  Apparently, McFadden believes these comments, assuming they were made, were insensitive or unduly invaded what she believes were personal medical or financial matters.  Even if this is the case, they hardly can be deemed to be harassing or otherwise unlawful.  The purported comments and statements certainly fall well far short of the standard of being sufficiently severe and pervasive to change the terms and conditions of McFadden's employment.[14]

At most, these examples of alleged "harassment" fall into the category of off-hand comments and isolated statements made over several years, which the Supreme Court has held

---

[12]    McFadden alleged that she received seven e-mails in one day from Riley-Jamison informing her that she was on leave without pay. (Complaint, ¶33). However, at her deposition, McFadden admitted that she did not know whether the e-mails were sent by Riley-Jamison and that the e-mails were sent in September, 2003, when Riley-Jamison was on maternity leave. (Ex. 5, McFadden Depo. 5/16/2007 at 242, 249-250).

[13]    See *Roof v. Howard University*, 2007 U.S. Dist. LEXIS 60762 (D. D.C. August 17, 2007) (severe criticisms of teaching philosophy and administration not harassment due to race).

[14]    Also, to the extent that McFadden's claims of harassment are based upon the comments or conduct of Riley-Jamison they are time barred.  Riley-Jamison began her maternity leave on June 25, 2003, and immediately after she returned to work on October 14, 2003, McFadden left on long-term disability leave for eight months until her termination on May 14, 2004. (SOF, ¶44). Hence, all of the harassing comments and conduct that McFadden attributes to Riley-Jamison would need to have occurred prior to June 25, 2003.   McFadden did not file her charge of discrimination until June 23, 2004. (SOF, ¶39).  By law only actions occurring within 300 days of filing are actionable. 29 CFR § 1601.13(a)(4). Because any comments made by Riley-Jamison all had to have been made well before this date, to the extent that McFadden's Title VII claim is predicated upon the allegation that Riley-Jamison engaged in racial harassment that part of her claim is time barred. See, e.g. *Mayers v. Laborers' Health and Safety Fund*, 478 F.3d 364 (D.C. Cir. 2007).

do not amount to discriminatory changes in the "terms and conditions of employment." *Clark County Sch. Dist.*, 532 U.S. at 270.  See *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (judicial standards for harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'").  Indeed, in assessing the legal implications of comments and statements much more egregious than those alleged by McFadden, the courts have held that, as a matter of law, they do not rise to the level of unlawful racial harassment.  For example, in *Stewart v. Evans*, 348 U.S.App.D.C. 382, 275 F.3d 1126 (D.C. Cir. 2002), the plaintiff was subjected to such verbally abusive comments as "you're a fucking idiot," "you're full of shit," "can't you fucking read," "fuck the goddamn memo," "I want to know where your fucking head was at," and "I don't have to listen to your fucking bullshit." Notwithstanding these expletive laced, abusive and hostile statements directed to the plaintiff, the district court concluded that the plaintiff had failed to show that she had been subjected to hostile work environment and granted summary judgment in favor of the employer.  Similarly, in *Davis v. Coastal Services*, 348 U.S.App.D.C. 375, 275 F.3d 1119 (D.C. Cir. 2002), the plaintiff endured vulgar comments and gestures, kissing noises, and crotch grabbing, yet the court concluded that they did not rise to the level of a hostile work environment.

McFadden's claims of being harassed fall far below the level of conduct the courts have considered to be severe and pervasive harassment.  Thus, even if McFadden's allegations of being subjected to hostile or offensive comments are assumed to be true, she has no legally cognizable claim of unlawful racial harassment.

> **b.**     **Plaintiff Made No Complaint of Race Discrimination or Harassment During Her Employment**

Ballard Spahr has an Equal Employment Opportunity ("EEO") policy that prohibits racial discrimination and harassment, and any other purported discriminatory conduct. Importantly, the firm's EEO policy sets forth a procedure for employees to report what they believe to be discriminatory or harassing conduct and specifically provides that if support staff believe they are being discriminated against or harassed, they are to report the conduct to the office administrator, the executive director, or the director of human resources. (SOF, ¶38).

