UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Vanessa A. McFadden, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:05CV02401 |
| ) | Judge Richard J. Leon |
| Ballard Spahr Andrews and ) | |
| Ingersoll, LLP, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants Ballard Spahr Andrews and Ingersoll, LLP ("Ballard Spahr"), and Margaret Riley-Jamison ("Riley-Jamison"), hereby submit the following statement of undisputed facts in support of their motion for summary judgment.

  **A. Plaintiff's Employment at Ballard Spahr**

    **1. Plaintiff's Position as a Legal Secretary**

  1. Vanessa McFadden ("Plaintiff" or "McFadden") was hired as a legal secretary by Ballard Spahr in 1989. (Ex. 1, Complaint at 13).

  2. Margaret Riley-Jamison holds the position of Human Resources Manager in the D.C. office of Ballard Spahr. (Ex. 1, Complaint at 11).

  3. McFadden worked primarily for Charles Henck, a partner in the Tax Department. (Ex. 2, Henck Depo. at 21).

  4. McFadden's responsibilities included managing time sheets, scheduling, organizing client files, managing expense sheets, and word processing for tax partner Charles Henck. (Ex. 3, Legal Secretary Job Description).

5.     Charles Henck evaluated McFadden's qualifications, suitability for employment, and performance. Riley-Jamison did not have the authority to hire or terminate. (Ex. 4, Riley-Jamison Depo. at 15-17, 38-39).

## 2.     Plaintiff Takes Leave to Care for Her Husband

6.     In October 2002, McFadden informed Ballard Spahr that her husband had been diagnosed with terminal cancer. (Ex. 1, Complaint at 18).

7.     McFadden requested time off from work in order to care for her husband. (Ex. 1, Complaint at 18). McFadden told other employees at Ballard Spahr about her husband's condition and often spoke with her family and friends about the situation. Ex. 5, McFadden Depo. 5/16/2007 at 226, 231, Ex. 6, Craig Depo. at 17).

8.     Ballard Spahr accommodated McFadden's request by scheduling McFadden to work three to four days per week, on alternating weeks. (Ex. 1, Complaint at 26, Ex. 4, Riley-Jamison Depo. at 76-77, Ex. 5, McFadden Depo. 5/16/2007 at 93).

9.     Henck, the partner in charge of McFadden, approved the modifications. McFadden considered her boss to be Charles Henck and followed what he said with regard to her schedule. (Ex. 5, McFadden Depo. 5/16/2007 at 103).

10.    On weeks where McFadden worked four days per week, she was given Mondays off and Ballard Spahr did not charge the time off to McFadden's FMLA entitlement. (Ex. 7, Riley-Jamison Dec. at 2-3, Ex. 5, McFadden Depo. 5/16/2007 at 94-96).

11.    Unlike all other employees who worked less than full-time, McFadden's employment status was never converted from full-time to part-time. McFadden is the only

employee in Ballard Spahr's D.C. office who has ever been allowed to work part-time without a decrease in salary. (Ex. 7, Riley-Jamison Dec. at 3).

12. McFadden received 34 days of paid time off for the year 2002. (Ex. 8, November 1, 2002 Memorandum).

13. By November, 2002, McFadden had exhausted her paid leave. Because McFadden had been employed by Ballard Spahr for so many years, the firm advanced her ten days from the paid leave to which she would be entitled in 2003. This was the first time Ballard Spahr's D.C. office had ever advanced an employee that amount of paid leave. (Ex. 8, November 1, 2002 Memorandum, Ex. 7, Riley-Jamison Dec. at 4).

### 3. Plaintiff Takes Leave for Her Medical Illnesses

14. At some point in 2002 and continuing into 2003, McFadden began to experience her own medical problems and complained to her co-workers about various medical problems. (Complaint at 36, Ex. 37, Plaintiff's First Supplemental Answers to Interrogatory No. 10, p. 4).

15. McFadden reported to work while she was ill. She had difficulties walking and typing. On multiple days in 2003 when McFadden came to work while sick, she was allowed to leave early without her early departure being counted against her. Ballard Spahr gave McFadden credit for a full day's work. (Ex. 7, Riley-Jamison Dec. at 6).

16. McFadden's condition worsened during 2003. In 2003, she was diagnosed with a variety of illnesses, including:

      a. Graves disease;

      b. fibromyalgia;

      c. depression;

  d. thyroid problems;

  e. bronchial asthma, and other chronic illnesses that have continued to this day. (Ex. 5, McFadden Depo. 5/16/2007 at 123-127).

