UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

DEC 1 4 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

VANESSA A. MCFADDEN )
3457 Massachusetts Ave S.E. )
Washington, DC 20019 )
)
)
Plaintiff, )
)
v. )  Civil Action No. _____
)
BALLARD SPAHR ANDREWS & )
INGERSOLL, LLP )
601 13th Street, N.W. )   CASE NUMBER 1:05CV02401
Suite 1000 South )
Washington, DC 20005-3807 )   JUDGE: Richard J. Leon
)
AND )   DECK TYPE: Employment Discrimination
)
)   DATE STAMP: 12/14/2005
MARGARET RILEY-JAMISON )
1505 Crystal Drive, Apt. 905 )
Arlington, VA 22202-4171 )
)
Defendants. )
)

# COMPLAINT
(EMPLOYMENT DISCRIMINATION: 442 CIVIL RIGHTS-EMPLOYMENT)

Comes now Plaintiff, Vanessa A. McFadden, and by way of Complaint against the Defendants, say as follows:

## NATURE OF THE ACTION

1. This action is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; The Civil Rights Act of 1866, 42 U.S.C. § 1981(1988);

EXHIBIT
1

11. Defendant Margaret Riley-Jamison is an individual. Plaintiff is informed and believes, and based thereon alleges, that Ms. Riley-Jamison is a resident of the Commonwealth of Virginia. Ms. Riley-Jamison is, and all times relevant herein, was the Human Resources Manager at Ballard Spahr's Washington, D.C. office. Hence, at all times relevant herein, Ms. Riley-Jamison was a managerial employee and agent of Ballard Spahr and its partners. In addition, Ms. Riley-Jamison is named as a Defendant here, in her individual capacity for purposes of personal liability.

## FACTUAL ALLEGATIONS

12. Plaintiff Vanessa A. McFadden is an African-American female who, during most time periods covered herein, worked as a Legal Secretary for Ballard Spahr at its Washington, D.C. office.

13. Ballard Spahr hired Ms. McFadden on or about June 5, 1989. Her duties as Legal Secretary included answering the telephone, managing clients, entering attorney timesilps and preparing billing invoices, setting up conference, and editing, finalizing and filing legal documents.

14. Throughout her employment, Ms. McFadden performed her duties and responsibilities well, and consistently met or exceeded Ballard Spahr's expectations.

15. Ballard Spahr provided its relatively-senior legal secretaries, including Ms. McFadden paid sick leave for absences from work necessitated by their illnesses or that of their family members, and for medical appointments, up to 10 days.

4

16. On or about Friday, October 17, 2002, Ms. McFadden took an absence from work for a doctor's appointment with Dr. Thompson at Providence Hospital for a colonoscopy. Ms. McFadden put in a leave request in advance and received approval for the absence.

17. On Monday, October 20, 2002, Ms. McFadden's husband, Cornelius McFadden was diagnosed with cancer. He was immediately scheduled for surgery on October 23, 2002 at Greater Southeast Community Hospital.

18. On October 20, 2002, Ms. McFadden called Ballard Spahr and spoke with the partner to whom she reported, Charles Henck and reported her husband's condition, impending surgery and her inability to report to work. Mr. Henck approved her absence.

19. On October 20 and 23, 2002, Ms. McFadden reported these matters and her husband's surgery to Ms. Riley-Jamison. On October 23, 2002, Ms. Riley-Jamison advised Ms. McFadden that she would have to be placed on "FMLA leave since [she's] been out more than three days."

20. After having been absent from work since October 20, 2002 due to her husband's serious illness, Ms. McFadden reported back to work on or about November 2, 2002. Upon her return, Ms. Riley-Jamison gave Ms. McFadden a memorandum from Fern Forman, Benefits Administrator in Ballard Spahr's Philadelphia, Pennsylvania office. The memorandum stated that Ms. McFadden had been out on FMLA leave, that her "FMLA Coverage [period was] 10/17/02– 1/8/03". The

5

only 12 weeks of family leave and that her 12-week FMLA entitlement included days she worked.

25. Before her husband began chemotherapy, Ms. McFadden emailed her husband's chemotherapy schedule to Mr. Henck and Ms. Riley-Jamison.

26. Ballard Spahr partners Charles Henck and managing partner, Allan Winn, approved the conversion of Ms. McFadden's full-time schedule to a part-time schedule to care for her husband. They agreed that Ms. McFadden would work the following alternating schedule: Week 1- Thursday and Friday (with Mondays, Tuesdays, and Wednesdays off) and Week 2-Tuesday-Friday (with Mondays off).

27. Mr. McFadden began chemotherapy on January 6, 2003. Accordingly, Ms. McFadden began working the part-time schedule on this date.

28. On or about January 23, 2003, however, Ms. Riley-Jamison told Ms. McFadden that her part-time schedule was "going to be a problem" and asked her if she could find anyone else to care for her husband so that she could work.

29. Ms. Riley-Jamison told Ms. McFadden that Ballard Spahr was doing her "a favor" allowing her to work part-time, since her FMLA had already expired. Ms. Riley-Jamison added that the FMLA does not actually permit leave to be taken intermittently. Ms. McFadden again questioned why her FMLA leave included times she worked. Ms. Riley-Jamison responded by saying: "that's the law."

30. To maintain her job, Ms. McFadden arranged for her sister to care for husband on Tuesdays and reported to work every Tuesday, as instructed.

