Charles Henck                                                October 31, 2006
                          Silver Spring, MD

                                                                    Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MARYLAND
 3      -------------------------------X
 4      VANESSA A. McFADDEN,            :
 5              Plaintiff,              :
 6          v.                          : Civil Case No.
 7      BALLARD SPAHR ANDREWS &,        :  05cv2401 (RJL)
 8      INGERSOLL, LLP, et al.,         :
 9              Defendants.             :
10      -------------------------------X
11
12                              Silver Spring, MD
13                              October 31, 2006
14
15          Deposition of CHARLES S. HENCK, a
16      witness herein, called for examination by counsel
17      for Plaintiff in the above-entitled matter, taken
18      at The Law Offices of T. W. Murray, 1111 Bonifant
19      Street, Silver Spring, Maryland 20910, at 3:00
20      p.m., on Tuesday, October 31, 2006, reported by
21      Ray Heer III and transcribed under his direction.
22
```



Charles Henck                                                          October 31, 2006
Silver Spring, MD

Page 18

1  the skills that she had. I would end up doing it
2  myself. And then, that was simply a task that I
3  wouldn't assign in the future. In most other
4  respects, the things that had become routine as a
5  part of my expectations, she, as far as I can
6  recall, met the requirements.
7           [Whereupon, a document was marked
8            as Henck Exhibit Number 2 for
9            purposes of identification.]
10      BY MS. MURRAY:
11   Q   You've been handed a document that has
12  been marked as Henck Exhibit 2, which, again, is
13  another multipage document. If you can review
14  that and let me know when you've completed your
15  review.
16   A   Okay.
17   Q   Would you please identify the document
18  for the record?
19   A   The first part is a document I don't
20  think I've ever seen. It appears to be a summary
21  of what's in the printed-out version of the
22  electronic -- what I believe to be an electronic

Page 19

1  form to which it is attached. It's apparently an
2  evaluation submitted, according to the document,
3  on August 30, 2002.
4   Q   Save the first 2 pages, the remainder of
5  Exhibit 2 represents the performance evaluation
6  that you conducted for Ms. McFadden?
7   A   Yes. I don't remember it specifically,
8  but it appears to be, yes.
9   Q   I direct your attention to the last page
10  of Exhibit 2, under "Overall Comments," number 1,
11  "Please identify your secretary's greatest
12  strengths." Answer, "A loyal, hardworking,
13  knowledgeable member of the team." Did I read
14  that correctly?
15   A   You did.
16   Q   And you found Ms. McFadden to be that
17  "loyal and hardworking member of the team"?
18   A   Yes.
19   Q   What would you say were the essential
20  functions of Ms. McFadden's job as legal secretary
21  working for you?
22   A   Working for me, it was basically to do

Page 20

1  my time sheets, to do my travel vouchers, to take
2  care of my billing -- that is, getting bills out
3  to clients -- taking phone messages, occasionally
4  interacting with clients to put things on my
5  schedule. It did not include word-processing,
6  with minor exceptions. It did not include any
7  preparation or use -- or very little preparation
8  or use of anything other than perhaps printing out
9  a final version of something to be signed.
10   Q   From 2000 until the time Ms. McFadden
11  was terminated by the firm, did she work for any
12  other lawyers, besides yourself?
13       MR. DiMURO: Objection to the form of
14  that question.
15       Go ahead.
16       THE WITNESS: Yes, she, from time to
17  time, was assigned to work for other lawyers. We
18  paired off with one or more other lawyers. Never,
19  to my recollection, more than two -- never more
20  than three lawyers. She would have -- I believe,
21  from time to time, was assigned to do work for the
22  legal assistants. But, again, I don't have any

Page 21

1  specific recollection of that.
2   Q   Would it be fair to say that her main
3  responsibility was to serve as your secretary?
