```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MARYLAND

 3     -------------------------------X

 4     VANESSA A. McFADDEN,            :

 5            Plaintiff,               :

 6       v.                            : Civil Case No.

 7     BALLARD SPAHR ANDREWS &,        : 05cv2401 (RJL)

 8     INGERSOLL, LLP, et al.,         :

 9            Defendants.              :

10     -------------------------------X

11

12                              Silver Spring, MD

13                              October 31, 2006

14

15          Deposition of MARGARET RILEY-JAMISON, a

16     witness herein, called for examination by counsel

17     for Plaintiff in the above-entitled matter, taken

18     at The Law Offices of T. W. Murray, 1111 Bonifant

19     Street, Silver Spring, Maryland 20910, at 10:12

20     a.m., on Tuesday, October 31, 2006, reported by

21     Ray Heer III and transcribed under his direction.

22
```

EXHIBIT 4

## Page 14

1  recruitment, employee relations. I'm the point of
2  contact for benefits. I do summer associates for
3  the next -- the first-years coming in, so I do the
4  summer associate program, and then the fall
5  recruitment for that.
6    Q   Do you have any payroll
7  responsibilities?
8    A   No.
9    Q   And who is your supervisor?
10   A   Wendy Iversen.
11   Q   Has she been your supervisor since March
12 of 2002 until the present?
13   A   Yes.
14   Q   Does the firm have other offices?
15   A   Yes.
16   Q   And I understand there's a Philadelphia
17 office.
18   A   That is our main office.
19   Q   Does that office also have a human
20 resources manager?
21   A   There's a national director of human
22 resources.

## Page 15

1    Q   Who is that person?
2    A   John DiBattista.
3    Q   What is Ms. Iversen's job title?
4    A   Office administrator.
5    Q   Does Mr. DiBattista oversee, in any way,
6  your activities?
7    A   I suppose you'd say it's a dotted line.
8  I work with him on issues. I would call issues in
9  to him. I would discuss things, at times, with
10 both Wendy and John.
11   Q   Who is Ms. Iversen's supervisor?
12   A   Well, on paper I suppose it would be
13 Mark Langdon, the executive director of the firm.
14 In essence, we all report to partners, but --
15   Q   Do you report to partners?
16   A   Partners weigh in on my evaluation, as
17 well as my -- as my -- the administrator.
18   Q   What evaluations do you conduct?
19   A   Staff, nonpartner -- the nonlawyers.
20   Q   You evaluate their performance?
21   A   I coordinate their evaluations. There's
22 very few people that directly report to me. I

## Page 16

1  coordinate evaluations for staff.
2    Q   Do you know of Vanessa McFadden?
3    A   Yes.
4    Q   How did you come to know her?
5    A   I -- probably the first time I met
6  Vanessa -- I don't remember if it was when I was
7  at Red Cross or not -- I'm -- her son was one of
8  my interns. But then I met Vanessa -- I remember
9  meeting Vanessa as a secretary at Ballard Spahr.
10   Q   What was her official job title?
11   A   Legal secretary.
12   Q   When you joined the firm, in March 2002,
13 Ms. McFadden was already employed in that capacity
14 at the firm, is that correct?
15   A   Yes.
16   Q   Did you make any assessments about Ms.
17 McFadden's qualifications to remain as a legal
18 secretary when you joined the firm?
19   A   No.
20   Q   Did you make any assessments about legal
21 secretaries' suitability to be retained in the
22 firm once you came onboard?

## Page 17

1    A   I did not make any assessments. I
2  talked to -- I was tasked by the managing partner
3  to go around and talk to every partner, and I did
4  that. And there were some folks who had issues.
5  And one secretary that I can remember -- I don't
6  remember any other secretarial issues -- but there
7  was one secretary, in specific -- and I --
8  actually, I think that's probably the only person
9  I didn't assess. I mean, I took their feedback if
10 they weren't particularly happy with their skills.
11   Q   And who is that individual, or who was
12 that secretary?
13   A   Lorraine Hegi.
14   Q   And what, if anything, did the firm do
15 in response to partners' displeasure with her
16 performance?
17   A   I don't believe she worked for partners
18 at the time. I believe she worked for, you know,
19 counsel. I actually don't remember who she worked
20 for. I would have to say I don't remember. But I
21 remember that there were some issues with her
22 performance. And shortly after having

Margaret Riley - Jamison  October 31, 2006
Silver Spring, MD

Page 38

1  were you asking status or the actual amount of
2  time that she worked? I don't know if it matters
3  in '02, but there's a difference between status
4  and actual time.
5       MS. MURRAY: Well, we can -- I can
6  clarify that.
7       BY MS. MURRAY:
8    Q   The 35-hour work week is her standard
9  work week as a full-time legal secretary, is that
10 right?
11   A   Thirty-five hours is full-time.
12   Q   And did Ms. McFadden pretty much work
13 that schedule in 2002, taking into account
14 vacation and other leave benefits?
15   A   Yes.
16   Q   Who makes the hiring decisions for the
17 legal secretaries?
18   A   If they work for lawyers, the lawyers
19 make the hiring decision.
20   Q   Are you involved in that at all?
21   A   Sure.
22   Q   What role do you play?

