UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

VANESSA A. McFADDEN,

        Plaintiff,

    -vs-

                        Civil Action No.
                          1:05CV02401

BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
AND
MARGARET RILEY-JAMISON,

        Defendants.

- - - - - - - - - - - - - - X

                    Alexandria, Virginia

                    Wednesday, May 16, 2007

Deposition of:

           VANESSA A. McFADDEN

the plaintiff, called for examination by

counsel on behalf of the defendants,

pursuant to notice, taken in the law offices

of DiMURO GINSBERG, P.C. 908 King Street,

Suite 200, Alexandria, Virginia, beginning

at approximately 10:27 o'clock a.m., before

Patricia D. Staffa, a Verbatim Reporter and

Notary Public in and for the Commonwealth of

Virginia at Large, when there were present

on behalf of the respective parties:



Page 2

On Behalf of the Plaintiff:
    TERESA W. MURRAY, ESQUIRE
    THE LAW OFFICE OF TERESA W. MURRAY
    1025 Connecticut Avenue, N.W.
    Suite 1000
    Washington, D.C. 20036
    (202) 327-5477
On Behalf of the Defendants:
    BERNARD J. DiMURO, ESQUIRE
    JONATHAN R. MOOK, ESQUIRE
    JENNIFER S. KESSLER, ESQUIRE
    DiMURO GINSBERG, P.C.
    908 King Street
    Suite 200
    Alexandria, Virginia 22314
    (703) 684-4333

Also Present:
    Meg Riley-Jamison
    Constantinos G. Panagopoulos

Page 3

1           C O N T E N T S
2   WITNESS                    PAGE
3   Vanessa A. McFadden
4       Examination by Mr. DiMuro       4
5
6           E X H I B I T S
7   (Exhibits 1 through 72 were pre-marked for
8   identification. See exhibit list to be
9   provided by Mr. DiMuro's office.)
10                  PAGE
11  Deposition Exhibit No. 73       113
12  Deposition Exhibit No. 74       138
13  Deposition Exhibit No. 75       142
14  Deposition Exhibit No. 76       145
15  Deposition Exhibit No. 77       316
16
17
18
19
20
21
22

Page 4

1           P R O C E E D I N G S
2   Whereupon,
3               VANESSA A. McFADDEN
4   the plaintiff, was called for examination by
5   counsel on behalf of the defendants, and,
6   having been duly sworn by the notary public,
7   was examined and testified as follows:
8           EXAMINATION ON BEHALF OF THE
9   DEFENDANTS
10          BY MR. DiMURO:
11      Q   Would you be kind enough to state
12  your full name.
13      A   Vanessa Adams McFadden.
14      Q   And, Ms. McFadden, you're giving a
15  deposition today in a lawsuit filed by you.
16  Do you understand that?
17      A   Yes.
18      Q   Have you ever given a deposition
19  before?
20      A   No.
21      Q   Because you worked in a law firm for
22  many years, did you ever read a deposition

Page 5

1   or parts of one? Do you recall doing that?
2       A   No. I know what a deposition is,
3   but I never participated in one.
4           MR. DiMURO: Okay. So, I'm going to
5   ask some questions, and I'd appreciate your
6   full and fair answers including "I don't
7   know" or "I don't recall."
8           If I ask something that's not clear
9   to you, it's perhaps because I didn't live
10  these events or I'm misreading some record,
11  and all you have to do is ask me to clarify.
12          BY MR. DiMURO:
13      Q   Are you on any medication today that
14  you believe might affect your memory?
15      A   Yes.
16      Q   And what medication is that?
17          THE WITNESS: (To Ms. Murray) Would
18  you hand me my purse? I want to make sure
19  I'm telling him the right ones.
20          I take Vicodin every six hours.
21          BY MR. DiMURO:
22      Q   And what is that? What is that for?

Page 6

1    A    For pain.
2    Q    For pain; all right.
3    A    I take ibuprofen. It's the other
4    bigger bottle.
5         MS. MURRAY: Just the ones that you
6    think affect your memory, though.
7         THE WITNESS: And that's also for
8    pain, but I take them like an hour after I
9    take the Vicodin.
10        MR. DiMURO: All right.
11        THE WITNESS: I take Effexor, which
12   is an anti-depressant. I take Zoloft, 100
13   milligrams twice a day. I take Xanax, two
14   milligrams three times a day.
15        MR. DiMURO: All three of those
16   sound like anti-depressants to me.
17        THE WITNESS: Yes. And the
18   ibuprofen. Did I say that?
19        MR. DiMURO: You did.
20        All right. I'm going to ask her
21   about other medications in a moment.
22        MS. MURRAY: Okay.

Page 7

1
2         BY MR. DiMURO:
3    Q    Do you think those five have some
4    effect on your ability to remember things?
5    A    I'm not as swift as I used to be.
6    Q    As what?
7    A    I'm not as swift as I used to be.
8    Q    Okay.
9    A    And if you could talk a little
10   louder.
11   Q    Okay. That is a criticism I've
12   never heard. My voice usually projects.
13   Okay.
14   A    Because I only have six percent of
15   my hearing in this ear, so --
16   Q    Okay. I'll be happy to speak up.
17   A    Yes. Speak a little louder.
18   Q    Well, describe for me what effect on
19   your memory you believe the medication has
20   as best as you can describe it.
21   A    Basically, it's anti-depressants for
22   depression because of my pain level.

Page 8

1    Q    But how would you describe the
2    effect the medication has on your ability to
3    remember things?
4    A    Oh. It makes my droggy (sic) I
5    don't do my own finances anymore. My
6    daughter does them.
7         Anything done with any business or
8    anything like that in my personal life, my
9    daughter, who is my caregiver, she takes
10   care of all of that. I don't take care of
11   anything anymore.
12   Q    Well, let me ask it this way.
13        Do you recall things -- Strike that.
14        Do you find that you have difficulty
15   remembering things from five years ago,
16   let's say, 2002, 2003, 2004?
17   A    No. I mean, if you ask me a
18   question and if I can't comprehend it, then
19   I'm going to ask you to repeat the question.
20   Q    Well, "comprehend" is different than
21   "remembering."
22   A    I mean, you know, if you're talking

Page 9

1    about as far as events of what happened at
2    the time I was an employee at Ballard --
3    Q    Well, in part, yes.
4    A    -- I'm very familiar with that.
5    Q    All right.
6    A    Because I've lived through that.
7    Q    Have you read anything in the last
8    few days to remind yourself of the events so
9    that you could prepare for the deposition?
10   A    For today, yes, with my attorney
11   yesterday.
12   Q    And what did you review? I don't
13   want to know what she said to you, but what
14   documents did you review?
15   A    Interrogatories and the documents
16   that I submitted through discovery.
17   Q    Did you see anything that was a
18   summary or a chronology of the events?
19   A    I don't understand what you're
20   saying.
21   Q    Sure.
22        Did you see any document in the last

Page 10

1   day or so that somebody else wrote, not you,
2   that attempted to summarize the events or to
3   put them in order?
4       A   No.
5       Q   Well, as we proceed today, if you
6   would be kind enough to make clear when you
7   do not remember something, because that is
8   an unacceptable answer or "I don't know" or
9   "I don't recall"; all right?
10      A   Yes.
11      Q   Now, where do you presently live?
12      A   I presently reside in Jacksonville,
13  Florida.
14      Q   And who lives in that -- Is it a
15  house or an apartment, or what is it?
16      A   It's a home.
17      Q   And who lives in the home with you?
18      A   My husband and my daughter.
19      Q   And what is her name?
20      A   Nicale McFadden.
21      Q   Anyone else?
22      A   I have a cat.

Page 11

1       Q   Okay. Anyone else?
2       A   That's it.
3       Q   And I thought I saw in the paperwork
4   that your son was living with you at some
5   point in time, but he doesn't currently live
6   with you?
7       A   No. I have a house in Southeast
8   Washington. My son and my other daughter
9   stay in that home.
10      Q   When did you move to Florida
11  approximately?
12      A   Around the middle of March, 2005.
13      Q   Why did you move to Florida?
14      A   For health reasons.
15      Q   What was it about Florida that made
16  it better for your health?
17      A   Most of the illnesses that I have
18  are chronic illnesses, so my doctor gave me
19  a choice. I could either live in Florida or
20  Arizona.
21      Q   I'm guessing that it was the heat
22  that he found beneficial for you?

Page 12

1       A   That would probably help me.
2       Q   And which doctor was that?
3       A   Dr. Phillip Mussenden.
4       Q   He had been your primary caregiver
5   for 20 years or so. Is that a fair
6   statement?
7       A   I saw him for a long period of time;
8   yes.
9       Q   Where did you live before you moved
10  to Florida?
11      A   Washington, D.C.
12      Q   And what address did you live at
13  just before you moved to Florida?
14      A   Could you repeat that?
15      Q   Sure.
16          Immediately prior to moving to
17  Florida, what address did you live at?
18      A   3457 Massachusetts Avenue,
19  Southeast.
20      Q   Was that a free-standing home or an
21  apartment or a townhouse? What was it?
22      A   It was a single-family home.

Page 13

1       Q   And how long had you lived there?
2       A   As of August the 15th, it's been our
3   home for eleven years.
4       Q   August the 15th of what year?
5       A   Let's see. This is 2007. Take away
6   four from 2000 --
7       Q   Oh, I see.
8       A   -- so I moved into the home in 1996.
9       Q   So, the Massachusetts Avenue
10  residence was your home from some point in
11  1996 until you moved to Florida in March of
12  '05; is that right?
13      A   No. It was exactly my home, because
14  I moved on my birthday. August the 15th is
15  the exact date that I moved into the
16  property.
17      Q   I see; okay.
18      A   So, it was on my birthday.
19      Q   So, the Massachusetts Avenue
20  residence was your home from August 15th,
21  1996 until you moved to Florida in March of
22  '05; is that right?

Page 14

1    A   Yes.
2    Q   In the years 2002, 2003, and 2004,
3   who lived with you at the Massachusetts
4   Avenue home?
5        Now, I've grouped the number of
6   years. If it's easier, because the people
7   have changed, for you to break it out year
8   by year, that's fine, too. But I'm
9   interested in those three years.
10   A   I need you to explain it different.
11   Q   Sure.
12        Who lived with you at the
13   Massachusetts Avenue address in 2002?
14   A   At the time, my daughters were in
15   college. My son was in grad school. So, it
16   was my husband and I.
17   Q   And I'm sure the children visited on
18   occasion.
19   A   Holidays.
20   Q   In 2003, who lived with you at the
21   Massachusetts Avenue address?
22   A   It was my husband and I, and my kids

Page 15

1   were still in school.
2    Q   And then in 2004, who lived with you
3   at any time at the Massachusetts Avenue
4   address?
5    A   In December -- Around about in
6   December of 2004, both of my daughters moved
7   back into the home to become my caregivers.
8    Q   That didn't happen until December of
9   '04? Is that your memory?
10   A   As far as when they moved back for
11   good.
12   Q   Do you recall that you applied for
13   long-term disability through the Ballard
14   Spahr program in some year?
15   A   From my understanding, the way that
16   it worked was my disability was paid through
17   the firm for the first 90 days.
18        And from what I can recall -- I
19   don't know the exact dates -- all of my
20   paperwork that was turned into the
21   disability company was submitted late.
22   Q   The question was do you recall that

Page 16

1   you applied for long-term disability at some
2   point while you worked at Ballard Spahr?
3        THE WITNESS:  (To Ms. Murray) I
4   don't understand what he's asking me.
5        MS. MURRAY:  Would you please
6   rephrase it.
7
8        BY MR. DiMURO:
9    Q   Let me try again, Ms. McFadden.
10        Do you recall that there came a time
11   when you applied for long-term disability,
12   that you submitted a form for long-term
13   disability?
14   A   Oh, okay. I submitted my paperwork
15   in October of 2003. Around the middle of
16   October 2003.
17   Q   And what was that paperwork that you
18   submitted? What was that for as you recall?
19   A   It was for short-term/long-term
20   disability, but it was also combined with a
21   document dealing with FMLA.
22   Q   Do you have a memory that at some

Page 17

1   point later on you applied for long-term
2   disability, that you submitted some
3   paperwork for long-term disability?
4    A   Ms. Forman took care of that.
5    Q   Well, do you recall being part of
6   that where you would sign the paperwork?
7    A   I still don't understand what you're
8   saying.
9    Q   Do you recall that there came a time
10   after you had applied for short-term
11   disability that you filled out or signed
12   other paperwork for long-term disability?
13   A   Well, on that, it's confusing to me
14   because of the way my paperwork was
15   processed, so I can't really give you an
16   accurate, accurate statement.
17   Q   But don't you have a memory of
18   asking --
19   A   Oh, no. I know the paperwork was
20   done.
21   Q   All right.
22   A   I know that the guy from Unum called

McFadden

Page 18

1  me and did a phone interview.
2  Q   Okay. That's what I'm asking you
3  about.
4      Do you have a memory of --
5  A   Yes. Okay. He called me on
6  February the 13th.
7  Q   Okay. Hold on.
8      Do you have a memory of signing the
9  paperwork for long-term disability through
10  the Unum Insurance program?
11  A   I'm not certain because it was
12  complicated  So -- Because it was like from
13  the letter that I received from the person
14  at the benefits department, Fern Forman, she
15  didn't send me -- She sent paperwork like
16  letters, one to my doctor, one to myself.
17      My short-term disability had ran out
18  the first pay in January. She didn't send
19  the paperwork out until almost the end of
20  January; okay?
21  Q   The paperwork for what?
22  A   For long-term disability.

Page 19

1  Q   Okay.
2  A   It was like just a letter that she
3  thought it was time that, you know, for me
4  to be placed on long-term disability.
5  Q   Did you disagree with the decision
6  to apply for long-term disability in January
7  of '04?
8  A   No. But what was confusing to me
9  was that Ms. Riley-Jamison called me
10  sometime in March and she told me that my
11  disability was approved.
12      I'm not exactly sure which day in
13  March, but she called me back that afternoon
14  and said, oh, I'm sorry, I made a mistake,
15  your disability has not been approved.
16  Q   And, as you later found out, she was
17  correct, that it had not been approved;
18  right?
19  A   I was only going by what she told
20  me.
21  Q   Okay. Let's back up.
22  A   So, maybe you need to rephrase it or

Page 20

1  we need to back up.
2  Q   Okay. But you need -- Ms. McFadden,
3  it would be helpful if you stayed with my
4  question and not talk about things that have
5  nothing to do with my question.
6  A   Okay.
7  Q   My question is, do you recall
8  applying for long-term disability in January
9  of '04?
10      MS. MURRAY: I believe she has
11  answered that.
12      BY MR. DiMURO:
13  Q   Well, I would like a direct answer
14  to that question, please.
15  A   What do you mean by "a direct
16  answer"?
17  Q   Yes or no.
18  A   I mean, the firm put me in for long-
19  term disability.
20  Q   Do you recall applying for long-term
21  disability in January of '04?
22      MS. MURRAY: Asked and answered.

Page 21

1      THE WITNESS: That's been answered?
2      MS. MURRAY: Just answer again.
3      THE WITNESS: Like I said, my
4  paperwork was put in by the firm.
5      BY MR. DiMURO:
6  Q   In January of '04?
7  A   I don't know exactly. All I know is
8  the letter that I received from Ms. Forman
9  was dated sometime around January the 26th,
10  somewhere in there.
11      And from my recollection, the letter
12  said something about -- and it went to my
13  doctor -- that we need to do this in a
14  manner as quickly as possible because her
15  paperwork is late or something to that
16  effect.
17      So, you're asking me, did I apply
18  for it myself. That wasn't my job to apply
19  for it. It was the firm's job to put me on
20  long-term disability. So, I don't know what
21  else you want me to tell you about my long-
22  term disability.

McFadden

Page 22

1    Q   Did you want long-term disability in
2  January of '04?
3    A   Well, basically, that was the
4  practice of Ballard Spahr as a firm
5  regarding with their employee handbook.
6    Q   Did you agree with the submission of
7  an application for long-term disability in
8  January of '04?
9    A   The only thing that I can remember
10  is that I was sent the form and I was told
11  not to fill out any part dealing with Social
12  Security disability. That's the only form
13  that I remember.
14       MR. DiMURO: Okay. I move to strike
15  that answer.
16       BY MR. DiMURO:
17    Q   Did you agree with the effort to
18  submit an application for you for long-term
19  disability in January of '04?
20       THE WITNESS: I don't understand
21  what he's -- what answer he's --
22       MS. MURRAY: Just tell him what you

Page 23

1  don't understand.
2       THE WITNESS: No, I don't understand
3  it.
4       MR. DiMURO: Could you re-read the
5  question, please.
6       (Whereupon, the court reported read
7  back the record.)
8       THE WITNESS: From what I can
9  recall, I've received a sheet of paper for,
10  I guess, long-term disability, and Ms
11  Forman told me not to fill out the part
12  dealing with Social Security disability, and
13  it was a one-page document. That's what I
14  recall.
15       MR. DiMURO: Okay. I move to strike
16  that answer as non-responsive.
17       BY MR. DiMURO:
18    Q   Did you sign any paperwork in
19  January of '04 to submit an application for
20  long-term disability?
21    A   Yes. That one sheet of paper that
22  she sent me.

Page 24

1    Q   Did you agree in January of '04 that
2  you met the criteria for long-term
3  disability?
4    A   Well, as far as I was concerned, at
5  that time I could have done another job at
6  the firm, but I wasn't offered any type of
7  other job at the firm.
8    Q   What do you recall being the
9  criteria for applying for long-term
10  disability in January of 2004?
11    A   All I recall is that my paperwork,
12  everything was submitted late. I filled out
13  one sheet of paper that Ms. Fern Forman sent
14  me. In February, I had a telephone
15  interview with, I think his last name was
16  Spellman, at Unum
17       MR. DiMURO: I move to strike that
18  answer as non-responsive, and I will seek
19  attorney's fees and costs for the delay in
20  this deposition.
21       BY MR. DiMURO:
22    Q   Do you recall the criteria for

Page 25

1  applying for long-term disability insurance
2  in January of 2004? What requirements were
3  there for you to get long-term disability?
4    A   As I said, Ms. Forman mailed me a
5  letter saying that it was time to put me on
6  long-term disability because, under firm
7  policy, the short-term disability had ran
8  out. That was Ballard's procedure
9       MR. DiMURO: I move to strike that
10  answer as non-responsive and seek attorney's
11  fees.
12       BY MR. DiMURO:
13    Q   Do you recall what standards or
14  criteria are applied in determining whether
15  or not you were eligible for long-term
16  disability in January of '04 when you
17  applied?
18       MS. MURRAY: I'd like to state an
19  objection and to respond. I've never heard
20  of a motion to strike in a deposition, but,
21  in any event, I think the problem -- here is
22  that she is not understanding -- the witness

Page 26

1  is not understanding what you're asking her
2  rather than any effort on her part to be
3  non-responsive.
4       And so I would just respond that
5  it's not the witness' effort to be non-
6  responsive. I think it's the clarity in the
7  question, at least in the witness' mind.
8       BY MR. DiMURO:
9    Q   Go ahead. Do you have any other
10 answer to that question?
11   A   No.
12   Q   Now, did you tell, in January of
13 2004, anyone at Ballard Spahr that you did
14 not want to apply for long-term disability?
15   A   Could you rephrase that?
16   Q   In January of 2004, did you tell
17 anyone at Ballard Spahr that you did not
18 want to apply for long-term disability?
19   A   From what I can recall from what Ms.
20 Forman and Ms. Riley told me, that was the
21 next step.
22       MR. DiMURO: I move to strike that

Page 27

1  as non-responsive, and I will seek
2  attorney's fees.
3       BY MR. DiMURO:
4    Q   Did you tell anybody at Ballard
5  Spahr in or about January of 2004 that you
6  did not want to apply for long-term
7  disability?
8    A   Are you asking me did I tell them,
9  no, don't submit the paperwork?
10   Q   That's a fine question. Yes.
11   A   No.
12   Q   Did you tell anybody at Ballard
13 Spahr that you did not want the insurance
14 company to consider you for long-term
15 disability in or about January of '04?
16   A   No.
17   Q   In or about January of 2004, did you
18 ask anybody at Ballard Spahr to consider you
19 for coming back to work?
20   A   From what I can recall from the
21 letter that I had received, which was
22 confusing to me, I received a letter in

Page 28

1  March, and Mr. Henck called me the day
2  before.
3       He said, you're going to receive a
4  letter, but it contains a bunch of legal
5  mumbo-jumbo, nothing to worry about. And
6  the letter basically stated that I didn't
7  have any more job protection as of February
8  the 9th.
9       My question to Mr. Henck was, well,
10 why did it take until February the 12th to
11 tell me that?
12      MR. DiMURO: I move to strike as
13 non-responsive, and I'll seek attorney's
14 fees.
15      BY MR. DiMURO:
16   Q   Did you, on or about January of 2004
17 when your application for long-term
18 disability was being submitted, ask anybody
19 at Ballard Spahr to consider you for another
20 position or consider you to come back to
21 work?
22   A   From what I was told, that if I got

Page 29

1  better, that I will always have a job with
2  Ballard.
3       MR. DiMURO: Move to strike, non-
4  responsive, and I'll ask for attorney's
5  fees.
6       BY MR. DiMURO:
7    Q   Did you, in or about -- Listen to my
8  question very carefully.
9    A   I'm listening, sir.
10   Q   Did you, in or about January of
11 2004, ask anybody at Ballard Spahr to
12 consider letting you come back to work?
13      THE WITNESS: (To Ms. Murray) I
14 don't understand what he's asking me.
15      BY MR. DiMURO:
16   Q   Did you, in January of 2004, at
17 about the -- Strike that.
18      Did you, in or about January of 2004
19 when your application for long-term
20 disability was being submitted, ask anybody
21 at Ballard Spahr to consider letting you
22 come back to work? Did you ask anybody

Page 30

1  that?
2     A   No.
3     Q   You've mentioned a couple of times
4  that you believe that the paperwork for
5  long-term disability was submitted late. Is
6  that your position?
7     A   Yes.
8     Q   And you recall the paperwork being
9  submitted in or about the second or third
10  week of January of '04; is that correct?
11     A   The letter that went to my doctor
12  from Ms. Forman and the letter that came to
13  me from Ms. Forman was dated around the end
14  of January. I don't recall the exact date.
15     Q   All right.
16     A   She was saying this had to be taken
17  care of because, as of January the 14th, my
18  short-term disability didn't exist anymore.
19        So, basically, I'm assuming, from
20  the letter that she sent me saying the
21  urgency of my doctor to do this, she
22  submitted the paperwork late.

Page 31

1     Q   I don't quite understand why you
2  think the paperwork was submitted late.
3     A   Well, I was out of income. I didn't
4  receive an income from Ballard.
5     Q   When would you have had her submit
6  the paperwork for long-term disability?
7     A   I would assume, as her being the
8  benefits administrator for as many years as
9  she was, I would feel that she would have
10  did everything in a timely manner.
11     Q   But when do you believe she should
12  have submitted the paperwork for long-term
13  disability?
14     A   I don't know. That's wasn't -- I
15  mean, it wasn't my job to submit it if
16  that's what you're asking me.
17     Q   No, that wasn't what I was asking
18  you.
19     A   Are you asking me when I believe she
20  should have done it?
21     Q   Yes, ma'am.
22     A   I don't know what Ms. Forman was --

Page 32

1  I don't know what she was thinking, so I
2  can't --
3     Q   Well --
4     A   You want me to -- Correct me if I'm
5  wrong. You want me to answer a question of
6  what another individual was thinking.
7        MR. DiMURO: No. I move to strike
8  as non-responsive, and I will again seek
9  attorney's fees.
10        BY MR. DiMURO:
11     Q   The question is, when do you contend
12  Ms. Riley-Jamison or anyone at Ballard Spahr
13  should have submitted the long-term
14  disability paperwork?
15     A   When it should have been submitted?
16     Q   Yes, ma'am.
17     A   Before my short-term disability ran
18  out.
19     Q   And is there any -- Do you have a
20  precise date that you believe the paperwork
21  should have been submitted?
22     A   No. I just went by what I saw in

Page 33

1  the employees handbook.
2     Q   What does it say in the employees
3  handbook about submitting long-term
4  disability, the date it should be done?
5     A   It doesn't say a date. It says it's
6  the next step from short-term disability.
7     Q   Do you agree that someone who is on
8  short-term disability might not go on to
9  long-term disability, depending on what
10  their doctors say?
11     A   Well, from what I can recall, the
12  paperwork that I submitted to Ms. Forman,
13  they already knew that I would be out for
14  nine months or more because of my illness.
15     Q   And did you ultimately get rejected
16  for long-term disability by Unum?
17     A   Yes.
18     Q   And there was a delay by Unum in
19  making a decision on the long-term
20  disability; is that correct?
21     A   Yes, there was a delay. Yes.
22     Q   And there was a period of time

Page 34

1  between late January '04 -- Strike that.
2        Do you recall that the first
3  decision to deny you long-term disability by
4  Unum was about May 11th, 2004?
5      A  I know it was sometime in May, but I
6  don't recall the exact date.
7      Q  Do you recall between the time the
8  application for long-term disability was
9  submitted and the time that Unum first
10 rejected the application, that there were
11 discussions about getting medical records
12 from your doctors to Unum?
13       MS. MURRAY: Let me just state an
14 objection. The plaintiff says she didn't
15 know when the application was submitted, so
16 how can she define the time period?
17       MR. DiMURO: She said January, late
18 January.
19       MS. MURRAY: She did not.
20       THE WITNESS: No, I did not.
21       MR. DiMURO: Okay. You say you saw
22 a form dated late January. I'll back up.

Page 35

1  Let's fix it.
2        BY MR. DiMURO:
3      Q  When do believe the application --
4        THE WITNESS: Excuse me. I need to
5  take one of my medications.
6        MR. DiMURO: Certainly.
7        THE WITNESS: Let's take maybe a
8  five-minute break or something.
9        MS. MURRAY: Is that okay?
10       MR. DiMURO: Of course. Absolutely.
11 In fact, while we're on the record,
12 I meant to mention before that I'm aware
13 that you have a number of medical
14 conditions, and if at any time you need a
15 break, you need to do what you just did;
16 okay?
17       THE WITNESS: Okay. All right.
18 Thank you.
19       (Whereupon, a brief recess was
20 taken.)
21       MS. MURRAY: If I may, Mr. DiMuro,
22 just make a comment on the record.

Page 36

1        I consulted with my client because
2  of the difficulty that has been experienced
3  with answering and asking questions.
4        I think it may help the witness --
5  and you conduct the deposition in the manner
6  that you choose -- if questions were posed
7  without sub-parts. She has identified her
8  as sort of the difficulty that she's having
9  with understanding what you're asking her.
10       So, to the extent that it's a
11 compound question, you may have difficulty
12 getting an answer. To the extent it has
13 sub-parts, it may be a little difficult. I
14 just wanted to state that on the record.
15       MR. DiMURO: Okay.
16       BY MR. DiMURO:
17     Q  Do you agree with that, Ms.
18 McFadden?
19     A  Yes.
20     Q  What is it about sub-part questions
21 or questions that have two parts to them
22 that cause you a problem, do you think?

Page 37

1      A  It's like you're asking me a
2  question in a question.
3      Q  Do you think there was a point in
4  the past that you could comfortably answer a
5  question that had two parts to it?
6      A  At this particular time in my life,
7  no.
8      Q  Listen to my question.
9        Do you believe that there was a
10 point in time before -- Strike that. I'll
11 start over again.
12     A  Okay.
13     Q  Do you think that there was a time
14 in your life before today that you felt
15 comfortable answering questions with two or
16 three parts to them?
17     A  I mean, like I explained to Ms.
18 Murray, I feel like you're asking me more
19 than one question at one time, but you want
20 me to give you one answer to cover all the
21 sub-parts of the question.
22     Q  Well, I don't think I've tried to do

Page 38

1  that, but what I'm asking you is, do you
2  believe you have difficulty answering
3  questions with more than one part in them?
4  Is that true?
5      A  To the extent of as to as far as the
6  way that you're asking me, I feel like
7  you're asking me to answer for others, which
8  I can't do.
9      Q  What has that got to do with
10  questions with more than one part?
11      A  No. I'm just saying, for instance,
12  you asked me the question about long-term
13  disability; okay? From what I read in the
14  employees handbook, that was my right, as
15  being an employee of Ballard Spahr for 15
16  years, that it was automatic I went from
17  short-term to long-term.
18      So, for you to tell me to pinpoint a
19  date on how Ms. Forman did her job, I can't
20  answer that.
21      Q  Do you think you have problems
22  answering questions that have two parts to

Page 39

1  them? That's just what your lawyer just
2  said, so I'm --
3      A  No. What I'm saying is it's just
4  the way that you're asking me the questions.
5      Q  And how would you describe that way?
6      A  I'm just saying, you know, if you're
7  going to ask me something, ask me one
8  question at a time.
9      Q  So, you have difficulty --
10      A  And I will do the best -- No, it's
11  not that. It's just that I feel that some
12  of the questions, sir, that you're asking
13  me, you're asking me to speak for someone
14  else. I can't do that.
15      Q  Okay. I'm just --
16      A  Does that make any sense?
17      Q  No, ma'am. Absolutely not.
18      A  Okay.
19      Q  Do you have a problem answering, as
20  your lawyer just said, questions that have
21  more than one part to them?
22      A  Yes.

Page 40

1      Q  Is that because you think you have
2  some difficulty understanding those
3  questions because of medication or your
4  medical condition or something?
5      A  I take 20 medications a day.
6      Q  All right. That's what I'm --
7      A  So, therefore, you know, it's like
8  I'm trying to really concentrate on what
9  you're saying.
10      Q  Right. So, you believe the
11  medication has some adverse affect on your
12  ability to understand questions?
13      A  Not to some point, no. All I'm
14  saying is that I feel that you're asking me
15  two or three questions in one question.
16      And I don't know if this is how a
17  deposition goes or not. I've never done one
18  before. So, do I have the right to tell you
19  when I don't understand?
20      Q  I'm going to show you Exhibit 51 --
21      A  You didn't answer my question.
22      MS. MURRAY: Yes, you can. I'll

Page 41

1  answer it. Go ahead.
2      THE WITNESS: Okay. Thanks.
3      BY MR. DiMURO:
4      Q  Exhibit 51, is that your signature
5  on the bottom of the front page?
6      A  Yes.
7      Q  What is this document?
8      A  Income Protection Claim.
9      Q  Right. But what was its purpose?
10  What did you understand its purpose to be
11  when you signed it?
12      A  To apply for long-term disability.
13  This is what they sent me.
14      Q  And did you sign it on January 27th,
15  2004?
16      A  Yes.
17      Q  Is that your handwriting on the
18  first page wherever handwriting exists?
19      A  Yes. But the -- Some of it is not.
20  This is not my handwriting (indicating).
21  That is not my handwriting (indicating).
22      Q  All right. Let's do them one at a

Page 42

1   time.
2       A   Okay.
3       Q   The "no" written in Section 2 is not
4   your handwriting?
5       A   No, it's not.
6       Q   And where else is it not your
7   handwriting on Page 1 of Exhibit 51?
8       A   Where it is for any accidental --
9       Q   Section 4?
10      A   Yes, sir. Section 4, "Sickness,"
11  that's not my handwriting.
12      Q   You're saying the X in the box
13  marked "Sickness" is not your handwriting?
14      A   No. I put the X there.
15      Q   Okay. You're talking about the
16  "N/A"?
17      A   Yes. That is not my handwriting.
18      Q   Anything else on this page that is
19  not your handwriting?
20      A   Now, on Number 8, from what I can
21  recall, I don't recall checking
22  automatically depositing to your bank

Page 43

1   account.
2       Q   All right.
3       A   And where my signature is, that X in
4   front of that, I don't know where that came
5   from. I didn't put it there.
6       Q   Anything else on this page that is
7   not your handwriting?
8       A   From as far as I can see and
9   remember, everything else on the page is my
10  handwriting.
11      Q   And did you write the words, about
12  in the middle of the page, that describe the
13  types of things you suffer from, severe
14  muscular and joint pain, shortness of
15  breath, lack of concentration, and severe
16  depression?
17      A   Yes.
18      Q   And if you'll look at the second
19  page, please. This is a form dated February
20  3rd, '04 signed by Dr. Mussenden at the
21  bottom?
22      A   Mussenden; yes.

