UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

File Copy

| | |
|---|---|
| VANESSA A. MCFADDEN )<br>      Plaintiff, )<br>)<br>v. )<br>)<br>BALLARD SPAHR ANDREWS & )<br>INGERSOLL, LLP et al. )<br>)<br>      Defendants. )<br>_____) | Civil Case No.05cv2401 (RJL) |

**PLAINTIFF'S THIRD SUPPLEMENTAL ANSWERS AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES
AND
SECOND SUPPLEMENTAL RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Federal Rules of Civil Procedures 33 and 34, applicable Local Rules Plaintiff, and the Court's Order of October 2, 2006, Vanessa A. McFadden, by and through undersigned counsel, hereby provides her Third Supplemental Answers to the Defendants' Interrogatories and Second Supplemental Responses to their Request for Production of Documents.

EXHIBIT 17

GENERAL OBJECTIONS

These general objections are specifically incorporated into each and all of the enumerated responses that follow:

1. Plaintiff objects to the Defendants' Interrogatories and Request for Production of Documents to the extent that they may be construed to request disclosure of information that was prepared in anticipation of litigation, constitutes attorney work product, discloses the mental impressions, conclusions, opinions or legal theories of any attorneys for Plaintiff, contains privileged attorney-client communications, or

1

seeks information that is protected by any other applicable privilege, law, rule or immunity.

2. Plaintiff objects to the Defendants' First Set of Interrogatories and Request for Production of Documents to the extent that they are vague, ambiguous or overbroad and not reasonably calculated to lead to the discovery of admissible evidence.

3. Plaintiff objects to the Defendants' requests for medical information to the extent it concerns, references, or describes confidential, doctor-patient privileged medical information pertaining to conditions unrelated to this case.

4. Plaintiff objects to the Interrogatories section marked "Instructions and Definitions", including but not limited to Instruction/Definition 6, which purports to include Ms. McFadden's attorneys among those who must provide answers to the Defendants' interrogatories. This obligation is greater than that which is required by the Federal Rules of Civil Procedure and if complied with, would result in the disclosure of information that was prepared in anticipation of litigation, contains privileged attorney-client communications, constitutes attorney work product, embodies the mental impressions, conclusions, opinions or legal theories of attorneys for Plaintiff, or seeks information that is protected by any other applicable privilege, law, rule or immunity.

5. Plaintiff objects to the section marked "Instructions and Definitions" as imposing obligations greater than those required by the Federal Rules of Civil Procedure.

GENERAL COMMENTS

These general comments are specifically incorporated into each and all of the enumerated responses that follow:

1. These responses are based upon facts and information presently available and are given without prejudice to the responding party's right to further amend or supplement these responses at a later date as such information becomes available or upon subsequent review of records or information learned.

2. By responding or failing to respond to some or all of the Interrogatories and Document Production Requests, Plaintiff does not concede the relevance, materiality, admissibility, or any applicable privilege or doctrine as such objections may apply at trial or otherwise in this action.

3. By responding or failing to respond to some or all of the Interrogatories and Document Production Requests, Plaintiff does not concede the objections raised herein.

## INTERROGATORIES

3. Identify any and all persons with whom you have had conversations with regarding the allegations made in your Lawsuit, the injuries and damages you allege and your employment with Defendants. Set forth and describe in detail the time, place, and facts surrounding any and all of these communications.

**OBJECTION:** Plaintiff objects to this interrogatory as unduly burdensome and overly broad. Plaintiff further asserts a privilege over any communications she may have had with her counsel, physicians, clergy, etc., where a privilege is applicable. Without waiving these objections, Plaintiff provides the answer below.

**ANSWER:** At Ballard Spahr, I have spoken to the following individuals regarding my Lawsuit: a) John Dibattista in September 2005 regarding a UNUM check. He mentioned that he was aware that the EEOC had given me a right to sue and I indicated that I would pursue this matter further; b) I spoke

3

with Charles Henck in January 2006 and he asked me to tell the EEOC that he was a good boss; c) I spoke with Allan Winn about my charge pending at the EEOC. At the EEOC, I spoke with Investigator Chandler regarding the allegations of my complaint. I also spoke with several other individuals regarding my Lawsuit, the dates and times I cannot recall precisely but most occurred in March 2006, they include: a) Cassandra Briscoe, b) Julia Jones; c) office of Eleanor Holmes-Norton; d) Patricia Dixon; e) Carolyn Plater-Fox; f) JoAnn Smith; and g) Elaine Wilbur.

