# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **VANESSA A. MCFADDEN** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Case No. 05cv2401 (RJL/JMF)** |
| | ) | |
| **BALLARD SPAHR ANDREWS &** | ) | |
| **INGERSOLL, LLP et al.** | ) | |
| | ) | |
| Defendants. | ) | |

_____)

### PLAINTIFF VANESSA MCFADDEN'S OPPOSITION
### TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Vanessa A. McFadden, by and through undersigned counsel, hereby opposes

Defendant Ballard Spahr Andrews & Ingersoll, LLP (hereinafter "Ballard Spahr" or "Firm") and

Defendant Margaret Riley-Jamison (hereinafter jointly referred to as "Defendants")'s Motion for

Summary Judgment. According to the applicable federal and local statutes, and given the myriad

of genuine disputes as to material facts, the Court must deny Defendants' Motion and set this

matter for trial.

## I. INTRODUCTION

Essentially, this case presents three critical issues:

> **FMLA Violations.** The Family and Medical Leave Act provides
> employees 12 weeks of unpaid leave for their or their family members'
> serious health conditions. McFadden's husband contracted colon cancer
> requiring surgery and chemotherapy treatments. When McFadden
> requested leave, Firm managers informed her that she must take leave
> during a specified period and that days she worked counted toward her
> entitlement. Haven't Defendants violated the FMLA by failing to provide
> McFadden accurate notice of her leave rights?

1

**Race and Disability Discrimination.**   Federal and local law prohibit employers from treating employees differently in terms and conditions of employment, due to their race or disability.  Employers are also required to reasonably accommodate disabled employees.  When McFadden, an African American became disabled, Ballard Spahr failed to accommodate her and fired her, while providing leave, schedule modifications and continued employment to similarly-situated, Caucasian employees.  Isn't a trial necessary to determine whether Defendants' actions were motivated by McFadden's race and/or disability?

**Retaliation.**   Employers are forbidden by law to retaliate against employees who engage in protected conduct that includes requests for and receipt of statutorily-protected leaves of absence.  Due to her disability, McFadden took leave from work and when her leave expired requested information about her employment status,  After her leave expiration and on the day she requested this information, the firm terminated her.  Shouldn't a jury determine whether McFadden's termination was retaliatory?

According to governing law, the answer to these questions is yes.

## II.  STATEMENT OF FACTS[1]

### A. VANESSA MCFADDEN'S EMPLOYMENT AND PERFORMANCE

Vanessa McFadden was a long-time, dedicated employee of Ballard Spahr.  The Firm hired her on June 5, 1989 as a full-time Legal Secretary.[2]  Throughout Ms. McFadden tenure, she primarily worked for Firm partner, Charles Henck who found her qualified for hire and concurred with the Firm's decision to employ her.[3]  Ms. McFadden's duties included typing documents, entering attorney time and preparing billing invoices, "paying accounts" and "depositing checks."[4]  While serving as Legal Secretary, Ms. McFadden met her supervisor's performance expectations.[5]  Henck considered her a "loyal hardworking, knowledgeable member of the team." Her yearly appraisals demonstrate that Henck found McFadden to "meet"

---

[1] In a separate document filed contemporaneously herewith as Exhibit 1, Plaintiff responds to Defendant's Statement of Undisputed Facts and identifies material facts to which there is a genuine dispute. Plaintiff incorporates her Response herein.
[2] Ex. 1, Deposition of Vanessa McFadden (hereinafter "McFadden Depo.") at 8-11.
[3] Ex.2, Deposition of Charles Henck (hereinafter "Henck Depo.") at 24-26.
[4] Ex. 1, McFadden Depo. II at 24-26.
[5] Ex. 2, Henck Depo. at 10-19.

his expectations and, in several areas, "exceed" his expectations.[6]   Pleased with Ms.

McFadden's dedication, Ballard Spahr consistently awarded her salary increases.[7]

## B.  MCFADDEN'S HUSBAND'S SERIOUS HEALTH CONDITION

On October 20, 2002, Ms. McFadden's husband, Cornelius McFadden was diagnosed

with colon cancer.  His physicians scheduled him for immediate surgery, three days later on

October 23, 2002.   On the day of his diagnosis, Ms. McFadden called Ballard Spahr and spoke

with Mr. Henck and reported her husband's condition, impending surgery and her inability to

come to work.[8]  Ms. McFadden also spoke with the Firm's Human Resources Manager,

Margaret Riley-Jamison advising her of the same.  Ms. McFadden telephoned Riley-Jamison

again on October 23rd to provide a status update.[9]  During this conversation, Riley-Jamison

advised Ms. McFadden that she would have to be placed on "FMLA leave since [she's] been out

more than three days."[10]  Before all of this occurred, Ballard Spahr approved, in advance sick

leave on October 17, 2002 for Ms. McFadden's colonoscopy.[11]

Following her husband's surgery, Ms. McFadden reported back to work on or about

November 2, 2002.[12]  Upon her return, Riley-Jamison gave Ms. McFadden a memorandum from

Fern Forman, the Firm's Benefits Administrator who worked in the Philadelphia, Pennsylvania

office.[13]  Forman's memorandum stated that Ms. McFadden had been out on FMLA leave, and

that her "FMLA Coverage [period was] 10/17/02– 1/8/03." The memorandum further requested

---

[6] Ex. 3, McFadden's Performance Evaluations 2001-2003;  Ex.2, Henck Deposition at 19.
[7] Ex. 4, McFadden's Salary Increases
[8] Ex.1, McFadden Depo. II at 13-19
[9] Ex.1, McFadden Depo. II at 13-19.
[10] Ex.1, McFadden Depo. at 13-19.
[11] Ex.1, McFadden Depo. at 97..
[12] Ex.1, McFadden Depo. at 14-20.
[13] Ibid.

that Ms. McFadden medically verify her husband's condition.[14]  Ms. McFadden supplied the certification of her husband's terminal illness to the Firm on or about November 14, 2002.[15]

Ms. McFadden requested additional leave to care for her husband and assist him with treatments.  In response, Riley-Jamison informed Ms. McFadden that her 12-week FMLA leave entitlement began the day of her colonoscopy, and that her "leave period" included the days/times she reported to work, not just the days she was absent. Ms. Forman communicated the same to Ms. McFadden.  Neither advised Ms. McFadden that she could take FMLA leave intermittently or outside the time-period they designated.[16]

Ms. McFadden questioned this.  She did not believe that the pre-approved sick leave on October 17th for *her* medical appointment should be counted as FMLA leave for her husband's serious health condition.[17]   Also, she requested 16 weeks of FMLA leave because she understood that she was entitled to 16, rather than 12 weeks, under the D.C. Family and Medical Leave Act.[18]  Ms. McFadden informed Riley-Jamison that she sought advice from the U.S. Department of Labor, who confirmed the 16-week entitlement.  Ms. Riley-Jamison, nevertheless, insisted that Ms. McFadden was only entitled to 12 weeks, starting October 17, 2002.[19]  Mr. Forman instructed Ms. McFadden similarly.[20]

Ms. McFadden then took the matter to Mr. Henck and requested that she be at least permitted to work a reduced schedule to transport her husband to chemotherapy treatments and to care for him afterwards.  Mr. Henck and Firm managing partner, Allan Winn, met with Ms. McFadden regarding the modified schedule.  They approved an alternating 3-days and 4-days a

---

[14] Ex. 5, Forman Memo FMLA Coverage period.
[15] Ex. 6, Cornelius McFadden's Medical Certification
[16] Ex. 1 McFadden Depo II. at 14-19;  McFadden Depo at 72-78.
[17] Ex.1, McFadden Depo. at 97.
[18] D.C. Code 332-501 et seq.
[19] Ex. 1, McFadden Depo. at 67-71.
[20] Ibid.

week schedule.[21]  McFadden provided Henck and Riley-Jamison a list of dates for her husband's chemotherapy to demonstrate the need for leave.[22]

