# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

—————————————————

**VANESSA A. MCFADDEN**          )
                                )
            Plaintiff,           )
                                )
        v.                       )    **Civil Case No. 05cv2401 (RJL/JMF)**
                                )
**BALLARD SPAHR ANDREWS &**      )
**INGERSOLL, LLP et al.**        )
                                )
            Defendants.          )
—————————————————

### PLAINTIFF VANESSA MCFADDEN'S RESPONSE TO DEFNDANTS' STATEMENT OF UNDISPUTED FACTS AND STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

Plaintiff Vanessa McFadden hereby responds to Defendants' Statement of Undisputed Facts and herewith files her Statement of Genuine Issues of Material Fact, which demonstrate that Defendants' Motion for Summary Judgment must be denied.

### A. PLAINTIFF VANESSA MCFADDEN'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Plaintiff responds *seriatim* to the enumerated paragraphs in Defendants' Statement of Undisputed Facts as follows:

1 .    Vanessa McFadden ("Plaintiff or "McFadden") was hired as a legal secretary by Ballard Spahr in 1989. (Ex. 1, Complaint at 13).

2.    Margaret Riley-Jamison holds the position of Human Resources Manager in the D.C. office of Ballard Spahr. (Ex. 1, Complaint at 1 1).

3.    McFadden worked primarily for Charles Henck, a partner in the Tax Department. (Ex. 2, Henck Depo. at 21).

4.    McFadden's responsibilities included managing time sheets, scheduling, organizing client files, managing expense sheets, and word processing for tax partner Charles

1

Henck. (Ex. 3, Legal Secretary Job Description).

5.     Charles Henck evaluated McFadden's qualifications, suitability for employment, and performance. Riley-Jamison did not have the authority to hire or terminate. (Ex. 4, Riley-Jamison Depo. at 15-17, 38-39).

**RESPONSE:**  While serving as Legal Secretary, Ms. McFadden met Mr. Henck's performance expectations.[1]  Henck considered her a "loyal hardworking, knowledgeable member of the team" and evaluated her favorably on her yearly appraisals.[2]  In addition, Plaintiff disputes Defendants' assertion that Ms. Riley-Jamison lacked authority to hire or terminate employees. First, Riley-Jamison was intimately involved in the hiring of legal secretaries, including the screening of candidates.  Consequently, she had the authority and ability to deny employment to individuals.  Ex. 9, R-J Depo. at 38-39.  Second, Riley-Jamison terminated other employees. Ex. 28, Termination Letters from Riley-Jamison.  Third, Riley-Jamison participated in the decision to terminate Vanessa McFadden.  Ex. 1, McFadden Depo. at 274, 280, 290-294, 297-299.

6.     In October 2002, McFadden informed Ballard Spahr that her husband had been diagnosed with terminal cancer. (Ex. 1, Complaint at 18).

7.     McFadden requested time off from work in order to care for her husband. (Ex. 1, Complaint at 18). McFadden told other employees at Ballard Spahr about her husband's condition and often spoke with her family and friends about the situation. Ex. 5, McFadden Depo. 5/16/2007 at 226, 231, Ex. 6, Craig Depo. at 17).

8.     Ballard Spahr accommodated McFadden's request by scheduling McFadden to work three to four days per week, on alternating weeks. (Ex. 1, Complaint at 26, Ex. 4, Riley-Jamison Depo. at 76-77, Ex. 5, McFadden Depo. 5/16/2007 at 93).

**RESPONSE:  Defendants denied McFadden her FMLA (12 weeks) and DCFMLA leave**

---

[1] Ex. 2, Henck Depo. at 10-19.
[2] Ex. 3, McFadden's Performance Evaluations 2001-2003;  Ex.2, Henck Deposition at 19.

entitlements (16 weeks).  Ex. 22, McFadden Decl. ¶ 2.

9.      Henck, the partner in charge of McFadden, approved the modifications. McFadden considered her boss to be Charles Henck and followed what he said with regard to her schedule. (Ex. 5, McFadden Depo. 5/16/2007 at 103).

10.     On weeks where McFadden worked four days per week, she was given Mondays off and Ballard Spahr did not charge the time off to McFadden's FMLA entitlement. (Ex. 7, Riley-Jamison Dec. at 2-3, Ex. 5, McFadden Depo. 5/16/2007 at 94-96).

**RESPONSE:  Plaintiff disputes Defendants' baseless contention that McFadden's absences on Mondays in 2003 were not charged toward her FMLA leave entitlement.  Defendants own records demonstrate otherwise, Ex. 26. Ballard Spahr counted five Mondays in 2003 toward her FMLA leave entitlement. Ibid; Ex. 19.**

11.     Unlike all other employees who worked less than full-time, McFadden's employment status was never converted from full-time to part-time. McFadden is the only employee in Ballard Spahr's D.C. office who has ever been allowed to work part-time without a decrease in salary. (Ex. 7, Riley-Jamison Dec. at 3).

**RESPONSE:  Other Legal Secretaries maintained their full-time status while working a modified schedule.  See Opposition to Motion for Summary Judgment (hereinafter "Opp.") at 29-30.**

12.     McFadden received 34 days of paid time off for the year 2002. (Ex. 8, November 1,2002 Memorandum).

**RESPONSE:  Defendants' reference to McFadden's paid time off in 2002 is irrelevant to Defendants' failure to provide her FMLA leave, which she was entitled to by law. Defendants granted McFadden ten days of FMLA leave in 2002 and an additional 30 days in 2003, Exs. 26, 19 & 22, McFadden Decl. ¶ 3.  The FMLA entitled her to four additional weeks of unpaid leave that she never received.**

13.     By November, 2002, McFadden had exhausted her paid leave. Because McFadden had been employed by Ballard Spahr for so many years, the firm advanced her ten days from the paid leave to which she would be entitled in 2003. This was the first time Ballard Spahr's D.C. office had ever advanced an employee that amount of paid leave. (Ex. 8, November 1, 2002 Memorandum, Ex. 7, Riley-Jamison Dec. at 4).