McFadden did not follow this policy and report any of the allegedly harassing conduct of which she now complains. At best, McFadden contends that she told Charles Henck, the tax partner for whom she worked, that Riley-Jamison complained about McFadden's need for leave. McFadden, however, did not inform Henck that she believed that she was being subjected to race discrimination or harassed due to her race, or any other type of discriminatory behavior. (SOF, ¶40).

Plaintiff McFadden bears the burden of demonstrating that Ballard Spahr knew (or should have known) of the alleged discriminatory comments or harassing conduct of her co-workers. See, e.g. *Kelley v. Billington*, 370 F.Supp.2d 151 (D.D.C. 2005) (the plaintiff must demonstrate that the employer knew or should have known of the harassment as part of a prima facie hostile work environment claim). Because she did not report any of the alleged harassing conduct by her co-workers, McFadden simply cannot make this showing.

Similarly, with regard to McFadden's allegations pertaining to Mr. Henck and Ms. Riley-Jamison, McFadden also failed to utilize Ballard Spahr's policies and procedures to report any of their purported harassing or discriminatory conduct. In such a situation, where an employer has an established procedure for reporting harassment or discriminatory conduct and an employee

fails to utilize the procedure, the employer may not be held liable.  See *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); see also *Curry v. District of Columbia*, 195 F.3d 654 (D.C. Cir. 1999) (granting an employer partial judgment as a matter of law where employee did not promptly report initial harassment). Such is the case here.

### 2.    Plaintiff Was Not Treated Disparately Because of Her Race as to Leave or Job Protection

McFadden claims that she was discriminated against on account of her race and treated disparately because Caucasian employees at Ballard Spahr were treated better than she in terms of leave that the firm granted.  McFadden attempts to show racial discrimination in her receipt of leave through the use of comparators, but she cannot point to any proper comparator who received better treatment.

A plaintiff, like McFadden, who attempts to make out a case of discrimination bears the burden of proving that proffered comparators are in fact similarly situated to the plaintiff. *Edwards v. U.S. Environmental Protection Agency*, 456 F.Supp.2d 72 (D.D.C. 2006). A plaintiff must demonstrate that all the relevant aspects of her employment situation were nearly identical to those of the employee who is not a member of the protected class. Generally, a plaintiff must show that the favorably treated co-workers dealt with the same supervisor, and have been subject to the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them. *Udah v. Trade Center Management Associates*, 479 F.Supp.2d 60, 64 (D.D.C. 2007); see also *Williams v. Chertoff*, 2007 U.S. Dist. LEXIS 46311 (D.D.C. June 27, 2007). A plaintiff must make this showing through the use of admissible evidence, rather than hearsay or other forms of evidence that

would be deemed inadmissible at trial. *Galdamez v. Xerox Corp.*, 2005 U.S. Dist. LEXIS 3578 (D.D.C. Feb. 28, 2005).

In Interrogatory No. 14, McFadden was asked to identify all the employees of Ballard Spahr who received considerations that were denied to her. McFadden identified five legal secretaries (Rhea Maher, Elaine Wilbur, Judy Mintz, Marti Hall and Kathey Hannah), one floater (Christie Hearn), the receptionist (Betty Anne Hahn), and the systems administrator (Janet Craig Kelly). Significantly, McFadden failed to explain how these individuals were proper comparators or how they were treated differently. (SOF, ¶90). In point of fact, none of these individuals are similarly situated to McFadden, nor did they receive better treatment from Ballard Spahr because of their race.

Janet Craig Kelly, as systems administrator, is an exempt employee under Ballard Spahr's policies and procedures, and exempt employees do not have a specified number of days of sick leave per year to which they are entitled. Legal secretaries, like McFadden, on the other hand, are non-exempt and receive a specified number of days of sick leave per year. Moreover, Ms. Craig Kelly's leave of absence occurred in 1996 and 1997, numerous years before McFadden and hence, there also is no temporal similarly to McFadden's situation either. (SOF, ¶91a).