17. McFadden's symptoms include:

  a. headache clusters, which can last for two to three days and cause loss of vision (Ex. 5, McFadden Depo. 5/16/2007 at 135-136);

  b. inability to maintain personal hygiene without help (Ex. 5, McFadden Depo. 5/16/2007 at 147-148);

  c. needing oxygen tanks;

  d. inability to stand without assistance;

  e. inability to stand with assistance for more than a few minutes;

  f. inability to lift anything, needs assistance getting out of bed; and

  g. incontinence. (Ex. 9, Plaintiff's Answers to Interrogatories, No. 10.)

18. Because of her illnesses, McFadden missed 67 days of work in 2003 and exceeded her paid leave days. (Ex. 24, 2002 and 2003 Leave Records). In 2003, Ballard Spahr advanced McFadden another ten days of paid leave from 2004. The two occasions in which Ballard Spahr advanced ten days of paid leave to McFadden are the only times Ballard Spahr's D.C. office ever has advanced such a substantial amount of leave. (Ex. 7, Riley-Jamison Dec. at 5).

  **4.** **Plaintiff Takes Disability Leave**

19. On or about October 15, 2003, McFadden took disability leave from her job at Ballard Spahr. (Ex. 1, Complaint at 39).

20. Riley-Jamison had no control over the approval or denial of leave and benefits. She was only responsible for ensuring the proper paperwork was completed and forwarding the information to the firm's benefits department. (Ex. 4, Riley-Jamison Depo. at 44, 47).

21. McFadden used most of her available FMLA leave during 2002 and 2003 for the illnesses of herself and her husband. In 2002, McFadden missed 59 days of work. In 2003, McFadden missed 67 days of work. (Ex. 24, 2002 and 2003 Attendance Table). Ballard Spahr decided to restart the clock on October 15, 2003, and give McFadden an additional sixteen weeks of medical leave under the D.C. FMLA from October 15, 2003. (Ex. 7, Riley-Jamison Dec. at 7). Ballard Spahr never denied McFadden any of the leave that she requested. (Ex. 5, McFadden Depo. 5/16/07 at 98-100).

22. McFadden's D.C. FMLA leave expired on February 4, 2004. (Ex. 10, Mar. 9, 2004, Letter from DiBattista to McFadden).

23. As McFadden was too sick to return to work, Ballard Spahr offered her an additional three months of non-FMLA leave. (Ex. 10, Letter from DiBattista to McFadden).

24. McFadden accepted the non-FMLA leave on March 15, 2004. In her letter accepting such leave, McFadden wrote that her disability would continue "indefinitely." (Ex. 11, Extension Request Form).

25. McFadden's three months of non-FMLA leave expired on May 4, 2004. (Ex. 10, Letter from DiBattista to McFadden).

### 5. Plaintiff's Leave Expires

26. After her leave had already expired, on May 14, 2004, McFadden called Ms. Riley-Jamison to inquire about her leave status. Ms. Riley-Jamison told McFadden that she

would have to get back to her. (Ex. 4, Riley-Jamison Depo. at 104, 108, Ex. 5, McFadden Depo. 5/16/2007 at 275-276).

27.  Later that afternoon, Ms. Riley-Jamison, Wendy Iverson, the office manager for Ballard Spahr's D.C. office, Fern Forman, the benefits administrator for Ballard Spahr, and John DiBattista, the Director of Human Resources for Ballard Spahr placed a conference call to McFadden. (Ex. 4, Riley-Jamison Depo. at 102, Ex. 5, McFadden Depo. 5/16/2007 at 276-277).

28.  During the call, McFadden was told that the firm had added a new policy to their insurance to allow her an accelerated death benefit for her husband. (Ex. 5, McFadden Depo. at 282).

29.  During the conference call, McFadden was offered a word processing position in the administrative department ("ARC") of Ballard Spahr. At the time, McFadden could not perform the work of a tax secretary. (Ex. 1, Complaint at 46, Ex. 4, Riley-Jamison Depo. at 119, Ex. 12, Plaintiff's Notes of conversation, Ex. 5, McFadden Depo. 5/16/2007 at 292).