7

Ms. McFadden had been "complaining about being mistreated." Ms. Riley-Jamison then yelled at Ms. McFadden, while denying she mistreats her.

36. In or around April 2003, Ms. McFadden began to experience her own health problems. Many of Ms. McFadden's co-workers and Mr. Henck observed the deterioration of her physical condition. By May 2003, Ms. McFadden had been diagnosed with Graves Disease. Her physician, Dr. Kristen Thomas, wrote Ballard Spahr and requested that she be placed on disability leave. This, however, did not occur.

37. In or around May and June 2003, Ms. McFadden took approximately 12 days off from work for testing at Georgetown Hospital and recuperation for her illnesses and adverse reaction to medication. Ballard Spahr approved these absences.

38. Ms. McFadden continued to work full-time from mid-May 2003 to October 2003. During this time, Ms. McFadden's health continued to deteriorate. She was diagnosed with Graves Disease, Fibromyalgia, Rheumatoid Arthritis, Depression, Hypertension and Bronchial Asthma. By the Fall of 2003, Ms. McFadden found herself substantially limited in standing, walking, breathing, manual dexterity, and sleeping due to her disabling conditions.

39. Her physician, Dr. Phillip Mussenden, deemed her disabled and no longer able to continue to work. Dr. Mussenden instructed her to take disability leave from Ballard Spahr. Ms. McFadden so informed Mr. Henck and she began her medical leave on or about October 15, 2003.

9

about her employment status. Ms. Forman told Ms. McFadden that she "should just make it easy on everybody and resign." Ms. McFadden refused to resign.

46. The following day, Ballard Spahr's management officials, Wendy Iversen, John DiBattista, Ms. Forman and Ms. Riley-Jamison called Ms. McFadden at home and told her that her leave had expired and that she needed to report back to work. Ms. McFadden communicated that she could not return to the Legal Secretary position, given her disabling conditions. They offered Ms. McFadden a job in word processing. Ms. McFadden indicated that she could not perform that job because she could not type for extended periods of time due to her Graves' Disease, Fibromyalgia and Arthritis for which she was wearing hand braces.

47. Ballard Spahr officials then advised Ms. McFadden that she was terminated.

48. Ms. McFadden then brought up the receptionist position and questioned why she was being treated differently than the Caucasian receptionist who had been absent from work due to breast cancer, since December 2003. The Firm officials simply replied that their situations were different.

49. Although Ms. McFadden had been provided provisional benefits during some portions of her absence from work since October 15, 2003, she was not approved for long-term disability benefits until September 22, 2005–after nearly two years of haranguing and mis-information provided by Ballard Spahr and Unum. Even more, Ms. McFadden is now being required to payback the provisional benefits she received, amounting to over $ 27,000.

11

90. Ms. McFadden's absences from work relating to her spouse's serious health condition were FMLA-qualifying absences and triggered her entitlement to 12 workweeks of unpaid leave.

91. Ballard Spahr and Ms. Riley-Jamison willfully violated the FMLA by denying Ms. McFadden intermittent family leave between January 2003 and May 2003 up to her 12-week entitlement. Ballard Spahr, through Fern Forman, as well as Ms. Riley-Jamison misrepresented to Ms. McFadden that the days she reported for duty counted toward her FMLA entitlement, that FMLA leave could not be taken intermittently, and that her FMLA leave had expired.

92. Ballard Spahr and Ms. Riley-Jamison miscalculated Ms. McFadden's family leave entitlement, and denied and interfered with her leave in violation of the FMLA, 29 U.S.C. § 2615.

93. Ballard Spahr and Ms. Riley-Jamison failed to provide Ms. McFadden accurate and proper notice of her FMLA leave period in violation of 29 CFR § 825.301(c)(d).

94. Through its partners, employees and/or agents, Ballard Spahr and Ms. Riley-Jamison failed to keep Ms. McFadden and her husband's medical information confidential as required by FMLA, 29 CFR § 825.500(g) and the ADA, 42 U.S.C. §12112 (d)(4)(c), 29 CFR § 1630.14(c)(1), but rather communicated their private medical conditions to Firm staff, during Ms. McFadden's leaves of absence.

18

104. Ballard Spahr and Ms. Riley Jamison engaged in the following adverse personnel actions against Ms. McFadden: denial of leave and schedule modification; disparate treatment with regard to terms and conditions of employment, including but not limited to leave procedures and job protection; denial of reasonable accommodation; and termination.

105. There is a causal nexus between the adverse personnel actions alleged above and Ms. McFadden's protected activities.

106. The reasons offered by the Defendants for taking the adverse personnel actions against Ms. McFadden are pretextual.

107. Ms. Riley-Jamison and Mr. Henck made statements to and about Ms. McFadden's leave and the reasons therefore that reflected a disdain for her FMLA-qualifying absences.

108. The Defendants did not treat Ms. McFadden as they had treated similarly-situated employees who had not engaged in protected activity.

109. Ballard Spahr, at all times relevant hereto, had actual and constructive knowledge of the conduct of its managerial employees as described above.

110. The Defendants retaliated against Ms. McFadden in violation of Title VII, 42 U.S.C. § 2000e-3(a).

111. The Defendants retaliated against Ms. McFadden in violation of the FMLA, 29 U.S.C.§ 2615.

112. The Defendants retaliated against Ms. McFadden in violation of the ADA, 42 U.S.C. § 12203.