4   A   That would be fair. Let me correct
5  that. That would be fair, except for occasions
6  when she was assigned to someone else. In one
7  case, another partner, who would have had, in
8  theory, equal claim to her time and attention as
9  I.
10   Q   Do you recall her being assigned to any
11  other partners --
12   A   Yes.
13   Q   -- from 2000 until 2004, in that time
14  period?
15   A   I do not remember the time period. I do
16  remember, that at one point -- at least at one
17  point, she was assigned to another lawyer.
18   Q   Who were the other partners she was
19  assigned to?
20   A   The other partner that I remember her
21  being assigned to was Tom Howard.
22   Q   Any other partner?

6 (Pages 18 to 21)

Charles Henck
Silver Spring, MD
October 31, 2006

**Page 34**

1  find that the facts were not as she was describing
2  them.
3  Q  Did Ms. McFadden ever complain to you
4  specifically about Ms. Riley-Jamison?
5  A  Yes.
6  Q  What complaints did Ms. McFadden
7  register with you regarding Ms. Riley-Jamison?
8  A  I can only characterize those by general
9  type, not by specifics, that Ms. Riley-Jamison was
10 docking her for time, or was checking on her leave
11 or -- and that's by way of general
12 characterization; in other words, that there were
13 issues with leave. I was aware that Vanessa had
14 long -- at the time that these conversations that
15 I can recall were taking place, that Vanessa was
16 long past any actual leave she had coming, and I
17 would -- every time I checked, which was two or
18 three, four times, something like that, I would
19 find out what was going on, and it was clear to me
20 that we were doing -- "we," the firm -- were doing
21 exactly what we should have.
22 Q  Did Ms. McFadden ever complain to you

**Page 35**

1  about receiving an excessive amount of e-mails
2  from Ms. Riley-Jamison?
3  A  I never heard any such complaint.
4  Q  Did Ms. McFadden ever show you a series
5  of e-mails from Ms. Riley-Jamison?
6  A  I have no recollection of seeing any e-
7  mail from Ms. Riley-Jamison to Vanessa.
8  Q  Did Ms. McFadden ever complain to you
9  that she believed she was being discriminated
10 against?
11 A  The closest she would come to saying
12 things that -- along those lines is, she would say
13 something to the effect that, "There are things
14 going on here that you just don't know about."
15 That was, sort of, the general characterization,
16 "I know it, but you don't. And everybody else
17 knows it, but you don't."
18 Q  Did she ever say that she was being
19 treated differently with respect to leave than
20 other legal secretaries?
21 A  She said, on at least one occasion, that
22 -- I don't remember the subject, whether it was

**Page 36**

1  leave or some other related issue with the firm --
2  but that she was being treated differently from --
3  actually, I do remember. It related to the
4  disability claim, not to leave, that I recall, and
5  that we were doing for others what we wouldn't do
6  for her. She gave me some specifics, on that one
7  case. I checked, and she was completely wrong.
8  We had done absolutely nothing remotely like what
9  she was describing.
10 Q  Do you recall the name of the other
11 employee, or employees, she referred to?
12 A  She alluded, generally, to two or three
13 other employees, who, at various points, had
14 gotten -- whose names I cannot recall right now.
15 There was a former word-processor -- her name was
16 Wanda Payton -- who had to move to the
17 Philadelphia office, and, I heard later, had gone
18 on disability. And I remember Vanessa telling me
19 that an employment lawyer in -- one of our
20 partners -- I think, Maureen Rayborn -- had
21 intervened with UNUM, the disability carrier, to
22 get Ms. Payton her disability claim. I contacted

**Page 37**

1  -- I was aware that Vanessa was having an issue
2  with UNUM -- I contacted Ms. Rayborn, whom I knew.
3  She said, "I never heard anything about it, never
4  picked up the phone, didn't have anything to do
5  with it." So, basically, what Vanessa was telling
6  me turned out not to be accurate.
7  Q  Any other employees Ms. McFadden
8  compared herself with respect to disabilities?