Page 39

1    A   I recruit for the position. I put
2  candidates in front of the attorneys, or I give
3  them resumes. It depends upon their preference.
4  I schedule interviews. I participate in
5  interviews, if they want me to, and I work with
6  either the individual directly, or the recruiter,
7  to make the offer, and then bring them into the
8  firm.
9    Q   Who makes decisions with respect to
10 terminating legal secretaries at Ballard Spahr?
11   A   Again, if they're working for lawyers,
12 the lawyers.
13   Q   There is no central body who approves or
14 disapproves a hiring decision of a partner?
15   A   No.
16   Q   Is there any central body within the
17 firm that approves or disapproves termination
18 decisions for legal secretaries?
19   A   I keep Wendy Iversen and Allan Winn
20 informed of anything, whether we're hiring someone
21 or letting someone go. I would run that by both
22 of them.

Page 40

1    Q   Who has final say?
2    A   I suppose you're asking if that's Allan
3  Winn, but he generally -- if a lawyer -- if the
4  person -- if a lawyer is unhappy with their
5  secretary's performance, Allan would support that
6  decision.
7    Q   Who makes decisions with respect to
8  legal secretaries' leave?
9    A   What decisions? Clarify your question
10 for me, please.
11   Q   Who makes the decision whether a legal
12 secretary may take a leave of absence from work?
13   A   There's a leave-of-absence form that I
14 give to any employee, lawyer, or administrative,
15 any staff member, and that would be sent up to
16 human resources, John DiBattista.
17   Q   So, if a legal secretary wants to take a
18 day of vacation, they have to fill out a leave-of-
19 absence form and --
20   A   I'm sorry, that is not -- that is not
21 the question. You asked me who makes the decision
22 for a leave of absence, not a day of leave or

Page 41

1  vacation, so I answered the question of who makes
2  the decision for a leave of absence, which is a
3  period of time away from the firm.
4    Q   What period of time were you referring
5  to?
6    A   It could be Family Medical Leave, it
7  could be leave of absence for no pay, it could be
8  for -- I would have to see the form.
9    Q   Why would you need to see the form?
10   A   You asked me the types of leave, and,
11 off the top of my head, I gave you the types of
12 leave on the form. There may be others. I don't
13 know them off the top of my head.
14   Q   So, on the form, there's all the types
15 of leave that can be taken?
16   A   For a leave of absence.
17   Q   Is that yes?
18       MR. DiMURO: No. Objection to form.
19 That was a no. You're missing each other on the
20 definition of a "leave of absence."
21       THE WITNESS: Are you asking me leave --
22 take a day of leave or are you asking --

11 (Pages 38 to 41)

Alderson Reporting Company
1-800-FOR-DEPO

Page 42

1    MS. MURRAY: Let's stick with leave of
2    absence right now, since you made the distinction.
3        BY MS. MURRAY:
4    Q   When would a legal secretary need to
5    complete a leave-of-absence form in order to take
6    a leave of absence from work?
7    A   When someone comes to me and they -- for
8    maternity, slash, Family Medical Leave, or if they
9    came to me with a medical situation and said, "I
10   need to be out for a period of time for myself or
11   someone else in my family, I'm taking a month off
12   work," for whatever reason, those would all be
13   leave of absence.
14   Q   You referenced a form. Can you
15   describe the form to me, please?
16   A   It's a one-page form. When people check
17   off the dates for the type of leave, and then they
18   check off the dates, the beginning date and end
19   date, they complete that, they give it to their
20   supervisor. There's a supervisory approval box.
21   Q   Does that form have a title?
22   A   I believe it is called a Leave of

Page 43

1    Absence Form.
2           [Whereupon, a document was marked
3            as Jamison Exhibit Number 1 for
4            purposes of identification.]
5        BY MS. MURRAY:
6    Q   Handing you a document that has been
7    marked by the court reporter as Jamison 1. Can
8    you identify that document?
9    A   The Leave of Absence Request Form.
10   Q   Was this form available for use by legal
11   secretaries in the years 2002 and 2003?
12   A   I do not believe it was available in
13   2002. I believe it was available in 2003.
14   Q   Was there a different form in use in
15   2002?
16   A   Actually, I take that back. I don't
17   know the date. I didn't create the form. I don't
18   know the date of availability.
19   Q   Have you seen Exhibit 1 before?
20   A   Yes.
21   Q   Can you identify what it is for the
22   record?