Page 44

1       Q   Did you see this form back in late
2   January, early February of 2004?
3       A   Yes.
4       Q   And when you saw the form, had it
5   been filled out by whoever filled it out and
6   then signed by Dr. Mussenden?
7       A   Dr. Mussenden filled it out himself.
8       Q   How do you know that?
9       A   I was there when he did it.
10      Q   So, you asked him to fill out the
11  form as part of the application for long-
12  term disability?
13      A   Yes.
14      Q   All right.
15      A   Because that's what they told me to
16  do. That's what I was instructed to do.
17      Q   And then what happened to the form?
18  Did you take it from Dr. Mussenden's office,
19  or did he send it to somebody? What
20  happened to the form that he signed?
21      A   I think he -- From what I can
22  recall, I think what he did was he faxed it

Page 45

1   to Mr. Spellman, and it was also mailed to
2   Mr. Robert Spellman.
3       Q   And Mr. Spellman is somebody who
4   works for Unum; is that right?
5       A   Yes.
6       Q   And for the next several months, Mr.
7   Spellman, as far as you knew, was the
8   primary person at Unum working on your
9   application?
10      A   I --
11      Q   I'll rephrase it.
12      A   Please do.
13      Q   For the next several months after
14  February 3, 2004, your primary contact at
15  Unum was Mr. Spellman; is that correct?
16      A   Robert Spellman; yes.
17      Q   Did you keep a copy of this form
18  after Dr. Mussenden filled it out and signed
19  it out in your presence?
20      A   Yes.
21      Q   So, you saw at that time that, under
22  Paragraph 3, he checked the box indicating

Page 46

1  that you are not released to work in your
2  occupation or in any occupation?
3      A  Yes.
4      Q  Did you tell him that that was not
5  true, that you could work in some position?
6      A  What I -- Well, as far as what I
7  told my doctor, I think, is confidential and
8  privileged; correct? I mean -- But, like I
9  explained to him, he said, well, I mean,
10  what is it that you could have done at work?
11
12      I said I could have done a
13  receptionist job. He said, so, why weren't
14  you given a position since you have been at
15  this firm for so long?
16      I said, I was told by Ms. Riley on a
17  conference call with Ms. Fern Forman and
18  John DiBattista, when I asked about the
19  receptionist job, they told me that job was
20  Ms. Hahn's job. Betty Hahn. That was the
21  receptionist.
22      Q  What you just said, was that a

Page 47

1  discussion that you had with Dr. Mussenden?
2      A  No. With my doctor because I told
3  him --
4      Q  Wait.
5      A  No. This is a discussion I had with
6  my doctor. He asked me, well, so --
7  Basically, he was asking me if there was
8  another job that they could accommodate you
9  with with your illnesses.
10      Q  Are you done?
11      A  Uh-huh.
12      Q  What you just described in that
13  answer and the answer right before it is a
14  discussion you say you had with Dr.
15  Mussenden?
16      A  Dr. Mussenden. He's my primary care
17  doctor.
18      Q  Is that a yes or a no? What you
19  just said in the last two answers about Dr.
20  Mussenden asking you about whether there was
21  a job you could do, that was a discussion
22  that you had with Dr. Mussenden in February

Page 48

1  of '04; is that right?
2      A  Yes.
3      Q  And why would Dr. Mussenden write
4  down that you could not work in any
5  occupation if you told him that you could do
6  a receptionist job?
7          MS. MURRAY: Objection. Calls for
8  speculation.
9          BY MR. DiMURO:
10      Q  Do you have any idea why Dr.
11  Mussenden would make a misrepresentation on
12  this form?
13      A  I don't feel that he did.
14      Q  Well, if you could do a receptionist
15  job, as you claim, in February of '04, why
16  didn't you tell him that checking the box
17  that you could not work in any occupation
18  was wrong?
19      A  Well, I couldn't see myself applying
20  to another firm in my condition for any type
21  of job.
22      Q  Well, you didn't apply to any other

Page 49

1  firm in 2004 for a job; is that --
2      A  Oh, no, I don't. What I did was I
3  exercised my right, and I applied for my
4  Social Security disability which Ballard
5  Spahr was aware of. Social Security pushed
6  me back because of my disability -- okay? --
7  even though I still worked.
8          MR. DiMURO: I move to strike, non-
9  responsive, and ask for attorney's fees.
10          BY MR. DiMURO:
11      Q  Did you apply for any job as a
12  receptionist or anywhere in 2004?
13      A  Could you explain that a little
14  further?
15      Q  Sure.
16          Did you apply with any potential
17  employer for any position in the year 2004?
18      A  No.
19      Q  A few moments ago, you were
20  describing a phone conference call you had
21  with Ms. Riley-Jamison and Mr. DiBattista?
22      A  John DiBattista and Fern Forman.

Page 50

1    Q    Yes. And you said that you told Dr.
2    Mussenden about that conference call?
3    A    No. Him and I discussed that later.
4    Q    All right. Well, I was --
5    A    And I also discussed that with my
6    psychiatrist.
7    Q    All right. But please stay with me
8    on --
9    A    Okay.
10   Q    In February of '04, when you're in
11   his office, Dr. Mussenden's office, and he's
12   filling out his part of Exhibit 51 --
13   A    Exactly.
14   Q    -- did you or did you not talk to
15   Dr. Mussenden about whether or not you could
16   do some type of work?
17   A    And my response to him was the only
18   job that I could see that I could do with my
19   present employer was the receptionist job.
20   Q    You are telling me in this
21   deposition that you talked with Dr.
22   Mussenden about the fact that you could do

Page 51

1    the receptionist job when you visited with
2    him on February 3rd, 2004?
3    A    If that option was given to me, but
4    it wasn't.
5    Q    Well, could you answer my question?
6    A    So, I don't know what you're asking
7    me.
8    Q    All right.
9    A    That's what I mean by you asking me
10   sub-part questions.
11   Q    There wasn't a sub-part in that
12   question.
13   A    Okay. Well --
14   Q    Were you with Dr. Mussenden when he
15   filled out the form?
16   A    Yes, I was.
17   Q    And was that date February 3rd --
18   A    Because he asked me what other job
19   can you do with your present employer?
20        MR. DiMURO: I move to strike, non-
21   responsive.
22        You're going to have to wait for my

Page 52

1    question --
2        THE WITNESS: All right.
3        MR. DiMURO: -- or I'm going to
4    apply for attorney's fees to be paid by your
5    side for the obstructionist effort in this
6    deposition; all right?
7        BY MR. DiMURO:
8    Q    Now, did Dr. Mussenden sign that
9    form in front of you on February 3rd, 2004?
10   A    Yes.
11   Q    Did you have a discussion with him
12   on February 3rd, 2004, about what type of
13   work you could do?  That's a yes or a no
14   question.
15   A    Yes.
16   Q    What did he say and what did you say
17   on February 3rd, 2004 about the type of work
18   that you thought you could do?
19   A    From what I recall telling him, I
20   probably could have did a job that didn't
21   require any lifting, nothing requiring where
22   -- that was stressful because of my

Page 53

1    illnesses.  The stress makes my illnesses
2    worse.
3    Q    Is that everything you recall
4    telling Dr. Mussenden on February 3rd, 2004
5    about the type of work you could do?
6    A    Yes.
7    Q    Do you know when Exhibit 51, the
8    application for long-term disability, was
9    actually sent in to Unum?
10   A    From what I can recall, Dr.
11   Mussenden faxed a copy in to Robert Spellman
12   while I was there at the office.
13   Q    Okay. That's the second page, which
14   you're looking at.
15   A    This here (indicating), this is what
16   he faxed to him.
17   Q    Right. Dr. Mussenden faxed in to
18   Mr. Spellman the page he filled out and
19   signed; right?
20   A    Right.
21   Q    Do you know when the first page was
22   sent in by anybody of Exhibit 51?

Page 54

1    A   I don't recall. I didn't -- From
2   what I can remember, I didn't receive both
3   things at the same time.
4    Q   Well, that might be an example of
5   when you might say "I don't know."
6       Do you know when the first page of
7   Exhibit 51 was sent in to Unum?
8       THE WITNESS: (To Ms. Murray)  Is he
9   asking me do I know where Ms. Forman turned
10  it in? No, I don't know.
11      BY MR. DiMURO:
12   Q   After Mr. Spellman at Unum -- Strike
13  that.
14      After your application for long-term
15  disability was turned in to Unum, Mr.
16  Spellman was your primary contact; is that
17  correct?
18      MS. MURRAY: In what respect?
19  Clarify your question.
20      BY MR. DiMURO:
21   Q   Well, he was the primary person you
22  spoke with at Unum. Is that true or not

Page 55

1   true?
2    A   It was Robert Spellman.
3    Q   And you spoke with Mr. Spellman in
4   February, March, and April of 2004 about his
5   efforts to get medical records from your
6   doctors; right?
7    A   The problem was my doctors have
8   proof of sending him the medical records.
9   Mr. Spellman kept telling me he did not
10  receive them.
11      My doctors' assistants were showing
12  me where they had faxed the documents to Mr.
13  Spellman, and he still said he didn't
14  receive them.
15   Q   Okay. But my question -- Well,
16  strike that.
17      Then it is true that in February,
18  March, April, and early May of 2004 you were
19  speaking to Mr. Spellman about what he was
20  doing about getting your medical records;
21  right?
22   A   The conversations we had is why he

Page 56

1   was having a problem receiving them when
2   they were sent to him.
3    Q   Well, in February, March, and April
4   of 2004, Mr. Spellman was saying we can't
5   complete deciding your claim until we get
6   all your medical records. That's what he
7   was saying to you; right?
8    A   Yes.
9    Q   And in February, March, and April of
10  2004, Mr. Spellman was telling you, whether
11  it was right or not, he was telling you that
12  some of your doctors had not sent in the
13  medical records; isn't that right?
14   A   Yes. That's what he told me.
15   Q   And at some points in February,
16  March, April of 2004, you actually contacted
17  your doctors to find out if there was a
18  problem with them sending the medical
19  records?
20   A   Yes.
21   Q   And some of your doctors were
22  telling you that they had already sent in

Page 57

1   the records; right?
2    A   And they showed me proof of that;
3   yes.
4    Q   Okay. So, you were getting
5   frustrated with Mr. Spellman's statements to
6   you that he didn't have all the records
7   because your doctors were saying they had
8   sent them in; right?
9    A   No. I don't think "frustrated" is
10  really the word.
11   Q   Okay. What's the word?
12   A   I just felt like he just didn't
13  care.
14   Q   Did you ever receive any information
15  that anybody at Ballard Spahr was holding up
16  the transfer of your medical records?
17   A   No. Because they wouldn't have went
18  to Ballard Spahr.
19   Q   All right. Do you know in fact that
20  people at Ballard Spahr in February, March,
21  April, and May of 2004 were making efforts
22  to help get the medical records transferred?

Page 58

1     A    The only thing that I recall is that
2    Ms. Riley-Jamison called me around the end
3    of February, the beginning of March. She
4    called me in the morning.
5         She said, Vanessa, I have good news,
6    your disability has been approved. She
7    called me back at -- So, at that point, I
8    contacted my mortgage company because my
9    house was going into foreclosure.
10        She calls me back at three o'clock
11    and said, oh, Vanessa, I made a mistake,
12    your disability is not approved.
13    Q    All right. This was March, you
14    think?
15    A    It was sometime around March 1st,
16    something like that, because from that, I
17    asked Ms. Forman would she please do a
18    letter to my mortgage company.
19    Q    All right. So, Ms. Riley-Jamison
20    calls you and tells you in one conversation
21    that the long-term disability had been
22    approved.

Page 59

1     A    It was approved; yes.
2     Q    And then in a subsequent phone call
3    shortly thereafter, she said she made a
4    mistake?
5     A    That afternoon.
6     Q    Right.
7     A    She said, oh, no, your disability
8    was not approved.
9     Q    Are you angry with Ms. Riley-
10    Jamison? Do you think she did something
11    intentional to hurt you by making that phone
12    call?
13    A    Yes.
14    Q    You don't think it was an honest
15    mistake on her part?
16    A    No.
17    Q    And why would you say that she
18    intentionally meant to hurt you by calling
19    you at one moment saying the disability was
20    approved and another moment saying she made
21    a mistake?
22    A    From previous conversations while I

Page 60

1    was an employee there and the way that I was
2    treated.
3     Q    All right. You're referring to what
4    type of -- You're talking about things that
5    Ms. Riley-Jamison said?
6     A    The harassment from her; yes.
7     Q    Now, you asked Ms. Forman to send a
8    letter to the mortgage company; right?
9     A    And she did; yes.
10    Q    And she did do that.
11    A    And she explained it off of -- I
12    don't know where they got the information
13    from that when my disability was approved,
14    how much I would be getting a month or what
15    have you.
16    Q    That was in the letter from Ms.
17    Forman to the mortgage company?
18    A    To my mortgage company.
19    Q    And that's Wells Fargo?
20    A    Wells Fargo; yes, sir.
21    Q    And you're criticizing that Ms.
22    Forman would know how much you would get for

Page 61

1    disability?
2     A    Oh, no, no, no. She stated how much
3    I would get.
4     Q    Okay. So, she did what you asked to
5    solve the problem with the mortgage company?
6     A    Okay.
7     Q    I'm just asking.
8     A    No. All I'm saying is, basically,
9    when she sent me the letter, it was the same
10    day that Ms. Riley-Jamison called me and
11    told me my disability was approved.
12        She called back around three or four
13    in the evening and said it wasn't approved.
14    But Ms. Forman had already mailed the letter
15    to me for my mortgage company, and she also
16    faxed a copy to my mortgage company.
17    Q    So, Ms. Forman did everything she
18    could to help you with the mortgage company
19    on that day?
20    A    She did what I asked her, and I went
21    off from what Ms. Riley-Jamison told me.
22    Q    And you won't agree that Ms. Forman

Page 62

1    was trying to help you?
2        A    Well -- No.
3        Q    Do you know --
4        A    Because of some of her actions
5    before then.
6        Q    Okay. So, you're angry with Ms.
7    Forman for her actions that you say she did
8    to you --
9        A    Sir, I'm not angry with nobody.
10       Q    All right.
11       A    No, no, no. I'm not angry with
12   nobody.
13       Q    Do you have any information that Ms.
14   Riley-Jamison actually tried to slow down or
15   stall or hurt your application for long-term
16   disability?
17       A    Do I have any -- a paper trail?
18       Q    Any proof.
19       A    I would find it strange that she
20   would call me and tell me that it was
21   approved and then call back in the evening
22   and tell me it's not approved.

Page 63

1        Q    Well, here's my question, because
2    you didn't answer my question. Here's my
3    question
4        Do you have any proof, any facts, to
5    show that Ms. Riley-Jamison slowed down,
6    stalled, or tried to block your application
7    for long-term disability insurance?
8        A    No. I don't have any proof; no.
9        Q    Do you have any proof that Ms.
10   Forman stalled or delayed or sought to have
11   your long-term disability application
12   denied?
13       A    All I know is that she sent in all
14   my paperwork late. You're asking me, and
15   that's all I know.
16       Q    All right.
17       A    She sent in my paperwork late.
18       Q    And you think Ms. Forman sent in
19   your paperwork late because it was after
20   your income had stopped?
21       A    I don't know. When I questioned her
22   about it, her response to me was why don't

Page 64

1    you just go ahead and resign and save
2    everybody the trouble
3        Q    When did this occur? When did she
4    say that?
5        A    On around a day or two before the
6    conference call they made.
7        Q    You talked to her sometime in May,
8    and she said something about you resigning?
9        A    She said it would make it easier for
10   everybody if I just resigned.
11       Q    And what was the reason you were
12   speaking to her on the phone?
13       A    Because when I was sent the letter
14   from Ballard -- I think it was dated around
15   March 12th or whatever -- it informed me
16   that on February the 9th that I had no more
17   job protection, which I wasn't aware of,
18   that my FMLA had expired.
19       Which I was confused, because I
20   called the U.S. Department of Labor and,
21   like I expressed to Ms. Riley, District
22   employees received 16 weeks, not 12 weeks.

Page 65

1        Both Ms. Forman and Ms. Riley told
2    me that, since it was a Philadelphia-based
3    firm, I was only entitled to 12 weeks.
4        Q    Okay. Let's get back to the
5    question and the answer.
6        A    Okay.
7        Q    My question is you had a phone call
8    with Ms. Forman a few days before May 14th,
9    2004; right?
10       A    Yes
11       Q    In that conversation, she said
12   something along the lines of why don't you
13   resign --
14       A    Why don't you do everybody a favor
15   and just resign. Yes.
16       Q    And that phone call occurred because
17   of a letter you received in March?
18       A    And they had me fill --
19       Q    That's a yes or a no question.
20       A    Yes. Yes.
21       Q    And so you waited from March until
22   May to discuss the March letter with her?

Page 66

1   Is that true?
2      A   Because the attachment to it --
3      Q   Is that true?
4      A   Yes.
5      Q   Okay. Now, you go ahead and explain
6   to me why you waited from March until May to
7   talk about a letter in March.
8      A   An attachment.
9      Q   All right.
10     A   That's what I talked to her about.
11     Q   What did the attachment --
12     A   Because the firm never responded to
13  what they told me to fill out. At the time,
14  I had spoken with Ms. Kathy Hanna, who I sat
15  beside, who had a stroke.
16         And I asked her, I said, when you
17  went out on long-term disability, did you
18  have to fill out this form? She said no.
19     Q   Which form was this?
20     A   It was a leave of absence or
21  something. Basically -- It was a leave of
22  absence. And I had put on the form "long-

Page 67

1   term disability."
2          I asked Ms. Hanna did she have to
3   fill out that form. She said no. Okay. I
4   sat beside her. So, after she had a stroke
5   after being out for six months, I covered
6   for her a lot, the people that she worked
7   for.
8          And then I asked her, well, I don't
9   understand why you were able to work a
10  modified schedule and still get paid from
11  Ballard and Unum, and I don't have no job
12  protection, I don't have nothing. She said,
13  Vanessa, I don't know.
14     Q   Now, you mentioned that Ms. Forman
15  and Ms. Riley-Jamison at some point said to
16  you that you only get 12 weeks of FMLA?
17     A   Yes
18     Q   When did Ms. Riley-Jamison say that
19  to you?
20     A   I don't know the exact date, but it
21  came up in the conversation when she thought
22  it was appropriate to tell me that, since my

Page 68

1   son was a senior in college, that it would
2   be best if I would take my daughters out of
3   college.
4          MR. DiMURO: Move to strike --
5          THE WITNESS: I'm trying to answer
6   your question.
7          MR. DiMURO: Move to strike, non-
8   responsive.
9          BY MR. DiMURO:
10     Q   Give me a date, an approximately
11  date -- Keep your thinking to yourself and
12  your gratuitous statements to yourself, and
13  --
14         MS. MURRAY: Object to that kind of
15  statement. Just rephrase your question,
16  sir.
17         BY MR. DiMURO:
18     Q   Tell me the approximate date that
19  Ms. Riley-Jamison told you you only get 12
20  weeks of FMLA.
21     A   It was January -- Well, that's when
22  I dealt with my husband. It was around

Page 69

1   January 2003.
2      Q   All right. January of 2003?
3      A   Uh-huh.
4      Q   You have to say yes or no, ma'am.
5      A   Yes.
6      Q   Thank you.
7      A   Oh, I'm sorry.
8      Q   That's fine.
9          And when, approximately, did Ms.
10  Forman tell you that you only get 12 weeks
11  of FMLA?
12     A   She put it in the document.
13     Q   Do you recall when approximately
14  that was?
15     A   I think I received the document on
16  November the 1st.
17     Q   Of which year, please?
18     A   2002. And from what I can recall in
19  the document, she had already put the dates
20  of my FMLA, which was 12 weeks. When I got
21  confused was where, at some point, I worked.
22  That's what I didn't understand.

Page 70

1    Q    All right. In any event, sometime
2  in 2002, Ms. Forman put in a document, as
3  you recall, that you only get 12 weeks of
4  FMLA?
5    A    Yes.
6    Q    And that's wrong because? What's
7  your understanding of what you're entitled
8  to?
9    A    Because, as a District of Columbia
10 resident, even with my husband, I was
11 entitled to 16 weeks of FMLA. That's a
12 District law.
13   Q    Did you know that back in 2002?
14   A    Yes, I did.
15   Q    And how did you know that?
16   A    I used to work for the Labor
17 Department.
18   Q    All right. So, did you argue with
19 Ms. -- Strike that.
20        Did you say to Ms. Forman back in
21 2002 this is wrong, I get 16 weeks?
22   A    Yes, I did.

Page 71

1    Q    Now, in 2004, did Ms. Forman ever
2  say to you you only get 12 weeks?
3    A    Yes, she did. And Ms. Riley.
4    Q    And when did Ms. Forman say that in
5  2004?
6        MS. MURRAY: What year did you say?
7        MR. DiMURO: 2004.
8        THE WITNESS: 2004? I wasn't
9  working at Ballard in 2004.
10       MR. DiMURO: All right. Let's --
11       THE WITNESS: That was in 2003.
12       MR. DiMURO: All right. Let's start
13 over again.
14       BY MR. DiMURO:
15   Q    In the year 2004, did Ms. Forman
16 ever tell you you only get 12 weeks of FMLA?
17   A    In 2004?
18   A    Yes, ma'am.
19   Q    No.
20   Q    In 2004, did Ms. Riley-Jamison ever
21 tell you you get 12 weeks of FMLA?
22   A    No. They told me 2003.

Page 72

1    Q    And in 2004, isn't it true that
2  someone from Ballard Spahr told you that,
3  yes, you do get 16 weeks of FMLA?
4    A    Yes. Yes. But after I filed a
5  complaint.
6    Q    Which complaint are you talking
7  about?
8    A    I filed a complaint with EEOC.
9    Q    What date do you think you filed the
10 complaint with EEOC roughly?
11   A    I'm not sure exactly of the exact
12 date, but I did it. So, I can't, you know -
13 -
14   Q    Did you file the complaint with EEOC
15 after you had been terminated in May of '04?
16   A    Well, I had contact with them prior
17 before that, and I told them my situation,
18 and they told me what my rights were.
19   Q    All right. Did you file your
20 written complaint with EEOC before or after
21 May 14th, 2004?
22   A    I filed it after May 14th, 2004.

Page 73

1    Q    So, when you said you -- Strike
2  that.
3        So, which is it? Did you -- Strike
4  that.
5        When did somebody --
6    A    Sir, what are you striking?
7    Q    Just the question.
8    A    I don't --
9        MS. MURRAY: Just listen to the
10 question.
11       MR. DiMURO: Ready?
12       THE WITNESS: Yes.
13       BY MR. DiMURO:
14   Q    When in 2004 did Ballard Spahr tell
15 you had 16 weeks of FMLA?
16   A    It was a letter that I received in
17 March, around March the 12th or whatever,
18 telling me at that time that I had 16 weeks
19 of FMLA in 2004.
20   Q    So, in 2004, Ballard Spahr told you
21 in a letter that you were entitled to 16
22 weeks of FMLA; right?

Page 74

1    A    In a letter that was a month and a
2    half late, as far as I'm concerned, when I
3    received it. If my FMLA expired on February
4    the 9th, it shouldn't have took them a month
5    and a half to send me a letter telling me
6    that I was entitled to 16 weeks.
7    Q    In March of 2004, Ballard Spahr sent
8    you a letter -- Ma'am, it's true, isn't it,
9    that in March of 2004, Ballard Spahr sent
10   you a letter saying that you were entitled
11   to 16 weeks of FMLA; isn't that true?
12   A    Yes.
13   Q    And in 2004, you were maintained at
14   -- Strike that.
15       In 2004, you had FMLA leave in
16   January, February, March, and April up to
17   May 14th; isn't that true?
18   A    No.
19   Q    And why do you say that?
20   A    Because in a letter it stated that
21   my FMLA leave expired as of February the
22   9th. Okay?

Page 75

1    Q    All right. Well, but as of that
2    point, you had been off of work since
3    October 15th; right?
4    A    Of 2003; yes.
5    Q    So, from October 15th, 2003,
6    November 15th, December 15th, January 15th,
7    and February 9th of '94, that's 16 weeks,
8    isn't it?
9    A    Yes.
10   Q    Okay. So, in point of fact, you did
11   get 16 weeks of FMLA leave from October
12   15th, 2003 to February 9th, 2004; isn't that
13   true?
14   A    Well, to be honest, that's where I'm
15   confused at, because when I was telling her
16   that, Ms. Riley and Ms. Forman, they kept
17   telling me no, 12 weeks.
18       So, what made all of a sudden them
19   believe it was 16 weeks after, with my
20   husband, they had already put the dates down
21   under FMLA on days that I was working.
22   Q    Ma'am --

Page 76

1    A    That's why I was confused.
2    Q    Ma'am --
3    A    I'm trying to answer you the best I
4    can.
5    Q    Thank you.
6    A    Okay.
7       MR. DiMURO: I move to strike as
8    non-responsive, and I will seek attorney's
9    fees.
10      BY MR. DiMURO:
11   Q    From October 15th of 2003 to
12   February 9th of 2004, you got 16 weeks of
13   FMLA leave; isn't that true?
14   A    Yes. I assume, yes.
15   Q    Now, you just said that Ms. Riley-
16   Jamison had talked to you about the 12 weeks
17   back in January of '03.
18      Do you recall now that she spoke to
19   you about the 12 weeks of FMLA leave later
20   in 2003?
21   A    When she spoke to me in January and
22   when I spoke to Ms. Forman, I was told I was

Page 77

1    entitled with my husband to 12 weeks of
2    FMLA.
3    Q    That's January of '03 that you're
4    talking about, a conversation?
5    A    Yes.
6    Q    And that's a conversation with Ms.
7    Riley-Jamison; right?
8    A    Yes.
9    Q    You didn't speak with Ms. Forman in
10   2003 about 12 weeks of FMLA; isn't that
11   right?
12   A    Yes, I did.
13   Q    Okay. When in 2003 did you speak
14   with Ms. Forman about the number of weeks
15   you get for FMLA?
16   A    Correction. I spoke to Ms. Forman
17   in November of 2002.
18   Q    That's right. I remembered that's
19   what you said before.
20   A    Okay. And she told me that they had
21   to do the dates that way.
22   Q    Okay.

Page 78

1   A   Okay. When I called Ms. Forman in
2   2003, which I was confused, I said, how can
3   you all put these dates here on days that I
4   work?
5   Q   So, when in 2003 did you speak with
6   Ms. Forman about FMLA leave?
7   A   The same day that I spoke with Ms.
8   Riley.
9   Q   So, that's January of 2003?
10  A   January of 2003.
11  Q   At any point later in 2003 after
12  those January conversations, did you speak
13  with Ms. Riley-Jamison or Ms. Forman about
14  FMLA leave again in which they said you only
15  get 12 weeks? Did they ever say that again
16  after January 2003?
17  A   No.
18  Q   This conversation you had with -- A
19  few days before May 14th, you had a
20  conversation we talked about earlier?
21  A   Of what?
22  Q   Sure. About the March letter.

Page 79

1   Sometime in early May, you spoke with
2   somebody about the letter you got in March
3   with the attachment.
4   A   Ms. Forman.
5   Q   Right; okay.
6        Did you make any notes or memo about
7   the conversation you had with Ms. Forman a
8   few days before May 14th, 2004?
9   A   Yes. I mean, I have it written on a
10  pad at home, yes, and what she said to me.
11  Q   All right. You have notes from that
12  conversation?
13  A   Yes. When she said, why don't you
14  just do everybody a favor and just resign
15  and apply for your Social Security
16  disability. And as I explained to her, my
17  Social Security disability had already been
18  approved. That was the gist of that
19  conversation.
20  Q   Well, I have notes of March 5th, and
21  I have notes of May 14th, and I have notes
22  of March 8th and March 9th, but I don't

Page 80

1   believe I have any notes of this
2   conversation you're talking about.
3        So, if you would look again, I would
4   appreciate it. And I'm sure your attorney
5   will speak to you about it. But I have not
6   seen the notes that you --
7   A   No. They're just something that I
8   had wrote on a steno pad, you know, for my
9   own benefit because, at that point, you
10  know, I was writing down things for my
11  benefit for me to remember.
12  Q   Right. Do those notes still exist,
13  the ones from May 10th, 11th, or 12th when
14  you spoke with Ms. Forman?
15  A   No. It's just a notation that I
16  made to myself. And that's when she got
17  angry and yelled at me and I called Ms.
18  Riley.
19  Q   You said at that time you made notes
20  of that conversation?
21  A   I mean, to myself on a steno pad.
22  Q   Yes, ma'am. I don't care if you

Page 81

1   made them for anybody else.
2        Did you make notes about the early
3   May conversation you had with Ms. Forman
4   about the March letter?
5   A   Yes.
6   Q   Okay. Did you keep those notes?
7   A   I still have them.
8   Q   Did you give those notes to Ms.
9   Murray to give to me or lawyers on this
10  side?
11  A   I didn't see the need to after the
12  conference call that we had on May the 14th.
13  Q   So, the answer is no, you have not
14  given the notes of that conversation with
15  Ms. Forman in early May 2004 to Ms. Murray;
16  right?
17  A   No.
18  Q   Okay. Would you please do so?
19  A   Oh, sure.
20  Q   Thank you.
21  A   No problem.
22      MS. MURRAY: We need a bathroom

Page 82

1  break at this point.
2      MR. DiMURO:  Oh, sure.
3      (Whereupon, a brief recess was
4  taken.)
5      BY MR. DiMURO:
6      Q    I'm going back now to when you went
7  out on October 15th, 2003; okay?
8      A    Okay.
9      Q    Did you ever go back to Ballard
10  Spahr, physically come into the office to
11  work, between October 15th, 2003 and May
12  14th, 2004?
13      A    No.
14      Q    Were you aware that Ms. Riley-
15  Jamison had made some efforts to get you
16  salary advances in 2004 from the firm?
17      A    From my understanding, that was a
18  discussion between Charles Henck and I.
19      Q    Do you know if she had any -- Well,
20  let's back up.
21      Mr. Henck lent you $2,000, I think,
22  in --

Page 83

1      A    No.  It was $4,500, and I have
2  repaid him.
3      Q    I understand that.
4      A    Okay.  I'm just saying --
5      Q    But Mr. Henck did, at some point,
6  loan you some money; right?
7      A    Advances from the firm because of
8  the problem with my disability being
9  approved.
10      Q    Okay.  Let me be very specific.
11      A    Okay.
12      Q    Did Mr. Henck loan you monies
13  personally at any time?  Not from the firm,
14  but his own personal monies?
15      A    That's personal.  I'm trying to, you
16  know -- Yes, he did, but it was personal.
17  It had nothing to do with firm funds.
18      Q    Okay.  That doesn't matter to me.
19      A    Okay.
20      Q    So, he lent you about $2,000
21  personally; right?
22      A    No.

Page 84

1      Q    How much was it that he lent you
2  personally?
3      A    Forty-five hundred dollars.
4      Q    And when did he lend you the $4,500?
5      A    He gave -- It was -- I don't know
6  the exact date, but it was in two separate
7  payments.
8      Q    When roughly?
9      A    It was in -- around -- It was
10  between, I would say, January and March of
11  2003.  I'm not sure of the exact date.
12      Q    So, Mr. Henck's personal loans to
13  you were in the early part of '03?
14      A    One, he gave me when I was still
15  working.  I don't know the exact dates.
16      Q    I'm just trying to confirm that they
17  were in the first couple of months of 2003.
18      A    No.  One was in 2003.
19      Q    Okay.
20      A    I guess around September or
21  something like that.  The other one was in
22  2004.

Page 85

1      Q    A few minutes ago, you told me it
2  was somewhere between January and March of
3  2003.  I didn't think that was right, so
4  that's why I asked you some more.  So, let's
5  start over again.
6      When did Mr. Henck give you the
7  first personal loan?
8      A    It was in -- The first personal loan
9  he gave me was around, I guess, August of
10  2003.
11      Q    How much was that roughly?
12      A    I'm not sure of the exact amount.
13  It was either $2,000 or $2,500.
14      Q    And the second personal loan from
15  Mr. Henck was in?
16      A    2004.
17      Q    Before May of 2004?
18      A    Yes.  Before May of 2004; yes.
19      Q    And you've paid back all of those
20  amounts?
21      A    Yes.
22      Q    Did the repayment occur after you

Page 86

1   left -- Strike that.
2       Did the repayment occur after you
3   were terminated?
4       A   Yes.
5       Q   Now, the law firm Ballard Spahr also
6   gave you salary advanced in 2003 and 2004;
7   is that true?
8       A   Yes.
9       Q   And whatever was remaining -- Strike
10  that.
11      In 2003 and 2004, you certainly did
12  not pay back the firm those salary advances;
13  is that true?
14      A   No. Because the way it was
15  perceived to me from Mr. Henck, this was the
16  least that the firm can do.
17      Q   All right. So, the monies that were
18  advanced --
19      A   So --
20      Q   -- in 2003, the law firm has never
21  asked you to pay them back?
22      A   Well, that was under the assumption

Page 87

1   that, I thought, when I got better, I had a
2   job.
3       Q   Well, ma'am, the law firm has never
4   asked -- Strike that.
5       In May of 2004, you were told the
6   law firm does not expect you to pay back the
7   salary advances; is that true?
8       A   Yes.
9       Q   Okay. All right.
10      Is it part of your claim that Mr.
11  Henck did anything discriminatory to you?
12      A   Yes.
13      Q   All right. What did Mr. Henck do
14  that was discriminatory?
15      A   When I would go to him and tell him
16  certain things, and afterwards he would talk
17  to Ms. Riley, he would come back and tell
18  me, well, Meg's saying she didn't say that.
19      And I was like, okay. But when I
20  got those seven e-mails that day, he saw it
21  for himself. I had seven e-mails telling me
22  I was on leave without pay for that day, but

Page 88

1   I was sitting at my desk working.
2       Q   All right.
3       A   And him and Ms. Briscoe witnessed
4   that.
5       Q   So, you're saying that Mr. Henck did
6   something discriminatory because he came
7   back to you and said Ms. Riley-Jamison
8   didn't say something?
9       A   Well, I felt it was discriminatory
10  because they both told me at that time when
11  I was pulling a modified schedule that the
12  firm was doing me a favor.
13      Q   All right. I'm trying to find out
14  what Mr. Henck did that was discriminatory,
15  and I wrote down that he would come back and
16  tell me that Meg said she didn't say
17  something.
18      A   Right. It was like a big circle of
19  confusion. As far as I'm concerned, when
20  you work for someone for 15 years, you know,
21  it was basically that he didn't do anything
22  to protect me as far as what he could have

Page 89

1   done if I was Caucasian.
2       Q   All right. So, what did you want
3   Mr. Henck -- or expect him to do to help you
4   or save you that he didn't do?
5       A   I wanted the same thing that, say,
6   Ms. Riley received or what Ms. Craig
7   receives, what other people of Caucasian on
8   the job have received that I did not
9   receive.
10      Caucasians was given modified
11  schedules to attend school. Ms. Riley-
12  Jamison herself was on a modified leave
13  schedule during her probationary period when
14  her husband was sick.
15      So, what made me different from all
16  these people to where I had to be harassed
17  and given such a hard time? So, I think I'm
18  trying to answer your question the best that
19  I can.
20      Q   Did Mr. Henck ever say any words
21  that were discriminatory like names or other
22  types of statements?