4.      Identify and describe each of the events, facts and communications which support, evidence, relate or refer to your requests for leave, as described in ¶ 21-29, 37, 39, 43-45 of the Complaint.

**ANSWER**: In addition to the allegations as stated in the Complaint, I state the following: When I requested leave for my husband's serious health condition, Fern Forman contacted me and told me that I needed to have my husband's doctor complete the FMLA documents she sent me in the firm's overnight mail. I asked her why did the FMLA leave for my husband start on October 17, 2002 because I had been out on October 17 and 18 for my own medical tests (colonoscopy). She answered that it didn't matter what date that it started on because I was only entitled to 12 weeks leave. I told her that I understood that I was entitled to 16 weeks of leave. Ms. Forman insisted that I was incorrect and that I could only receive 12 weeks of leave because the firm was based in Philadelphia.

Also, even though Mr. Henck and Mr. Winn approved my modified work schedule to care for my husband while he received chemotherapy treatments, Ms. Riley-Jamison still had a problem with it. She would constantly ask me to take my daughters out of school, and get family and church members to assist my husband when going for his

4

chemotherapy. One day, she sent me several emails (7 or more) placing me on Leave Without Pay that day when I reported to work and was working. I brought this to Mr. Henck's attention and showed him the emails. Ms. Cassandra Briscoe also saw the emails.

In addition, when I took a leave of absence in October 2003 for my serious health condition, I asked Kathy Hannah (Caucasian) if Ballard required her to submit a Leave of Absence Form for unpaid leave when she had been out for six months after suffering a stroke (and later received a modified schedule for 2 years) and she responded, "no." I also asked her if she received a letter from the firm stating that she no longer had job security. Again she responded that she received no such letter from the firm.

I informed Mr. Henck and Ms. Forman that I needed to go out on disability in October 2003. Mr. Henck agreed. Ms. Forman sent a medical certification for Family and Medical Leave/Long-Term Disability Benefits paperwork for me to complete on October 13, 2003. I received the documents on October 14, 2003 and took them to Dr. Phillip Mussenden that same day. I submitted the documents to Ballard the following day, October 15, 2003. Ms. Forman also informed me that my FMLA leave started October 16, 2003.

5.      List all the times you missed work for either the partial day or entire day from 2001 onward and the reason why.

**OBJECTION:** Plaintiff objects to this interrogatory as overly broad. It calls for the disclosure of information outside the time period relevant to this lawsuit.

**ANSWER:** I cannot recall every day that I was absent from work from 2001-2004, but I do recall being out of the office during the following times and for the reasons indicated:

5

October 17 & 18, 2002 – my colonoscopy

October 21 through November 2, 2002 – my husband's surgery and need to care for him

On or about October 23, 2002 – day off given to me by Charles Henck

December 5, 2006 – my husband's post-operation/six-week check up

Various days between January and June 2003 to care for my husband and assist him in attending chemotherapy.

August 2003 – two-week vacation

I was also out various days in the year 2003 for doctor's appointments.

October 18, 2003 until termination – out of work due to disability

Please see Plaintiff's Bates 027 for other dates of absence. Approved leave taken had to be pre-approved by my immediate supervisors (with the exception of sick and personal) before being submitted to Ms. Briscoe for approval and secretarial coverage. When Ms. Riley-Jamison was hired the request went from Ms. Briscoe to Ms. Riley-Jamison for approval.

6.  Describe each of the events, facts and communications which support, evidence, relate or refer to what you were told about FMLA policies, by whom and when, as described in ¶¶ 19-24, 29, 43, 90-95 of the Complaint.

**ANSWER:** Ms. Riley-Jamison (Human Resources Manager) told me that I was the first FMLA situation she had to deal with. On or about October 23, 2002 (the day of my husband's surgery), Ms. Riley informed me that I had to be placed on FMLA leave as of October 17, 2002 (I was out on approved leave October 17th and 18th for a colon test). Ms. Riley-Jamison checked with Fern Forman, Benefits Administrator in our Philly office, and was told that I was entitled to 12 weeks FMLA beginning October 17, 2002.

6

7. Describe each of the events, facts and communications which support, evidence, relate or refer to the conversion of your work schedule from full-time to part-time and approval of that schedule by Defendants, as described in ¶¶ 26-29 of the Complaint.

**ANSWER:** Mr. Charles Henck and Allan Winn, Managing Partner for the DC office approved my reduced work hours to accommodate attending my husband's chemotherapy treatments. Mr. Henck called me in his office with Mr. Winn in mid-January 2003 to discuss my modified work schedule. I informed them of my husband's therapy schedule and the days I needed off. They told me that the schedule was fine.