## C.  RILEY-JAMISON'S HARASSMENT AND INTERFERENCE

According to Riley-Jamison, the Firm's approval of a modified schedule, which provided limited leave to Ms. McFadden, was a "favor" being afforded her.[23]  She required McFadden to "call in," on her pre-scheduled and pre-approved days off for FMLA leave.[24]  Almost immediately after Ms. McFadden commenced the FMLA-leave schedule, Riley-Jamison advised her that it "wasn't working out."[25]  Ms. Riley-Jamison told Ms. McFadden to find someone else to care for her husband, since he "was dying anyway."[26]  Both Henck and Riley-Jamison advised McFadden to put her husband in hospice care, which Ms. McFadden believed to be a "cruel" way to treat dying people.[27]  Henck even put another employee, Janet Craig, up to talking to McFadden about placing her husband in hospice.[28]  On a weekly basis from January through June 2003, Riley-Jamison instructed Ms. McFadden to arrange for someone else – other family or church members – to look after Mr. McFadden so that Ms. McFadden could resume her normal schedule.[29]  Riley-Jamison admittedly felt that Ms. McFadden took "an awful lot of time off of work."[30]  On one of the days that Ms. McFadden did report to work, she received seven emails from Riley-Jamison's office stating that the Firm had placed her on Leave Without Pay

---

[21] Ex. 1, McFadden Depo. at 92-93.  Ms. McFadden worked Tuesday, Thursday and Friday one week and Tuesday-Friday the next week and alternated this schedule until June 2003, McFadden Depo at 93.
[22] Ex. 7, Email re: chemotherapy treatments
[23] Complaint ¶ 29
[24] Complaint ¶ 33
[25] Ex. 1, McFadden Depo. at 102-03
[26] Ex. 1, McFadden Depo. at 104-107.
[27] Ex. 1, McFadden Depo. at 111.
[28] Ex. 1, McFadden Depo. at 109, 114-117.  Ex.8, Deposition of Janet Craig at 21.
[29] Ex. 1McFadden Depo. at 263-265.
[30] Ex. 9, Deposition of Margaret Riley-Jamison (hereinafter "R-J Depo") at 66.

for that day.[31]  Claiming that Ms. McFadden's reduced schedule caused "turmoil" with the staff and generated complaints from other legal secretaries, Riley-Jamison badgered McFadden to abandon her modified schedule.[32]  Ms. Riley-Jamison even remarked to McFadden and another Firm employee, Cassandra Briscoe that the Firm needed to hire younger people with fewer "medical problems."[33]

Although Ms. McFadden needed more time to care for her severely-ill husband, she felt pressured to not take any more leave from work, other than the set modified schedule, due to Ms. Riley-Jamison's conduct.[34]  Ms. McFadden reported Riley-Jamison's harassment to her supervisor Mr. Henck,[35] who, besides speaking with Riley-Jamison, took no other action.[36]  In response to McFadden's complaints, Riley-Jamison, in March 2003, berated Ms. McFadden in the Firm's lunchroom and yelled at her for "telling people that [she's] being mistreated."[37]  Ms. McFadden resumed her full-time schedule around June 14, 2003.

### D.  MS. MCFADDEN'S DISABILITY

#### 1.  PHYSICAL AND MENTAL IMPAIRMENTS THAT SUBSTANTIALLY LIMIT MAJOR LIFE ACTIVITIES

Unfortunately, during these events, Ms. McFadden's own health deteriorated.  She became substantially impaired in her ability to stand, walk, breathe, and lift and manipulate objects.[38]  She is unable to walk without the assistance of a cane and then, is able to only walk very short distances.  She cannot cook, drive, perform chores, write, type or sit for extended

---

[31] Ex.1, McFadden Depo at 241-243; Ex. 10, Declaration of Cassandra Briscoe (hereinafter "Briscoe Decl."). ¶ 7.
[32] Ex. 1, McFadden Depo. at 263-265. See also, Ex. 11, Plaintiff's Third Supplemental Answers to Defendants' Interrogatory Nos. 8 & 9.
[33] Ex. 1, McFadden Depo. at 222-226; Ex. 10, Briscoe Decl. ¶ 4.
[34] Ex. 1 McFadden Depo. at 265-266.
[35] Ex.11, Plaintiff's Third Supplemental Answers to Defendants' Interrogatory No. 9.

[36] Ex. 2 Henck Depo at 33-36.
[37] Complaint ¶ 35; Ex11; Plaintiff's Third Supplemental Answers to Defendants' Interrogatory No. 8; Ex. 1, McFadden Depo. at 134, 135, 144.
[38] Complaint ¶ 38.

periods, due to constant pain.[39]  Riley-Jamison, Henck, and McFadden's coworkers all observed her limitations, particularity her difficulty walking.[40] Ms. Briscoe noticed the swelling in Ms. McFadden's hands and ankles and witnessed Ms. McFadden loose her balance at times.[41] Doctors later diagnosed Ms. McFadden with Graves' Disease, Fibromyalgia, Rheumatoid Arthritis, Depression, Hypertension and Bronchial Asthma.[42]  Given these disabling conditions, particularly her typing limitations, Ms. McFadden ultimately became unable to continue working as a Legal Secretary.  Accordingly, she requested short-term disability leave and took a leave of absence from work effective October 18, 2003.[43]  The Firm simultaneously placed Ms. McFadden on FMLA leave.[44]

### 2. UNUM LONG-TERM DISABILITY BENEFITS

In late January 2004, Ms. Forman advised Ms. McFadden that she needed to obtain medical verification of her disability for submission to UNUM Provident-the Firm's Long-Term Disability (LTD) benefits provider.[45]  Ballard Spahr requested these records weeks <u>after</u> her short-term disability benefits expired.[46]  Ms. McFadden visited with her doctors and requested that they complete medical forms and submit information to UNUM.  Ms. McFadden explained to her doctors, chiefly Drs. Mussenden and Clark, that she could not perform the duties of a Legal Secretary but could perform the duties of Firm Receptionist.[47]  Since Ballard Spahr had not offered the Receptionist job to Ms. McFadden and because she was not serving in that job,

---

[39] Ex. 1, McFadden Depo. at 161-167.
[40] Ex. 9, R-J Depo. at 154-155; Henck Depo. at 43-45; Ex. 8, Craig Depo  at 18; Ex. 10, Briscoe Decl ¶ 10.
[41] Ex. 10, Briscoe Decl. ¶ 10.
[42] Complaint ¶ 38;  Ex. 1, McFadden Depo. at 161-167.
[43] Ex. 11, Plaintiff's Third Supplemental Answers to Defendants' Interrogatory No.5; Ex. 12, McFadden's Leave of Absence Request.
[44] Under the Firm's policy, Ms. McFadden first FMLA leave year ran from October 17, 2002 to October 16, 2002 and a second FMLA leave year began October 17, 2003 to October 16, 2004.  See Ex. 13, Ballard Spahr FMLA policy.
[45] Ex. 1, McFadden Depo. at 18.
[46] Ex. 1, McFadden Depo. at 18.
[47] Ex. 1, McFadden Depo. at 42-52, 190 & 236.

her physicians reported that Ms. McFadden was incapable of resuming employment now or in the future.[48]

In February or March 2004, Riley-Jamison telephoned Ms. McFadden at home and advised her that UNUM approved her LTD benefits claim. Later that same day, Riley-Jamison telephoned Ms. McFadden again recanting her prior statement and stating that her benefits had not been approved.[49]  After numerous delays and countless calls by McFadden to UNUM, her doctors, and the firm for a year and a half, Ms. McFadden's LTD benefits were approved in September 2005. [50]

### D. DEFENDANTS' FAILURE TO PROVIDE A REASONABLE ACCOMMODATION AND MS. MCFADDEN'S TERMIINATION

#### 1.  FMLA LEAVE EXPIRATION

Mr. DiBattista sent a letter dated March 9, 2004 to Ms. McFadden claiming that her FMLA leave expired on February 4, 2004.[51]  Ms. McFadden had not previously received notice that her FMLA leave was set to expire on this date. This letter was inconsistent with a prior notice given Ms. McFadden on September 29, 2003 that her leave expired January 7, 2004.[52] The March 9th letter invited Ms. McFadden to apply for "a non-FMLA covered leave of absence for up to an additional 3 months of time," that offered "no job protection."[53]  Ms. McFadden completed and submitted the "Non-FMLA Leave of Absence" request form and heard nothing further from Ballard Spahr. [54]

#### 2.  MS. MCFADDEN REQUESTED INFORMATION AND A REASSIGNMENT; YET, BALLARD SPAHR TERMINATED HER.

---

[48] Ex. 1, McFadden Depo. at 186.
[49] Ex. 1, McFadden Depo. at 58-59.
[50] Complaint. ¶ 49; Ex. 1_McFadden Depo. at 311-312.
[51] Ex. 14, March 9, 2004 Letter
[52] Ex. 15, Forman 9/29/03 Memo re: Long Term Disability - staff
[53] Ex. 14 March 9, 2004 Letter
[54] Ex. 16, Request for Non-FMLA Leave of Absence; Ex. 1, McFadden Depo. at 277-280.