14.     At some point in 2002 and continuing into 2003, McFadden began to experience her own medical problems and complained to her co-workers about various medical problems. (Complaint at 36, Ex. 37, Plaintiffs First Supplemental Answers to Interrogatory No. 10, p. 4).

**RESPONSE:  McFadden did not "complain" to her coworkers about her medical conditions, but they themselves observed her physical limitations.  Riley-Jamison, Henck, and other individuals who worked with McFadden noticed her limitations, particularity her difficulty walking.[3] Ms. Briscoe noted the swelling in Ms. McFadden's hands and ankles and witnessed Ms. McFadden lose her balance at times.[4]**

15.     McFadden reported to work while she was ill. She had difficulties walking and typing. On multiple days in 2003 when McFadden came to work while sick, she was allowed to leave early without her early departure being counted against her. Ballard Spahr gave McFadden credit for a full day's work. (Ex. 7, Riley-Jamison Dec. at 6).

**RESPONSE:  McFadden worked longer hours on the days she reported to work.  The Firm never compensated her for her extra effort.  Ex. 1, McFadden Depo. at 93-95.**

16.     McFadden's condition worsened during 2003. In 2003, she was diagnosed with a variety of illnesses, including:

      a.     Graves disease;

      b.     fibromyalgia;

      c.     depression;

---

[3] Ex. 9, R-J Depo. at 154-155; Henck Depo. at 43-45; Ex. 8, Craig Depo  at 18; Ex. 10, Briscoe Decl ¶ 10.
[4] Ex. 10, Briscoe Decl. ¶ 10.

      d.     thyroid problems;

      e.     bronchial asthma, and other chronic illnesses that have continued to this

               day. (Ex. 5, McFadden Depo. 5/16/2007 at 123-127).

17.    McFadden's symptoms include:

      a.     headache clusters, which can last for two to three days and cause loss of
vision (Ex. 5, McFadden Depo. 5/16/2007 at 135-136);

      b.     inability to maintain personal hygiene without help (Ex. 5, McFadden
Depo. 5/16/2007 at 147-148);

      c.     needing oxygen tanks;

      d.     inability to stand without assistance;

      e.     inability to stand with assistance for more than a few minutes;

      f.     inability to lift anything, needs assistance getting out of bed; and

      g.     incontinence. (Ex. *9*, Plaintiffs Answers to Interrogatories, No. 10.)

**RESPONSE to 16 & 17:  Notwithstanding McFadden's disability, she could have
performed the essential functions of the Receptionist position.  At the time of her
termination, McFadden was physically capable of performing the essential duties of the
Receptionist position.  The position required only that the incumbent answer a 16-line
telephone system and make scheduling arrangements for the use of the conference room.[5]
With the aid of a headset and a few breaks during the workday, McFadden could have
performed the Receptionist job.[6]  The issue of whether McFadden could have performed
the essential functions of Receptionist is a factual dispute precluding summary judgment.**

18.    Because of her illnesses, McFadden missed 67 days of work in 2003 and
exceeded her paid leave days. (Ex. 24, 2002 and 2003 Leave Records). In 2003, Ballard Spahr
advanced McFadden another ten days of paid leave from 2004. The two occasions in which

---

[5] Ex.1, McFadden Depo. at 168-180; Ex. 10, Briscoe Decl. ¶ 14.
[6] Ex. 1, McFadden Depo. at 187-179, 182.

Ballard Spahr advanced ten days of paid leave to McFadden are the only times Ballard Spahr's

D.C. office ever has advanced such a substantial amount of leave. (Ex. 7, Riley-Jamison Dec. at 5).

**RESPONSE:  McFadden's absences from work in 2003 were not all caused by or related to**

**her disability.  Twenty days of the 67 days reported by Defendants were vacation days and**

**32.5 of the days were due to her husband's condition.  As Defendants' records show,**

**McFadden took only 10.5 days of sick days in 2003 for her own illness(es).  Ex. 26.**

19.    On or about October 15, 2003, McFadden took disability leave from her job at

Ballard Spahr. (Ex. 1, Complaint at 39).

**RESPONSE:  The date Defendants indicate that McFadden took leave due to disability and**

**FMLA is incorrect.  McFadden took disability leave on or about October 18, 2003.  Ex. 11,**

**Answer to Interrogatory No. 5.  This date is significant since the Firm's FMLA leave year,**

**in McFadden' case began anew on October 17, 2003.  See definition of "Leave Year" under**

**Firm's FMLA Policy, Ex. 15 at 3.**

20.    Riley-Jamison had no control over the approval or denial of leave and benefits.

She was only responsible for ensuring the proper paperwork was completed and forwarding the

information to the firm's benefits department. (Ex. 4, Riley-Jamison Depo. at 44, 47).

**RESPONSE:  See Response to No. 5**

21.    McFadden used most of her available FMLA leave during 2002 and 2003 for the

illnesses of herself and her husband. In 2002, McFadden missed 59 days of work. In 2003,

McFadden missed 67 days of work. (Ex. 24, 2002 and 2003 Attendance Table). Ballard Spahr

decided to restart the clock on October 15, 2003, and give McFadden an additional sixteen

weeks of medical leave under the D.C. FMLA from October 15, 2003. (Ex. 7, Riley-Jamison

Dec. at 7). Ballard Spahr never denied McFadden any of the leave that she requested. (Ex. 5,

McFadden Depo. 5/16/07 at 98-100).