Christie Hearn, a floater, received a modified work schedule to attend college. In order to do so, she relinquished her full-time position with benefits and accepted a part-time hourly position without health benefits. Ms. McFadden never gave up the benefit of being a full-time employee. (SOF, ¶91b).

Betty Anne Hahn, the receptionist, received the same amount of FMLA leave and non-FMLA leave as Ms. McFadden.  Her first leave period was from September 12, 2003 through November 27, 2003. She then returned to work until February 12, 2004. None of her duties were adjusted, and she did not receive a modified schedule. Moreover, Ms. Hahn held a different position than Ms. McFadden with different responsibilities and a different supervisor. (SOF, ¶91c).

Rhea Maher, a legal secretary, received intermittent FMLA leave due to illness. As of February 19, 2002, she worked four days a week. She left the firm on December 7, 2002, almost a year before McFadden began her disability leave in mid-October, 2003.  After she exhausted her accrued leave, Ms. Maher was docked pay for days she did not work.  Ms. Maher had a different supervisor than Ms. McFadden, and her leave period was separated in time from Ms. McFadden's disability leave. (SOF, ¶92a).

Elaine Wilbur, a secretary, received a temporary modified work schedule. She worked 9:30 a.m. through 3:30 p.m. with no lunch break three days a week. For two days a week, she worked 9:00 a.m. through 5:30 p.m. She maintained full-time hours, unlike Ms. McFadden who received a part-time, modified schedule. Ms. Wilbur and Ms. McFadden had different supervising attorneys, and their schedules were approved by different attorneys. (SOF, ¶92b).

Judy Mintz, a secretary, currently has a modified work schedule where she takes a leave of absence from the last week of June through the first week of September. During her leave of absence, she does not receive pay or accrue leave. Her schedule was approved by Allen Winn, who was not Ms. McFadden's supervisor. (SOF, ¶92c).

Martha Hall and Kathey Hannah, both secretaries, worked together in a job share position, which was put in place in 2002. At the time, Ms. Hannah was recovering from a medical condition and could work only 3.5 days a week. Ms. Hall was not interested in working full-time. Both were paid a percentage of a full-time Ballard Spahr employee. On March 3, 2003, Ms. Hannah was able to return to full-time employment, and Ms. Hall was transferred to the ARC to perform overflow work. When Ms. Hall was asked to work additional hours, she resigned. Unlike Ms. Hannah and Ms. Hall, Ms. McFadden's pay level was not decreased when she received a modified schedule. Also, Ms. McFadden had a different supervisor than Ms. Hall and Ms. Hannah. (SOF, ¶92d).

As the above discussion makes clear, McFadden cannot satisfy her burden of showing she was treated differently from any similarly situated Caucasian employee of Ballard Spahr. The relevant aspects of her employment situation were not "nearly identical" to any of the individuals whom she has named as being alleged comparators. This particularly is the case because each employee cited by McFadden had a different supervisor who approved any modifications to the employee's schedule. To determine who is a proper comparator, the courts most often have looked at whether there was common supervision of the employees. See, e.g. *Johnson*, 2005 U.S. Dist. LEXIS 13811 *10-11; *Willingham*, 226 F.R.D. at 62. In this matter, there is no common supervisor between McFadden and her purported comparators. McFadden's supervisor was Charles Henck, who did not supervise any of the other secretaries with schedule modifications.

In sum, McFadden has failed to identify any comparators who were treated better than she or, otherwise, show any connection between her race and the manner in which she was

treated by Ballard Spahr. The facts demonstrate that McFadden was actually treated better than the other employees. McFadden received salary advances and vacation advances that she was not asked to repay. Ballard Spahr provided legal representation to Mr. McFadden without charge and worked on expanding its insurance policies to help McFadden. (SOF, ¶85). No other employee was ever given the amount of help and consideration that McFadden received. Unlike the other employees with schedule accommodations, McFadden kept her status as a full-time employee accruing benefits and leave. (SOF, ¶78). Her claim of disparate treatment with respect to leave should be dismissed.