30.  McFadden responded to the offer by stating that she could not work in word processing. (Complaint at 46, Ex. 4, Riley-Jamison Depo. at 119, Ex. 5, McFadden Depo. 5/16/2007 at 292).

31.  McFadden claims that she then asked about the receptionist position and was told it was unavailable. (Ex. 5, McFadden Depo. 5/16/2007 at 292-293).[1] McFadden was told that the

---

[1]  For the purposes of summary judgment, Defendants accept McFadden's testimony, although the three Ballard Spahr employees on the conference call will testify that McFadden did not request a receptionist position and McFadden's contemporaneous notes do not reflect that she requested a receptionist position. (Ex. 12, McFadden's Notes, Ex. 4, Riley-Jamison Depo. at 102, 120).

position was being held for an employee on medical leave. (Ex. 5, McFadden Depo. 5/16/2007 at 293).

### 6. Plaintiff Cannot Return to Work and Is Terminated as No Other Available Position was Acceptable to Her

32.     McFadden was terminated by John DiBattista, the director of human resources, on May 14, 2004, due to her inability to return to work in an available position. (Ex. 1, Complaint at 47, Ex. 4, Riley-Jamison Depo. at 102-103, Ex. 13 May 20, 2004 Letter from DiBattista to McFadden).

33.     In an ARC position, McFadden could come to work intermittently. It was the only position for which McFadden had the requisite skills that did not require her to report to work every day. (Ex. 7, Riley-Jamison Dec. at 8).

34.     A receptionist at Ballard Spahr was required to report to work at regular hours, every day. A receptionist position could not be filled by an employee working intermittently. (Ex. 4, Riley-Jamison Depo. at 177).

35.     At the time, McFadden was unable to attend work consistently and had no way of predicting whether her illnesses would allow her to attend work that day until she woke up in the morning. At one point, in March of 2004, McFadden was confined to bed for a week and a half, unable to move more than turning her head from side to side. (Ex. 5, McFadden Depo. 5/16/2007 at 136-139).

36.     McFadden's physicians told her that she was disabled and could not work starting in April of 2003. (Ex. 5, McFadden Depo. 5/16/2007 at 140-141).

37.     At the time of McFadden's termination, there was no receptionist position available. The sole receptionist, Betty Ann Hahn, was on medical leave and Ballard Spahr was

holding Ms. Hahn's position open. Ballard Spahr could not give McFadden the receptionist position. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 16, 20). Ms. Hahn was eventually terminated and replaced in August. (Id.).

### B.    No Harassing or Racist Comments Were Made about Plaintiff

38.    Ballard Spahr has an Anti-Discrimination Policy that was signed by McFadden on February 1, 1999. (Ex. 15, EEO Policy, Ex. 16, Plaintiff's signature on policy).

39.    Prior to the filing of her EEOC charge on June 23, 2004, McFadden never made any complaints of race or disability discrimination to Ballard Spahr. (Ex. 17, Plaintiff's Third Supplementary Interrogatory Answers, No. 9).

40.    McFadden contends that she told Charles Henck, the partner for whom she worked, that Riley-Jamison complained about McFadden's need for leave. (Ex. 17, Plaintiff's Third Supplemental Interrogatory Answer, No. 9). McFadden did not inform Henck that she believed that she was being subjected to race discrimination. (Ex. 2, Henck Depo. at 35).

41.    McFadden cannot recall any racist comments made to or about her. (Ex. 9, Plaintiff's Answers to Interrogatory No. 8, 9, Ex. 5, McFadden Depo. at 219-220, 223).

42.    McFadden cannot recall the specifics of any purported harassing comments made to her. (Ex. 9, Plaintiff's Answers to Interrogatory No. 8, 9, Ex. 5, McFadden Depo. at 219-220, 223)

43.    Neither Ms. Riley-Jamison nor any other employee of Ballard Spahr ever used any racial epithets in front of McFadden or regarding McFadden. (Ex. 5, McFadden Depo. at 219-220, 223).

8

44. Ms. Riley-Jamison was on maternity leave from June 25 through October 13, 2003. Riley-Jamison did not return to work until two days before McFadden left on long term disability leave. (Ex. 4, Riley-Jamison Depo. at 94).

### C. Plaintiff's Receipt of Disability Insurance

45. Ballard Spahr's disability insurance plan for employees includes an elimination period of 30 days. From days 31-90, Ballard Spahr pays 60% of the employee's salary. From days 91 forward, Ballard Spahr's disability insurance carrier pays 60% of the employee's salary. (Ex. 18, Ballard Spahr Long Term Disability Plan).