9  A  She -- yes. There was a receptionist --
10 sadly, whose name I've forgotten, and --
11 Q  Would that have been Betty Ann Hahn?
12 A  Yes, Betty Ann Hahn, and a woman that
13 worked in -- Casey Briscoe -- I believe, are the
14 other two names -- or the names I have any
15 recollection of.
16 Q  When Ms. McFadden said to you that there
17 were things going on that you didn't know about,
18 and you construed that to perhaps imply
19 discrimination, what, if anything, did you do?
20 A  I didn't construe it "to, perhaps, imply
21 discrimination." Let me correct that. I
22 construed it that there was a -- an issue. I had

10 (Pages 34 to 37)

Charles Henck                                                                October 31, 2006
Silver Spring, MD

Page 46

1  disability in the fall of 2003, was she performing
2  the essential functions of her job?
3     A   The rather limited things that I had
4  done before -- the answer is -- the honest answer
5  is "not really." She was gone too much. It was
6  something I was certainly willing to do, which was
7  find other ways to cover -- there were other
8  secretaries -- "Will you put together this package
9  of materials to mail out?" -- call on other people
10 to do my time sheets, call on other people to
11 handle billing for me. If Vanessa was in, you
12 know, she did -- she always did those things well,
13 but she was increasingly not available to do them;
14 and so, I often had to make do to -- which,
15 frankly, wasn't --
16    Q   So, in her absence, you would either ask
17 other support staff to help you or do it yourself,
18 is that fair to say?
19    A   Yes.
20    Q   When she did report to work, was she
21 performing the essential functions of her job, in
22 2003 --

Page 47

1     MR. DiMURO: Before she --
2     BY MS. MURRAY:
3     Q   -- before she went out on disability?
4     A   Before she went out on disability. If I
5  asked her to do my time sheets and she was able to
6  sit at her desk and do them, she did them; if I
7  asked her to do the -- to set up bills for two or
8  three clients, and she was there, she did them.
9  And, as far as I can recall, she did them fine.
10    Q   Prior to Ms. McFadden going out on
11 disability, did she inform you that she would be
12 taking a leave --
13    A   Yes.
14    Q   -- of absence? What reasons, if any,
15 did she tell you for why she was taking the leave?
16    A   As I recall the conversation, she
17 stepped into my office, told me she was going on
18 disability, that she really had to. And I told
19 her I thought that was good, that I was very
20 concerned about her health, and she needed to take
21 care of her health or she wasn't going to do
22 anybody any good.

Page 48

1     Q   During that conversation, did either of
2  you discuss an expectation of her return to work?
3     A   Not that I specifically recall.
4     Q   After her departure, for disability
5  reasons, in the fall of 2003, did you have
6  communication with Ms. McFadden, through May of
7  '04?
8     A   There were -- and I can't be certain of
9  the time; it may have been within that timeframe
10 -- but there were two or three times after she had
11 gone out on disability that she stopped by the
12 office, would sit down, and we would talk about
13 her kids and my kids, and how she was doing, and
14 how Mack was doing. She stopped by, one time, and
15 wrote me a check to repay some loans -- personal
16 loans I made to her. She seemed relatively
17 chipper at the time. And that -- I can think of
18 two instances, there may have been three, or
19 possibly -- but that happened at least once or
20 twice, but I can't be certain it's within that
21 time.
22    Q   During any of the two or three occasions

Page 49

1  that you just referenced, did she indicate when
2  she would return back to work, or if she would
3  return back to work?
4     A   I don't recall her ever indicating when,
5  or if, she would return.
6     Q   You referenced her repaying a loan --
7  personal loan to you, is that correct?
8     A   Yes.
9     Q   How many personal loans did you make to
10 Ms. McFadden?
11    A   I made two.
12    Q   When were those loans?
13    A   I don't recall, specifically. It was --
14 it was -- in each case, it was immediately after
15 she had told me that she was not paying some bill
16 that I thought was key. She was upset. And I
17 believe the amounts -- it happened on two
18 different occasions -- I believe the amounts were
19 $2500 and $2,000. I got a checkbook, I wrote her
20 a check.