Page 44

1    A   It's -- Vanessa McFadden's completed
2    this form to take a leave of absence. She's
3    checked "Other" for long-term disability, in the
4    comments section.
5    Q   Did she fill that out correctly?
6    A   I'm not -- it looks fine to me, but I'm
7    not the one it goes to.
8    Q   You said you forward the form on to John
9    DiBattista in Philadelphia. Is that correct?
10   A   Uh-huh.
11   Q   What happens after that, typically?
12   A   It would depend upon what boxes were
13   checked, but basically I would forward any leave
14   records or -- to them. And, other than that, it's
15   administered out of Philadelphia.
16   Q   Are you informed of Philadelphia's
17   decision?
18   A   Sure. They would probably tell me. I
19   mean, but -- I've never known one to be denied, so
20   they would tell me --
21   Q   You made a distinction, in your answer,
22   between "leave of absence" and, presumably, other

Page 45

1    forms of leave.
2    A   Uh-huh.
3    Q   What other forms of leave are available
4    to legal secretaries at Ballard Spahr?
5    A   Currently?
6    Q   Not currently. In 2002-2003.
7    A   There would have been vacation, sick,
8    personal, floating holidays, jury duty,
9    bereavement, military.
10   Q   Is there a set number of days available
11   to each legal secretary, or does that depend on
12   years of service with the firm?
13   A   I believe it's both, and we're under a
14   different leave policy, so right now I can't quote
15   the set number. But, yes, at the time, there
16   would have been a set number for under 10 years of
17   service, I believe was the number, and over 10
18   years of service.
19   Q   Do you recall a set number of hours
20   available for legal secretaries, over 10 years of
21   service, in 2002-2003?
22   A   I don't. I'm sorry.

Margaret Riley - Jamison                                                October 31, 2006
Silver Spring, MD

Page 46

1   Q   What's the procedure for legal
2   secretaries to utilize the forms of leave that you
3   discussed?
4   A   There is a -- I don't know the title of
5   it, but a leave form, a leave -- I think it's a
6   leave -- it might be very similar -- it might be a
7   leave request form -- that they would complete,
8   have their lawyers sign off on it, and then turn
9   it in to me or to my assistant. Generally, they
10  would turn it in to my assistant.
11  Q   Was that practice consistently followed
12  in the year 2002?
13  A   Uh-huh. While I was there, I was -- I
14  mean, yes.
15  Q   Was that practice consistently followed
16  in the year 2003?
17  A   Yes.
18  Q   Was the practice, with respect to the
19  leave-of-absence request, consistently followed in
20  2002?
21  A   I don't -- you asked me about the form
22  -- I don't believe the form was in place in 2002.

Page 47

1   Q   What procedure was in place in 2002?
2   A   For what type of leave of absence?
3   Q   A disability-related leave of absence.
4   A   I would forward our leave records and
5   any initial information I had up to benefits, and
6   it would be administered out of benefits.
7   Q   How did employees, in -- strike that.
8       How did legal secretaries, in 2002,
9   request a leave of absence from work for
10  disability-related reasons?
11  A   Come to me. I would tell benefits, and
12  benefits -- I would forward the records to them,
13  and benefits would administer it.
14  Q   They would make a verbal request to you.
15  A   Like, "I need to be -- I need to have
16  surgery."
17  Q   Is that a yes?
18  A   Yes.
19  Q   Could they make that verbal request to
20  the lawyers they worked for, in 2002?
21  A   I'm -- you need to restate your
22  question. I'm very confused by what you're asking

Page 48

1   me.
2   Q   Sure. In 2002, could legal secretaries
3   at Ballard Spahr's Washington, D.C., office
4   request leave of absence from work from the
5   lawyers that they worked for?
6       MR. DiMURO: Objection to the form of
7   that question.
8       Go ahead.
9       THE WITNESS: That would not be the only
10  approval -- or the only person that would need to
11  know that. I mean, the lawyer -- the lawyer
12  saying yes is -- I don't know how to answer your
13  question.
14      BY MS. MURRAY:
15  Q   Let's do a hypothetical, then. If a
16  legal secretary asked the lawyer that she worked
17  for, for a leave of absence for a medical-related
18  reason, and that occurred, would there be
19  anything, in addition, that the employee needed to
20  do?
21  A   The lawyer would probably -- and you're
22  -- and this is all hypothetical, so I'll give you

Page 49

1   a hypothetical response -- the lawyer would
2   probably say -- refer them to human resources, and
3   I would gather the necessary paperwork and get it
4   -- or gather what records I had, medical -- leave
5   records and if there was any medical documentation
6   handed to me; otherwise, I turned everything over
7   to benefits.
8   Q   Did you retain any copies of the leave
9   records once you turned them over --
10      MR. DiMURO: Objection -- hold on --
11  objection to form. We're working in this
12  hypothetical world, so "what would have happened"
13  is, I think, the problem with the question.
14      But go ahead.
15      MS. MURRAY: I'll state my question,
16  because I didn't get to finish my entire question.
17      BY MS. MURRAY:
18  Q   It is not a hypothetical question. When
19  you would forward leave records on to
20  Philadelphia, pursuant to a leave-of-absence
21  request by a legal secretary, did you maintain
22  copies of those records?