Page 90

1   A   No. He made little comments like,
2   you know, I don't know if this is going to
3   work or not after we agreed on the schedule
4   for my husband going for his chemo. He
5   said, because when you're not here, I can't
6   function.
7   Q   Right. So --
8   A   Okay? But then, on the other side,
9   Ms. Briscoe was the one in charge of the
10  floaters or whatever. He wouldn't give
11  anybody his work. He would leave it there
12  the next day for me to do.
13  Q   So, in your mind, that is
14  discriminatory?
15  A   I mean, I look at it this way. If
16  I'm out with my husband and I had the same
17  rights as everybody else, I don't feel that,
18  you know, I should be told that I had to do
19  certain things that other people did not
20  have to do.
21  Q   All right. Well, let's break that
22  down.

Page 91

1   A   Okay. But this is what I'm saying.
2   That's what I meant by you asking me --
3   You're asking me questions with sub-parts in
4   the question.
5       I would greatly appreciate it if you
6   would ask me one question at a time, and I
7   will answer you the best I can. That's all
8   I can tell you at this point.
9   Q   Your husband was diagnosed with
10  cancer in the fall of 2002; right?
11  A   October 23rd, 2002, he was diagnosed
12  with colon cancer that metastasized to the
13  liver.
14  Q   Okay. Ms. McFadden, I'm trying to
15  get through this. I --
16  A   No. You asked me what was he --
17  Q   No. I asked you the following
18  question. In the fall of 2002, your husband
19  was diagnosed with colon cancer? The answer
20  to that question --
21  A   Is yes.
22  Q   -- is yes.

Page 92

1   A   Okay.
2   Q   It is not the long answer that you
3   gave.
4   A   Okay, fine.
5   Q   And the point being is that we'll be
6   here a lot longer than is necessary.
7   A   Okay, fine.
8   Q   And we just took a long break, and
9   I'm happy to accommodate you, but, you know,
10  I'm just pointing out to you that you're
11  only prolonging it.
12  A   Okay.
13  Q   All right. So, after he was
14  diagnosed with cancer, you discussed with
15  the firm you going on a modified schedule;
16  isn't that right?
17  A   No, not at that particular time.
18  No.
19  Q   Okay. When did that occur that you
20  --
21  A   That occurred in, I think, the
22  second week of January.

Page 93

1   Q   Of 2003?
2   A   2003.
3   Q   Because your husband needed various
4   treatments, chemotherapy treatments?
5   A   Yes
6   Q   And a modified work schedule was
7   agreed upon, was it not, between you and the
8   firm?
9   A   Yes.
10  Q   And what was the modification? I
11  think I know, but I'd probably mess it up.
12  A   On the week that he got his chemo, I
13  didn't work on Monday and Wednesdays. And
14  on the week where he got -- it was a
15  vaccination he was getting, I was only off
16  on that Monday.
17  Q   So, one week you would work three
18  days, the next week you would work four
19  days?
20  A   Four days; yes.
21  Q   And he would have to do one of those
22  two things every week was my impression; is

Page 94

1  that correct?
2      A   Yes.
3      Q   So, did the firm ever put you on a
4  part-time status and take away any full-time
5  benefits?
6      A   I was pulling leave without pay, but
7  I wasn't put on a -- I was still considered
8  a full-time employee.
9      Q   And on those days that you actually
10  worked on this modified work schedule, you
11  worked the regular hours; is that right?
12      A   I would work more than the regular
13  hours to try to compensate for the days that
14  I was off.
15      Q   Do you agree that there were days
16  after your husband was diagnosed with cancer
17  that you didn't come in until a certain hour
18  or had to leave early and Ms. Riley-Jamison
19  didn't dock you for that or put down leave?
20      A   She docked me for it.
21      Q   Do you agree that there were times -
22  - Strike that.

Page 95

1          Are you aware that there were times
2  that when she could have put you down for
3  leave or docked you, that she didn't? Are
4  you aware of any of those times?
5      A   She used the leave that I had.
6      Q   Are you aware of any times when she,
7  instead of using up your leave or instead of
8  docking you, Ms. Riley-Jamison actually did
9  you favor and didn't write it down, gave you
10  credit for the time?
11      A   No, I'm not.
12      Q   Are you aware of any efforts by Ms.
13  Riley-Jamison to assist the process of you
14  getting salary advances in 2003 and 2004?
15      A   No
16      Q   All right.
17      A   I mean, she did the Federal Express
18  envelope, but besides that, no, truly I
19  don't know.
20      Q   Now, I'm trying to get back to Mr.
21  Henck.
22          So, you get the modified work

Page 96

1  schedule in place and you're working it?
2      A   Yes.
3      Q   Do you consider that to have been
4  something that was a nice thing for the firm
5  to do?
6      A   Well, since, under the law, I was
7  still entitled to FMLA for my husband and
8  I'm constantly being told the firm is doing
9  me a favor, when in fact my rights under the
10  law FMLA was still in existence, no.
11      Q   You don't consider it a nice thing
12  that the firm did to put you on a modified
13  schedule keeping your full-time status --
14          MS. MURRAY:  Asked and answered.
15          BY MR. DiMURO:
16      Q   -- and not docking you for FMLA?
17      A   I mean, you're -- How many questions
18  do you want to ask me about one thing?
19          What I'm saying to you is, at the
20  time that she was telling me that the firm
21  was doing me a favor -- okay? -- and before
22  I got sick and when my husband was sick, he

Page 97

1  still qualified for FMLA.
2      Q   Do you know if in 2002 you used up
3  any FMLA time?
4      A   I only know the days that she put
5  down.
6      Q   Do you know if in 2002 you used up
7  any FMLA time?
8      A   I know in 2002 they advanced me two
9  weeks of vacation.
10      Q   Do you know if in 2002 you used up
11  any FMLA time?
12      A   Yes. But the days weren't correct.
13      Q   Well, how do you know that? Do you
14  have records?
15      A   I have it in writing.
16      Q   You have what in writing?
17      A   I have a document from Fern Forman.
18  On the day that she started my FMLA with my
19  husband, on the 17th or 18th I had put in
20  leave. I was having a colonoscopy myself.
21      Q   That's 2003.
22      A   No. That's 2002. I know when I had

McFadden

Page 98

1  my colonoscopy; okay, sir?
2      Q   Okay. Well, I'm sure we all do.
3  That, I'll agree with you.
4      A   Yes. I think we all know that. But
5  I'm just saying, you know, if you're going
6  to
7  -- By the law, if I put in leave to have a
8  colonoscopy done over two days, and my
9  husband gets sick 1:00 a.m. that Friday
10 night, by law my FMLA shouldn't have started
11 until that Monday. And that's the day when
12 I was out when I had leave to cover it for a
13 colonoscopy.
14     Q   Do you have any records in your own
15 handwriting or that you kept about the days
16 that you worked or didn't work in 2002? Do
17 you have any records you kept?
18     A   Well, this might sound strange, but
19 I don't know who was doing the leave system,
20 so we used to get statements telling us what
21 we did. So, I can only tell you what I know
22 from memory.

Page 99

1      Q   All right. That's what I'm asking.
2      A   Okay.
3      Q   In 2002, did you keep any records in
4  your own handwriting or that you typed out
5  on your own about what days you worked or
6  didn't work?
7      A   I have them written out on my own.
8      Q   Pardon me?
9      A   I wrote them -- I kept track of it
10 myself.
11     Q   All right. So, you kept some
12 records?
13     A   But, also, in a letter that Ms.
14 Forman gave me, she broke it down to the two
15 weeks they gave me after my husband's
16 surgery --
17     Q   Ma'am, here's an example of --
18     A   Okay. Sorry.
19     Q   If you don't stay with the question,
20 we're going to be here a lot longer than is
21 necessary.
22     A   Okay.

Page 100

1      Q   Did you, in 2002, write down in your
2  own handwriting the days you worked and
3  didn't work?
4      A   Yes.
5      Q   What happened to those records?
6      A   I mean, they were just things I just
7  scribbled in a steno pad, but if you would
8  like it, you can have it.
9      Q   Well, in reading your interrogatory
10 answers, they say you don't have any records
11 of when you worked or didn't work, that you
12 have to rely on the law firm's records.
13     A   That's for 2003. You asked me about
14 2002.
15     Q   I am asking you about 2002.
16         Do you have written records in your
17 own handwriting at home about days you
18 worked and didn't work?
19     A   I know the days.
20     Q   Do you have written records at home
21 --
22     A   No, I do not.

Page 101

1      Q   Then why did you just tell me that
2  you had written down records --
3      A   I mean, I have --
4      Q   Ma'am, why did you just tell me you
5  had written down records from 2002 about the
6  days you worked and didn't work?
7      A   Because I know the exact days that I
8  worked in 2002.
9      Q   But you don't have anything in your
10 handwriting or in your own typing at home
11 reflecting what days you worked in 2002; is
12 that right?
13     A   No. I don't have nothing in
14 writing.
15     Q   Okay.
16     A   It's what I know -- I don't have it
17 in writing, period.
18     Q   Do you have anything in your own
19 handwriting or in your own typewriting
20 reflecting what days you worked or didn't
21 work in 2003?
22     A   No.

Page 102

1    Q    The schedule gets modified. Is it
2  your testimony that at some point Mr. Henck
3  said that the modified work schedule wasn't
4  working out or something like that?
5    A    He made the comment that it wasn't
6  working out because Ms. Riley-Jamison told
7  him that we were short of support staff.
8    Q    When was this?
9    A    Around the end of May 2003.
10  Somewhere around there. I'm not sure of the
11  date.
12    Q    And what happened with the modified
13  work schedule?
14    A    I mean, at that time then in June,
15  my husband's treatment was over with, so I
16  stuck with the modified schedule.
17    Q    You stayed with the modified
18  schedule?
19    A    Yes, I did.
20    Q    So, after Mr. Henck said Ms. Riley-
21  Jamison said there was a problem with the
22  modified work schedule, you still worked the

Page 103

1  modified work schedule; right?
2    A    Yes. But Mr. Henck also said that
3  he didn't personally have a problem with it.
4    Q    But you continued to work the
5  modified work schedule as you had done --
6    A    Yes. If Mr. Henck is my boss and
7  he's telling me he doesn't have a problem
8  with it and having Ms. Riley-Jamison telling
9  me it is a problem, you see what I'm saying?
10
11        As far as I was concerned, I went by
12  what Mr. Henck said, not what Ms. Riley-
13  Jamison said.
14    Q    So, nothing changed, and you got to
15  work the modified work schedule. Yes or no?
16    A    Yes.
17    Q    So, I'm still trying to figure out
18  what Mr. Henck did that's discriminatory.
19        You said that he would tell you that
20  Ms. Riley-Jamison said she didn't say
21  something. What are you talking about
22  there?

Page 104

1    A    Take, for instance, at the time
2  before I knew I had Graves' disease, I had
3  to get some tests done at Georgetown
4  Hospital.
5    Q    I'm sorry. You had --
6    A    Tests at Georgetown Hospital.
7    Q    All right.
8    A    I called Ms. Riley. I told her, I
9  said, I know my situation on Monday and
10  Friday. My doctor wanted to run some tests
11  because she thinks I have Graves' disease.
12        Ms. Riley's response was, well, you
13  know, you're off enough as it is. I know
14  you have health issues, but since your
15  husband is hospice anyway, can't someone
16  else take care of his situation?
17    A    All right. Your husband is in a
18  hospice or should be in a hospice? I just
19  didn't understand what you meant.
20    A    No. That's what she said. My
21  husband basically had the surgery and they
22  said he was terminally ill.

Page 105

1    Q    Right.
2    A    So, from that, the way she said it
3  was like, you know, can't somebody else deal
4  with my husband's situation.
5    Q    Did you take it that she was
6  suggesting that he should be placed in a
7  hospice?
8    A    Oh, she has told me that.
9    Q    Well, I'm asking about this
10  conversation.
11    A    Yes. I mean, she has told me that
12  on various occasions.
13    Q    But stay with this conversation.
14    A    Okay. I'll stay with this
15  conversation. So, that's one of the reasons
16  where I felt that Mr. Henck was being
17  discriminatory because of the fact that I
18  called him on his cell phone out of town and
19  I told him what happened.
20        He said, I will get to the bottom of
21  this when I get back. He confronted Ms.
22  Riley. Ms. Riley denied everything.

Page 106

1    Q    What did you tell Mr. Henck she had
2  said?
3    A    Exactly what I just told you.
4    Q    And you were offended by what she
5  said because --
6    A    Yes, I was offended by it. Because,
7  basically, what she was saying was my
8  husband's dying anyway, so why are you going
9  to waste time with that, take off for
10  yourself and take care of that. That's
11  basically how she put it. That's the way
12  she put it to me.
13    Q    I see. So, you did go to the test
14  for the Graves' diagnosis; right?
15    A    Oh, Mr. Henck told me to go ahead
16  and take off --
17    Q    Just stay with my question.
18    A    -- so I did; yes. Yes, I did.
19    Q    Ms. Riley-Jamison didn't tell you
20  not to go to the test; right?
21    A    She wasn't supportive.
22    Q    Right. But she didn't say to you

Page 107

1  don't go to the test; right?
2    A    After I went to her office and we
3  talked about it and I told her I had called
4  Mr. Henck, that's when her whole
5  conversation changed.
6    Q    No. Before you called Mr. Henck --
7    A    And she apologized to me for saying
8  what she said.
9    Q    Before you called Mr. Henck, Ms.
10  Riley-Jamison did not say to you don't go to
11  the test; isn't that right?
12    A    She told me to try to find somebody
13  else to deal with my situation; yes.
14    Q    Is that telling you not to go to the
15  test?
16    A    But I'm saying my husband was dying.
17    Q    Ma'am, did Ms. Riley-Jamison tell
18  you not to go to the test at anytime before
19  you spoke with Mr. Henck?
20    A    She didn't tell me not to go, but I
21  went.
22    Q    And have doctors told you that your

Page 108

1  husband should be in a hospice or suggested
2  -- Strike that. Let me back up.
3         Have any doctors suggested to you
4  that your husband should at some point be in
5  a hospice?
6    A    It has been mentioned.
7    Q    So, which doctors have mentioned
8  that?
9    A    The doctor he had at Georgetown.
10    Q    All right. Okay.
11    A    Okay?
12    Q    Do you think it is an unusual
13  thought for somebody to express to a cancer
14  patient that there might come a time when
15  hospice is needed?
16    A    But I don't think it was Ms. Riley's
17  decision to decide if my husband -- or Mr.
18  Henck's -- if my husband should be placed in
19  hospice care.
20    Q    Well, she wasn't telling you to do
21  that.
22    A    Oh, she -- No, no, no. She has told

Page 109

1  me that.
2    Q    So, you think --
3    A    Basically, like she told me, you
4  know, you need to take your daughters -- You
5  asked me to answer the question, see?
6         That's what I mean by you asking me
7  -- trying to ask me two or three questions
8  at a time; okay? You can't ask me one
9  question. That's what your doing, and
10  that's why I keep pointing it out.
11         THE WITNESS: (To Ms. Murray) Am I
12  right or wrong?
13         MS. MURRAY: Just answer the
14  question, Ms. McFadden.
15         THE WITNESS: Okay. As far as I'm
16  concerned, her and Mr. Henck constantly
17  badgered me to put my husband in hospice
18  care. That was a personal matter. It
19  wasn't a firm matter.
20         BY MR. DiMURO:
21    Q    Whatever she said about hospice care
22  to you, if she did, you didn't take it as a

Page 110

1  suggestion or as an expression of concern
2  that --
3     A    No, not at all.
4     Q    Are you opposed to hospice care?  Do
5  you think that no patient should be in
6  hospice care ever?
7     A    I didn't say that.
8     Q    Well, I'm asking you.
9     A    How do I feel about it personally?
10    A    Well --
11    Q    You might be a person who says I
12  don't care how far along the relative gets,
13  how ill they become, I just don't believe
14  they should be at hospice, they should be at
15  home.  You might feel that way.  I'm just
16  trying to find out.
17       MS. MURRAY:  You've asked two
18  questions and you didn't let her answer the
19  first one, so which one would you like for
20  her to answer?
21       THE WITNESS:  For me to answer.
22  That's what I'm saying.

Page 111

1       MR. DiMURO:  Well, there you go.
2  You got me.
3       THE WITNESS:  Yes, you're right.
4       BY MR. DiMURO:
5     Q    Are you personally against hospice
6  care regardless of the circumstances?
7     A    I feel like you're asking me do I
8  believe in God.  I don't know how to answer
9  you.
10       THE WITNESS:  (To Ms. Murray) Am I
11  making any sense?
12       MS. MURRAY:  Answer as best you can,
13  Ms. McFadden.
14       THE WITNESS:  You know, my thing on
15  hospice care?
16       MR. DiMURO:  Yes.
17       THE WITNESS:  My personal belief?
18       MR. DiMURO:  Yes.
19       THE WITNESS:  As far as putting
20  someone in a hospice care facility, no, I
21  think it's cruel.
22       MR. DiMURO:  Okay.

Page 112

1       THE WITNESS:  But as far as having
2  hospice care come in the home to help me,
3  no, it's not cruel --
4       MR. DiMURO:  Okay.
5       THE WITNESS:  -- because that person
6  is still with me.
7       MR. DiMURO:  All right.
8       THE WITNESS:  Did I answer your two
9  or three questions you asked me?
10       MR. DiMURO:  You did a fine job.
11       THE WITNESS:  Okay.
12       MR. DiMURO:  It's certainly a matter
13  of personal belief.
14       THE WITNESS:  I mean, it's personal
15  preference.  But as an employee, when you
16  cross the line and when you have another
17  employee call me at home --
18       MR. DiMURO:  Hold on.  If you go
19  down -- You're not answering the question.
20       THE WITNESS:  Okay.  We're not going
21  to go down there.
22       MR. DiMURO:  You'll be here

Page 113

1  tomorrow, Ms. McFadden --
2       THE WITNESS:  Okay.  Well, we're not
3  going to be here tomorrow.
4       All I'm saying is, as far as I'm
5  concerned, it was inappropriate for her or
6  Mr. Henck to tell me what to do with my
7  husband.
8       MR. DiMURO:  Okay.
9       THE WITNESS:  That's just like me
10  telling her, if her husband was sick, do you
11  do a --
12       MR. DiMURO:  Ma'am, the more you
13  keep talking, the more I guarantee you --
14       THE WITNESS:  Okay.  Well, fine.
15       MR. DiMURO:  -- you'll be here
16  tomorrow.
17       THE WITNESS:  Well, what you need to
18  do is ask me a question.  Don't ask me three
19  or four questions.
20       MR. DiMURO:  Ma'am, please, you're
21  only hurting yourself.
22       THE WITNESS:  No, no, no.  I'm not

Page 114

1  hurting myself.
2       MS. MURRAY: Just answer --
3       THE WITNESS: No, no. I'm not
4  hurting myself.
5       MR. DiMURO: Ms. Murray, please --
6       MS. MURRAY: Stop.
7       If you have a question, Mr. Dimuro -
8  -
9       MR. DiMURO: Thank you.
10       MS. MURRAY: Answer only what he is
11  asking you.
12       THE WITNESS: All right.
13       BY MR. DiMURO:
14    Q  Was Ms. Riley-Jamison suggesting
15  that he should be placed in a hospice
16  facility as you described, or that hospice
17  helpers should come to the home, or didn't
18  she make it clear one way or the other?
19    A  She suggested that he should be
20  placed in a hospice facility.
21    Q  And you are personally opposed to
22  those types of facilities for your

Page 115

1  relatives; right?
2    A  Yes.
3    Q  Whatever she said about bringing
4  your daughters home to help, did you not
5  take that as an expression of concern that
6  maybe some family members could help you
7  with your burden?
8    A  No.
9    Q  All right. What else did Mr. Henck
10  do? Is there any other example where Mr.
11  Henck was discriminatory?
12    A  I'm not sure of the exact date in
13  March. He had Ms. Janet Craig call me at my
14  home, and he instructed her to tell me to
15  put my husband in a hospice care facility
16  and that I should sell my rental properties.
17    Q  I'm sorry. You understand that Mr.
18  Henck told Ms. Craig --
19    A  Janet Craig. She called me at home
20  --
21    Q  To tell you that?
22    A  -- because Mr. Henck asked her to do

Page 116

1  that.
2    Q  Okay. And, of course, she --
3    A  And I called Mr. Henck the next day.
4  I said, why didn't you speak to me yourself?
5    Q  All right.
6    A  His answer was, I thought you would
7  receive it better from Janet since she's
8  been through that, which I couldn't
9  understand because Ms. Craig took care of
10  her husband at home. He was not in a
11  hospice facility.
12    Q  You, of course, were not present
13  when Mr. Henck spoke with Ms. Craig; right?
14    A  No.
15    Q  Did Ms. Craig -- Why do you take
16  that as discriminatory?
17    A  It is discriminatory. I mean, he
18  knew that she was home with her husband
19  taking care of her husband --
20    Q  Well --
21    A  -- and that she didn't have hospice
22  care.

Page 117

1    Q  Did --
2    A  You know, the way you're asking me -
3  - For instance, I mean, everybody --
4    Q  Tomorrow.
5    A  -- has a personal choice.
6    Q  Tomorrow. Tomorrow. We're going to
7  be here tomorrow.
8    A  No. All I'm saying is --
9       MS. MURRAY: Complete your answer,
10  Ms. McFadden.
11       THE WITNESS: No, I'm just saying,
12  if she was allowed to get paid for her
13  husband being sick, who doesn't work for the
14  firm, and I had to go through what I had to
15  go through, it's discrimination. I don't
16  care how anyone puts it. It's
17  discrimination.
18       MR. DiMURO: We'll come back to
19  that.
20       BY MR. DiMURO:
21    Q  You applied for Social Security
22  disability; is that true?

Page 118

1    A   Yes, I did.
2    Q   When did you do that?
3    A   On November -- It was around the
4  beginning of November of 2003. Somewhere in
5  the beginning of November.
6    Q   And did you fill out the form
7  yourself?
8    A   My daughter filled it out.
9        MR. DiMURO: Let's mark this as
10 Exhibit 73.
11           (Whereupon, the document
12           was marked as Deposition
13           Exhibit No. 73, for
14           identification.)
15       BY MR. DiMURO:
16   Q   Do you recognize this form, ma'am?
17       (Whereupon, the witness reviewed the
18 document.)
19       MR. DiMURO: There are numbers at
20 the very bottom. The numbers there --
21       THE WITNESS: Yes.
22       MR. DiMURO: -- if you go to Page

Page 119

1  18, you'll see your signature, I believe.
2        (Whereupon, the witness further
3  reviewed the document.)
4        THE WITNESS: Did you say Page 18,
5  sir?
6        MR. DiMURO: Yes. Using the
7  numbers, where it says SSA-18 --
8        THE WITNESS: I see it; yes.
9        BY MR. DiMURO:
10   Q   Okay. Is that your signature?
11   A   Yes. It says "Please print." Yes
12   Q   You filled out this form?
13   A   My daughter did.
14   Q   But you signed it verifying
15 everything was true and accurate; is that
16 right?
17   A   Yes.
18   Q   And this is part of the paperwork
19 used to get total disability benefits from
20 the Social Security Administration?
21   A   Social Security disability; yes.
22   Q   And as part of that application

Page 120

1  process, you have to say to them that you're
2  unable to work; isn't that right?
3    A   Yes.
4    Q   So, you applied for Social Security
5  benefits for the first time in November of
6  2003; right?
7    A   November the 6th; yes.
8    Q   And as part of that application
9  process, you told the Social Security
10 Administration that you were unable to do
11 any work; isn't that right?
12   A   I was unable to work at that time;
13 yes.
14   Q   Right. And you have continued to
15 fill out paperwork as the Social Security
16 Administration asks you for updated
17 information; isn't that correct?
18   A   Yes.
19   Q   And that's to keep your Social
20 Security disability payments coming; isn't
21 that true?
22   A   Yes.

Page 121

1    Q   And you've received Social Security
2  benefits continuously since the first time
3  you got them after you applied in 2003 to
4  the present date; right?
5    A   (No response.)
6    Q   I'll rephrase it. Are you with me,
7  Ms. McFadden?
8    A   Okay. Yes. I'm sorry.
9    Q   Sometime after you applied in
10 November of 2003, Social Security approved
11 your request for long-term disability -- I'm
12 sorry.
13       Sometime after you filed your
14 application with Social Security for total
15 disability, they approved it; right?
16   A   They back-dated it. Yes, they
17 approved it. Yes.
18   Q   Right. And you started getting
19 monies?
20   A   Yes.
21   Q   Based on your claim of total
22 disability; right?

Page 122

1    A   Yes.
2    Q   Based on your claim you were unable
3 to work; right?
4    A   Yes. That was my right. I paid for
5 Social Security benefits; okay?
6    Q   I understand.
7    A   Okay.
8    Q   And, in fact, they found you were
9 disabled on a date earlier than you had
10 suggested in the paperwork. I don't know if
11 you remember that.
12    A   Yes. They took it back to January
13 of 2003.
14    Q   And since that time when you started
15 first getting benefits from Social Security
16 for total disability, you have continuously
17 told them that you were unable to work;
18 right?
19    A   Yes
20    Q   And that's part of the process of
21 keeping your Social Security disability
22 payments; right?

Page 123

1    A   Yes.
2    Q   And that continues to the present
3 day? You still get those benefits?
4    A   Yes.
5    Q   Now, on this form, Exhibit 73, you
6 list disabling conditions including
7 fibromyalgia. Do you see that?
8    A   Uh-huh.
9    Q   You have to say yes or no, ma'am.
10    A   Yes.
11    Q   And that condition was diagnosed in
12 2003; isn't that true?
13    A   Yes.
14    Q   And you also list on Exhibit 73 that
15 you suffer from rheumatoid arthritis; is
16 that correct?
17    A   Yes.
18    Q   And that condition was first
19 diagnosed in 2003; is that true?
20    A   Yes.
21    Q   And you list on Exhibit 73 that you
22 suffer, as a disabling condition,

Page 124

1 depression; is that true?
2    A   Yes.
3    Q   And that condition was first
4 diagnosed in 2003; is that correct?
5    A   Can I ask my attorney a question?
6    Q   Sure.
7    (Whereupon, the witness conferred
8 with her counsel off the record.)
9    THE WITNESS: Yes.
10    BY MR. DiMURO:
11    Q   And the form, Exhibit 73, lists as a
12 disabling condition anxiety and panic
13 attacks; is that correct?
14    A   Yes.
15    Q   And that condition was first
16 diagnosed in 2003 also, wasn't it?
17    A   Yes.
18    Q   And the form, Exhibit 73, lists high
19 blood pressure as a disabling condition; is
20 that correct?
21    A   Yes.
22    Q   And that was first diagnosed in

Page 125

1 2003; is that true?
2    A   Yes.
3    Q   The form, Exhibit 73, lists
4 bronchitis as a disabling condition; is that
5 correct?
6    A   Yes.
7    Q   And it was first diagnosed in 2003;
8 is that correct?
9    A   With the bronchitis, I was told that
10 I had that around September -- Yes, you're
11 right, 2003.
12    Q   And the form, Exhibit 73, identifies
13 hyperthyroidism as a disabling condition; is
14 that correct?
15    A   Yes.
16    Q   And that was first diagnosed, I
17 think it was, through Dr. Thomas in 2003;
18 right?
19    A   Dr. Kristen Thomas; yes.
20    Q   And Exhibit 73 lists pain from
21 chronic illness as a disabling condition; is
22 that true?

McFadden

Page 126

1    A   Yes.
2    Q   And that was a condition that was
3  present and first diagnosed in 2003?
4    A   But in different stages, because at
5  one point they didn't know what was wrong
6  with me.
7    Q   Right.
8    A   So --
9    Q   Your medical records show that you
10  complained to the doctors about chronic pain
11  in your extremities and your joints and all
12  over; right?
13    A   Exactly.
14    Q   And since at least 2003 to the
15  present; right?
16    A   Yes. I'm in pain 24 hours a day.
17  Is that what you're asking me?
18    Q   Yes, ma'am.
19    A   Yes.
20    Q   And we're talking about the type of
21  pain --
22    A   Yes.

Page 127

1    Q   -- that disables you from working.
2    A   Yes. I'm in pain 24 hours a day.
3    Q   And all of these conditions that you
4  list on Exhibit 73 have continued to the
5  present date?
6    A   Yes.
7    Q   And the things that they make you
8  feel, the symptoms, the pain, and the
9  conditions they give you cause you to be
10  unable to work; right?
11    A   Yes.
12       MR. DiMURO: We're going to stop for
13  lunch. Let's go off the record.
14       (Whereupon, a lunch recess was
15  taken.)
16       BY MR. DiMURO:
17    Q   Before the break, we had gone over
18  some of the conditions listed on Exhibit 73,
19  the form submitted to the Social Security
20  Administration.
21       I'm going to ask you about some
22  other conditions that I think are in the

Page 128

1  medical records from the same period of
2  time.
3    A   Okay.
4    Q   First of all, when I see endocrine
5  disease in some of the medical records, I
6  equate that with the Graves' disease.
7       Would you agree or not agree or --
8    A   Yes.
9    Q   And on this form where it says
10  "hyperthyroidism," Exhibit 73, that's just
11  another word for the Graves' disease issue?
12    A   Yes. It's like -- Graves' disease
13  is the type that I have.
14    Q   Right. Okay.
15    A   Yes. It's the type that I have.
16    Q   You had a negative reaction to the
17  medication that somebody tried for the
18  Graves' disease?
19    A   Yes.
20    Q   And I think that was Tapazole?
21    A   Yes.
22    Q   And it caused rashes and severe

Page 129

1  blisters, it sounded like?
2    A   Yes.
3    Q   The way I read the records, that was
4  resolved, that the blisters and rash were
5  cured in one or two months or something like
6  that?
7    A   Yes.
8    Q   What I'm really asking is, you did
9  not suffer from the rash or the blisters in
10  2004?
11    A   No.
12    Q   The medical records list decreased
13  concentration. Do you recall complaining to
14  the doctors that you had in 2003 and 2004
15  decreased concentration?
16    A   Only if I was stressed.
17    Q   Dr. Morgan lists increased mistakes
18  at work due to your memory. Do you recall
19  telling Dr. Morgan that?
20    A   Is that Seth Morgan?
21    Q   Yes.
22    A   Yes. I told him that, and, you

Page 130

1  know, he was saying, with everything going
2  on with your health and your problems and
3  dealing with your husband's health, he said
4  that's normal. It's not abnormal.
5      Q   Do you recall telling two or three
6  of your doctors, at least in 2003 and early
7  2004, that you had shortness of breath?
8      A   Yes.
9      Q   Do you recall telling one or more of
10  your doctors in 2003 and early 2004 that you
11  had palpitations? I don't know if that's
12  your word or their word, but --
13     A   Yes. Heart palpitations.
14     Q   Okay. So, you told them that?
15     A   Yes
16     Q   Do you recall in 2003 and early 2004
17  telling your doctors that you suffered from
18  anxiety attacks?
19     A   Yes.
20     Q   Do you recall in 2003 and early 2004
21  telling one or more doctors that you were
22  suffering from blurry vision?