8. List and describe each of the harassing comments you allege to have been subjected to in the Complaint including the time, date, speaker, comment, location and witnesses.

**ANSWER:**

A. Ms. Betty Anne Hahn (receptionist) asked me frequently what my modified schedule was and how I was getting paid for my time off. I considered that a form of harassment. Interestingly, Ms. Hahn also disclosed to me that she believed I was being treated differently than others especially Ms. Craig when she was out with her mother then out with her husband, when they were ill.

B. Ms. Riley-Jamison remarked to me, Ms. Briscoe and Ms. Hahn that Ballard "needed to hire some healthy people."

C. Ms Riley-Jamison suggested to me that I take my senior daughters out of college to care for their father so I could come to work everyday. She constantly suggested that I find someone else to take care of my husband, so that I could report to work. She also told me that my modified schedule was causing turmoil with these staff members and others she would not mention.

D. My sister (Velta Adams) took off every Tuesday to help out with my husband so that I could come to work because I began to fear for my job. Every time Ms. Riley-Jamison and I were in a meeting she would remind me that the firm was doing me a favor to accommodate me.

E. Ms. Riley Jamison discussed issues of my husband's health with Mr. Panogoupolus and

7

others. Mr. Panogoupolus also made reference about Dr. Kristen Thomas who we both were patients of. Also other staff members would ask me about confidential information that I only told to Ms. Riley-Jamison and Mr. Henck.

F. Even though my work schedule was approved by upper management Ms. Riley-Jamison constantly reminded me that this was not acceptable because of the amount of floaters on staff. Which was contradicted when Mr. Henck didn't utilize these resources. Ms. Henck would give his work to Ms. Briscoe (time sheets for a month) or waited until I returned to work.

G. Mr. Henck and Ms. Riley-Jamison often reminded me that my husband only had 4-6 months to live and that I should consider putting him in a hospice care facility.

H. Mr. Henck instructed Ms. Janet Craig to call my home (on or about mid March), after I went out on disability, to tell me to place my husband in hospice because of my condition and to sell my rental properties for income.

J. Ms. Craig went to Ms. Iverson without my knowledge to complain about how she felt I was being mistreated by Ms. Riley-Jamison. Ms. Riley-Jamison confronted me in the lunch room yelling at me about why did I tell these individuals that I was being mistreated. At the time of the verbal attack, I had no clue of what she was speaking of until she mentioned Ms. Craig's name.

9. Describe each of the complaints about discriminatory or retaliatory behavior you allege to have made to Defendants including the time, date, substance of the complaint, to whom you made the complaint, location and witnesses.
**ANSWER:** One morning around the end of April 2003, Ms. Hahn, Ms. Briscoe, and I were at the front desk in Ballard's DC office, when Ms. Riley-Jamison reviewed the sign-in sheet and commented that we need to have more staff with less health problems and walked away. Ms. Hahn and I were offended because we both have health issues. Ms. Winley and Ms. Curry called in sick that day. Both of them are African-Americans with known health issues.

In addition, several times Ms. Riley-Jamison would confront me in the hallway and at my desk regarding my leave. She would badger me about getting other family members or friends to take care of my husband, even after arranging help with one of my sisters to

8

take off from work every Tuesday to assist me with him. At least once a week or more, she reminded me that she believed a hospice-care facility would be better for me and my husband. Mr. Henck made this suggestion too. The stress from these confrontations with Ms. Riley-Jamison caused my health to deteriorate.

I complained about both of these matters to Mr. Henck and he said that he would speak to Ms. Riley-Jamison about it. I also told him that she can't keep harassing me about my need to be out for my husband's chemotherapy.

I also had a discussion with Mr. Henck to complain about him asking Janet Craig to call me to talk me into putting my husband in a hospice-care facility and selling my rental properties to take care of my finances. I also expressed how very upset I was him about not standing up for me and allowing Ms. Riley-Jamison to harass me (particularly since she had been out of work after recently joining the firm one month prior, for her husband's surgery) and not doing anything about me being treated differently than other firm employees.


10.     Identify and describe when and how you became disabled as alleged in ¶¶ 36, 38-39, 71, 73, 76, 82 of the Complaint including a description of what you were able to do, what activities you were not able to do, how you were not able to do the activities, and to what illness/medical condition you attribute your inability to undertake the activity.

**OBJECTION:** Plaintiff objects to this interrogatory as calling for information protected by the doctor-patient privilege. The interrogatory is also overly broad since it fails to delineate any time parameters, and as such, calls for the disclosure of the medical information concerning treatment and conditions, which fall outside the time period relevant to this lawsuit. Without waiving these

9

objections, Plaintiff provides the answer below.