Surmising that her non-FMLA leave had expired, Ms. McFadden called Ms. Forman inquiring about her job status on May 13, 2004.  Ms. Forman quipped "why don't you just save everyone the trouble and just resign," and hung up the telephone.  Ms. McFadden then called Riley-Jamison the following day on May 14, 2004 and communicated the exchange she had with Ms. Forman. [55]  Ms. Riley-Jamison promised to call her back with some information.  When Riley-Jamison returned the call later that day, Mr. DiBattista, Forman, and Wendy Iverson, Riley-Jamison's supervisor, were also on the line.  The five held a conference call during which firm officials asked Ms. McFadden if she was planned to return to work.  She replied that she was unable to return.   DiBattista offered Ms. McFadden a job in the firm's word processing department.  Ms. McFadden explained that due to her disabilities she could not perform the volume of typing that position required.  She then asked to be placed in the Receptionist job. DiBattista and Iverson both rejected her request contending that Betty Ann Hahn, who had been on an extended leave of absence and out of the position, was "still on the payroll."[56] Consequently, Ms. McFadden was terminated.  DiBattista forward Ms. McFadden a letter dated May 20, 2004 confirming her termination, effective May 14, 2004.[57]

### 3. BALLARD SPAHR'S ACCOMMODATION OF CAUCASIAN SUPPORT STAFF EMPLOYEES

While failing to accommodate Ms. McFadden, Ballard Spahr provided leave and schedule modifications to its Caucasian legal secretaries-some of whom had no medical disabilities.  Among those accommodated were: 1) Kathy Hannah who had a stroke and was afforded a part-time schedule for over two years; 2) Rhea Mahr who suffered from cancer and

---

[55] Ex. 1, McFadden Depo. at 63-65, 275-276.
[56] Ex. 1, McFadden Depo. at 274, 280, 290-294, 297-299.
[57] Ex. 17, May 20, 2004 Termination Letter

was granted a long-term 4-days a week schedule; 3) Judy Mintz who the Firm permitted to take a leave of absence for two weeks in the Spring and the entire summer, (June – September) for vacationing every year; and 4) Elaine Wilbur who the Firm allowed to work from home for extended months (two times) for maternity leave, and later granted her a 4-day week schedule due to her son's post-9/11 anxiety.[58]  The Firm also granted Betty Ann Hahn who suffered from breast cancer FMLA leave at precisely the same time as Ms. McFadden; however, Ballard Spahr retained her, after her FMLA leave and non-FMLA leave expired.  None of these Caucasian employees were harassed by Riley-Jamison nor were they terminated, like Ms. McFadden.

## III.  APPLICABLE LEGAL STANDARDS

### A.  SUMMARY JUDGMENT STANDARD

#### 1.  F.R.C.P. 56

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings, depositions, responses to discovery, affidavits, etc., show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  F.R.C.P. 56(c).  The non-moving party is entitled to all reasonable inferences that may be drawn from the facts placed before the Court.[59]  Facts in support of a motion for summary judgment must be more than persuasive; they must establish that the other party cannot recover under any "discernible circumstances."[60]  Once the moving party meets its burden, the opposing party must come forward with specific facts, to show that a genuine issue remains for trial.[61]  Moreover, the Supreme Court has held that in ruling on summary judgment motions, a

---

[58] Ex. 1, McFadden Depo. at 66-67, 191, 254-273, 307-314, 319-321; Ex. 10, Briscoe Decl. ¶¶ 12-17.

[59] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *see also,* 29 C.F.R. § 1614.109(g).

[60] *Shields v. Grocers Supply Co.,* 568 F. Supp. 61, 63 (S.D. Tex. 1983).

[61] *DeHorney v. Bank of America Nat. Trust & Sav. Assoc.,* 879 F.2d 459 (9th Cir. 1989); *see also Hayes v. Dep't of Health and Human Serv.,* 902 F. Supp. 259, 263 (D.D.C. 1995) (the non-moving party must present evidence that would permit a reasonable jury to find in its favor).

court cannot weigh the evidence or grant summary judgment merely because it believes that the nonmoving party will lose at trial.[62]  The court in *Lutes v. Goldin* noted that if the non-moving party supports their allegations or denials through affidavits or other competent evidence that sets forth specific facts to show that a genuine issue for trial exists, summary judgment should not be granted.[63]  In *Reeves v. Sanderson Plumbing Products, Inc.*,[64] the Court held that evidence from the moving party will be credited only when that evidence is uncontroverted, unimpeached and from uninterested parties.[65]

### 2. CREDIBILITY ISSUES

In certain cases, summary judgment is clearly inappropriate and precluded, such as where there are factual disputes, the veracity of witnesses is crucial, or issues of motive or intent are involved.[66]  Also, courts "recognize the difficulty of disposing of issues of discriminatory or retaliatory intent at the summary judgment stage, particularly after a plaintiff establishes a *prima facie* case."[67]

### B. FAMILY AND MEDICAL LEAVE ACT

The Family and Medical Leave Act (FMLA) entitles eligible employees who have worked at lease one year and 1,250 hours to 12 weeks of unpaid leave.[68]  Unlike other discrimination statutes claims under the FMLA are not analyzed to discern intent on the part of the employer.  Rather Courts merely look to whether an employee is eligible for FMLA leave

---

[62] *Anderson*, 477 U.S. at 249.
[63] See *Lutes v.Goldin*. 62 F. Supp. 2d 118, (D.D.C. 1999)
[64] 530 U.S. 133 (2000).
[65] *Id.* at 151.
[66] *Scwapp v. Town of Avon*, 118 F.3d 106, 110 (2nd Cir. 1997) (court is "particularly cautious" in granting summary judgment when defendant's intent is at issue); *Grier v. Medtronic Inc.,* 99 F.3d 238, 240 (7th Cir. 1996) (applying summary judgment standards with "special scrutiny" where cases turn on issues of intent or credibility); *Hossaini v. Western Missouri Medical Ctr.,* 97 F.3d 1085, 1088 (8th Cir. 1996) (recognizing the difficulty of disposing of intent issues at the summary judgment stage).
[67] *Hossaini*, 97 F.3d at 1086.  *See also Davis v. Fleming Companies, Inc.,* 55 F.3d 1369, 1371 (8th Cir. 1995); *Gill v. Reorganized Sen. Dist. R-6, Fostus, Mo.*, 32 F. 3d 376, 378 (8th Cir. 1994).
[68] 29 U.S. C. § 2601 et seq;  29 CFK § 825.200 (b)

and whether s/he had a FMLA-qualifying absence, which triggered the leave entitlement. Under FMLA regulations, employers must apprise of their FMLA rights, including adequate and accurate notice of their leave entitlement.[69] Employees who wish to remedy for FMLA violations must bring a civil action in federal court within two years of the "last event constituting the alleged violation for which the action is brought." In cases involving "willful" violations, the action must be brought within three years.[70]

C. BURDEN OF PROOF IN EMPLOYMENT DISCRIMINATION CASES

1. MIXED MOTIVE

There are essentially two methods to prove intentional employment discrimination: 1) through the introduction of direct evidence; and 2) through the introduction of circumstantial evidence. Courts analyze employment discrimination cases differently depending upon the method employed. Both methods serve as a means to answer the ultimate question of the employer's motive for the adverse employment action at issue. Plaintiffs may, however, argue – and prove – that an employer's actions were motivated by both lawful and unlawful reason. In *Desert Palace Inc. v. Costa*, the Supreme Court held that the presentation of direct evidence is not required to prove discrimination in such mixed-motive cases under Title VII.[71] 123 S.C.t. 2148 (2003). But where - there exists evidence of both legitimate and illegitimate motivations for an adverse action, a plaintiff need not refute the employer's legitimate reason or show pretext, but may proceed to a jury to determine whether the plaintiff's protected status was really the motivating factor for the challenged employment action. *Id.*

---

[69] 29 CFR §§ 825.300, 825.301 (a).
[70] 29 U.S.C. § 2617 (c ) (1) – (2).
[71] 123 S.C.t 2148 (2003).