**RESPONSE:  Plaintiff disputes these allegations on several grounds; 1) Defendants use of**

the term "missed" connotes that McFadden's 59 days absent in the year 2002 was unauthorized by the Firm.  The Firm approved all of McFadden's leaves of absence – none were unauthorized; 2) Defendants claim that they benevolently "restart[ed] the [FMLA] clock on October 15, 2003" is insincere.  The FMLA and Ballard Spahr's FMLA policy required the Firm to renew on a *yearly basis,* the FMLA leave year; thus, employees are entitled to 12 weeks of unpaid leave every year.  29 CFR §§ 825.300, 825.301 (a); 3) that the Firm finally granted McFadden DCFMLA leave of 16 weeks in late 2003 to early 2004 bears little relevance to the issue of whether Defendants denied her FMLA leave in November 2002.  Indeed, a reasonable juror can infer from Defendants' November 2002 memorandum, which references only a *12 week* entitlement, rather than the correct 16-week entitlement, Ex. 5, that Defendants did not grant her the appropriate leave and misinformed her about the amount she was entitled to, in 2002 and 2003; 4) McFadden attests to the fact that Ballard Spahr, through Riley-Jamison and Forman, denied her FMLA leave request, Ex. 22, McFadden Decl. ¶ 2.

22.    McFadden's D.C. FMLA leave expired on February 4, 2004. (Ex. 10, Mar. 9, 2004, Letter from DiBattista to McFadden).

23.    As McFadden was too sick to return to work, Ballard Spahr offered her an additional three months of non-FMLA leave. (Ex. 10, Letter from DiBattista to McFadden).

**RESPONSE:  Plaintiff disputes Defendants' assertion that she was "too sick to return to work."  While McFadden was incapable of performing the duties of a Legal Secretary due to her medical conditions, she possessed the ability to return to work in the available Receptionist position, for which she was qualified.  See Opp. at 26-29.  Because the Firm failed to provide McFadden a reasonable accommodation, she was unable to return and thus requested non-FMLA leave.**

24.    McFadden accepted the non-FMLA leave on March 15, 2004. In her letter

accepting such leave, McFadden wrote that her disability would continue "indefinitely." (Ex. 11, Extension Request Form).

25.    McFadden's three months of non-FMLA leave expired on May 4, 2004. (Ex. 10, Letter from DiBattista to McFadden).

26.    After her leave had already expired, on May 14, 2004, McFadden called Ms. Riley-Jamison to inquire about her leave status. Ms. Riley-Jamison told McFadden that she would have to get back to her. (Ex. 4, Riley-Jamison Depo. at 104, 108, Ex. 5, McFadden Depo. 5/16/2007 at 275-276).

27.    Later that afternoon, Ms. Riley-Jamison, Wendy Iverson, the office manager for Ballard Spahr's D.C. office, Fern Forman, the benefits administrator for Ballard Spahr, and John DiBattista, the Director of Human Resources for Ballard Spahr placed a conference call to McFadden. (Ex. 4, Riley-Jamison Depo. at 102, Ex. 5, McFadden Depo. 5/16/2007 at 276-277).

28.    During the call, McFadden was told that the firm had added a new policy to their insurance to allow her an accelerated death benefit for her husband. (Ex. 5, McFadden Depo. at 282).

**RESPONSE:  While it is true that the Firm communicated to McFadden that it added a new policy "for her," Plaintiff later discovered that Defendants were again being disingenuous with their purported kindness and already possessed accelerated death benefits prior to Mr. McFadden's terminal illness.  Ex. 1, McFadden Depo. at 280-286.**

29.    During the conference call, McFadden was offered a word processing position in the administrative department ("ARC") of Ballard Spahr. At the time, McFadden could not perform the work of a tax secretary. (Ex. 1, Complaint at 46, Ex. 4, Riley-Jamison Depo. at 119, Ex. 12, Plaintiffs Notes of conversation, Ex. 5, McFadden Depo. 5/16/2007 at 292).

30.    McFadden responded to the offer by stating that she could not work in word processing. (Complaint at 46, Ex. 4, Riley-Jamison Depo. at 119, Ex. 5, McFadden Depo.

5/16/2007 at 292).

31.    McFadden claims that she then asked about the receptionist position and was told it was unavailable. (Ex. 5, McFadden Depo. 5/16/2007 at 292-293).' McFadden was told that the position was being held for an employee on medical leave. (Ex. 5, McFadden Depo. 5/16/2007 at 293).

_footnote_: For the purposes of summary judgment, Defendants accept McFadden's testimony, although the three Ballard Spahr employees on the conference call will testify that McFadden did not request a receptionist position and McFadden's contemporaneous notes do not reflect that she requested a receptionist position. (Ex. 12, McFadden's Notes, Ex. 4, Riley-Jamison Depo. at 102, 120).

**RESPONSE:  Plainly, there exists a factual dispute as to whether McFadden requested reassignment to the Receptionist job as a reasonable accommodation.  Because such a fact is material to the resolution of McFadden's disability and race discrimination claims, summary judgment cannot be granted in this case.  Further, McFadden explained, in her deposition, that her notes contain only those items the Firm offered to her, but do not purport to be minutes of the May 14th conference call.  Ex. 1, McFadden Depo. at 280-286.  Lastly, in May 2004, the position of Receptionist was filled with a temporary worker, Ex. 10, Briscoe Decl. ¶ 14, and the former incumbent, Betty Ann Hahn was out on disability and her FMLA leave had expired.  Ex. 20, Defs' Supplemental Answers to Interrogatory No. 20 and attached letter dated 8/15/07 clarifying same; Ex. 19, 2002-2004 FMLA leave calendars (blue underlined dates).**

33.    McFadden was terminated by John DiBattista, the director of human resources, on May 14, 2004, due to her inability to return to work in an available position. (Ex. 1, Complaint at 47, Ex. 4, Riley-Jamison Depo. at 102-103, Ex. 13 May 20, 2004 Letter from DiBattista to McFadden).