### 3.     McFadden Cannot Prove Her Claims of Discriminatory Termination

#### a.     McFadden Cannot State a *Prima Facie* Case

In order to state a *prima facie* claim that she was terminated on the basis of her race, McFadden must establish that (1) she is the member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination.  *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002); *Nichols v. Truscott*, 42 F.Supp.2d 124 (D.D.C. 2006).  Additionally, McFadden must prove that she was qualified for the position from which she was terminated.  *Id.*

As an initial matter, even if McFadden could satisfy the first three elements of a claim of discriminatory termination, as discussed above, she cannot establish that she was qualified to perform the position from which she was terminated, i.e., a legal secretary.  Indeed, McFadden admits that due to her various medical conditions, she could not perform her job.  McFadden cannot state even a *prima facie* case that she was terminated for discriminatory reasons if, as she

admits, she could not perform her job. *Cf. Bass v. SBC Communications, Inc.*, 418 F.3d 870 (8th Cir. 2005) (employee who was incapacitated and could not perform the essential functions of his job did not make a *prima facie* case of disability discrimination); *Gerth v. Sears, Roebuck & Co.*, 1995 U.S. App. LEXIS 22577 (6th Cir. Aug. 14, 1995) (employee who could not perform job could not satisfy *prima facie* case of age discrimination).

### b.    Plaintiff Cannot Show Defendants' Legitimate, Non-Discriminatory Reason Was a Pretext for Discrimination

Even if McFadden could make a *prima facie* showing, Ballard Spahr had a legitimate, non-discriminatory reason for her termination. McFadden was unable to return to work after the expiration of her D.C. FMLA and additional non-FMLA leave. In order to rebut such a legitimate, non-discriminatory reason and overcome Ballard Spahr's summary judgment motion, McFadden must demonstrate that the reason offered by the firm is a pretext for discrimination.

A plaintiff may attempt to establish pretext by showing that the employer's proffered explanation is "unworthy of credence" and that a reasonable jury could conclude that she was treated differently for a discriminatory reason. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff, however, remains at all times with the plaintiff. *Threadgill v. Spellings*, 377 F.Supp.2d 158 (D.D.C. 2005). Thus, at the pretext stage, the plaintiff "bears the **ultimate burden** of proving that she has been the victim . . ." *Dowe v. Total Action against Poverty*, 145 F. 3d 653, 656 (4th Cir. 1998); *see also King v. Jackson*, 468 F.Supp.2d 33 (D.D.C. 2006). Moreover, a plaintiff must meet this ultimate burden of proof without inappropriately relying upon mere speculation and possibilities.

*Lovelace v. Sherwin Williams,* 681 F.2d 230 (4th Cir. 1982).

In this case, McFadden cannot show that her termination was a pretext for race discrimination. There is no evidence that the reason advanced by Ballard Spahr was not the actual basis for her termination. There also is no evidence that McFadden's race played any role whatsoever in the termination of her employment. McFadden has testified that neither Riley-Jamison nor any other employees of Ballard Spahr ever used racial epithets to refer to her or in conversation around her. (SOF, ¶43). There simply is no evidence whatsoever of any racial animus in this case. See, e.g. *Jonas v. University of D.C.*, 1993 U.S. Dist. LEXIS 9151 (D. D.C. June 30, 1993) (no evidence of discrimination where the plaintiff had no incidents of ethnic epithets or slurs).

**E.    Defendants Are Entitled to Summary Judgment on McFadden's Retaliation Claim**

Although McFadden asserts in her Complaint that she was retaliated against for seeking to exercise her rights under the FMLA and various anti-discrimination laws, she cannot establish the elements of a retaliation claim.