46. Typically 80% of the disability insurance premium is paid by Ballard Spahr and 20% of the premium is deducted from the employee's salary. (Ex. 19, Ballard Spahr Income Protection Claim).

47. In the case of McFadden, Ballard Spahr paid 100% of her disability insurance premium from January, 2004, through her termination. Ballard Spahr made payments of McFadden's disability insurance premium on her behalf because the firm sought to provide assistance to her in light her personal and family situation. (Ex. 7, Riley-Jamison Dec. at 11, Ex. 13, May 20, 2004 Letter from DiBattista).

48. McFadden's disability leave began on October 15, 2003. Ballard Spahr paid her 60% of her salary from November 15, 2003 through January 15, 2004. (Ex. 7, Riley-Jamison Dec. at 12).

49. Beginning on or about January 15, 2004, it was the responsibility of Ballard Spahr's insurance carrier, UnumProvident, to make any disability payments under the terms of

the plan. In McFadden's case, UnumProvident had difficulties processing and approving her application. (Ex. 7, Riley-Jamison Dec. at 12-13).

50. On or about May 11, 2004, UnumProvident denied McFadden's disability application. (Ex. 20, May 11, 2004 Letter from UnumProvident to Plaintiff).

51. In mid-2004, McFadden submitted additional doctor's records in support of her disability. (Ex. 21, August 19, 2004 Letter from UnumProvident).

52. Ballard Spahr took steps to assist McFadden, and convinced UnumProvident to provide her with disability payments under a reservation of rights. (Ex. 7, Riley-Jamison Dec. at 13).

53. As a result, UnumProvident paid McFadden $6572.91 on March 15, 2004, under a reservation of rights, the full amount owed for payments from January 15, 2004 through March 31, 2004. (Ex. 22, Mar. 15, 2004 Letter from UnumProvident to Plaintiff).

54. UnumProvident also paid McFadden $16,366.92 on October 29, 2004, under a reservation of rights, the full amount owed for payments starting from April 1, 2004. (Ex. 23, Oct. 29, 2004, Letter from UnumProvident to Plaintiff).

55. Ballard Spahr further convinced UnumProvident to begin paying McFadden monthly the maximum disability amount that she would have received had her application been timely approved. These monthly amounts were paid starting October, 2004. (Ex. 23, Oct. 29, 2004 Letter from Unum, Ex. 7, Riley-Jamison Dec. at 13).

56. On or about September 22, 2005, UnumProvident approved McFadden's disability application. (Ex. 25, Sept. 22, 2005 Letter from UnumProvident to Plaintiff).

57.     UnumProvident's standard for long-term disability insurance coverage is "that because of injury or sickness: (1) the insured cannot perform each of the material duties of his regular occupation; and (2) after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience." (Ex. 25, Letter from UnumProvident to Plaintiff, Ex. 27, Feb. 18, 2004 Letter from Unum to Plaintiff).

58.     McFadden initially was approved for long term benefits under the first clause of the disability insurance standard. (Ex. 25, Sept. 22, 2005 Letter from UnumProvident to McFadden).

59.     On September 22, 2005, UnumProvident informed McFadden she had been approved under the standard of not being able to perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience. (Ex. 25, Sept. 22, 2005 Letter from UnumProvident to Plaintiff).

**D.      Plaintiff's Receipt of Social Security Disability**

60.     On or about November, 2003, McFadden applied for social security disability insurance ("SSDI").  McFadden was approved for benefits on or about March 16, 2004. (Ex. 26, Mar. 16, 2004 Letter from SSA to McFadden).

61.     The standard to be approved of SSDI benefits is the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairments which can reasonably be expected to result in death or which has lasted or can be expected to last for a continuous period of time of not less than 12 months. (20 CFR § 404.1505).

  **E.** **Failure to Seek Alternative Employment As a Receptionist, the Position McFadden Claims that She Could Have Performed**

  62. Following her termination on May 14, 2004, McFadden did not apply for a single position of any type of employment. (Ex. 17, Plaintiff's Third Supplemental Answers to Interrogatories, Ex. 5, McFadden Depo. 5/16/2007 at 49).