21    Q   Did she repay one or both of those
22 loans?

13 (Pages 46 to 49)

Page 50

1  A  She stopped by and repaid both of those
2  loans. She wrote me a check. If I've got the
3  numbers right, it was 4500 bucks.
4        [Whereupon, a document was marked
5         as Henck Exhibit Number 3 for
6         purposes of identification.]
7     BY MS. MURRAY:
8  Q  The court reporter has handed you a
9  document that is marked as Henck Exhibit 3. Can
10 you identify this document?
11 A  It is a memorandum, which I -- which I
12 signed. And I can recall -- I recall sending
13 this. She had asked me, and insisted, that I
14 produce -- I had simply written her a check and
15 said, "Pay me back when you can." She insisted
16 that I produce a note. And so, I -- outside my
17 bailiwick -- I found a form of note, which I
18 prepared and filled in zero as the interest rate.
19 And this is a memo, pursuant to which I sent her a
20 check. This was -- I clearly sent her a check and
21 copies of the note and any personal --
22    MR. DiMURO: I thought tax lawyers,

Page 51

1  that's all they did was forms.
2     THE WITNESS: No, not what I do.
3     [Laughter.]
4     BY MS. MURRAY:
5  Q  Does the copy at the bottom of this
6  exhibit represent a check that she tendered -- you
7  tendered to her, a form of a loan?
8  A  Yes.
9  Q  And, as we sit here today, does Ms.
10 McFadden owe you any money?
11 A  She does not owe me any money.
12 Q  While Ms. McFadden was out on
13 disability, did you make a request of any firm
14 employee to contact Ms. McFadden?
15 A  There was one occasion that I can recall
16 in which I was speaking with Janet Craig, who I
17 knew, like me, was very concerned about Ms.
18 McFadden's health. I was aware that Janet had --
19 lives well south on I-95, Stafford or Dale City,
20 something like that, and had traveled up to
21 Washington, or Southeast, wherever Ms. McFadden
22 lived, and had helped her do things, and, at one

Page 52

1  point, I think I had bought an appliance for her
2  to install in one of her homes. And, as I recall
3  the conversation, Ms. Craig was -- had stuck her
4  head in my office, said she was going to visit
5  Vanessa; and it was some point after the
6  conversation I had had with Vanessa about not
7  letting her houses get foreclosed on, which was --
8  according to this memo, was the reason for that
9  check for the $2,000, "Make sure you pay your
10 mortgage. Do something." And I said -- the
11 response I got from Vanessa, when I said that, had
12 been similar to the response she gave to a lot of
13 things, which was, "I've got it under control."
14 And, frankly, I didn't believe she had it under
15 control. I said, "Please encourage Vanessa to do
16 something" -- words to that effect -- "to do
17 something about the houses so she doesn't lose
18 them."
19 Q  In your conversation with Ms. Craig, did
20 you discuss placing Mr. McFadden in hospice care?
21 A  The subject of Mr. McFadden's illness
22 was -- I knew that she had discussed this many

Page 53

1  times with Ms. Craig. They were friends. And she
2  certainly discussed it with me many times. And we
3  were both amazed and pleasantly surprised, given
4  what we had heard about Mack's -- Mr. McFadden's
5  illness, that he was still alive, because he -- he
6  was -- early in the process, she had indicated she
7  put him -- that she'd -- that he was in hospice
8  care, which I understand generically means that he
9  was expected to have less than 6 months to live,
10 and he certainly would not have -- if that had
11 been accurate, would not have survived to see any
12 of his kids graduate from college, and he was able
13 to see both of those things. But what we heard --
14 or at least what I heard; I don't know what Ms.
15 Craig heard -- but what I heard was that Mack was
16 deteriorating, that there was this problem and
17 that problem. And I think I -- I recall talking
18 with Janet about, "I wonder if they're going to
19 put him in hospice again, or whether he should be
20 in hospice," or something to that -- I believe
21 that was the general direction of the
22 conversation.

14 (Pages 50 to 53)