13 (Pages 46 to 49)

## Page 50

1   A   I sent Philadelphia -- no, I did not
2   maintain copies. I maintained the original.
3   Q   What is the firm's Family Medical Leave
4   Act policy in Washington, D.C., office?
5   A   That the employee is entitled to up to
6   16 weeks.
7       MR. DiMURO: I think she asked you about
8   the Federal --
9       THE WITNESS: She said the Washington,
10  D.C., office, correct?
11      MS. MURRAY: Right.
12      THE WITNESS: We would follow the D.C.
13  Family Medical Leave Act, which is 16 weeks.
14      BY MS. MURRAY:
15  Q   What is your understanding of when an
16  employee is eligible for that leave?
17  A   My understanding of when they're
18  eligible, after they've been employed with the
19  firm for 12 months.
20  Q   What is your understanding of when an
21  employee is entitled to the 16 weeks?
22  A   Please clarify your question.

## Page 51

1       MR. DiMURO: May I suggest -- are you
2   asking what triggers their ability to go out?
3       MS. MURRAY: She said it -- the policy
4   was that employees are entitled to up to 16 work
5   weeks. So, my question is, When are employees
6   entitled to 16 work weeks of FMLA leave?
7       THE WITNESS: I'm still not sure what
8   you're asking.
9       BY MS. MURRAY:
10  Q   Under what circumstances are employees
11  at Ballard Spahr's Washington, D.C., office
12  entitled to 16 work weeks of FMLA leave?
13  A   If someone comes to me with a situation,
14  I take any initial information given to me, and I
15  turn them over to the benefits administrator.
16  Q   Do you make any decisions with respect
17  to whether an employee is entitled to this FMLA
18  leave?
19  A   I am not the decisionmaker in the Family
20  Medical Leave administration in the firm.
21  Q   How do you know when to forward an
22  employee's request on to benefits administrator

## Page 52

1   for FMLA consideration?
2   A   I forward them all.
3   Q   When an employee comes to you and makes
4   a request for a leave of absence, do you have any
5   discussions with them about the Family Medical
6   Leave Act?
7   A   I generally don't. I give them -- I
8   direct them to the policy, if they haven't already
9   looked it up, or I put them directly in contact
10  with benefits. They get information on the policy
11  from benefits, and anything they may be entitled
12  to. I forward their leave records to benefits so
13  that they can calculate.
14  Q   Is there any other time in which the
15  legal secretaries at Ballard Spahr's Washington,
16  D.C., office is informed of the firm's FMLA
17  policy?
18  A   I'm sorry, what did you just ask me?
19  Q   Are there any other times in which legal
20  secretaries in Ballard Spahr's Washington, D.C.,
21  office are informed of the firm's FMLA policy?
22      MR. DiMURO: Objection to form.

## Page 53

1       Go ahead, as best you can.
2       THE WITNESS: As best I can -- I think
3   what you're asking me is, they're given a policy
4   manual when they start with the firm, when they go
5   through orientation, or a trainer shows them how
6   to find it online -- the policy manual online.
7       BY MS. MURRAY:
8   Q   Does that complete your answer?
9   A   I'm not sure what else you're asking me.
10  That is when I would recall that someone would be
11  familiarized with the policy, other than coming in
12  to my office or calling benefits directly. I
13  don't know what else you're asking me.
14  Q   What other records, besides the leave
15  records that we discussed, does the firm maintain
16  regarding the firm's FMLA policy, besides the
17  leave records and the manual and some information
18  online?
19  A   I don't understand the question. Please
20  clarify.
21  Q   What other documents contain information
22  about the firm's FMLA policy, besides those that

14 (Pages 50 to 53)

Page 74

1   A   Typically, I do, or my assistant. In
2   2003, it would have been myself, and then the
3   people -- the two different people who covered for
4   me while I was on maternity leave.
5   Q   Who entered the data that's identified
6   in the document?
7   A   Myself and the people who covered for me
8   while I was on maternity leave.
9   Q   Let's look at the handwriting on the
10  document. Let's refer to the top, January through
11  December, 1 through 31, that graph --
12  A   Uh-huh.
13  Q   -- for lack of a better way to describe
14  it. Is -- any of the handwritten notations on
15  here belong to you?
16  A   Yes.
17  Q   Are there any handwritten notations that
18  do not belong to you?
19  A   Yes. Oh, in January? No.
20      MR. DiMURO: Well, I thought you were
21  referring to the whole graph.
22      MS. MURRAY: I was. I was trying to

Page 75

1   save time, but --
2       THE WITNESS: Oh, no, no, no. I can
3   very -- be quick about this. Yes, handwritten
4   notations in the grid -- I can't be sure. I would
5   probably assume that June, July, and September,
6   where it's written "Dock" or "Half off," and all
7   of that, are not mine. That may be someone who
8   filled in for me.
9       BY MS. MURRAY:
10  Q   I direct your attention to the next
11  grid, for lack of a better term, where it lists
12  "Vacation, Personal," et cetera, down to "Total" --
13  
14  A   Uh-huh.
15  Q   -- and also goes over from January to
16  December. I direct your attention to the line
17  "FMLA." Do you see that there?
18  A   Uh-huh.
19  Q   Who put in, if you know, the numbers on
20  that line?
21  A   I don't know for sure who put those in.
22  Q   Do you recall doing so?