Page 131

1      A   Yes.
2      Q   Do you recall telling your doctors
3  in 2003 and early 2004 that you were having
4  trouble sleeping?
5      A   Yes.
6      Q   And do you recall that you reported
7  to the doctors that you could only get two
8  to four hours of sleep a night in '03 and
9  '04?
10     A   Yes.
11     Q   Do you recall in 2003 and early 2004
12  reporting to your doctors that you had
13  numbness in your hands?
14     A   Yes.
15     Q   And do you recall in 2003 and early
16  2004 telling your doctors you had numbness
17  in your face?
18     A   Yes.
19     Q   I separated the hands and the face
20  because I couldn't tell if that's sort of
21  the same condition, or were there different
22  causes for the --

Page 132

1      A   It's fibromyalgia.
2      Q   It caused both the hands and face?
3      A   It caused the numbness; yes.
4      Q   In both places?
5      A   On this side of my body
6  (indicating).
7      Q   I see. So, it went from the face
8  down to the hands?
9      A   Yes. And then I'd get the double
10  vision and whatever. It's worse on this
11  side than on this side (indicating).
12     Q   And you suffered from that in 2003
13  and 2004?
14     A   Yes.
15     Q   And do you recall telling your
16  doctors in 2003 and early 2004 that you
17  suffered from spasms in your neck, hands,
18  shoulders?
19     A   Yes.
20     Q   And did the doctor ever tell you
21  what the spasms were from?
22     A   From the fibromyalgia.

Page 133

1      Q   So, whether it's the neck, the
2  hands, the shoulders, or the feet, it's all
3  the same source as far as the doctors are
4  concerned?
5      A   As far as the pain level with the
6  fibromyalgia. The rheumatoid arthritis,
7  that basically affects my hands and my knees
8  and my legs.
9      Q   What does it do to your knees and
10  hands and legs, the rheumatoid arthritis?
11     A   It makes them swell up. And it's
12  like -- I feel like every day I have like a
13  very bad case of the flu, and sometimes the
14  medicine works, sometimes it doesn't.
15     I've also been told that, at some
16  point, I probably will be in a wheelchair.
17  But I'm not claiming that. All I'm saying
18  is most of my illnesses are chronic.
19     But the major depressive disorder, I
20  think, just came from stress of my situation
21  when I was at Ballard and trying to do
22  everything in my situation and that I was

McFadden

Page 134

1   getting sick myself.
2       Q   What does the rheumatoid arthritis
3   do to your hands and legs and knees?  What
4   do you feel is what I'm trying to get at.
5       A   Pain.
6       Q   Debilitating pain where you can't
7   stand on the leg or walk?
8       A   I have a mark on my leg now where I
9   fell on the step.
10      Q   No.  I'm talking back in 2003 and
11  the first half of 2004.
12      A   It's the same thing.  My balance is
13  terrible.  It's painful when I walk.
14      Q   When the rheumatoid arthritis was
15  acting up in 2003 and early 2004, is it true
16  that you had difficulty walking?
17      A   Yes.
18      Q   Were there times in 2003 and early
19  2004 where you couldn't walk?
20      A   When I had the blisters.
21      Q   How about after the blisters
22  resolved?

Page 135

1       A   And from the medication.  Well, it
2   was painful because my feet used to swell so
3   bad --
4       Q   Right.
5       A   -- to where it just hurt.  I mean,
6   basically, I really didn't wear a shoe at
7   work.  I wore socks.
8       Q   At work in '03?
9       A   When I was working in '03; yes.
10      Q   Oh, okay.
11      A   I wore socks because my feet were
12  swelling so bad to where it was painful.
13      Q   In 2003 and early 2004, do you
14  recall telling one or more doctors that your
15  right knee had given out?
16      A   It's my left knee, not my right.
17      Q   But that's something that you
18  mentioned to the doctors?
19      A   Yes.
20      Q   Do you recall in 2003 and early 2004
21  mentioning to the doctors that were
22  attending you that you would get severe

Page 136

1   headaches at times?
2       A   Yes.
3       Q   And that they would last for two to
4   three days?
5       A   Two to three days.  That's when I
6   see two of everything.
7       Q   And I believe the records reflect
8   that you told the doctors that they would be
9   described as "cluster headaches"?
10      A   Headache clusters; yes.
11      Q   Is that your word or their word?
12      A   Their word.
13      Q   Okay.
14      A   They said it was from the
15  fibromyalgia.
16      Q   Okay.
17      A   It's the type of disease where, when
18  you wake up, you don't know what you're
19  going to wake up to.
20      Q   All right.
21      A   That is, if you go to sleep the
22  night before.  I mean, you don't know how

Page 137

1   your body is going to react from day to day.
2   That's the only way I can explain it that I
3   think would make any sense to anyone.
4       Q   I've had it described to me before.
5   I've had rheumatoid arthritis described to
6   me before.
7       A   I'm talking about fibromyalgia.
8       Q   Right.  What is the difference, as
9   you feel it, between the fibromyalgia and
10  the rheumatoid arthritis?
11      A   Oh, I mean, the rheumatoid
12  arthritis, you know, I take medication for
13  it, but they told me that the type I have is
14  the crippling type.  At some point -- I
15  don't know when -- but at some point I'm
16  going to have to be in a wheelchair.
17      Q   In 2003 and early 2004, you say that
18  you wouldn't know from day to day how you
19  would feel in the morning?
20      A   That was from the fibromyalgia.
21      Q   And in 2003 and early 2004, is it
22  true that there would be days that you could

Page 138

1   not bring yourself out of bed?
2       A   Yes.
3       Q   How often would that happen in the
4   first half of '04?
5       A   For instance, I had one attack that
6   lasted a week and a half, and all I could do
7   was turn my head from side to side.
8       Q   Couldn't get out of bed?
9       A   All I could do was turn my head from
10  side to side.
11      Q   And that was either '03 or '04?
12      A   In '04.
13      Q   The first half of '04 or the second
14  half of '04?
15      A   Around March, I guess, of '04.
16      Q   Do you recall reporting to your
17  doctors in 2003 and early 2004 suffering
18  from low back pain?
19      A   Yes.
20      Q   When you put all these terrible
21  medical conditions together that are set
22  forth on Exhibit 73 or the things we just

Page 139

1   discussed, is it true that in 2003 and 2004
2   that your medical condition was such that
3   there were days you couldn't bring yourself
4   out of bed?
5       A   After I stopped working.
6       Q   In October of '03?
7       A   In October of '03.
8       Q   So, between October '03 and the
9   middle of '04, there were days when you just
10  couldn't get out of bed?
11      A   No. Even before that. But I didn't
12  have a choice but to work because I was the
13  only income.
14      Q   Okay.
15      A   I don't know if that's a fair answer
16  for you or not.
17      Q   Well, I understand.
18      A   I'm just saying, I came to work even
19  when I was sick. And, basically, what I did
20  -- Kristen Thomas was the doctor.
21          She called Ms. Riley one time and
22  spoke to her about my condition, and I also

Page 140

1   had her call Mr. Henck, because she felt at
2   that time, any disability program that
3   Ballard Spahr had, I should have been under
4   from what she witnessed.
5       Q   Dr. Thomas was saying that your
6   condition was such that you were totally
7   disabled from work?
8       A   But no one ever told me.
9       Q   All right.
10      A   So, that's neither here nor there.
11  I'm just going by what she wrote in her
12  letter. I think you've seen that.
13      Q   Yes.
14      A   So, that wasn't explained to me one
15  way or the other.
16      Q   So, let me just re-ask it.
17          Dr. Thomas said to you that she felt
18  that sometime in 2003 you were totally
19  disabled from work?
20      A   She was saying that I should have
21  been up under whatever disability program
22  that the firm had.

Page 141

1       Q   Before the application actually went
2   in?
3       A   Yes. Back in April of 2003.
4       Q   Well, in 2003 and early 2004, your
5   conditions were such that you were under so
6   much pain, either from the headaches or from
7   the fibromyalgia or the arthritis or the
8   panic attacks, that you couldn't go to work.
9   Is that a fair statement?
10      A   I still worked the days I was
11  scheduled to work; yes.
12      Q   Well, we're talking about after you
13  leave October 15th, 2003.
14      A   No, I haven't worked since then.
15  No, sir.
16      Q   Right.
17      A   Okay.
18      Q   After October 15th, 2003 through the
19  middle of 2004, there were periods of time
20  when the cluster headaches were so bad or
21  the fibromyalgia was so bad or these other
22  conditions were so bad that you couldn't

Page 142

1  bring yourself out of bed?
2      A   Yes.
3      Q   And you gave me one example of about
4  a week where you could only turn your head?
5      A   Yes.
6      Q   Is there any predictability to when
7  your various conditions after the beginning
8  of '04 would occur where you can't get out
9  of bed? Is there any predictability of when
10  you can't get out of bed?
11      A   What she tells me is maybe six
12  months to a year I will probably be confined
13  to a wheelchair.
14      Q   I'm sorry. I didn't mean to bring
15  that up.
16      A   But, sir, that's what you asked me;
17  right?
18      Q   Maybe I didn't ask it well enough.
19      A   That's fine.
20      Q   I was talking about the second half
21  of '03 and the first half of '04, were you
22  able to predict which days you were not

Page 143

1  going to be able to get to work?
2      A   Back at that time when I was still
3  working, I was the only income, so I did
4  what was necessary.
5      Q   I'm sorry. I didn't ask the
6  question correctly.
7      A   Okay.
8      Q   After October 15th of '03 through
9  the first half of '04 --
10      A   Okay.
11      Q   -- was there any ability for you to
12  predict which day you couldn't drag yourself
13  out of bed because of the pain or the
14  headaches or whatever was going on?
15      A   And as I've said before, when you
16  wake up, you don't know how you're going to
17  wake up.
18      Q   Well, that's my point, is it wasn't
19  predictable.
20      A   I mean, it's not predictable. It's
21  still not predictable.
22          MR. DiMURO: Let me have this marked

Page 144

1  as Exhibit 74.
2          (Whereupon, the document
3          was marked as Deposition
4          Exhibit No. 74, for
5          identification.)
6      BY MR. DiMURO:
7      Q   This came from the Social Security
8  Administration, and it's entitled
9  "Activities of Daily Living," and it looks
10  like it's signed by you on the second page.
11          If you would look at it please, I'm
12  going to ask you, did you fill it out and
13  did you sign it, and the answer may be
14  different for each of those parts.
15          (Whereupon, the witness reviewed the
16  document.)
17      BY MR. DiMURO:
18      Q   Let's start with the first question.
19          Did you fill it out if you recall?
20      A   Yes. My daughter helped me fill it
21  out.
22      Q   Is it her handwriting or your

Page 145

1  handwriting?
2      A   Some of it's mine, some of it's
3  hers.
4      Q   In any event, you signed it?
5      A   I signed it, yes, on 12/15/03.
6      Q   And Paragraph 9 or Section 9 says,
7  quote, "My life has changed tremendously.
8  I'm not able to work, exercise, lift objects
9  over five pounds. I need help with getting
10  in and out of the tub, off toilet, and
11  sometimes help out of bed. I can only walk
12  small distances at a time with the use of a
13  cane."
14          You approved that description of
15  your daily life activities?
16      A   At that particular time.
17      Q   And that was December 15th, 2003?
18      A   Uh-huh.
19      Q   Yes or no?
20      A   Yes.
21      Q   Has anything changed in how you
22  described to the Social Security

Page 146

1  Administration your ability to get around
2  and do these things?
3     A   It's worse.
4     Q   So, after you signed this document
5  on December 15th, 2003, Exhibit 74, the
6  description in Section 9, any updates you've
7  made would only describe a worse situation?
8     A   Yes.
9     Q   And I think, if I recall correctly,
10 that the Social Security has people either
11 come to the house or interview over the
12 phone. I don't recall.
13    A   Yes. You send your paperwork out
14 and -- you know, you fill it out and they
15 check with your doctors or whatever.
16    Q   And I'm sure they ask about the
17 doctors and I'm sure they ask about the
18 medical treatment; right?
19    A   Yes.
20    Q   But they also ask you about how
21 you're doing, if you're doing personal
22 chores or household stuff, how you're doing

Page 147

1  in your daily life activities; is that
2  right?
3     A   Yes.
4     Q   And anything you said to the Social
5  Security Administration after December 15th,
6  2003 about your daily life activities,
7  anything you said would describe a situation
8  that's worse than what's in Section 9?
9     A   Yes.
10    Q   And up in Section 1 where it says,
11 "My chronic body pain enables me to do too
12 much of anything" -- see that sentence up
13 here? -- I think what you meant to say was -
14 -
15    A   I am unable to --
16    Q   -- unable to do it?
17    A   -- groom myself; yes.
18    Q   So, that was a true statement on
19 December 15th, 2003?
20    A   Yes.
21    Q   And it remains to be a true
22 statement to the present date?

Page 148

1     A   Yes.
2        MR. DiMURO: We can mark this as
3  Exhibit 75.
4              (Whereupon, the document
5              was marked as Deposition
6              Exhibit No. 75, for
7              identification.)
8        BY MR. DiMURO:
9     Q   Exhibit 75 is a document from the
10 Social Security Administration entitled
11 "Function Report Adult-Third Party." This
12 is dated December 16th, 2003.
13    A   Yes.
14    Q   It looks like it's a report being
15 filed by your husband in support of your
16 claim for total Social Security benefits; is
17 that correct?
18    A   (No response.)
19    Q   I think what it is is your husband
20 saying what he observes about your
21 condition?
22    A   Yes.

Page 149

1     Q   Do you know if he did this himself
2  or if he had help?
3     A   My daughter.
4     Q   Is that his signature on the very
5  last page? I'll show it to you, ma'am.
6  It's Page SSA-49. Is that his signature?
7     A   Yes.
8     Q   Did you actually take a look at it
9  after he or your daughter filled it out?
10    A   No. She just asked the questions,
11 and we just answered them.
12    Q   Okay. So, you were there while they
13 were being answered and filled out?
14    A   Yes.
15    Q   So, when he says, in Section 8 on
16 Page 2, "Ms. McFadden grooms herself, aid
17 getting in and out of the tub, takes her
18 medications, and sleeps a lot, she is
19 constantly in chronic pain," all that's a
20 true statement?
21    A   Yes. I think what he means by
22 "grooms herself" --

Page 150

1     Q    Right.
2     A    -- no offense, I'm able to wipe my
3   own behind.
4     Q    Okay. I understand.
5     A    Okay? I just wanted to clear that
6   up. No offense.
7     Q    And none taken, ma'am.
8     A    I couldn't think of another way to
9   put it.
10    Q    I am sympathetic and empathetic to
11  your conditions. I feel badly about it, and
12  I just need to ask my questions.
13    A    That's okay. I'm still here.
14    Q    Section 16, where Mr. McFadden says
15  -- I'll just show it to you, ma'am, it will
16  be faster -- quote, "The disabled person has
17  chronic pain 24 hours a day" --
18    A    Yes.
19    Q    -- that was true back in December of
20  '03; right?
21    A    Yes.
22    Q    And it was a constant from that date

Page 151

1   to the present date; is that right? It's a
2   true statement since that time?
3     A    Yes.
4         MR. DiMURO: Let's mark this as
5   Exhibit 76.
6             (Whereupon, the document
7             was marked as Deposition
8             Exhibit No. 76, for
9             identification.)
10        BY MR. DiMURO:
11    Q    The document marked as Exhibit 76 is
12  a document entitled "Work Activity Report -
13  Employee," and I don't know who filled this
14  out. Let's see.
15    A    Well, I don't know either.
16    Q    Here it is  SSA-69 of Exhibit 76
17  has your signature; right?
18    A    No. What happened, my doctor filled
19  it out.
20    Q    Okay. Did you sign it?
21    A    I signed it.
22    Q    Okay, great.

Page 152

1     A    Dr. Phillip Mussenden filled this
2   out, and I signed it.
3     Q    Which doctor filled this out?
4     A    Phillip Mussenden.
5     Q    Okay.
6     A    And I signed it.
7     Q    So, just to show you Page SSA-68
8   where he --
9     A    This here --
10    Q    Which page are you looking at,
11  ma'am?
12        MS. MURRAY: He's asking about Page
13  68.
14        THE WITNESS: No. But this says --
15  I thought there was another -- No. This is
16  the work activity sheet filled out by Social
17  Security, and I signed it.
18        MR. DiMURO: Okay.
19        THE WITNESS: I just got it a little
20  twisted around --
21        MR. DiMURO: That's all right.
22        THE WITNESS: -- because you said

Page 153

1   something about my doctor. But this was
2   done by the person who took -- When you call
3   Social Security, they take information over
4   the phone, and they send you the
5   application.
6         So, this is what they filled out and
7   had me sign, so this was filled out by the
8   Social Security Administration.
9         BY MR. DiMURO:
10    Q    Ma'am, let's do it one at a time.
11    A    Okay.
12    Q    SSA-68, whose handwriting is it?
13  You're looking at it. Whose handwriting is
14  that, if you know?
15    A    The young lady from Social Security.
16    Q    The handwriting on SSA-69, the lady
17  from Social Security?
18    A    Besides my signature.
19    Q    Okay. So, I see what happens. They
20  call and interview you, they fill out the
21  form for you, and they send it to you for
22  signing, this particular form?

Page 154

1    A    And what they do is -- No. When you
2    get there, they get you to sign it and date
3    it for the date they did the interview.
4    That's why they put this date here.
5    Q    All right. I'm asking --
6    A    Is that making any sense?
7    Q    Well, no.
8    A    Okay. They do the interview over
9    the phone.
10   Q    Right.
11   A    They tell you what date to come in
12   and turn in your major paperwork, which is -
13   -
14   Q    Don't mix all that up. Just listen
15   to the --
16   A    I know. That's what I'm trying to
17   explain to you. And this is the form that
18   you have to fill out when you come back.
19   Not this one, but the other application you
20   showed me earlier.
21   Q    Yes, ma'am.
22   A    Yes. So, this here, this is the one

Page 155

1    my daughter had to fill out.
2    Q    That's Exhibit 73?
3    A    Right. When you talk to them on the
4    phone, they do like a telephone interview.
5    Q    Right.
6    A    They're writing down what you're
7    telling them.
8    Q    Right. You're now talking about
9    Exhibit 76?
10   A    Right. And this is my signature.
11   Q    And when and how does it get
12   presented to you for signature?
13   A    When you go into the office.
14   Q    So, you went in the office, somebody
15   gave it to you, and you read it and you
16   signed and verified the information?
17   A    And I signed it; yes
18   Q    And the date of January 23, '03 is
19   the date of the interview or the date that
20   you're in the office?
21   A    October the 23rd
22   Q    That's right. I'm sorry. I was

Page 156

1    reading upside down.
2    A    That's okay. I do that sometimes,
3    too.
4    Q    Is that the date you're in the
5    office or the date of the interview?
6    A    The day of the interview.
7    Q    So, you're in the office a couple of
8    weeks later or what?
9    A    I think it was around November the
10   6th or something. Around that time. I'm
11   not sure.
12   Q    It says here on Page 69 of Exhibit
13   76, "My job is very tolerant with me and
14   they wouldn't fire me, although I just
15   couldn't function to my full job capacity."
16       So, the lady from SSA wrote that
17   down, but does that express your feelings at
18   that period of time?
19   A    Basically, what was meant by that at
20   that time, Mr. Henck and I both agreed to --
21   you can no longer work. So, that's why I
22   put that in at the time, that they wouldn't

Page 157

1    fire me, even though they knew I was working
2    and that I was sick. That wasn't a secret.
3    Q    When you went on the modified
4    schedule in roughly January of '03 --
5    A    In January; yes.
6    Q    -- you kept your full-time pay;
7    isn't that correct? You still got paid for
8    being full-time, even though you were off
9    two days one week and off one day the other
10   week?
11   A    Are you saying that I would get
12   docked?
13   Q    No, no no.
14       When you went to the modified
15   schedule, one week you would not work two
16   days, and the next week when you had the
17   vaccination -- or your husband did --
18   A    For my husband; yes.
19   Q    -- you would only work four days.
20   So, in a two-week period, you were off three
21   days.
22       What I'm asking is, you still got

Page 158

1    paid your full salary; right?
2        A    No.
3        Q    Why didn't you get -- You weren't
4    still --
5        A    I mean, if I had leave to cover it -
6    - But I think I submitted my pay stubs when
7    it showed where I was paid different things
8    at different times.
9        Q    Let me back up and ask it this way.
10           When you went to the --
11       A    I'm getting kind of -- You asked me
12   did I get a full pay.  No.
13       Q    Let me ask it this way.
14       A    Okay?
15       Q    Okay.
16       A    Okay.
17       Q    I'm not saying you did anything
18   wrong.
19       A    No.  I'm just trying to comprehend
20   what you're saying.
21       Q    Okay.
22       A    I just want to give you a straight

Page 159

1    answer, because I want to go home, too.
2        Q    All right.
3        A    Because I'm in pain at this point.
4        Q    Well, all right.  I'm --
5        A    So, you asked me if, when I worked
6    that two-week period --
7        Q    If you let me re-ask the question,
8    we'll get to it faster.
9        A    Okay.  Well, re-ask your question.
10       Q    In a two-week period, there are ten
11   work days, you know, unless there's a
12   holiday; right?
13       A    Well, we got paid twice a month at
14   that point.
15       Q    Ma'am --
16           MS. MURRAY:  Just wait until he asks
17   you a question.
18           THE WITNESS:  Okay.
19           BY MR. DiMURO:
20       Q    In a two-week period, there are ten
21   work days; right?
22       A    (No response.)

Page 160

1        Q    Ma'am, back in '03 and early '04 --
2        A    Yes.
3        Q    Your modified work schedule
4    basically broke down to you only had to work
5    seven out of those ten days; right?
6        A    Yes.
7        Q    You, nonetheless, were still set at
8    a full-time salary; isn't that true?
9        A    Could you explain that?
10       Q    Sure.
11       A    I don't know what that means.
12       Q    Nobody put you on part-time and gave
13   you 70 percent of your salary?
14       A    Oh, no.
15       Q    And you still accrued benefits like
16   sick leave and vacation leave as if you were
17   still a full-time employee?
18       A    Yes.
19       Q    Okay.  That's all.
20           Now, sometimes you used leave that
21   was paid, and sometimes, when you couldn't
22   come in on the days you were supposed to be

Page 161

1    there, you got docked?
2        A    Yes.
3            MR. DiMURO:  Okay.  I'm going to
4    step out for a minute, and I'll be right
5    back.
6            (Whereupon, a brief recess was
7    taken.)
8            BY MR. DiMURO:
9        Q    Back now to late '03, after you
10   leave on October 15th or so, 2003 through
11   the first half of '04, in terms of all the
12   medical conditions and problems you had,
13   what I'm going to ask is a series of
14   questions about what you could or could not
15   do.
16           So, after October 15th, 2003 until
17   the middle of the year 2004, were you
18   cooking at home?  Could you cook at home?
19       A    No.
20       Q    Could you drive?  Do you drive?  Did
21   you ever drive a car?
22       A    Yes.

Page 162

1    Q    So, in that period of time --
2    A    I haven't driven since then.
3    Q    Every once in a while you meet
4    people who say, you know, I just never
5    learned to drive, especially in cities.
6    A    Okay.
7    Q    But you were a driver at some point?
8    A    Yes.
9    Q    After October 15th, 2003 to the
10    middle of May 2004, could you drive?
11    A    No.
12    Q    Could you do household chores,
13    cleaning?
14    A    No.
15    Q    Could you do the laundry?
16    A    No.
17    Q    Could you go shopping?
18    A    You mean as far as for --
19    Q    Food shopping.
20    A    Food shopping?
21    Q    Yes.
22    A    My daughter took care of that.

Page 163

1    Q    You can always go clothes shopping.
2    A    No. I didn't do that either.
3    Q    It sounds like, because you were
4    having your daughter fill out forms, that
5    you couldn't write either?
6    A    Because of my hands. They would
7    cramp up.
8    Q    Was that the arthritis?
9    A    The rheumatoid arthritis. With the
10    fibromyalgia, what I did was I took fluid
11    pills every day. Usually, my fingers were
12    twice the size of what you see now, and I
13    can't even bend them. But I took fluid
14    pills.
15    Q    And that's the way it was after
16    October 15th, 2003 through May --
17    A    Oh, even before that before I
18    stopped working.
19    Q    So, you couldn't write?
20    A    No.
21    Q    Could you hold the phone like a cell
22    phone or a kitchen phone?

Page 164

1    A    As far as I knew, I never got to the
2    phone, so I guess the answer is no.
3    Q    Okay.
4    A    I mean, basically, the phone that I
5    had in my bedroom was a speaker phone. So,
6    you know, it was like we could see the
7    number.    Somehow, my son connected it
8    to the TV so we could see the number, so if
9    it wasn't necessary to answer, we didn't,
10    especially if we was there alone.
11    Q    Is it a fair assumption that given
12    the fibromyalgia and the rheumatoid
13    arthritis, that after October 15th, 2003
14    holding a regular house phone or a kitchen
15    phone would not be comfortable to you, that
16    you couldn't do it?
17    A    Not for a long period of time; no.
18    Q    After October 15th, 2003, did you
19    have difficulty sitting in one spot for any
20    length of time?
21    A    Yes.
22    Q    And what is it about sitting that

Page 165

1    causes the problem? Does it cause back
2    problems or --
3    A    It causes the lower back pain, the
4    spasms in my neck.
5    Q    And what do you have to do to
6    relieve that? Go lie down?
7    A    Vicodin is a wonderful thing.
8    Ibuprofen.
9    Q    All right.
10    A    Basically, like I said, sometimes
11    the medication works or doesn't. That's why
12    my doctor suggested I move to a warmer
13    climate.
14    Q    But what you're describing about the
15    lower back pain from sitting too long
16    occurred after October 15th, 2003 to the
17    present day?
18    A    No. It was happening before that.
19    Q    Yes. But it was present --
20    A    But I had a thing in my chair at
21    work that I had for my back.
22    Q    Right. But after October 15th,

Page 166

1   2003, certainly you couldn't sit for long
2   periods of time without either having taken
3   the medication, Vicodin, or --
4      A   Ibuprofen or the anti-depressant
5   because of the pain.
6      Q   Right.
7      A   And it would make me sleep.
8      Q   What does the Vicodin do to you?  I
9   haven't had the pleasure.  Strike that.
10  I'll back up.
11         What does the Vicodin do to you?
12     A   Want one?  I'm just joking.
13  Basically -- Well, I'm trying to think of a
14  nice way to put it.
15     Q   Well, what I'm asking is, does it
16  cause you to be drowsy or lack of
17  concentration?
18     A   Yes, drowsy.  Like my equilibrium is
19  also -- Basically, you know, I can walk into
20  a wall and it's just normal to me now.  Does
21  that make any sense?
22         If I'm in the house and I'm walking

Page 167

1   around and if I walk into a wall, it's like,
2   oh, okay.
3      Q   Okay.
4      A   I have to accept that.
5      Q   Because these things don't happen to
6   people on just a specific date, what I think
7   you're telling me is the things we've been
8   discussing in the last few minutes about
9   what you couldn't do and how you felt and
10  what you had to do to relieve the pain, they
11  existed prior to October 15th, but they had
12  gotten to the point where, as of October
13  15th, you agreed to go on disability because
14  of these conditions?
15     A   Yes.  Mr. Henck and I discussed
16  that.
17     Q   And you felt the disabilities and
18  the conditions and the restrictions on your
19  abilities had gotten to a point where you
20  needed to leave work?
21     A   Yes.
22     Q   And those restrictions on your

Page 168

1   ability to work and function never got
2   better.  They continually progressed to --
3      A   It gets worse; yes.
4      Q   Okay.  Let me show you a few things.
5   Well, let me just ask you this question.
6         What job could you have done at
7   Ballard Spahr after October 15th, 2003?
8      A   The receptionist job.
9      Q   After everything we've talked about
10  and gone over your medical records and
11  discussed your limitations and restrictions,
12  do you really honestly feel and contend that
13  you could do the receptionist job after
14  October 15th, 2003?
15     A   Yes.  Because at the receptionist
16  desk, there was a headset --
17     Q   Right.
18     A   -- that you put on.  So, it was a
19  matter of it wasn't a complicated system to
20  work.  So, I could always use the end of a
21  pencil -- I mean, you're talking about
22  hitting a button about this little; okay?

Page 169

1         The job that I was offered was word
2   processing.  Word processing types more than
3   a legal secretary.  So, with wearing these
4   (indicating), I couldn't see myself being a
5   word processor.
6      Q   Let's stay with the receptionist.
7         So, you think you really could have
8   done the receptionist job as of 2004?
9      A   Yes.
10     Q   Do you think you can do the
11  receptionist job today?
12     A   Now?  No.
13     Q   At what point along the progression
14  of your medical condition do you look back
15  and say I couldn't do the receptionist job
16  anymore?  Was it the summer of '03, the fall
17  of '03?
18     A   I would say in 2005.  Basically, my
19  condition is progressive.
20     Q   Right.
21     A   It's not going to get any better, so
22  --

Page 170

1    Q    At what point in '05 -- and I don't
2  mean a specific date -- but are you talking
3  about January, February, July, or March?
4    A    The beginning of '05.
5    Q    So, we're back in '04 -- I'm trying
6  to get your mind in May of '04 -- and you
7  want to be the receptionist. How are you
8  going to be able to sit for six, seven,
9  eight hours and do the job?
10    A    Well, the receptionist that was
11  doing it didn't sit for six or seven hours.
12    Q    Well --
13    A    I mean, she got breaks. Three or
14  four breaks a day. She had a lunch hour.
15    Q    Three or four breaks a day?
16    A    Oh, yes. And I used to do a lot of
17  them. Because of her medical condition, she
18  --
19    Q    And how are you going to sit for an
20  hour and a half?
21    A    Sometimes she used to sit for an
22  hour and a half because I used to relieve

Page 171

1  her.
2    Q    Well, I understand --
3    A    No, no. I understand what you're
4  saying, but I'm explaining. If I was
5  treated the way she was treated, yes, I
6  could have done the job.
7    Q    Okay.
8    A    But if it was strictly, okay, break
9  in the morning, break in the evening, lunch,
10  no.
11    Q    Okay.
12    A    Is that a fair answer?
13    Q    Well, I need to focus in on you and
14  not the other lady for the moment.
15    A    Oh, okay.
16    Q    In May of '04, you could not sit for
17  more than a half-hour, an hour, hour and a
18  half, two hours?
19    A    It all depends on how the
20  fibromyalgia -- I mean, how my illnesses
21  acted that day.
22    Q    Could it have been the case in May

Page 172

1  or June of '04 that there were days you
2  couldn't sit for more than 30 minutes?
3    A    In '04, I was in better condition
4  than I am in now.
5    Q    Well, I'm trying to put your head
6  back into May of '04.
7    A    May of '04; right.
8    Q    In May of '04, isn't it true that
9  there would be days that you'd wake up and,
10  because of the unpredictability of your
11  condition, you couldn't sit for 30 minutes?
12  Isn't that true?
13    A    It all depends. But then, on the
14  same token --
15    Q    Well, I'll let you say anything you
16  want --
17    A    Okay.
18    Q    -- but do you agree that there could
19  be days in May of '04, given your condition
20  as of that stage in time, that you couldn't
21  sit for more than 30 minutes?
22    A    I'm probably doped up; yes. I'm

Page 173

1  trying to answer as truly as possible, sir.
2    Q    All right. But you would need to
3  have medication to do so in the May '04 time
4  frame to sit for 30 minutes; is that right?
5    A    At that point, I wasn't taking as
6  many medications as I'm taking.
7    Q    All right. Then I don't know which
8  it is. I don't know if it's the medication
9  --
10    A    I don't --
11    Q    Ma'am --
12      MS. MURRAY: Let him ask the
13  question.
14      THE WITNESS: I'm trying to listen
15  to what he's saying
16      MS. MURRAY: Wait for the question
17  BY MR. DiMURO:
18    Q    I don't know which you are telling
19  me, whether you could sit with medication or
20  sit without medication.
21      In May of '04, isn't it true that
22  there would be days that you'd wake up and

Page 174

1  your condition was such that you couldn't
2  sit for more than 30 minutes or a short
3  period of time like 30 minutes, 40 minutes,
4  an hour?
5      A   I could have done it in May of '04.
6      Q   Think about the worst day you would
7  have in May of '04. Just do your best to
8  think about the worst you would feel in May
9  of '04.     What's the amount of time
10  you could sit on the days that you would
11  feel the worst in May of '04?
12      A   I'm trying to think back. I'm just
13  trying to think back to the type of chair
14  that was there or whatever, and probably
15  with some type of back brace or whatever, I
16  probably would have been able to do it --
17      Q   Well, that's --
18      A   -- and sit maybe for an hour and a
19  half at a time and then get a break.
20      Q   And you're saying on the worst day
21  you could go to an hour and a half? I'm
22  trying to ask you about what --

Page 175

1      A   Yes. On a worst day, like I said,
2  if I have some type of back brace or some
3  type of support for my back with my
4  medication.
5      Q   All right. So, you've got to have
6  the medication in there?
7      A   But not as much as I'm taking now.
8      Q   But would have been Vicodin back
9  then in May of '04 to get through that hour
10  and a half?
11      A   I would take Vicodin; yes.
12      Q   And you would have also had to take
13  the anti-depressants or some type of anti-
14  depressant back in May of '04 to get through
15  the day as the receptionist; is that true?
16      A   Well, the receptionist job wasn't a
17  stressful job, so I don't think I would have
18  had to take as much medication as far as
19  having an anxiety or panic attack or
20  anything of that nature.
21      Q   Okay.
22      A   You know, my pain determines and

Page 176

1  stress determines how my body is going to
2  react.
3      Q   I have not had to take anti-
4  depressants myself. I know a lot of people
5  who do. So, this is not a judgment issue.
6      But I thought that when you take
7  anti-depressants, you have to take them on a
8  continuous basis. You can't just take one
9  on a --
10      A   No. You take them every day.
11      Q   Right. So, in May of '04 when
12  you're doing the receptionist job and you're
13  not feeling good, you wake up and you're not
14  feeling good, you would take pain medication
15  like Vicodin and you would already be on
16  anti-depressants; right?
17      A   Yes.
18      Q   And the Vicodin causes you to sort
19  of "space out," for lack of a better word?
20  Doesn't it cause that?
21      A   I don't know if "space out" is the
22  word. I think it makes you forget about the

Page 177

1  pain mind-wise. But, you know --
2      Q   Does it make you lose focus and
3  concentration?
4      A   I wouldn't drive under the influence
5  of it. Is that a reasonable answer?
6      Q   Well, does it make you lose focus or
7  concentration, the Vicodin? You just said -
8  -
9      A   I mean, at that point in time --
10  Could we just kind of break this down into
11  dates? Then I think I can --
12      Q   We're staying right in May of '04.
13      A   Okay. May of '04. In May of '04, I
14  think I would have been able to have done it
15  to accommodate my financial need at the
16  time.
17      Q   Okay.
18      A   But if you asked me if I could do
19  that job today or since the beginning of,
20  say, February or March of '05, the answer
21  would be no.
22      Q   Okay. We're back in May of '04, and

Page 178

1  you're trying to do the receptionist job.
2      A   Yes.
3      Q   On your worst days, you'd have to
4  have some Vicodin; right?
5      A   I mean --
6      Q   I need an answer to the question.
7      A   Yes.
8      Q   What does Vicodin do to you?  What
9  does it make you feel?  Do you sort of lose
10 focus or concentration?  Do you --
11     A   It makes you droggy sometimes.  I've
12 been droggy since I've been here.
13     A   Because of the Vicodin?
14     A   Yes.
15     Q   And it --
16     A   But, I mean, if I heard a phone
17 ring, I would answer it.
18     Q   How many phone lines are there at
19 Ballard Spahr?
20     A   At the receptionist?
21     Q   Yes.
22     A   As I recall, there wasn't that many.