**ANSWER:** I believe I became disabled on or about May 2003.

11. Identify and describe what type of position you contend that you could perform during 2004, including a description of what the job responsibilities are and state whether you could perform them.

**ANSWER:** During the conference with Ballard's management from DC and Philly I was offered a position in word processing. I stated that I could not perform those duties with my mental and physical health. I asked about the receptionist position which required answering the switch board, which I could have performed using a headset. I was told that position wasn't available, that Ms. Hahn had job protection and I didn't (even though I was the senior support staff member in the DC office).

14. Identify and describe all of the employees of Ballard Spahr who received considerations that you did not and contend you are entitled to as described in ¶¶ 55-59,108 of the Complaint, including the names of the employees and how you contend that they were treated differently than you.

**ANSWER:** All of the following individuals received leave and/or schedule modifications for their alleged medical conditions or their family members' medical conditions: a) legal secretaries – Rhear Mahr, Elaine Wilbur (allowed to work at home), Judy Mintz, Marti Hall, and Cathy Hannah; b) Chrsitie Hearn – floater; c) Janet Craig – Systems Administrator; and d) Betty Ann Hahn – Receptionist.

While on disability in March 2004, I received a call at home from Janet Craig, per

10

Mr. Henck's instruction. Mr. Henck wanted Ms. Craig to convince me to put my husband in hospice care and sell my rental properties to supplement my income. Ms. Craig made the comment that she believed that I should retain legal counsel because she thought that Ballard was about to "screw" me. She also informed me that she had a conversation with Mr. Henck where she asked him "why" the firm was treating me "differently." She also told me that if anyone asks her about this, she will deny it because she can't afford to loose her job. We also discussed when Ms. Craig had been out on leave for several months due to her husband's pancreatic cancer. She stated that the firm did not have to fill out any forms to request leave, that she was not placed on FMLA leave, but received paid sick leave.

16.    Identify and describe in detail the way in which Defendants miscalculated your FMLA entitlement and denied and interfered with your leave as alleged in ¶ 92 of your complaint, including what leave you contend you were entitled to and did not get.
**ANSWER:** After checking with U.S. Department of Labor as a DC resident I was entitled to 16 weeks of FMLA in 2003 and also entitled to 16 weeks starting over in 2004. Ballard ran my FMLA concurrently.

17.    Describe in detail the way in which Defendants failed to keep your and your husband's medical information confidential as alleged in ¶ 94 of the Complaint, including what information was not kept confidential, who did not keep it confidential, to whom it was told, and when.
**OBJECTION:** Plaintiff objects to the disclosure of any information of a doctor-patient privileged

11

nature pertaining to Mr. McFadden's medical condition and expressly preserves same.

**ANSWER:** Several confidential conversations between myself and Ms. Riley-Jamison were repeated to Dino Panogopolus (Partner Litigation Department) Janet Craig, (System Administrator), Wendy Iversin (Office Manager) and other attorneys and support staff members regarding my and my husband's health. I know this because several of the above individuals repeated parts (or in whole) of the conversations to me.

18. Identify and describe in detail each of the "adverse personnel actions" taken against you as alleged in ¶104 of the Complaint, including what actions were taken, by whom and when.

**OBJECTION:** Plaintiff objects to this interrogatory as calling for a legal conclusion.

**ANSWER:** Ballard Spahr denied me FMLA/DCFMLA leave and modifications to my schedule that would have allowed me time off from work to take care for my severely ill husband. I was suibjected to disparate treatment because Ballard Spahr granted leave, schedule changes, relaxed leave procedures, job protection and other forms of reasonable accommodation to Caucasian disabled and non-disabled support-staff employees. The Defendants also terminated me when there was a vacant receptionist position that I could have filled.   See Complaint and Answers to Defendants First Set of Interrogatories No. 8, 9, 17, 20, 25 and requests for production of documents Nos. 18, 19 and 30.

19. Identify the medical conditions you attribute to Defendants' behavior as alleged in ¶ 117 of the Complaint and how you attribute that condition to Defendants' behavior.

**ANSWER:** I started to suffer severe panic and anxiety attacks, as a result of Ms. Riley-

12

Jamison's constant harassment. After several visits and countless tests I was diagnosed with Graves Disease. My illnesses are Grave disease, sigmoid Diverticulosis, Fibromyalgia Syndrome, Rheumatoid Arthritis, High Blood Pressure, Bronchitis, severe anxiety and panic attacks. I was also diagnosed as having Major Depressive Disorder. The constant harassment by Ms. Riley-Jamison and other firm employees worsened these conditions.