## 2. CIRCUMSTANTIAL EVIDENCE/BURDEN-SHIFTING

### a. Disability Discrimination – *Prima Facie* Case

The Americans with Disabilities Act (ADA) and the D.C. Human Rights Act (DCHRA) contain employer affirmative duties and prohibitions, which are designed to afford disabled workers equal employment opportunity as well as provide them a workplace free of discriminatory practices. These statutes forbid employers from "discriminate[ing] against qualified individuals with a disability because of the disability of such individual in regard to job application procedures, the hiring, . . . or discharge of employees ... "[72]  "The term 'disability' means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[73]

In addition, the Acts mandate that employers provide qualified disabled individuals reasonable accommodation unless doing so would pose an undue hardship.  "[A]n accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities."[74]

To arrive at such an accommodation employers must engage in an "interactive process" with the disabled employee to discuss his or her limitations and possible accommodations, which would allow him or her to perform the essential functions of the job.[75]  The ADA and EEOC Enforcement Guidance specifically delineate reassignment to a vacant position as one form of reasonable accommodation.[76]  According to *AKA*, if an employee is qualified for an open position, an employer must reassign that employee into that position without competing

---

[72] 42 U.S.C. § 12112(a).
[73] 42 U.S.C. § 12102(2).
[74] 29 CFR § 1630.2(o).
[75] Id.
[76] 42 U.S.C. § 12111(9)(B) (1994); 29 C.F.R. § 1630.2(o)(2)(ii) (1997).

with other candidates.[77]  The duty to provide a reasonable accommodation is an ongoing obligation.

Under the ADA and the DCHRA, to make *prima facie* case of disability discrimination, an employee must show: a) that s/he is a person with a disability; b) s/he suffered an adverse employment action; and c) the facts surrounding the adverse action give rise to an inference of discrimination."[78]  To establish a prima facie case of failure to accommodate, an employee must show that she has a disability and that a reasonable accommodation could have been made by the employer for that disability.[79]

### b. Race Discrimination – *Prima Facie* Case

The analytical framework for disparate treatment cases involving circumstantial evidence of race discrimination has long been established through the *McDonnell Douglas* analysis. To satisfy his or her *prima facie* burden, a plaintiff must show: (1) s/he is a member of a protected group; (2) s/he suffered an adverse employment action; and (3) that circumstances exist, which give rise to an inference of discrimination.[80]  Plaintiff's may, but are not required to, satisfy the third prong by showing they were replaced by someone outside their protected group.[81]  Once the plaintiff has demonstrated a *prima facie* case of discrimination, the burden then shifts to the agency to articulate legitimate, nondiscriminatory reason(s) for the adverse action.[82]  The D.C. Circuit characterizes the burden on the plaintiff as a "relatively light prima facie burden" and "not onerous," indicating that courts should weigh all inferences in the light most favorable to

---

[77] 156 F.3d 1284.
[78] *Aka v. Washington Hospital Cntr.,* 156 F.3d 1284 (D.C. Cir. 1998)
[79] *Grant v. May Department Stores Company, 786 A.2d 580 (D.C. 2001)*
[80] *George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005); Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1150 (D.C. Cir. 2004).*
[81] *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973);  Stella v. Mineta, 284 F. 3d 135, 145-46 (D.C.Cir. 2002).*
[82] *Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).*

the non-moving party.[83]  Both the DCHRA and section 1981 of the Civil Right Act of 1866 are

analyzed using this same framework.[84]

### c. Retaliation – *Prima Facie* Case

Courts have interpreted Title VII to provide "exceptionally broad protection" to those

who oppose unlawful employment practices or policies.[85]  Violations of Title VII, DCHRA, §

1981, and the ADA should be found if an employer retaliates against an employee for engaging

in protected activity through threats, harassment in or out of the workplace, or any other adverse

treatment that is reasonably likely to deter protected activity by those individual or other

employees.[86]

To prove retaliation through circumstantial evidence, a plaintiff must demonstrate: (1)

s/he engaged in protected activity; (2) s/he suffered an adverse action; and (3) they are causally

connected.[87]   Protected activity consists of two kinds of conduct: (1) opposition to an activity

made unlawful under the Acts; and (2) participation, whether directly or indirectly, in a process

to redress perceived violations of the Acts.[88]

### d. Employer's Burden of Production

Once an employee establishes a *prima facie* case of discrimination or retaliation, the

burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the

adverse action. [89]  If the employer satisfies its burden of production,  the burden then shifts back

to the plaintiff to prove that proffered reasons are a mere pretext for discrimination.[90]

---

[83] *Cones at 516 (citation omitted).*
[84] *Murray v. Gilmore, 406 F.3d 708 (D.C.Cir. 2005).*
[85] *See Pettway v. American Cast Iron Pipe Co._411 F.2d 998, 1006 n. 18 (5th Cir. 1969)).*
[86] EEOC Compliance Manual on Retaliation, No. 915.003, 8-14 – 8-16 (May 20, 1998).
[87] *Smith v. District of Columbia*, 430 F.3d 450 (D.C.Cir. 2005); *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).
[88] 42 U.S.C. § 2000e-3(a);  42 U.S.C. § 1981;  D.C.Code § 2-1402.61;  *Smith*, 430 F.3d 450.
[89] *McDonnell Douglas*, 411 U.S. at 802; *Brown v. Brody*, 199 F.3d 446, 456 n.10 (D.C. Cir. 1999).
[90] *Burdine*, 450 U.S. at 255-56.

### e. Pretext and Plaintiff's Ultimate Burden

To meet her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her *prima facie* case, without more.[91]  And as with the first stage of *McDonnel Douglass*, a plaintiff is not required to show that similarly situated employees outside his group were treated differently.[92]   Rather, per *Reeves v. Sanderson Plumbing Products, Inc.*,[93] the plaintiff' need only establish a *prima facie* case and proffer evidence concerning the falsity of the defendant's reason(s) for its action to create a jury issue.  In *Aka v. Washington Hosp. Ctr.*, the D.C. Circuit held that a plaintiff may defeat a summary judgment motion and prevail at trial by presenting other evidence that permits an inference of discrimination.[94]

Additionally, this circuit recognizes that "[i]n employment discrimination cases, summary judgment 'must be viewed with special caution because intentional discrimination . . . [is] difficult for a plaintiff to establish."[95]  Thus, unless the defendants' proffered nondiscriminatory reason is "dispositive and forecloses any issue of material fact," summary judgment is inappropriate.[96]  In other words, summary judgment should only be granted if "no reasonable juror could find in favor of the non-movant."[97]

### IV.  LEGAL ARGUMENT

---

[91] *See Holtz v. Rockefeller & Co.*, 258 F. 3d 62, 79 (*citing Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

[92] *Id.* at 78 ("[J]ust as evidence of disparate treatment is not an essential element of a prima facie case of discrimination, such evidence is also not always necessary at the final state of the *McDonnell Douglas* analysis." (citation omitted)).

[93] 530 U.S. 133 (2000).

[94] 156 F.3d 1284, 1295, n. 11 (D.C. Cir. 1998).