**RESPONSE:  McFadden disputes the argument and contention that she was terminated due to her inability to return to work in an available position.  See Response to No. 31.  At the center of this dispute is whether the Defendants terminated McFadden due in whole in or in part to her race, disability, and/or protected activity, as McFadden claims.  See Opp.**

33.     In an ARC position, McFadden could come to work intermittently. It was the only position for which McFadden had the requisite skills that did not require her to report to work every day. (Ex. 7, Riley-Jamison Dec. at 8).

**RESPONSE:  There is no evidence, which supports Defendants' allegation that it offered McFadden an "intermittent" job in word processing.  McFadden's account of the May 14th conference call indicates that none of the Firm officials offered her a word processing position with an intermittent schedule, Ex. 1, McFadden Depo. at  280-297.  Defendants' new assertion that it proposed a position that McFadden could be work intermittently creates another factual dispute for the jury to resolve.**

34.     A receptionist at Ballard Spahr was required to report to work at regular hours, every day. A receptionist position could not be filled by an employee working intermittently. (Ex. 4, Riley-Jamison Depo. at 177).

**RESPONSE:  Whether one of the Receptionist's essential functions is attendance constitutes a genuine issue of material fact.**

35.     At the time, McFadden was unable to attend work consistently and had no way of predicting whether her illnesses would allow her to attend work that day until she woke up in the morning. At one point, in March of 2004, McFadden was confined to bed for a week and a half, unable to move more than turning her head from side to side. (Ex. 5, McFadden Depo. 5/16/2007 at 136-139).

**RESPONSE:  See Response to No. 23.**

36.     McFadden's physicians told her that she was disabled and could not work starting

in April of 2003. (Ex. 5, McFadden Depo. 5/16/2007 at 140-141).

**RESPONSE: See Response to No. 23.**

37.    At the time of McFadden's termination, there was no receptionist position available. The sole receptionist, Betty Ann Hahn, was on medical leave and Ballard Spahr was holding Ms. Hahn's position open. Ballard Spahr could not give McFadden the receptionist position. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 16, 20). Ms. Hahn was eventually terminated and replaced in August. (Id.).

**RESPONSE: See Response to No. 37. The Firm did not terminate Hahn, but rather retained her, despite the expiration of her FMLA and non-FMLA, unlike McFadden and Briscoe. Ex.10, Briscoe Decl. ¶ 11; Ex. 24, Briscoe's Request for Leave of Absence and Termination Letter; Ex. 23 Hahn Request for Leave of Absence; Ex. 20, Defendants Supplemental Answer to Interrogatory No. 20 and Clarifying Letter.**

38.    Ballard Spahr has an Anti-Discrimination Policy that was signed by McFadden on February 1, 1999. (Ex. 15, EEO Policy, Ex. 16, Plaintiffs signature on policy).

39.    Prior to the filing of her EEOC charge on June 23, 2004, McFadden never made any complaints of race or disability discrimination to Ballard Spahr. (Ex. 17, Plaintiffs Third Supplementary Interrogatory Answers, No. 9).

40.    McFadden contends that she told Charles Henck, the partner for whom she worked, that Riley-Jamison complained about McFadden's need for leave. (Ex. 17, Plaintiffs Third Supplemental Interrogatory Answer, No. 9). McFadden did not inform Henck that she believed that she was being subjected to race discrimination. (Ex. 2, Henck Depo. at 35).

**RESPONSE to Nos. 39 & 40: Ms. McFadden complained to her Supervisor, Charles Henck about Riley-Jamison's harassment. She informed him that Riley-Jamison made derogatory statements about employees with serious health conditions and constantly directed her to find other friends or family to care for her husband or place him in a**

hospice facility.[7]  Since Riley-Jamison is the Firm's Human Resources Manager, it was reasonable for McFadden to report the harassment to her supervisor.  Henck merely talked to Riley-Jamison about McFadden's leave situation, but he and no other member of the firm took additional steps to stop Riley-Jamison's coercive tactics. [8]  Henck's talks with Riley- Jamison proved completely ineffective.  Indeed, Riley-Jamison's harassment of McFadden escalated. [9]  Ms. Riley-Jamison denies ever making the harassing comments to McFadden.[10]  This denial creates a genuine dispute as to material fact and jury should be permitted to evaluate the credibility of McFadden and Riley-Jamison.

41.    McFadden cannot recall any racist comments made to or about her. (Ex. 9, Plaintiffs Answers to Interrogatory No. 8, 9, Ex. 5, McFadden Depo. at 219-220, 223).

42.    McFadden cannot recall the specifics of any purported harassing comments made to her. (Ex. 9, Plaintiffs Answers to Interrogatory No. 8, 9, Ex. 5, McFadden Depo. at 219-220, 223).

RESPONSE:  Ms. McFadden has consistently reported having experienced harassment while working at Ballard Spahr.  Riley-Jamison told McFadden that the Firm's approval of a modified schedule was a "favor" being afforded her.[11]  She required McFadden to "call in," on her pre-scheduled and pre-approved days off for FMLA leave.[12]  Almost immediately after Ms. McFadden commenced the FMLA-leave schedule, Riley-Jamison advised her that it "wasn't working out."[13]  Ms. Riley-Jamison told Ms. McFadden to find someone else to care for her husband, since he "was dying anyway."[14]  Both Henck and Riley-Jamison advised McFadden to put her husband in hospice care, which Ms.