**1.    *Prima Facie* Standard for Retaliation Claims**

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) her employer took an adverse employment action against her, and (3) there was a causal connection between the protected activity and the adverse employment action. *Laboy v. O'Neill*, 180 F. Supp. 2d 18 (D. D.C. 2001); *Hill v. Lockheed Martin Logistics Management, Inc.,* 354 F.3d 277, 298 (4th Cir. 2004). As is the case with a claim for disparate

treatment, once a plaintiff makes this showing, a defendant need come forward only with a legitimate non-discriminatory reason for the adverse employment action. The plaintiff, then, must demonstrate that the employer's reason is nothing more than a pretext for retaliation, and if a plaintiff fails to make this showing, summary judgment should be granted to the employer. *Tsehaye v. William C. Smith & Co.*, 402 F. Supp. 2d 185 (D. D.C. 2005); *Hawkins v. PepsiCo, Inc.*, 203 F. 3d 274 (4th Cir. 2000).

### 2.    McFadden's Claims of Retaliation

Purportedly as a result of exercising her right to FMLA leave, McFadden asserts that the Defendants retaliated against her by engaging in the following adverse personnel actions: (1) denial of leave and schedule modifications; (2) disparate treatment with regard to terms and conditions of employment, including leave procedures and job protections; (3) denial of reasonable accommodations; and (4) termination. None of these assertions has any merit.

As set forth above, McFadden received all the FMLA to which she was entitled under the federal and D.C. FMLA. Accordingly, she cannot show that she suffered any purported denial of leave or schedule modifications. Further, as demonstrated above, McFadden was not treated disparately with respect to leave procedures or job protections. In fact, she received more leave and job protection than other Ballard Spahr employees. She also was not denied any accommodations. It stands undisputed that Ballard Spahr offered McFadden a job in the ARC where she could have worked on an intermittent basis, but she turned down the job.

Finally, McFadden also contends that she was terminated because she requested FMLA leave, but McFadden can come forward with no facts to show a "causal nexus" between her

protected conduct and her termination.  McFadden started taking leave in October, 2002 due to

the medical condition of her husband.  Later, in 2003, she started taking leave for her own

illnesses. (Complaint, ¶ 34). However, McFadden was not terminated until mid-May, 2004, after

she had exhausted all her available FMLA and non-FMLA leave and more than a year and a half

after she first began taking leave. This period of time is too long to support any inference of

causation. See, e.g. *Sullivan-Obst v. Powell*, 300 F.Supp.2d 85 (D.D.C. 2004) (three month gap

between protected activity and retaliatory e-mails insufficient to show causation).   This is not a

situation where an employer may have terminated an employee after the employee requests

FMLA leave to prevent the person from taking leave.  McFadden received all the FMLA leave to

which she was entitled, and then some.

### 3.    McFadden Cannot Establish Pretext

Finally, even if McFadden could establish a *prima facie* case, she cannot show that

Ballard Spahr's reason for terminating her, i.e., her inability to return to work, was a pretext for

retaliation.  McFadden does not dispute that she could not return to her job as a legal secretary at

the end of her FMLA and non-FMLA leave.  Terminating an employee who cannot return to

work at the end of his or her FMLA leave is specifically permitted under the statute (see

discussion Section II.C.1., *supra*).  Hence, taking an employment action that is authorized under

the FMLA, by its very nature, cannot constitute a pretext for retaliation under the statute.

### F.    Plaintiff Cannot Show Individual Liability for Ms. Riley-Jamison

In addition to suing Ballard Spahr, McFadden has brought an individual claim against

Margaret Riley-Jamison, the human resource manager of Ballard Spahr's Washington D.C.

office. (Complaint, ¶ 11). McFadden asserts claims against Riley-Jamison for race discrimination in violation of Section 1981, for disability discrimination under the D.C. Human Rights Act ("DCHRA"), for violations of the D.C. and federal FMLA, and for retaliation under Section 1981 and the DCHRA.[15]  As discussed above, McFadden can prove none of these claims. In addition, even if she could, McFadden cannot establish individual liability against Riley-Jamison.

### 1.    Individual Liability for Discrimination, Retaliation, and Violation of FMLA

To make out a claim for individual liability for race discrimination or retaliation under Section 1981, a plaintiff must demonstrate an affirmative link to causally connect the defendant with the discriminatory action. *Tnaib v. Document Technologies*, LLC, 450 F.Supp.2d 87 (D.D.C. 2006). For an individual to be liable, he or she must have supervisory control over the plaintiff.  *Id*.