  63. McFadden contends that she could have worked as a receptionist. (Ex. 1, Complaint at 48).  From her termination through the present, there have been thousands of available receptionist positions in the Washington, D.C. area. (Ex. 27, Defendants' Expert Report).

  64. In 2005, McFadden moved to Florida for her health. (Ex. 5, McFadden Depo. 5/17/2007 at 76-78).

  **F.** **Plaintiff's Medical Condition Renders Her Unable to Work**

  65. McFadden's physicians have stated that she is and will be unable to return to work.

  66. Philip Mussenden, M.D., McFadden's primary care physician, has stated that Ms. McFadden is "physically and mentally incapacitated" (Ex. 28, Plaintiff's Responses to Request for Admission at 29).

  67. Dr. Mussenden has stated that Ms. McFadden is "unable to perform any work" (Ex. 28, Plaintiff's Responses to Request for Admission at 31).

  68. Dr. Mussenden has certified that Ms. McFadden cannot be released to full time or part time work "indefinitely" (Ex. 28, Plaintiff's Responses to Request for Admission at 33).

69. Ranville Clark, M.D., McFadden's psychiatrist, has stated that "Ms. McFadden is incapable of resuming employment, now or in the foreseeable future" (Ex. 28, Plaintiff's Responses to Request for Admission at 30).

70. Dr. Clark opined on March 17, 2004 that "it is not to be expected that [Ms. McFadden] will ever be able to resume gainful employment" (Ex. 29, Clark Records, Unum 00256).

71. Seth Morgan, M.D., McFadden's neurologist, has reported that Ms. McFadden believes her memory is "not too good." (Ex. 30, Morgan Records, HCP 53).

72. Earl Armstrong, M.D., McFadden's pulmonologist, has prescribed Ms. McFadden an oxygen canister for her lifetime. (Ex. 31, Armstrong Records, Unum 00626, 00628).

73. None of McFadden's medical providers have rescinded their statements that McFadden is unable to work. (Ex. 5, McFadden Depo. 5/16/07 at 216-217).

74. McFadden has stated repeatedly that she is unable to work.

   a. McFadden informed UnumProvident, in her signed Claimant's Statement, that she would never be able to return to work on a full or part time basis; (Ex. 28, Plaintiff's Responses to Request for Admission at 19, 26).

   b. In October, 2003, McFadden applied for social security and informed the Social Security Administration that she was totally disabled; (Ex. 32, Work Activity Report).

   c. McFadden also informed the SSA that she was unable to return to work; (Ex. 33, SSA Report of Continuing Disability Interview).

   d. McFadden also informed the SSA that she could not work, exercise, lift objects over five pounds, get in or out of the bathtub, off the toilet or out of bed alone. This statement remains true to the present date. (Ex. 36, Activities of Daily Living Form submitted to SSA, Ex. 5, McFadden Depo. 5/16/2007 at 145, 147-148).

      e.      McFadden's condition is progressive and continually worsens. (Ex. 5, McFadden Depo. 5/16/2007 at 136-139).

      f.      McFadden's written request of non-FMLA leave on March 15, 2004, stated that her leave would continue indefinitely. (Ex. 11, Plaintiff's Leave of Absence Request Form).

75. McFadden has received more than two years (January 2004-January 2006) of disability benefits from UnumProvident. After two years, the standard to be disabled rises to the level of being unable to perform any position for which the person is suited by education or training. McFadden was approved by UnumProvident under the stricter standard. (Ex. 25, Sept. 22, 2005 Letter from UnumProvident to Plaintiff).

76. McFadden is also receiving SSDI benefits and has continuously accepted and retained SSDI benefits. The standard to receive SSDI benefits is the inability to engage in any gainful employment. 20 CFR § 404.1505.

**G.    Ballard Spahr's Extensive Assistance Shows It Has No Discriminatory Animus**

77. Since 2002, when McFadden's husband became ill, Ballard Spahr provided benefits and assistance to McFadden without legal obligation to do so. (Ex. 34, Defendants' Answers to Interrogatory No. 3).

78. Ballard Spahr paid McFadden as a full-time employee even though she worked part-time. (Ex. 7, Riley-Jamison Dec. at 2-3).

79. Ballard Spahr advanced salary to McFadden without requesting or receiving repayment. Ex. 7, Riley-Jamison Dec. at 14).