Page 76

1   A   No, that's not my handwriting.
2   Q   What do these numbers signify in the row
3   for FMLA?
4   A   The days off in the month that would be
5   counted towards Family Medical Leave.
6   Q   So, these are days, not hours?
7   A   No. We don't keep leave in hours.
8   Q   I asked you previously whether Ms.
9   McFadden had given you medical documents
10  pertaining to her husband. Have you otherwise
11  seen any medical documentation regarding Mr.
12  McFadden's medical condition?
13  A   I do not recall.
14  Q   Do you recall reviewing any medical
15  documents from Southeast -- Greater Southeast
16  Hospital pertaining to Mr. McFadden?
17  A   I do not recall that.
18  Q   Did you take any notes regarding Ms.
19  McFadden's request for FMLA leave for her
20  husband's medical condition?
21  A   I don't recall taking any notes.
22  Q   In 2003, Ms. McFadden worked a reduced

Page 77

1   or modified schedule to care for her husband for
2   purposes of his chemotherapy treatments, is that
3   correct?
4   A   Yes.
5   Q   Who approved that modified schedule?
6   A   I believe -- I'm not sure who came to
7   who on it, whether Charlie came to me or Vanessa
8   sought me out, but I know that I had discussions
9   with Allan Winn and Wendy Iversen and Charlie.
10  Q   What discussions did you have with Ms.
11  Iversen regarding Ms. McFadden's modified
12  schedule?
13  A   It would have probably been Wendy,
14  Allan, and I sitting down, maybe in one of our
15  management meetings.
16  Q   What do you recall from that meeting?
17  A   I don't have -- I don't recall details.
18  I remember that -- Allan and Wendy both saying
19  things like, "We need to do whatever we can."
20  Q   What do you recall from discussions from
21  Mr. Henck regarding Ms. McFadden's modified
22  schedule for the care of her husband?

20 (Pages 74 to 77)

Page 94

1  have gone up to benefits.
2      Q  Do you recall asking Ms. McFadden to
3  submit any medical documents to verify her --
4      A  I --
5      Q  -- medical condition?
6      A  I do not recall.
7      Q  In 2003, did you have any discussions
8  with Ms. McFadden regarding a leave of absence for
9  her own medical condition?
10     A  I don't recall. Let me please clarify.
11 I don't recall specifics, and I also went out on
12 maternity leave, so I'm very unclear as to when
13 all of this took place. I do not believe I
14 discussed leave of absence with Vanessa.
15     Q  Are you aware that Ms. McFadden took a
16 leave of absence in October of 2003?
17     A  When I returned to work on October 13th,
18 I believe Vanessa told me this was her last week,
19 her last day of work. She was going out on
20 disability.
21     Q  What, if anything, did she discuss with
22 you about her medical condition?

Page 95

1      A  Vanessa would -- I mean, I remember that
2  conversation, standing -- she caught me in the
3  hallway and sat and told me about her medical
4  condition. Vanessa was very free with her
5  information about her medical condition.
6      Q  And that occurred on or around October
7  13th, 2003?
8      A  On my first or second day back, yes.
9      Q  After your conversation with Ms.
10 McFadden, did you draw conclusions about her
11 ability to continue to work?
12     A  That was only handled out of
13 Philadelphia. I was taking instruction from them.
14     Q  After your conversation with Ms.
15 McFadden, did you consider her to be disabled?
16        MR. DiMURO:  Objection to the form of
17 that question.
18        Go ahead.
19        THE WITNESS: No. It wasn't my call.
20 Vanessa told me she couldn't be at work.
21     BY MS. MURRAY:
22     Q  Did she tell you why she couldn't be at

Page 96

1  work?
2      A  I'm sure she did. I don't recall
3  details.
4      Q  What was your response to her providing
5  this information to you?
6      A  As it always was, very sympathetic. I
7  felt awful for her.
8      Q  Did you provide any advice to Ms.
9  McFadden about how she could go about getting a
10 leave of absence from work?
11     A  That would have all been -- when I came
12 back to work, her dates of leave and everything
13 were already set and handled by either the person
14 taking my place -- but I would assume
15 Philadelphia. I was not in the loop on that.
16     Q  Were you involved in finding any
17 replacements, if any were provided, when Ms.
18 McFadden did go out on leave?
19     A  I don't believe we did anything to --
20 other than local coverage or put someone at the
21 desk as much as we could for months.
22     Q  Did you expect Ms. McFadden to return to

Page 97

1  work?
2         MR. DiMURO:  Objection, form. May I ask
3  a timeframe?
4         MS. MURRAY:  After she left work, in
5  October 2003.
6         THE WITNESS:  Sure, we were hopeful.
7      BY MS. MURRAY:
8      Q  What discussions, if any, did you have
9  with firm partners regarding keeping her position
10 open for her, should she return?
11     A  I don't recall specifics, but we were
12 absolutely committed to keeping that position
13 open, and we did.
14     Q  Going back to that conversation that you
15 had with Ms. McFadden around October 13th, 2003,
16 was there any discussion of FMLA during that
17 conversation?
18     A  I don't recall.
19     Q  So, even though she told you about a
20 medical condition, which would prevent her from
21 working, you didn't inform her anything about
22 FMLA.