Page 179

1  Maybe 16, if that many.  It was a very
2  simple piece of equipment to work.  It
3  wasn't like a big phone line thing or
4  whatever.  You basically transfer your
5  calls, you put people in voicemail, you took
6  messages.
7      Q   How do you take the message?  Did
8  you type up the message on an e-mail system
9  at that point in time, or did you write it
10 down on a message pad?
11     A   You write it down on a message pad.
12     Q   How are you going to write when you
13 can't really write that well in May of '04?
14     A   I don't think I would have been
15 writing letters.  I think I would write the
16 date and the time that the person called and
17 who the call was to.  Or I would have put
18 that person to the person's voicemail.
19     Q   What do you do as the receptionist
20 in May of '04 when the cluster of headaches
21 and the joint pain from fibromyalgia is so
22 severe that you can't get out of bed that

Page 180

1  day?  What do you do as the receptionist?
2      A   I would do like any other employee
3  would do.  I would call in sick.
4      Q   How many sick days do you get?
5      A   You get ten a year.
6      Q   Ten a year.
7      A   It all depends.
8      Q   So, you're reporting to the doctors
9  clusters of headaches several times a month,
10 aren't you?
11     A   No.  I haven't -- I mean, the thing
12 of it is, I'm looking at what you're asking
13 me, and I want to give short answers because
14 I want to go home, too.  But from April of
15 '03, I did what I had to do because I was
16 the only income.
17     Q   I understand that, ma'am.  I really
18 do understand that.
19     A   Okay.  So, the same thing would have
20 applied in May of '04 because, at that time,
21 I wasn't getting any type of income from
22 Unum.

Page 181

1      Q   I understand that.
2      A   So, I would have did what was
3  necessary.  I'm not saying that I wouldn't
4  have made a mistake along the way.
5      Q   But if you had been approved for
6  benefits in May '04 by Unum, you would have
7  taken the benefits and stayed on disability,
8  wouldn't you?
9      A   Who wouldn't?  I mean -- But that's
10 not the way it went.  It went a different
11 way.  I mean, basically, you know, it just
12 didn't go that way.  I mean, I think that's
13 one of the reasons why we're here; okay?
14         Because I feel like it wasn't like
15 my condition wasn't seen.  Other employees
16 would testify they saw how my feet were
17 swollen and how they would help me out and
18 help me do things.
19     Q   I understand.
20     A   Okay.  So --
21     Q   Does the receptionist have --
22     A   The receptionist basically answers

McFadden

Page 182

1    the telephone. She didn't do memos or type
2    letters or whatever even though, on her
3    evaluation, it says front office secretary,
4    but that's not the job she performed.
5        So, if it's a matter of fairness and
6    I answered the phone as only she did, I
7    could have done the job. And I think I've
8    answered all three or four of your
9    questions. I think.
10    Q    Did the receptionist have any need
11    to walk and leave the desk?
12    A    Go to the bathroom.
13    Q    All right.
14    A    I mean, I didn't know what she would
15    do. What do you want me to say?
16    Q    I'm talking about you. You, as the
17    receptionist back in May of '04, would have
18    had to leave the receptionist desk at times,
19    isn't that true, to go on breaks?
20    A    As any receptionist would get
21    breaks; yes.
22    Q    Okay. All right. Just answer the

Page 183

1    question.
2    A    I'm trying to answer --
3    Q    I don't care about other
4    receptionists. I'm talking about you.
5    A    Okay. Yes.
6    Q    Various of your doctors in late '03
7    and -- Well, basically, what you're saying
8    is that, if you had gotten the benefits from
9    Unum in May of '04, you wouldn't have
10    worried about taking the receptionist job;
11    right?
12    A    It was a thing of finances. I had
13    to survive.
14    Q    But if you had gotten the benefits
15    from Unum, you would have stayed on long-
16    term disability?
17    A    Yes. For my pain level; yes.
18    Q    Because you were disabled?
19    A    Yes. But that didn't happen.
20    Q    But you appealed. The denial of the
21    Unum benefits came in, I think, on May 11th;
22    right? The letter is dated May 11th.

Page 184

1    A    Yes. May 11th; yes.
2    Q    You subsequently filed an appeal
3    sometime later that year.
4    A    My son did appeal for me.
5    Q    About three or four months later;
6    right?
7    A    I did an appeal in October. I know
8    my son was in grad school.
9    Q    Okay.
10    A    He came, I think, around the
11    holiday. So, therefore, I didn't have any
12    income from Unum from --
13    Q    Ma'am, all I asked you was when you
14    filed the appeal.
15    A    Okay. I filed the appeal in
16    October.
17    Q    October of '05?
18    A    Yes.
19    Q    And, ultimately, there was another
20    review, and they granted your benefits;
21    right?
22    A    Yes. After EEOC gave me the right

Page 185

1    to sue. That's the way it happened. I'm
2    sorry.
3    Q    I'm just asking you, after you filed
4    --
5    A    Okay, yes. After I got it, well,
6    yes.
7    Q    You have to wait for me sometimes.
8    I know it's hard.
9    A    Well, like I said, I'm on Vicodin.
10    Q    Okay.
11    A    Okay.
12    Q    After you filed the appeal of Unum's
13    denial of the benefits, they ultimately
14    reconsidered and awarded you the benefits;
15    right?
16    A    No. What they did was they went
17    back and they paid me for the months they
18    did not pay me.
19        And every letter I've received, from
20    what I comprehended, if my disability was
21    approved, I didn't owe any back money. If
22    it wasn't approved, I didn't owe any back

Page 186

1  money.
2      Q    I don't think you heard the
3  question.
4          Unum denied the long-term disability
5  in May of '04. You appealed, and ultimately
6  they reconsidered and awarded you your long-
7  term disability benefits; right?
8      A    Not until September -- Yes.
9      Q    Thanks.
10     A    Okay.
11     Q    I'm showing you Exhibit 3, ma'am, a
12 letter from Dr. Clark to Mr. Spellman.
13     A    Yes.
14     Q    Did you see this letter from the
15 doctor?
16     A    Randall Clark? Yes.
17     Q    Pardon me?
18     A    Randall Clark? Yes.
19     Q    You saw the letter back in October
20 of '04 is what I'm asking.
21     A    Yes. That's my psychiatrist.
22     Q    Yes. And if you look on the second

Page 187

1  page, he says that "Ms. McFadden is
2  incapable of resuming employment now or in
3  the foreseeable future."
4          Did you see that statement back in
5  October of '04?
6      A    Yes.
7      Q    And this letter was submitted to
8  Unum for purposes of reconsidering your
9  request for long-term benefits; is that
10 true?
11     A    That's not true.
12     Q    Well, look at the front page.
13     A    No. The first letter -- and I don't
14 know if you have a copy of that -- when my
15 doctor did a conference call, which I was in
16 on, basically Unum sent my psychiatrist a
17 letter calling him a quack.
18     Q    Ma'am, that has nothing to do with
19 the question.
20     A    Oh, okay.
21     Q    Exhibit 3 is a letter sent by Dr.
22 Clark to Mr. Spellman; right?

Page 188

1      A    Uh-huh.
2      Q    You have to say yes or no, ma'am.
3      A    Yes.
4      Q    Mr. Spellman was someone at Unum
5  working on your application for long-term
6  disability benefits; right?
7      A    Yes. But at some point, they
8  changed the person that was doing it.
9  That's why I confused that.
10     Q    This letter --
11     A    It went to Unum.
12     Q    -- went to Unum for the purpose of
13 convincing Unum that you're entitled to
14 long-term disability benefits because you're
15 disabled; right?
16         MS. MURRAY: Calls for speculation.
17         MR. DiMURO: Well, it's not
18 speculation.
19         Go ahead and answer.
20         MS. MURRAY: You're asking why Dr.
21 Clark sent the letter. That's what you're
22 asking her, so calls for speculation as to

Page 189

1  why he did that.
2          MR. DiMURO: Thank you.
3          BY MR. DiMURO:
4      Q    Was this letter submitted to Unum,
5  Exhibit 3?
6      A    Yes.
7      Q    Was it submitted as part of your
8  request for them to reconsider the denial of
9  your long-term disability benefits?
10     A    It was included in my appeal.
11     Q    Okay. For the purpose of asking
12 them to reconsider their denial of your
13 benefits; right?
14     A    But that wasn't the only -- I mean,
15 this is not what made me get my disability.
16     Q    But it was part of the package that
17 you hoped would get you your long-term
18 disability benefits; right?
19     A    I put it with the appeal that I did
20 in October or November of '04.
21     Q    And at that time, you knew that Dr.
22 Clark had written "Ms. McFadden is incapable

Page 190

1  of resuming employment now or in the
2  foreseeable future"; is that correct?
3      A   Sure. He's my doctor. Why wouldn't
4  I know?
5      Q   And you had discussed with Dr. Clark
6  earlier that you thought maybe you could do
7  the receptionist job?
8      A   Yes.
9      Q   But he didn't say in this letter
10 that you could do the receptionist job?
11     A   No. But that was back in -- back in
12 after I sort of had no more job protection.
13 I told Dr. Clark that, well, I could have
14 done the receptionist job since she was
15 already out on disability and a temp was
16 working in that position.
17     Q   Right. But when --
18     A   Okay?
19     Q   When Dr. Clark says you cannot
20 resume employment now or in the foreseeable
21 future, he had already heard from you
22 earlier that you thought you could do the

Page 191

1  receptionist job at an earlier date; right?
2      A   At an earlier date; yes.
3      Q   By the way, who was the lady who was
4  out on disability in May of '04 that had the
5  receptionist job? Betty --
6      A   Betty Ann Hahn.
7      Q   She was out on disability because, I
8  believe, she was a cancer patient also?
9      A   She was a cancer patient; yes, sir.
10     Q   Was she out on -- Well, you know
11 that she was out on FMLA leave; right?
12     A   Uh-huh.
13     Q   You have to say yes or no.
14     A   Yes.
15     Q   And I had the impression that you
16 understand from your readings the rights
17 under FMLA?
18     A   Yes, I do. Yes.
19     Q   And you did know that in May of '04;
20 right?
21     A   I knew it in '03, too.
22     Q   Okay.

Page 192

1      A   I mean, it's all -- All I'm saying
2  is that --
3      Q   No. When Ms. Hahn --
4      A   -- I knew that she was out on FMLA.
5      Q   And that meant to you in May of '04
6  that, under FMLA, her job as the
7  receptionist was protected and secured for
8  when she came back; right?
9      A   For 16 weeks
10     Q   Right
11     A   Correct
12     Q   Where was she on May 14th of '04?
13 How many weeks had it been?
14     A   She wasn't at Ballard
15     Q   How many weeks of FMLA leave had she
16 used up as of May 14th, 2004?
17     A   I don't know   I went out in the
18 middle of October   She went out at the end
19 of October. So, I guess it's fair. If you
20 look at it, she was out in November. She
21 came back to work -- She called me in
22 September to ask me did I receive my

Page 193

1  Christmas bonus.
2      Q   Ma'am, ma'am --
3      A   No. I'm trying to -- What you're
4  doing, you're still -- you're asking me a
5  question in a question; okay?
6      Q   No, ma'am.
7      A   Sir, yes, you are. All I'm saying
8  is that we went out at the same time, Ms.
9  Hahn and I. There wasn't too far difference
10 in that.
11     Q   Do you know, as of May 14th, 2004,
12 how much FMLA leave protection Ms. Hahn
13 still had? Do you know from your personal
14 knowledge?
15     A   Oh, I don't know, but she was only
16 entitled to 12 weeks. She was a Virginia
17 resident, so I don't know how to answer
18 that.
19     Q   But you don't really know how much
20 time she came back and how much time she
21 worked or didn't work. So, you really don't
22 know, as of May 14th, 2004, how much FMLA

| Page 194 |
|---|

1  job protection she had remaining?
2      A    I only know what she spoke of to me,
3  and she's not here to tell that today, so I
4  don't know what else to tell you.
5      Q    Ma'am, if you could answer my
6  question, please.
7      A    I am answering it.
8      Q    On May 14th, 2004, you have no
9  personal knowledge of how much FMLA leave
10  protection she had remaining; isn't that
11  true?
12      A    (No response.)
13      Q    You don't know her personal leave
14  records.
15      A    Okay. Now, you need to ask me
16  again.
17      Q    As of May 14th, 2004, you do not
18  have any personal knowledge of the amount of
19  FMLA leave protection or job security Ms.
20  Hahn had remaining?
21      A    It's still not making sense to me.
22  Maybe you could ask me another way perhaps?

| Page 195 |
|---|

1      Q    All right. FMLA gives the person
2  job security. Do you understand that?
3      A    By law; right?
4      Q    Yes. It saves the job for them when
5  they come back.
6      A    Okay. For a total of 12 weeks?
7      Q    For whatever number of weeks
8  applies.
9      A    Okay. Well, I've answered your
10  question as this. I guess she received
11  better benefits than I, because she was
12  Caucasian and I was African-American.
13      Q    Well --
14      A    So, that's my answer.
15      Q    Here's the question.
16      A    I've answered your question.
17      Q    Ma'am, the question was, how much
18  FMLA leave left did Ms. Hahn have on May
19  14th, 2004 from your personal knowledge?
20      A    From my personal knowledge, I don't
21  know.
22      Q    I'm showing you Exhibit 13. The

| Page 196 |
|---|

1  first page is a cover sheet sending the fax
2  to Mr. Spellman from Dr. Clark. Do you see
3  that?
4      A    (No response.)
5      Q    Do you see that?
6      A    (No response.)
7      Q    Exhibit 13, the first page is a fax
8  cover sheet from Dr. Clark to Mr. Spellman
9  at Unum; right?
10      A    (No response.)
11      Q    Ma'am?
12      A    Can I read the document?
13      Q    I just want the record to reflect --
14      A    No.
15      Q    -- that it's been at least a minute
16  and a half --
17      A    No. I --
18      Q    -- since I asked you about a cover
19  sheet --
20      A    No. I want to make sure that this
21  document is truly from my doctor. I've
22  never seen this document before.

| Page 197 |
|---|

1      Q    Okay.
2      A    Is that okay?
3          (Whereupon, the witness reviewed the
4  document.)
5          THE WITNESS: Okay.
6          BY MR. DiMURO:
7      Q    This document has a fax cover sheet
8  from Dr. Clark to Mr. Spellman; right?
9      A    From what I see, yes.
10      Q    And then the second page is a
11  handwritten note on Dr. Clark's stationery;
12  right?
13      A    I'm assuming that's his stationery.
14      Q    Okay. Well, let's get to the point.
15          Are you saying this isn't Dr.
16  Clark's letter?
17      A    No. I -- I -- I don't know.
18      Q    At the very bottom, he says, quote,
19  "It is not to be expected that she will ever
20  be able to resume gainful employment."
21          That's a true statement, isn't it,
22  from your doctor in March of '04?

Page 198

1     A   If that's what he wrote, yes. I
2 just don't ever remember seeing the letter.
3     Q   This letter was submitted to Mr.
4 Spellman at a time when your application for
5 long-term disability benefits was under
6 consideration; right?
7     A   Yes.
8     Q   Was Dr. Clark one of the doctors
9 that Mr. Spellman was saying he wasn't
10 getting records from?
11     A   No.
12     Q   And you agree that it is a true
13 statement that as of March 17th, 2004 it was
14 not expected that you will ever be able to
15 resume gainful employment? Do you agree
16 with that?
17     MS. MURRAY: Object to the form of
18 the question.
19     THE WITNESS: Yes, the question
20 because --
21     MS. MURRAY: There's about four or
22 five problems with that. The main one is,

Page 199

1 are you asking her at that time Dr. Clark's
2 expectation?
3     MR. DiMURO: No.
4     BY MR. DiMURO:
5     Q   I'm asking you, based on what you
6 knew about yourself, that you would agree
7 with the statement that as of March 17th,
8 2004, it was not to be expected that you
9 will ever be able to resume gainful
10 employment?
11     MS. MURRAY: Object again. Who?
12     MR. DiMURO: I'm asking of her.
13     MS. MURRAY: I know you're asking it
14 of her. I'm asking you --
15     MR. DiMURO: Her mind set.
16     MS. MURRAY: Let me just do this.
17 I'll object to the form of the question in
18 that it does not identify who expected this.
19     You can answer if you understand it.
20     MR. DiMURO: Go ahead. You don't
21 need to look at the letter for this
22 question.

Page 200

1     BY MR. DiMURO:
2     Q   Do you agree that as of March 17th
3 or the middle of March 2004 you were not
4 expected to be able --
5     A   March 17th in the middle? "The
6 middle," to me, means June -- of the year.
7     Q   I said middle of March.
8     A   Middle of March; okay.
9     Q   Do you agree that as of the middle
10 of March 2004, it was reasonable for you not
11 to expect to resume gainful employment?
12     THE WITNESS: (To Ms. Murray) Do I
13 have to answer that question?
14     MS. MURRAY: If you understand it.
15     THE WITNESS: Because he's -- I
16 don't understand it.
17     MR. DiMURO: Don't give me this "if
18 you understand it" stuff.
19     THE WITNESS: No. I don't
20 understand it.
21     MS. MURRAY: First of all, I'm not
22 giving you anything, and you're not

Page 201

1 instructing me what to give my client.
2     MR. DiMURO: Well, as a speaking
3 objection, you're just telling her to mimic
4 you and say, oh, I don't understand the
5 question. That is in perfect English.
6     THE WITNESS: No. I don't
7 understand the question.
8     MS. MURRAY: That's why she's asking
9 me the question.
10     THE WITNESS: That's why I'm asking
11 you the question. I'm asking you to break
12 it down. Because, sir, seriously, I don't
13 understand the question.
14     MR. DiMURO: All right. I'll ask
15 for attorney's fees, Ms. Murray.
16     MS. MURRAY: You can do that, and I
17 will oppose it.
18     MR. DiMURO: Thank you.
19     MS. MURRAY: Continue.
20     BY MR. DiMURO:
21     Q   Now, in March of '04, you agree that
22 you did not expect, given your condition, to

Page 202

1   resume gainful employment thereafter; right?
2   That's a true statement, isn't it?
3       A   I'm not answering the question.
4       Q   You're not answering that question?
5       A   I mean, what do you want me to do?
6   You're asking me something that -- You're
7   asking me to predict the future sort of in a
8   way.
9           It's sort of like you're asking me -
10  - It's like -- I'm not understanding what
11  you're asking me. And I don't feel that I
12  should have to go into detail what I
13  discussed with my psychiatrist.
14      Q   I haven't asked you that question.
15      A   And to why he came to that point. I
16  think that's personal between my
17  psychiatrist and I.
18      Q   The pending question is, in March of
19  2004, your mind set was that you were not
20  going to resume gainful employment given
21  your condition back then.
22      A   That wasn't my mind set. I had a

Page 203

1   psychiatrist.
2       Q   Now, what did you talk to Dr. Clark
3   about concerning your ability to resume
4   gainful employment in 2004?
5       A   It was a series of things.
6       Q   Well, he didn't write this out of
7   thin air. You must have had a discussion
8   with him
9   --
10      A   No, no, no. Sir, I understand that.
11  But, I mean, like you said, you don't want
12  me to go down Memory Lane, and I'm not doing
13  that.      That's something that was
14  confidential between my psychiatrist and I,
15  and I don't think this is the appropriate
16  forum to discuss it. I'm sorry, sir. I
17  don't know what else you want from me.
18      Q   What did you and Dr. Clark discuss
19  in 2003 and 2004 about your ability to
20  resume gainful employment?
21      A   I'm not doing this right here at
22  all. As far as you want to know October

Page 204

1   here? No. This one here --
2       Q   This is not answering my question.
3       A   Yes, it is. Because you are trying
4   to make me -- You want me to tell you what
5   was my mental status then or what I was
6   going through, and I feel that's doctor-
7   privileged information.
8       Q   Ms. Murray will tell you that when
9   you bring a lawsuit of this nature, that
10  that goes by the wayside. You waive your
11  rights in that regard.
12          MS. MURRAY: Would you like to
13  consult about that? We can do that.
14          THE WITNESS: You and I?
15          MS. MURRAY: Yes.
16          THE WITNESS: Yes.
17          MS. MURRAY: Give us a minute,
18  please. I appreciate it.
19          (Whereupon, a brief recess was
20  taken.)
21          MS. MURRAY: I've consulted with my
22  client about her response to the last

Page 205

1   question posed. If we can have the question
2   read back, she will answer it.
3           (Whereupon, the court reporter read
4   back the record.)
5           BY MR. DiMURO:
6       Q   All right. What did you talk to Dr.
7   Clark about in late 2003 and early 2004
8   about you resuming gainful employment?
9       A   The things we talked about was my
10  treatment at Ballard, how I felt that I was
11  discriminated against because of my race,
12  retaliation because of things that
13  previously happened between Ms. Riley and I.
14
15          I talked about how I felt the firm
16  didn't show me any type of loyalty and I
17  have been an exemplary employee. I told him
18  mentally that I was very hurt, if anything,
19  emotionally, dealing with the situation
20  which Ballard put me in a depressive state.
21          You know, we talked about that and I
22  expressed to him how I felt about Mr. Henck,

Page 206

1  how I felt about Mr. Panagopoulos, how I
2  felt about Ms. Riley, how I felt about Janet
3  Craig, and, you know, things that were
4  confidential in my husband's and my life,
5  how these people would come to me -- Mr.
6  Panagopoulos, Janet Craig, other employees -
7  - and would ask me personal things I only
8  discussed with Ms. Riley.
9       So, therefore, it shouldn't have
10  went no further than that. How I felt
11  humiliated. And there was a subject brought
12  up of, well, you know, she didn't do too
13  bad. She lives in Southeast Washington, but
14  she was able to send four kids to college
15  I wonder how she did that? You know, just
16  things.
17       And I'm thinking, you know, what is
18  going on here? And I told him how Ms.
19  Riley, I felt like she disturbed my peace
20  because of the cruel things she would say to
21  me and the way that she would harass me.
22       And how, you know, I felt like Mr.

Page 207

1  Henck, after being loyal to him for 15
2  years, he just stood back and went, you
3  know, whatever.
4       And then it got to the point where,
5  you know, her harassment was to the point
6  where it was unnecessary, uncalled for. I
7  thought it was done for the fact that I was
8  African-American.
9       You know, maybe everybody takes
10  things different. I had to hear things
11  like, well -- from her and Mr. Henck -- you
12  know -- Okay.
13       Q   When you decide to get on the
14  question, you let me know.
15       A   No. I'm just saying -- You asked me
16  to explain why he put that there. At that
17  time, mentally, I couldn't have worked for
18  nobody because I was a mess.
19       Q   So --
20       A   No, no. I'm saying mentally, how
21  dealing with Ballard in the situation and
22  trying to get my disability and trying to

Page 208

1  maintain, everywhere I turned there was a
2  block going up there.
3       So, therefore, he was saying, you
4  know, mentally, right now, and with your
5  pain, he said, I don't know -- he said, who
6  would hire you in the condition you're in
7  now? And that's what he meant by as far as
8  gainful employment.
9       Because I expressed to him how, for
10  being treated and being degraded from these
11  people, my suicidal thoughts of taking my
12  life -- You see what I'm saying? Just
13  different things.
14       Sir, I'm answering your question.
15  You wanted to know the rhyme for the reason.
16  I'm giving you the rhyme for the reason.
17  That's why I didn't want to explain it.
18       Well, fine. He thought, at that
19  time, I was suicidal. So, I'm answering
20  your question.
21       THE WITNESS: (To Ms. Murray) Did I
22  answer his question?

Page 209

1       MS. MURRAY: Yes.
2       THE WITNESS: Okay.
3       BY MR. DiMURO:
4       Q   Did you and Dr. Clark discuss the
5  fact that you did not want to go back to
6  Ballard Spahr?
7       A   No.
8       Q   Okay.
9       A   You know, I told him, you know, it
10  was like I'm a very proud person and --
11       Q   Ma'am, you said no.
12       A   No, no  We discussed it because it
13  was a thing where, you know, it's like I
14  felt, because I was black and I went to Mr.
15  Henck, I had discussed it with Ms. Iversen -
16  - I did -- I went through the proper
17  channels, and nothing was being done, or it
18  was my imagination that Ms. Riley was saying
19  these things to me.
20       Q   Well --
21       A   You see what I'm saying, sir? So,
22  you're getting my point of view; okay? I'm

Page 210

1  giving my husband chemo; okay? He's
2  throwing up. When he gets home, I'm
3  cleaning up his feces.
4        I've got to come in on Tuesday, and
5  I've got someone telling me, okay, you were
6  out late. I'm not going to leave my husband
7  laying in feces until I get back home at
8  five o'clock or whatever. I'm going to
9  clean him up before I come there.
10       And the days that I did that, I
11 worked that time after that. So, from going
12 through all that and the way I was treated
13 and just the way they did things, yes, I had
14 suicidal thoughts.
15       No, I could not function. I was a
16 mess. No, I didn't bathe for a month. Is
17 this what you want to hear? You can hear
18 it. No, I couldn't comb my hair. I
19 couldn't do things.         You opened up
20 the door for you to know why this was said.
21 I think I just explained it to you, and
22 that's all I can say.

Page 211

1     Q   All right.
2     A   And I answered your question. Am I
3  right?
4        MS. MURRAY: You answered it. Now,
5  let him ask the next question.
6        THE WITNESS: Thank you.
7        BY MR. DiMURO:
8     Q   So, you and Dr. Clark discussed the
9  fact, isn't it true, that you did not want
10 to go back to Ballard Spahr? Isn't that
11 true? Yes or no?
12       MS. MURRAY: At what point in time?
13       MR. DiMURO: Prior to May of '04.
14       THE WITNESS: No. It wasn't about
15 going back to Ballard Spahr.
16       MR. DiMURO: Well, then, all you
17 have to do is say no.
18       THE WITNESS: No. No.
19       BY MR. DiMURO:
20    Q   Now, you talked to Dr. Clark about
21 the fact that you needed some support for
22 your long-term disability claim with Unum.

Page 212

1        You needed some medical support;
2  isn't that true?
3     A   No. I just told him that I have to
4  respond -- They sent the memo to Dr. Clark
5  referring to him as a quack, which he was
6  insulted. That's when the second letter
7  came from Unum stating that.
8     Q   You knew in February, March, and
9  April of 2004 that Unum was seeking Dr.
10 Clark's opinion on your long-term disability
11 application; right?
12    A   Yes. And I was there in the meeting
13 when he told them that some of the stuff
14 they was asking for was too confidential and
15 personal.
16    Q   And you knew that --
17    A   And he took that as an insult as
18 referring to him as a quack.
19       MR. DiMURO: I will just move to
20 strike and ask for attorney's fees if you
21 don't answer my questions, please. We will
22 just continue this as an extended

Page 213

1  deposition. I don't particularly care to do
2  that, but that's what's happened.
3        BY MR. DiMURO:
4     Q   Now, it is true that you were aware
5  that Dr. Clark was writing a report to Unum;
6  isn't that true?
7     A   Yes.
8        (Whereupon, Ms. Riley-Jamison and
9  Mr. Panagopoulos exited the deposition room
10 at this time.)
11
12       BY MR. DiMURO:
13    Q   And as we talked about it, do you
14 recall seeing the letter that's attached to
15 Exhibit 13 back in the February, March, or
16 April '04 time frame?
17    A   Yes. He faxed it to Mr. Spellman.
18    Q   All right. And you saw it back in
19 February, March, or April of '04; isn't that
20 true?
21       MS. MURRAY: Are you referring to
22 Exhibit 13?

Page 214

1       MR. DiMURO: Yes.
2       THE WITNESS: Yes. But, as you can
3   see, Dr. Clark had to write another letter
4   on October the 7th. That wasn't good
5   enough.
6       MR. DiMURO: All right.
7       THE WITNESS: That's why the second
8   letter was written.
9       BY MR. DiMURO:
10      Q   So, you knew in February, March,
11  April of '04 that Dr. Clark was saying that
12  it is not -- Strike that.
13      You knew in the February, March, or
14  April time frame of '04 that Dr. Clark had
15  written that it is not to be expected that
16  you will ever be able to resume gainful
17  employment; isn't that true?
18      A   Yes.
19      Q   And you knew that that letter was
20  being used to support your application for
21  long-term disability benefits; right?
22      A   Yes.

Page 215

1       Q   And you talked to Dr. Clark about
2   the fact that you didn't really want to work
3   anymore because of the medical conditions
4   and the pain; isn't that true?
5       A   No. I didn't want to -- Well, he
6   felt that mentally I wasn't able to hold a
7   job at that time.
8       Q   But you told him that you didn't
9   really want to work anyway. You wanted the
10  long-term disability benefits?
11      A   It wasn't about whether I wanted the
12  long-term disability or not.
13      Q   All right. Then you told him --
14      A   No. It was about my mental
15  stability at that time, my emotional state
16  at that time. So, therefore, he said -- and
17  I agreed -- I am in no emotional or mental
18  state to work at this time.
19      Q   Did that change by May 14th, 2004
20  that you were mentally able to work again?
21      A   Him and I had talked about it. And
22  I told him, I said, well, Dr. Clark, I know

Page 216

1   I can do the receptionist job.
2       Q   And did he file a letter with Unum
3   retracting his statement of March 17, 2004?
4       A   Well, at that time, Unum hadn't
5   approved my disability or not. They hadn't
6   came to a conclusion. So, what was there
7   for him to retract?
8       Q   He had previously said to Unum, for
9   purposes of getting you tens of thousands of
10  dollars, if not more, that it is not to be
11  expected that you will ever be able to
12  resume gainful employment.
13      A   That was at that time.
14      Q   Right.
15      A   Yes.
16      Q   Did he ever retract that statement,
17  write a supplemental letter saying, after
18  talking to her some more, she can do some
19  gainful employment?
20      A   Well, after I showed him the letter
21  that I received from the firm, that's how we
22  got to this point.

Page 217

1       Q   I'm just asking did he ever write a
2   letter saying what I wrote in March of '04,
3   I'm changing, I'm modifying --
4       A   No.
5       Q   -- I'm altering?
6       A   No.
7       Q   Do you remember that one of the
8   doctors was giving some difficulty about
9   sending the records because they wanted to
10  have the $40 copying charge paid first? Do
11  you recall that?
12      A   I don't remember.
13      Q   Just to see if I can refresh your
14  memory, Unum reported to you that one of the
15  doctors was not sending in the medical
16  records because they wanted to have the
17  copying charges paid. You don't recall
18  that?
19      A   I've never paid no doctor for no
20  records.
21      Q   I'm just asking you if you --
22      A   No.