20. Identify each element of damage which you claim and the amount of compensation you seek. As to each set, forth the method and manner in which calculate the amount you claim. Identify all documents that support same.

**OBJECTION:** Plaintiff objects to this interrogatory as calling for a legal conclusion.

**ANSWER**:
  A. Back pay – I am claiming an entitlement to back pay in the amount of $151,042 (and continuing) plus prejudgment interest. This figure was calculated based on my most-recent annual salary of $62,500, which from May 2004 to present equals a gross loss in pay of approximately $151,042. I am also claiming the loss of any salary increases that I would have realized had I remained employed at Ballard.
  B. Lost Benefits/Medical Expenses – Lost benefits equals approximately $50,000 (using general rule of thumb that benefits equate to roughly 1/3 of salary). I pay an average of $500.00/month for replacement health insurance that, to date, totals approximately $16,000.
  C. Future lost earnings – 18 years of future employment lost – cannot be calculated without salary projections from Defendant Ballard Spahr

13

D. Loss of rental property equity and income – Loss of $1,554.75/monthly in rental income after having to sell two investment properties to support family. This an ongoing loss.

E. Liquidated and treble damages – to be determined by judge

F. Compensatory Damages for emotional distress – cannot be quantified and is a jury question. I am seeking the maximum compensation permitted by law.

G. Punitive Damages for Defendants' reckless disregard for Ms. McFadden's rights - cannot presently be quantified and is a jury question.

H. Attorney's fees and costs – approximately $32,000 (using prevailing/Laffey Matrix attorney rates) and continuing.

I. For supporting documents, see answers to No. 65, 73, and 83 from Defendant's First Request of Production of Documents.


21.   Set forth and describe all steps you have taken since your separation from Ballard Spahr to obtain new employment and the results of your search; identify all persons or entities from whom you have sought employment.

**ANSWER**: I have not been able to seek or secure new employment.


22.   Set forth all income or unemployment compensation you have received since that date, identify the source of same, identify each of your employers since that date and identify your position and the rate of your compensation whether salaried, commissioned, hourly or otherwise.

**OBJECTION:** Plaintiff objects to this interrogatory. It calls for the disclosure of information, which in no way offsets or mitigates damages alleged to be owed by Defendants to Plaintiff under the collateral source doctrine and other applicable legal precedent.

**ANSWER:**
**June 2004- December 2004**
$7,783.38 Social Security Disability
$17,458.04 UNUM Disability

**January 2005-December 2005**
$18,816.00 Social Security Disability
$18,809.00 UNUM Disability

**January 2006-July 2006**
$10,976.00 SSI

UNUM $651.71 per month after two deductions: 1) $579.05 overpayment reduction with 4 year penalty ; and 2) minus $1,497.00 for SSD Benefits

My monthly income is $2,219.19. If I were currently employed, it would be $5,025.32


23.     List and describe each instance in which you applied for short or long term disability insurance, whether from Unum Provident, Ballard Spahr, the Social Security Administration or other private companies or governmental programs, and set forth the basis for your claim that you qualified for short or long term disability.

**ANSWER:** See documents produced in response to Nos. 89 and 90 of Defendant's First Request for Production of Documents.

24.     Set forth all short or long term disability payments you have received and identify the source, dates, amounts received and whether any claim has been asserted to return any payments.

**ANSWER:** On the basis of payments from UNUM under "reservation of rights," my long-term disability was not approved. After submitting my Appeal to UNUM in October 2004,

15

my disability was not approved until September 2005. See documents produced in response to Document Production Requests Nos. 31 & 90.

25.    Set forth the basis for your claim that Ms. Riley-Jamison is subject to individual liability.

**OBJECTION:** Plaintiff objects to this interrogatory as one calling for a legal conclusion. Defendants are directed to 29 U.S.C. § 2611 and cases interpreting the definition of employer to include individuals.

**ANSWER:** Ms. Riley-Jamison was Human Resources Manager and had the discretion and control over my leave, work schedule and continued employment at the firm.

26.    Identify any and all documents that refer to or relate your responses to interrogatories 1-25 above or were relied upon in answering the above interrogatories.

**ANSWER:** See documents produced in response to Defendants' Request for the Production of Documents.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

31.    Any documents that support you contentions in Paragraph 49 of the Complaint that you were subject to haranguing and misinformation and required to pay back provisional benefits.

**RESPONSE:** Documents attached. Also see previously produced documents P068-098 and documents produced in response to Request No. 90.

16