[95] *Lutes v. Goldin,* 62 F. Supp.2d 118, 122 (D.C. Cir. 1999) (*citing Plummer v. Safeway, Inc.,* 1995 WL 1291001 (D.C. Cir. 1995) (citation omitted)).

[96] *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000); *see also Holtz*, 258 F.3d at 79 (noting that the issue of pretext "is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment").

[97] *Carter v. George Washington University*, 387 F.3d 872, 878 (D.C. Cir. 2004).

A.    BALLARD SPAHR VIOLATED THE FAMILY AND MEDICAL LEAVE ACT

Ms. McFadden was eligible to receive FMLA leave given her years of service with the Firm.  By 2002, Ms. McFadden had worked for Ballard Spahr for 13 years as a full-time Legal Secretary.  Defendants admit that prior to McFadden's first need for leave in October 2002, she had worked for the Firm at least one year and at least 1,250 hours.[98]  Thus, there is no dispute in this matter that Ms. McFadden was eligible for FMLA leave.

Similarly, Defendants do not dispute that Ms. McFadden qualified for the 12-week FMLA entitlement when her husband, Cornelius McFadden required her care and assistance. Sadly, Mr. McFadden had "terminal colonic adeno carcinomia (stage 4)" with "limited hope of recovery." His physician certified to the Firm that he had a permanent long-term condition resulting in incapacity that "require[ed] supervision" by "employee or family member."[99]  Mr. McFadden's health status fully met the definition of a "serious health condition" triggering Ms. McFadden's entitlement to FMLA leave.[100]

Ms. McFadden informed Mr. Henck and Ms. Riley-Jamison of her husband's condition on or about October 21, 2002 and October 23, 2002.  She specifically advised them of her husband's diagnosis, his need for surgery and her required care, which prevented her from working.[101]  The Firm acknowledged Ms. McFadden's absence as FMLA-qualifying by providing her an FMLA Memorandum dated November 1, 2002.[102]

1.  **BALLARD SPAHR AND RILEY-JAMISON WILLFULLY DENIED MS. MCFADDEN HER FMLA LEAVE ENTITLEMENT**

---

[98] Ex. 28, Defendants' Answer to Request for Admission No. 23.
[99] Ex. 6 FMLA Certification for C. McFadden, Section II  (Bates P025)
[100] 29 U.S.C. § 2612(1)(C); 29 CFR §§ 825.114, 825.115(b)
[101] Ex. 1, McFadden Depo. II at 13-19.
[102] Ex. 5, Forman Memo to McFadden 11/1/02 re: FMLA

a.   <u>Riley-Jamison and Forman Provided False Information Regarding McFadden's FMLA Leave Rights.</u>

When Ms. McFadden received the FMLA Memorandum, she discussed with Riley-Jamison and Forman the amount of leave she could receive and her other leave rights under the FMLA and the D.C.FMLA.  During these discussions both Riley-Jamison and Forman provided misinformation to McFadden.  First, McFadden was told verbally and through the FMLA memorandum that her FMLA coverage period was October 17, 2002 through January 8, 2003.  They represented to McFadden that her FMLA leave had to be taken with this "coverage period" only.  Second, Defendants miscalculated McFadden's leave entitlement claiming that her FMLA "leave began on October 17, 2002."[103]  On October 17th and 18th, Ms. McFadden used sick leave for her own pre-scheduled medical appoints.  Her absences on those days had nothing to do with Mr. McFadden's serious health condition, and therefore, was not a FMLA-qualifying absence.[104]  The Firm inaccurately counted these two days toward her FMLA leave entitlement, even over the objection of Ms. McFadden.[105]  Third, both Forman and Riley-Jamison misinformed McFadden concerning the amount of leave to which she was entitled.  They advised McFadden that she could only have up to 12 weeks of unpaid leave.  McFadden then requested 16 weeks of leave stating that she had conferred with the U.S. Department of Labor that informed her that under the DCFMLA she was entitled to 16 weeks.  When she communicated this to Forman and Riley-Jamison, however, they both denied she had such an entitlement and reiterated their earlier misrepresentations.

b.   <u>Ballard Spahr and Riley-Jamison Willfully Denied McFadden Her FMLA Leave Entitlement</u>

---

[103] Ex. 5, Forman Memo to McFadden 11/1/02 re: FMLA
[104] Ex. 1, McFadden Depo. at 97.
[105] Ex. 5

Because of the false information transmitted to her, McFadden took the minimum amount of leave necessary to transport her husband to chemotherapy treatments.[106]  After the November 2002 exchange with Forman and Riley-Jamison, McFadden worked her normal schedule through the end of the year, despite her husband needing "constant supervision" as prescribed by his doctor.  According to Ballard Spahr's own records, Ms. McFadden then only took 28.5 days (or almost six weeks) of FMLA leave on an intermittent basis, between January and June 2003.  When her October absences are added to this amount, Ms. McFadden took a total of eight weeks of FMLA leave.[107]

The Act entitled Ms. McFadden to much more than that. McFadden should have received eight additional weeks of leave under the DCFMLA and at least four additional weeks under the federal FMLA.  However, the Firm did not grant her any leave in addition to the part-time schedule in the first half of 2003.  This denial violates 29 U.S. C. § 2615.[108]

The Defendants' FMLA violations constitute willful violations.  In order to establish "willful" violations of the FMLA, plaintiffs must demonstrate that "the employer know or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."[109]  Here, Ms. McFadden's request for FMLA leave to care for her husband was a valid leave request that Defendants unlawfully denied.  Even when confronted with accurate information about the DCFMLA and the appropriate calculation of McFadden's leave entitlement (not to include non-FMLA qualifying absences), Riley-Jamison and Forman misinformed McFadden and miscalculated her leave.  They bore an obligation under the Act to provide accurate and complete

---

[106] Ex. 7, Emails re: chemotherapy treatments.
[107] For the Court's convenience, Plaintiff provides calendars for the years 2002-2004 and have highlighted those days the Firm counted as FMLA leave.  See Ex. 19 (yellow highlighted days)
[108] Defendants misapprehend Ms. McFadden's FMLA claim.  She does not contend that the Firm denied her FMLA leave for her serious health condition in late 2003 to 2004; yet, she claims that the Firm unlawfully denied her FMLA family leave for her husband's serious health condition starting October 2002.
[109] *Hillstrom v. Best Western*, 354F.3d.27 (1st Cir. 2003)(citing *McLaughlin v. Richland Show Co*., 486 U.S. 128, 133 (1988).

FMLA rights,[110] and at the very minimum, should have looked into her request for additional leave. For her part, Riley-Jamison stated during her deposition that she "pulled" the DCFMLA and forwarded a copy to the Firm's Philadelphia Benefits department.[111] Although Riley-Jamison did not specify the date in which she reviewed the local statute, her actions were either intentional or reckless. If she reviewed the statute at or around the time of Ms. McFadden's request, then she knowingly denied her request for more leave. If, on the other hand, she neglected to review the statute until some later point in time and then later discovered the correct entitlement, she acted with reckless disregard for McFadden's rights by not researching the issue in a timely manner. Whether knowing or reckless, both constitute willful violations under the FMLA. *Supra.*

### 2. RILEY-JAMISON COERCED AND HARASSED MS. MCFADDEN

As recounted in the Factual Allegations above, Riley-Jamison harassed McFadden by:

- Telling McFadden the Firm was doing her a "favor" by allowing her to work a modified schedule;

- Requiring McFadden to call the office in everyday of her pre-scheduled and pre-approved days off for FMLA leave.[112]

- Informing McFadden that her reduced schedule "wasn't working out."[113]

- Demanding that Ms. McFadden find someone else to care for her husband, since he "was dying anyway."[114] Also, Riley-Jamison instructed Ms. McFadden to

---

[110] 29 CFR § 825.301(a).
[111] Ex. 9, R-J Depo. at 135-136.
[112] Complaint ¶ 28
[113] Ex. 1, McFadden Depo. at 102-03
[114] Ex. 1, McFadden Depo. at 104-107.

arrange for other family or church members to look after Mr. McFadden so that Ms. McFadden could resume her normal schedule.[115]

- Barraging McFadden with seven emails back-to-back informing her that she was being docked for a day she reported to work.[116]

- Admonishing McFadden for continuing her reduced schedule, since it was causing "turmoil" with the staff and generating complaints from other legal secretaries.[117]

> ### a. Riley-Jamison's Harassment Interfered With McFadden's FMLA Leave

As a result of Riley-Jamison's disinformation and harassment, McFadden felt coerced into coming to work. She feared that if she took any additional days off, she would loose her job. Hence, Riley-Jamison's conduct interfered with McFadden enjoying her full FMLA entitlement and restricted her absences to those necessary to take her husband for chemotherapy. The FMLA expressly precludes employers and individuals from interfering with an employee's right to take FMLA-qualifying leave.[118] Given the coercive actions undertaken by Ms. Riley-Jamison, a reasonable jury could conclude that Defendants violated the Act.