---

[7] Ex. 1, McFadden Depo. at 125-126. Ex. 11, Plaintiff's Third Supplement Answer to Interrogatory No.9.
[8] Ex. 2, Henck Depo. at 33-36.
[9] Ex. 1, McFadden Depo. at 134, 135, 144.
[10] Ex. 9, R-J Depo. at 79-82.
[11] Complaint ¶ 29
[12] Complaint ¶ 33
[13] Ex. 1, McFadden Depo. at 102-03
[14] Ex. 1, McFadden Depo. at 104-107.

McFadden believed to be a "cruel" way to treat dying people.[15]  Henck even put another employee, Janet Craig, up to talking to McFadden about placing her husband in hospice.[16]  On a weekly basis from January through June 2003, Riley-Jamison instructed Ms. McFadden to arrange for someone else – other family or church members – to look after Mr. McFadden so that Ms. McFadden could resume her normal schedule.[17]  On one of the days that Ms. McFadden did report to work, she received seven emails from Riley-Jamison's office stating that the Firm had placed her on Leave Without Pay for that day.[18]  Claiming that Ms. McFadden's reduced schedule caused "turmoil" with the staff and generated complaints from other legal secretaries, Riley-Jamison badgered McFadden to abandon her modified schedule.[19]  Ms. Riley-Jamison even remarked to McFadden that the Firm needed to hire younger people with fewer "medical problems."[20]

43.    Neither Ms. Riley-Jamison nor any other employee of Ballard Spahr ever used any racial epithets in front of McFadden or regarding McFadden. (Ex. 5, McFadden Depo. at 219-220,223).

44.    Ms. Riley-Jamison was on maternity leave from June 25 through October 13, 2003. Riley-Jamison did not return to work until two days before McFadden left on long term disability leave. (Ex. 4, Riley-Jamison Depo. at 94).

45.    Ballard Spahr's disability insurance plan for employees includes an elimination period of 30 days. From days 31-90, Ballard Spahr pays 60% of the employee's salary. From days 91 forward, Ballard Spahr's disability insurance carrier pays 60% of the employee's salary. (Ex. 18, Ballard Spahr Long Term Disability Plan).

---

[15] Ex. 1, McFadden Depo. at 111.
[16] Ex. 1, McFadden Depo. at 109, 114-117.  Ex.8, Deposition of Janet Craig at 21.
[17] Ex. 1McFadden Depo. at 263-265.
[18] Ex.1, McFadden Depo at 241-243; Ex. 10, Briscoe Decl. ¶ 7.
[19] Ex. 1, McFadden Depo. at 263-265. See also, Ex. 11, Plaintiff's Third Supplemental Answers to Defendants' Interrogatory Nos. 8 & 9.
[20] Ex. 1, McFadden Depo. at 222-226; Ex. 10, Briscoe Decl. ¶ 4.

46.    Typically 80% of the disability insurance premium is paid by Ballard Spahr and 20% of the premium is deducted from the employee's salary. (Ex. 19, Ballard Spahr Income Protection Claim).

47.    In the case of McFadden, Ballard Spahr paid 100% of her disability insurance premium from January, 2004, through her termination. Ballard Spahr made payments of McFadden's disability insurance premium on her behalf because the firm sought to provide assistance to her in light her personal and family situation. (Ex. 7, Riley-Jamison Dec. at 11, Ex. 13, May 20, 2004 Letter from DiBattista).

48.    McFadden's disability leave began on October 15, 2003. Ballard Spahr paid her 60% of her salary from November 15, 2003 through January 15, 2004. (Ex. 7, Riley-Jamison Dec. at 12).

**RESPONSE:  See Response to No. 19.**

49.    Beginning on or about January 15, 2004, it was the responsibility of Ballard Spahr's insurance carrier, UnumProvident, to make any disability payments under the terms of the plan. In McFadden's case, UnumProvident had difficulties processing and approving her application. (Ex. 7, Riley-Jamison Dec. at 12-13).

50.    On or about May 11, 2004, UnumProvident denied McFadden's disability application. (Ex. 20, May 11, 2004 Letter from UnumProvident to Plaintiff).

51.    In mid-2004, McFadden submitted additional doctor's records in support of her disability. (Ex. 21, August 19, 2004 Letter from UnumProvident).

52.    Ballard Spahr took steps to assist McFadden, and convinced UnumProvident to provide her with disability payments under a reservation of rights. (Ex. 7, Riley-Jamison Dec. at 13).

53.    As a result, UnumProvident paid McFadden $6572.91 on March 15, 2004, under a reservation of rights, the full amount owed for payments from January 15, 2004 through March

14

31, 2004. (Ex. 22, Mar. 15, 2004 Letter from UnumProvident to Plaintiff).

54.     UnumProvident also paid McFadden $ 16,366.92 on October 29, 2004, under a reservation of rights, the full amount owed for payments starting from April 1, 2004. (Ex. 23, Oct. 29, 2004, Letter from UnumProvident to Plaintiff).

55.     Ballard Spahr further convinced UnumProvident to begin paying McFadden monthly the maximum disability amount that she would have received had her application been timely approved. These monthly amounts were paid starting October, 2004. (Ex. 23, Oct. 29, 2004 Letter from Unum, Ex. 7, Riley-Jamison Dec. at 13).