Similarly, in order for an individual to be liable for violations of the FMLA, the individual must exercise decision making control over the plaintiff's exercise of his or her FMLA rights. *Bryant v. Delbar Products, Inc*., 18 F.Supp.2d 799, 808 (M.D. Tenn. 1998). Conclusory statements by a plaintiff that an individual was responsible for making FMLA decisions are insufficient to establish individual liability. *Wilson v. Adcovate Health and*

---

[15]     There is no individual liability under Title VII. *Gary v. Long*, 313 U.S.App.D.C. 403 (D.C. Cir. 1995); *Cooke-Seals v. District of Columbia*, 973 F.Supp. 184 (D. D.C. 1997).  The ADA also has no individual liability. *Cooke-Seals v. District of Columbia*, 973 F.Supp. 184 (D. D.C. 1997); *EEOC v. AIC Security Investigations*, 55 F.3d 1276 (7th Cir. 1995). McFadden's individual claims can exist only under Section 1981, the D.C. Human Rights Act, and the FMLA.

*Hospital Corp.*, 2006 U.S. Dist. LEXIS 45283 (N.D. Ill. June 21, 2006).

### 2.    Riley-Jamison Had No Supervisory Nor Decision-Making Control Over Plaintiff

The undisputed facts confirm that Riley-Jamison did not supervise McFadden, nor did she have decision-making control over her.  McFadden was a secretary for Charles Henck, a partner in the tax department.  McFadden, herself, has acknowledged that she reported to Henck, and not Riley-Jamison. (SOF, ¶9, Ex. 5 where McFadden states "Mr. Henck is my boss... As far as I was concerned, I went by what Mr. Henck said, not what Ms. Riley-Jamison said").

Significantly, Riley-Jamison did not have the authority to hire or terminate secretaries; the attorneys did. (SOF, ¶15). Riley-Jamison made no assessments as to McFadden's qualifications or suitability for employment. (*Id*. at 16-17). Riley-Jamison coordinated the evaluations of non-attorney staff, but the staff did not report to her. (*Id.* at 15-16). Neither did Riley-Jamison have control over the approval or denial of leave and benefits. Riley-Jamison was responsible for ensuring the proper paperwork was completed and, then, forwarded the paperwork to the firm's benefits department.  (*Id*. at 44, 47). All requests for FMLA leave were assessed and determined by that department.  Riley-Jamison made no decisions regarding whether or not to grant FMLA leave, including leave for McFadden. (*Id*. at 51-52).  Riley-Jamison also did not terminate McFadden when her leave expired.

Given these facts, McFadden cannot establish a causal link between Riley-Jamison's actions and her alleged race discrimination, retaliation, and FMLA claims. Riley-Jamison did not have control over the granting of FMLA leave. While McFadden asserts that she was discriminatorily discharged, Riley-Jamison also had no control over whether McFadden was

discharged.  In short, there can be no individual liability for Riley-Jamison; therefore, she is

entitled to summary judgment as to McFadden's discrimination and retaliation claims against her

personally.

## III. CONCLUSION

The undisputed facts show an employer struggling to accommodate a sick employee. Yet

no matter how accommodating an employer can be, it is no guarantee against being sued.

McFadden has no evidence of discriminatory animus, received every leave day that she

requested, and is unable to work with or without reasonable accommodation. For the foregoing

reasons, Defendants' motion for summary judgment should be granted and this case dismissed in

its entirety.

Respectfully submitted,

Ballard Spahr LLP, etc.
By counsel

_____/s/_____
Bernard J. DiMuro, Esq. (D.C. Bar #393020)
Jonathan R. Mook, Esq. (D.C. Bar #929406)
DiMURO GINSBERG, P.C.
908 King Street, Suite 200
Alexandria, VA  22314
(703) 684-4333
(703) 548-3181 (facsimile)
*Counsel for Defendants*