80. Ballard Spahr twice advanced McFadden paid leave, including ten days from 2004, a year during which McFadden did not work a single day. (Ex. 7, Riley-Jamison Dec. at 4-5).

81. Ballard Spahr paid McFadden's disability insurance premiums to UnumProvident from January, 2004, through her termination. (Ex. 7, Riley-Jamison Dec. at 11, Ex. 13, May 20, 2004 Letter from DiBattista).

82. Ballard Spahr provided McFadden more leave than required under the federal FMLA and the D.C. FMLA. (Ex. 7, Riley-Jamison Dec. at 6-7).

83. Ballard Spahr allowed McFadden to work partial days that were recorded as full days. (Ex. 7, Riley-Jamison Dec. at 6).

84. Ballard Spahr obtained a new insurance policy retroactively in order to cover McFadden and provide an accelerated death benefit for her husband's life insurance policy. (Ex. 13, May 20, 2004 Letter from DiBattista).

85. When McFadden's husband became ill, Ballard Spahr, without charge, provided legal representation. Ballard Spahr represented Mr. McFadden in a dispute over his life insurance coverage when his request for coverage was denied. Due to Ballard Spahr's efforts, Mr. McFadden's life insurance coverage was granted. (Ex. 35, Panagopoulos Dec. at 2, 5).

86. Ballard Spahr convinced its insurance carrier, UnumProvident, to begin disability insurance payments to McFadden even though the company initially had denied her claims for benefits. (Ex. 7, Riley-Jamison Dec. at 13).

87. Mr. Henck gave McFadden two personal loans without interest, which McFadden eventually repaid. (Ex. 2, Henck Depo. at 49-50).

88. When McFadden initially left Ballard Spahr on disability leave, she acknowledged that Ballard Spahr was very tolerant of her even though she could not function to her full job capacity and missed an excessive amount of work. (Ex. 32, Work Activity Report submitted by McFadden to SSA on October 23, 2003).

### H. McFadden Has No Proper Comparators

89. McFadden claims that other employees received better leave and benefits. (Ex. 1, Complaint at 59).

90. Without explanation, McFadden lists five legal secretaries (Rhea Maher, Elaine Wilbur, Judy Mintz, Marti Hall and Kathey Hannah), one floater (Christie Hearn), the receptionist Betty Anne Hahn, and the systems administrator Janet Craig Kelly as potential comparators. (Ex. 17, Plaintiff's Third Supplemental Interrogatory Answer, No. 14).

91. McFadden lists comparators who worked in different position from her.

   a. Janet Craig Kelly is the systems administrator. She is an exempt employee who receives unlimited sick time. She took leave in 1996 and 1999. (Ex. 6, Craig Depo. at 36-37).

   b. Christie Hearn was not a legal secretary and did not have the same responsibilities as McFadden. She was an hourly employee and did not receive benefits. (Ex. 7, Riley-Jamison Dec. at 3).

   c. Betty Ann Hahn was the receptionist in the Washington D.C. office. She had different responsibilities. She received FMLA and non-FMLA leave for her medical condition, but she did not receive a modified work schedule. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 20).

92. None of the legal secretaries listed by McFadden had the same supervisor as McFadden. Secretaries were supervised by the attorneys (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

a. Rhea Maher received intermittent FMLA leave due to illness. As of February 19, 2002 she worked four days a week. She left the firm on December 7, 2002. Maher was docked pay for days she did not work after she ran out of accrued leave. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

b. Elaine Wilbur received a temporary modified work schedule. She worked 9:30a.m. through 3:30p.m. with no lunch break three days a week. On two days a week she worked 9:00a.m. through 5:30p.m. She maintained full-time hours. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

c. Judy Mintz received a modified work schedule where she takes a leave of absence from the last week of June through the first week of September. During her leave of absence, she does not receive pay or accrue leave. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

d. Martha Hall and Kathey Hannah shared a job in 2002. When Ms. Hannah could return to a full-time schedule, Ms. Hall was transferred to the ARC. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

Respectfully submitted,

Ballard Spahr LLP, etc.
By counsel

_____/s/_____
Bernard J. DiMuro, Esq. (D.C. Bar #393020)
Jonathan R. Mook, Esq. (D.C. Bar #929406)
DiMURO GINSBERG, P.C.
908 King Street, Suite 200
Alexandria, VA  22314
(703) 684-4333
(703) 548-3181 (facsimile)
*Counsel for Defendants*