25 (Pages 94 to 97)

### Page 102

1  2004  How was that termination communicated to
2  Ms. McFadden?
3     A   By John DiBattista, when he asked her if
4  she could return to work.
5     Q   And how do you know that?
6     A   Because it was a conference call.
7     Q   Did you participate on that call?
8     A   I sat in on the call.
9     Q   Who all participated on the call?
10    A   Wendy Iversen, Fern Forman, John
11 DiBattista, myself.
12    Q   Who made the decision to terminate Ms.
13 McFadden?
14    A   Vanessa. When she was asked to return
15 -- she was told that we had a position for her,
16 and she said -- I don't remember specifics, but --
17 "I can't return to work. I'm disabled. I'm not
18 coming back."
19    Q   Who, at Ballard Spahr, made the decision
20 to terminate Ms. McFadden?
21    A   The policy, because she was unable to
22 return to work. So, John DiBattista, who would

### Page 103

1  administer the policies.
2     Q   To your knowledge, did Charles Henck
3  have any involvement in the decision to terminate
4  Ms. McFadden?
5     A   Charlie -- I -- to my knowledge, no.
6  Was he aware of the situation? Yes.
7     Q   Are you aware of whether he was
8  consulted with respect to whether to terminate Ms.
9  McFadden?
10    A   I would -- I mean, you're asking
11 specifics. I don't -- it wouldn't have been me
12 that went in to him, no. But would someone have?
13 Probably yes. I'm sure someone did. Wendy --
14       MR. DiMURO: The question was, "Do you
15 know?"
16       THE WITNESS: No. It wasn't me. I
17 didn't consult with him.
18       BY MS. MURRAY:
19    Q   Are you aware of anyone else consulting
20 with him?
21    A   I don't know.
22    Q   As best as you recall, tell me

### Page 104

1  everything you recall -- you remember being said
2  at that conference call that you discussed with
3  John DiBattista, Iversen, Forman, and Ms.
4  McFadden, in May of 2004.
5     A   I do not recall many details of the
6  conversation. I made notes of the conversation.
7     Q   What do you recall?
8     A   Of that conversation? I recall that we
9  called Vanessa, because she wanted to discuss when
10 she was "going to be terminated." Those were her
11 words. So, I called John. John, I believe -- I
12 mean, John -- I don't remember the conversation.
13 I'd have to look at my notes.
14    Q   How do you know Ms. McFadden wanted to
15 have this discussion?
16    A   She called me and said, "Where's my
17 termination letter?" That's how she started the
18 conversation.
19    Q   Did you know what she was referring to?
20    A   I asked her what she was talking about.
21    Q   What did she say?
22    A   She said, "I" -- from my notes, I would

### Page 105

1  know it, but from what I remember, of looking at
2  my notes, she said, "Where's my letter of
3  termination? By my calculation, my Family Medical
4  Leave should have ended May 6th, or something like
5  that. It's May 13, May 14, whatever. I should
6  have had a letter. The employee manual says I
7  need a letter of termination." And I said,
8  probably back -- I must have said, "I'll have to
9  get with John on that, Vanessa."
10    Q   Sometime between October 2003 and the
11 time of this conversation, were you aware of what
12 periods of time Ms. McFadden was entitled to FMLA
13 leave?
14    A   I was aware she was eligible for 16
15 weeks of Family Medical Leave.
16    Q   Did you perform any calculations of when
17 the leave would start or end?
18    A   Well, I probably did, myself, but I
19 wasn't the one administering it. It would have
20 come out of benefits, and they would have sent me
21 something saying when the leave started and ended.
22    Q   What responsibility, if any, did you

### Page 106

1  have to notify legal secretaries regarding the --
2  their FMLA period of time?
3  A  If someone came to me with a situation,
4  I would report it up to benefits, and I would let
5  them send the official paperwork -- the forms, the
6  policy.
7  Q  Was it your understanding that someone
8  in Philadelphia was to notify the employee of
9  their FMLA leave entitlement start and end date?
10  A  Absolutely
11  Q  What, if anything, is your understanding
12  of what occurs after an employee's FMLA leave
13  expires at Ballard Spahr?
14  A  My understanding is -- I'm not going to
15  quote policy, because I don't know it, exactly --
16  but I believe it's that they're entitled to an
17  additional 3 months leave of absence, and then
18  there's an additional month or something in there;
19  that they're entitled to request an additional
20  leave of absence. So, it's -- maybe it's up to
21  the 3 months. I don't have the policy in front of
22  me. And that would be handled from John