Page 218

1    Q   Do you recall Ms. Riley-Jamison
2  paying the $40 for the copying charges on
3  her own Visa card or credit card?
4    A   Sir, I told you no. You asked me to
5  answer the question --
6      MS. MURRAY: Just stop.
7      MR. DiMURO: It was a different
8  question.
9      BY MR. DiMURO:
10    Q   Do you recall Ms. Riley-Jamison,
11  when she was at the Red Cross, hiring your
12  son? Do you recall that?
13    A   What -- What does that have to do
14  with why we're here today?
15    Q   You're charging this lady with being
16  a racist. She --
17    A   Well, what does that have to do with
18  her prior --
19    Q   Did she or did she not help get your
20  son a job with the Red Cross?
21      MS. MURRAY: Just answer the
22  question, Ms. McFadden.

Page 219

1      THE WITNESS: Mr. Panagopoulos did.
2      BY MR. DiMURO:
3    Q   Okay. You don't credit Ms. Riley-
4  Jamison with that?
5    A   Mr. Panagopoulos spoke with Ms.
6  Riley.
7    Q   And --
8    A   But since you said that, also
9  remember -- I want you to remember this --
10  he didn't work for her but a month, because
11  he ended up being the intern for Donna
12  Shalala, who, at the time, was the Secretary
13  of Health and Human Services.
14    Q   Okay.
15    A   Okay.
16    Q   Did Ms. Riley-Jamison ever use any
17  racist comments?
18    A   What do you mean by "racist"?
19    Q   Well, mean-spirited, derogatory
20  comments that have a racial connotation -- a
21  racist connotation.
22    A   Could you please give me an example?

Page 220

1    A   Well, I'm not going to say it out
2  loud, but the N word comes to mind, and
3  there are all sorts of other racial epithets
4  or words that have, unfortunately, been
5  used.
6      I'm asking you if you've ever heard
7  Ms. Riley-Jamison refer to you or other
8  African-Americans in any racist terms?
9    A   The only thing that I've ever heard
10  her say as far as support staff was that we
11  need to get younger people in here that are
12  able to do the job that won't have as many
13  medical problems.
14    Q   All right. Let's start with racist
15  terms.
16    A   Okay.
17    Q   Did you ever hear Ms. Riley-Jamison
18  --
19    A   Are you asking me did she ever call
20  me a nigger? No.
21    Q   All right.
22    A   That's what -- You need to tell me

Page 221

1  what you're asking me.
2    Q   You don't know what "a racist term"
3  means?
4    A   Well, I'm not -- I'm not racist, so
5  --
6    Q   All right.
7    A   So, you're asking me to talk about
8  something that's not an everyday part of my
9  life, sir.
10    Q   Yes, but you would know it if you
11  heard it, wouldn't you, if somebody used a
12  racist term in front of you that offended
13  you, whether they meant it that way or not?
14      Do you ever recall Ms. Riley-Jamison
15  using a racist term or a term that you felt
16  was racist?
17    A   I just need you to explain that
18  better.
19    Q   I can't do any better. That's about
20  as simple as --
21    A   Because you're asking me about
22  racism; okay? Racism is not based solely on

Page 222

1  calling a person a name.
2      Q   I'm just asking a question. I need
3  an answer.
4      A   Okay. Did she ever call me out of
5  my culture? No.
6      Q   I don't know what that means.
7      A   I'm African-American.
8      Q   Right.
9      A   That's my culture.
10     Q   Try answering my question.
11     A   Okay.
12     Q   Did Ms. Riley-Jamison ever use a
13 term in your presence or about you that you
14 considered to be racist or to show racial
15 bias?
16     A   What do you mean by "racial bias"?
17     A   Ma'am, it's about as simple a word
18 as I can -- Basically, you've sued people.
19 You've sued --
20         THE WITNESS: See, he doesn't --
21 This is where --
22         MS. MURRAY: Just answer the

Page 223

1  question.
2         BY MR. DiMURO:
3      Q   Ma'am, you sued people for being
4  racial discriminators, and you don't know
5  what the term "racist" means or "racial
6  bias"?
7         Did she ever use a term about you or
8  in your presence that you considered to be a
9  racist term, a racial slur of any sort?
10     A   Can we take a break?
11     Q   No. That's an easy question.
12     A   No. Just no.
13     Q   Okay. That wasn't so hard.
14     A   No. I'm just saying, I got confused
15 because you was asking me two questions at
16 one time.
17     Q   Did Ms. Riley-Jamison ever use a
18 term that was derogatory of people with
19 disabilities?
20     A   Yes.
21     Q   What terms did she use?
22     A   She said we needed to get some

Page 224

1  younger people in here in better health and
2  get rid of some of these old people. That's
3  a derogatory remark.
4      Q   Any others that come to mind?
5      A   That's the only one that I witnessed
6  her saying in front of Ms. Hahn and Ms.
7  Briscoe. That's why I was asking you to
8  further explain what you were saying. I
9  wasn't trying to be smart.
10     Q   So, when did this happen?
11     A   I'm not sure round about the date.
12     Q   Rough time frame?
13     A   I know I have it in one of my
14 documents that you have there.
15     Q   But you don't recall the date
16 roughly?
17     A   It was around maybe August or
18 September of 2003, around that time. Around
19 that time frame.
20     Q   Who was present to hear the
21 statement?
22     A   Ms. Betty Ann Hahn and Ms. Cassandra

Page 225

1  Briscoe. And she made the remark that day
2  at the sign-in sheet, and at that time, Pam
3  Curry and a Ms. Wendy, who were two African-
4  American secretaries, had called in sick.
5  One had lupus and one had asthma.
6      Q   Did you say anything to her that day
7  about that statement?
8      A   What was I supposed to say?
9      Q   Ma'am --
10     A   No
11     Q   -- just answer the question.
12     A   No.
13     Q   I'm really getting --
14     A   No.
15     Q   -- a little tired.
16     A   So am I. No.
17     Q   Okay. Try answering the question.
18         Did anybody, to your knowledge, say
19 something to her about the comment?
20     A   Not that I know of; no.
21     Q   Did you complain to anybody about
22 the comment?

Page 226

1    A   I told Mr. Henck.
2    Q   And what did he say?
3    A   He said he would talk to her about
4  that.
5    Q   And did he get back to you on that
6  point?
7    A   No, he did not.
8    Q   Did you ever ask him about it again?
9    A   He's a grown man. He should have
10  maybe come back and asked me. No --
11    Q   Try answering --
12    A   -- I never asked him about it.
13    Q   -- that question. Did he ever get
14  back to you?
15    A   No, he did not.
16    Q   Did you tell Mr. Panagopoulos about
17  your husband's medical condition?
18    A   He knew some details of it.
19    Q   From you?
20    A   From me. But some of the things I
21  told Ms. Riley, she shouldn't have repeated
22  it to no one.

Page 227

1    Q   Well, what was Mr. Panagopoulos'
2  position at the firm in '03 and '04?
3    A   Okay. Mr. Panagopoulos, when I left
4  there, he was a partner for the litigation
5  department. Okay. Ms. Riley was the human
6  resources manager.
7    Q   Right.
8    A   I don't see where -- And Ms. Janet
9  Craig was a systems administrator. She
10  dealt with computers. I don't see where
11  these people interchange with my life in
12  their positions with the firm.
13    Q   What did you tell Mr. Panagopoulos
14  about your husband's condition?
15    A   I would try to respond to him from
16  what Ms. Riley told him.
17    Q   Ma'am, you said that Mr.
18  Panagopoulos knew some things from you,
19  isn't that true, about your husband's
20  condition?
21    A   When he was -- The only thing that
22  he knew at the time was that they were going

Page 228

1  to try to give my husband his health
2  benefits, and Dino -- Mr. Panagopoulos
3  helped me with that.    But as far as
4  other things with my husband's medical care
5  or whatever, when Mr. Panagopoulos would
6  approach me, the only person he could have
7  gotten it from was Ms. Riley-Jamison.
8         For instance, when I was going to
9  Kristen Thomas, I didn't tell Mr.
10  Panagopoulos that. I mentioned it to Ms.
11  Riley, you know, that's the doctor I was
12  going to.
13         Mr. Panagopoulos come up to me the
14  next day and go, oh, I hear you're going to
15  see Kristen Thomas. That is something that
16  has -- one had nothing to do with the other.
17    Q   Dr. Thomas coincidentally --
18    A   I mean, but what does -- You told me
19  I have to answer the question to the best I
20  can. What does that have to do with it?
21  She's the human resources manager.
22    Q   Ma'am, you just keep right on

Page 229

1  talking, and we're just going to keep on
2  with this deposition.
3    A   Okay. But I'm trying to answer your
4  question.
5         MS. MURRAY: Just stop. You've
6  answered it.
7         THE WITNESS: Okay. I've answered
8  it. Leave it alone. Could we go to the
9  next question, please?
10         BY MR. DiMURO:
11    Q   Mr. Panagopoulos is also treated by
12  Dr. Thomas? If you know.
13    A   I don't know.
14    Q   Now, did you ever talk about your
15  husband's condition to other staff members,
16  lady friends, or other male friends at the
17  office?
18    A   It wasn't a secret that my husband
19  had cancer.
20    Q   Okay. That's my point.
21    A   Because, unfortunately, an office
22  manager and the human resources manager do

Page 230

1  not know how to keep these confidential.
2      Q    Well, hold on a second. That wasn't
3  my question.
4      A    Okay.
5      Q    My question was -- Please don't try
6  to divert me, because I'm not --
7      A    No, I'm not trying to divert you.
8      Q    -- capable of being diverted. I
9  know what my question is.
10         My question is, did you talk to some
11  of the other staff members about your
12  husband's condition?
13     A    Mr. Henck.
14     Q    Okay. Mr. Henck. And he's not
15  human resources, is he?
16     A    He's my boss. He was my boss.
17     Q    Did you talk to Ms. Hahn about your
18  husband's condition?
19     A    No, I did not.
20     Q    Did you talk to Ms. Craig about your
21  husband's condition?
22     A    No.

Page 231

1      Q    Did you talk to Ms. Briscoe about
2  your husband's condition?
3      A    We would talk about it when I would
4  call in if I was going to be off or
5  whatever. I would tell her that my husband
6  was throwing up or whatever.
7      Q    Isn't it true that people --
8      A    To that extent.
9      Q    -- knew you were on a modified
10  schedule because your husband had cancer?
11  That was generally known?
12     A    No, it was not.
13     Q    People didn't ask you where you were
14  three out of the ten days?
15     A    Well, personally, I didn't think
16  that was anyone' business, and nobody didn't
17  ever confront me about that; no.
18     Q    And you never told them why you were
19  on a modified schedule?
20     A    Why would I?
21     Q    Ma'am, just answer the question.
22     A    No. No, I didn't, sir. No.

Page 232

1      Q    So, it is possible that Mr. Henck or
2  Ms. Craig said something to the others?
3      A    I don't know. I assume. I don't
4  know.
5      Q    Why is it Ms. Riley-Jamison, you
6  assume, said something about your husband's
7  condition to others? Maybe it was Ms.
8  Craig.
9      A    No. It was Ms. Riley-Jamison.
10     Q    But you never heard her say that?
11     A    But the things she repeated, I only
12  told to her in a confidential manner. So,
13  she was the human resources manager. That's
14  proper protocol at a law firm.
15     Q    You were never present when Ms.
16  Riley-Jamison discussed your husband's
17  medical condition with anybody else; right?
18     A    I mean, if she's repeating something
19  of a confidential nature --
20     Q    Ma'am --
21     A    No, I was not present.
22     Q    All right. Just try and answer my

Page 233

1  question.
2      A    No, I was not present.
3      Q    And you deny telling Mr
4  Panagopoulos about your husband's condition?
5      A    He -- Mr. Panagopoulos knew that my
6  husband had surgery.
7      Q    He knew that from you; right?
8      A    Yes, from me. But as far as other
9  details of my personal and my husband's
10  medical condition, no, I did not discuss
11  with Dino.
12     Q    Well, when you tell Dino that your
13  husband's having surgery, did you tell him
14  what type of surgery or give him any other
15  facts about the surgery?
16     A    I mean, no. At that point, I wasn't
17  even at work. I was out on leave --
18     Q    Correct.
19     A    -- for my own health reasons. So,
20  when I called Ms. Riley on October 23rd to
21  tell her that my husband was having surgery
22  because they found he had cancer in his

Page 234

1  colon, I wasn't even at work. Do you
2  understand what I'm saying? I wasn't even
3  there. I was at the hospital.
4      Q   Who told you things that led you to
5  believe that Ms. Riley-Jamison had said
6  something to them about your husband's
7  condition?
8      A   Because when I went back to work,
9  everybody was like, well, is your husband
10 okay, how far did the cancer spread, things
11 of that nature.
12     Q   Who said that to you?
13     A   Ms. Craig -- Just about the whole
14 staff.
15     Q   It was generally known your husband
16 had cancer; right?
17     A   No. But I'm just saying --
18     Q   Ma'am, is it true that it was
19 generally known that your husband had
20 cancer?
21     A   Yes, through Ms. Riley-Jamison and
22 others.

Page 235

1      Q   And you think that that was --
2  Strike that.
3          You didn't tell anybody else in the
4  firm that your husband had cancer?
5      A   Mr. Henck and I talked about it.
6  That was my boss.
7      Q   And Ms. Craig and you talked about
8  it.
9      A   Ms Craig discussed with me more so
10 her situation, because her husband just died
11 of cancer.
12     Q   Ma'am, answer my question.
13         You told Ms. Craig your husband had
14 cancer; right?
15     A   No, I did not. Ms. Riley-Jamison
16 did.
17     Q   Ma'am, you just testified earlier
18 that you talked to Ms. Craig about your
19 husband's condition.
20     A   No.
21         MS. MURRAY: No, she didn't.
22         THE WITNESS: No, I didn't. I

Page 236

1  testified earlier --
2          MS. MURRAY: Objection to the
3  question.
4          THE WITNESS: I testified earlier
5  that Mr. Henck instructed Ms. Craig to call
6  my home; okay? That's what I said from what
7  I can recall.
8          BY MR. DiMURO:
9      Q   Did Mr. Panagopoulos help in getting
10 your husband's life insurance reinstated at
11 Auto Zone?
12     A   No, he did not. I did not get the
13 waiver.
14     Q   Did he try to help to get your
15 husband's life insurance reinstated at Auto
16 Zone?
17     A   Mr. Henck thought it was taken care
18 of, and I told -- No. He didn't perform no
19 effort. I mean, why, I don't know.
20     Q   You're saying that Mr. Panagopoulos
21 made no effort to help get your husband's
22 life insurance policy reinstated at Auto

Page 237

1  Zone? That's what you're saying?
2      A   As far as putting forth a true
3  effort -- Are you talking about an effort?
4      Q   Any effort.
5      A   No. Because I wouldn't be paying
6  $1,350 every three months.
7      Q   Well, whether --
8      A   So, that's what I'm saying. Just
9  because he had to fill out the paperwork for
10 the waiver. He told Mr. Henck he had
11 already done so.
12     Q   Well, let's --
13     A   So, he didn't do so, so it was too
14 late to do anything.
15     Q   Your husband's policy lapsed at Auto
16 Zone; right?
17     A   My husband still has his life
18 insurance policy.
19     Q   Ma'am, there was a point in time
20 when it lapsed; isn't that true?
21     A   No, it did not.
22     Q   What was the problem with the life

Page 238

1  insurance at Auto Zone that needed fixing?
2     A   It was a point of trying to get a
3  waiver.
4     Q   A waiver for what?
5     A   As far as the costs of the life
6  insurance policy.
7     Q   The premiums?
8     A   Yes.
9     Q   Okay.
10    A   Yes
11    Q   On hardship grounds or --
12    A   Yes.  Because of his illness; yes.
13    Q   And were there efforts made by
14 someone to get a waiver?
15    A   Like I said, I assume a letter went
16 out.
17    Q   By whom?
18    A   Jeff Larroca.
19    Q   Is he a lawyer at the firm?
20    A   Jeffrey Larroca.  He works in the
21 litigation department.
22    Q   Okay.  He tried to get a waiver, and

Page 239

1  you're saying it was unsuccessful?
2     A   No  What I'm saying is that --
3  Well, I would ask Mr. Panagopoulos, who Mr.
4  Henck instructed me to ask, about my
5  husband's waiver, and the response was I
6  will get to it.
7     Q   Okay.  Here's my question.
8     A   Okay.
9     Q   You said a letter went out by Mr.
10 Larroca; right?
11    A   Uh-huh.
12    Q   You have to say yes or no.
13    A   Yes.
14    Q   The letter was an effort to get a
15 waiver of the premium for the life insurance
16 policy; right?
17    A   The letter was an effort to send out
18 the proper paperwork for that to be done.
19    Q   Okay.
20    A   Okay?
21    Q   So, Mr. Larroca tried to help you
22 and your husband; right?

Page 240

1     A   Perhaps in his own way.
2     Q   Okay.
3     A   I'm sorry.  I mean --
4     Q   Did he have to help you?  Did he
5  have to write the letter?
6     A   No.  He didn't have to write the
7  letter.
8     Q   All right.
9     A   No.
10    Q   I'm showing you Exhibit 18, ma'am.
11 These are records from Dr. Mussenden.
12       MR. DiMURO:  I'll remind your
13 counsel that these were attached to
14 admission requests, and you admitted these
15 were the records, authentic records, so I
16 don't think there's any need to go through
17 them.
18       BY MR. DiMURO:
19    Q   Except for Page 639, the third page,
20 ma'am.  I think you're there.  The last
21 sentence, "Ms. McFadden is physically and
22 mentally incapacitated."

Page 241

1        He wrote that on 12/22/03.  Do you
2  see that?
3     A   Yes.
4     Q   And he wrote that for purposes of
5  your long-term disability application?
6     A   He wrote it for various reasons.
7     Q   Did he ever make a writing that said
8  you were no longer physically and mentally
9  incapacitated?
10    A   No.
11    Q   You mentioned earlier sitting down
12 at your desk and turning on the computer and
13 seven e-mails came out about -- I'm not sure
14 what it was -- a leave status?  Do you
15 remember what we're talking about?
16    A   That I was placed on leave without
17 pay for that day?  I was at my desk.  I was
18 typing a document.
19    Q   Right
20    A   And I received seven e-mails saying
21 the same thing, you will be placed on leave
22 without pay for today.

Page 242

1    Q   When, roughly, was this? Was this
2  the second half of '03 or '04?
3    A   I wasn't there in '04, so it was in
4  '03.
5    Q   Okay.
6    A   I guess around the early part of
7  September. And Mr. Henck and Ms. Cassandra
8  Briscoe witnessed that because I showed it
9  to both of them.
10   Q   Now, prior to that point in time,
11  there were times that you had to take off
12  for your husband and your conditions; right?
13   A   Yes.
14   Q   And the firm was within its right to
15  either up leave or dock you when you
16  were gone; isn't that right?
17   A   Yes. But, see --
18       MS. MURRAY: I'd like to state an
19  objection.
20       THE WITNESS: Thank you.
21       MS. MURRAY: Are you asking about a
22  legal conclusion about the defendant's

Page 243

1  right?
2       MR. DiMURO: No. I think that if an
3  employee doesn't come to work for legitimate
4  reasons, I don't think it's rocket science
5  to say, yeah, they can dock me, they don't
6  have to pay me.
7       THE WITNESS: But when I'm sitting
8  there at my desk and I'm at work that day
9  and you're docking me for that day and I'm
10  there --
11
12       BY MR. DiMURO:
13   Q   So, this system -- All right. Hold
14  on.
15   A   Okay.
16   Q   This system is set up electronically
17  to let the employees know from the HR
18  people, you know, the use of leave or the
19  status of leave; right?
20   A   The e-mail came from the human
21  resources manager.
22   Q   That's right.

Page 244

1    A   Okay.
2    Q   But that system is used to notify
3  all employees about either docking of pay or
4  sick leave or vacation leave. It's a way of
5  communicating that type of information to
6  employees; right?
7    A   Well, at that particular time, Ms.
8  Riley didn't know how to use the system, so
9  I don't know how you want me to answer that.
10   Q   Try to --
11   A   Because Ms. Briscoe was doing the
12  system.
13   Q   Okay. Hold on.
14   A   I'm here.
15   Q   I'm just asking you if that system,
16  that electronic system, that general
17  electronic system, was used by the HR people
18  to notify employees about their leave that
19  they were using up --
20   A   Their leave or sick or whatever.
21   Q   Yes.
22   A   Yes.

Page 245

1    Q   You weren't the only employee that
2  got e-mails about pay issues or leave
3  issues; right?
4    A   But I don't think any other employee
5  got --
6    Q   Ma'am --
7    A   -- seven e-mails the same day as I'm
8  sitting at my desk working.
9    Q   Okay.
10   A   So, I think I've answered this
11  question. I don't want to collaborate on
12  that because you're saying it's taking not a
13  rocket scientist. You're right. Who would
14  send someone seven e-mails?
15       You're sitting at your desk on a
16  computer working, and you're there, and
17  they're going to send you seven e-mails to
18  say you're being docked with leave without
19  pay for this date, and you're sitting at
20  your desk.
21       So, does that take a rocket
22  scientist, or does that just take what? I

Page 246

1  don't know. So, maybe you need to ask me in
2  another way. You see what I'm saying?
3      Q   Are you done?
4      A   Yes. Because you need to ask me
5  another way.
6          MR. DiMURO: I move to strike the
7  non-responsive --
8          THE WITNESS: No, no. Because,
9  basically, you're saying that this would be
10  a normal practice of any law firm or -- or
11  any place.
12
13          BY MR. DiMURO:
14      Q   Other employees got information
15  electronically from HR in that same time
16  period about use of leave, docking of pay,
17  things like that; right?
18      A   I would say yes, but not when they
19  were sitting at their desk; no.
20      Q   Ma'am --
21      A   I mean, I don't know what you --
22  Yes.

Page 247

1      Q   You don't have to add about sitting
2  at the desk. I asked you about the system
3  generally; okay?
4      A   Okay.
5      Q   Now, you say the seven e-mails said
6  something about docking your pay for not
7  being at work; right?
8      A   For that day; yes.
9      Q   All seven of them addressed that
10  day?
11      A   The same day. Seven in a row.
12      Q   And all for the same day, the day
13  you were there?
14      A   The same day I was at my desk. Yes,
15  sir.
16      Q   And, obviously, you're saying that
17  the person made a mistake in sending you an
18  e-mail about that day because you were on
19  time that day?
20      A   I look at it as harassment.
21      Q   Ma'am. Ma'am.
22      A   Sir?

Page 248

1      Q   Did you come to work on time that
2  day?
3      A   Yes, I did.
4      Q   So, there was no reason to dock your
5  pay that day. Is that what you're saying?
6      A   Yes.
7      Q   And all seven e-mails were the same
8  about docking your pay that day?
9      A   The exact same one.
10      Q   And you think somebody sat there and
11  sent seven separate e-mails?
12      A   Well, you can ask Ms. Briscoe and
13  ask Mr. Henck. They witnessed it.
14      Q   Well, I'm asking you if --
15      A   No. I'm just saying, I don't know
16  what her rhyme for a reason was.
17      Q   And by the way, who --
18      A   I can't explain that.
19      Q   It wasn't Ms. Riley-Jamison who sent
20  --
21      A   No. The office manager.
22      Q   But earlier you said --

Page 249

1      A   It came from HR. It came from Ms.
2  Riley-Jamison's computer. At the time, the
3  young lady from Baltimore was working in
4  D.C. two times a day. And like she said,
5  she did what Ms. Riley-Jamison instructed
6  her to do. That's all I can answer.
7      Q   So, Ms. Riley-Jamison wasn't in the
8  office the day the seven e-mails came;
9  right?
10      A   I'm not sure. I was so upset at
11  that point to where --
12      Q   Ma'am.
13      A   All I know is I saw the seven e-
14  mails and -- So, all I can say is that I'm
15  not sure, and that's the honest to God
16  truth. I mean, at that time, I was just
17  floored.
18      Q   Do you recall seeing Ms. Riley-
19  Jamison that day?
20      A   I can't remember that far if I saw
21  her or not that day. All I know is that I
22  got seven e-mails that day.

Page 250

1    Q    Ma'am, who sent the seven e-mails?
2    Who pushed the button? Do you know?
3    A    All the other e-mails came from Ms.
4    Riley-Jamison.
5    Q    Ma'am, do you know who sent the e-
6    mail that came in seven consecutive e-mails?
7    Do you know who sent that e-mail?
8    A    The human resources manager.
9    Q    Do you know the person who sent the
10   e-mail of your own personal knowledge?
11   A    I answered your question. I said
12   the human resources manager.
13   Q    And who is that?
14   A    Ms. Riley-Jamison.
15   Q    I thought it was the person from
16   Baltimore.
17   A    Well, I'm just saying, she came in
18   twice a week, but she used Ms. Riley's
19   computer.
20   Q    Okay. So --
21   A    So, I don't know at the exact time
22   when the e-mails occurred, I don't know if

Page 251

1    Ms. Riley was off of maternity leave or not.
2    I'm not sure, sir.
3        I'm answering the best I can.
4    You're asking me something about something
5    that happened in 2003, and here it is 2007;
6    okay?
7    Q    Well, you make it part of your
8    lawsuit, so I need to know.
9    A    No, okay. But I'm just saying, so -
10   - All I'm saying is that Mr. Henck and Ms.
11   Briscoe witnessed the seven e-mails.
12   Q    Now, stay with my question.
13   A    Okay.
14   Q    It is true, isn't it, that you do
15   not know who sent the seven e-mails?
16   A    Like I said, human resources
17   manager, so --
18   Q    Ma'am, answer my question.
19   A    I'm answering your question. It --
20   Q    Do you know --
21   A    -- said human resources manager.
22   Q    Of your own personal knowledge,

Page 252

1    besides what you read on the e-mail, do you
2    know who pushed the buttons on the
3    equipment?
4    A    It was someone in the human
5    resources department.
6    Q    Give me a name of the person who did
7    it.
8    A    Ms. Riley is the only one in human
9    resources besides Wendy Iversen and
10   Cassandra Briscoe, but --
11   Q    But you didn't --
12   A    I think the question -- You want me
13   to -- I don't know what you want from me.
14   I'm telling you I got some e-mails --
15       MR. DiMURO: (To Ms. Murray) Let me
16   talk to you for a second.
17       THE WITNESS: I got it from the
18   human resources manager.
19       MS. MURRAY: Are we going off the
20   record?
21       MR. DiMURO: Yes. We're going off
22   the record.

Page 253

1        (Whereupon, a brief discussion was
2    held off the record between counsel.)
3        MR. DiMURO: Back on the record.
4        THE WITNESS: Okay. Before we start
5    this, I'll just say I'm just a little edgy,
6    which don't have nothing to do with the
7    other, but right now my mind is in Florida.
8    But I'm okay.
9        MR. DiMURO: Yes, ma'am. I had --
10       THE WITNESS: So, no. We're going
11   to finish this. I'm going to answer you
12   quickly and swiftly, and we're all going to
13   go home.
14       MR. DiMURO: Well, we'll see. I
15   have asked to extend it to tomorrow. I
16   understand you've got a flight tomorrow.
17       I don't want to get in a fight with
18   you, but I think this has gone on longer
19   than it needed to, and, given the scope of
20   the allegations, I'm going to have to resume
21   some other day and we'll just have to figure
22   it out.

Page 254

1    But we're going to go to 5:30. I've
2 cleared that with the court reporter.
3    BY MR. DiMURO:
4    Q   Do you know of your own personal
5 knowledge who sent the seven e-mails?
6    A   No, I don't.
7    Q   And do you know if the person who
8 sent the seven e-mails did it by
9 intentionally sending seven e-mails or there
10 was some sort of electronic or machine
11 problem that did it?
12    A   No, I don't.
13    Q   Part of your complaint has a series
14 of claims of harassing comments, and they're
15 also in the interrogatory answers.
16    Actually, I'm going to give you that
17 so you can look at it along with me. I'm
18 showing you Exhibit 28, specifically Page 7.
19    A   Okay.
20    Q   You remember that the interrogatory
21 process is where one side asks written
22 questions and you file written answers;

Page 255

1 right?
2    A   Yes.
3    Q   And both sides have done that, I
4 think, in this case.
5    So, this particular question asks
6 about harassing comments, and you list A
7 through J. So, we're just going to go
8 through them, and I just need to get some
9 information.
10    A   Okay.
11    Q   Now, you say that she asked you this
12 frequently. Can you tell me what time frame
13 Ms. Betty Hahn asked you about your modified
14 schedule?
15    A   Through the middle of January until,
16 say, around the middle of June.
17    Q   Of which year?
18    A   2003
19    Q   Did you ever tell her what your
20 modified schedule was?
21    A   No, I did not.
22    Q   And you write that she asked you,

Page 256

1 quote, "how I was getting paid for my time
2 off," closed quote.
3    I just don't understand what you're
4 trying to say there. What is she asking
5 you?
6    A   She was trying to ask me if I was
7 getting paid or not.
8    Q   For your time off?
9    A   For my time off.
10    Q   I see.
11    A   Yes.
12    Q   For example, using your situation,
13 ten work days really reduced down to seven
14 so you could go with your husband, was she
15 trying to find out if you were getting paid
16 for those three days?
17    A   The three days off; yes.
18    Q   Got it.
19    Did you ever tell her one way or the
20 other?
21    A   No.
22    Q   And Ms. Hahn is white, I take it?

Page 257

1    A   Yes.
2    Q   Did you ever tell anyone in
3 management what Ms. Hahn was asking you
4 about your modified schedule?
5    A   I mentioned it to -- well, not
6 management -- but I mentioned it to Mr.
7 Henck.
8    Q   Did you ask him to do anything about
9 it?
10    A   I just -- At that point, I just told
11 him I was tired of staff members -- Yes, I
12 did ask him to do something about it.
13    Q   What did you ask him to do?
14    A   I asked him, you know, could someone
15 tell some staff members to mind their
16 business.
17    Q   And do you know if he did anything
18 about it? Did he report back to you, or did
19 you see him do anything about it?
20    A   He didn't report back to me after I
21 asked him; no.
22    Q   So, you don't know one way or the

Page 258

1   other if he did something?
2       A    Or not.  No.
3       Q    All right, next sentence.
4           She disclosed to you that she
5   believed you were being treated differently
6   than others, especially Ms. Craig when she
7   was out with her mother and out with her
8   husband when they were ill.
9           Okay.  I just need a little flesh to
10  these bones.  What did she say you were --
11  Strike that.
12          How did she say the treatment was
13  different?
14      A    She was basically saying how can
15  Janet get paid for being out with her
16  husband and her husband is not an employee
17  of Ballard Spahr.
18      Q    Just so I can get it, she's
19  complaining that when Ms. Craig had to go
20  attend to business with family members, she
21  was getting paid?
22      A    Exactly.

Page 259

1       Q    But it is true that when you were
2   out attending to your husband's chemotherapy
3   and vaccinations, you were getting paid,
4   too?
5       A    No.  I got paid when I had leave to
6   cover it.  When I didn't have leave to cover
7   it, I was put on leave without pay.
8       Q    So, Ms. Hahn believes that Ms. Craig
9   was actually getting paid even after she
10  used all her leave?
11      A    Ms. Craig was salary.  But her
12  complaint was it's not Janet that's sick,
13  it's her husband.  And from what I
14  understand and from what Ms. Craig told me
15  herself, they put her on sick leave, and she
16  wasn't the one sick.
17      Q    Ms. Hahn was complaining about
18  comparing her situation to Craig's
19  situation?
20      A    And mine, but I just sort of just
21  walked away from it.
22      Q    Okay.  Let's start over again.

Page 260

1       A    Okay.
2       Q    Hahn is sick.  She's a cancer
3   patient.
4       A    Yes.
5       Q    And what does she say happens to her
6   when she's out?  That she doesn't get paid?
7       A    She just felt that Ms. Craig got
8   more leeway than what we did as far as --
9   You know, when Ms. Craig's husband's was
10  sick, from the day she left, she didn't come
11  back until after his passing.
12      Q    Right.
13      A    Maybe three -- close to a month
14  after he passed.
15      Q    Right.
16      A    So, she was looking at so why, you
17  know, do you have to come in here all these
18  different hours and a couple of times I came
19  in on Saturdays and there wasn't work left
20  for me or whatever.  She would see where I
21  signed in on a weekend or whatever.  So, she
22  was just saying, why are they treating you

Page 261

1   different from her?
2       Q    Which of Ms. Craig's relatives
3   passed, the mother or the husband?
4       A    Her mother passed first, and then
5   her husband passed next.
6       Q    Ms. Hahn believed that Ms. Craig,
7   when she went off to attend to these two
8   situations, still got her full pay?
9       A    Well, Ms. Craig had even stated
10  herself -- she even told me that she was
11  placed on sick leave and that no FMLA
12  paperwork was ever done on her.
13          So, I'm just saying, it was like --
14  I don't know if Ms. Hahn expressed that to
15  Ms. Craig, but I didn't feel that I wanted
16  to get into it with her.
17      Q    When I ask you about what Ms. Hahn
18  says --
19      A    Okay.
20      Q    -- it confuses everything to go over
21  to say what Ms. Craig told you.
22      A    Okay.