> ### b. McFadden Complained About Riley-Jamison's Harassment; Yet, Her Harassment Continued.

Ms. McFadden complained to her Supervisor, Charles Henck about Riley-Jamison's harassment. She informed him that Riley-Jamison made derogatory statements about employees with serious health conditions and constantly directed her to find other friends or family to care

---

[115] Ex. 1McFadden Depo. at 263-265.
[116] Ex. 1, McFadden Depo. at 241-243; Ex. 10 Briscoe Decl. ¶ 7.
[117] Ex. 1, McFadden Depo. at 263-265. See also, Ex. 11, Plaintiff's Third Supplemental Answers to Defendants' Interrogatory Nos. 8 & 9.
[118] 29 U.S.C. § 2615(a)(1).

for her husband or place him in a hospice facility.[119]  Since Riley-Jamison is the Firm's Human

Resources Manager, it was reasonable for McFadden to report the harassment to her supervisor.

Henck merely talked to Riley-Jamison about McFadden's leave situation, but he and no other

member of the firm took additional steps to stop Riley-Jamison's coercive tactics. [120]  Indeed,

after Henck's "discussions" with Riley-Jamison, her harassment of McFadden escalated to verbal

abuse.  She confronted McFadden in the firm's lunchroom and shouted at her for "telling people

that [she was] being mistreated."[121]  Clearly, Henck's talks with Riley- Jamison proved

completely ineffective. Ms. Riley-Jamison denies ever having such an exchange with

McFadden.[122]  This denial creates a genuine dispute as to material fact and jury should be

permitted to evaluate the credibility of McFadden and Riley-Jamison to determine who is telling

the truth.

c.     <u>Ms. McFadden's FMLA Claims Are Timely</u>

Defendants erroneously claim that Plaintiff's FMLA claims are time-barred.  They are

not.  Because Ms. McFadden claims that Defendants willfully violated the FMLA, the three-year

statute of limitations is applicable.  Given that the last day of family leave occurred on or around

June 14, 2003, Ms. McFadden's December 2005 Complaint in this action is timely.

d.     <u>Riley-Jamison is Subject to Individual Liability Under the FMLA,<br>DCHRA and § 198</u>1.

Defendants assert another erroneous argument in defense of McFadden's FMLA claims.

Defendants contend that Riley-Jamison is not subject to individual liability and thus, asks the

Court to dismiss all claims against her.  Defendants are mistaken.  First, McFadden seeks to hold

---

[119] Ex. 1, McFadden Depo. at 125-126. Ex. 11, Plaintiff's Third Supplement Answer to Interrogatory No.9.
[120] Ex. 2, Henck Depo. at 33-36.
[121] Ex. 1, McFadden Depo. at 134, 135, 144.
[122] Ex. 9, R-J Depo. at 79-82.

Riley-Jamison liable for her personal commission of acts, which contravene the FMLA, DCHRA and § 1981. All of these statutes include individuals in their definition of "employer" or in the case of Section 1981 expressly applies to individuals.[123] Contrary to Defendants' assertion, individuals must not have had supervisory control in order to be held personally liable for their unlawful conduct. Albeit supervisory control is one way to secure individual liability, it is not the exclusive means. Under the DCHRA, for instance, individual liability can be found of the official acted "in the interest" of the organization and exercised management and administrative authority in the organization.[124] Here, Riley-Jamison acted within the scope of her duties as Human Resources Manager and acted under actual and apparent administrative authority to affect leave and work schedules. Defendant's self-serving assertion that Riley-Jamison had no decision-making control[125] should not be credited by the Court, but rather if anything, leave such a factual determination to the jury to decipher.

B.    MCFADDEN SATISFIES HER *PRIMA FACIE* BURDENS FOR DISABILITY AND RACE DISCRIMINATION AND RETALIATION.

1.    *PRIMA FACIE* CASE OF DISABILITY DISCRIMINATION UNDER THE ADA AND DCHRA

Ms. McFadden is a qualified individual with a disability within the meaning of the ADA and the DCHRA. She has significant physical and mental impairments that substantially limit several major life activities, including walking, breathing, and manipulating small objects. *Supra*. Defendants do not dispute that Ms. McFadden is "disabled", nor do they disavow having records of her disability.

---

[123] D.C. Code § 2-1401.02; *Wallace v. Skadden Arps, Slate, Meagher & Flom*, 715 A.2d 873, 887-89 (D.C. 1998); 29 CFR § 2611; 42 U.S. § 1981.

[124] *Purcell v. Thomas*, No. 03-CV-1038 (D.C. July 26, 2007).

[125] MSJ at 32.

Defendants do however contend that McFadden is not a "qualified" individual with a disability.[126]  Essentially, Defendants rest their contention on Ms. McFadden's application and receipt of Social Security Disability Benefits.  Defendants' contentions carry little weight.  First, Ms. McFadden need not show that could perform the essential functions of the job of Legal Secretary, but may meet the statutory definitions by demonstrating that she could perform the essential functions of any available job.  In Smith v. District of Columbia, this  Court addressed this issue squarely.  In Smith, the defendant argued that because the plaintiff could not perform one or more of the essential functions of her position , she was not a qualified individual with a disability.  This Court held "[t]hat a person cannot perform an essential function of her position without accommodation is not a defense to a violation of the act.  If it were, the Act would be meaningless."  The Court concluded, as it should here, that a plaintiff, if deemed a disabled person, has the right to insist that she be provided with a reasonable accommodation to perform the essential functions of her job, despite her disability."[127]

Second, Defendants hang their entire defense to McFadden's claims on its contention that McFadden made an inconsistent statement that she was totally disabled and unable to work to receive SSDI benefits.[128]  Upon close examination, however, the Court and jury would find no inconsistency at all.  To obtain SSDI, the Social Security Administration must find that McFadden cannot perform her prior job and cannot engage in any other kind of substantial gainful work.[129]  As an initial matter, Social Security standards do not take into account the possibility of reasonable accommodation.  But more, because Ballard Spahr refused McFadden an accommodation, which would have allowed her to work in gainful employment (i.e. the

---

[126] Defendants' Motion for Summary Judgment (hereinafter "MSJ")  at 10-11.
[127] *Smith v. District of Columbia*, 271 F.Supp2d 165 (D.D.C. 2003).
[128] MSJ at 10.
[129] 42 U.S.C. § 423(d)(2)(a).

Receptionist position), she cannot and has not engaged in other gainful work. At least two federal appellate courts have reconciled what the Defendants characterize as an inconsistency in this fashion,[130] and one of the courts indicated that a jour should determine whether the representations are factually inconsistent or not.[131] This Court should similarly find.

Ultimately, McFadden demonstrates that she is an individual with a disability who with accommodation was qualified to for reassignment to Receptionist and Defendants denied her request. She also suffered an adverse employment action (termination) and was replaced by an individual with no known disabilities.[132] Hence, she satisfies her *prima facie* burden.