**RESPONSE to Nos. 52-55:  See Complaint ¶ 45.**

56.     On or about September 22, 2005, UnumProvident approved McFadden's disability application. (Ex. 25, Sept. 22, 2005 Letter from UnumProvident to Plaintiff).

57.     UnumProvident's standard for long-term disability insurance coverage is "that because of injury or sickness: (1) the insured cannot perform each of the material duties of his regular occupation; and (2) after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience." (Ex. 25, Letter from UnumProvident to Plaintiff, Ex. 27, Feb. 18, 2004 Letter from Unum to Plaintiff).

58.     McFadden initially was approved for long term benefits under the first clause of the disability insurance standard. (Ex. 25, Sept. 22, 2005 Letter from UnumProvident to McFadden).

59.     On September 22, 2005, UnumProvident informed McFadden she had been approved under the standard of not being able to perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience. (Ex. 25, Sept. 22, 2005 Letter from UnumProvident to Plaintiff).

60.     On or about November, 2003, McFadden applied for social security disability

insurance ("SSDI"). McFadden was approved for benefits on or about March 16, 2004. (Ex. 26, Mar. 16, 2004 Letter from SSA to McFadden).

61.    The standard to be approved of SSDI benefits is the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairments which can reasonably be expected to result in death or which has lasted or can be expected to last for a continuous period of time of not less than 12 months. (20 CFR § 404.1505).

62.    Following her termination on May 14, 2004, McFadden did not apply for a single position of any type of employment. (Ex. 17, Plaintiffs Third Supplemental Answers to Interrogatories, Ex. 5, McFadden Depo. 5/16/2007 at 49).

63.    McFadden contends that she could have worked as a receptionist. (Ex. 1, Complaint at 48). From her termination through the present, there have been thousands of available receptionist positions in the Washington, D.C. area. (Ex. 27, Defendants' Expert Report).

64.    In 2005, McFadden moved to Florida for her health. (Ex. 5, McFadden Depo. 5/17/2007 at 76-78).

**F.    Plaintiff's Medical Condition Renders Her Unable to Work**

65.    McFadden's physicians have stated that she is and will be unable to return to work.

66.    Philip Mussenden, M.D., McFadden's primary care physician, has stated that Ms. McFadden is "physically and mentally incapacitated" (Ex. 28, Plaintiffs Responses to Request for Admission at 29).

67.    Dr. Mussenden has stated that Ms. McFadden is "unable to perform any work" (Ex. 28, Plaintiffs Responses to Request for Admission at 31).

68.    Dr. Mussenden has certified that Ms. McFadden cannot be released to full time or part time work "indefinitely" (Ex. 28, Plaintiffs Responses to Request for Admission at 33).

69.     Ranville Clark, M.D., McFadden's psychiatrist, has stated that "Ms. McFadden is incapable of resuming employment, now or in the foreseeable future" (Ex. 28, Plaintiffs Responses to Request for Admission at 30).

70.     Dr. Clark opined on March 17, 2004 that "it is not to be expected that [Ms. McFadden] will ever be able to resume gainful employment" (Ex. 29, Clark Records, Unum 00256).

71.     Seth Morgan, M.D., McFadden's neurologist, has reported that Ms. McFadden believes her memory is "not too good." (Ex. 30, Morgan Records, HCP 53).

72.     Earl Armstrong, M.D., McFadden's pulmonologist, has prescribed Ms. McFadden an oxygen canister for her lifetime. (Ex. 31, Armstrong Records, Unum 00626, 00628).

73.     None of McFadden's medical providers have rescinded their statements that McFadden is unable to work. (Ex. 5, McFadden Depo. 5/16/07 at 216-217).

74.     McFadden has stated repeatedly that she is unable to work.

  a.  McFadden informed UnumProvident, in her signed Claimant's Statement, that she would never be able to return to work on a full or part time basis; (Ex. 28, Plaintiffs Responses to Request for Admission at 19, 26).

  b.  In October, 2003, McFadden applied for social security and informed the Social Security Administration that she was totally disabled; (Ex. 32, Work Activity Report).

  c.  McFadden also informed the SSA that she was unable to return to work; (Ex. 33, SSA Report of Continuing Disability Interview).

  d.  McFadden also informed the SSA that she could not work, exercise, lift objects over five pounds, get in or out of the bathtub, off the toilet or out of bed alone. This statement remains true to the present date. (Ex. 36, Activities of Daily Living Form submitted to SSA, Ex. 5, McFadden Depo. 5/16/2007 at 145, 147-148).

  e.  McFadden's condition is progressive and continually worsens. (Ex. 5, McFadden Depo. 5/16/2007 at 136-139).

  f.  McFadden's written request of non-FMLA leave on March 15, 2004, stated that her leave would continue indefinitely. (Ex. 11, Plaintiffs Leave of Absence Request Form).

75.    McFadden has received more than two years (January 2004-January 2006) of disability benefits from UnumProvident. After two years, the standard to be disabled rises to the level of being unable to perform any position for which the person is suited by education or training. McFadden was approved by UnumProvident under the stricter standard. (Ex. 25, Sept. 22, 2005 Letter from UnumProvident to Plaintiff).

76.    McFadden is also receiving SSDI benefits and has continuously accepted and retained SSDI benefits. The standard to receive SSDI benefits is the inability to engage in any gainful employment. 20 CFR § 404.1505.