### Page 107

1  DiBattista. I would have notified him. He got
2  the forms to her. She completed the form.
3  Q  So, it's your testimony that it's
4  Philadelphia's responsibility to notify Ms.
5  McFadden when her FMLA leave expired?
6  A  They administered Family Medical Leave,
7  yes.
8  Q  So, just to be clear, the "they" you're
9  referring to is John DiBattista and Fern Forman,
10  in 2004.
11  A  Yes
12      [Whereupon, a document was marked
13      as Jamison Exhibit Number 5 for
14      purposes of identification.]
15  BY MS. MURRAY:
16  Q  You've been handed a document that has
17  been marked as Jamison Exhibit 5, which is a 3-
18  page document. Please review the document and let
19  me know when you have completed your review.
20  A  I'm done.
21  Q  Can you identify the first two pages of
22  Exhibit 5 for the record?

### Page 108

1  A  The first two pages are the conversation
2  notes from the conference call that we had with
3  Vanessa in which we were talking -- asking her --
4  telling her she had a position with the firm.
5  Q  Identify the last page of Exhibit 5
6  A  That's the conversation that I had with
7  Vanessa when she called me asking for her
8  termination letter, which then caused -- you know,
9  I told her -- I must have said something along the
10  lines of, "I'll get with John, and we'll get with
11  -- he or I will get back to you," and then we had
12  a conference call with her, that afternoon.
13  Q  You just testified that the May 13th
14  conversation with Ms. McFadden, it was
15  communicated to her that there was a job for her,
16  a position for her. Is that correct?
17  A  Yes. Moving forward, but asked, "Would
18  you like to come back to work in an ARC position?"
19  Q  What's an ARC position?
20  A  That's what we call our administrative
21  resources center, where we do word-processing, and
22  we put floating secretaries there.

### Page 109

1  Q  Prior to the May 13th conversation, are
2  you aware of whether Ms. McFadden submitted a
3  leave-of-absence form to the firm?
4  A  Yes, I am aware of it, because I think
5  Vanessa actually sent it back to me, and I had to
6  forward it to John. It's the same as this form,
7  here.
8  Q  We'll come back to that.
9      Have you seen any medical certification
10  submitted by Ms. McFadden in support of her
11  request for a leave of absence starting in October
12  of 2003?
13  A  October of 2003? I wouldn't have
14  received any medical certification. She -- I was
15  on maternity leave. I came back She told me she
16  was leaving, that week. Someone else handled it.
17  Q  Between the time that she left and the
18  time of your conference call with Ms. McFadden, in
19  May 2004, had you seen a medical certification
20  submitted by Ms. McFadden?
21  A  I don't recall that.
22      [Whereupon, a document was marked

**Page 118**

1  document like Exhibit 9 explaining the FMLA leave
2  -- FMLA coverage period, is that --
3      MR. DiMURO: Objection to that --
4      BY MS. MURRAY:
5  Q  -- fair to say?
6      MR. DiMURO: Objection to that question.
7  That's not what I heard.
8      But you tell her.
9      THE WITNESS: Each employee that Fern,
10 or the current benefits administrator worked with
11 on Family Medical Leave would have a memo back,
12 and it would be -- and the copies that are sent to
13 me, I would put in the file, in the personnel
14 file.
15     BY MS. MURRAY:
16 Q  Prior to the conversation -- the
17 conference call, rather, with Ms. McFadden, on or
18 around May 13th, 2004, you were aware that she had
19 a medical condition that rendered her unable to
20 work. Is that correct?
21 A  Yes.
22 Q  And at that time -- "that time,"

**Page 119**

1  referring to May 13th, 2004 -- you were aware that
2  she had been out on FMLA leave, correct?
3  A  Yes.
4  Q  And also at that time, May 13th, 2004,
5  had Ms. McFadden made a claim for long-term
6  disability benefits?
7  A  Yes. I believe -- yes.
8  Q  During the May 13th conference call, was
9  there any discussion regarding the reassignment of
10 Ms. McFadden to a vacant position at Ballard
11 Spahr?
12 A  We said what I wrote down in my notes.
13 I don't know any other -- anything else than I see
14 in my notes, "Would you like to come back to work
15 in an ARC position?"
16 Q  What was Ms. McFadden's response to
17 that?
18 A  My notes say, "The doctors know I'm
19 physically disabled -- mentally and physically
20 disabled. Not coming."
21 Q  Were any other positions at Ballard
22 Spahr discussed in that conference call, to your

**Page 120**

1  recollection?
2  A  I don't recall.
3  Q  Was there any reasonable accommodation
4  offered to Ms. McFadden during that conference
5  call?
6      MR. DiMURO: Objection to the form of
7  that question and the legal definition of
8  "accommodation."
9      But, go ahead and answer, as best you
10 can.
11     THE WITNESS: Vanessa said, "I'm not
12 coming back to work." There was no discussion,
13 then, of -- she said she wasn't coming back to
14 work, and she wanted to know when she was going to
15 get a letter saying that she was terminated.
16     BY MS. MURRAY:
17 Q  Did Ms. McFadden, during that conference
18 call, mention the receptionist position at the
19 firm?
20 A  Vanessa said she wasn't coming back to
21 work. She didn't mention any positions.
22 Q  What are the -- strike that.