Page 262

1     Q    The question and answer don't match
2  up.
3     A    Okay.  Ask me the question again,
4  sir.
5     Q    Ms. Hahn was concerned that she
6  thought Ms. Craig was getting her regular
7  pay even when she was out with these
8  relatives?
9     A    Yes.
10    Q    Does Ms. Hahn know how much leave
11 Ms. Craig had?
12    A    At the time, Ms. Hahn was in charge
13 of the leave.
14    Q    So, she knew how much leave as far -
15 -
16    A    As far as I know, yes.
17    Q    She was saying she knew how much
18 leave she had?
19    A    Well, she took care of the leave, so
20 --
21    Q    All right.  All right.
22       Number B, "Ms. Riley-Jamison

Page 263

1  remarked to me" -- Oh, this is the statement
2  about healthy people.  We talked about that
3  earlier today.
4     A    Yes.  We talked about that earlier;
5  yes.
6     Q    It's the same thing?
7     A    Yes.
8     Q    C, where Ms. Riley-Jamison is
9  suggesting that you take your daughters out
10 of college to care for their father "so I
11 can come to work every day."
12       When did this -- How frequently did
13 she mention this to you?
14    A    Maybe once a week.
15    Q    Was this back when you were taking
16 care of your --
17    A    My husband.
18    Q    So, it started --
19    A    It started when my husband started
20 his chemo treatment.
21    Q    January of '03?
22    A    Yes.

Page 264

1     Q    And did you ever write down the date
2  and time and the words she used when she
3  said these things in subparagraph C?
4     A    No.
5     Q    "She constantly suggested that I
6  find someone else to take care of my husband
7  so I could report to work."
8        What do you mean by "constantly"?
9  How often?
10    A    It was a weekly thing.
11    Q    "She also told me that my modified
12 schedule was causing turmoil with these
13 staff members and others she would not
14 mention."
15       Who do you mean by "these staff
16 members"?
17    A    From what she had told me, other
18 staff members were complaining about my
19 modified leave schedule.
20    Q    But did she say who it was?
21    A    Betty Ann Hahn.  Somebody -- I can't
22 think of her name.  I don't even think she's

Page 265

1  there anymore.  Can I get back -- I can't
2  think of her name right off.  Oh, one young
3  lady's name was Sevonne Parker.
4     Q    Is she still there?
5     A    Ms. Parker?  I assume.  I'm not
6  sure.
7     Q    When you would discuss with Ms.
8  Riley-Jamison your issues, did you discuss
9  with her the conflict you were having, the
10 tension you were having between wanting and
11 needing to take care of your husband and
12 yourself, but also being the sole
13 breadwinner, that there was some friction
14 between those two concepts?
15    A    Could you please rephrase that?
16    Q    Yes.
17       Did you talk to her about it was
18 hard for you to resolve in your mind the
19 need to spend more time with your husband,
20 but you had to come to work because you
21 needed the money?  Did you ever talk about
22 those issues with her?

Page 266

1    A   I mean, at one point, we talked
2    about it. You know, I told her I was the
3    only income, so I didn't have any choice but
4    to come to work.
5         And that's when she was like, well,
6    you know, the firm is doing you a favor
7    giving you this modified leave schedule.
8    So, basically, I feared for my job. If I
9    went out of that mode of that schedule, that
10   I just wouldn't have a job.
11   Q    Well, okay. Which is sort of to my
12   point, which is, obviously, Ballard Spahr
13   isn't in the business of just paying people
14   for no work -- for not coming to work;
15   right? Do you agree with that?
16   A    Yes, I agree with that. Yes.
17   Q    Would you agree that there comes a
18   point where Ballard Spahr's management
19   people have to decide how much leeway they
20   can give you versus being fair to the
21   regular work force or fair to the partners,
22   et cetera? They can't just let you not come

Page 267

1    to work.
2    A    I don't think that's a fair question
3    when other people that I know of, like Ms.
4    Riley, who was on a 90-day promotion and
5    she's in management, that she got paid when
6    her husband was sick during her 90-day
7    probationary period. I don't think that's
8    fair.
9         And I had been there 15 years. She
10   has been there less than a year. Like I
11   said, the young lady I sat by, Kathy Hanna,
12   I covered for her for two and a half years.
13        We had one young lady, Kristine
14   Hearn. She was allowed a modified schedule
15   to go to school. Judy Mintz, she works for
16   one of the partners. She takes off every
17   summer from June to Labor Day. She goes to
18   Martha's Vineyard. Brenda Dillman, another
19   employee that works for Ballard.
20        All these people are Caucasians, and
21   their schedules were modified to accommodate
22   their needs that really, in a lot of cases,

Page 268

1    didn't have to do with illness or a family
2    member. So, I don't know if that falls up
3    under FMLA or just favoritism.
4    Q    All right. Well, we'll talk about
5    it here in a moment.
6    A    Okay.
7    Q    But you agree that everybody's needs
8    and what the accommodation should be or what
9    the leeway should be is going to be
10   different? You can't just compare them
11   apples to apples?
12        That wasn't a very good question,
13   I'll give you that.
14        You would agree that it's impossible
15   to make sure that every accommodation or
16   leeway that an employer gives one employee
17   matches up exactly with the accommodation or
18   leeway given to another employee?
19   A    Are you asking me -- Please rephrase
20   that another way.
21   Q    Well --
22   A    Because what you're saying is

Page 269

1    favoritism.
2    Q    But why are you --
3    A    That's the way I'm receiving it, so
4    could you please explain it another way.
5    Q    Are you saying that the employer is
6    required, in order to avoid favoritism, to
7    make sure that what one employee needs,
8    because they have children who got ill,
9    should be the same thing that the next
10   employee needs, because they've got a parent
11   who's ill, that the next employee needs
12   because of some other personal emergency?
13   That the employer is supposed to make sure
14   that the benefit is equal to everybody?
15   A    Okay. Back to Ms. Hearn, Kristine
16   Hearn. She was able to go to G.W. during
17   working hours. An African-American young
18   lady, Shelby Green, who wanted to do the
19   same thing, was denied. She was Caucasian.
20   She was black. So, that's why I need you to
21   explain it to me a little better.
22   Q    Well, I'm asking you generally in

Page 270

1  the abstract.
2      Does the employer need to make sure
3  that every employee's accommodation, whether
4  it's for school or for children or for
5  parents passing away, that each of those
6  things or accommodations that the employer
7  does for the employee, that they have to be
8  equal from employee to employee?
9      A   Well, the way Ballard used to do it
10  before it came to me was by seniority.
11      Q   By what?
12      A   Seniority. And at the time, I was
13  the senior support staff member
14      Q   But I'm really asking a different
15  question which is every --
16      A   That's why I'm not understanding --
17  I'm seriously not understanding what you're
18  saying.
19      Q   Okay.
20      A   I mean, if you can allow a person to
21  work one day a week because she wants to
22  improve her Mary Kay business, is that fair

Page 271

1  to a person that wants to spend time with
2  someone that's terminally ill?
3      See, like you said, you asked me
4  about apples and oranges, so you want me to
5  give you an answer on your apples, but not
6  on the oranges, so I'm doing the best I can.
7  So, the --
8      Q   Well, let me ask you this way.
9      A   The bottom line is, since I've been
10  at Ballard -- I understand what you're
11  saying -- I didn't care what they did for
12  nobody else. Didn't care. It didn't matter
13  to me; okay?
14      Q   Right.
15      A   Once it came to me, I just wanted to
16  be treated fairly.
17      Q   Okay. Well, do you think that they
18  didn't give you enough leeway?
19      A   No. I was not treated fairly.
20      Q   How much longer did you want them to
21  keep you on -- your job protected or how
22  much more pay did you want them to give you

Page 272

1  to treat you fairly?
2      A   No. All I'm saying is that once my
3  husband's schedule -- and I took him to
4  Florida, after that I was going to work
5  every day. I was on a modified schedule.
6      Q   Right.
7      A   I went to work sick or not sick.
8      Q   Right. And then October 15th came,
9  and you went on long-term disability.
10      A   I went out on long-term disability
11  because I didn't have any other choice.
12      Q   So, what I'm really asking is, come
13  May 14th, 2004, what else did you want them
14  to do?
15      A   The same thing they did for other
16  employees.
17      Q   Well, but how does that translate
18  into you?
19      A   I mean, as far as job protection,
20  having job protection, hiring temps to cover
21  these individuals.
22      Q   But what Ballard Spahr does for

Page 273

1  somebody because they need a day off for a
2  funeral or they need --
3      A   No. I'm not talking about a day off
4  for a funeral.
5      Q   Ma'am, please --
6      A   I'm talking about --
7      MS. MURRAY: Just let him ask his
8  question.
9      THE WITNESS: All right.
10      BY MR. DiMURO:
11      Q   Tell me precisely in your context
12  and what you need.
13      Come May 14th, 2004, what else did
14  you want them to do for you on May 14th,
15  2004 to make it fair?
16      A   I mean, basically, at that point, I
17  just wanted to know what was going on
18  because no one contacted me one way or the
19  other.
20      Q   But in order for you to feel like
21  they're treating you fairly on May 14th,
22  2004, what would you have had them say to

Page 274

1  you, told you, done for you?
2      A   I mean, the thing of it is I just
3  wanted to be treated fairly.
4      Q   But what does that mean?  What do
5  you think they should have done on May 14th,
6  2004?
7      A   As far as I'm concerned, you treat
8  employees -- if you treat one one way,
9  regardless if they're white, black,
10  Hispanic, you have to treat everybody the
11  same way across the board.
12      Q   So, what does that mean for you?  On
13  May 14th, 2004, what should they have done
14  for you?
15      A   Basically, they could have -- I
16  mean, they could have at least offered me
17  the receptionist job and see if it would
18  have worked out until Ms. Hahn came back.
19      If she came back, if there wasn't a
20  job for me, I would have understood that.
21  There was no provisions made for me at all.
22  None at all.

Page 275

1      Q   All right.  Let's go --
2      A   Don't you think that's a fair
3  answer?
4      Q   May 14th, 2004, who called whom on
5  that day?
6      A   I called Ms. Riley.
7      Q   Why were you calling her?
8      A   Because I didn't get a response to
9  the leave request form that they told me I
10  had to fill out.
11      Q   Does this go back to the attachment
12  to the March letter?
13      A   Yes.
14      Q   So, a couple of days before that,
15  you did or did not have a phone call with
16  Ms. Forman?
17      A   I called Fern Forman the day before.
18      Q   Right.  And did you actually talk to
19  her?
20      A   Yes.
21      Q   And she said she'd get back to you?
22      A   No.  She said, why don't you do all

Page 276

1  of us a favor and resign.
2      Q   What did she say, if anything, about
3  the --
4      A   She hung up the phone.  She said
5  nothing.  She hung up on me.
6      Q   Did you report that to anybody?
7      A   That's why the next day I called Ms.
8  Riley.
9      Q   Okay.  And did you tell her --
10      A   And I told her what happened.  She
11  said, Vanessa, you know, you are the first
12  FMLA situation I've had to deal with, so I
13  need to call Fern and John to see what's
14  going on.
15      Q   Okay.
16      A   And she told me she would get back
17  with me.
18      Q   And --
19      A   And we had a call later on in the
20  evening about four o'clock.
21      Q   They called you, obviously?
22      A   At four o'clock; yes.

Page 277

1      Q   Did you know it was coming?
2      A   Yes.
3      Q   Do you have any notes from that
4  conversation with Riley-Jamison that morning
5  of the 14th?
6      A   No.  I don't think so; no.
7      Q   All right   What happened on the
8  call on the 14th?
9      A   We discussed my employment, which
10  they told me, as of February the 9th, I had
11  no more job protection.  They had me fill
12  out a form called "Leave of Absence," which
13  was only for 90 days.
14      So, I was calling to see if I was a
15  Ballard employee or not, which I was told
16  that I was not.  Then it came to them
17  offering me something to do with my
18  husband's life insurance.  But if you read,
19  it's all in the letter of May the 14th.
20      Q   A letter or notes?
21      A   No.  It was a letter.
22      Q   Let me show you Exhibit 70.  That's

Page 278

1  the letter you mentioned that you got in
2  March of '04?
3     A   Uh-huh.
4     Q   You have to say yes or no, ma'am.
5     A   Oh, yes.
6     Q   It advises you that you are entitled
7  to 16 weeks of protected leave during any
8  24-month period; right?
9     A   Yes.
10    Q   And it advises you that the firm
11 does permit a non-FMLA-covered leave of
12 absence for up to an additional three months
13 of time; is that right?
14    A   I assumed, you know, after they sent
15 me the letter, that that was their policy.
16    Q   And then the letter says "the
17 request for this type of leave of absence
18 form is attached." That's what the letter
19 says; right?
20    A   Uh-huh.
21    Q   You have to say yes or no, ma'am.
22    A   Oh, yes.

Page 279

1     Q   Oh, and there it is. It is actually
2  attached. So, you actually filled out the
3  form?
4     A   Yes.
5     Q   We'll attach Page 102 to this
6  exhibit.       So, you actually filled in
7  the form and sent it in?
8     A   Yes.
9     Q   And the 90 days would run sometime
10 in early May if all their calculations are
11 right; right?
12    A   I question that.
13    Q   Why is that?
14    A   Because if my FMLA expired February
15 the 4th -- March, April, May -- it's like
16 they didn't give me an answer one way or the
17 other if this was approved or not. I never
18 received anything from Ballard. Nothing.
19    Q   And that's why you called Ms. Forman
20 on the 11th?
21    A   The day before the 14th or whatever;
22 yes. That's why I called her. I never

Page 280

1  received the answer one way or the other.
2     Q   And Ms. Forman didn't give you an
3  answer in addition to whatever else she
4  said?
5     A   No.
6     Q   And the next morning Ms. Riley-
7  Jamison said this is the first FMLA case
8  I've handled, so she'd have to get back to
9  you?
10    A   Yes.
11    Q   The letter of March 9th did indicate
12 that if you are still unable to return to
13 your employment at the end of the extended
14 leave of absence, Ballard Spahr will
15 terminate you; right?
16    A   Yes.
17    Q   And you did write some notes on the
18 14th. Let me find those. All right.
19 Exhibit 68 is your handwritten notes from
20 the 14th; right?
21    A   Yes.
22    Q   And you've dated it May 14th, '04 at

Page 281

1  4:08 p.m. I presume that's the time of the
2  call?
3     A   Yes.
4     Q   Did you write these notes as the
5  call was going on or sometime thereafter?
6     A   After the call.
7     Q   Within the same hour -- or that
8  evening, I should say?
9     A   Oh, yes. Definitely.
10    Q   And I think I can read your
11 handwriting, but what you've written here is
12 they offered you a position in the word
13 processing center, and you said that the
14 doctors had found you to be mentally and
15 physically disabled permanently; right?
16    A   Yes.
17    Q   And then the Point Number 2
18 basically boils down to any salary advances
19 you had been given and any benefits they
20 paid, they were not going to ask you to pay
21 those back; right?
22    A   Yes.

Page 282

1    Q    And then I think Point Number 3
2    boils down to the following. Somebody said
3    they had a new supplement to their policy
4    that permitted you to draw out half of your
5    husband's life insurance policy under
6    certain conditions?
7    A    I can't answer that one with one
8    answer. I have to answer with two.
9    Q    Okay.
10   A    The policy already existed. They
11   didn't present it to me until May the 14th.
12   Q    Well, that's right. They said that
13   they had gotten some sort of new rider that
14   permitted you to apply to take out half of
15   the money before your husband passed away.
16   A    My husband's still living.
17   Q    Well, I understand. But didn't you
18   understand what they were saying on May 14th
19   was that --
20   A    No. They told me that they had
21   gotten an addendum just for me.
22   Q    Right.

Page 283

1    A    But I found paperwork where it
2    existed before then, and it wasn't ever
3    offered to me. But this here existed before
4    they said they did this rider, and you have
5    that information.
6    Q    Let's back up. Let's make it clear.
7    A    Okay.
8    Q    Point Number 3 relates to statements
9    made by the Ballard Spahr people on May 14th
10   about what they said was a new --
11   A    Oh, okay. Rider.
12   Q    -- what they said was a new rider --
13   A    Yes.
14   Q    -- to life insurance policies
15   including your husband's?
16   A    Yes.
17   Q    They said that?
18   A    They said that; yes.
19   Q    And they said that this new rider
20   was gotten for you; right?
21   A    Just for me.
22   Q    It might have applied to other

Page 284

1    people --
2    A    No. Well, I'm telling you the
3    truth, sir. They told me they did it just
4    for me; okay? So --
5    Q    Whether or not it applies to other
6    people --
7    A    No matter. No. I'm just saying,
8    I'm answering you truthfully; yes.
9    Q    And did you understand what they
10   said was that this new rider -- Strike that.
11        To state the obvious, life insurance
12   policies are never paid until the person
13   passes away. That's the normal policy;
14   right? That's what a life insurance policy
15   is about.
16   A    Depending on what type you have. If
17   you have one on a cash value, you can pull
18   the cash value out.
19   Q    Okay.
20   A    So --
21   Q    What they were saying to you on May
22   14th was this new rider, they were saying,

Page 285

1    had a provision that you could take out
2    half, or $50,000, before your husband passed
3    away?
4    A    Yes.
5    Q    That you would have to apply and
6    qualify; right?
7    A    Yes.
8    Q    Now, what did you -- This Exhibit 68
9    is one page of notes. Is this all the notes
10   you wrote on May 14th about the May 14th
11   call?
12   A    Yes.
13   Q    And how long did the call last
14   roughly? Just roughly. I'm not going to
15   hold you to it.
16   A    It was about 30, 35 minutes long.
17   I'm not sure.
18   Q    Sometime before five o'clock it was
19   over?
20   A    Oh, of course. People were going
21   home on Friday. Yes.
22   Q    A couple of true statements today.

Page 286

1  You know when you got your colonoscopy. I
2  will never forget that. I will never forget
3  that.
4      A    You never forget what?
5      Q    When you get your colonoscopy.
6      A    Oh, okay.
7      Q    Never mind.
8      A    Have you had yours yet?
9      Q    Yes, ma'am. Now, see I've lost -- I
10  did it to myself.
11      A    Yes, you did. You can't blame that
12  one on me.
13      Q    So, did you get the notes done
14  before dinner that night or later in the
15  evening or you don't --
16      A    It was right after I got off the
17  phone.
18      Q    Okay, great.
19          So, you said something to me that
20  you now have seen some paperwork or since
21  that time have seen some paperwork to
22  suggest that the rider that they talked

Page 288

1  you to believe that they didn't get it just
2  for you?
3      A    Because I got it from out of -- The
4  information, I think, is dated in 2000 and
5  2002 or even before that. It's like the
6  insurance policy itself. It's what Ms.
7  Iversen sent me.
8      Q    And it looks like an addendum to the
9  insurance policy?
10      A    No, no, no. It shows that it was in
11  existence before the addendum that they got
12  just for me.
13      Q    I understand. But where does this
14  document come from that --
15      A    It's a Ballard document.
16      Q    Does it look like a policy memo?
17  Does it look like something they got from
18  the insurance company?
19      A    No. It's a copy of a policy. It's
20  a booklet, but it was copied.
21      Q    All right. A booklet that would
22  come from an insurance company or a booklet

Page 287

1  about had already existed?
2      A    Yes.
3      Q    What paperwork was that? I don't
4  recall it, or maybe I didn't understand what
5  it was.
6      Q    I don't have it with me. It was
7  sent in the package that you sent to the --
8      Q    What is it? Is it something from
9  the insurance company?
10      A    No. It's something saying, you
11  know, basically when -- Like I said, if you
12  have a loved one and you're going through a
13  financial issue or a financial problem --
14      Q    Right.
15      A    -- that you're able to take out half
16  of the money to help with your finances or
17  whatever.
18      Q    Right.
19      A    Yes.
20      Q    But what was it about the document
21  that said that this rider had existed before
22  your situation or earlier and that that led

Page 289

1  from Ballard Spahr?
2      A    I assume Ballard Spahr because Ms.
3  Iversen sent it to me, and she's an employee
4  of Ballard Spahr.
5      Q    So, as you read the document that
6  you're talking about, you think it proves
7  that this rider provision was in place for a
8  couple of years at least?
9      A    Yes.
10      Q    Did you not apply for the $50,000 --
11  It's called an "accelerated withdrawal."
12  Did you apply for it?
13      A    When it was offered to me at that
14  point, yes.
15      Q    And you applied for it sometime
16  later?
17      A    Yes. Sometime later; yes.
18      Q    And you did get it, I think?
19      A    I did receive it; yes.
20      Q    And so you declined the word
21  processing position, as you've written here;
22  right?

Page 290

1    A    Uh-huh.
2    Q    You have to say yes or no, please.
3    A    Yes.
4    Q    And then the notes don't say
5    anything about the receptionist position.
6    Why is that?
7    A    The way that it was -- When I asked
8    about the receptionist position, they told
9    me that that was about Ms. Betty Ann. It
10    had nothing to do with me. So, I was like,
11    okay.
12    Q    Well, what did you say to bring up
13    the receptionist issue?
14    A    Because I knew Ms. Hahn was out on
15    disability also.
16    Q    But what did you say to these three
17    people?
18    A    I told them, I said, well, I think I
19    can do the receptionist job.
20    Q    And who responded on that point?
21    A    John DiBattista.
22    Q    And what did he say about the

Page 291

1    receptionist job?
2    A    And Ms. Iversen. They were saying,
3    no, Betty Ann is still on the payroll.
4    Q    All right.
5    A    So, my question was, well, how come
6    she got job protection and she had been
7    there ten years, and I didn't have any job
8    protection and I've been there 15 years, and
9    why is there a temp working in her place
10    when the temp that was working in my place
11    was hired as of April the 1st?
12    Q    And what did they say in response to
13    those comments by you?
14    A    I think that's when the confusion
15    came in.
16    Q    Well --
17    A    It was like, at that point, all
18    three of us were talking at the same time.
19    Q    Do you recall anything that any
20    specific person said thereafter?
21    A    No. Basically, it was like, okay,
22    we've got a wonderful idea here, we created

Page 292

1    this just for you, and it was this insurance
2    policy thing. That's the only reason why I
3    accepted it.
4    Q    So, who said the words -- When you
5    raised the receptionist issue, who said the
6    words about, no, that's for Betty Ann and
7    it's not for you or whatever they said? Who
8    said that? Battista or Iversen?
9    A    Jamison. Ms. Riley-Jamison and Ms.
10    Iversen.
11    Q    Well, I thought it was Battista and
12    Iversen before.
13    A    No. Battista was saying, well, if
14    you don't take the word processing position,
15    there's no other jobs available. And I
16    explained to him, how could you put me in a
17    job where I have to wear hand braces and do
18    word processing that's more typing than when
19    I was a legal secretary?
20    Q    We're not talking about that topic
21    right now.
22    A    Okay.

Page 293

1    Q    We're talking about when you said,
2    how about the receptionist, and then
3    somebody said, no, that's held for Betty
4    Ann. Who said that?
5    A    Ms. Iversen.
6    Q    Okay. Did Ms. --
7    A    And then I was, like, pardon me?
8    And Ms. Jamison was, like, well, that's
9    Betty Ann's job. So, I came back with,
10    well, so why is there a temp in that
11    position if I could be working in that
12    position?
13    Q    And who said what next?
14    A    Then Mr. DiBattista said, well, you
15    know, Betty Ann plans to come back to work.
16    Q    Right.
17    A    And that's how we got into the
18    conversation when I said, so, how could she
19    get job protection and I can't and I'm the
20    senior support staff person?
21    Q    The FMLA does not -- Strike that.
22    The FMLA gives people a certain

Page 218

1    Q   Do you recall Ms. Riley-Jamison
2    paying the $40 for the copying charges on
3    her own Visa card or credit card?
4    A   Sir, I told you no. You asked me to
5    answer the question --
6        MS. MURRAY: Just stop.
7        MR. DiMURO: It was a different
8    question.
9        BY MR. DiMURO:
10   Q   Do you recall Ms. Riley-Jamison,
11   when she was at the Red Cross, hiring your
12   son? Do you recall that?
13   A   What -- What does that have to do
14   with why we're here today?
15   Q   You're charging this lady with being
16   a racist. She --
17   A   Well, what does that have to do with
18   her prior --
19   Q   Did she or did she not help get your
20   son a job with the Red Cross?
21       MS. MURRAY: Just answer the
22   question, Ms. McFadden.

Page 219

1        THE WITNESS: Mr. Panagopoulos did.
2        BY MR. DiMURO:
3    Q   Okay. You don't credit Ms. Riley-
4    Jamison with that?
5    A   Mr. Panagopoulos spoke with Ms.
6    Riley.
7    Q   And --
8    A   But since you said that, also
9    remember -- I want you to remember this --
10   he didn't work for her but a month, because
11   he ended up being the intern for Donna
12   Shalala, who, at the time, was the Secretary
13   of Health and Human Services.
14   Q   Okay.
15   A   Okay.
16   Q   Did Ms. Riley-Jamison ever use any
17   racist comments?
18   A   What do you mean by "racist"?
19   Q   Well, mean-spirited, derogatory
20   comments that have a racial connotation -- a
21   racist connotation.
22   A   Could you please give me an example?

Page 220

1    A   Well, I'm not going to say it out
2    loud, but the N word comes to mind, and
3    there are all sorts of other racial epithets
4    or words that have, unfortunately, been
5    used.
6        I'm asking you if you've ever heard
7    Ms. Riley-Jamison refer to you or other
8    African-Americans in any racist terms?
9    A   The only thing that I've ever heard
10   her say as far as support staff was that we
11   need to get younger people in here that are
12   able to do the job that won't have as many
13   medical problems.
14   Q   All right. Let's start with racist
15   terms.
16   A   Okay.
17   Q   Did you ever hear Ms. Riley-Jamison
18   --
19   A   Are you asking me did she ever call
20   me a nigger?  No.
21   Q   All right.
22   A   That's what -- You need to tell me

Page 221

1    what you're asking me.
2    Q   You don't know what "a racist term"
3    means?
4    A   Well, I'm not -- I'm not racist, so
5    --
6    Q   All right.
7    A   So, you're asking me to talk about
8    something that's not an everyday part of my
9    life, sir.
10   Q   Yes, but you would know it if you
11   heard it, wouldn't you, if somebody used a
12   racist term in front of you that offended
13   you, whether they meant it that way or not?
14       Do you ever recall Ms. Riley-Jamison
15   using a racist term or a term that you felt
16   was racist?
17   A   I just need you to explain that
18   better.
19   Q   I can't do any better. That's about
20   as simple as --
21   A   Because you're asking me about
22   racism; okay? Racism is not based solely on

Page 222

1  calling a person a name.
2      Q   I'm just asking a question. I need
3  an answer.
4      A   Okay. Did she ever call me out of
5  my culture? No.
6      Q   I don't know what that means.
7      A   I'm African-American.
8      Q   Right.
9      A   That's my culture.
10      Q   Try answering my question.
11      A   Okay.
12      Q   Did Ms. Riley-Jamison ever use a
13  term in your presence or about you that you
14  considered to be racist or to show racial
15  bias?
16      A   What do you mean by "racial bias"?
17      A   Ma'am, it's about as simple a word
18  as I can -- Basically, you've sued people.
19  You've sued --
20      THE WITNESS: See, he doesn't --
21  This is where --
22      MS. MURRAY: Just answer the

Page 223

1  question.
2      BY MR. DiMURO:
3      Q   Ma'am, you sued people for being
4  racial discriminators, and you don't know
5  what the term "racist" means or "racial
6  bias"?
7      Did she ever use a term about you or
8  in your presence that you considered to be a
9  racist term, a racial slur of any sort?
10      A   Can we take a break?
11      Q   No. That's an easy question.
12      A   No. Just no.
13      Q   Okay. That wasn't so hard.
14      A   No. I'm just saying, I got confused
15  because you was asking me two questions at
16  one time.
17      Q   Did Ms. Riley-Jamison ever use a
18  term that was derogatory of people with
19  disabilities?
20      A   Yes.
21      Q   What terms did she use?
22      A   She said we needed to get some

Page 224

1  younger people in here in better health and
2  get rid of some of these old people. That's
3  a derogatory remark.
4      Q   Any others that come to mind?
5      A   That's the only one that I witnessed
6  her saying in front of Ms. Hahn and Ms.
7  Briscoe. That's why I was asking you to
8  further explain what you were saying. I
9  wasn't trying to be smart.
10      Q   So, when did this happen?
11      A   I'm not sure round about the date.
12      Q   Rough time frame?
13      A   I know I have it in one of my
14  documents that you have there.
15      Q   But you don't recall the date
16  roughly?
17      A   It was around maybe August or
18  September of 2003, around that time. Around
19  that time frame.
20      Q   Who was present to hear the
21  statement?
22      A   Ms. Betty Ann Hahn and Ms. Cassandra

Page 225

1  Briscoe. And she made the remark that day
2  at the sign-in sheet, and at that time, Pam
3  Curry and a Ms. Wendy, who were two African-
4  American secretaries, had called in sick.
5  One had lupus and one had asthma.
6      Q   Did you say anything to her that day
7  about that statement?
8      A   What was I supposed to say?
9      Q   Ma'am --
10      A   No.
11      Q   -- just answer the question.
12      A   No.
13      Q   I'm really getting --
14      A   No.
15      Q   -- a little tired.
16      A   So am I. No.
17      Q   Okay. Try answering the question.
18      Did anybody, to your knowledge, say
19  something to her about the comment?
20      A   Not that I know of; no.
21      Q   Did you complain to anybody about
22  the comment?

Page 294

1  amount of job protection by week. It isn't
2  calculated by seniority; isn't that right?
3      A   Okay. But when I said that at that
4  point, Ms. Betty Ann and I have been out the
5  same amount of time
6      Q   But you really don't know from your
7  personal knowledge how much time she had
8  come back to work --
9      A   The only thing I can say is --
10     Q   Wait, wait, wait, wait, wait.
11     A   Okay. Go ahead, sir. I'm sorry.
12     Q   This is a yes or no question. You
13 don't know from your own personal knowledge
14 whether Ms. Hahn had come back to work after
15 she went out on leave and how much FMLA
16 leave she actually had left. You don't know
17 that, do you?
18     A   I know what she told me.
19     Q   Well, first of all, do you know from
20 her personal records what leave she had?
21     A   No.
22     Q   Okay. What did she tell you on that

Page 295

1  topic?
2      A   Now, when I called to speak to Mr.
3  Henck around the 15th of December, Ms. Hahn
4  answered the phone.
5      Q   December of '03?
6      A   Yes.
7      Q   Okay.
8      A   And she said, oh, you know, how are
9  you doing? I said, everything's okay. I
10 said, I thought you were out on disability.
11 She said, no, I figured I'd try to work a
12 week or two to get the Christmas bonus, and
13 then I'm going back out on disability.
14     Q   Did you talk to her thereafter up to
15 May 14th about when she went back to work,
16 when she didn't go back to work?
17     A   I called her, and I was told that
18 she was out on disability.
19     Q   When was that?
20     A   I called her February, and I talked
21 to Laura Swanson, which was a friend of
22 hers, in April. Because I told her, I said,

Page 296

1  something's telling my heart that Betty Ann
2  is terminally ill.
3      Q   In February, you called in to speak
4  to Betty?
5      A   Betty Ann; yes.
6      Q   And you were told --
7      A   That she was out on disability.
8      Q   And who told you that?
9      A   The temporary receptionist, whoever
10 that was.
11     Q   And she would tell you that she's
12 out on disability?
13     A   She said she was out on disability.
14     Q   And who did you call in April?
15     A   Laura Swanson.
16     Q   And for what purpose?
17     A   Because her and Betty Ann were real
18 close friends, and they lived near each
19 other.
20     Q   And what --
21     A   It was more for me out of concern.
22     Q   And what did you say?

Page 297

1      A   And I asked her, I said, you know,
2  what's wrong with Betty Ann? She said,
3  well, Betty Ann won't be coming back to the
4  firm. And I said, okay.
5      Q   Besides those two phone calls --
6      A   Yes.
7      Q   -- and your phone call in December
8  of '03, do you have any other knowledge
9  about how much time Betty Ann worked in '04
10 and how much FMLA leave she had as of May
11 14th, '04?
12     A   No. All I know is that -- No, I
13 don't
14     Q   I'm sorry. I didn't understand your
15 statement about why the discussion about the
16 receptionist is not in your Exhibit 68, your
17 notes of that day.
18     A   Because, basically, when I asked
19 about it, they said, no, that's Betty Ann's
20 job. And I was like, well, but how can she
21 get job protection and I can't? If she's
22 still out on disability, why can't I do this

Page 298

1  job?
2      Q    You were questioning whether or not
3  they were right?
4      A    Yes.
5      Q    So, I'm wondering why you didn't
6  write it down?
7      A    I felt it was more important for me
8  to put down that they've offered me a
9  position in word processing knowing that I
10  have to wear these. So, why would you offer
11  me a position that you knew I couldn't do?
12      Q    So, you felt they were being
13  discriminatory by offering you a position
14  they should have known you couldn't handle;
15  right?
16      A    I mean, that was more like one plus
17  one equals two.
18      Q    Well --
19      A    I mean, if you were a word
20  processor, your typing speed is anywhere
21  from 80 words to 100 words a minute. I
22  don't think, with rheumatoid arthritis and

Page 299

1  wearing these, that I could have done that,
2  sir. So, like I said, as far as I'm
3  concerned, I was discriminated against.
4      Q    But that's why you wrote down the
5  word processing part of the conversation?
6      A    Yes.
7      Q    But you felt that they weren't being
8  forthright with you on Betty Ann's -- saving
9  the job for Betty Ann? They weren't --
10  Strike --
11      A    Oh, no, they weren't. Because, as a
12  matter of fact, she died on my anniversary.
13  I'll never forget it.
14      Q    So, you felt that they were treating
15  you unfairly by this story about Betty Ann
16  on May 14th?
17      A    No. I'm just saying, what makes her
18  different from me is because she's white and
19  I'm African-American.
20      Q    Oh, I see. So, you thought it was
21  another --
22      A    So, it's discrimination.