### 2. PRIMA FACIE CASE OF RETALIATION UNDER THE FMLA, ADA, TITLE VII, DCHRA, AND § 1981

McFadden engaged in protected activity by taking and requesting leave for FMLA-qualifying and disabling conditions. She also invoked her rights under the FMLA and DCFMLA and such conduct is protected by law. Additionally, McFadden requested a reasonable accommodation on May 14, 2004 so that she could enjoy employment opportunities enjoyed by non-disabled workers. Lastly, Ms. McFadden advised Riley-Jamison of her receipt of advice from the Department of Labor regarding her leave entitlement and this activity, too, is protected by the FMLA.

After McFadden engaged in these protected activities, she was denied a reassignment to an available position for which she qualified. The Firm then terminated her employment. These adverse actions are causally connected to her protected activity because they occurred close in time to her protected conduct. Ms. McFadden was on FMLA leave due to her disability when the Firm denied her reasonable accommodation. Even more, the day McFadden

---

[130] *Kiely v. Heartland Rehabilitation Services, Inc.*, 359 F.3d 386 (6th Cir. 2004).

[131] *Voeltz v. Arctic Cat, Inc,*. 406 F.3d 1047 (8th Cir. 2005).

[132] Ex. 20, Defendants Supplemental Objections and Answers to Plaintiff's Interrogatory No. 6.

inquired about her employment status upon her leave expiration and requested a reassignment

accommodation, Ballard Spahr terminated her.  These facts fully satisfy Plaintiff's prima facie

requirements for her retaliation claims.

### 3. *PRIMA FACIE* CASE OF RACE DISCRIMINATION UNDER TITLE VII, DCHRA AND § 1981.

Without dispute, McFadden is an African American.[133]  It is also undisputed that she was

terminated by the Firm on May 14, 2004.[134]  Defendants also failed to provide McFadden a

reasonable accommodation, in the form of a reassignment to the Receptionist position that would

have allowed her to remain employed.  The Firm replaced McFadden with a Caucasian Legal

Secretary.[135]  Ms. McFadden, consequently, puts forth a *prima facie* case of race discrimination.

### C.    BALLARD SPAHR FAILED TO ACCOMMODATE MS. MCFADDEN IN VIOLATION OF FEDERAL AND LOCAL LAW.

#### 1. BALLARD SPAHR DID NOT SATISFY ITS DUTY TO PROVIDE MS. MCFADDEN A REASONABLE ACCOMMODATION

Because McFadden is a unquestionably an individual with a disability, Ballard Spahr was

obligated by the ADA and DCHRA to provide her a reasonable accommodation.  See *Smith*,

*supra*.  This, however, it did not do.

##### a.    Ms. McFadden Requested a Reasonable Accommodation

On May 14, 2004, McFadden requested that the firm reassign her to the position of

Receptionist.[136]  She requested this position because she knew, eve with her limitations, that she

could perform the essential functions of the position.  Defendants, nonetheless, rejected her

---

[133] Ex. 18, Defs' Answers to Request for Admission No. 17.
[134] Ibid, Request No. 3.
[135] Ex. 20, Defs Supp. Answers to Interrogatory No. 6.
[136] Ex.1, McFadden Depo. at 290-294.

request out of hand and failed to inquire about McFadden's abilities vis-à-vis the Receptionist's essential functions.[137]

>    b.    Defendants Proposed Reassignment Was Not Reasonable

Defendants proposed an accommodation to Ms. McFadden on May 14, 2004 that was neither effective nor reasonable. Defendants offered McFadden a position in the Firm's word processing department or "ARC."[138] McFadden declined the offer because her disabling conditions prohibited her from performing the volume of typing that positions within that department demanded. McFadden has swelling in her hands and is substantially limited in maneuvering her fingers.[139] She communicated this to Firm representatives during their May 14th conference call; yet, they failed to offer an alternative accommodation. Consequently, they informed McFadden she was fired.

>    c.    Ballard Spahr Should Have Reassigned McFadden to the
>          Receptionist Position

>        i.    *McFadden Could Have Performed the Essential*
>              *Functions of Receptionist With or Without Accommodation*

McFadden was physically able to perform the essential functions required in the Receptionist position. The position required only that the incumbent answer a 16-line telephone system and make scheduling arrangements for the use of the conference room.[140] Ms. Briscoe, former human resources specialist, confirms that the essential duties were limited to these functions.[141] With the aid of a headset and a few breaks during the workday, McFadden attests to the fact that she could have performed the Receptionist job at the time of her discharge.[142]

---

[137] Ex. 1, McFadden Depo. at 168-172.
[138] MSJ at 11-12.
[139] Ex. 1, McFadden Depo. at 161-167.
[140] Ex.1, McFadden Depo. at 168-180.
[141] Ex. 10, Briscoe Decl. ¶ 14.
[142] Ex. 1, McFadden Depo. at 187-179, 182.

Since McFadden would have been over-qualified for the Receptionist and could have completed the essential duties of the job, Ballard Spahr had a duty to reassign her to the position. At a minimum, whether McFadden could have performed the essential functions as Receptionist is a factual dispute precluding summary judgment.

<em>ii.        The Receptionist Position Was Vacant</em>

Defendants argue that the position of Receptionist was not vacant until August 9, 2004 and therefore was not available to McFadden for reassignment.[143] The facts, however, demonstrate otherwise. The former incumbent of the Receptionist job was Betty Ann Hahn. Ms. Hahn did not occupy the position on May 14, 2004 because she had been on an extended leave of absence and receiving disability benefits for a breast cancer condition. The position, at the time of McFadden's termination was occupied by temporary workers and available to be filled.[144]

Further, Hahn's had not job protection on May 14, 2004 and therefore had no entitlement to the position. Ms. Hahn first took FMLA leave from September 12, 2003 through November 27, 2003 (11 weeks). She then took additional FMLA leave on February 12, 2004 and remained on leave until her death in October 2004.[145] Thus, Hahn's FMLA leave and job protection ended on <u>March 19, 2004</u>. Consequently, the Receptionist position was vacant as of the date of Hahn's FMLA leave expiration and McFadden could have, and indeed should have been reassigned to the position.

## 2.   BALLARD SPAHR FAILED TO ACCOMMODATE MCFADDEN IN RETALIATION FOR HER PROTECTED ACTIVITY AND USE OF FMLA LEAVE

McFadden's termination on the heals of her FMLA leave is no coincidence. When McFadden previously took FMLA leave, Riley-Jamison expressed displeasure and frustration

---

[143] MSJ at 12-13; Ex. 1, McFadden Depo. at 290-294..
[144] Ex. 10, Briscoe Decl. ¶ 14.
[145] Ex. 20, Defs Supplemental Answers to Interrogatory No. 20 and attached letter dated 8/15/07 clarifying same; Ex. 19, 2002-2004 FMLA leave calendars (blue underlined dates).

with McFadden's absence.  Indeed, her frustration rose to the level of harassment.  *Supra*.  When

McFadden took FMLA again, although the second time for her own serious health condition,[146]

the Firm found her leave problematic.  In fact, when McFadden telephoned Forman to inquire

about whether she remained an employee of the firm and/or the next steps after her leave

expiration, Forman barked, "why don't you just resign and save everyone the trouble."[147]  Such a

remark, if considered by a jury, could lead them to reasonably conclude that McFadden's

termination served the same end – the save the Firm some trouble.

### 3.  DEFENDANTS' FAILURE TO ACCOMMODATE MCFADDEN CONSTITUTES RACE DISCRIMINATION

A reasonable juror can also infer that Defendants' refusal to provide McFadden a

reasonable accommodation was motivated by her race, when compared to the Firm's treatment

of Caucasian support staff.[148]  The Firm accommodated at least four other legal secretaries in the

firm's Washington D.C. office.  They include:

- **Betty Ann Hahn** – granted extended leave benefits in 2004 and granted job retention despite the expiration of her FMLA leave.[149]

- **Kathy Hannah** – the Firm granted Ms. Hannah a part-time schedule for almost two years following a stroke.  This accommodation allowed her to work her way back up to full-time employment.[150]

- **Rhea Mahr** – the Firm allowed Ms. Mahr to work an adjusted schedule of approximately 4 days a week because she suffered from cancer.[151]

---

[146]Under a new FMLA leave year, Ms. McFadden was entitled to 12 weeks of FMLA leave starting October 18, 2003.  Disingenuously, Defendants claim that they "decided to restart the clock and provide McFadden sixteen weeks of medical leave under the D.C. FMLA starting October 15, 2003."  MSJ at 4.  The Firm's FMLA policy states that the first use of FMLA leave triggers the start of an FMLA leave year, i.e. a rolling leave year.  Ex. 19 Here, the Firm first started McFadden's FMLA leave.