**RESPONSE to Nos. 45-61 and 65-76:  The disability standard and analysis employed for purposes of UNUM Long-Term Disability Benefits and Social Security Disability Benefits are not congruent with, nor serve the same purposes of the ADA or DCHRA; thus, UNUM's and the Social Security Administration's determination of McFadden's disability is separate and distinct from the Court's determinations under the ADA and DCHRA.   To award SSDI, for instance, the Social Security Administration found that McFadden cannot perform her prior job and cannot engage in any other kind of substantial gainful work.[21]  Yet, Social Security standards do not take into account the possibility of reasonable accommodation.  Because Ballard Spahr refused McFadden an accommodation, which would have allowed her to work in gainful employment (i.e. the Receptionist position), she had not engaged in other gainful work.  A jury should determine whether McFadden's representations to UNUM and/or Social Security Administration are factually inconsistent or not.[22] *Voeltz v. Arctic Cat, Inc,.* 406 F.3d 1047 (8th Cir. 2005); *Kiely v. Heartland Rehabilitation Services, Inc.,* 359 F.3d 386 (6th Cir. 2004).**

---

[21] 42 U.S.C. § 423(d)(2)(a).
[22] *Voeltz v. Arctic Cat, Inc,.* 406 F.3d 1047 (8th Cir. 2005).

77.    Since 2002, when McFadden's husband became ill, Ballard Spahr provided benefits and assistance to McFadden without legal obligation to do so. (Ex. 34, Defendants' Answers to Interrogatory No. 3).

78.    Ballard Spahr paid McFadden as a full-time employee even though she worked part-time. (Ex. 7, Riley-Jamison Dec. at 2-3).

79.    Ballard Spahr advanced salary to McFadden without requesting or receiving repayment. Ex. 7, Riley-Jamison Dec. at 14).

80.    Following her termination on May 14, 2004, McFadden did not apply for a single position of any type of employment. (Ex. 17, Plaintiffs Third Supplemental Answers to Interrogatories, Ex. 5, McFadden Depo. 5/16/2007 at 49).

81.    Ballard Spahr paid McFadden's disability insurance premiums to UnumProvident from January, 2004, through her termination. (Ex. 7, Riley-Jamison Dec. at 11, Ex. 13, May 20, 2004 Letter from DiBattista).

82.    Ballard Spahr provided McFadden more leave than required under the federal FMLA and the D.C. FMLA. (Ex. 7, Riley-Jamison Dec. at 6-7).

83.    Ballard Spahr allowed McFadden to work partial days that were recorded as full days. (Ex. 7, Riley-Jamison Dec. at 6).

84.    Ballard Spahr obtained a new insurance policy retroactively in order to cover McFadden and provide an accelerated death benefit for her husband's life insurance policy. (Ex. 13, May 20, 2004 Letter from DiBattista).

85.    When McFadden's husband became ill, Ballard Spahr, without charge, provided legal representation. Ballard Spahr represented Mr. McFadden in a dispute over his life insurance coverage when his request for coverage was denied. Due to Ballard Spahr's efforts, Mr. McFadden's life insurance coverage was granted. (Ex. 35, Panagopoulos Dec. at 2, 5).

86.    Ballard Spahr convinced its insurance carrier, UnumProvident, to begin disability

insurance payments to McFadden even though the company initially had denied her claims for

benefits. (Ex. 7, Riley-Jamison Dec. at 13).

87.    Mr. Henck gave McFadden two personal loans without interest, which McFadden

eventually paid. (Ex. 2, Henck Depo. at 49-50)

88.    When McFadden initially left Ballard Spahr on disability leave, she

acknowledged that Ballard Spahr was very tolerant of her even though she could not function to

her full job capacity and missed an excessive amount of work. (Ex. 32, Work Activity Report

submitted by McFadden to SSA on October 23, 2003).

89.    McFadden claims that other employees received better leave and benefits. (Ex. 1,

Complaint at 59).

90.    Without explanation, McFadden lists five legal secretaries (Rhea Maher, Elaine

Wilbur, Judy Mintz, Marti Hall and Kathey Hannah), one floater (Christie Hearn), the

receptionist Betty Anne Hahn, and the systems administrator Janet Craig Kelly as potential

comparators. (Ex. 17, Plaintiffs Third Supplemental Interrogatory Answer, No. 14).

91.    McFadden lists comparators who worked in different position from her.

    a.    Janet Craig Kelly is the systems administrator. She is an exempt employee
       who receives unlimited sick time. She took leave in 1996 and 1999. (Ex.
       6, Craig Depo. at 36-37).

    b.    Christie Hearn was not a legal secretary and did not have the same
       responsibilities as McFadden. She was an hourly employee and did not
       receive benefits. (Ex. 7, Riley-Jamison Dec. at 3).

    c.    Betty Ann Hahn was the receptionist in the Washington D.C. office. She
       had different responsibilities. She received FMLA and non-FMLA leave
       for her medical condition, but she did not receive a modified work
       schedule. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No.
       20).

92.    None of the legal secretaries listed by McFadden had the same supervisor as

McFadden. Secretaries were supervised by the attorneys (Ex. 14, Defendant's Supplemental

Interrogatory Answers, No. 17).

a.    Rhea Maher received intermittent FMLA leave due to illness. As of February 19, 2002 she worked four days a week. She left the firm on December 7, 2002. Maher was docked pay for days she did not work after she ran out of accrued leave. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

b.    Elaine Wilbur received a temporary modified work schedule. She worked 9:30a.m. through 3:30p.m. with no lunch break three days a week. On two days a week she worked 9:00a.m. through 5:30p.m. She maintained full-time hours. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

c.    Judy Mintz received a modified work schedule where she takes a leave of absence from the last week of June through the first week of September. During her leave of absence, she does not receive pay or accrue leave. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

d.    Martha Hall and Kathey Hannah shared a job in 2002. When Ms. Hannah could return to a full-time schedule, Ms. Hall was transferred to the ARC. (Ex. 14, Defendant's Supplemental Interrogatory Answers, No. 17).