**Page 121**

1      When you had the conference call with
2  Ms. McFadden on May 13th, 2004, who was working as
3  the firm's receptionist?
4  A  I don't know if -- I believe we had a
5  temp in place.
6  Q  Who was the incumbent -- the permanent
7  employee?
8  A  Betty Ann Hahn was also out on long-term
9  disability. We filled her position with a temp
10 until we knew whether she could return to work or
11 not.
12 Q  When did Ms. Hahn go out on disability?
13 A  I don't recall exact dates. I believe
14 she went out when I was on maternity leave. She
15 went back, so -- I don't remember. She was out
16 twice. She went out, then, when -- after I went
17 back. And then she went back out again. I don't
18 remember.
19 Q  What are the essential functions of the
20 receptionist job?
21 A  Greet visitors, answer phones, keep
22 track of courier, visitors, sign-in sheets for

Margaret Riley - Jamison                                              October 31, 2006
                        Silver Spring, MD

Page 174

1  Q  What did you say about being surprised?
2  A  Probably, "I can't believe it."
3  Q  During your May 13th, 2004, conference
4  call with Ms. McFadden and the other individuals
5  we've discussed, did she request a reasonable
6  accommodation?
7  A  No, she requested a letter of
8  termination and wanted to know how soon it could
9  be there.
10  Q  Are you aware that the firm is permitted
11  to grant leave to employees, above and beyond that
12  which is mandated in the Family Medical Leave Act?
13  A  Yes. And she applied for that. That's
14  the leave of absence that she applied for after
15  her Family Medical Leave expired.
16      [Whereupon, a document was marked
17       as Jamison Exhibit Number 29 for
18       purposes of identification.]
19  BY MS. MURRAY:
20  Q  The court reporter is handing you a
21  document that has been marked as Jamison Exhibit
22  29. Can you identify this document for the

Page 175

1  record?
2  A  It's the same one you gave me before,
3  the leave of absence request form completed by
4  Vanessa, stating that she wanted other leave for
5  long-term disability from the period of -- or
6  through March 9th, or something like that --
7  "indefinite," she said -- from March 9th,
8  indefinitely.
9  Q  And is this the leave that you
10  understand is above and beyond that which is
11  required by the law? "The law," meaning FMLA.
12  A  This is the -- it's my understanding
13  this is the leave of absence that she can apply
14  for after her Family Medical Leave benefits have
15  been exhausted.
16  Q  Are you aware of any other employees
17  taking advantage of this additional leave, post-
18  FMLA?
19  A  The only two that come to mind is Betty
20  Ann Hahn and Casey Briscoe.
21  Q  Are legal secretaries required to call
22  in when they are out on approved FMLA leave?

Page 176

1  A  No.
2      MS. MURRAY: I don't, at this time, have
3  any additional questions. However, I reserve the
4  right to recall the witness when additional
5  documents are produced, pursuant to agreements of
6  counsel or court order. But I have no further
7  questions at this time.
8      MR. DiMURO: Okay. By our silence, we
9  do not agree that you would be able to recall Ms.
10  Riley-Jamison, but we don't need to fight about
11  that right now. Okay.
12          EXAMINATION
13  BY MR. DiMURO:
14  Q  Now, Ms. Murray asked you a question
15  about whether Ms. Briscoe was on FMLA when she was
16  terminated. Had her FMLA --
17      COURT REPORTER: Start your question
18  again, please.
19      MR. DiMURO: All right. Are you ready?
20  Okay.
21  BY MR. DiMURO:
22  Q  Ms. Murray had asked you a question

Page 177

1  about whether or not Ms. Briscoe was on FMLA when
2  she was terminated. Had -- do you recall that
3  question?
4  A  I do recall the question.
5  Q  Okay. And had Ms. Briscoe's FMLA leave
6  been exhausted, or expired, at the time of her
7  termination?
8  A  Yes.
9  Q  Okay. And Ms. Murray asked you a
10  question about whether or not Ms. McFadden could
11  fulfill the requirements of a receptionist, and
12  you mentioned something about "if she was there,"
13  or "when she was there." Do you recall that?
14  A  I do.
15  Q  Okay. Is being present at the job on a
16  reliable and -- reliable basis part of the
17  receptionist job?
18  A  It's part of the job description. I
19  believe it says "reliable and punctual."
20  Q  All right. I'm showing you Exhibit 10.
21  The word "reliable" exists in the position
22  requirements, does it not?