Page 300

1      Q    And that's my point. Why didn't you
2  write it down?
3      A    What did I have to write down, oh,
4  the white man is discriminating against me?
5      Q    Well, why did you keep these notes
6  then? What's the point of these notes if
7  you're not keeping track of --
8      A    No. Just to show a pattern. I
9  mean, if my memory was a hundred percent,
10  sir, I wouldn't have to write any notes at
11  all. I did it for that reason.
12          (Whereupon, a brief discussion was
13  held off the record.)
14          BY MR. DiMURO:
15      Q    Earlier, I wrote down some names
16  when you were giving me a list of people who
17  you thought got benefits or accommodations
18  that showed that you should have gotten
19  something better or something.
20          They're called "comparatories."
21  Lawyers call them "comparatories," but we
22  won't use that term.

Page 301

1      A    Please don't.
2      Q    Okay. Kathy Hanna. No, I'm sorry.
3  Let's start with Ms. Riley-Jamison. I don't
4  understand what the issue is during her
5  probation period.
6          Staying just with her, what is the
7  issue there? What is the concern with Ms.
8  Riley-Jamison getting better treatment than
9  you or somebody else?
10      A    In the employee handbook, it states
11  -- and I believe that goes for all Ballard
12  Spahr employees -- during the 90-day
13  probation period, if you're off for any
14  period of time, that you would not get paid
15  for time off.
16      Q    And it's your understanding that she
17  took time off during her probation period?
18      A    And she had a modified schedule.
19      Q    And what did she have to take time
20  off during her probation period for?
21      A    For her husband. He had surgery.
22  What kind, I don't know.

Page 302

1    Q    And how do you know that he had
2  surgery? Was that just generally known in
3  the office?
4    A    I think I can say this freely.
5  Ballard Spahr is not the place to work if
6  you want anything kept confidential. It's
7  like a loud speaker went off.
8    Q    How long was she gone roughly
9  according to your information?
10   A    He had to have surgery twice, so I
11 guess around two or three weeks the first
12 time around and maybe a week and a half the
13 next time around.
14   Q    Both within her probationary period?
15   A    Yes.
16   Q    How do you know she got paid?
17   A    Ms. Briscoe did the leave.
18   Q    So, your information comes from Ms.
19 Briscoe?
20   A    Yes. Who used to be -- She was Ms.
21 Riley's assistant -- Ms. Riley-Jamison's
22 assistant.

Page 303

1    Q    It doesn't sound like she's keeping
2  her mouth shut either, does it? Why is Ms.
3  Briscoe telling you this information?
4    A    Because they also terminated her
5  when they terminated me.
6    Q    So, she got upset?
7    A    No. They terminated her on,
8  basically, discrimination. She had been
9  with the firm for 20 years.
10   Q    But why did that cause her to tell
11 you about Ms. Riley-Jamison's situation?
12   A    I asked her. I mean, it was like,
13 okay, what's going on here, I'm not crazy.
14   Q    So, you asked her, and she told you
15 about Ms. Riley-Jamison's situation?
16   A    Yes.
17   Q    Have you ever seen Ms. Riley-
18 Jamison's personnel file?
19   A    No. I don't work at management; no.
20   Q    Have you seen any documents that
21 show what she did or did not get paid in her
22 90-day probationary period?

Page 304

1    A    No.
2    Q    When you say somebody doesn't get
3  paid for time off on their probationary
4  period, does that mean they also don't get
5  any sick leave or vacation leave?
6    A    You don't get any leave or anything.
7    Q    So, if you have to take a day off in
8  the first 90 days --
9    A    It's leave without pay.
10   Q    It's without pay; okay.
11   A    Regardless if it's attorneys,
12 secretaries, or management, it's leave
13 without pay.
14   Q    If Ms. Briscoe does the leave --
15   A    Yes.
16   Q    -- how does she know Ms. Riley-
17 Jamison actually got paid?
18   A    Because she's the one that submitted
19 the information to payroll. That's what she
20 did, you know, she submitted the information
21 to payroll.
22   Q    Oh, so she just submitted to payroll

Page 305

1  that Ms. Riley-Jamison was here every work
2  day for her 90 days?
3    A    Because that's what she was
4  instructed to do.
5    Q    Did she say who instructed her to do
6  that?
7    A    Mr. Panagopoulos.
8    Q    Anyone else?
9    A    That's all I know. Mr.
10 Panagopoulos.
11   Q    Does that exhaust your knowledge or
12 information about Ms. Riley-Jamison getting
13 paid during the 90-day probationary period?
14 Is that all you know about this issue?
15   A    Yes. I mean, like I said before,
16 sir -- I mean, I didn't care how it -- I
17 guess that's why I felt they discriminated
18 against me so badly.
19      I saw a lot of things. But I was
20 the type, I never commented on anything.
21 So, why did my personal life have to be an
22 open book?

Page 306

1    Q   So, Ms. Riley-Jamison might have
2  gotten two or --
3    A   Three weeks of pay.
4    Q   -- three weeks of pay. Did you not
5  get things from Ballard Spahr for --
6    A   I didn't get paid for my husband.
7    Q   You got --
8    A   My husband had cancer. I didn't.
9  Ms. Riley-Jamison got paid because her
10 husband was sick, not her. The same thing
11 with Ms. Craig.
12   Q   Well, hold on. Let's stay with one
13 at a time.
14   A   Okay. With Ms. Riley-Jamison, I'm
15 just saying --
16   Q   Your husband is sick. Ms. Riley-
17 Jamison's husband is sick.
18   A   Right.
19   Q   She gets paid. You get a modified
20 work schedule at your full salary.
21   A   But I didn't get paid. I had a
22 modified work schedule, but I didn't get

Page 307

1  paid. Does that make any sense? All I'm
2  saying is, for one thing, her husband is not
3  a Ballard Spahr employee, nor is my husband.
4    Q   Right.
5    A   So, therefore, as far as pay, she
6  wasn't sick. Her husband was. So,
7  therefore, if she got paid because her
8  husband was sick, don't you think I should
9  get paid since my husband was sick?
10   Q   And you don't agree that there were
11 times you were not there that HR did not
12 dock you for?
13   A   I haven't looked at my pay stubs
14 lately. To tell you the honest to God
15 truth, I didn't know what I was getting
16 paid when I got my pay stub.
17   Q   Kathy Hanna. What's the issue
18 there?
19   A   Ms. Hanna had a stroke. She was out
20 for six months. She kept her job. But for
21 two years, she worked a modified leave
22 schedule, and 90 percent of the time I was

Page 308

1  the one covering for her. And she's also
2  Caucasian.
3    Q   All right. She --
4    A   I hate using that word. Can't I say
5  "white"?
6    Q   You can "white." I don't care.
7    A   "Caucasian" is hard. I'm sorry. I
8  can't even spell it.
9    Q   So, she had a stroke, was out for
10 six months, kept her job on a modified leave
11 schedule.
12   A   For two years.
13   Q   Do you know if she got paid for a
14 full-time schedule versus just getting paid
15 for her modified time?
16   A   No. What she told me was, she said
17 -- She told me not to fill out -- When I
18 called her about the form that came with
19 this letter, I asked her, I said, Kathy, did
20 you have to fill this out? She went, no,
21 what is that for?
22   Q   "This form" you're talking about is

Page 309

1  the attachment --
2    A   Leave of Absence Request Form.
3    Q   Okay. You've got to slow down.
4        The form you're talking about is the
5  one attached to the March 9th, '04 letter,
6  Exhibit 70; right?
7    A   Uh-huh.
8    Q   You have to say yes or no.
9    A   Okay.
10   Q   Yes or no?
11   A   Yes or no what?
12   Q   The form you're talking about is the
13 form attached to the March 9th letter?
14   A   Yes.
15   Q   So, she said she never had to fill
16 that out; right?
17   A   Right.
18   Q   Now I'm asking you, do you know,
19 when she was on modified leave -- I'm sorry.
20 Was it modified leave or modified work?
21   A   Modified leave and modified work
22 because she had had a stroke. So,

## Page 310

1  basically, even the days she was there, I
2  would do her walking like her Xeroxing or
3  whatever I could do to help her.
4    Q   So, when she's on modified work
5  schedule -- she's back and she's now on
6  modified work --
7    A   Yes.
8    Q   -- do you know if she's just getting
9  paid for the time she works or if she's
10  getting her regular full-time pay?
11    A   Okay. The way --
12    Q   Do you know one way or the other?
13    A   Like she told me, the way it worked
14  -- and she couldn't understand why they
15  didn't work this way with me -- on the days
16  she worked for Ballard, she got paid from
17  Ballard.
18        The other days, for two years, Unum
19  paid her 60 percent of her salary. So, she
20  couldn't understand, well, why didn't they
21  do you like that to see if you would get
22  better as far as your situation?

## Page 311

1    Q   Did she say that she got this 60
2  percent pay on the days she didn't work
3  right away, or was there a waiting period?
4    A   When she first came back from off
5  for six months. No, there wasn't a waiting
6  period.
7    Q   That's what she told you?
8    A   That's what she told me; yes.
9    Q   Now, while she was out for roughly
10  six months because of the stroke, did she
11  get any money or accommodation there?
12    A   Yes. She got short-term disability.
13  Then, after 90 days, she fell under long-
14  term disability.
15    Q   But you got that. You got the
16  short-term provisions and then you got the
17  long-term provisions. I mean, there were
18  lots of problems --
19    A   Not without a fight.
20    Q   I understand. But that's Unum's
21  fault. That's Unum's fault.
22    A   Well --

## Page 312

1    Q   Let's not go there.
2    A   Okay. You're right. That's Unum's
3  fault. Let's not go there.
4    Q   Right. So, you got whatever the
5  short-term provisions are followed by the
6  long-term provisions, and, I agree, you had
7  to fight with Unum to get that; right? But
8  you got that.
9    A   I almost lost my home. I'm sorry.
10    Q   But that's Unum's fault, not Ballard
11  Spahr's.
12    A   Okay. But what I don't understand
13  is, everybody white that I talked to that
14  had to go through Unum, all their stuff was
15  done in a timely manner. They got their
16  benefits within -- just like that.
17    Q   Well, you know, when you start
18  saying "everybody I talked to," I'm going to
19  start asking you who all these people are.
20    A   No, no, no. I'm just saying, as far
21  as -- I wasn't close to a lot of people, but
22  I did have white -- I mean, the office was

## Page 313

1  predominantly white. So, all I'm saying is,
2  you know --
3    Q   Ma'am, you need to answer my
4  question.
5    A   Okay. What do you want me to
6  answer?
7    Q   Ms. Hanna got whatever the firm
8  provided for the short-term leave --
9    A   And the long-term.
10    Q   -- and the long-term leave, the
11  long-term leave being paid by Unum.
12    A   Yes.
13    Q   You got both, but you had a much
14  more difficult time with Unum than
15  apparently Ms. Hanna did.
16    A   Yes.
17    Q   And I presume you've never seen Ms.
18  Hanna's personnel or pay records that would
19  show all this in documents?
20    A   No. But --
21    Q   Do you know anything else about Ms.
22  Hanna's situation, her pay, her leave?

Page 314

1    A    No.
2    Q    I mean, what you know is what she
3    told you of something?
4    A    Yes.
5    Q    Kristine Hearn. What's her
6    situation?
7    A    She worked with the firm maybe a
8    year at that, and she was able to have a
9    modified work schedule to go to George
10   Washington University.
11   Q    What type of work did she do at the
12   firm?
13   A    She was a floater.
14   Q    Was she a typist or --
15   A    Like sitting when somebody's out or
16   whatever.
17   Q    So, she was permitted to drop from
18   full-time to some sort of modified work
19   schedule to go to school?
20   A    To go to school; yes.
21   Q    She only got paid for the time she
22   worked; right? She didn't get a full week's

Page 315

1    salary while she was on modified work
2    schedule, did she?
3    A    I don't know.
4    Q    And what's wrong about her getting a
5    modified work schedule so she can go to
6    school?
7    A    Because when Shelby Green wanted to
8    do it, who had been there longer than her
9    and who was African-American, she was told
10   no.
11   Q    Ms. Green --
12   A    Shelby Green; yes.
13   Q    -- what position did she hold?
14   A    Floater.
15   Q    Where do you get the information
16   that Ms. Green asked and was rejected? From
17   Ms. Green, I'm guessing.
18   A    When she saw that kind of light, she
19   came out of the office unappropriately
20   (sic).
21   Q    She what?
22   A    I mean, she was very upset about it,

Page 316

1    so she was very vocal about it.
2    Q    But what I'm asking you is you got
3    it from her?
4    A    I got it from her arguing with Ms.
5    Riley.
6    Q    All right. Where?
7    A    They was in the hallway near my
8    desk.
9    Q    So, were you listening in on the
10   yelling, I guess?
11   A    I couldn't help it, sir.
12   Q    Okay.
13   A    Okay? I mean, I'm just saying, just
14   like Brenda Dillman. She worked for the
15   accounting department --
16   Q    Wait. One thing at a time, ma'am.
17   A    Okay.
18   Q    When you do that --
19   A    Okay. I know, I know. I'm jumping
20   the gun.
21   Q    Anything you know about Ms. Green's
22   request for a modified schedule to go to

Page 317

1    school, you know from what you heard from
2    Ms. Green?
3    A    Ms. Green; exactly.
4    Q    Now, you heard her speaking to Ms.
5    Riley-Jamison out in the hall; right?
6    A    Uh-huh.
7    Q    Yes or no, please.
8    A    Yes.
9    Q    Thank you.
10       Did you talk to her about it later
11   after that?
12   A    The only thing she said to me about
13   it was, how come everybody up here white can
14   do whatever they want to do. And there
15   wasn't that many minorities at Ballard. How
16   come, if we ask for anything, we don't get
17   it?
18   Q    Okay. Do you know what --
19   A    And I told her I did not know.
20   Q    Do you know any of the specifics of
21   what she proposed -- you know, I go to
22   school on these days, I work these days? Do

Page 318

1  you know anything about the specifics that
2  she suggested?
3      A    She just said that the days that she
4  wanted to do it or whatever, they said that
5  that's the time when they really needed her;
6  okay?
7      Q    And that was Ms. Riley-Jamison who
8  told her that? Is that your understanding?
9      A    Yes. And that those two could not
10 be out at the same time.
11     Q    Do you know anything else about Ms.
12 Green's situation?
13     A    No.
14     Q    Do you know anything else about Ms.
15 Hearn's situation?
16     A    Kristine Hearn? No.
17         (Whereupon, there was a brief pause
18 in the deposition.)
19         BY MR. DiMURO:
20     Q    Judy Mintz. What was her situation?
21     A    Well --
22     Q    I presume Ms. Hearn is white as

Page 319

1  well?
2      A    Yes.
3      Q    Okay. Judy Mintz?
4      A    She's white.
5      Q    And what's her situation in terms of
6  leave or accommodation or whatever?
7      A    She takes off around the middle of
8  June --
9      Q    Oh, that's right.
10     A    -- and she's off until September
11 where she resides at Martha's Vineyard.
12     Q    What type of position does she have?
13     A    Secretary.
14     Q    For whom?
15     A    The managing partner.
16     Q    And does she get paid while she's
17 gone?
18     A    I'm not sure. I can't answer that.
19 No. I don't know.
20     Q    And what's wrong with her being a
21 nine-month employee? Why is it unfair or
22 discriminatory?

Page 320

1      A    Why is it unfair and discriminatory?
2      Q    Yes. Why is it discriminatory for
3  Ms. --
4      A    Okay. You asked me why is this
5  discriminatory. I mean, maybe people think
6  of things in life and take things more
7  seriously than others. I mean, I just look
8  at it -- I don't how to answer that.
9      Q    But you're the one who said to me
10 these things show discrimination.
11     A    No. I mean, these things show the
12 pattern of discrimination.
13     Q    Okay.
14     A    If I was white, I wouldn't be
15 sitting here talking to you now. That's the
16 way that I feel.
17     Q    But if these examples of people's
18 leave histories or pay histories show
19 discrimination, why does Judy Mintz's
20 situation show discrimination? Why can't
21 she just negotiate with the company to be a
22 nine-month employee?

Page 321

1      A    Okay. I don't know the answer to
2  that.
3      Q    All right. Is that everything you
4  know about Ms. Mintz?
5      A    Yes.
6      Q    And I presume you only know this
7  because it's general knowledge about the
8  office that she takes off three months;
9  right?
10     A    (No response.)
11     Q    Is that right?
12     A    Uh-huh.
13     Q    You have to say yes or no, please.
14     A    Yes.
15     Q    Have you ever talked to her about
16 it?
17     A    Oh, yeah. I mean, she takes off in
18 December to go to Paris, so, I mean, I wish
19 I could do it.
20     Q    Brenda Dillman. What is her
21 situation?
22     A    She used to be a Ballard Spahr

Page 322

1    employee and she worked in accounting, so
2    she had a modified leave schedule to get her
3    degree in accounting.
4        Q   She's white, I take it?
5        A   Yes.
6        Q   And what is it about her modified
7    leave schedule that's unfair or
8    discriminatory?
9        A   I guess maybe -- maybe -- maybe I'm
10   missing something. When you work in an
11   office and you see everybody getting treated
12   different that's of a specific color, and
13   then when it comes to you, it's like you're
14   not getting treated the same, there is a
15   difference, sir. I don't know how else to
16   explain it. There is a difference.
17       Q   Well, but you got a modified work
18   schedule, you got the short-term benefit,
19   you got the long-term benefit eventually,
20   you got the extended leave, the three
21   months, and you got the 16 weeks.
22       A   Not when my husband was sick; no. I

Page 323

1    barely took ten months.
2        Q   But you didn't ask for it back then
3    when your husband was sick.
4        A   No. I'm just saying, it was
5    basically they gave me -- Basically, they
6    knew what they were doing. I went by what
7    they did in fear of losing my job. That's
8    all I'm -- I mean, that's --
9        Q   Who ever said to you you're going to
10   lose your job?
11       A   I mean, if you're constantly telling
12   me that you're doing me a favor.
13       Q   And what does that mean to you?
14       A   I mean, she don't go around telling
15   white employees that she's doing them a
16   favor.
17       Q   Well, how do you know that?
18       A   No. I mean, come on now, let's be
19   realistic.
20       Q   Well, how do you know that?
21       A   If she did it all day long, then
22   when would she have time to do anything

Page 324

1    else?
2        Q   So, you really don't know what she
3    says or does --
4        A   No, no, no. I'm just saying, you
5    know, I don't know if it's the way that she
6    treats her loved ones or -- I don't know.
7        But for as long as I've been with
8    that firm, anything they asked me to do, I
9    accommodated regardless. And when it came
10   to me, as far as I'm concerned, I was
11   treated like a refugee.
12       I mean, I wasn't even treated -- I
13   mean, the whole format changed as far as I'm
14   concerned. That's how it mentally affected
15   me. I felt like, you know, like I said.
16       And the reason why we're here is
17   because I was discriminated by race,
18   retaliation, disability. You know, I mean,
19   that's why we're here.
20       And I just -- I'm trying to answer
21   your questions as best as I can. Okay.
22   Yes, don't answer, whatever. But I mean,

Page 325

1    maybe you need to -- Can I ask you a
2    question? Could you tell me what
3    "discrimination" means?
4        Q   Ma'am --
5        A   Then maybe we can be on the same
6    page.
7        Q   It's your lawsuit, not mine.
8        A   This is what I know. So, therefore,
9    I feel that they discriminated against me by
10   race, disability, retaliation, and whatever.
11   So, therefore, my thing is, why didn't they
12   just -- Why did they treat me different?
13       Q   Okay. That's what I'm trying to get
14   at. That's what I'm really trying to
15   understand.
16       A   No, no, seriously. Seriously.
17       Q   You got a modified leave schedule,
18   you got salary advances, you got the short-
19   term benefit, you got the long-term benefit,
20   you got the three-month extended leave, and
21   you got the FMLA leave.
22       What is it that you didn't get that

Page 326

1    somebody else got?
2        A    I didn't have any job protection.
3    When I walked out that door on October the
4    15th, Ms. Iversen told me, you can always
5    come back here to Ballard at any time.
6        Q    Regardless of what position is
7    available?
8        A    Regardless -- Exactly.
9        Q    Regardless if your doctors and you
10    are certifying to insurance companies --
11        A    No. I'm saying --
12        Q    -- the Social Security
13    Administration --
14        A    She said regardless.
15        Q    You've got to --
16        A    Mr. Henck told me the same thing.
17        Q    You've got to listen to my question.
18        A    Okay. I'm listening to your
19    question.
20        Q    Regardless of whether or not you and
21    your doctors are certifying that you are
22    incapacitated and unable to resume gainful

Page 327

1    employment, you think they should have held
2    a job for you?
3        A    No. I would have thought that they
4    would have treated me differently, some of
5    the mental and some of the stress. Some of
6    the things I went through, I wouldn't have
7    had to went through.
8        Q    All right. Let's keep going.
9            Brenda Dillman. What was -- Oh, she
10    was the accounting person?
11        A    Right.
12        Q    Do you know what modified work
13    schedule she got?
14        A    I think she only worked on Tuesdays
15    and Thursdays.
16        Q    And she was in accounting?
17        A    Accounting; yes.
18        Q    Do you know, one way or the other,
19    if that adversely affected the accounting
20    department? Did they need her or --
21        A    What they would do is, Ms. Briscoe,
22    on the days that she wasn't there, Ms.

Page 328

1    Briscoe handled the accounting needs with
2    her other duties.
3        Q    And do you know if she got paid more
4    than for the time she actually worked?
5        A    Ms. Dillman?
6        Q    Yes.
7        A    No. I don't know.
8        Q    Do you know if she accrued vacation
9    and sick leave at full-time status or part-
10    time status?
11        A    From my understanding, she was part-
12    time.
13        Q    Do you know if Ms. Mintz accrues
14    sick leave or vacation leave on those months
15    that she's out?
16        A    I don't know.
17        Q    Do you know if Ms. Hanna or Ms.
18    Hearn accrued sick leave or vacation leave
19    on their modified schedules at full rates or
20    at modified rates?
21        A    I don't know.
22        Q    Ms. Betty Ann Hahn, she got treated

Page 329

1    better for reasons you've discussed? You've
2    already told me about that; right?
3        A    Yes.
4        Q    Yvonne Parker, what's her issue?
5        A    Who?
6        Q    I wrote down Yvonne Parker. Maybe -
7    -
8        A    Oh, Sevonne Parker.
9        Q    I'm sorry.
10        A    No. I think she was one of the
11    young ladies that confronted Ms. Riley, and
12    I can't think of the other young lady's
13    name.
14            They were support staff members that
15    would go to Ms. Riley and ask her, you know,
16    what is her modified schedule, is she
17    getting paid, this and that.
18            My belief is, if you're the human
19    resources manager, that some things are
20    confidential. You don't have to tell a
21    support staff member.
22            MR. DiMURO: Let's mark this as the

Page 330

1  next one.
2              (Whereupon, the document
3              was marked as Deposition
4              Exhibit No. 77, for
5              identification.)
6        BY MR. DiMURO:
7     Q   I'm showing you Exhibit 77.
8     A   Okay. Yes.
9     Q   Do all these pages go together, the
10 fax followed by --
11    A   No. This is someone that took care
12 of this fax for me that worked for the
13 Justice Department.
14    Q   So, you're sending a fax from
15 yourself through this friend at Department
16 of Justice?
17    A   No. She sent it -- A previous
18 attorney that I had, I had her fax it to her
19 because I had no other way of sending it.
20    Q   Right. So, Ms. Giles is helping you
21 send something to Ms. Maxi?
22    A   Yes.

Page 331

1     Q   And the next page is your
2  handwritten note to Ms. Maxi?
3     A   Yes.
4     Q   And who is Ms. Maxi?
5     A   She works for a previous attorney I
6  had, Joan Wilbon.
7     Q   Okay.
8     A   A lot of pages are not here of this
9  document.
10    Q   And the first handwritten note says
11 -- You're making the point that, the way you
12 read the attached document, the accelerated
13 benefit was in effect in 2002 and 2003?
14    A   Yes.
15    Q   "If Ballard Spahr is willing to pay
16 the full amount of my husband's insurance
17 policy, I will agree to that. Otherwise, I
18 will accept the accelerated amount."
19        What was your thinking? Why should
20 they pay the full amount?
21    A   The full amount?
22    Q   Right.

Page 332

1     A   I mean, since I was so special and
2  they claimed that they did the addendum for
3  me.
4     Q   Well, what's that got to do with --
5     A   No, no. I'm just saying it's just a
6  note to Ms. Wilbon my assistant. It was
7  just something that I was writing.
8     Q   I don't understand why you think
9  Ballard Spahr should pay the --
10    A   No. I'm just saying that because,
11 if you're telling me that, in the other
12 document that we looked at, that the
13 addendum -- They're telling me that you paid
14 Unum, which is Ballard -- Ballard pays Unum.
15
16        You're telling me that you spent all
17 these thousands of dollars just to make me
18 feel special, and it doesn't make sense.
19 Not when I have proof of where it was in
20 effect in 2002 and 2003. So --
21    Q   What does that have to do with them
22 paying you $100,000?

Page 333

1     A   No. I'm just saying, hey, they're
2  trying to tell me that, when they told me
3  about the addendum, that was a typographical
4  error, it was not.
5     Q   Now, the document that we're --
6     A   A lot of this is missing. You have
7  all this.
8     Q   All right. We'll look for it.
9     A   There's two of them.
10    Q   We'll look for it
11    A   Okay. That's fine
12    Q   But this is the fax.
13    A   Yes.
14    Q   And if we get all the attachments,
15 you're saying that will show that the
16 benefit was in effect -- Rider A was in
17 effect in 2002?
18    A   And 2003; yes, sir.
19        MR. DiMURO: All right. We're going
20 to quit for today. We all have to resume.
21 I would like to resume in the morning, but I
22 understand -- Ms. Murray and I had a

Page 334

1   conversation about this off the record.
2        She consulted with her client, and I
3   think her client is going back to Florida
4   tomorrow, so we would like to know -- not
5   right now -- but sometime in the near future
6   when we can resume.
7        MS. MURRAY:  (To the witness) Do you
8   want to consult for a minute on that?  Maybe
9   we should talk for a minute.
10       THE WITNESS:  Yes.
11       (Whereupon, a discussion was held
12  off the record.)
13             *    *    *
14       (Whereupon, at approximately 5:42
15  o'clock p.m., the taking of the deposition
16  was concluded for the day, to be resumed on
17  May 17, 2007 at 10:00 a.m.)
18             *    *    *
19
20
21
22

Page 335

1   DATE: June 1, 2007
2   RE: McFadden v. Spahr & Riley-Jamison
3   DEPONENT: Vanessa A. McFadden
4   DEPOSITION DATE:  May 16, 2007
5        Under the Rules of Court, you have the right to
6   read and review the transcript of your deposition.  If you
7   are represented by counsel and he/she has obtained a copy of
8   the transcript, you may review his/her copy and (1) complete
9   the original Correction/Change Form if you feel there has
10  been an error in the transcription, and (2) sign the
11  Correction/Change Form.  The form should then be forwarded to
12  our office at 1010 Cameron Street, Alexandria, Virginia 22314
13  so that we may incorporate it into the original transcript.
14       If you do not have a copy of the transcript
15  available for your review, please contact this office at
16  (703) 837-0076 and make an appointment to come in and read
17  the original.  The Rules allow 21 days for this review.
18  However, if a court date is pending, it should be done right
19  away.  If you choose not to read your transcript, the
20  original may be filed at the request of counsel without your
21  signature at the time of trial or hearing this matter.
22       Thank you.

Page 336

1   RE: McFadden v. Spahr Riley-Jamison
2   DEPONENT: Vanessa A. McFadden
3   DEPOSITION DATE: May 16, 2007
4        I have read the entire transcript of my deposition
5   taken on the 16th day of May, 2007, or the same has been read
6   to me.  I request that the following changes be entered upon
7   the record for the reasons indicated.  I have signed my name
8   to the signature line below and authorize you to attach the
9   same to the original transcript.
10  Page/Line   Correction or change and reason
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  Signature:
22  Date:

Page 337

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Patricia D. Staffa, the officer before whom the
3   foregoing deposition was taken, do hereby certify that the
4   witness whose testimony appears in the foregoing deposition
5   was duly sworn by me; that the testimony of said witness was
6   taken by me stenographically, and that I thereafter reduced
7   it to typewriting; that the foregoing is a true record of the
8   testimony given by said witness; that I am neither counsel
9   for, related to, nor employed by any of the parties to the
10  action in which this deposition was taken; and, further, that
11  I am not a relative or employee of any attorney or counsel
12  employed by the parties thereto, nor financially or otherwise
13  interested in the outcome of the action.
14
15
16        PATRICIA D. STAFFA
17        Notary Public in and for
18        the Commonwealth of
19        Virginia at Large
20
21  My Commission expires:   March 31, 2008
22

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - X
VANESSA A. McFADDEN,
             Plaintiff,
        -vs-

                          Civil Action No.
                             1:05CV02401

BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
AND
MARGARET RILEY-JAMISON,
             Defendants.
- - - - - - - - - - - - - - X
                     Alexandria, Virginia
                     Thursday, May 17, 2007
Continued Deposition of:


            VANESSA A. McFADDEN

the plaintiff, recalled for further

examination by counsel on behalf of the

defendants, pursuant to notice, taken in the

law offices of DiMURO GINSBERG, P.C., 908

King Street, Suite 200, Alexandria,

Virginia, beginning at approximately 10:13

o'clock a.m., before Patricia D. Staffa, a

Verbatim Reporter and Notary Public in and

for the Commonwealth of Virginia at Large,

when there were present on behalf of the

respective parties:

Page 98

1    Q    Is there a day or a time that you
2  asked for leave and you didn't get it?
3    A    I'm still not understanding what
4  you're asking me.
5    Q    Is there a day or a time in which
6  you asked for leave from Ballard Spahr and
7  you did not get the leave for that day or
8  period of time?
9    A    Can we take a break?
10    Q    No.
11    A    Why not?
12    Q    Because I want an answer to that
13  question.
14    A    No. I need to take a break.
15    Q    Ma'am --
16    MS. MURRAY: There's a pending
17  question. You have to answer the question -
18  -
19    THE WITNESS: No, no. I'm answering
20  the question.
21    MS. MURRAY: -- before your break --
22  before you request a break.

Page 99

1    THE WITNESS: Oh, okay. Not that I
2  can recall.
3    MR. DiMURO: Do you need a break
4  now?
5    THE WITNESS: Yes.
6    (Whereupon, a brief recess was
7  taken.)
8    BY MR. DiMURO:
9    Q    Still on Paragraph 53, it says,
10  "Ballard Spahr and Ms. Riley-Jamison denied
11  Ms. McFadden schedule modification."
12    Tell me a schedule modification that
13  you asked for that you didn't get. Maybe
14  there aren't any.
15    A    I was given a schedule modification.
16  The e-mail that you presented earlier. I
17  forgot which exhibit it was.
18    Q    Right. It's the one where you list
19  the things you need to --
20    A    Yes, sir. Even with that schedule
21  modification, she still constantly harassed
22  me.

Page 100

1    Q    But the schedule modification we're
2  talking about is three days --
3    A    My husband was getting his
4  chemotherapy.
5    Q    I understand.
6    A    Okay.
7    Q    The schedule modification we're
8  talking about is four days one week, three
9  days the next, and it keeps alternating?
10    A    Yes.
11    Q    And did you agree to that schedule
12  modification, the seven days out of ten
13  days?
14    A    Yes.
15    Q    Did you ask for it to be changed
16  even further -- Strike that.
17    Did you ever ask that your schedule
18  be modified in a different way and it was
19  denied?
20    A    No.
21    Q    And then in Paragraph 53, you talked
22  about Ms. Riley-Jamison and the law firm

Page 101

1  treating you disparately, or differently,
2  with regard to leave procedures and job
3  protection.    I'm assuming that that
4  is the same issue as the six or seven
5  employees we talked about yesterday?
6    A    Yes.
7    Q    And, in fairness, I think you
8  mentioned somebody else today. Erika? I
9  thought it was Erika.
10    A    Yes, Erika. Maybe Ms. Riley can
11  help me with that.
12    Q    Well, something about two months for
13  a wedding and --
14    A    Oh, a wedding, and then another
15  month off to go spend with her father.
16    Q    But if we add that person to the
17  list of people you --
18    A    She was white.
19    Q    If you add that person --
20    A    To the list
21    MS. MURRAY: Let him ask the
22  question.