[147]Ex. 1, McFadden Depo. at 63-65, 275-276.

[148] See Ex.21, List of Washington D.C. Support Staff and identification of race.

[149] Ex. 1, McFadden Depo. at 191; Ex. 10 Briscoe Decl. ¶ 14.; Ex. 20, Defs. Supplemental Answers to Interrogatory Nos. 17 & 20.

[150] Ex. 1, McFadden Depo. at 307-314; Ex. 10 Briscoe Decl. ¶ 15Ex. 20_, Defs. Supplemental Answers to Interrogatory Nos. 17 & 20.

[151] Ex. __ Briscoe Decl. ¶ ___ Ex. ___, Defs. Supplemental Answers to Interrogatory Nos 17 & 20.

- **Judy Mintz** – the Firm accommodated her request to have 2 weeks off in March and the entire summer to travel, ski and vacation – none of which was medically necessary.[152]

- **Elaine Wilbur** – the Firm permitted Ms. Wilbur to work from home for 4-6 months during two stints of maternity leave.  The Firm also allowed her to work a reduced schedule because her son experienced anxiety issues post-9/11.[153]

Defendants attempt to defend against this blatant disparity by claiming that these legal secretaries are not similarly-situated to McFadden.[154]  This argument fails since there is not meaningful difference between McFadden and these other legal secretaries.  Riley-Jamison, the Firm's Human Resources Manager testified that all of the Legal Secretaries were covered by the same Firm policies, they were all required to engage the same procedures for accommodation and leave and the same decision makers (DiBattista and Forman) made the leave determinations.[155]  Thus, the fact that the legal secretaries worked for different partners who specialized in different practice areas is nothing more than a distinction without a legal significance.

Comparators need only be similarly situated not identical in every way.  To establish a proper comparator, a plaintiff need only establish that "the *relevant* aspects of her employment situation" were nearly identical.[156]  Here, the "relevant aspects" are their type of short-term disability, race, and the disparate application of FMLA leave and schedule modification, and this Court need not accept Defendants overly-narrow interpretation of "similarly situated."[157]

D.    BALLARD SPAHR UNLAWFULLY TERMINATED MS. MCFADDEN

---

[152] Ex. 10__ Briscoe Decl. ¶12 Ex. 20, Defs. Supplemental Answers to Interrogatory Nos. 17 & 20.
[153] Ex. 1, McFadden Depo. at 319-321_; Ex.10 Briscoe Decl. ¶ 13 Ex. 20, Defs. Supplemental Answers to Interrogatory Nos. 17 & 20.
[154] MSJ at 24-27.
[155] Ex. 9, R-J Depo. at 102-107.
[156] *Neuren v. Adduci, Mastrani, Meeks & Schill*, 310 U.S.App.DC 82, 43 F.3d 1507, 1512 (D.C. Cir. 1995) (emphasis added).
[157] *Judge v. Marsh*, 649 F.Supp. 770 (D.D.C. 1986).

## 1. DEFENDANTS FAIL TO SATISFY THEIR BURDEN OF PRODUCTION

Having satisfied her prima facie burdens for retaliation and discrimination, the burden shifts to Defendants to produce a legitimate, non-discriminatory reason for their termination of McFadden.[158]  Defendants fail to meet this burden.  Defendants admit they "terminated McFadden due to her medical condition."[159]  Such an explanation is, on its face, discriminatory on the basis of disability. If accepted as true, as Defendants concede, they terminated an employee due to disability in violation of the ADA and DCHRA.  Thus, the Court should find that Defendants do not satisfy their burden of production and deny their Motion for claims based on unlawful termination.

## 2. Even if Burden is Satisfied, Defendants' Rationale is Pretext

Defendants' rationale that it terminated McFadden because of her medical inability to perform her legal secretary job is pretext for discrimination and retaliation.  At least thee Caucasian secretaries – Hahn, Hannah and Mahr – all were physically unable to perform their jobs; yet, Ballard Spahr did not fire them.  Indeed, no Caucasian legal secretaries have been terminated by the firm due to medical inability to perform.  McFadden's camparator evidence precludes the dismissal of her claims because a jury, as fact finder, must discern the Defendants' true motives behind her termination.

## 3. SUBSTANTIAL EVIDENCE PROVIDES ADDITIONAL PROOF OF DISCRIMINATORY AND RETALIATORY INTENT THAT PRECLUDES SUMMARY JUDGMENT

### a. Disability Discrimination

---

[158] In their Motion, Defendants do not argue for the dismissal of McFadden's disability discrimination claim for her unlawful termination; thus summary judgment should not be granted on this claim.  MSJ at 28-29.

[159] MSJ at 8, nt3.

In addition to the above, McFadden can demonstrate that one of the decision makers harbored animus against employees with medical conditions.  Riley-Jamison remarked to McFadden, Briscoe and Hahn that the Firm needed to hire people with fewer health problems.[160] Briscoe recalled such a statement.  She too attests to the fact that Riley-Jamison said the firm should hire "healthier people."[161]  Riley-Jamison does not admit to making this statement.[162] This then begs the question, what did Riley-Jamison think the firm should do with the disabled workers employed there?  A jury must be permitted to ponder and decide that question.

b.    Retaliation

Forman made a similar remark that evinces a bias against McFadden.  When McFadden contacted Forman on May 13, 2004, Forman asked Mc. Fadden to "resign to save everyone some trouble."  Such a remark clearly connotes her view that McFadden's leave and employment issues troubled her and others at the  Firm.  Forman was undoubtedly apart of the decision-making body in McFadden's termination since she participated in the conference call when McFadden was terminated the following day.[163]  The fact that McFadden was fired the very next day after Forman's retaliatory remark could lead a reasonable juror to conclude that McFadden's protected absences unlawfully motivated the Firm's decision to terminate her.

c.    Race Discrimination

Finally, a jury must be permitted to weigh the facts and evidence of disparate treatment in termination and retention on the basis of race.  All the legal secretaries above were provided accommodation and none were terminated.  At the same time, McFadden and another African-

---

[160] Ex. 1, McFadden Depo. at 222-226.
[161] Ex. 10, Briscoe Decl. ¶ 4.
[162] Ex. 9, R-J Depo. at 81-82.
[163] Ex._1, McFadden Depo. at 275-76.

American disabled employee, Ms. Briscoe were almost simultaneously terminated.[164]  This stands in stark and undeniable contrast to the Firm's treatment of Betty Ann Hahn.  Ms. Hahn was on FMLA leave and was receiving disability benefits at the same time as McFadden and Briscoe.  Yet when her FMLA and non-FMLA leave expired, the Firm did not terminate her but maintained her employment.  McFadden and Briscoe were not so privileged.  Upon their leave expiration they were offered no reasonable accommodation and were summarily discharged.  These compelling facts strongly suggest a racial motive behind McFadden's termination and require the Court to deny Defendants' Motion for Summary Judgment.

V.  CONCLUSION

This case presents a panoply of factual disputes at to factual events, employer motive and witness credibility – any and all which preclude the dismissal of any of Plaintiff's claims.  Therefore, McFadden respectfully requests that this Court deny Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,


Dated: October 9, 2007                    By**:_____/s/_____**
                                              Teresa W. Murray

                                          THE LAW OFFICES OF T.W. MURRAY
                                          7474 Greenway Center Drive
                                          Suite 820
                                          Greenbelt, Maryland 20770
                                          Phone: 301-982-2005
                                          Fax: 301-982-0004

---

[164] Ex.10 Briscoe Decl. ¶ 11.