**RESPONSE to Nos. 89-92:  The Firm accommodated and retained at least four**

**Caucasian legal secretaries and one other support staff employee in the firm's**

**Washington D.C. office.  They include:**

- **Betty Ann Hahn – granted extended leave benefits in 2004 and granted job retention despite the expiration of her FMLA and non-FMLA leave.[23]**

- **Kathy Hannah – the Firm granted Ms. Hannah a part-time schedule for almost two years following a stroke.  This accommodation allowed her to work her way back up to full-time employment.[24]**

- **Rhea Mahr – the Firm allowed Ms. Mahr to work an adjusted schedule of approximately 4 days a week because she suffered from cancer.[25]**

- **Judy Mintz – the Firm accommodated her request to have 2 weeks off in March and the entire summer to travel, ski and vacation – none of which was medically necessary.[26]**

- **Elaine Wilbur – the Firm permitted Ms. Wilbur to work from home for 4-6 months during two stints of maternity leave.  The Firm also allowed her to**

---

[23] Ex. 1, McFadden Depo. at 191; Ex. 10, Briscoe Decl. ¶ 12.; Ex. 20, Defs. Supplemental Answers to Interrogatory Nos. 17 & 20.

[24] Ex. 1, McFadden Depo. at 307-314; Ex. 10 Briscoe Decl. ¶ 15Ex. 20, Defs. Supplemental Answers to Interrogatory Nos. 17 & 20.

[25] Ex.10, Briscoe Decl. ¶ 12; Ex. 20, Defs. Supplemental Answers to Interrogatory Nos 17 & 20.

[26] Ex. 10, Briscoe Decl. ¶12 Ex. 20, Defs. Supplemental Answers to Interrogatory Nos. 17 & 20.

work a reduced schedule because her son experienced anxiety issues post-9/11.[27]

**Plaintiff disputes any claim that these legal secretaries are not similarly-situated to McFadden. In actuality, there is no meaningful difference between McFadden and these other legal secretaries. Riley-Jamison, the Firm's Human Resources Manager testified that all of the Legal Secretaries were covered by the same Firm policies, they were all required to engage the same procedures for accommodation and leave and the same decision makers (DiBattista and Forman) made the leave determinations.[28] Thus, the fact that the legal secretaries worked for different partners who specialized in different practice areas is of no legal consequence. To establish a proper comparator, a plaintiff need only establish that "the *relevant* aspects of her employment situation" were nearly identical.[29] Here, the "relevant aspects" are their medical conditions, race, applicable firm policies and their disparate treatment in terms of FMLA leave, schedule modification, and job retention. Defendants narrowly and incorrectly interpret the "similarly situated" requirement[30]**

## B. PLAINTIFF'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

The resolution of the following genuine issues of material fact warrant the denial of Defendants' Motion for Summary Judgment:

    A.    Whether either of the Defendants misinformed McFadden about her FMLA leave entitlement and/or leave rights?

    B.    Whether such misinformation was willful?

---

[27] Ex. 1, McFadden Depo. at 319-321; Ex.10 Briscoe Decl. ¶ 13 Ex. 20, Defs. Supplemental Answers to Interrogatory Nos. 17 & 20.
[28] Ex. 9, R-J Depo. at 102-107.
[29] *Neuren v. Adduci, Mastrani, Meeks & Schill*, 43 F.3d 1507, 1512 (D.C. Cir. 1995) (emphasis added).
[30] *Judge v. Marsh*, 649 F.Supp. 770 (D.D.C. 1986).

C.     When Ballard Spahr and Ms. Riley-Jamison knew or should have known of the DCFMLA's 16-week unpaid leave entitlement to persons with serious health conditions?

D.     Whether Margaret Riley-Jamison engaged in any or all of the activities, which McFadden claimed were harassment due to her use of leave to care for her husband?

E.     Whether Ms. Riley-Jamison's conduct toward Ms. McFadden while working a modified schedule due to her husband's condition amounted to unlawful harassment and/or coercion that interfered with McFadden's use of FMLA leave?

F.     Whether Ms. Riley-Jamison had authority and/or control to affect employee leave, schedule, reassignment, and/or termination?

G.     Whether McFadden made inconsistent statements about her condition and ability to work to UNUM and/or Social Security Administration?

H.     Whether Ballard Spahr failed to offer McFadden a reasonable accommodation?

I.     Whether McFadden requested a reasonable accommodation?

J.     Whether McFadden requested reassignment to the Receptionist position?

K.     Whether there were any vacant positions for which McFadden qualified to she could have been reassigned?

L.     Whether the word processing position was a reasonable accommodation?

M.     Whether the Defendants offered McFadden an intermittent position in lieu of termination as a reasonable accommodation?

N.     Whether McFadden could have performed the essential functions of the

Receptionist position?

O.    Whether Defendant's failure to provide McFadden an accommodation was due to her disability?

P.    Whether Defendant's failure to provide McFadden an accommodation was due to her race?

Q.    Whether Defendant's failure to provide McFadden an accommodation was due to her prior protected activity?

R.    Whether Defendant's termination of  McFadden was due to her disability?

S.    Whether Defendant's termination of  McFadden was due to her race?

T.    Whether Defendant's termination of  McFadden was due to her prior protected activity?

Respectfully submitted,

Dated: October 9, 2007                    By**:_____/s/_____**
                                                          Teresa W. Murray

THE LAW OFFICES OF T.W. MURRAY
7474 Greenway Center Drive
Suite 820
Greenbelt, Maryland 20770
Phone: 301-982-2005
Fax: 301-982-0004