McFadden

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - X

VANESSA A. McFADDEN,
            Plaintiff,

        -vs-
                                    Civil Action No.
                                        1:05CV02401

BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
AND
MARGARET RILEY-JAMISON,
            Defendants.

- - - - - - - - - - - - - X

                            Alexandria, Virginia

                            Wednesday, May 16, 2007

Deposition of:

            VANESSA A. McFADDEN

the plaintiff, called for examination by

counsel on behalf of the defendants,

pursuant to notice, taken in the law offices

of DiMURO GINSBERG, P.C. 908 King Street,

Suite 200, Alexandria, Virginia, beginning

at approximately 10:27 o'clock a.m., before

Patricia D. Staffa, a Verbatim Reporter and

Notary Public in and for the Commonwealth of

Virginia at Large, when there were present

on behalf of the respective parties:

Page 2

On Behalf of the Plaintiff:

TERESA W. MURRAY, ESQUIRE

THE LAW OFFICE OF TERESA W. MURRAY

1025 Connecticut Avenue, N.W.

Suite 1000

Washington, D.C. 20036

(202) 327-5477

On Behalf of the Defendants:

BERNARD J. DiMURO, ESQUIRE

JONATHAN R. MOOK, ESQUIRE

JENNIFER S. KESSLER, ESQUIRE

DiMURO GINSBERG, P.C.

908 King Street

Suite 200

Alexandria, Virginia 22314

(703) 684-4333

Also Present:

Meg Riley-Jamison

Constantinos G. Panagopoulos

Page 3

1              CONTENTS
2    WITNESS                         PAGE
3    Vanessa A. McFadden
4       Examination by Mr. DiMuro          4
5
6              EXHIBITS
7    (Exhibits 1 through 72 were pre-marked for
8    identification. See exhibit list to be
9    provided by Mr. DiMuro's office.)
10                      PAGE
11   Deposition Exhibit No. 73         113
12   Deposition Exhibit No. 74         138
13   Deposition Exhibit No. 75         142
14   Deposition Exhibit No. 76         145
15   Deposition Exhibit No. 77         316
16
17
18
19
20
21
22

Page 4

1        P R O C E E D I N G S
2    Whereupon,
3             VANESSA A. McFADDEN
4    the plaintiff, was called for examination by
5    counsel on behalf of the defendants, and,
6    having been duly sworn by the notary public,
7    was examined and testified as follows:
8        EXAMINATION ON BEHALF OF THE
9    DEFENDANTS
10       BY MR. DiMURO:
11       Q    Would you be kind enough to state
12   your full name.
13       A    Vanessa Adams McFadden.
14       Q    And, Ms. McFadden, you're giving a
15   deposition today in a lawsuit filed by you.
16   Do you understand that?
17       A    Yes.
18       Q    Have you ever given a deposition
19   before?
20       A    No.
21       Q    Because you worked in a law firm for
22   many years, did you ever read a deposition

Page 5

1    or parts of one? Do you recall doing that?
2        A    No. I know what a deposition is,
3    but I never participated in one.
4        MR. DiMURO: Okay. So, I'm going to
5    ask some questions, and I'd appreciate your
6    full and fair answers including "I don't
7    know" or "I don't recall."
8        If I ask something that's not clear
9    to you, it's perhaps because I didn't live
10   these events or I'm misreading some record,
11   and all you have to do is ask me to clarify.
12       BY MR. DiMURO:
13       Q    Are you on any medication today that
14   you believe might affect your memory?
15       A    Yes.
16       Q    And what medication is that?
17       THE WITNESS: (To Ms. Murray) Would
18   you hand me my purse? I want to make sure
19   I'm telling him the right ones.
20       I take Vicodin every six hours.
21       BY MR. DiMURO:
22       Q    And what is that? What is that for?

Page 6

1      A    For pain.
2      Q    For pain; all right.
3      A    I take ibuprofen. It's the other
4   bigger bottle.
5          MS. MURRAY: Just the ones that you
6   think affect your memory, though.
7          THE WITNESS: And that's also for
8   pain, but I take them like an hour after I
9   take the Vicodin.
10         MR. DiMURO: All right.
11         THE WITNESS: I take Effexor, which
12  is an anti-depressant. I take Zoloft, 100
13  milligrams twice a day. I take Xanax, two
14  milligrams three times a day.
15         MR. DiMURO: All three of those
16  sound like anti-depressants to me.
17         THE WITNESS: Yes. And the
18  ibuprofen. Did I say that?
19         MR. DiMURO: You did.
20         All right. I'm going to ask her
21  about other medications in a moment.
22         MS. MURRAY: Okay.

Page 7

1
2          BY MR. DiMURO:
3      Q    Do you think those five have some
4   effect on your ability to remember things?
5      A    I'm not as swift as I used to be.
6      Q    As what?
7      A    I'm not as swift as I used to be.
8      Q    Okay.
9      A    And if you could talk a little
10  louder.
11     Q    Okay. That is a criticism I've
12  never heard. My voice usually projects.
13  Okay.
14     A    Because I only have six percent of
15  my hearing in this ear, so --
16     Q    Okay. I'll be happy to speak up.
17     A    Yes. Speak a little louder.
18     Q    Well, describe for me what effect on
19  your memory you believe the medication has
20  as best as you can describe it.
21     A    Basically, it's anti-depressants for
22  depression because of my pain level.

Page 8

1      Q    But how would you describe the
2   effect the medication has on your ability to
3   remember things?
4      A    Oh. It makes my droggy (sic). I
5   don't do my own finances anymore. My
6   daughter does them.
7          Anything done with any business or
8   anything like that in my personal life, my
9   daughter, who is my caregiver, she takes
10  care of all of that. I don't take care of
11  anything anymore.
12     Q    Well, let me ask it this way.
13         Do you recall things -- Strike that.
14         Do you find that you have difficulty
15  remembering things from five years ago,
16  let's say, 2002, 2003, 2004?
17     A    No. I mean, if you ask me a
18  question and if I can't comprehend it, then
19  I'm going to ask you to repeat the question.
20     Q    Well, "comprehend" is different than
21  "remembering."
22     A    I mean, you know, if you're talking

Page 9

1   about as far as events of what happened at
2   the time I was an employee at Ballard --
3      Q    Well, in part, yes.
4      A    -- I'm very familiar with that.
5      Q    All right.
6      A    Because I've lived through that.
7      Q    Have you read anything in the last
8   few days to remind yourself of the events so
9   that you could prepare for the deposition?
10     A    For today, yes, with my attorney
11  yesterday.
12     Q    And what did you review? I don't
13  want to know what she said to you, but what
14  documents did you review?
15     A    Interrogatories and the documents
16  that I submitted through discovery.
17     Q    Did you see anything that was a
18  summary or a chronology of the events?
19     A    I don't understand what you're
20  saying.
21     Q    Sure.
22         Did you see any document in the last

Page 10

1 day or so that somebody else wrote, not you,
2 that attempted to summarize the events or to
3 put them in order?
4    A   No.
5    Q   Well, as we proceed today, if you
6 would be kind enough to make clear when you
7 do not remember something, because that is
8 an unacceptable answer or "I don't know" or
9 "I don't recall"; all right?
10   A   Yes.
11   Q   Now, where do you presently live?
12   A   I presently reside in Jacksonville,
13 Florida.
14   Q   And who lives in that -- Is it a
15 house or an apartment, or what is it?
16   A   It's a home.
17   Q   And who lives in the home with you?
18   A   My husband and my daughter.
19   Q   And what is her name?
20   A   Nicole McFadden.
21   Q   Anyone else?
22   A   I have a cat.

Page 11

1    Q   Okay.  Anyone else?
2    A   That's it.
3    Q   And I thought I saw in the paperwork
4 that your son was living with you at some
5 point in time, but he doesn't currently live
6 with you?
7    A   No.  I have a house in Southeast
8 Washington.  My son and my other daughter
9 stay in that home.
10   Q   When did you move to Florida
11 approximately?
12   A   Around the middle of March, 2005.
13   Q   Why did you move to Florida?
14   A   For health reasons.
15   Q   What was it about Florida that made
16 it better for your health?
17   A   Most of the illnesses that I have
18 are chronic illnesses, so my doctor gave me
19 a choice.  I could either live in Florida or
20 Arizona.
21   Q   I'm guessing that it was the heat
22 that he found beneficial for you?

Page 12

1    A   That would probably help me.
2    Q   And which doctor was that?
3    A   Dr. Phillip Mussenden.
4    Q   He had been your primary caregiver
5 for 20 years or so.  Is that a fair
6 statement?
7    A   I saw him for a long period of time;
8 yes.
9    Q   Where did you live before you moved
10 to Florida?
11   A   Washington, D.C.
12   Q   And what address did you live at
13 just before you moved to Florida?
14   A   Could you repeat that?
15   Q   Sure.
16       Immediately prior to moving to
17 Florida, what address did you live at?
18   A   3457 Massachusetts Avenue,
19 Southeast.
20   Q   Was that a free-standing home or an
21 apartment or a townhouse?  What was it?
22   A   It was a single-family home.

Page 13

1    Q   And how long had you lived there?
2    A   As of August the 15th, it's been our
3 home for eleven years.
4    Q   August the 15th of what year?
5    A   Let's see.  This is 2007.  Take away
6 four from 2000 --
7    Q   Oh, I see.
8    A   -- so I moved into the home in 1996.
9    Q   So, the Massachusetts Avenue
10 residence was your home from some point in
11 1996 until you moved to Florida in March of
12 '05; is that right?
13   A   No.  It was exactly my home, because
14 I moved on my birthday.  August the 15th is
15 the exact date that I moved into the
16 property.
17   Q   I see; okay.
18   A   So, it was on my birthday.
19   Q   So, the Massachusetts Avenue
20 residence was your home from August 15th,
21 1996 until you moved to Florida in March of
22 '05; is that right?

Page 14

1      A   Yes.
2      Q   In the years 2002, 2003, and 2004,
3   who lived with you at the Massachusetts
4   Avenue home?
5          Now, I've grouped the number of
6   years. If it's easier, because the people
7   have changed, for you to break it out year
8   by year, that's fine, too. But I'm
9   interested in those three years.
10     A   I need you to explain it different.
11     Q   Sure.
12         Who lived with you at the
13   Massachusetts Avenue address in 2002?
14     A   At the time, my daughters were in
15   college. My son was in grad school. So, it
16   was my husband and I.
17     Q   And I'm sure the children visited on
18   occasion.
19     A   Holidays.
20     Q   In 2003, who lived with you at the
21   Massachusetts Avenue address?
22     A   It was my husband and I, and my kids

Page 15

1   were still in school.
2      Q   And then in 2004, who lived with you
3   at any time at the Massachusetts Avenue
4   address?
5      A   In December -- Around about in
6   December of 2004, both of my daughters moved
7   back into the home to become my caregivers.
8      Q   That didn't happen until December of
9   '04? Is that your memory?
10     A   As far as when they moved back for
11   good.
12     Q   Do you recall that you applied for
13   long-term disability through the Ballard
14   Spahr program in some year?
15     A   From my understanding, the way that
16   it worked was my disability was paid through
17   the firm for the first 90 days.
18         And from what I can recall -- I
19   don't know the exact dates -- all of my
20   paperwork that was turned into the
21   disability company was submitted late.
22     Q   The question was do you recall that

Page 16

1   you applied for long-term disability at some
2   point while you worked at Ballard Spahr?
3          THE WITNESS:  (To Ms. Murray) I
4   don't understand what he's asking me.
5          MS. MURRAY:  Would you please
6   rephrase it.
7
8          BY MR. DiMURO:
9      Q   Let me try again, Ms. McFadden.
10         Do you recall that there came a time
11   when you applied for long-term disability,
12   that you submitted a form for long term
13   disability?
14     A   Oh, okay. I submitted my paperwork
15   in October of 2003. Around the middle of
16   October 2003.
17     Q   And what was that paperwork that you
18   submitted? What was that for as you recall?
19     A   It was for short-term/long-term
20   disability, but it was also combined with a
21   document dealing with FMLA.
22     Q   Do you have a memory that at some

Page 17

1   point later on you applied for long-term
2   disability, that you submitted some
3   paperwork for long-term disability?
4      A   Ms. Forman took care of that.
5      Q   Well, do you recall being part of
6   that where you would sign the paperwork?
7      A   I still don't understand what you're
8   saying.
9      Q   Do you recall that there came a time
10   after you had applied for short-term
11   disability that you filled out or signed
12   other paperwork for long-term disability?
13     A   Well, on that, it's confusing to me
14   because of the way my paperwork was
15   processed, so I can't really give you an
16   accurate, accurate statement.
17     Q   But don't you have a memory of
18   asking --
19     A   Oh, no. I know the paperwork was
20   done.
21     Q   All right.
22     A   I know that the guy from Unum called

Page 18

1 me and did a phone interview.
2    Q   Okay. That's what I'm asking you
3 about.
4      Do you have a memory of --
5    A   Yes. Okay. He called me on
6 February the 13th.
7    Q   Okay. Hold on.
8      Do you have a memory of signing the
9 paperwork for long-term disability through
10 the Unum Insurance program?
11    A   I'm not certain because it was
12 complicated. So -- Because it was like from
13 the letter that I received from the person
14 at the benefits department, Fern Forman, she
15 didn't send me. She sent paperwork like
16 letters, one to my doctor, one to myself.
17      My short-term disability had ran out
18 the first pay in January. She didn't send
19 the paperwork out until almost the end of
20 January; okay?
21    Q   The paperwork for what?
22    A   For long-term disability.

Page 19

1    Q   Okay.
2    A   It was like just a letter that she
3 thought it was time that, you know, for me
4 to be placed on long-term disability.
5    Q   Did you disagree with the decision
6 to apply for long-term disability in January
7 of '04?
8    A   No. But what was confusing to me
9 was that Ms. Riley-Jamison called me
10 sometime in March and she told me that my
11 disability was approved.
12      I'm not exactly sure which day in
13 March, but she called me back that afternoon
14 and said, oh, I'm sorry, I made a mistake,
15 your disability has not been approved.
16    Q   And, as you later found out, she was
17 correct, that it had not been approved;
18 right?
19    A   I was only going by what she told
20 me.
21    Q   Okay. Let's back up.
22    A   So, maybe you need to rephrase it or

Page 20

1 we need to back up.
2    Q   Okay. But you need -- Ms. McFadden,
3 it would be helpful if you stayed with my
4 question and not talk about things that have
5 nothing to do with my question.
6    A   Okay.
7    Q   My question is, do you recall
8 applying for long-term disability in January
9 of '04?
10      MS. MURRAY: I believe she has
11 answered that.
12      BY MR. DiMURO:
13    Q   Well, I would like a direct answer
14 to that question, please.
15    A   What do you mean by "a direct
16 answer"?
17    Q   Yes or no.
18    A   I mean, the firm put me in for long-
19 term disability.
20    Q   Do you recall applying for long-term
21 disability in January of '04?
22      MS. MURRAY: Asked and answered.

Page 21

1      THE WITNESS: That's been answered?
2      MS. MURRAY: Just answer again.
3      THE WITNESS: Like I said, my
4 paperwork was put in by the firm.
5      BY MR. DiMURO:
6    Q   In January of '04?
7    A   I don't know exactly. All I know is
8 the letter that I received from Ms. Forman
9 was dated sometime around January the 26th,
10 somewhere in there.
11      And from my recollection, the letter
12 said something about -- and it went to my
13 doctor -- that we need to do this in a
14 manner as quickly as possible because her
15 paperwork is late or something to that
16 effect.
17      So, you're asking me, did I apply
18 for it myself. That wasn't my job to apply
19 for it. It was the firm's job to put me on
20 long-term disability. So, I don't know what
21 else you want me to tell you about my long-
22 term disability.

Page 22

1    Q    Did you want long-term disability in
2  January of '04?
3    A    Well, basically, that was the
4  practice of Ballard Spahr as a firm
5  regarding with their employee handbook.
6    Q    Did you agree with the submission of
7  an application for long-term disability in
8  January of '04?
9    A    The only thing that I can remember
10  is that I was sent the form and I was told
11  not to fill out any part dealing with Social
12  Security disability. That's the only form
13  that I remember.
14    MR. DiMURO: Okay. I move to strike
15  that answer.
16    BY MR. DiMURO:
17    Q    Did you agree with the effort to
18  submit an application for you for long-term
19  disability in January of '04?
20    THE WITNESS: I don't understand
21  what he's -- what answer he's --
22    MS. MURRAY: Just tell him what you

Page 23

1  don't understand.
2    THE WITNESS: No, I don't understand
3  it.
4    MR. DiMURO: Could you re-read the
5  question, please.
6    (Whereupon, the court reported read
7  back the record.)
8    THE WITNESS: From what I can
9  recall, I've received a sheet of paper for,
10  I guess, long-term disability, and Ms.
11  Forman told me not to fill out the part
12  dealing with Social Security disability, and
13  it was a one-page document. That's what I
14  recall.
15    MR. DiMURO: Okay. I move to strike
16  that answer as non-responsive.
17    BY MR. DiMURO:
18    Q    Did you sign any paperwork in
19  January of '04 to submit an application for
20  long-term disability?
21    A    Yes. That one sheet of paper that
22  she sent me.

Page 24

1    Q    Did you agree in January of '04 that
2  you met the criteria for long-term
3  disability?
4    A    Well, as far as I was concerned, at
5  that time I could have done another job at
6  the firm, but I wasn't offered any type of
7  other job at the firm.
8    Q    What do you recall being the
9  criteria for applying for long-term
10  disability in January of 2004?
11    A    All I recall is that my paperwork,
12  everything was submitted late. I filled out
13  one sheet of paper that Ms. Fern Forman sent
14  me. In February, I had a telephone
15  interview with, I think his last name was
16  Spellman, at Unum.
17    MR. DiMURO: I move to strike that
18  answer as non-responsive, and I will seek
19  attorney's fees and costs for the delay in
20  this deposition.
21    BY MR. DiMURO:
22    Q    Do you recall the criteria for

Page 25

1  applying for long-term disability insurance
2  in January of 2004? What requirements were
3  there for you to get long-term disability?
4    A    As I said, Ms. Forman mailed me a
5  letter saying that it was time to put me on
6  long-term disability because, under firm
7  policy, the short-term disability had ran
8  out. That was Ballard's procedure.
9    MR. DiMURO: I move to strike that
10  answer as non-responsive and seek attorney's
11  fees.
12    BY MR. DiMURO:
13    Q    Do you recall what standards or
14  criteria are applied in determining whether
15  or not you were eligible for long term
16  disability in January of '04 when you
17  applied?
18    MS. MURRAY: I'd like to state an
19  objection and to respond. I've never heard
20  of a motion to strike in a deposition, but,
21  in any event, I think the problem here is
22  that she is not understanding -- the witness

McFadden

Page 26

1  is not understanding what you're asking her
2  rather than any effort on her part to be
3  non-responsive.
4      And so I would just respond that
5  it's not the witness' effort to be non-
6  responsive. I think it's the clarity in the
7  question, at least in the witness' mind.
8      BY MR. DiMURO:
9      Q   Go ahead. Do you have any other
10 answer to that question?
11     A   No.
12     Q   Now, did you tell, in January of
13 2004, anyone at Ballard Spahr that you did
14 not want to apply for long-term disability?
15     A   Could you rephrase that?
16     Q   In January of 2004, did you tell
17 anyone at Ballard Spahr that you did not
18 want to apply for long-term disability?
19     A   From what I can recall from what Ms.
20 Forman and Ms. Riley told me, that was the
21 next step.
22     MR. DiMURO: I move to strike that

Page 27

1  as non-responsive, and I will seek
2  attorney's fees.
3      BY MR. DiMURO:
4      Q   Did you tell anybody at Ballard
5  Spahr in or about January of 2004 that you
6  did not want to apply for long-term
7  disability?
8      A   Are you asking me did I tell them,
9  no, don't submit the paperwork?
10     Q   That's a fine question. Yes.
11     A   No.
12     Q   Did you tell anybody at Ballard
13 Spahr that you did not want the insurance
14 company to consider you for long-term
15 disability in or about January of '04?
16     A   No.
17     Q   In or about January of 2004, did you
18 ask anybody at Ballard Spahr to consider you
19 for coming back to work?
20     A   From what I can recall from the
21 letter that I had received, which was
22 confusing to me, I received a letter in

Page 28

1  March, and Mr. Henck called me the day
2  before.
3      He said, you're going to receive a
4  letter, but it contains a bunch of legal
5  mumbo-jumbo, nothing to worry about. And
6  the letter basically stated that I didn't
7  have any more job protection as of February
8  the 9th.
9      My question to Mr. Henck was, well,
10 why did it take until February the 12th to
11 tell me that?
12     MR. DiMURO: I move to strike as
13 non-responsive, and I'll seek attorney's
14 fees.
15     BY MR. DiMURO:
16     Q   Did you, on or about January of 2004
17 when your application for long-term
18 disability was being submitted, ask anybody
19 at Ballard Spahr to consider you for another
20 position or consider you to come back to
21 work?
22     A   From what I was told, that if I got

Page 29

1  better, that I will always have a job with
2  Ballard.
3      MR. DiMURO: Move to strike, non-
4  responsive, and I'll ask for attorney's
5  fees.
6      BY MR. DiMURO:
7      Q   Did you, in or about -- Listen to my
8  question very carefully.
9      A   I'm listening, sir.
10     Q   Did you, in or about January of
11 2004, ask anybody at Ballard Spahr to
12 consider letting you come back to work?
13     THE WITNESS: (To Ms. Murray) I
14 don't understand what he's asking me.
15     BY MR. DiMURO:
16     Q   Did you, in January of 2004, at
17 about the -- Strike that.
18     Did you, in or about January of 2004
19 when your application for long term
20 disability was being submitted, ask anybody
21 at Ballard Spahr to consider letting you
22 come back to work? Did you ask anybody

Page 30

1    that?
2       A    No.
3       Q    You've mentioned a couple of times
4    that you believe that the paperwork for
5    long-term disability was submitted late.  Is
6    that your position?
7       A    Yes.
8       Q    And you recall the paperwork being
9    submitted in or about the second or third
10   week of January of '04; is that correct?
11      A    The letter that went to my doctor
12   from Ms. Forman and the letter that came to
13   me from Ms. Forman was dated around the end
14   of January.  I don't recall the exact date.
15      Q    All right.
16      A    She was saying this had to be taken
17   care of because, as of January the 14th, my
18   short-term disability didn't exist anymore.
19         So, basically, I'm assuming, from
20   the letter that she sent me saying the
21   urgency of my doctor to do this, she
22   submitted the paperwork late.

Page 31

1       Q    I don't quite understand why you
2    think the paperwork was submitted late.
3       A    Well, I was out of income.  I didn't
4    receive an income from Ballard.
5       Q    When would you have had her submit
6    the paperwork for long-term disability?
7       A    I would assume, as her being the
8    benefits administrator for as many years as
9    she was, I would feel that she would have
10   did everything in a timely manner.
11      Q    But when do you believe she should
12   have submitted the paperwork for long-term
13   disability?
14      A    I don't know.  That's wasn't -- I
15   mean, it wasn't my job to submit it if
16   that's what you're asking me.
17      Q    No, that wasn't what I was asking
18   you.
19      A    Are you asking me when I believe she
20   should have done it?
21      Q    Yes, ma'am.
22      A    I don't know what Ms. Forman was --

Page 32

1    I don't know what she was thinking, so I
2    can't --
3       Q    Well --
4       A    You want me to -- Correct me if I'm
5    wrong.  You want me to answer a question of
6    what another individual was thinking.
7         MR. DiMURO:  No.  I move to strike
8    as non-responsive, and I will again seek
9    attorney's fees.
10        BY MR. DiMURO:
11      Q    The question is, when do you contend
12   Ms. Riley-Jamison or anyone at Ballard Spahr
13   should have submitted the long-term
14   disability paperwork?
15      A    When it should have been submitted?
16      Q    Yes, ma'am.
17      A    Before my short-term disability ran
18   out.
19      Q    And is there any -- Do you have a
20   precise date that you believe the paperwork
21   should have been submitted?
22      A    No.  I just went by what I saw in

Page 33

1    the employees handbook.
2       Q    What does it say in the employees
3    handbook about submitting long-term
4    disability, the date it should be done?
5       A    It doesn't say a date.  It says it's
6    the next step from short-term disability.
7       Q    Do you agree that someone who is on
8    short-term disability might not go on to
9    long-term disability, depending on what
10   their doctors say?
11      A    Well, from what I can recall, the
12   paperwork that I submitted to Ms. Forman,
13   they already knew that I would be out for
14   nine months or more because of my illness.
15      Q    And did you ultimately get rejected
16   for long-term disability by Unum?
17      A    Yes.
18      Q    And there was a delay by Unum in
19   making a decision on the long-term
20   disability; is that correct?
21      A    Yes, there was a delay.  Yes.
22      Q    And there was a period of time

Page 34

1 between late January '04 -- Strike that.
2      Do you recall that the first
3 decision to deny you long-term disability by
4 Unum was about May 11th, 2004?
5      A    I know it was sometime in May, but I
6 don't recall the exact date.
7      Q    Do you recall between the time the
8 application for long-term disability was
9 submitted and the time that Unum first
10 rejected the application, that there were
11 discussions about getting medical records
12 from your doctors to Unum?
13      MS. MURRAY: Let me just state an
14 objection. The plaintiff says she didn't
15 know when the application was submitted, so
16 how can she define the time period?
17      MR. DiMURO: She said January, late
18 January.
19      MS. MURRAY: She did not.
20      THE WITNESS: No, I did not.
21      MR. DiMURO: Okay. You say you saw
22 a form dated late January. I'll back up.

Page 35

1 Let's fix it.
2      BY MR. DiMURO:
3      Q    When do believe the application --
4      THE WITNESS: Excuse me. I need to
5 take one of my medications.
6      MR. DiMURO: Certainly.
7      THE WITNESS: Let's take maybe a
8 five-minute break or something.
9      MS. MURRAY: Is that okay?
10      MR. DiMURO: Of course. Absolutely.
11      In fact, while we're on the record,
12 I meant to mention before that I'm awate
13 that you have a number of medical
14 conditions, and if at any time you need a
15 break, you need to do what you just did;
16 okay?
17      THE WITNESS: Okay. All right.
18 Thank you.
19      (Whereupon, a brief recess was
20 taken.)
21      MS. MURRAY: If I may, Mr. DiMuro,
22 just make a comment on the record.

Page 36

1      I consulted with my client because
2 of the difficulty that has been experienced
3 with answering and asking questions.
4      I think it may help the witness --
5 and you conduct the deposition in the manner
6 that you choose -- if questions were posed
7 without sub-parts. She has identified that
8 as sort of the difficulty that she's having
9 with understanding what you're asking her.
10      So, to the extent that it's a
11 compound question, you may have difficulty
12 getting an answer. To the extent it has
13 sub-parts, it may be a little difficult. I
14 just wanted to state that on the record.
15      MR. DiMURO: Okay.
16      BY MR. DiMURO:
17      Q    Do you agree with that, Ms.
18 McFadden?
19      A    Yes.
20      Q    What is it about sub-part questions
21 or questions that have two parts to them
22 that cause you a problem, do you think?

Page 37

1      A    It's like you're asking me a
2 question in a question.
3      Q    Do you think there was a point in
4 the past that you could comfortably answer a
5 question that had two parts to it?
6      A    At this particular time in my life,
7 no.
8      Q    Listen to my question.
9      Do you believe that there was a
10 point in time before -- Strike that. I'll
11 start over again.
12      A    Okay.
13      Q    Do you think that there was a time
14 in your life before today that you felt
15 comfortable answering questions with two or
16 three parts to them?
17      A    I mean, like I explained to Ms.
18 Murray, I feel like you're asking me more
19 than one question at one time, but you want
20 me to give you one answer to cover all the
21 sub-parts of the question.
22      Q    Well, I don't think I've tried to do

Page 38

1  that, but what I'm asking you is, do you
2  believe you have difficulty answering
3  questions with more than one part in them?
4  Is that true?
5      A    To the extent of as to as far as the
6  way that you're asking me, I feel like
7  you're asking me to answer for others, which
8  I can't do.
9      Q    What has that got to do with
10  questions with more than one part?
11      A    No.  I'm just saying, for instance,
12  you asked me the question about long-term
13  disability; okay?  From what I read in the
14  employees handbook, that was my right, as
15  being an employee of Ballard Spahr for 15
16  years, that it was automatic I went from
17  short-term to long term.
18      So, for you to tell me to pinpoint a
19  date on how Ms. Forman did her job, I can't
20  answer that.
21      Q    Do you think you have problems
22  answering questions that have two parts to

Page 39

1  them?  That's just what your lawyer just
2  said, so I'm --
3      A    No.  What I'm saying is it's just
4  the way that you're asking me the questions.
5      Q    And how would you describe that way?
6      A    I'm just saying, you know, if you're
7  going to ask me something, ask me one
8  question at a time.
9      Q    So, you have difficulty --
10      A    And I will do the best -- No, it's
11  not that.  It's just that I feel that some
12  of the questions, sir, that you're asking
13  me, you're asking me to speak for someone
14  else.  I can't do that.
15      Q    Okay.  I'm just --
16      A    Does that make any sense?
17      Q    No, ma'am.  Absolutely not.
18      A    Okay.
19      Q    Do you have a problem answering, as
20  your lawyer just said, questions that have
21  more than one part to them?
22      A    Yes.

Page 40

1      Q    Is that because you think you have
2  some difficulty understanding those
3  questions because of medication or your
4  medical condition or something?
5      A    I take 20 medications a day.
6      Q    All right.  That's what I'm --
7      A    So, therefore, you know, it's like
8  I'm trying to really concentrate on what
9  you're saying.
10      Q    Right.  So, you believe the
11  medication has some adverse affect on your
12  ability to understand questions?
13      A    Not to some point, no.  All I'm
14  saying is that I feel that you're asking me
15  two or three questions in one question.
16      And I don't know if this is how a
17  deposition goes or not.  I've never done one
18  before.  So, do I have the right to tell you
19  when I don't understand?
20      Q    I'm going to show you Exhibit 51 --
21      A    You didn't answer my question.
22      MS. MURRAY:  Yes, you can.  I'll

Page 41

1  answer it.  Go ahead.
2      THE WITNESS:  Okay.  Thanks.
3      BY MR. DiMURO:
4      Q    Exhibit 51, is that your signature
5  on the bottom of the front page?
6      A    Yes.
7      Q    What is this document?
8      A    Income Protection Claim.
9      Q    Right.  But what was its purpose?
10  What did you understand its purpose to be
11  when you signed it?
12      A    To apply for long-term disability.
13  This is what they sent me.
14      Q    And did you sign it on January 27th,
15  2004?
16      A    Yes.
17      Q    Is that your handwriting on the
18  first page wherever handwriting exists?
19      A    Yes.  But the  - Some of it is not.
20  This is not my handwriting (indicating).
21  That is not my handwriting (indicating).
22      Q    All right.  Let's do them one at a

Page 42

1  time.
2      A    Okay.
3      Q    The "no" written in Section 2 is not
4  your handwriting?
5      A    No, it's not.
6      Q    And where else is it not your
7  handwriting on Page 1 of Exhibit 51?
8      A    Where it is for any accidental --
9      Q    Section 4?
10      A    Yes, sir. Section 4, "Sickness,"
11  that's not my handwriting.
12      Q    You're saying the X in the box
13  marked "Sickness" is not your handwriting?
14      A    No. I put the X there.
15      Q    Okay. You're talking about the
16  "N/A"?
17      A    Yes. That is not my handwriting.
18      Q    Anything else on this page that is
19  not your handwriting?
20      A    Now, on Number 8, from what I can
21  recall, I don't recall checking
22  automatically depositing to your bank

Page 43

1  account.
2      Q    All right.
3      A    And where my signature is, that X in
4  front of that, I don't know where that came
5  from. I didn't put it there.
6      Q    Anything else on this page that is
7  not your handwriting?
8      A    From as far as I can see and
9  remember, everything else on the page is my
10  handwriting.
11      Q    And did you write the words, about
12  in the middle of the page, that describe the
13  types of things you suffer from, severe
14  muscular and joint pain, shortness of
15  breath, lack of concentration, and severe
16  depression?
17      A    Yes.
18      Q    And if you'll look at the second
19  page, please. This is a form dated February
20  3rd, '04 signed by Dr. Mussenden at the
21  bottom?
22      A    Mussenden; yes.

Page 44

1      Q    Did you see this form back in late
2  January, early February of 2004?
3      A    Yes.
4      Q    And when you saw the form, had it
5  been filled out by whoever filled it out and
6  then signed by Dr. Mussenden?
7      A    Dr. Mussenden filled it out himself.
8      Q    How do you know that?
9      A    I was there when he did it.
10      Q    So, you asked him to fill out the
11  form as part of the application for long-
12  term disability?
13      A    Yes.
14      Q    All right.
15      A    Because that's what they told me to
16  do. That's what I was instructed to do.
17      Q    And then what happened to the form?
18  Did you take it from Dr. Mussenden's office,
19  or did he send it to somebody? What
20  happened to the form that he signed?
21      A    I think he -- From what I can
22  recall, I think what he did was he faxed it

Page 45

1  to Mr. Spellman, and it was also mailed to
2  Mr. Robert Spellman.
3      Q    And Mr. Spellman is somebody who
4  works for Unum; is that right?
5      A    Yes.
6      Q    And for the next several months, Mr.
7  Spellman, as far as you knew, was the
8  primary person at Unum working on your
9  application?
10      A    I --
11      Q    I'll rephrase it.
12      A    Please do.
13      Q    For the next several months after
14  February 3, 2004, your primary contact at
15  Unum was Mr. Spellman; is that correct?
16      A    Robert Spellman; yes.
17      Q    Did you keep a copy of this form
18  after Dr. Mussenden filled it out and signed
19  it out in your presence?
20      A    Yes.
21      Q    So, you saw at that time that, under
22  Paragraph 3, he checked the box indicating

Page 46

1  that you are not released to work in your
2  occupation or in any occupation?
3      A   Yes.
4      Q   Did you tell him that that was not
5  true, that you could not work in some position?
6      A   What I -- Well, as far as what I
7  told my doctor, I think, is confidential and
8  privileged; correct? I mean -- But, like I
9  explained to him, he said, well, I mean,
10  what is it that you could have done at work?

12      I said I could have done a
13  receptionist job. He said, so, why weren't
14  you given a position since you have been at
15  this firm for so long?
16      I said, I was told by Ms. Riley on a
17  conference call with Ms. Fern Forman and
18  John DiBattista, when I asked about the
19  receptionist job, they told me that job was
20  Ms. Hahn's job. Betty Hahn. That was the
21  receptionist.
22      Q   What you just said, was that a

Page 47

1  discussion that you had with Dr. Mussenden?
2      A   No. With my doctor because I told
3  him --
4      Q   Wait.
5      A   No. This is a discussion I had with
6  my doctor. He asked me, well, so --
7  Basically, he was asking me if there was
8  another job that they could accommodate you
9  with with your illnesses.
10      Q   Are you done?
11      A   Uh-huh.
12      Q   What you just described in that
13  answer and the answer right before it is a
14  discussion you say you had with Dr.
15  Mussenden?
16      A   Dr. Mussenden. He's my primary care
17  doctor.
18      Q   Is that a yes or a no? What you
19  just said in the last two answers about Dr.
20  Mussenden asking you about whether there was
21  a job you could do, that was a discussion
22  that you had with Dr. Mussenden in February

Page 48

1  of '04; is that right?
2      A   Yes.
3      Q   And why would Dr. Mussenden write
4  down that you could not work in any
5  occupation if you told him that you could do
6  a receptionist job?
7          MS. MURRAY: Objection. Calls for
8  speculation.
9          BY MR. DiMURO:
10      Q   Do you have any idea why Dr.
11  Mussenden would make a misrepresentation on
12  this form?
13      A   I don't feel that he did.
14      Q   Well, if you could do a receptionist
15  job, as you claim, in February of '04, why
16  didn't you tell him that checking the box
17  that you could not work in any occupation
18  was wrong?
19      A   Well, I couldn't see myself applying
20  to another firm in my condition for any type
21  of job.
22      Q   Well, you didn't apply to any other

Page 49

1  firm in 2004 for a job; is that --
2      A   Oh, no, I don't. What I did was I
3  exercised my right, and I applied for my
4  Social Security disability which Ballard
5  Spahr was aware of. Social Security pushed
6  me back because of my disability -- okay? --
7  even though I still worked.
8          MR. DiMURO: I move to strike, non-
9  responsive, and ask for attorney's fees.
10          BY MR. DiMURO:
11      Q   Did you apply for any job as a
12  receptionist or anywhere in 2004?
13      A   Could you explain that a little
14  further?
15      Q   Sure.
16          Did you apply with any potential
17  employer for any position in the year 2004?
18      A   No.
19      Q   A few moments ago, you were
20  describing a phone conference call you had
21  with Ms. Riley-Jamison and Mr. DiBattista?
22      A   John DiBattista and Fern Forman.

Page 50

1    Q    Yes.  And you said that you told Dr.
2  Mussenden about that conference call?
3    A    No.  Him and I discussed that later.
4    Q    All right.  Well, I was --
5    A    And I also discussed that with my
6  psychiatrist.
7    Q    All right.  But please stay with me
8  on --
9    A    Okay.
10    Q    In February of '04, when you're in
11  his office, Dr. Mussenden's office, and he's
12  filling out his part of Exhibit 51 --
13    A    Exactly.
14    Q    -- did you or did you not talk to
15  Dr. Mussenden about whether or not you could
16  do some type of work?
17    A    And my response to him was the only
18  job that I could see that I could do with my
19  present employer was the receptionist job.
20    Q    You are telling me in this
21  deposition that you talked with Dr.
22  Mussenden about the fact that you could do

Page 51

1  the receptionist job when you visited with
2  him on February 3rd, 2004?
3    A    If that option was given to me, but
4  it wasn't.
5    Q    Well, could you answer my question?
6    A    So, I don't know what you're asking
7  me.
8    Q    All right.
9    A    That's what I mean by you asking me
10  sub-part questions.
11    Q    There wasn't a sub-part in that
12  question.
13    A    Okay.  Well --
14    Q    Were you with Dr. Mussenden when he
15  filled out the form?
16    A    Yes, I was.
17    Q    And was that date February 3rd --
18    A    Because he asked me what other job
19  can you do with your present employer?
20    MR. DiMURO:  I move to strike, non-
21  responsive.
22    You're going to have to wait for my

Page 52

1  question --
2    THE WITNESS:  All right.
3    MR. DiMURO:  -- or I'm going to
4  apply for attorney's fees to be paid by your
5  side for the obstructionist effort in this
6  deposition; all right?
7    BY MR. DiMURO:
8    Q    Now, did Dr. Mussenden sign that
9  form in front of you on February 3rd, 2004?
10    A    Yes.
11    Q    Did you have a discussion with him
12  on February 3rd, 2004, about what type of
13  work you could do?  That's a yes or a no
14  question.
15    A    Yes.
16    Q    What did he say and what did you say
17  on February 3rd, 2004 about the type of work
18  that you thought you could do?
19    A    From what I recall telling him, I
20  probably could have did a job that didn't
21  require any lifting, nothing requiring where
22  -- that was stressful because of my

Page 53

1  illnesses.  The stress makes my illnesses
2  worse.
3    Q    Is that everything you recall
4  telling Dr. Mussenden on February 3rd, 2004
5  about the type of work you could do?
6    A    Yes.
7    Q    Do you know when Exhibit 51, the
8  application for long-term disability, was
9  actually sent in to Unum?
10    A    From what I can recall, Dr.
11  Mussenden faxed a copy in to Robert Spellman
12  while I was there at the office.
13    Q    Okay.  That's the second page, which
14  you're looking at.
15    A    This here (indicating), this is what
16  he faxed to him.
17    Q    Right.  Dr. Mussenden faxed in to
18  Mr. Spellman the page he filled out and
19  signed; right?
20    A    Right.
21    Q    Do you know when the first page was
22  sent in by anybody of Exhibit 51?

Page 54

1     A   I don't recall. I didn't -- From
2  what I can remember, I didn't receive both
3  things at the same time.
4     Q   Well, that might be an example of
5  when you might say "I don't know."
6        Do you know when the first page of
7  Exhibit 51 was sent in to Unum?
8        THE WITNESS: (To Ms. Murray) Is he
9  asking me do I know where Ms. Forman turned
10 it in? No, I don't know.
11       BY MR. DiMURO:
12    Q   After Mr. Spellman at Unum -- Strike
13 that.
14       After your application for long-term
15 disability was turned in to Unum, Mr.
16 Spellman was your primary contact; is that
17 correct?
18       MS. MURRAY: In what respect?
19 Clarify your question.
20       BY MR. DiMURO:
21    Q   Well, he was the primary person you
22 spoke with at Unum. Is that true or not

Page 55

1  true?
2     A   It was Robert Spellman.
3     Q   And you spoke with Mr. Spellman in
4  February, March, and April of 2004 about his
5  efforts to get medical records from your
6  doctors; right?
7     A   The problem was my doctors have
8  proof of sending him the medical records.
9  Mr. Spellman kept telling me he did not
10 receive them.
11       My doctors' assistants were showing
12 me where they had faxed the documents to Mr.
13 Spellman, and he still said he didn't
14 receive them.
15    Q   Okay. But my question -- Well,
16 strike that.
17       Then it is true that in February,
18 March, April, and early May of 2004 you were
19 speaking to Mr. Spellman about what he was
20 doing about getting your medical records;
21 right?
22    A   The conversations we had is why he

Page 56

1  was having a problem receiving them when
2  they were sent to him.
3     Q   Well, in February, March, and April
4  of 2004, Mr. Spellman was saying we can't
5  complete deciding your claim until we get
6  all your medical records. That's what he
7  was saying to you; right?
8     A   Yes.
9     Q   And in February, March, and April of
10 2004, Mr. Spellman was telling you, whether
11 it was right or not, he was telling you that
12 some of your doctors had not sent in the
13 medical records; isn't that right?
14    A   Yes. That's what he told me.
15    Q   And at some points in February,
16 March, April of 2004, you actually contacted
17 your doctors to find out if there was a
18 problem with them sending the medical
19 records?
20    A   Yes.
21    Q   And some of your doctors were
22 telling you that they had already sent in

Page 57

1  the records; right?
2     A   And they showed me proof of that;
3  yes.
4     Q   Okay. So, you were getting
5  frustrated with Mr. Spellman's statements to
6  you that he didn't have all the records
7  because your doctors were saying they had
8  sent them in; right?
9     A   No. I don't think "frustrated" is
10 really the word.
11    Q   Okay. What's the word?
12    A   I just felt like he just didn't
13 care.
14    Q   Did you ever receive any information
15 that anybody at Ballard Spahr was holding up
16 the transfer of your medical records?
17    A   No. Because they wouldn't have went
18 to Ballard Spahr.
19    Q   All right. Do you know in fact that
20 people at Ballard Spahr in February, March,
21 April, and May of 2004 were making efforts
22 to help get the medical records transferred?

Page 58

1       A    The only thing that I recall is that
2    Ms. Riley-Jamison called me around the end
3    of February, the beginning of March.  She
4    called me in the morning.
5           She said, Vanessa, I have good news,
6    your disability has been approved.  She
7    called me back at -- So, at that point, I
8    contacted my mortgage company because my
9    house was going into foreclosure.
10          She calls me back at three o'clock
11   and said, oh, Vanessa, I made a mistake,
12   your disability is not approved.
13      Q    All right.  This was March, you
14   think?
15      A    It was sometime around March 1st,
16   something like that, because from that, I
17   asked Ms. Forman would she please do a
18   letter to my mortgage company.
19      Q    All right.  So, Ms. Riley-Jamison
20   calls you and tells you in one conversation
21   that the long-term disability had been
22   approved.

Page 59

1       A    It was approved; yes.
2       Q    And then in a subsequent phone call
3    shortly thereafter, she said she made a
4    mistake?
5       A    That afternoon.
6       Q    Right.
7       A    She said, oh, no, your disability
8    was not approved.
9       Q    Are you angry with Ms. Riley-
10   Jamison?  Do you think she did something
11   intentional to hurt you by making that phone
12   call?
13      A    Yes.
14      Q    You don't think it was an honest
15   mistake on her part?
16      A    No.
17      Q    And why would you say that she
18   intentionally meant to hurt you by calling
19   you at one moment saying the disability was
20   approved and another moment saying she made
21   a mistake?
22      A    From previous conversations while I

Page 60

1    was an employee there and the way that I was
2    treated.
3       Q    All right.  You're referring to what
4    type of -- You're talking about things that
5    Ms. Riley-Jamison said?
6       A    The harassment from her; yes.
7       Q    Now, you asked Ms. Forman to send a
8    letter to the mortgage company; right?
9       A    And she did; yes.
10      Q    And she did do that.
11      A    And she explained it off of -- I
12   don't know where they got the information
13   from that when my disability was approved,
14   how much I would be getting a month or what
15   have you.
16      Q    That was in the letter from Ms.
17   Forman to the mortgage company?
18      A    To my mortgage company.
19      Q    And that's Wells Fargo?
20      A    Wells Fargo; yes, sir.
21      Q    And you're criticizing that Ms.
22   Forman would know how much you would get for

Page 61

1    disability?
2       A    Oh, no, no, no.  She stated how much
3    I would get.
4       Q    Okay.  So, she did what you asked to
5    solve the problem with the mortgage company?
6       A    Okay.
7       Q    I'm just asking.
8       A    No.  All I'm saying is, basically,
9    when she sent me the letter, it was the same
10   day that Ms. Riley-Jamison called me and
11   told me my disability was approved.
12          She called back around three or four
13   in the evening and said it wasn't approved.
14   But Ms. Forman had already mailed the letter
15   to me for my mortgage company, and she also
16   faxed a copy to my mortgage company.
17      Q    So, Ms. Forman did everything she
18   could to help you with the mortgage company
19   on that day?
20      A    She did what I asked her, and I went
21   off from what Ms. Riley-Jamison told me.
22      Q    And you won't agree that Ms. Forman

Page 62

1    was trying to help you?
2        A    Well -- No.
3        Q    Do you know --
4        A    Because of some of her actions
5    before then.
6        Q    Okay. So, you're angry with Ms.
7    Forman for her actions that you say she did
8    to you --
9        A    Sir, I'm not angry with nobody.
10        Q    All right.
11        A    No, no, no. I'm not angry with
12    nobody.
13        Q    Do you have any information that Ms.
14    Riley-Jamison actually tried to slow down or
15    stall or hurt your application for long-term
16    disability?
17        A    Do I have any -- a paper trail?
18        Q    Any proof.
19        A    I would find it strange that she
20    would call me and tell me that it was
21    approved and then call back in the evening
22    and tell me it's not approved.

Page 63

1        Q    Well, here's my question, because
2    you didn't answer my question. Here's my
3    question.
4            Do you have any proof, any facts, to
5    show that Ms. Riley-Jamison slowed down,
6    stalled, or tried to block your application
7    for long-term disability insurance?
8        A    No. I don't have any proof; no.
9        Q    Do you have any proof that Ms.
10    Forman stalled or delayed or sought to have
11    your long-term disability application
12    denied?
13        A    All I know is that she sent in all
14    my paperwork late. You're asking me, and
15    that's all I know.
16        Q    All right.
17        A    She sent in my paperwork late.
18        Q    And you think Ms. Forman sent in
19    your paperwork late because it was after
20    your income had stopped?
21        A    I don't know. When I questioned her
22    about it, her response to me was why don't

Page 64

1    you just go ahead and resign and save
2    everybody the trouble.
3        Q    When did this occur? When did she
4    say that?
5        A    On around a day or two before the
6    conference call they made.
7        Q    You talked to her sometime in May,
8    and she said something about you resigning?
9        A    She said it would make it easier for
10    everybody if I just resigned.
11        Q    And what was the reason you were
12    speaking to her on the phone?
13        A    Because when I was sent the letter
14    from Ballard -- I think it was dated around
15    March 12th or whatever -- it informed me
16    that on February the 9th that I had no more
17    job protection, which I wasn't aware of,
18    that my FMLA had expired.
19            Which I was confused, because I
20    called the U.S. Department of Labor and,
21    like I expressed to Ms. Riley, District
22    employees received 16 weeks, not 12 weeks.

Page 65

1            Both Ms. Forman and Ms. Riley told
2    me that, since it was a Philadelphia based
3    firm, I was only entitled to 12 weeks.
4        Q    Okay. Let's get back to the
5    question and the answer.
6        A    Okay.
7        Q    My question is you had a phone call
8    with Ms. Forman a few days before May 14th,
9    2004; right?
10        A    Yes.
11        Q    In that conversation, she said
12    something along the lines of why don't you
13    resign --
14        A    Why don't you do everybody a favor
15    and just resign. Yes.
16        Q    And that phone call occurred because
17    of a letter you received in March?
18        A    And they had me fill --
19        Q    That's a yes or a no question.
20        A    Yes. Yes.
21        Q    And so you waited from March until
22    May to discuss the March letter with her?

Page: 66

1    Is that true?
2        A    Because the attachment to it --
3        Q    Is that true?
4        A    Yes.
5        Q    Okay. Now, you go ahead and explain
6    to me why you waited from March until May to
7    talk about a letter in March.
8        A    An attachment.
9        Q    All right.
10       A    That's what I talked to her about.
11       Q    What did the attachment  -
12       A    Because the firm never responded to
13   what they told me to fill out. At the time,
14   I had spoken with Ms. Kathy Hanna, who I sat
15   beside, who had a stroke.
16           And I asked her, I said, when you
17   went out on long-term disability, did you
18   have to fill out this form? She said no.
19       Q    Which form was this?
20       A    It was a leave of absence or
21   something. Basically -- It was a leave of
22   absence. And I had put on the form "long-

Page: 67

1    term disability."
2            I asked Ms. Hanna did she have to
3    fill out that form. She said no. Okay. I
4    sat beside her. So, after she had a stroke
5    after being out for six months, I covered
6    for her a lot, the people that she worked
7    for.
8            And then I asked her, well, I don't
9    understand why you were able to work a
10   modified schedule and still get paid from
11   Ballard and Unum, and I don't have no job
12   protection, I don't have nothing. She said,
13   Vanessa, I don't know.
14       Q    Now, you mentioned that Ms. Forman
15   and Ms. Riley-Jamison at some point said to
16   you that you only get 12 weeks of FMLA?
17       A    Yes.
18       Q    When did Ms. Riley-Jamison say that
19   to you?
20       A    I don't know the exact date, but it
21   came up in the conversation when she thought
22   it was appropriate to tell me that, since my

Page: 68

1    son was a senior in college, that it would
2    be best if I would take my daughters out of
3    college.
4            MR. DiMURO: Move to strike --
5            THE WITNESS: I'm trying to answer
6    your question.
7            MR. DiMURO: Move to strike, non-
8    responsive.
9            BY MR. DiMURO:
10       Q    Give me a date, an approximately
11   date -- Keep your thinking to yourself and
12   your gratuitous statements to yourself, and
13   --
14           MS. MURRAY: Object to that kind of
15   statement. Just rephrase your question,
16   sir.
17           BY MR. DiMURO:
18       Q    Tell me the approximate date that
19   Ms. Riley-Jamison told you you only get 12
20   weeks of FMLA.
21       A    It was January -- Well, that's when
22   I dealt with my husband. It was around

Page: 69

1    January 2003.
2        Q    All right. January of 2003?
3        A    Uh-huh.
4        Q    You have to say yes or no, ma'am.
5        A    Yes.
6        Q    Thank you.
7        A    Oh, I'm sorry.
8        Q    That's fine.
9            And when, approximately, did Ms.
10   Forman tell you that you only get 12 weeks
11   of FMLA?
12       A    She put it in the document.
13       Q    Do you recall when approximately
14   that was?
15       A    I think I received the document on
16   November the 1st.
17       Q    Of which year, please?
18       A    2002. And from what I can recall in
19   the document, she had already put the dates
20   of my FMLA, which was 12 weeks. When I got
21   confused was where, at some point, I worked.
22   That's what I didn't understand.

Page 70

1    Q    All right. In any event, sometime
2    in 2002, Ms. Forman put in a document, as
3    you recall, that you only get 12 weeks of
4    FMLA?
5    A    Yes.
6    Q    And that's wrong because? What's
7    your understanding of what you're entitled
8    to?
9    A    Because, as a District of Columbia
10   resident, even with my husband, I was
11   entitled to 16 weeks of FMLA. That's a
12   District law.
13   Q    Did you know that back in 2002?
14   A    Yes, I did.
15   Q    And how did you know that?
16   A    I used to work for the Labor
17   Department.
18   Q    All right. So, did you argue with
19   Ms. -- Strike that.
20       Did you say to Ms. Forman back in
21   2002 this is wrong, I get 16 weeks?
22   A    Yes, I did.

Page 71

1    Q    Now, in 2004, did Ms. Forman ever
2    say to you you only get 12 weeks?
3    A    Yes, she did. And Ms. Riley.
4    Q    And when did Ms. Forman say that in
5    2004?
6        MS. MURRAY: What year did you say?
7        MR. DiMURO: 2004.
8        THE WITNESS: 2004? I wasn't
9    working at Ballard in 2004.
10       MR. DiMURO: All right. Let's --
11       THE WITNESS: That was in 2003.
12       MR. DiMURO: All right. Let's start
13   over again.
14       BY MR. DiMURO:
15   Q    In the year 2004, did Ms. Forman
16   ever tell you you only get 12 weeks of FMLA?
17   A    In 2004?
18   A    Yes, ma'am.
19   Q    No.
20   Q    In 2004, did Ms. Riley-Jamison ever
21   tell you you get 12 weeks of FMLA?
22   A    No. They told me 2003.

Page 72

1    Q    And in 2004, isn't it true that
2    someone from Ballard Spahr told you that,
3    yes, you do get 16 weeks of FMLA?
4    A    Yes. Yes. But after I filed a
5    complaint.
6    Q    Which complaint are you talking
7    about?
8    A    I filed a complaint with EEOC.
9    Q    What date do you think you filed the
10   complaint with EEOC roughly?
11   A    I'm not sure exactly of the exact
12   date, but I did it. So, I can't, you know --
13
14   Q    Did you file the complaint with EEOC
15   after you had been terminated in May of '04?
16   A    Well, I had contact with them prior
17   before that, and I told them my situation,
18   and they told me what my rights were.
19   Q    All right. Did you file your
20   written complaint with EEOC before or after
21   May 14th, 2004?
22   A    I filed it after May 14th, 2004.

Page 73

1    Q    So, when you said you -- Strike
2    that.
3        So, which is it? Did you -- Strike
4    that.
5        When did somebody --
6    A    Sir, what are you striking?
7    Q    Just the question.
8    A    I don't --
9        MS. MURRAY: Just listen to the
10   question.
11       MR. DiMURO: Ready?
12       THE WITNESS: Yes.
13       BY MR. DiMURO:
14   Q    When in 2004 did Ballard Spahr tell
15   you had 16 weeks of FMLA?
16   A    It was a letter that I received in
17   March, around March the 12th or whatever,
18   telling me at that time that I had 16 weeks
19   of FMLA in 2004.
20   Q    So, in 2004, Ballard Spahr told you
21   in a letter that you were entitled to 16
22   weeks of FMLA; right?

Page 74

1    A    In a letter that was a month and a
2    half late, as far as I'm concerned, when I
3    received it. If my FMLA expired on February
4    the 9th, it shouldn't have took them a month
5    and a half to send me a letter telling me
6    that I was entitled to 16 weeks.
7    Q    In March of 2004, Ballard Spahr sent
8    you a letter -- Ma'am, it's true, isn't it,
9    that in March of 2004, Ballard Spahr sent
10    you a letter saying that you were entitled
11    to 16 weeks of FMLA; isn't that true?
12    A    Yes.
13    Q    And in 2004, you were maintained at
14    -- Strike that.
15        In 2004, you had FMLA leave in
16    January, February, March, and April up to
17    May 14th; isn't that true?
18    A    No.
19    Q    And why do you say that?
20    A    Because in a letter it stated that
21    my FMLA leave expired as of February the
22    9th. Okay?

Page 75

1    Q    All right. Well, but as of that
2    point, you had been off of work since
3    October 15th; right?
4    A    Of 2003; yes.
5    Q    So, from October 15th, 2003,
6    November 15th, December 15th, January 15th,
7    and February 9th of '94, that's 16 weeks,
8    isn't it?
9    A    Yes.
10    Q    Okay. So, in point of fact, you did
11    get 16 weeks of FMLA leave from October
12    15th, 2003 to February 9th, 2004; isn't that
13    true?
14    A    Well, to be honest, that's where I'm
15    confused at, because when I was telling her
16    that, Ms. Riley and Ms. Forman, they kept
17    telling me, no, 12 weeks.
18        So, what made all of a sudden them
19    believe it was 16 weeks after, with my
20    husband, they had already put the dates down
21    under FMLA on days that I was working.
22    Q    Ma'am --

Page 76

1    A    That's why I was confused.
2    Q    Ma'am --
3    A    I'm trying to answer you the best I
4    can.
5    Q    Thank you.
6    A    Okay.
7        MR. DiMURO: I move to strike as
8    non-responsive, and I will seek attorney's
9    fees.
10        BY MR. DiMURO:
11    Q    From October 15th of 2003 to
12    February 9th of 2004, you got 16 weeks of
13    FMLA leave; isn't that true?
14    A    Yes. I assume, yes.
15    Q    Now, you just said that Ms. Riley-
16    Jamison had talked to you about the 12 weeks
17    back in January of '03.
18        Do you recall now that she spoke to
19    you about the 12 weeks of FMLA leave later
20    in 2003?
21    A    When she spoke to me in January and
22    when I spoke to Ms. Forman, I was told I was

Page 77

1    entitled with my husband to 12 weeks of
2    FMLA.
3    Q    That's January of '03 that you're
4    talking about, a conversation?
5    A    Yes.
6    Q    And that's a conversation with Ms.
7    Riley-Jamison; right?
8    A    Yes.
9    Q    You didn't speak with Ms. Forman in
10    2003 about 12 weeks of FMLA; isn't that
11    right?
12    A    Yes, I did.
13    Q    Okay. When in 2003 did you speak
14    with Ms. Forman about the number of weeks
15    you get for FMLA?
16    A    Correction. I spoke to Ms. Forman
17    in November of 2002.
18    Q    That's right. I remembered that's
19    what you said before.
20    A    Okay. And she told me that they had
21    to do the dates that way.
22    Q    Okay.

Page 78

1    A    Okay.  When I called Ms. Forman in
2  2003, which I was confused, I said, how can
3  you all put these dates here on days that I
4  work?
5    Q    So, when in 2003 did you speak with
6  Ms. Forman about FMLA leave?
7    A    The same day that I spoke with Ms.
8  Riley.
9    Q    So, that's January of 2003?
10    A    January of 2003.
11    Q    At any point later in 2003 after
12  those January conversations, did you speak
13  with Ms. Riley-Jamison or Ms. Forman about
14  FMLA leave again in which they said you only
15  get 12 weeks?  Did they ever say that again
16  after January 2003?
17    A    No.
18    Q    This conversation you had with - A
19  few days before May 14th, you had a
20  conversation we talked about earlier?
21    A    Of what?
22    Q    Sure.  About the March letter.

Page 79

1  Sometime in early May, you spoke with
2  somebody about the letter you got in March
3  with the attachment.
4    A    Ms. Forman.
5    Q    Right; okay.
6      Did you make any notes or memo about
7  the conversation you had with Ms. Forman a
8  few days before May 14th, 2004?
9    A    Yes.  I mean, I have it written on a
10  pad at home, yes, and what she said to me.
11    Q    All right.  You have notes from that
12  conversation?
13    A    Yes.  When she said, why don't you
14  just do everybody a favor and just resign
15  and apply for your Social Security
16  disability.  And as I explained to her, my
17  Social Security disability had already been
18  approved.  That was the gist of that
19  conversation.
20    Q    Well, I have notes of March 5th, and
21  I have notes of May 14th, and I have notes
22  of March 8th and March 9th, but I don't

Page 80

1  believe I have any notes of this
2  conversation you're talking about.
3      So, if you would look again, I would
4  appreciate it.  And I'm sure your attorney
5  will speak to you about it.  But I have not
6  seen the notes that you --
7    A    No.  They're just something that I
8  had wrote on a steno pad, you know, for my
9  own benefit because, at that point, you
10  know, I was writing down things for my
11  benefit for me to remember.
12    Q    Right.  Do those notes still exist,
13  the ones from May 10th, 11th, or 12th when
14  you spoke with Ms. Forman?
15    A    No.  It's just a notation that I
16  made to myself.  And that's when she got
17  angry and yelled at me and I called Ms.
18  Riley.
19    Q    You said at that time you made notes
20  of that conversation?
21    A    I mean, to myself on a steno pad.
22    Q    Yes, ma'am.  I don't care if you

Page 81

1  made them for anybody else.
2      Did you make notes about the early
3  May conversation you had with Ms. Forman
4  about the March letter?
5    A    Yes.
6    Q    Okay.  Did you keep those notes?
7    A    I still have them.
8    Q    Did you give those notes to Ms.
9  Murray to give to me or lawyers on this
10  side?
11    A    I didn't see the need to after the
12  conference call that we had on May the 14th.
13    Q    So, the answer is no, you have not
14  given the notes of that conversation with
15  Ms. Forman in early May 2004 to Ms. Murray;
16  right?
17    A    No.
18    Q    Okay.  Would you please do so?
19    A    Oh, sure.
20    Q    Thank you.
21    A    No problem.
22      MS. MURRAY:  We need a bathroom

Page 82

1  break at this point.
2       MR. DiMURO: Oh, sure.
3       (Whereupon, a brief recess was
4  taken.)
5       BY MR. DiMURO:
6   Q   I'm going back now to when you went
7  out on October 15th, 2003; okay?
8   A   Okay.
9   Q   Did you ever go back to Ballard
10  Spahr, physically come into the office to
11  work, between October 15th, 2003 and May
12  14th, 2004?
13  A   No.
14  Q   Were you aware that Ms. Riley-
15  Jamison had made some efforts to get you
16  salary advances in 2004 from the firm?
17  A   From my understanding, that was a
18  discussion between Charles Henck and I.
19  Q   Do you know if she had any -- Well,
20  let's back up.
21      Mr. Henck lent you $2,000, I think,
22  in --

Page 83

1   A   No. It was $4,500, and I have
2  repaid him.
3   Q   I understand that.
4   A   Okay. I'm just saying --
5   Q   But Mr. Henck did, at some point,
6  loan you some money; right?
7   A   Advances from the firm because of
8  the problem with my disability being
9  approved.
10  Q   Okay. Let me be very specific.
11  A   Okay.
12  Q   Did Mr. Henck loan you monies
13  personally at any time? Not from the firm,
14  but his own personal monies?
15  A   That's personal. I'm trying to, you
16  know -- Yes, he did, but it was personal.
17  It had nothing to do with firm funds.
18  Q   Okay. That doesn't matter to me.
19  A   Okay.
20  Q   So, he lent you about $2,000
21  personally; right?
22  A   No.

Page 84

1   Q   How much was it that he lent you
2  personally?
3   A   Forty-five hundred dollars.
4   Q   And when did he lend you the $4,500?
5   A   He gave -- It was -- I don't know
6  the exact date, but it was in two separate
7  payments.
8   Q   When roughly?
9   A   It was in -- around -- It was
10  between, I would say, January and March of
11  2003. I'm not sure of the exact date.
12  Q   So, Mr. Henck's personal loans to
13  you were in the early part of '03?
14  A   One, he gave me when I was still
15  working. I don't know the exact dates.
16  Q   I'm just trying to confirm that they
17  were in the first couple of months of 2003.
18  A   No. One was in 2003.
19  Q   Okay.
20  A   I guess around September or
21  something like that. The other one was in
22  2004.

Page 85

1   Q   A few minutes ago, you told me it
2  was somewhere between January and March of
3  2003. I didn't think that was right, so
4  that's why I asked you some more. So, let's
5  start over again.
6       When did Mr. Henck give you the
7  first personal loan?
8   A   It was in -- The first personal loan
9  he gave me was around, I guess, August of
10  2003.
11  Q   How much was that roughly?
12  A   I'm not sure of the exact amount.
13  It was either $2,000 or $2,500.
14  Q   And the second personal loan from
15  Mr. Henck was in?
16  A   2004.
17  Q   Before May of 2004?
18  A   Yes. Before May of 2004; yes.
19  Q   And you've paid back all of those
20  amounts?
21  A   Yes.
22  Q   Did the repayment occur after you

Page 86

1  left -- Strike that.
2      Did the repayment occur after you
3  were terminated?
4      A  Yes.
5      Q  Now, the law firm Ballard Spahr also
6  gave you salary advanced in 2003 and 2004;
7  is that true?
8      A  Yes.
9      Q  And whatever was remaining -- Strike
10 that.
11     In 2003 and 2004, you certainly did
12 not pay back the firm those salary advances;
13 is that true?
14     A  No.  Because the way it was
15 perceived to me from Mr. Henck, this was the
16 least that the firm can do.
17     Q  All right.  So, the monies that were
18 advanced --
19     A  So --
20     Q  -- in 2003, the law firm has never
21 asked you to pay them back?
22     A  Well, that was under the assumption

Page 87

1  that, I thought, when I got better, I had a
2  job.
3      Q  Well, ma'am, the law firm has never
4  asked -- Strike that.
5      In May of 2004, you were told the
6  law firm does not expect you to pay back the
7  salary advances; is that true?
8      A  Yes.
9      Q  Okay.  All right.
10     Is it part of your claim that Mr.
11 Henck did anything discriminatory to you?
12     A  Yes.
13     Q  All right.  What did Mr. Henck do
14 that was discriminatory?
15     A  When I would go to him and tell him
16 certain things, and afterwards he would talk
17 to Ms. Riley, he would come back and tell
18 me, well, Meg's saying she didn't say that.
19     And I was like, okay.  But when I
20 got those seven e-mails that day, he saw it
21 for himself.  I had seven e-mails telling me
22 I was on leave without pay for that day, but

Page 88

1  I was sitting at my desk working.
2      Q  All right.
3      A  And him and Ms. Briscoe witnessed
4  that.
5      Q  So, you're saying that Mr. Henck did
6  something discriminatory because he came
7  back to you and said Ms. Riley-Jamison
8  didn't say something?
9      A  Well, I felt it was discriminatory
10 because they both told me at that time when
11 I was pulling a modified schedule that the
12 firm was doing me a favor.
13     Q  All right.  I'm trying to find out
14 what Mr. Henck did that was discriminatory,
15 and I wrote down that he would come back and
16 tell me that Meg said she didn't say
17 something.
18     A  Right.  It was like a big circle of
19 confusion.  As far as I'm concerned, when
20 you work for someone for 15 years, you know,
21 it was basically that he didn't do anything
22 to protect me as far as what he could have

Page 89

1  done if I was Caucasian.
2      Q  All right.  So, what did you want
3  Mr. Henck -- or expect him to do to help you
4  or save you that he didn't do?
5      A  I wanted the same thing that, say,
6  Ms. Riley received or what Ms. Craig
7  receives, what other people of Caucasian on
8  the job have received that I did not
9  receive.
10     Caucasians was given modified
11 schedules to attend school.  Ms. Riley-
12 Jamison herself was on a modified leave
13 schedule during her probationary period when
14 her husband was sick.
15     So, what made me different from all
16 these people to where I had to be harassed
17 and given such a hard time?  So, I think I'm
18 trying to answer your question the best that
19 I can.
20     Q  Did Mr. Henck ever say any words
21 that were discriminatory like names or other
22 types of statements?

Page 90

1    A    No. He made little comments like,
2 you know, I don't know if this is going to
3 work or not after we agreed on the schedule
4 for my husband going for his chemo. He
5 said, because when you're not here, I can't
6 function.
7    Q    Right. So --
8    A    Okay? But then, on the other side,
9 Ms. Briscoe was the one in charge of the
10 floaters or whatever. He wouldn't give
11 anybody his work. He would leave it there
12 the next day for me to do.
13    Q    So, in your mind, that is
14 discriminatory?
15    A    I mean, I look at it this way. If
16 I'm out with my husband and I had the same
17 rights as everybody else, I don't feel that,
18 you know, I should be told that I had to do
19 certain things that other people did not
20 have to do.
21    Q    All right. Well, let's break that
22 down.

Page 91

1    A    Okay. But this is what I'm saying.
2 That's what I meant by you asking me --
3 You're asking me questions with sub-parts in
4 the question.
5    I would greatly appreciate it if you
6 would ask me one question at a time, and I
7 will answer you the best I can. That's all
8 I can tell you at this point.
9    Q    Your husband was diagnosed with
10 cancer in the fall of 2002; right?
11    A    October 23rd, 2002, he was diagnosed
12 with colon cancer that metastasized to the
13 liver.
14    Q    Okay. Ms. McFadden, I'm trying to
15 get through this. I --
16    A    No. You asked me what was he --
17    Q    No. I asked you the following
18 question. In the fall of 2002, your husband
19 was diagnosed with colon cancer? The answer
20 to that question --
21    A    Is yes.
22    Q    -- is yes.

Page 92

1    A    Okay.
2    Q    It is not the long answer that you
3 gave.
4    A    Okay, fine.
5    Q    And the point being is that we'll be
6 here a lot longer than is necessary.
7    A    Okay, fine.
8    Q    And we just took a long break, and
9 I'm happy to accommodate you, but, you know,
10 I'm just pointing out to you that you're
11 only prolonging it.
12    A    Okay.
13    Q    All right. So, after he was
14 diagnosed with cancer, you discussed with
15 the firm you going on a modified schedule;
16 isn't that right?
17    A    No, not at that particular time.
18 No.
19    Q    Okay. When did that occur that you
20 --
21    A    That occurred in, I think, the
22 second week of January.

Page 93

1    Q    Of 2003?
2    A    2003.
3    Q    Because your husband needed various
4 treatments, chemotherapy treatments?
5    A    Yes.
6    Q    And a modified work schedule was
7 agreed upon, was it not, between you and the
8 firm?
9    A    Yes.
10    Q    And what was the modification? I
11 think I know, but I'd probably mess it up.
12    A    On the week that he got his chemo, I
13 didn't work on Monday and Wednesdays. And
14 on the week where he got -- it was a
15 vaccination he was getting, I was only off
16 on that Monday.
17    Q    So, one week you would work three
18 days, the next week you would work four
19 days?
20    A    Four days; yes.
21    Q    And he would have to do one of those
22 two things every week was my impression; is

Page 94

1    that correct?
2        A    Yes.
3        Q    So, did the firm ever put you on a
4    part-time status and take away any full-time
5    benefits?
6        A    I was pulling leave without pay, but
7    I wasn't put on a -- I was still considered
8    a full-time employee.
9        Q    And on those days that you actually
10   worked on this modified work schedule, you
11   worked the regular hours; is that right?
12       A    I would work more than the regular
13   hours to try to compensate for the days that
14   I was off.
15       Q    Do you agree that there were days
16   after your husband was diagnosed with cancer
17   that you didn't come in until a certain hour
18   or had to leave early and Ms. Riley-Jamison
19   didn't dock you for that or put down leave?
20       A    She docked me for it.
21       Q    Do you agree that there were times -
22   - Strike that.

Page 95

1            Are you aware that there were times
2    that when she could have put you down for
3    leave or docked you, that she didn't?  Are
4    you aware of any of those times?
5        A    She used the leave that I had.
6        Q    Are you aware of any times when she,
7    instead of using up your leave or instead of
8    docking you, Ms. Riley-Jamison actually did
9    you favor and didn't write it down, gave you
10   credit for the time?
11       A    No, I'm not.
12       Q    Are you aware of any efforts by Ms.
13   Riley-Jamison to assist the process of your
14   getting salary advances in 2003 and 2004?
15       A    No.
16       Q    All right.
17       A    I mean, she did the Federal Express
18   envelope, but besides that, no, truly I
19   don't know.
20       Q    Now, I'm trying to get back to Mr.
21   Henck.
22            So, you get the modified work

Page 96

1    schedule in place and you're working it?
2        A    Yes.
3        Q    Do you consider that to have been
4    something that was a nice thing for the firm
5    to do?
6        A    Well, since, under the law, I was
7    still entitled to FMLA for my husband and
8    I'm constantly being told the firm is doing
9    me a favor, when in fact my rights under the
10   law FMLA was still in existence, no.
11       Q    You don't consider it a nice thing
12   that the firm did to put you on a modified
13   schedule keeping your full-time status --
14           MS. MURRAY:  Asked and answered.
15           BY MR. DiMURO:
16       Q    -- and not docking you for FMLA?
17       A    I mean, you're -- How many questions
18   do you want to ask me about one thing?
19           What I'm saying to you is, at the
20   time that she was telling me that the firm
21   was doing me a favor -- okay? -- and before
22   I got sick and when my husband was sick, he

Page 97

1    still qualified for FMLA.
2        Q    Do you know if in 2002 you used up
3    any FMLA time?
4        A    I only know the days that she put
5    down.
6        Q    Do you know if in 2002 you used up
7    any FMLA time?
8        A    I know in 2002 they advanced me two
9    weeks of vacation.
10       Q    Do you know if in 2002 you used up
11   any FMLA time?
12       A    Yes.  But the days weren't correct.
13       Q    Well, how do you know that?  Do you
14   have records?
15       A    I have it in writing.
16       Q    You have what in writing?
17       A    I have a document from Fern Forman.
18   On the day that she started my FMLA with my
19   husband, on the 17th or 18th I had put in
20   leave.  I was having a colonoscopy myself.
21       Q    That's 2003.
22       A    No.  That's 2002.  I know when I had

Page 98

1  my colonoscopy; okay, sir?
2      Q    Okay.  Well, I'm sure we all do.
3  That, I'll agree with you.
4      A    Yes.  I think we all know that.  But
5  I'm just saying, you know, if you're going
6  to
7  -- By the law, if I put in leave to have a
8  colonoscopy done over two days, and my
9  husband gets sick 1:00 a.m. that Friday
10  night, by law my FMLA shouldn't have started
11  until that Monday.  And that's the day when
12  I was out when I had leave to cover it for a
13  colonoscopy.
14      Q    Do you have any records in your own
15  handwriting or that you kept about the days
16  that you worked or didn't work in 2002?  Do
17  you have any records you kept?
18      A    Well, this might sound strange, but
19  I don't know who was doing the leave system,
20  so we used to get statements telling us what
21  we did.  So, I can only tell you what I know
22  from memory.

Page 99

1      Q    All right.  That's what I'm asking.
2      A    Okay.
3      Q    In 2002, did you keep any records in
4  your own handwriting or that you typed out
5  on your own about what days you worked or
6  didn't work?
7      A    I have them written out on my own.
8      Q    Pardon me?
9      A    I wrote them -- I kept track of it
10  myself.
11      Q    All right.  So, you kept some
12  records?
13      A    But, also, in a letter that Ms.
14  Forman gave me, she broke it down to the two
15  weeks they gave me after my husband's
16  surgery --
17      Q    Ma'am, here's an example of --
18      A    Okay.  Sorry.
19      Q    If you don't stay with the question,
20  we're going to be here a lot longer than is
21  necessary.
22      A    Okay.

Page 100

1      Q    Did you, in 2002, write down in your
2  own handwriting the days you worked and
3  didn't work?
4      A    Yes.
5      Q    What happened to those records?
6      A    I mean, they were just things I just
7  scribbled in a steno pad, but if you would
8  like it, you can have it.
9      Q    Well, in reading your interrogatory
10  answers, they say you don't have any records
11  of when you worked or didn't work, that you
12  have to rely on the law firm's records.
13      A    That's for 2003.  You asked me about
14  2002.
15      Q    I am asking you about 2002.
16          Do you have written records in your
17  own handwriting at home about days you
18  worked and didn't work?
19      A    I know the days.
20      Q    Do you have written records at home
21  --
22      A    No, I do not.

Page 101

1      Q    Then why did you just tell me that
2  you had written down records  ·
3      A    I mean, I have --
4      Q    Ma'am, why did you just tell me you
5  had written down records from 2002 about the
6  days you worked and didn't work?
7      A    Because I know the exact days that I
8  worked in 2002.
9      Q    But you don't have anything in your
10  handwriting or in your own typing at home
11  reflecting what days you worked in 2002; is
12  that right?
13      A    No.  I don't have nothing in
14  writing.
15      Q    Okay.
16      A    It's what I know -- I don't have it
17  in writing, period.
18      Q    Do you have anything in your own
19  handwriting or in your own typewriting
20  reflecting what days you worked or didn't
21  work in 2003?
22      A    No.

Page 102

1    Q   The schedule gets modified. Is it
2    your testimony that at some point Mr. Henck
3    said that the modified work schedule wasn't
4    working out or something like that?
5    A   He made the comment that it wasn't
6    working out because Ms. Riley-Jamison told
7    him that we were short of support staff.
8    Q   When was this?
9    A   Around the end of May 2003.
10   Somewhere around there. I'm not sure of the
11   date.
12   Q   And what happened with the modified
13   work schedule?
14   A   I mean, at that time then in June,
15   my husband's treatment was over with, so I
16   stuck with the modified schedule.
17   Q   You stayed with the modified
18   schedule?
19   A   Yes, I did.
20   Q   So, after Mr. Henck said Ms. Riley-
21   Jamison said there was a problem with the
22   modified work schedule, you still worked the

Page 103

1    modified work schedule; right?
2    A   Yes. But Mr. Henck also said that
3    he didn't personally have a problem with it.
4    Q   But you continued to work the
5    modified work schedule as you had done --
6    A   Yes. If Mr. Henck is my boss and
7    he's telling me he doesn't have a problem
8    with it and having Ms. Riley-Jamison telling
9    me it is a problem, you see what I'm saying?
10
11         As far as I was concerned, I went by
12   what Mr. Henck said, nor what Ms. Riley-
13   Jamison said.
14   Q   So, nothing changed, and you got to
15   work the modified work schedule. Yes or no?
16   A   Yes.
17   Q   So, I'm still trying to figure out
18   what Mr. Henck did that's discriminatory.
19         You said that he would tell you that
20   Ms. Riley-Jamison said she didn't say
21   something. What are you talking about
22   there?

Page 104

1    A   Take, for instance, at the time
2    before I knew I had Graves' disease, I had
3    to get some tests done at Georgetown
4    Hospital.
5    Q   I'm sorry. You had --
6    A   Tests at Georgetown Hospital.
7    Q   All right.
8    A   I called Ms. Riley. I told her, I
9    said, I know my situation on Monday and
10   Friday. My doctor wanted to run some tests
11   because she thinks I have Graves' disease.
12        Ms. Riley's response was, well, you
13   know, you're off enough as it is. I know
14   you have health issues, but since your
15   husband is hospice anyway, can't someone
16   else take care of his situation?
17   A   All right. Your husband is in a
18   hospice or should be in a hospice? I just
19   didn't understand what you meant.
20   A   No. That's what she said. My
21   husband basically had the surgery and they
22   said he was terminally ill.

Page 105

1    Q   Right.
2    A   So, from that, the way she said it
3    was like, you know, can't somebody else deal
4    with my husband's situation.
5    Q   Did you take it that she was
6    suggesting that he should be placed in a
7    hospice?
8    A   Oh, she has told me that.
9    Q   Well, I'm asking about this
10   conversation.
11   A   Yes. I mean, she has told me that
12   on various occasions.
13   Q   But stay with this conversation.
14   A   Okay. I'll stay with this
15   conversation. So, that's one of the reasons
16   where I felt that Mr. Henck was being
17   discriminatory because of the fact that I
18   called him on his cell phone out of town and
19   I told him what happened.
20        He said, I will get to the bottom of
21   this when I get back. He confronted Ms.
22   Riley. Ms. Riley denied everything.

Page 106

1    Q   What did you tell Mr. Henck she had
2  said?
3    A   Exactly what I just told you.
4    Q   And you were offended by what she
5  said because --
6    A   Yes, I was offended by it. Because,
7  basically, what she was saying was my
8  husband's dying anyway, so why are you going
9  to waste time with that, take off for
10 yourself and take care of that. That's
11 basically how she put it. That's the way
12 she put it to me.
13   Q   I see. So, you did go to the test
14 for the Graves' diagnosis; right?
15   A   Oh, Mr. Henck told me to go ahead
16 and take off ·
17   Q   Just stay with my question.
18   A   -- so I did; yes. Yes, I did.
19   Q   Ms. Riley Jamison didn't tell you
20 not to go to the test; right?
21   A   She wasn't supportive.
22   Q   Right. But she didn't say to you

Page 107

1  don't go to the test; right?
2    A   After I went to her office and we
3  talked about it and I told her I had called
4  Mr. Henck, that's when her whole
5  conversation changed.
6    Q   No. Before you called Mr. Henck --
7    A   And she apologized to me for saying
8  what she said.
9    Q   Before you called Mr. Henck, Ms.
10 Riley-Jamison did not say to you don't go to
11 the test; isn't that right?
12   A   She told me to try to find somebody
13 else to deal with my situation; yes.
14   Q   Is that telling you not to go to the
15 test?
16   A   But I'm saying my husband was dying.
17   Q   Ma'am, did Ms. Riley-Jamison tell
18 you not to go to the test at anytime before
19 you spoke with Mr. Henck?
20   A   She didn't tell me not to go, but I
21 went.
22   Q   And have doctors told you that your

Page 108

1  husband should be in a hospice or suggested
2  -- Strike that. Let me back up.
3    Q   Have any doctors suggested to you
4  that your husband should at some point be in
5  a hospice?
6    A   It has been mentioned.
7    Q   So, which doctors have mentioned
8  that?
9    A   The doctor he had at Georgetown.
10   Q   All right. Okay.
11   A   Okay?
12   Q   Do you think it is an unusual
13 thought for somebody to express to a cancer
14 patient that there might come a time when
15 hospice is needed?
16   A   But I don't think it was Ms. Riley's
17 decision to decide if my husband -- or Mr.
18 Henck's -- if my husband should be placed in
19 hospice care.
20   Q   Well, she wasn't telling you to do
21 that.
22   A   Oh, she -- No, no, no. She has told

Page 109

1  me that.
2    Q   So, you think --
3    A   Basically, like she told me, you
4  know, you need to take your daughters -- You
5  asked me to answer the question, see?
6        That's what I mean by you asking me
7  -- trying to ask me two or three questions
8  at a time; okay? You can't ask me one
9  question. That's what your doing, and
10 that's why I keep pointing it out.
11       THE WITNESS: (To Ms. Murray) Am I
12 right or wrong?
13       MS. MURRAY: Just answer the
14 question, Ms. McFadden.
15       THE WITNESS: Okay. As far as I'm
16 concerned, her and Mr. Henck constantly
17 badgered me to put my husband in hospice
18 care. That was a personal matter. It
19 wasn't a firm matter.
20       BY MR. DiMURO:
21   Q   Whatever she said about hospice care
22 to you, if she did, you didn't take it as a

Page 110

1    suggestion or as an expression of concern
2    that --
3        A    No, not at all.
4        Q    Are you opposed to hospice care?  Do
5    you think that no patient should be in
6    hospice care ever?
7        A    I didn't say that.
8        Q    Well, I'm asking you.
9        A    How do I feel about it personally?
10       A    Well --
11       Q    You might be a person who says I
12   don't care how far along the relative gets,
13   how ill they become, I just don't believe
14   they should be at hospice, they should be at
15   home.  You might feel that way.  I'm just
16   trying to find out.
17       MS. MURRAY:  You've asked two
18   questions and you didn't let her answer the
19   first one, so which one would you like for
20   her to answer?
21       THE WITNESS:  For me to answer.
22   That's what I'm saying.

Page 111

1        MR. DiMURO:  Well, there you go.
2    You got me.
3        THE WITNESS:  Yes, you're right.
4        BY MR. DiMURO:
5        Q    Are you personally against hospice
6    care regardless of the circumstances?
7        A    I feel like you're asking me do I
8    believe in God.  I don't know how to answer
9    you.
10       THE WITNESS:  (To Ms. Murray)  Am I
11   making any sense?
12       MS. MURRAY:  Answer as best you can,
13   Ms. McFadden.
14       THE WITNESS:  You know, my thing on
15   hospice care?
16       MR. DiMURO:  Yes.
17       THE WITNESS:  My personal belief?
18       MR. DiMURO:  Yes.
19       THE WITNESS:  As far as putting
20   someone in a hospice care facility, no, I
21   think it's cruel.
22       MR. DiMURO:  Okay.

Page 112

1        THE WITNESS:  But as far as having
2    hospice care come in the home to help me,
3    no, it's not cruel --
4        MR. DiMURO:  Okay.
5        THE WITNESS:  -- because that person
6    is still with me.
7        MR. DiMURO:  All right.
8        THE WITNESS:  Did I answer your two
9    or three questions you asked me?
10       MR. DiMURO:  You did a fine job.
11       THE WITNESS:  Okay.
12       MR. DiMURO:  It's certainly a matter
13   of personal belief.
14       THE WITNESS:  I mean, it's personal
15   preference.  But as an employee, when you
16   cross the line and when you have another
17   employee call me at home --
18       MR. DiMURO:  Hold on.  If you go
19   down -- You're not answering the question.
20       THE WITNESS:  Okay.  We're not going
21   to go down there.
22       MR. DiMURO:  You'll be here

Page 113

1    tomorrow, Ms. McFadden --
2        THE WITNESS:  Okay.  Well, we're not
3    going to be here tomorrow.
4        All I'm saying is, as far as I'm
5    concerned, it was inappropriate for her or
6    Mr. Henck to tell me what to do with my
7    husband.
8        MR. DiMURO:  Okay.
9        THE WITNESS:  That's just like me
10   telling her, if her husband was sick, do you
11   do a --
12       MR. DiMURO:  Ma'am, the more you
13   keep talking, the more I guarantee you --
14       THE WITNESS:  Okay.  Well, fine.
15       MR. DiMURO:  -- you'll be here
16   tomorrow.
17       THE WITNESS:  Well, what you need to
18   do is ask me a question.  Don't ask me three
19   or four questions.
20       MR. DiMURO:  Ma'am, please, you're
21   only hurting yourself.
22       THE WITNESS:  No, no, no.  I'm not

Page 114

1  hurting myself.
2      MS. MURRAY: Just answer --
3      THE WITNESS: No, no. I'm not
4  hurting myself.
5      MR. DiMURO: Ms. Murray, please --
6      MS. MURRAY: Stop.
7      If you have a question, Mr. Dimuro -
8  -
9      MR. DiMURO: Thank you.
10     MS. MURRAY: Answer only what he is
11  asking you.
12     THE WITNESS: All right.
13     BY MR. DiMURO:
14     Q   Was Ms. Riley-Jamison suggesting
15  that he should be placed in a hospice
16  facility as you described, or that hospice
17  helpers should come to the home, or didn't
18  she make it clear one way or the other?
19     A   She suggested that he should be
20  placed in a hospice facility.
21     Q   And you are personally opposed to
22  those types of facilities for your

Page 115

1  relatives; right?
2      A   Yes.
3      Q   Whatever she said about bringing
4  your daughters home to help, did you not
5  take that as an expression of concern that
6  maybe some family members could help you
7  with your burden?
8      A   No.
9      Q   All right. What else did Mr. Henck
10  do? Is there any other example where Mr.
11  Henck was discriminatory?
12     A   I'm not sure of the exact date in
13  March. He had Ms. Janet Craig call me at my
14  home, and he instructed her to tell me to
15  put my husband in a hospice care facility
16  and that I should sell my rental properties.
17     Q   I'm sorry. You understand that Mr.
18  Henck told Ms. Craig --
19     A   Janet Craig. She called me at home
20  . . .
21     Q   To tell you that?
22     A   -- because Mr. Henck asked her to do

Page 116

1  that.
2      Q   Okay. And, of course, she --
3      A   And I called Mr. Henck the next day.
4  I said, why didn't you speak to me yourself?
5      Q   All right.
6      A   His answer was, I thought you would
7  receive it better from Janet since she's
8  been through that, which I couldn't
9  understand because Ms. Craig took care of
10  her husband at home. He was not in a
11  hospice facility.
12     Q   You, of course, were not present
13  when Mr. Henck spoke with Ms. Craig; right?
14     A   No.
15     Q   Did Ms. Craig -- Why do you take
16  that as discriminatory?
17     A   It is discriminatory. I mean, he
18  knew that she was home with her husband
19  taking care of her husband --
20     Q   Well --
21     A   -- and that she didn't have hospice
22  care.

Page 117

1      Q   Did --
2      A   You know, the way you're asking me -
3  - For instance, I mean, everybody --
4      Q   Tomorrow.
5      A   -- has a personal choice.
6      Q   Tomorrow. Tomorrow. We're going to
7  be here tomorrow.
8      A   No. All I'm saying is --
9      MS. MURRAY: Complete your answer,
10  Ms. McFadden.
11     THE WITNESS: No, I'm just saying,
12  if she was allowed to get paid for her
13  husband being sick, who doesn't work for the
14  firm, and I had to go through what I had to
15  go through, it's discrimination. I don't
16  care how anyone puts it. It's
17  discrimination.
18     MR. DiMURO: We'll come back to
19  that.
20     BY MR. DiMURO:
21     Q   You applied for Social Security
22  disability; is that true?

Page 118

1    A    Yes, I did.
2    Q    When did you do that?
3    A    On November -- It was around the
4  beginning of November of 2003.  Somewhere in
5  the beginning of November.
6    Q    And did you fill out the form
7  yourself?
8    A    My daughter filled it out.
9    MR. DiMURO:  Let's mark this as
10 Exhibit 73.
11          (Whereupon, the document
12          was marked as Deposition
13          Exhibit No. 73, for
14          identification.)
15    BY MR. DiMURO:
16    Q    Do you recognize this form, ma'am?
17          (Whereupon, the witness reviewed the
18 document.)
19    MR. DiMURO:  There are numbers at
20 the very bottom.  The numbers there --
21    THE WITNESS:  Yes.
22    MR. DiMURO:  -- if you go to Page

Page 119

1  18, you'll see your signature, I believe.
2          (Whereupon, the witness further
3  reviewed the document.)
4    THE WITNESS:  Did you say Page 18,
5  sir?
6    MR. DiMURO:  Yes.  Using the
7  numbers, where it says SSA-18 --
8    THE WITNESS:  I see it; yes.
9    BY MR. DiMURO:
10    Q    Okay.  Is that your signature?
11    A    Yes.  It says "Please print."  Yes.
12    Q    You filled out this form?
13    A    My daughter did.
14    Q    But you signed it verifying
15 everything was true and accurate; is that
16 right?
17    A    Yes.
18    Q    And this is part of the paperwork
19 used to get total disability benefits from
20 the Social Security Administration?
21    A    Social Security disability; yes.
22    Q    And as part of that application

Page 120

1  process, you have to say to them that you're
2  unable to work; isn't that right?
3    A    Yes.
4    Q    So, you applied for Social Security
5  benefits for the first time in November of
6  2003; right?
7    A    November the 6th; yes.
8    Q    And as part of that application
9  process, you told the Social Security
10 Administration that you were unable to do
11 any work; isn't that right?
12    A    I was unable to work at that time;
13 yes.
14    Q    Right.  And you have continued to
15 fill out paperwork as the Social Security
16 Administration asks you for updated
17 information; isn't that correct?
18    A    Yes.
19    Q    And that's to keep your Social
20 Security disability payments coming; isn't
21 that true?
22    A    Yes.

Page 121

1    Q    And you've received Social Security
2  benefits continuously since the first time
3  you got them after you applied in 2003 to
4  the present date; right?
5    A    (No response.)
6    Q    I'll rephrase it.  Are you with me,
7  Ms. McFadden?
8    A    Okay.  Yes.  I'm sorry.
9    Q    Sometime after you applied in
10 November of 2003, Social Security approved
11 your request for long-term disability -- I'm
12 sorry.
13          Sometime after you filed your
14 application with Social Security for total
15 disability, they approved it; right?
16    A    They back-dated it.  Yes, they
17 approved it.  Yes.
18    Q    Right.  And you started getting
19 monies?
20    A    Yes.
21    Q    Based on your claim of total
22 disability; right?

Page 122

1    A    Yes.
2    Q    Based on your claim you were unable
3    to work; right?
4    A    Yes. That was my right. I paid for
5    Social Security benefits; okay?
6    Q    I understand.
7    A    Okay.
8    Q    And, in fact, they found you were
9    disabled on a date earlier than you had
10    suggested in the paperwork. I don't know if
11    you remember that.
12    A    Yes. They took it back to January
13    of 2003.
14    Q    And since that time when you started
15    first getting benefits from Social Security
16    for total disability, you have continuously
17    told them that you were unable to work;
18    right?
19    A    Yes.
20    Q    And that's part of the process of
21    keeping your Social Security disability
22    payments; right?

Page 123

1    A    Yes.
2    Q    And that continues to the present
3    day? You still get those benefits?
4    A    Yes.
5    Q    Now, on this form, Exhibit 73, you
6    list disabling conditions including
7    fibromyalgia. Do you see that?
8    A    Uh huh.
9    Q    You have to say yes or no, ma'am.
10    A    Yes.
11    Q    And that condition was diagnosed in
12    2003; isn't that true?
13    A    Yes.
14    Q    And you also list on Exhibit 73 that
15    you suffer from rheumatoid arthritis; is
16    that correct?
17    A    Yes.
18    Q    And that condition was first
19    diagnosed in 2003; is that true?
20    A    Yes.
21    Q    And you list on Exhibit 73 that you
22    suffer, as a disabling condition,

Page 124

1    depression; is that true?
2    A    Yes.
3    Q    And that condition was first
4    diagnosed in 2003; is that correct?
5    A    Can I ask my attorney a question?
6    Q    Sure.
7    (Whereupon, the witness conferred
8    with her counsel off the record.)
9    THE WITNESS:  Yes.
10    BY MR. DiMURO:
11    Q    And the form, Exhibit 73, lists as a
12    disabling condition anxiety and panic
13    attacks; is that correct?
14    A    Yes.
15    Q    And that condition was first
16    diagnosed in 2003 also, wasn't it?
17    A    Yes.
18    Q    And the form, Exhibit 73, lists high
19    blood pressure as a disabling condition; is
20    that correct?
21    A    Yes.
22    Q    And that was first diagnosed in

Page 125

1    2003; is that true?
2    A    Yes.
3    Q    The form, Exhibit 73, lists
4    bronchitis as a disabling condition; is that
5    correct?
6    A    Yes.
7    Q    And it was first diagnosed in 2003;
8    is that correct?
9    A    With the bronchitis, I was told that
10    I had that around September -- Yes, you're
11    right, 2003.
12    Q    And the form, Exhibit 73, identifies
13    hyperthyroidism as a disabling condition; is
14    that correct?
15    A    Yes.
16    Q    And that was first diagnosed, I
17    think it was, through Dr. Thomas in 2003;
18    right?
19    A    Dr. Kristen Thomas; yes.
20    Q    And Exhibit 73 lists pain from
21    chronic illness as a disabling condition; is
22    that true?

Page 126

1    A    Yes.
2    Q    And that was a condition that was
3  present and first diagnosed in 2003?
4    A    But in different stages, because at
5  one point they didn't know what was wrong
6  with me.
7    Q    Right.
8    A    So --
9    Q    Your medical records show that you
10  complained to the doctors about chronic pain
11  in your extremities and your joints and all
12  over; right?
13    A    Exactly.
14    Q    And since at least 2003 to the
15  present; right?
16    A    Yes.  I'm in pain 24 hours a day.
17  Is that what you're asking me?
18    Q    Yes, ma'am.
19    A    Yes.
20    Q    And we're talking about the type of
21  pain --
22    A    Yes.

Page 127

1    Q    -- that disables you from working.
2    A    Yes.  I'm in pain 24 hours a day.
3    Q    And all of these conditions that you
4  list on Exhibit 73 have continued to the
5  present date?
6    A    Yes.
7    Q    And the things that they make you
8  feel, the symptoms, the pain, and the
9  conditions they give you cause you to be
10  unable to work; right?
11    A    Yes.
12    MR. DiMURO:  We're going to stop for
13  lunch.  Let's go off the record.
14    (Whereupon, a lunch recess was
15  taken.)
16    BY MR. DiMURO:
17    Q    Before the break, we had gone over
18  some of the conditions listed on Exhibit 73,
19  the form submitted to the Social Security
20  Administration.
21    I'm going to ask you about some
22  other conditions that I think are in the

Page 128

1  medical records from the same period of
2  time.
3    A    Okay.
4    Q    First of all, when I see endocrine
5  disease in some of the medical records, I
6  equate that with the Graves' disease.
7    Would you agree or not agree or --
8    A    Yes.
9    Q    And on this form where it says
10  "hyperthyroidism," Exhibit 73, that's just
11  another word for the Graves' disease issue?
12    A    Yes.  It's like -- Graves' disease
13  is the type that I have.
14    Q    Right.  Okay.
15    A    Yes.  It's the type that I have.
16    Q    You had a negative reaction to the
17  medication that somebody tried for the
18  Graves' disease?
19    A    Yes.
20    Q    And I think that was Tapazole?
21    A    Yes.
22    Q    And it caused rashes and severe

Page 129

1  blisters, it sounded like?
2    A    Yes.
3    Q    The way I read the records, that was
4  resolved, that the blisters and rash were
5  cured in one or two months or something like
6  that?
7    A    Yes.
8    Q    What I'm really asking is, you did
9  not suffer from the rash or the blisters in
10  2004?
11    A    No.
12    Q    The medical records list decreased
13  concentration.  Do you recall complaining to
14  the doctors that you had in 2003 and 2004
15  decreased concentration?
16    A    Only if I was stressed.
17    Q    Dr. Morgan lists increased mistakes
18  at work due to your memory.  Do you recall
19  telling Dr. Morgan that?
20    A    Is that Seth Morgan?
21    Q    Yes.
22    A    Yes.  I told him that, and you

Page 130

1   know, he was saying, with everything going
2   on with your health and your problems and
3   dealing with your husband's health, he said
4   that's normal. It's not abnormal.
5       Q   Do you recall telling two or three
6   of your doctors, at least in 2003 and early
7   2004, that you had shortness of breath?
8       A   Yes.
9       Q   Do you recall telling one or more of
10  your doctors in 2003 and early 2004 that you
11  had palpitations? I don't know if that's
12  your word or their word, but --
13      A   Yes. Heart palpitations.
14      Q   Okay. So, you told them that?
15      A   Yes.
16      Q   Do you recall in 2003 and early 2004
17  telling your doctors that you suffered from
18  anxiety attacks?
19      A   Yes.
20      Q   Do you recall in 2003 and early 2004
21  telling one or more doctors that you were
22  suffering from blurry vision?

Page 131

1       A   Yes.
2       Q   Do you recall telling your doctors
3   in 2003 and early 2004 that you were having
4   trouble sleeping?
5       A   Yes.
6       Q   And do you recall that you reported
7   to the doctors that you could only get two
8   to four hours of sleep a night in '03 and
9   '04?
10      A   Yes.
11      Q   Do you recall in 2003 and early 2004
12  reporting to your doctors that you had
13  numbness in your hands?
14      A   Yes.
15      Q   And do you recall in 2003 and early
16  2004 telling your doctors you had numbness
17  in your face?
18      A   Yes.
19      Q   I separated the hands and the face
20  because I couldn't tell if that's sort of
21  the same condition, or were there different
22  causes for the --

Page 132

1       A   It's fibromyalgia.
2       Q   It caused both the hands and face?
3       A   It caused the numbness; yes.
4       Q   In both places?
5       A   On this side of my body
6   (indicating).
7       Q   I see. So, it went from the face
8   down to the hands?
9       A   Yes. And then I'd get the double
10  vision and whatever. It's worse on this
11  side than on this side (indicating).
12      Q   And you suffered from that in 2003
13  and 2004?
14      A   Yes.
15      Q   And do you recall telling your
16  doctors in 2003 and early 2004 that you
17  suffered from spasms in your neck, hands,
18  shoulders?
19      A   Yes.
20      Q   And did the doctor ever tell you
21  what the spasms were from?
22      A   From the fibromyalgia.

Page 133

1       Q   So, whether it's the neck, the
2   hands, the shoulders, or the feet, it's all
3   the same source as far as the doctors are
4   concerned?
5       A   As far as the pain level with the
6   fibromyalgia. The rheumatoid arthritis,
7   that basically affects my hands and my knees
8   and my legs.
9       Q   What does it do to your knees and
10  hands and legs, the rheumatoid arthritis?
11      A   It makes them swell up. And it's
12  like -- I feel like every day I have like a
13  very bad case of the flu, and sometimes the
14  medicine works, sometimes it doesn't.
15          I've also been told that, at some
16  point, I probably will be in a wheelchair.
17  But I'm not claiming that. All I'm saying
18  is most of my illnesses are chronic.
19          But the major depressive disorder, I
20  think, just came from stress of my situation
21  when I was at Ballard and trying to do
22  everything in my situation and that I was

Page 134

1  getting sick myself.
2      Q    What does the rheumatoid arthritis
3  do to your hands and legs and knees?  What
4  do you feel is what I'm trying to get at.
5      A    Pain.
6      Q    Debilitating pain where you can't
7  stand on the leg or walk?
8      A    I have a mark on my leg now where I
9  fell on the step.
10     Q    No.  I'm talking back in 2003 and
11  the first half of 2004.
12     A    It's the same thing.  My balance is
13  terrible.  It's painful when I walk.
14     Q    When the rheumatoid arthritis was
15  acting up in 2003 and early 2004, is it true
16  that you had difficulty walking?
17     A    Yes.
18     Q    Were there times in 2003 and early
19  2004 where you couldn't walk?
20     A    When I had the blisters.
21     Q    How about after the blisters
22  resolved?

Page 135

1      A    And from the medication.  Well, it
2  was painful because my feet used to swell so
3  bad --
4      Q    Right.
5      A    -- to where it just hurt.  I mean,
6  basically, I really didn't wear a shoe at
7  work.  I wore socks.
8      Q    At work in '03?
9      A    When I was working in '03; yes.
10     Q    Oh, okay.
11     A    I wore socks because my feet were
12  swelling so bad to where it was painful.
13     Q    In 2003 and early 2004, do you
14  recall telling one or more doctors that your
15  right knee had given out?
16     A    It's my left knee, not my right.
17     Q    But that's something that you
18  mentioned to the doctors?
19     A    Yes.
20     Q    Do you recall in 2003 and early 2004
21  mentioning to the doctors that were
22  attending you that you would get severe

Page 136

1  headaches at times?
2      A    Yes.
3      Q    And that they would last for two to
4  three days?
5      A    Two to three days.  That's when I
6  see two of everything.
7      Q    And I believe the records reflect
8  that you told the doctors that they would be
9  described as "cluster headaches"?
10     A    Headache clusters; yes.
11     Q    Is that your word or their word?
12     A    Their word.
13     Q    Okay.
14     A    They said it was from the
15  fibromyalgia.
16     Q    Okay.
17     A    It's the type of disease where, when
18  you wake up, you don't know what you're
19  going to wake up to.
20     Q    All right.
21     A    That is, if you go to sleep the
22  night before.  I mean, you don't know how

Page 137

1  your body is going to react from day to day.
2  That's the only way I can explain it that I
3  think would make any sense to anyone.
4      Q    I've had it described to me before.
5  I've had rheumatoid arthritis described to
6  me before.
7      A    I'm talking about fibromyalgia.
8      Q    Right.  What is the difference, as
9  you feel it, between the fibromyalgia and
10  the rheumatoid arthritis?
11     A    Oh, I mean, the rheumatoid
12  arthritis, you know, I take medication for
13  it, but they told me that the type I have is
14  the crippling type.  At some point -- I
15  don't know when -- but at some point I'm
16  going to have to be in a wheelchair.
17     Q    In 2003 and early 2004, you say that
18  you wouldn't know from day to day how you
19  would feel in the morning?
20     A    That was from the fibromyalgia.
21     Q    And in 2003 and early 2004, is it
22  true that there would be days that you could

Page 138

1  not bring yourself out of bed?
2      A    Yes.
3      Q    How often would that happen in the
4  first half of '04?
5      A    For instance, I had one attack that
6  lasted a week and a half, and all I could do
7  was turn my head from side to side.
8      Q    Couldn't get out of bed?
9      A    All I could do was turn my head from
10 side to side.
11     Q    And that was either '03 or '04?
12     A    In '04.
13     Q    The first half of '04 or the second
14 half of '04?
15     A    Around March, I guess, of '04.
16     Q    Do you recall reporting to your
17 doctors in 2003 and early 2004 suffering
18 from low back pain?
19     A    Yes.
20     Q    When you put all these terrible
21 medical conditions together that are set
22 forth on Exhibit 73 or the things we just

Page 139

1  discussed, is it true that in 2003 and 2004
2  that your medical condition was such that
3  there were days you couldn't bring yourself
4  out of bed?
5      A    After I stopped working.
6      Q    In October of '03?
7      A    In October of '03.
8      Q    So, between October '03 and the
9  middle of '04, there were days when you just
10 couldn't get out of bed?
11     A    No.  Even before that.  But I didn't
12 have a choice but to work because I was the
13 only income.
14     Q    Okay.
15     A    I don't know if that's a fair answer
16 for you or not.
17     Q    Well, I understand.
18     A    I'm just saying, I came to work even
19 when I was sick.  And, basically, what I did
20 -- Kristen Thomas was the doctor.
21          She called Ms. Riley one time and
22 spoke to her about my condition, and I also

Page 140

1  had her call Mr. Henck, because she felt at
2  that time, any disability program that
3  Ballard Spahr had, I should have been under
4  from what she witnessed.
5      Q    Dr. Thomas was saying that your
6  condition was such that you were totally
7  disabled from work?
8      A    But no one ever told me.
9      Q    All right.
10     A    So, that's neither here nor there.
11 I'm just going by what she wrote in her
12 letter.  I think you've seen that.
13     Q    Yes.
14     A    So, that wasn't explained to me one
15 way or the other.
16     Q    So, let me just re-ask it.
17          Dr. Thomas said to you that she felt
18 that sometime in 2003 you were totally
19 disabled from work?
20     A    She was saying that I should have
21 been up under whatever disability program
22 that the firm had.

Page 141

1      Q    Before the application actually went
2  in?
3      A    Yes.  Back in April of 2003.
4      Q    Well, in 2003 and early 2004, your
5  conditions were such that you were under so
6  much pain, either from the headaches or from
7  the fibromyalgia or the arthritis or the
8  panic attacks, that you couldn't go to work.
9  Is that a fair statement?
10     A    I still worked the days I was
11 scheduled to work; yes.
12     Q    Well, we're talking about after you
13 leave October 15th, 2003.
14     A    No, I haven't worked since then.
15 No, sir.
16     Q    Right.
17     A    Okay.
18     Q    After October 15th, 2003 through the
19 middle of 2004, there were periods of time
20 when the cluster headaches were so bad or
21 the fibromyalgia was so bad or these other
22 conditions were so bad that you couldn't

Page 142

1  bring yourself out of bed?
2     A   Yes.
3     Q   And you gave me one example of about
4  a week where you could only turn your head?
5     A   Yes.
6     Q   Is there any predictability to when
7  your various conditions after the beginning
8  of '04 would occur where you can't get out
9  of bed?  Is there any predictability of when
10  you can't get out of bed?
11     A   What she tells me is maybe six
12  months to a year I will probably be confined
13  to a wheelchair.
14     Q   I'm sorry.  I didn't mean to bring
15  that up.
16     A   But, sir, that's what you asked me;
17  right?
18     Q   Maybe I didn't ask it well enough.
19     A   That's fine.
20     Q   I was talking about the second half
21  of '03 and the first half of '04, were you
22  able to predict which days you were not

Page 143

1  going to be able to get to work?
2     A   Back at that time when I was still
3  working, I was the only income, so I did
4  what was necessary.
5     Q   I'm sorry.  I didn't ask the
6  question correctly.
7     A   Okay.
8     Q   After October 15th of '03 through
9  the first half of '04 --
10     A   Okay.
11     Q   -- was there any ability for you to
12  predict which day you couldn't drag yourself
13  out of bed because of the pain or the
14  headaches or whatever was going on?
15     A   And as I've said before, when you
16  wake up, you don't know how you're going to
17  wake up.
18     Q   Well, that's my point, is it wasn't
19  predictable.
20     A   I mean, it's not predictable.  It's
21  still not predictable.
22     MR. DiMURO:  Let me have this marked

Page 144

1  as Exhibit 74.
2             (Whereupon, the document
3             was marked as Deposition
4             Exhibit No. 74, for
5             identification.)
6     BY MR. DiMURO:
7     Q   This came from the Social Security
8  Administration, and it's entitled
9  "Activities of Daily Living," and it looks
10  like it's signed by you on the second page.
11        If you would look at it please, I'm
12  going to ask you, did you fill it out and
13  did you sign it, and the answer may be
14  different for each of those parts.
15             (Whereupon, the witness reviewed the
16  document.)
17     BY MR. DiMURO:
18     Q   Let's start with the first question.
19        Did you fill it out if you recall?
20     A   Yes.  My daughter helped me fill it
21  out.
22     Q   Is it her handwriting or your

Page 145

1  handwriting?
2     A   Some of it's mine, some of it's
3  hers.
4     Q   In any event, you signed it?
5     A   I signed it, yes, on 12/15/03.
6     Q   And Paragraph 9 or Section 9 says,
7  quote, "My life has changed tremendously.
8  I'm not able to work, exercise, lift objects
9  over five pounds.  I need help with getting
10  in and out of the tub, off toilet, and
11  sometimes help out of bed.  I can only walk
12  small distances at a time with the use of a
13  cane."
14        You approved that description of
15  your daily life activities?
16     A   At that particular time.
17     Q   And that was December 15th, 2003?
18     A   Uh-huh.
19     Q   Yes or no?
20     A   Yes.
21     Q   Has anything changed in how you
22  described to the Social Security

Page 146

1  Administration your ability to get around
2  and do these things?
3      A   It's worse.
4      Q   So, after you signed this document
5  on December 15th, 2003, Exhibit 74, the
6  description in Section 9, any updates you've
7  made would only describe a worse situation?
8      A   Yes.
9      Q   And I think, if I recall correctly,
10  that the Social Security has people either
11  come to the house or interview over the
12  phone. I don't recall.
13      A   Yes. You send your paperwork out
14  and -- you know, you fill it out and they
15  check with your doctors or whatever.
16      Q   And I'm sure they ask about the
17  doctors and I'm sure they ask about the
18  medical treatment; right?
19      A   Yes.
20      Q   But they also ask you about how
21  you're doing, if you're doing personal
22  chores or household stuff, how you're doing

Page 147

1  in your daily life activities; is that
2  right?
3      A   Yes.
4      Q   And anything you said to the Social
5  Security Administration after December 15th,
6  2003 about your daily life activities,
7  anything you said would describe a situation
8  that's worse than what's in Section 9?
9      A   Yes.
10      Q   And up in Section 1 where it says,
11  "My chronic body pain enables me to do too
12  much of anything" -- see that sentence up
13  here? -- I think what you meant to say was -
14  -
15      A   I am unable to --
16      Q   -- unable to do it?
17      A   - groom myself; yes.
18      Q   So, that was a true statement on
19  December 15th, 2003?
20      A   Yes.
21      Q   And it remains to be a true
22  statement to the present date?

Page 148

1      A   Yes.
2          MR. DiMURO: We can mark this as
3  Exhibit 75.
4              (Whereupon, the document
5              was marked as Deposition
6              Exhibit No. 75, for
7              identification.)
8  BY MR. DiMURO:
9      Q   Exhibit 75 is a document from the
10  Social Security Administration entitled
11  "Function Report Adult-Third Party." This
12  is dated December 16th, 2003.
13      A   Yes.
14      Q   It looks like it's a report being
15  filed by your husband in support of your
16  claim for total Social Security benefits; is
17  that correct?
18      A   (No response.)
19      Q   I think what it is is your husband
20  saying what he observes about your
21  condition?
22      A   Yes.

Page 149

1      Q   Do you know if he did this himself
2  or if he had help?
3      A   My daughter.
4      Q   Is that his signature on the very
5  last page? I'll show it to you, ma'am.
6  It's Page SSA-49. Is that his signature?
7      A   Yes.
8      Q   Did you actually take a look at it
9  after he or your daughter filled it out?
10      A   No. She just asked the questions,
11  and we just answered them.
12      Q   Okay. So, you were there while they
13  were being answered and filled out?
14      A   Yes.
15      Q   So, when he says, in Section 8 on
16  Page 2, "Ms. McFadden grooms herself, aid
17  getting in and out of the tub, takes her
18  medications, and sleeps a lot, she is
19  constantly in chronic pain," all that's a
20  true statement?
21      A   Yes. I think what he means by
22  "grooms herself" --

Page 150

1    Q    Right.
2    A    -- no offense, I'm able to wipe my
3    own behind.
4    Q    Okay. I understand.
5    A    Okay? I just wanted to clear that
6    up. No offense.
7    Q    And none taken, ma'am.
8    A    I couldn't think of another way to
9    put it.
10    Q    I am sympathetic and empathetic to
11    your conditions. I feel badly about it, and
12    I just need to ask my questions.
13    A    That's okay. I'm still here.
14    Q    Section 16, where Mr. McFadden says
15    -- I'll just show it to you, ma'am, it will
16    be faster -- quote, "The disabled person has
17    chronic pain 24 hours a day" --
18    A    Yes.
19    Q    -- that was true back in December of
20    '03; right?
21    A    Yes.
22    Q    And it was a constant from that date

Page 151

1    to the present date; is that right? It's a
2    true statement since that time?
3    A    Yes.
4    MR. DiMURO: Let's mark this as
5    Exhibit 76.
6        (Whereupon, the document
7        was marked as Deposition
8        Exhibit No. 76, for
9        identification.)
10    BY MR. DiMURO:
11    Q    The document marked as Exhibit 76 is
12    a document entitled "Work Activity Report -
13    Employee," and I don't know who filled this
14    out. Let's see.
15    A    Well, I don't know either.
16    Q    Here it is. SSA-69 of Exhibit 76
17    has your signature; right?
18    A    No. What happened, my doctor filled
19    it out.
20    Q    Okay. Did you sign it?
21    A    I signed it.
22    Q    Okay, great.

Page 152

1    A    Dr. Phillip Mussenden filled this
2    out, and I signed it.
3    Q    Which doctor filled this out?
4    A    Phillip Mussenden.
5    Q    Okay.
6    A    And I signed it.
7    Q    So, just to show you Page SSA-68
8    where he
9    A    This here --
10    Q    Which page are you looking at,
11    ma'am?
12        MS. MURRAY: He's asking about Page
13    68.
14        THE WITNESS: No. But this says --
15    I thought there was another -- No. This is
16    the work activity sheet filled out by Social
17    Security, and I signed it.
18        MR. DiMURO: Okay.
19        THE WITNESS: I just got it a little
20    twisted around --
21        MR. DiMURO: That's all right.
22        THE WITNESS: -- because you said

Page 153

1    something about my doctor. But this was
2    done by the person who took -- When you call
3    Social Security, they take information over
4    the phone, and they send you the
5    application.
6        So, this is what they filled out and
7    had me sign, so this was filled out by the
8    Social Security Administration.
9    BY MR. DiMURO:
10    Q    Ma'am, let's do it one at a time.
11    A    Okay.
12    Q    SSA-68, whose handwriting is it?
13    You're looking at it. Whose handwriting is
14    that, if you know?
15    A    The young lady from Social Security.
16    Q    The handwriting on SSA-69, the lady
17    from Social Security?
18    A    Besides my signature.
19    Q    Okay. So, I see what happens. They
20    call and interview you, they fill out the
21    form for you, and they send it to you for
22    signing, this particular form?

Page 154

1    A    And what they do is -- No. When you
2  get there, they get you to sign it and date
3  it for the date they did the interview.
4  That's why they put this date here.
5    Q    All right. I'm asking --
6    A    Is that making any sense?
7    Q    Well, no.
8    A    Okay. They do the interview over
9  the phone.
10    Q    Right.
11    A    They tell you what date to come in
12  and turn in your major paperwork, which is
13  -
14    Q    Don't mix all that up. Just listen
15  to the --
16    A    I know. That's what I'm trying to
17  explain to you. And this is the form that
18  you have to fill out when you come back.
19  Not this one, but the other application you
20  showed me earlier.
21    Q    Yes, ma'am.
22    A    Yes. So, this here, this is the one

Page 155

1  my daughter had to fill out.
2    Q    That's Exhibit 73?
3    A    Right. When you talk to them on the
4  phone, they do like a telephone interview.
5    Q    Right.
6    A    They're writing down what you're
7  telling them.
8    Q    Right. You're now talking about
9  Exhibit 76?
10    A    Right. And this is my signature.
11    Q    And when and how does it get
12  presented to you for signature?
13    A    When you go into the office.
14    Q    So, you went in the office, somebody
15  gave it to you, and you read it and you
16  signed and verified the information?
17    A    And I signed it; yes.
18    Q    And the date of January 23, '03 is
19  the date of the interview or the date that
20  you're in the office?
21    A    October the 23rd.
22    Q    That's right. I'm sorry. I was

Page 156

1  reading upside down.
2    A    That's okay. I do that sometimes,
3  too.
4    Q    Is that the date you're in the
5  office or the date of the interview?
6    A    The day of the interview.
7    Q    So, you're in the office a couple of
8  weeks later or what?
9    A    I think it was around November the
10  6th or something. Around that time. I'm
11  not sure.
12    Q    It says here on Page 69 of Exhibit
13  76, "My job is very tolerant with me and
14  they wouldn't fire me, although I just
15  couldn't function to my full job capacity."
16    So, the lady from SSA wrote that
17  down, but does that express your feelings at
18  that period of time?
19    A    Basically, what was meant by that at
20  that time, Mr. Henek and I both agreed to --
21  you can no longer work. So, that's why I
22  put that in at the time, that they wouldn't

Page 157

1  fire me, even though they knew I was working
2  and that I was sick. That wasn't a secret.
3    Q    When you went on the modified
4  schedule in roughly January of '03 --
5    A    In January; yes.
6    Q    -- you kept your full-time pay;
7  isn't that correct? You still got paid for
8  being full-time, even though you were off
9  two days one week and off one day the other
10  week?
11    A    Are you saying that I would get
12  docked?
13    Q    No, no, no.
14    When you went to the modified
15  schedule, one week you would not work two
16  days, and the next week when you had the
17  vaccination -- or your husband did --
18    A    For my husband; yes.
19    Q    -- you would only work four days.
20  So, in a two-week period, you were off three
21  days.
22    What I'm asking is, you still got

Page 158

1  paid your full salary; right?
2      A    No.
3      Q    Why didn't you get    You weren't
4  still --
5      A    I mean, if I had leave to cover it -
6  - But I think I submitted my pay stubs when
7  it showed where I was paid different things
8  at different times.
9      Q    Let me back up and ask it this way.
10         When you went to the --
11      A    I'm getting kind of -- You asked me
12  did I get a full pay.  No.
13      Q    Let me ask it this way.
14      A    Okay?
15      Q    Okay.
16      A    Okay.
17      Q    I'm not saying you did anything
18  wrong.
19      A    No.  I'm just trying to comprehend
20  what you're saying.
21      Q    Okay.
22      A    I just want to give you a straight

Page 159

1  answer, because I want to go home, too.
2      Q    All right.
3      A    Because I'm in pain at this point.
4      Q    Well, all right.  I'm --
5      A    So, you asked me if, when I worked
6  that two-week period --
7      Q    If you let me re-ask the question,
8  we'll get to it faster.
9      A    Okay.  Well, re-ask your question.
10      Q    In a two-week period, there are ten
11  work days, you know, unless there's a
12  holiday; right?
13      A    Well, we got paid twice a month at
14  that point.
15      Q    Ma'am --
16      MS. MURRAY:  Just wait until he asks
17  you a question.
18      THE WITNESS:  Okay.
19      BY MR. DiMURO:
20      Q    In a two-week period, there are ten
21  work days; right?
22      A    (No response.)

Page 160

1      Q    Ma'am, back in '03 and early '04 --
2      A    Yes.
3      Q    Your modified work schedule
4  basically broke down to you only had to work
5  seven out of those ten days; right?
6      A    Yes.
7      Q    You, nonetheless, were still set at
8  a full-time salary; isn't that true?
9      A    Could you explain that?
10      Q    Sure.
11      A    I don't know what that means.
12      Q    Nobody put you on part-time and gave
13  you 70 percent of your salary?
14      A    Oh, no.
15      Q    And you still accrued benefits like
16  sick leave and vacation leave as if you were
17  still a full-time employee?
18      A    Yes.
19      Q    Okay.  That's all.
20         Now, sometimes you used leave that
21  was paid, and sometimes, when you couldn't
22  come in on the days you were supposed to be

Page 161

1  there, you got docked?
2      A    Yes.
3      MR. DiMURO:  Okay.  I'm going to
4  step out for a minute, and I'll be right
5  back.
6      (Whereupon, a brief recess was
7  taken.)
8      BY MR. DiMURO:
9      Q    Back now to late '03, after you
10  leave on October 15th or so, 2003 through
11  the first half of '04, in terms of all the
12  medical conditions and problems you had,
13  what I'm going to ask is a series of
14  questions about what you could or could not
15  do.
16         So, after October 15th, 2003 until
17  the middle of the year 2004, were you
18  cooking at home?  Could you cook at home?
19      A    No.
20      Q    Could you drive?  Do you drive?  Did
21  you ever drive a car?
22      A    Yes.

Page 162

1    Q   So, in that period of time --

2    A   I haven't driven since then.

3    Q   Every once in a while you meet

4  people who say, you know, I just never

5  learned to drive, especially in cities.

6    A   Okay.

7    Q   But you were a driver at some point?

8    A   Yes.

9    Q   After October 15th, 2003 to the

10  middle of May 2004, could you drive?

11    A   No.

12    Q   Could you do household chores,

13  cleaning?

14    A   No.

15    Q   Could you do the laundry?

16    A   No.

17    Q   Could you go shopping?

18    A   You mean as far as for --

19    Q   Food shopping.

20    A   Food shopping?

21    Q   Yes.

22    A   My daughter took care of that.

Page 163

1    Q   You can always go clothes shopping.

2    A   No. I didn't do that either.

3    Q   It sounds like, because you were

4  having your daughter fill out forms, that

5  you couldn't write either?

6    A   Because of my hands. They would

7  cramp up.

8    Q   Was that the arthritis?

9    A   The rheumatoid arthritis. With the

10  fibromyalgia, what I did was I took fluid

11  pills every day. Usually, my fingers were

12  twice the size of what you see now, and I

13  can't even bend them. But I took fluid

14  pills.

15    Q   And that's the way it was after

16  October 15th, 2003 through May --

17    A   Oh, even before that before I

18  stopped working.

19    Q   So, you couldn't write?

20    A   No.

21    Q   Could you hold the phone like a cell

22  phone or a kitchen phone?

Page 164

1    A   As far as I knew, I never got to the

2  phone, so I guess the answer is no.

3    Q   Okay.

4    A   I mean, basically, the phone that I

5  had in my bedroom was a speaker phone. So,

6  you know, it was like we could see the

7  number.    Somehow, my son connected it

8  to the TV so we could see the number, so if

9  it wasn't necessary to answer, we didn't,

10  especially if we was there alone.

11    Q   Is it a fair assumption that given

12  the fibromyalgia and the rheumatoid

13  arthritis, that after October 15th, 2003

14  holding a regular house phone or a kitchen

15  phone would not be comfortable to you, that

16  you couldn't do it?

17    A   Not for a long period of time; no.

18    Q   After October 15th, 2003, did you

19  have difficulty sitting in one spot for any

20  length of time?

21    A   Yes.

22    Q   And what is it about sitting that

Page 165

1  causes the problem? Does it cause back

2  problems or --

3    A   It causes the lower back pain, the

4  spasms in my neck.

5    Q   And what do you have to do to

6  relieve that? Go lie down?

7    A   Vicodin is a wonderful thing.

8  Ibuprofen.

9    Q   All right.

10    A   Basically, like I said, sometimes

11  the medication works or doesn't. That's why

12  my doctor suggested I move to a warmer

13  climate.

14    Q   But what you're describing about the

15  lower back pain from sitting too long

16  occurred after October 15th, 2003 to the

17  present day?

18    A   No. It was happening before that.

19    Q   Yes. But it was present --

20    A   But I had a thing in my chair at

21  work that I had for my back.

22    Q   Right. But after October 15th,

Page 166

1  2003, certainly you couldn't sit for long
2  periods of time without either having taken
3  the medication, Vicodin, or --
4      A   Ibuprofen of the anti-depressant
5  because of the pain.
6      Q   Right.
7      A   And it would make me sleep.
8      Q   What does the Vicodin do to you?  I
9  haven't had the pleasure.  Strike that.
10  I'll back up.
11         What does the Vicodin do to you?
12      A   Want one?  I'm just joking.
13  Basically -- Well, I'm trying to think of a
14  nice way to put it.
15      Q   Well, what I'm asking is, does it
16  cause you to be drowsy or lack of
17  concentration?
18      A   Yes, drowsy.  Like my equilibrium is
19  also -- Basically, you know, I can walk into
20  a wall and it's just normal to me now.  Does
21  that make any sense?
22         If I'm in the house and I'm walking

Page 167

1  around and if I walk into a wall, it's like,
2  oh, okay.
3      Q   Okay.
4      A   I have to accept that.
5      Q   Because these things don't happen to
6  people on just a specific date, what I think
7  you're telling me is the things we've been
8  discussing in the last few minutes about
9  what you couldn't do and how you felt and
10  what you had to do to relieve the pain, they
11  existed prior to October 15th, but they had
12  gotten to the point where, as of October
13  15th, you agreed to go on disability because
14  of these conditions?
15      A   Yes.  Mr. Henck and I discussed
16  that.
17      Q   And you felt the disabilities and
18  the conditions and the restrictions on your
19  abilities had gotten to a point where you
20  needed to leave work?
21      A   Yes.
22      Q   And those restrictions on your

Page 168

1  ability to work and function never got
2  better.  They continually progressed to --
3      A   It gets worse; yes.
4      Q   Okay.  Let me show you a few things.
5  Well, let me just ask you this question.
6         What job could you have done at
7  Ballard Spahr after October 15th, 2003?
8      A   The receptionist job.
9      Q   After everything we've talked about
10  and gone over your medical records and
11  discussed your limitations and restrictions,
12  do you really honestly feel and contend that
13  you could do the receptionist job after
14  October 15th, 2003?
15      A   Yes.  Because at the receptionist
16  desk, there was a headset --
17      Q   Right.
18      A   -- that you put on.  So, it was a
19  matter of it wasn't a complicated system to
20  work.  So, I could always use the end of a
21  pencil -- I mean, you're talking about
22  hitting a button about this little; okay?

Page 169

1         The job that I was offered was word
2  processing.  Word processing types more than
3  a legal secretary.  So, with wearing these
4  (indicating), I couldn't see myself being a
5  word processor.
6      Q   Let's stay with the receptionist.
7         So, you think you really could have
8  done the receptionist job as of 2004?
9      A   Yes.
10      Q   Do you think you can do the
11  receptionist job today?
12      A   Now? No.
13      Q   At what point along the progression
14  of your medical condition do you look back
15  and say I couldn't do the receptionist job
16  anymore?  Was it the summer of '03, the fall
17  of '03?
18      A   I would say in 2005.  Basically, my
19  condition is progressive.
20      Q   Right.
21      A   It's not going to get any better, so
22  --

Page 170

1    Q    At what point in '05 -- and I don't
2  mean a specific date -- but are you talking
3  about January, February, July, or March?
4    A    The beginning of '05.
5    Q    So, we're back in '04 -- I'm trying
6  to get your mind in May of '04 -- and you
7  want to be the receptionist. How are you
8  going to be able to sit for six, seven,
9  eight hours and do the job?
10    A    Well, the receptionist that was
11  doing it didn't sit for six or seven hours.
12    Q    Well --
13    A    I mean, she got breaks. Three or
14  four breaks a day. She had a lunch hour.
15    Q    Three or four breaks a day?
16    A    Oh, yes. And I used to do a lot of
17  them. Because of her medical condition, she
18  --
19    Q    And how are you going to sit for an
20  hour and a half?
21    A    Sometimes she used to sit for an
22  hour and a half because I used to relieve

Page 171

1  her.
2    Q    Well, I understand --
3    A    No, no. I understand what you're
4  saying, but I'm explaining. If I was
5  treated the way she was treated, yes, I
6  could have done the job.
7    Q    Okay.
8    A    But if it was strictly, okay, break
9  in the morning, break in the evening, lunch,
10  no.
11    Q    Okay.
12    A    Is that a fair answer?
13    Q    Well, I need to focus in on you and
14  not the other lady for the moment.
15    A    Oh, okay.
16    Q    In May of '04, you could not sit for
17  more than a half-hour, an hour, hour and a
18  half, two hours?
19    A    It all depends on how the
20  fibromyalgia -- I mean, how my illnesses
21  acted that day.
22    Q    Could it have been the case in May

Page 172

1  or June of '04 that there were days you
2  couldn't sit for more than 30 minutes?
3    A    In '04, I was in better condition
4  than I am in now.
5    Q    Well, I'm trying to put your head
6  back into May of '04.
7    A    May of '04; right.
8    Q    In May of '04, isn't it true that
9  there would be days that you'd wake up and,
10  because of the unpredictability of your
11  condition, you couldn't sit for 30 minutes?
12  Isn't that true?
13    A    It all depends. But then, on the
14  same token --
15    Q    Well, I'll let you say anything you
16  want --
17    A    Okay.
18    Q    -- but do you agree that there could
19  be days in May of '04, given your condition
20  as of that stage in time, that you couldn't
21  sit for more than 30 minutes?
22    A    I'm probably doped up; yes. I'm

Page 173

1  trying to answer as truly as possible, sir.
2    Q    All right. But you would need to
3  have medication to do so in the May '04 time
4  frame to sit for 30 minutes; is that right?
5    A    At that point, I wasn't taking as
6  many medications as I'm taking.
7    Q    All right. Then I don't know which
8  it is. I don't know if it's the medication
9  --
10    A    I don't --
11    Q    Ma'am --
12    MS. MURRAY: Let him ask the
13  question.
14    THE WITNESS: I'm trying to listen
15  to what he's saying.
16    MS. MURRAY: Wait for the question.
17    BY MR. DiMURO:
18    Q    I don't know which you are telling
19  me, whether you could sit with medication or
20  sit without medication.
21    In May of '04, isn't it true that
22  there would be days that you'd wake up and

Page 174

1  your condition was such that you couldn't
2  sit for more than 30 minutes or a short
3  period of time like 30 minutes, 40 minutes,
4  an hour?
5      A    I could have done it in May of '04.
6      Q    Think about the worst day you would
7  have in May of '04. Just do your best to
8  think about the worst you would feel in May
9  of '04.         What's the amount of time
10  you could sit on the days that you would
11  feel the worst in May of '04?
12      A    I'm trying to think back. I'm just
13  trying to think back to the type of chair
14  that was there or whatever, and probably
15  with some type of back brace or whatever, I
16  probably would have been able to do it --
17      Q    Well, that's --
18      A    -- and sit maybe for an hour and a
19  half at a time and then get a break.
20      Q    And you're saying on the worst day
21  you could go to an hour and a half? I'm
22  trying to ask you about what --

Page 175

1      A    Yes. On a worst day, like I said,
2  if I have some type of back brace or some
3  type of support for my back with my
4  medication.
5      Q    All right. So, you've got to have
6  the medication in there?
7      A    But not as much as I'm taking now.
8      Q    But it would have been Vicodin back
9  then in May of '04 to get through that hour
10  and a half?
11      A    I would take Vicodin; yes.
12      Q    And you would have also had to take
13  the anti-depressants or some type of anti-
14  depressant back in May of '04 to get through
15  the day as the receptionist; is that true?
16      A    Well, the receptionist job wasn't a
17  stressful job, so I don't think I would have
18  had to take as much medication as far as
19  having an anxiety or panic attack or
20  anything of that nature.
21      Q    Okay.
22      A    You know, my pain determines and

Page 176

1  stress determines how my body is going to
2  react.
3      Q    I have not had to take anti-
4  depressants myself. I know a lot of people
5  who do. So, this is not a judgment issue.
6          But I thought that when you take
7  anti-depressants, you have to take them on a
8  continuous basis. You can't just take one
9  on a --
10      A    No. You take them every day.
11      Q    Right. So, in May of '04 when
12  you're doing the receptionist job and you're
13  not feeling good, you wake up and you're not
14  feeling good, you would take pain medication
15  like Vicodin and you would already be on
16  anti-depressants; right?
17      A    Yes.
18      Q    And the Vicodin causes you to sort
19  of "space out," for lack of a better word?
20  Doesn't it cause that?
21      A    I don't know if "space out" is the
22  word. I think it makes you forget about the

Page 177

1  pain mind-wise. But, you know --
2      Q    Does it make you lose focus and
3  concentration?
4      A    I wouldn't drive under the influence
5  of it. Is that a reasonable answer?
6      Q    Well, does it make you lose focus or
7  concentration, the Vicodin? You just said --
8
9      A    I mean, at that point in time --
10  Could we just kind of break this down into
11  dates? Then I think I can --
12      Q    We're staying right in May of '04.
13      A    Okay. May of '04. In May of '04, I
14  think I would have been able to have done it
15  to accommodate my financial need at the
16  time.
17      Q    Okay.
18      A    But if you asked me if I could do
19  that job today or since the beginning of,
20  say, February or March of '05, the answer
21  would be no.
22      Q    Okay. We're back in May of '04, and

Page 178

1  you're trying to do the receptionist job.
2      A   Yes.
3      Q   On your worst days, you'd have to
4  have some Vicodin; right?
5      A   I mean --
6      Q   I need an answer to the question.
7      A   Yes.
8      Q   What does Vicodin do to you? What
9  does it make you feel? Do you sort of lose
10  focus or concentration? Do you --
11      A   It makes you droggy sometimes. I've
12  been droggy since I've been here.
13      A   Because of the Vicodin?
14      A   Yes.
15      Q   And it --
16      A   But, I mean, if I heard a phone
17  ring, I would answer it.
18      Q   How many phone lines are there at
19  Ballard Spahr?
20      A   At the receptionist?
21      Q   Yes.
22      A   As I recall, there wasn't that many.

Page 179

1  Maybe 16, if that many. It was a very
2  simple piece of equipment to work. It
3  wasn't like a big phone line thing or
4  whatever. You basically transfer your
5  calls, you put people in voicemail, you took
6  messages.
7      Q   How do you take the message? Did
8  you type up the message on an e-mail system
9  at that point in time, or did you write it
10  down on a message pad?
11      A   You write it down on a message pad.
12      Q   How are you going to write when you
13  can't really write that well in May of '04?
14      A   I don't think I would have been
15  writing letters. I think I would write the
16  date and the time that the person called and
17  who the call was to. Or I would have put
18  that person to the person's voicemail.
19      Q   What do you do as the receptionist
20  in May of '04 when the cluster of headaches
21  and the joint pain from fibromyalgia is so
22  severe that you can't get out of bed that

Page 180

1  day? What do you do as the receptionist?
2      A   I would do like any other employee
3  would do. I would call in sick.
4      Q   How many sick days do you get?
5      A   You get ten a year.
6      Q   Ten a year.
7      A   It all depends.
8      Q   So, you're reporting to the doctors
9  clusters of headaches several times a month,
10  aren't you?
11      A   No. I haven't -- I mean, the thing
12  of it is, I'm looking at what you're asking
13  me, and I want to give short answers because
14  I want to go home, too. But from April of
15  '03, I did what I had to do because I was
16  the only income.
17      Q   I understand that, ma'am. I really
18  do understand that.
19      A   Okay. So, the same thing would have
20  applied in May of '04 because, at that time,
21  I wasn't getting any type of income from
22  Unum.

Page 181

1      Q   I understand that.
2      A   So, I would have did what was
3  necessary. I'm not saying that I wouldn't
4  have made a mistake along the way.
5      Q   But if you had been approved for
6  benefits in May '04 by Unum, you would have
7  taken the benefits and stayed on disability,
8  wouldn't you?
9      A   Who wouldn't? I mean - But that's
10  not the way it went. It went a different
11  way. I mean, basically, you know, it just
12  didn't go that way. I mean, I think that's
13  one of the reasons why we're here; okay?
14         Because I feel like it wasn't like
15  my condition wasn't seen. Other employees
16  would testify they saw how my feet were
17  swollen and how they would help me out and
18  help me do things.
19      Q   I understand.
20      A   Okay. So --
21      Q   Does the receptionist have --
22      A   The receptionist basically answers

Page 182

1  the telephone. She didn't do memos or type
2  letters or whatever even though, on her
3  evaluation, it says front office secretary,
4  but that's not the job she performed.
5      So, if it's a matter of fairness and
6  I answered the phone as only she did, I
7  could have done the job. And I think I've
8  answered all three or four of your
9  questions. I think.
10     Q    Did the receptionist have any need
11  to walk and leave the desk?
12     A    Go to the bathroom.
13     Q    All right.
14     A    I mean, I didn't know what she would
15  do. What do you want me to say?
16     Q    I'm talking about you. You, as the
17  receptionist back in May of '04, would have
18  had to leave the receptionist desk at times,
19  isn't that true, to go on breaks?
20     A    As any receptionist would get
21  breaks; yes.
22     Q    Okay. All right. Just answer the

Page 183

1  question.
2      A    I'm trying to answer --
3      Q    I don't care about other
4  receptionists. I'm talking about you.
5      A    Okay. Yes.
6      Q    Various of your doctors in late '03
7  and -- Well, basically, what you're saying
8  is that, if you had gotten the benefits from
9  Unum in May of '04, you wouldn't have
10  worried about taking the receptionist job;
11  right?
12     A    It was a thing of finances. I had
13  to survive.
14     Q    But if you had gotten the benefits
15  from Unum, you would have stayed on long
16  term disability?
17     A    Yes. For my pain level; yes.
18     Q    Because you were disabled?
19     A    Yes. But that didn't happen.
20     Q    But you appealed. The denial of the
21  Unum benefits came in, I think, on May 11th;
22  right? The letter is dated May 11th.

Page 184

1      A    Yes. May 11th; yes.
2      Q    You subsequently filed an appeal
3  sometime later that year.
4      A    My son did appeal for me.
5      Q    About three or four months later;
6  right?
7      A    I did an appeal in October. I know
8  my son was in grad school.
9      Q    Okay.
10     A    He came, I think, around the
11  holiday. So, therefore, I didn't have any
12  income from Unum from --
13     Q    Ma'am, all I asked you was when you
14  filed the appeal.
15     A    Okay. I filed the appeal in
16  October.
17     Q    October of '05?
18     A    Yes.
19     Q    And, ultimately, there was another
20  review, and they granted your benefits;
21  right?
22     A    Yes. After EEOC gave me the right

Page 185

1  to sue. That's the way it happened. I'm
2  sorry.
3      Q    I'm just asking you, after you filed
4  --
5      A    Okay, yes. After I got it, well,
6  yes.
7      Q    You have to wait for me sometimes.
8  I know it's hard.
9      A    Well, like I said, I'm on Vicodin.
10     Q    Okay.
11     A    Okay.
12     Q    After you filed the appeal of Unum's
13  denial of the benefits, they ultimately
14  reconsidered and awarded you the benefits;
15  right?
16     A    No. What they did was they went
17  back and they paid me for the months they
18  did not pay me.
19         And every letter I've received, from
20  what I comprehended, if my disability was
21  approved, I didn't owe any back money. If
22  it wasn't approved, I didn't owe any back

Page 186

```
1   money.
2       Q   I don't think you heard the
3   question.
4           Unum denied the long-term disability
5   in May of '04. You appealed, and ultimately
6   they reconsidered and awarded you your long-
7   term disability benefits; right?
8       A   Not until September -- Yes.
9       Q   Thanks.
10      A   Okay.
11      Q   I'm showing you Exhibit 3, ma'am, a
12  letter from Dr. Clark to Mr. Spellman.
13      A   Yes.
14      Q   Did you see this letter from the
15  doctor?
16      A   Randall Clark? Yes.
17      Q   Pardon me?
18      A   Randall Clark? Yes.
19      Q   You saw the letter back in October
20  of '04 is what I'm asking.
21      A   Yes. That's my psychiatrist.
22      Q   Yes. And if you look on the second
```

Page 187

```
1   page, he says that "Ms. McFadden is
2   incapable of resuming employment now or in
3   the foreseeable future."
4           Did you see that statement back in
5   October of '04?
6       A   Yes.
7       Q   And this letter was submitted to
8   Unum for purposes of reconsidering your
9   request for long-term benefits; is that
10  true?
11      A   That's not true.
12      Q   Well, look at the front page.
13      A   No. The first letter -- and I don't
14  know if you have a copy of that -- when my
15  doctor did a conference call, which I was in
16  on, basically Unum sent my psychiatrist a
17  letter calling him a quack.
18      Q   Ma'am, that has nothing to do with
19  the question.
20      A   Oh, okay.
21      Q   Exhibit 3 is a letter sent by Dr.
22  Clark to Mr. Spellman; right?
```

Page 188

```
1       A   Uh-huh.
2       Q   You have to say yes or no, ma'am.
3       A   Yes.
4       Q   Mr. Spellman was someone at Unum
5   working on your application for long-term
6   disability benefits; right?
7       A   Yes. But at some point, they
8   changed the person that was doing it.
9   That's why I confused that.
10      Q   This letter --
11      A   It went to Unum.
12      Q   -- went to Unum for the purpose of
13  convincing Unum that you're entitled to
14  long-term disability benefits because you're
15  disabled; right?
16          MS. MURRAY: Calls for speculation.
17          MR. DiMURO: Well, it's not
18  speculation.
19          Go ahead and answer.
20          MS. MURRAY: You're asking why Dr.
21  Clark sent the letter. That's what you're
22  asking her, so calls for speculation as to
```

Page 189

```
1   why he did that.
2           MR. DiMURO: Thank you.
3           BY MR. DiMURO:
4       Q   Was this letter submitted to Unum,
5   Exhibit 3?
6       A   Yes.
7       Q   Was it submitted as part of your
8   request for them to reconsider the denial of
9   your long-term disability benefits?
10      A   It was included in my appeal.
11      Q   Okay. For the purpose of asking
12  them to reconsider their denial of your
13  benefits; right?
14      A   But that wasn't the only -- I mean,
15  this is not what made me get my disability.
16      Q   But it was part of the package that
17  you hoped would get you your long-term
18  disability benefits; right?
19      A   I put it with the appeal that I did
20  in October or November of '04.
21      Q   And at that time, you knew that Dr.
22  Clark had written "Ms. McFadden is incapable
```

Page 190

1  of resuming employment now or in the
2  foreseeable future"; is that correct?
3      A   Sure. He's my doctor. Why wouldn't
4  I know?
5      Q   And you had discussed with Dr. Clark
6  earlier that you thought maybe you could do
7  the receptionist job?
8      A   Yes.
9      Q   But he didn't say in this letter
10  that you could do the receptionist job?
11      A   No. But that was back in -- back in
12  after I sort of had no more job protection.
13  I told Dr. Clark that, well, I could have
14  done the receptionist job since she was
15  already out on disability and a temp was
16  working in that position.
17      Q   Right. But when --
18      A   Okay?
19      Q   When Dr. Clark says you cannot
20  resume employment now or in the foreseeable
21  future, he had already heard from you
22  earlier that you thought you could do the

Page 191

1  receptionist job at an earlier date; right?
2      A   At an earlier date; yes.
3      Q   By the way, who was the lady who was
4  out on disability in May of '04 that had the
5  receptionist job? Betty?
6      A   Betty Ann Hahn.
7      Q   She was out on disability because, I
8  believe, she was a cancer patient also?
9      A   She was a cancer patient; yes, sir.
10      Q   Was she out on -- Well, you know
11  that she was out on FMLA leave; right?
12      A   Uh-huh.
13      Q   You have to say yes or no.
14      A   Yes.
15      Q   And I had the impression that you
16  understand from your readings the rights
17  under FMLA?
18      A   Yes, I do. Yes.
19      Q   And you did know that in May of '04;
20  right?
21      A   I knew it in '03, too.
22      Q   Okay.

Page 192

1      A   I mean, it's all -- All I'm saying
2  is that --
3      Q   No. When Ms. Hahn --
4      A   -- I knew that she was out on FMLA.
5      Q   And that meant to you in May of '04
6  that, under FMLA, her job as the
7  receptionist was protected and secured for
8  when she came back; right?
9      A   For 16 weeks.
10      Q   Right.
11      A   Correct.
12      Q   Where was she on May 14th of '04?
13  How many weeks had it been?
14      A   She wasn't at Ballard.
15      Q   How many weeks of FMLA leave had she
16  used up as of May 14th, 2004?
17      A   I don't know. I went out in the
18  middle of October. She went out at the end
19  of October. So, I guess it's fair. If you
20  look at it, she was out in November. She
21  came back to work -- She called me in
22  September to ask me did I receive my

Page 193

1  Christmas bonus.
2      Q   Ma'am, ma'am --
3      A   No. I'm trying to - What you're
4  doing, you're still -- you're asking me a
5  question in a question; okay?
6      Q   No, ma'am.
7      A   Sir, yes, you are. All I'm saying
8  is that we went out at the same time, Ms.
9  Hahn and I. There wasn't too far difference
10  in that.
11      Q   Do you know, as of May 14th, 2004,
12  how much FMLA leave protection Ms. Hahn
13  still had? Do you know from your personal
14  knowledge?
15      A   Oh, I don't know, but she was only
16  entitled to 12 weeks. She was a Virginia
17  resident, so I don't know how to answer
18  that.
19      Q   But you don't really know how much
20  time she came back and how much time she
21  worked or didn't work. So, you really don't
22  know, as of May 14th, 2004, how much FMLA

Page 194

1  job protection she had remaining?
2      A   I only know what she spoke of to me,
3  and she's not here to tell that today, so I
4  don't know what else to tell you.
5      Q   Ma'am, if you could answer my
6  question, please.
7      A   I am answering it.
8      Q   On May 14th, 2004, you have no
9  personal knowledge of how much FMLA leave
10 protection she had remaining; isn't that
11 true?
12     A   (No response.)
13     Q   You don't know her personal leave
14 records.
15     A   Okay.  Now, you need to ask me
16 again.
17     Q   As of May 14th, 2004, you do not
18 have any personal knowledge of the amount of
19 FMLA leave protection or job security Ms.
20 Hahn had remaining?
21     A   It's still not making sense to me.
22 Maybe you could ask me another way perhaps?

Page 195

1      Q   All right.  FMLA gives the person
2  job security.  Do you understand that?
3      A   By law, right?
4      Q   Yes.  It saves the job for them when
5  they come back.
6      A   Okay.  For a total of 12 weeks?
7      Q   For whatever number of weeks
8  applies.
9      A   Okay.  Well, I've answered your
10 question as this.  I guess she received
11 better benefits than I, because she was
12 Caucasian and I was African-American.
13     Q   Well --
14     A   So, that's my answer.
15     Q   Here's the question.
16     A   I've answered your question.
17     Q   Ma'am, the question was, how much
18 FMLA leave left did Ms. Hahn have on May
19 14th, 2004 from your personal knowledge?
20     A   From my personal knowledge, I don't
21 know.
22     Q   I'm showing you Exhibit 13.  The

Page 196

1  first page is a cover sheet sending the fax
2  to Mr. Spellman from Dr. Clark.  Do you see
3  that?
4      A   (No response.)
5      Q   Do you see that?
6      A   (No response.)
7      Q   Exhibit 13, the first page is a fax
8  cover sheet from Dr. Clark to Mr. Spellman
9  at Unum; right?
10     A   (No response.)
11     Q   Ma'am?
12     A   Can I read the document?
13     Q   I just want the record to reflect --
14     A   No.
15     Q   -- that it's been at least a minute
16 and a half --
17     A   No, I --
18     Q   -- since I asked you about a cover
19 sheet --
20     A   No.  I want to make sure that this
21 document is truly from my doctor.  I've
22 never seen this document before.

Page 197

1      Q   Okay.
2      A   Is that okay?
3          (Whereupon, the witness reviewed the
4  document.)
5          THE WITNESS:  Okay.
6          BY MR. DiMURO:
7      Q   This document has a fax cover sheet
8  from Dr. Clark to Mr. Spellman; right?
9      A   From what I see, yes.
10     Q   And then the second page is a
11 handwritten note on Dr. Clark's stationery;
12 right?
13     A   I'm assuming that's his stationery.
14     Q   Okay.  Well, let's get to the point.
15         Are you saying this isn't Dr.
16 Clark's letter?
17     A   No.  I -- I -- I don't know.
18     Q   At the very bottom, he says, quote,
19 "It is not to be expected that she will ever
20 be able to resume gainful employment."
21         That's a true statement, isn't it,
22 from your doctor in March of '04?

Page 198

1    A    If that's what he wrote, yes.  I
2  just don't ever remember seeing the letter.
3    Q    This letter was submitted to Mr.
4  Spellman at a time when your application for
5  long-term disability benefits was under
6  consideration; right?
7    A    Yes.
8    Q    Was Dr. Clark one of the doctors
9  that Mr. Spellman was saying he wasn't
10  getting records from?
11    A    No.
12    Q    And you agree that it is a true
13  statement that as of March 17, 2004 it was
14  not expected that you will ever be able to
15  resume gainful employment?  Do you agree
16  with that?
17    MS. MURRAY:  Object to the form of
18  the question.
19    THE WITNESS:  Yes, the question
20  because --
21    MS. MURRAY:  There's about four or
22  five problems with that.  The main one is,

Page 199

1  are you asking her at that time Dr. Clark's
2  expectation?
3    MR. DiMURO:  No.
4  BY MR. DiMURO:
5    Q    I'm asking you, based on what you
6  knew about yourself, that you would agree
7  with the statement that as of March 17th,
8  2004, it was not to be expected that you
9  will ever be able to resume gainful
10  employment?
11    MS. MURRAY:  Object again.  Who?
12    MR. DiMURO:  I'm asking of her.
13    MS. MURRAY:  I know you're asking it
14  of her.  I'm asking you --
15    MR. DiMURO:  Her mind set.
16    MS. MURRAY:  Let me just do this.
17  I'll object to the form of the question in
18  that it does not identify who expected this.
19    You can answer if you understand it.
20    MR. DiMURO:  Go ahead.  You don't
21  need to look at the letter for this
22  question.

Page 200

1    BY MR. DiMURO:
2    Q    Do you agree that as of March 17th
3  or the middle of March 2004 you were not
4  expected to be able --
5    A    March 17th in the middle?  "The
6  middle," to me, means June -- of the year.
7    Q    I said middle of March.
8    A    Middle of March; okay.
9    Q    Do you agree that as of the middle
10  of March 2004, it was reasonable for you not
11  to expect to resume gainful employment?
12    THE WITNESS:  (To Ms. Murray)  Do I
13  have to answer that question?
14    MS. MURRAY:  If you understand it.
15    THE WITNESS:  Because he's -- I
16  don't understand it.
17    MR. DiMURO:  Don't give me this "if
18  you understand it" stuff.
19    THE WITNESS:  No.  I don't
20  understand it.
21    MS. MURRAY:  First of all, I'm not
22  giving you anything, and you're not

Page 201

1  instructing me what to give my client.
2    MR. DiMURO:  Well, as a speaking
3  objection, you're just telling her to mimic
4  you and say, oh, I don't understand the
5  question.  That is in perfect English.
6    THE WITNESS:  No.  I don't
7  understand the question.
8    MS. MURRAY:  That's why she's asking
9  me the question.
10    THE WITNESS:  That's why I'm asking
11  you the question.  I'm asking you to break
12  it down.  Because, sir, seriously, I don't
13  understand the question.
14    MR. DiMURO:  All right.  I'll ask
15  for attorney's fees, Ms. Murray.
16    MS. MURRAY:  You can do that, and I
17  will oppose it.
18    MR. DiMURO:  Thank you.
19    MS. MURRAY:  Continue.
20    BY MR. DiMURO:
21    Q    Now, in March of '04, you agree that
22  you did not expect, given your condition, to

Page 202

1  resume gainful employment thereafter, right?
2  That's a true statement, isn't it?
3      A    I'm not answering the question.
4      Q    You're not answering that question?
5      A    I mean, what do you want me to do?
6  You're asking me something that -- You're
7  asking me to predict the future sort of in a
8  way.
9          It's sort of like you're asking me --
10  It's like -- I'm not understanding what
11  you're asking me. And I don't feel that I
12  should have to go into detail what I
13  discussed with my psychiatrist.
14      Q    I haven't asked you that question.
15      A    And to why he came to that point. I
16  think that's personal between my
17  psychiatrist and I.
18      Q    The pending question is, in March of
19  2004, your mind set was that you were not
20  going to resume gainful employment given
21  your condition back then.
22      A    That wasn't my mind set. I had a

Page 203

1  psychiatrist.
2      Q    Now, what did you talk to Dr. Clark
3  about concerning your ability to resume
4  gainful employment in 2004?
5      A    It was a series of things.
6      Q    Well, he didn't write this out of
7  thin air. You must have had a discussion
8  with him
9      --
10      A    No, no, no. Sir, I understand that.
11  But, I mean, like you said, you don't want
12  me to go down Memory Lane, and I'm not doing
13  that.      That's something that was
14  confidential between my psychiatrist and I,
15  and I don't think this is the appropriate
16  forum to discuss it. I'm sorry, sir. I
17  don't know what else I want from me.
18      Q    What did you and Dr. Clark discuss
19  in 2003 and 2004 about your ability to
20  resume gainful employment?
21      A    I'm not doing this right here at
22  all. As far as you want to know October

Page 204

1  here? No. This one here --
2      Q    This is not answering my question.
3      A    Yes, it is. Because you are trying
4  to make me -- You want me to tell you what
5  was my mental status then or what I was
6  going through, and I feel that's doctor-
7  privileged information.
8      Q    Ms. Murray will tell you that when
9  you bring a lawsuit of this nature, that
10  that goes by the wayside. You waive your
11  rights in that regard.
12          MS. MURRAY:  Would you like to
13  consult about that? We can do that.
14          THE WITNESS:  You and I?
15          MS. MURRAY:  Yes.
16          THE WITNESS:  Yes.
17          MS. MURRAY:  Give us a minute,
18  please. I appreciate it.
19          (Whereupon, a brief recess was
20  taken.)
21          MS. MURRAY:  I've consulted with my
22  client about her response to the last

Page 205

1  question posed. If we can have the question
2  read back, she will answer it.
3          (Whereupon, the court reporter read
4  back the record.)
5          BY MR. DiMURO:
6      Q    All right. What did you talk to Dr.
7  Clark about in late 2003 and early 2004
8  about you resuming gainful employment?
9      A    The things we talked about was my
10  treatment at Ballard, how I felt that I was
11  discriminated against because of my race,
12  retaliation because of things that
13  previously happened between Ms. Riley and I.
14
15          I talked about how I felt the firm
16  didn't show me any type of loyalty and I
17  have been an exemplary employee. I told him
18  mentally that I was very hurt, if anything,
19  emotionally, dealing with the situation
20  which Ballard put me in a depressive state.
21          You know, we talked about that and I
22  expressed to him how I felt about Mr. Henck,

Page 206

1  how I felt about Mr. Panagopoulos, how I
2  felt about Ms. Riley, how I felt about Janet
3  Craig, and, you know, things that were
4  confidential in my husband's and my life,
5  how these people would come to me -- Mr.
6  Panagopoulos, Janet Craig, other employees
7  - and would ask me personal things I only
8  discussed with Ms. Riley.
9       So, therefore, it shouldn't have
10  went no further than that. How I felt
11  humiliated. And there was a subject brought
12  up of, well, you know, she didn't do too
13  bad. She lives in Southeast Washington, but
14  she was able to send four kids to college.
15  I wonder how she did that? You know, just
16  things.
17       And I'm thinking, you know, what is
18  going on here? And I told him how Ms.
19  Riley, I felt like she disturbed my peace
20  because of the cruel things she would say to
21  me and the way that she would harass me.
22       And how, you know, I felt like Mr.

Page 207

1  Henck, after being loyal to him for 15
2  years, he just stood back and went, you
3  know, whatever.
4       And then it got to the point where,
5  you know, her harassment was to the point
6  where it was unnecessary, uncalled for. I
7  thought it was done for the fact that I was
8  African-American.
9       You know, maybe everybody takes
10  things different. I had to hear things
11  like, well - from her and Mr. Henck -- you
12  know -- Okay.
13    Q   When you decide to get on the
14  question, you let me know.
15    A   No. I'm just saying -- You asked me
16  to explain why he put that there. At that
17  time, mentally, I couldn't have worked for
18  nobody because I was a mess.
19    Q   So -
20    A   No, no. I'm saying mentally, how
21  dealing with Ballard in the situation and
22  trying to get my disability and trying to

Page 208

1  maintain, everywhere I turned there was a
2  block going up there.
3       So, therefore, he was saying, you
4  know, mentally, right now, and with your
5  pain, he said, I don't know -- he said, who
6  would hire you in the condition you're in
7  now? And that's what he meant by as far as
8  gainful employment.
9       Because I expressed to him how, for
10  being treated and being degraded from these
11  people, my suicidal thoughts of taking my
12  life -- You see what I'm saying? Just
13  different things.
14       Sir, I'm answering your question.
15  You wanted to know the rhyme for the reason.
16  I'm giving you the rhyme for the reason.
17  That's why I didn't want to explain it.
18       Well, fine. He thought, at that
19  time, I was suicidal. So, I'm answering
20  your question.
21       THE WITNESS: (To Ms. Murray) Did I
22  answer his question?

Page 209

1       MS. MURRAY: Yes.
2       THE WITNESS: Okay.
3       BY MR. DiMURO:
4    Q   Did you and Dr. Clark discuss the
5  fact that you did not want to go back to
6  Ballard Spahr?
7    A   No.
8    Q   Okay.
9    A   You know, I told him, you know, it
10  was like I'm a very proud person and --
11    Q   Ma'am, you said no.
12    A   No, no. We discussed it because it
13  was a thing where, you know, it's like I
14  felt, because I was black and I went to Mr.
15  Henck, I had discussed it with Ms. Iversen -
16  I did -- I went through the proper
17  channels, and nothing was being done, or it
18  was my imagination that Ms. Riley was saying
19  these things to me.
20    Q   Well --
21    A   You see what I'm saying, sir? So,
22  you're getting my point of view; okay? I'm

Page 210

1  giving my husband chemo; okay? He's
2  throwing up. When he gets home, I'm
3  cleaning up his feces.
4      I've got to come in on Tuesday, and
5  I've got someone telling me, okay, you were
6  out late. I'm not going to leave my husband
7  laying in feces until I get back home at
8  five o'clock or whatever. I'm going to
9  clean him up before I come there.
10     And the days that I did that, I
11 worked that time after that. So, from going
12 through all that and the way I was treated
13 and just the way they did things, yes, I had
14 suicidal thoughts.
15     No, I could not function. I was a
16 mess. No, I didn't bathe for a month. Is
17 this what you want to hear? You can hear
18 it. No, I couldn't comb my hair. I
19 couldn't do things.    You opened up
20 the door for you to know why this was said.
21 I think I just explained it to you, and
22 that's all I can say.

Page 211

1      Q    All right.
2      A    And I answered your question. Am I
3  right?
4      MS. MURRAY: You answered it. Now,
5  let him ask the next question.
6      THE WITNESS: Thank you.
7      BY MR. DiMURO:
8      Q    So, you and Dr. Clark discussed the
9  fact, isn't it true, that you did not want
10 to go back to Ballard Spahr? Isn't that
11 true? Yes or no?
12     MS. MURRAY: At what point in time?
13     MR. DiMURO: Prior to May of '04.
14     THE WITNESS: No. It wasn't about
15 going back to Ballard Spahr.
16     MR. DiMURO: Well, then, all you
17 have to do is say no.
18     THE WITNESS: No. No.
19     BY MR. DiMURO:
20     Q    Now, you talked to Dr. Clark about
21 the fact that you needed some support for
22 your long-term disability claim with Unum.

Page 212

1      You needed some medical support;
2  isn't that true?
3      A    No. I just told him that I have to
4  respond -- They sent the memo to Dr. Clark
5  referring to him as a quack, which he was
6  insulted. That's when the second letter
7  came from Unum stating that.
8      Q    You knew in February, March, and
9  April of 2004 that Unum was seeking Dr.
10 Clark's opinion on your long-term disability
11 application; right?
12     A    Yes. And I was there in the meeting
13 when he told them that some of the stuff
14 they was asking for was too confidential and
15 personal.
16     Q    And you knew that --
17     A    And he took that as an insult as
18 referring to him as a quack.
19     MR. DiMURO: I will just move to
20 strike and ask for attorney's fees if you
21 don't answer my questions, please. We will
22 just continue this as an extended

Page 213

1  deposition. I don't particularly care to do
2  that, but that's what's happened.
3      BY MR. DiMURO:
4      Q    Now, is it true that you were aware
5  that Dr. Clark was writing a report to Unum;
6  isn't that true?
7      A    Yes.
8      (Whereupon, Ms. Riley-Jamison and
9  Mr. Panagopoulos exited the deposition room
10 at this time.)
11
12     BY MR. DiMURO:
13     Q    And as we talked about it, do you
14 recall seeing the letter that's attached to
15 Exhibit 13 back in the February, March, or
16 April '04 time frame?
17     A    Yes. He faxed it to Mr. Spellman.
18     Q    All right. And you saw it back in
19 February, March, or April of '04; isn't that
20 true?
21     MS. MURRAY: Are you referring to
22 Exhibit 13?

McFadden

Page 214

1      MR. DiMURO: Yes.
2      THE WITNESS: Yes. But, as you can
3  see, Dr. Clark had to write another letter
4  on October the 7th. That wasn't good
5  enough.
6      MR. DiMURO: All right.
7      THE WITNESS: That's why the second
8  letter was written.
9      BY MR. DiMURO:
10     Q   So, you knew in February, March,
11  April of '04 that Dr. Clark was saying that
12  it is not -- Strike that.
13        You knew in the February, March, or
14  April time frame of '04 that Dr. Clark had
15  written that it is not to be expected that
16  you will ever be able to resume gainful
17  employment; isn't that true?
18     A   Yes.
19     Q   And you knew that that letter was
20  being used to support your application for
21  long-term disability benefits; right?
22     A   Yes.

Page 215

1      Q   And you talked to Dr. Clark about
2  the fact that you didn't really want to work
3  anymore because of the medical conditions
4  and the pain; isn't that true?
5      A   No. I didn't want to -- Well, he
6  felt that mentally I wasn't able to hold a
7  job at that time.
8      Q   But you told him that you didn't
9  really want to work anyway. You wanted the
10  long-term disability benefits?
11     A   It wasn't about whether I wanted the
12  long-term disability or not.
13     Q   All right. Then you told him --
14     A   No. It was about my mental
15  stability at that time, my emotional state
16  at that time. So, therefore, he said -- and
17  I agreed -- I am in no emotional or mental
18  state to work at this time.
19     Q   Did that change by May 14th, 2004
20  that you were mentally able to work again?
21     A   Him and I had talked about it. And
22  I told him, I said, well, Dr. Clark, I know

Page 216

1  I can do the receptionist job.
2      Q   And did he file a letter with Unum
3  retracting his statement of March 17, 2004?
4      A   Well, at that time, Unum hadn't
5  approved my disability or not. They hadn't
6  came to a conclusion. So, what was there
7  for him to retract?
8      Q   He had previously said to Unum, for
9  purposes of getting you tens of thousands of
10  dollars, if not more, that it is not to be
11  expected that you will ever be able to
12  resume gainful employment.
13     A   That was at that time.
14     Q   Right.
15     A   Yes.
16     Q   Did he ever retract that statement,
17  write a supplemental letter saying, after
18  talking to her some more, she can do some
19  gainful employment?
20     A   Well, after I showed him the letter
21  that I received from the firm, that's how we
22  got to this point.

Page 217

1      Q   I'm just asking did he ever write a
2  letter saying what I wrote in March of '04,
3  I'm changing, I'm modifying --
4      A   No.
5      Q   -- I'm altering?
6      A   No.
7      Q   Do you remember that one of the
8  doctors was giving some difficulty about
9  sending the records because they wanted to
10  have the $40 copying charge paid first? Do
11  you recall that?
12     A   I don't remember.
13     Q   Just to see if I can refresh your
14  memory, Unum reported to you that one of the
15  doctors was not sending in the medical
16  records because they wanted to have the
17  copying charges paid. You don't recall
18  that?
19     A   I've never paid no doctor for no
20  records.
21     Q   I'm just asking you if you --
22     A   No.

Page 218

1    Q    Do you recall Ms. Riley-Jamison
2    paying the $40 for the copying charges on
3    her own Visa card or credit card?
4    A    Sir, I told you no.  You asked me to
5    answer the question --
6        MS. MURRAY:  Just stop.
7        MR. DiMURO:  It was a different
8    question.
9        BY MR. DiMURO:
10    Q    Do you recall Ms. Riley-Jamison,
11    when she was at the Red Cross, hiring your
12    son?  Do you recall that?
13    A    What -- What does that have to do
14    with why we're here today?
15    Q    You're charging this lady with being
16    a racist.  She --
17    A    Well, what does that have to do with
18    her prior --
19    Q    Did she or did she not help get your
20    son a job with the Red Cross?
21        MS. MURRAY:  Just answer the
22    question, Ms. McFadden.

Page 219

1        THE WITNESS:  Mr. Panagopoulos did.
2        BY MR. DiMURO:
3    Q    Okay.  You don't credit Ms. Riley-
4    Jamison with that?
5    A    Mr. Panagopoulos spoke with Ms.
6    Riley.
7    Q    And --
8    A    But since you said that, also
9    remember - I want you to remember this --
10    he didn't work for her but a month, because
11    he ended up being the intern for Donna
12    Shalala, who, at the time, was the Secretary
13    of Health and Human Services.
14    Q    Okay.
15    A    Okay.
16    Q    Did Ms. Riley-Jamison ever use any
17    racist comments?
18    A    What do you mean by "racist"?
19    Q    Well, mean spirited, derogatory
20    comments that have a racial connotation -- a
21    racist connotation.
22    A    Could you please give me an example?

Page 220

1    A    Well, I'm not going to say it out
2    loud, but the N word comes to mind, and
3    there are all sorts of other racial epithets
4    or words that have, unfortunately, been
5    used.
6        I'm asking you if you've ever heard
7    Ms. Riley-Jamison refer to you or other
8    African-Americans in any racist terms?
9    A    The only thing that I've ever heard
10    her say as far as support staff was that we
11    need to get younger people in here that are
12    able to do the job that won't have as many
13    medical problems.
14    Q    All right.  Let's start with racist
15    terms.
16    A    Okay.
17    Q    Did you ever hear Ms. Riley-Jamison
18    --
19    A    Are you asking me did she ever call
20    me a nigger?  No.
21    Q    All right.
22    A    That's what -- You need to tell me

Page 221

1    what you're asking me.
2    Q    You don't know what "a racist term"
3    means?
4    A    Well, I'm not -- I'm not racist, so
5    --
6    Q    All right.
7    A    So, you're asking me to talk about
8    something that's not an everyday part of my
9    life, sir.
10    Q    Yes, but you would know it if you
11    heard it, wouldn't you, if somebody used a
12    racist term in front of you that offended
13    you, whether they meant it that way or not?
14        Do you ever recall Ms. Riley-Jamison
15    using a racist term or a term that you felt
16    was racist?
17    A    I just need you to explain that
18    better.
19    Q    I can't do any better.  That's about
20    as simple as --
21    A    Because you're asking me about
22    racism; okay?  Racism is not based solely on

Page 222

1  calling a person a name.
2      Q   I'm just asking a question. I need
3  an answer.
4      A   Okay. Did she ever call me out of
5  my culture? No.
6      Q   I don't know what that means.
7      A   I'm African-American.
8      Q   Right.
9      A   That's my culture.
10      Q   Try answering my question.
11      A   Okay.
12      Q   Did Ms. Riley-Jamison ever use a
13  term in your presence or about you that you
14  considered to be racist or to show racial
15  bias?
16      A   What do you mean by "racial bias"?
17      A   Ma'am, as simple a word
18  as I can -- Basically, you've sued people.
19  You've sued --
20      THE WITNESS: See, he doesn't --
21  This is where --
22      MS. MURRAY: Just answer the

Page 223

1  question.
2      BY MR. DiMURO:
3      Q   Ma'am, you sued people for being
4  racial discriminators, and you don't know
5  what the term "racist" means or "racial
6  bias"?
7      Did she ever use a term about you or
8  in your presence that you considered to be a
9  racist term, a racial slur of any sort?
10      A   Can we take a break?
11      Q   No. That's an easy question.
12      A   No. Just no.
13      Q   Okay. That wasn't so hard.
14      A   No. I'm just saying, I got confused
15  because you was asking me two questions at
16  one time.
17      Q   Did Ms. Riley-Jamison ever use a
18  term that was derogatory of people with
19  disabilities?
20      A   Yes.
21      Q   What terms did she use?
22      A   She said we needed to get some

Page 224

1  younger people in here in better health and
2  get rid of some of these old people. That's
3  a derogatory remark.
4      Q   Any others that come to mind?
5      A   That's the only one that I witnessed
6  her saying in front of Ms. Hahn and Ms.
7  Briscoe. That's why I was asking you to
8  further explain what you were saying. I
9  wasn't trying to be smart.
10      Q   So, when did this happen?
11      A   I'm not sure round about the date.
12      Q   Rough time frame?
13      A   I know I have it in one of my
14  documents that you have there.
15      Q   But you don't recall the date
16  roughly?
17      A   It was around maybe August or
18  September of 2003, around that time. Around
19  that time frame.
20      Q   Who was present to hear the
21  statement?
22      A   Ms. Betty Ann Hahn and Ms. Cassandra

Page 225

1  Briscoe. And she made the remark that day
2  at the sign-in sheet, and at that time, Pam
3  Curry and a Ms. Wendy, who were two African-
4  American secretaries, had called in sick.
5  One had lupus and one had asthma.
6      Q   Did you say anything to her that day
7  about that statement?
8      A   What was I supposed to say?
9      Q   Ma'am --
10      A   No.
11      Q   -- just answer the question.
12      A   No.
13      Q   I'm really getting --
14      A   No.
15      Q   -- a little tired.
16      A   So am I. No.
17      Q   Okay. Try answering the question.
18      Did anybody, to your knowledge, say
19  something to her about the comment?
20      A   Not that I know of; no.
21      Q   Did you complain to anybody about
22  the comment?

Page 226

1    A    I told Mr. Henck.
2    Q    And what did he say?
3    A    He said he would talk to her about
4    that.
5    Q    And did he get back to you on that
6    point?
7    A    No, he did not.
8    Q    Did you ever ask him about it again?
9    A    He's a grown man. He should have
10    maybe come back and asked me. No --
11    Q    Try answering --
12    A    -- I never asked him about it.
13    Q    -- that question. Did he ever get
14    back to you?
15    A    No, he did not.
16    Q    Did you tell Mr. Panagopoulos about
17    your husband's medical condition?
18    A    He knew some details of it.
19    Q    From you?
20    A    From me. But some of the things I
21    told Ms. Riley, she shouldn't have repeated
22    it to no one.

Page 227

1    Q    Well, what was Mr. Panagopoulos'
2    position at the firm in '03 and '04?
3    A    Okay. Mr. Panagopoulos, when I left
4    there, he was a partner for the litigation
5    department. Okay. Ms. Riley was the human
6    resources manager.
7    Q    Right.
8    A    I don't see where -- And Ms. Janet
9    Craig was a systems administrator. She
10    dealt with computers. I don't see where
11    these people interchange with my life in
12    their positions with the firm.
13    Q    What did you tell Mr. Panagopoulos
14    about your husband's condition?
15    A    I would try to respond to him from
16    what Ms. Riley told him.
17    Q    Ma'am, you said that Mr.
18    Panagopoulos knew some things from you,
19    isn't that true, about your husband's
20    condition?
21    A    When he was -- The only thing that
22    he knew at the time was that they were going

Page 228

1    to try to give my husband his health
2    benefits, and Dino -- Mr. Panagopoulos
3    helped me with that.       But as far as
4    other things with my husband's medical care
5    or whatever, when Mr. Panagopoulos would
6    approach me, the only person he could have
7    gotten it from was Ms. Riley-Jamison.
8        For instance, when I was going to
9    Kristen Thomas, I didn't tell Mr.
10    Panagopoulos that. I mentioned it to Ms.
11    Riley, you know, that's the doctor I was
12    going to.
13        Mr. Panagopoulos come up to me the
14    next day and go, oh, I hear you're going to
15    see Kristen Thomas. That is something that
16    has -- one had nothing to do with the other.
17    Q    Dr. Thomas coincidentally --
18    A    I mean, but what does -- You told me
19    I have to answer the question to the best I
20    can. What does that have to do with it?
21    She's the human resources manager.
22    Q    Ma'am, you just keep right on

Page 229

1    talking, and we're just going to keep on
2    with this deposition.
3    A    Okay. But I'm trying to answer your
4    question.
5        MS. MURRAY: Just stop. You've
6    answered it.
7        THE WITNESS: Okay. I've answered
8    it. Leave it alone. Could we go to the
9    next question, please?
10        BY MR. DiMURO:
11    Q    Mr. Panagopoulos is also treated by
12    Dr. Thomas? If you know.
13    A    I don't know.
14    Q    Now, did you ever talk about your
15    husband's condition to other staff members,
16    lady friends, or other male friends at the
17    office?
18    A    It wasn't a secret that my husband
19    had cancer.
20    Q    Okay. That's my point.
21    A    Because, unfortunately, an office
22    manager and the human resources manager do

Page 230

1    not know how to keep these confidential.
2        Q    Well, hold on a second. That wasn't
3    my question.
4        A    Okay.
5        Q    My question was -- Please don't try
6    to divert me, because I'm not --
7        A    No, I'm not trying to divert you.
8        Q    -- capable of being diverted. I
9    know what my question is.
10        My question is, did you talk to some
11    of the other staff members about your
12    husband's condition?
13        A    Mr. Henck.
14        Q    Okay. Mr. Henck. And he's not
15    human resources, is he?
16        A    He's my boss. He was my boss.
17        Q    Did you talk to Ms. Hahn about your
18    husband's condition?
19        A    No, I did not.
20        Q    Did you talk to Ms. Craig about your
21    husband's condition?
22        A    No.

Page 231

1        Q    Did you talk to Ms. Briscoe about
2    your husband's condition?
3        A    We would talk about it when I would
4    call in if I was going to be off or
5    whatever. I would tell her that my husband
6    was throwing up or whatever.
7        Q    Isn't it true that people --
8        A    To that extent.
9        Q    -- knew you were on a modified
10    schedule because your husband had cancer?
11    That was generally known?
12        A    No, it was not.
13        Q    People didn't ask you where you were
14    three out of the ten days?
15        A    Well, personally, I didn't think
16    that was anyone' business, and nobody didn't
17    ever confront me about that; no.
18        Q    And you never told them why you were
19    on a modified schedule?
20        A    Why would I?
21        Q    Ma'am, just answer the question.
22        A    No. No, I didn't, sir. No.

Page 232

1        Q    So, it is possible that Mr. Henck or
2    Ms. Craig said something to the others?
3        A    I don't know. I assume. I don't
4    know.
5        Q    Why is it Ms. Riley-Jamison, you
6    assume, said something about your husband's
7    condition to others? Maybe it was Ms.
8    Craig.
9        A    No. It was Ms. Riley-Jamison.
10        Q    But you never heard her say that?
11        A    But the things she repeated, I only
12    told to her in a confidential manner. So,
13    she was the human resources manager. That's
14    proper protocol at a law firm.
15        Q    You were never present when Ms.
16    Riley-Jamison discussed your husband's
17    medical condition with anybody else; right?
18        A    I mean, if she's repeating something
19    of a confidential nature --
20        Q    Ma'am --
21        A    No, I was not present.
22        Q    All right. Just try and answer my

Page 233

1    question.
2        A    No, I was not present.
3        Q    And you deny telling Mr.
4    Panagopoulos about your husband's condition?
5        A    He -- Mr. Panagopoulos knew that my
6    husband had surgery.
7        Q    He knew that from you; right?
8        A    Yes, from me. But as far as other
9    details of my personal and my husband's
10    medical condition, no, I did not discuss
11    with Dino.
12        Q    Well, when you tell Dino that your
13    husband's having surgery, did you tell him
14    what type of surgery or give him any other
15    facts about the surgery?
16        A    I mean, no. At that point, I wasn't
17    even at work. I was out on leave --
18        Q    Correct.
19        A    -- for my own health reasons. So,
20    when I called Ms. Riley on October 23rd to
21    tell her that my husband was having surgery
22    because they found he had cancer in his

Page 234

1  colon, I wasn't even at work. Do you
2  understand what I'm saying? I wasn't even
3  there. I was at the hospital.
4     Q   Who told you things that led you to
5  believe that Ms. Riley-Jamison had said
6  something to them about your husband's
7  condition?
8     A   Because when I went back to work,
9  everybody was like, well, is your husband
10  okay, how far did the cancer spread, things
11  of that nature.
12     Q   Who said that to you?
13     A   Ms. Craig -- Just about the whole
14  staff.
15     Q   It was generally known your husband
16  had cancer; right?
17     A   No. But I'm just saying --
18     Q   Ma'am, is it true that it was
19  generally known that your husband had
20  cancer?
21     A   Yes, through Ms. Riley-Jamison and
22  others.

Page 235

1     Q   And you think that that was --
2  Strike that.
3        You didn't tell anybody else in the
4  firm that your husband had cancer?
5     A   Mr. Henck and I talked about it.
6  That was my boss.
7     Q   And Ms. Craig and you talked about
8  it.
9     A   Ms Craig discussed with me more so
10  her situation, because her husband just died
11  of cancer.
12     Q   Ma'am, answer my question.
13        You told Ms. Craig your husband had
14  cancer; right?
15     A   No, I did not. Ms. Riley-Jamison
16  did.
17     Q   Ma'am, you just testified earlier
18  that you talked to Ms. Craig about your
19  husband's condition.
20     A   No.
21     MS. MURRAY: No, she didn't.
22     THE WITNESS: No, I didn't. I

Page 236

1  testified earlier --
2     MS. MURRAY:  Objection to the
3  question.
4     THE WITNESS:  I testified earlier
5  that Mr. Henck instructed Ms. Craig to call
6  my home; okay? That's what I said from what
7  I can recall.
8     BY MR. DiMURO:
9     Q   Did Mr. Panagopoulos help in getting
10  your husband's life insurance reinstated at
11  Auto Zone?
12     A   No, he did not. I did not get the
13  waiver.
14     Q   Did he try to help to get your
15  husband's life insurance reinstated at Auto
16  Zone?
17     A   Mr. Henck thought it was taken care
18  of, and I told -- No. He didn't perform no
19  effort. I mean, why, I don't know.
20     Q   You're saying that Mr. Panagopoulos
21  made no effort to help get your husband's
22  life insurance policy reinstated at Auto

Page 237

1  Zone? That's what you're saying?
2     A   As far as putting forth a true
3  effort. -- Are you talking about an effort?
4     Q   Any effort.
5     A   No. Because I wouldn't be paying
6  $1,350 every three months.
7     Q   Well, whether --
8     A   So, that's what I'm saying. Just
9  because he had to fill out the paperwork for
10  the waiver. He told Mr. Henck he had
11  already done so.
12     Q   Well, let's --
13     A   So, he didn't do so, so it was too
14  late to do anything.
15     Q   Your husband's policy lapsed at Auto
16  Zone; right?
17     A   My husband still has his life
18  insurance policy.
19     Q   Ma'am, there was a point in time
20  when it lapsed; isn't that true?
21     A   No, it did not.
22     Q   What was the problem with the life

Page 238

1  insurance at Auto Zone that needed fixing?
2      A   It was a point of trying to get a
3  waiver.
4      Q   A waiver for what?
5      A   As far as the costs of the life
6  insurance policy.
7      Q   The premiums?
8      A   Yes.
9      Q   Okay.
10     A   Yes.
11     Q   On hardship grounds or --
12     A   Yes. Because of his illness; yes.
13     Q   And were there efforts made by
14  someone to get a waiver?
15     A   Like I said, I assume a letter went
16  out.
17     Q   By whom?
18     A   Jeff Larroca.
19     Q   Is he a lawyer at the firm?
20     A   Jeffrey Larroca. He works in the
21  litigation department.
22     Q   Okay. He tried to get a waiver, and

Page 239

1  you're saying it was unsuccessful?
2      A   No. What I'm saying is that --
3  Well, I would ask Mr. Panagopoulos, who Mr.
4  Henek instructed me to ask, about my
5  husband's waiver, and the response was I
6  will get to it.
7      Q   Okay. Here's my question.
8      A   Okay.
9      Q   You said a letter went out by Mr.
10  Larroca; right?
11     A   Uh-huh.
12     Q   You have to say yes or no.
13     A   Yes.
14     Q   The letter was an effort to get a
15  waiver of the premium for the life insurance
16  policy; right?
17     A   The letter was an effort to send out
18  the proper paperwork for that to be done.
19     Q   Okay.
20     A   Okay?
21     Q   So, Mr. Larroca tried to help you
22  and your husband; right?

Page 240

1      A   Perhaps in his own way.
2      Q   Okay.
3      A   I'm sorry. I mean --
4      Q   Did he have to help you? Did he
5  have to write the letter?
6      A   No. He didn't have to write the
7  letter.
8      Q   All right.
9      A   No.
10     Q   I'm showing you Exhibit 18, ma'am.
11  These are records from Dr. Mussenden.
12         MR. DiMURO: I'll remind your
13  counsel that these were attached to
14  admission requests, and you admitted these
15  were the records, authentic records, so I
16  don't think there's any need to go through
17  them.
18         BY MR. DiMURO:
19     Q   Except for Page 639, the third page,
20  ma'am. I think you're there. The last
21  sentence, "Ms. McFadden is physically and
22  mentally incapacitated."

Page 241

1  He wrote that on 12/22/03. Do you
2  see that?
3      A   Yes.
4      Q   And he wrote that for purposes of
5  your long-term disability application?
6      A   He wrote it for various reasons.
7      Q   Did he ever make a writing that said
8  you were no longer physically and mentally
9  incapacitated?
10     A   No.
11     Q   You mentioned earlier sitting down
12  at your desk and turning on the computer and
13  seven e-mails came out about -- I'm not sure
14  what it was -- a leave status? Do you
15  remember what we're talking about?
16     A   That I was placed on leave without
17  pay for that day? I was at my desk. I was
18  typing a document.
19     Q   Right.
20     A   And I received seven e-mails saying
21  the same thing, you will be placed on leave
22  without pay for today.

Page 242

1    Q    When, roughly, was this? Was this
2    the second half of '03 or '04?
3    A    I wasn't there in '04, so it was in
4    '03.
5    Q    Okay.
6    A    I guess around the early part of
7    September. And Mr. Henck and Ms. Cassandra
8    Briscoe witnessed that because I showed it
9    to both of them.
10   Q    Now, prior to that point in time,
11   there were times that you had to take off
12   for your husband and your conditions; right?
13   A    Yes.
14   Q    And the firm was within its right to
15   either use up leave or dock you when you
16   were gone; isn't that right?
17   A    Yes. But, see --
18       MS. MURRAY: I'd like to state an
19   objection.
20       THE WITNESS: Thank you.
21       MS. MURRAY: Are you asking about a
22   legal conclusion about the defendant's

Page 243

1    right?
2        MR. DiMURO: No. I think that if an
3    employee doesn't come to work for legitimate
4    reasons, I don't think it's rocket science
5    to say, yeah, they can dock me, they don't
6    have to pay me.
7        THE WITNESS: But when I'm sitting
8    there at my desk and I'm at work that day
9    and you're docking me for that day and I'm
10   there --
11
12       BY MR. DiMURO:
13   Q    So, this system -- All right. Hold
14   on.
15   A    Okay.
16   Q    This system is set up electronically
17   to let the employees know from the HR
18   people, you know, the use of leave or the
19   status of leave; right?
20   A    The e-mail came from the human
21   resources manager.
22   Q    That's right.

Page 244

1    A    Okay.
2    Q    But that system is used to notify
3    all employees about either docking of pay or
4    sick leave or vacation leave. It's a way of
5    communicating that type of information to
6    employees; right?
7    A    Well, at that particular time, Ms.
8    Riley didn't know how to use the system, so
9    I don't know how you want me to answer that.
10   Q    Try to --
11   A    Because Ms. Briscoe was doing the
12   system.
13   Q    Okay. Hold on.
14   A    I'm here.
15   Q    I'm just asking you if that system,
16   that electronic system, that general
17   electronic system, was used by the HR people
18   to notify employees about their leave that
19   they were using up --
20   A    Their leave or sick or whatever.
21   Q    Yes.
22   A    Yes.

Page 245

1    Q    You weren't the only employee that
2    got e-mails about pay issues or leave
3    issues; right?
4    A    But I don't think any other employee
5    got --
6    Q    Ma'am --
7    A    . seven e-mails the same day as I'm
8    sitting at my desk working.
9    Q    Okay.
10   A    So, I think I've answered this
11   question. I don't want to collaborate on
12   that because you're saying it's taking not a
13   rocket scientist. You're right. Who would
14   send someone seven e-mails?
15       You're sitting at your desk on a
16   computer working, and you're there, and
17   they're going to send you seven e-mails to
18   say you're being docked with leave without
19   pay for this date, and you're sitting at
20   your desk.
21       So, does that take a rocket
22   scientist, or does that just take what? I

Page 246

1  don't know. So, maybe you need to ask me in
2  another way. You see what I'm saying?
3     Q  Are you done?
4     A  Yes. Because you need to ask me
5  another way.
6     MR. DiMURO: I move to strike the
7  non-responsive --
8     THE WITNESS: No, no. Because,
9  basically, you're saying that this would be
10  a normal practice of any law firm or - of
11  any place.
12
13     BY MR. DiMURO:
14     Q  Other employees got information
15  electronically from HR in that same time
16  period about use of leave, docking of pay,
17  things like that; right?
18     A  I would say yes, but not when they
19  were sitting at their desk; no.
20     Q  Ma'am
21     A  I mean, I don't know what you --
22  Yes.

Page 247

1     Q  You don't have to add about sitting
2  at the desk. I asked you about the system
3  generally; okay?
4     A  Okay.
5     Q  Now, you say the seven e-mails said
6  something about docking your pay for not
7  being at work; right?
8     A  For that day; yes.
9     Q  All seven of them addressed that
10  day?
11     A  The same day. Seven in a row.
12     Q  And all for the same day, the day
13  you were there?
14     A  The same day I was at my desk. Yes,
15  sir.
16     Q  And, obviously, you're saying that
17  the person made a mistake in sending you an
18  e-mail about that day because you were on
19  time that day?
20     A  I look at it as harassment.
21     Q  Ma'am. Ma'am.
22     A  Sir?

Page 248

1     Q  Did you come to work on time that
2  day?
3     A  Yes, I did.
4     Q  So, there was no reason to dock your
5  pay that day. Is that what you're saying?
6     A  Yes.
7     Q  And all seven e-mails were the same
8  about docking your pay that day?
9     A  The exact same one.
10     Q  And you think somebody sat there and
11  sent seven separate e-mails?
12     A  Well, you can ask Ms. Briscoe and
13  ask Mr. Henck. They witnessed it.
14     Q  Well, I'm asking you if --
15     A  No. I'm just saying, I don't know
16  what her rhyme for a reason was.
17     Q  And by the way, who --
18     A  I can't explain that.
19     Q  It wasn't Ms. Riley-Jamison who sent
20  --
21     A  No. The office manager.
22     Q  But earlier you said --

Page 249

1     A  It came from HR. It came from Ms.
2  Riley-Jamison's computer. At the time, the
3  young lady from Baltimore was working in
4  D.C. two times a day. And like she said,
5  she did what Ms. Riley-Jamison instructed
6  her to do. That's all I can answer.
7     Q  So, Ms. Riley-Jamison wasn't in the
8  office the day the seven e-mails came;
9  right?
10     A  I'm not sure. I was so upset at
11  that point to where --
12     Q  Ma'am.
13     A  All I know is I saw the seven e-
14  mails and -- So, all I can say is that I'm
15  not sure, and that's the honest to God
16  truth. I mean, at that time, I was just
17  floored.
18     Q  Do you recall seeing Ms. Riley-
19  Jamison that day?
20     A  I can't remember that far if I saw
21  her or not that day. All I know is that I
22  got seven e-mails that day.

Page 250

```
 1      Q    Ma'am, who sent the seven e-mails?
 2   Who pushed the button?  Do you know?
 3      A    All the other e-mails came from Ms.
 4   Riley-Jamison.
 5      Q    Ma'am, do you know who sent the e-
 6   mail that came in seven consecutive e-mails?
 7   Do you know who sent that e-mail?
 8      A    The human resources manager.
 9      Q    Do you know the person who sent the
10   e-mail of your own personal knowledge?
11      A    I answered your question.  I said
12   the human resources manager.
13      Q    And who is that?
14      A    Ms. Riley-Jamison.
15      Q    I thought it was the person from
16   Baltimore.
17      A    Well, I'm just saying, she came in
18   twice a week, but she used Ms. Riley's
19   computer.
20      Q    Okay.  So --
21      A    So, I don't know at the exact time
22   when the e-mails occurred, I don't know if
```

Page 252

```
 1   besides what you read on the e-mail, do you
 2   know who pushed the buttons on the
 3   equipment?
 4      A    It was someone in the human
 5   resources department.
 6      Q    Give me a name of the person who did
 7   it.
 8      A    Ms. Riley is the only one in human
 9   resources besides Wendy Iversen and
10   Cassandra Briscoe, but --
11      Q    But you didn't --
12      A    I think the question -- You want me
13   to -- I don't know what you want from me.
14   I'm telling you I got some e-mails --
15           MR. DiMURO:  (To Ms. Murray)  Let me
16   talk to you for a second.
17           THE WITNESS:  I got it from the
18   human resources manager.
19           MS. MURRAY:  Are we going off the
20   record?
21           MR. DiMURO:  Yes.  We're going off
22   the record.
```

Page 251

```
 1   Ms. Riley was off of maternity leave or not.
 2   I'm not sure, sir.
 3           I'm answering the best I can.
 4   You're asking me something about something
 5   that happened in 2003, and here it is 2007;
 6   okay?
 7      Q    Well, you make it part of your
 8   lawsuit, so I need to know.
 9      A    No, okay.  But I'm just saying, so
10   - All I'm saying is that Mr. Henck and Ms.
11   Briscoe witnessed the seven e-mails.
12      Q    Now, stay with my question.
13      A    Okay.
14      Q    It is true, isn't it, that you do
15   not know who sent the seven e-mails?
16      A    Like I said, human resources
17   manager, so --
18      Q    Ma'am, answer my question.
19      A    I'm answering your question.  It --
20      Q    Do you know --
21      A    - said human resources manager.
22      Q    Of your own personal knowledge,
```

Page 253

```
 1           (Whereupon, a brief discussion was
 2   held off the record between counsel.)
 3           MR. DiMURO:  Back on the record.
 4           THE WITNESS:  Okay.  Before we start
 5   this, I'll just say I'm just a little edgy,
 6   which don't have nothing to do with the
 7   other, but right now my mind is in Florida.
 8   But I'm okay.
 9           MR. DiMURO:  Yes, ma'am.  I had -
10           THE WITNESS:  So, no.  We're going
11   to finish this.  I'm going to answer you
12   quickly and swiftly, and we're all going to
13   go home.
14           MR. DiMURO:  Well, we'll see.  I
15   have asked to extend it to tomorrow.  I
16   understand you've got a flight tomorrow.
17           I don't want to get in a fight with
18   you, but I think this has gone on longer
19   than it needed to, and, given the scope of
20   the allegations, I'm going to have to resume
21   some other day and we'll just have to figure
22   it out.
```

Page 254

1       But we're going to go to 5:30. I've
2   cleared that with the court reporter.
3       BY MR. DiMURO:
4   Q   Do you know of your own personal
5   knowledge who sent the seven e-mails?
6   A   No, I don't.
7   Q   And do you know if the person who
8   sent the seven e-mails did it by
9   intentionally sending seven e-mails or there
10  was some sort of electronic or machine
11  problem that did it?
12  A   No, I don't.
13  Q   Part of your complaint has a series
14  of claims of harassing comments, and they're
15  also in the interrogatory answers.
16      Actually, I'm going to give you that
17  so you can look at it along with me. I'm
18  showing you Exhibit 28, specifically Page 7.
19  A   Okay.
20  Q   You remember that the interrogatory
21  process is where one side asks written
22  questions and you file written answers;

Page 255

1   right?
2   A   Yes.
3   Q   And both sides have done that, I
4   think, in this case.
5       So, this particular question asks
6   about harassing comments, and you list A
7   through J. So, we're just going to go
8   through them, and I just need to get some
9   information.
10  A   Okay.
11  Q   Now, you say that she asked you this
12  frequently. Can you tell me what time frame
13  Ms. Betty Hahn asked you about your modified
14  schedule?
15  A   Through the middle of January until,
16  say, around the middle of June.
17  Q   Of which year?
18  A   2003.
19  Q   Did you ever tell her what your
20  modified schedule was?
21  A   No, I did not.
22  Q   And you write that she asked you,

Page 256

1   quote, "how I was getting paid for my time
2   off," closed quote.
3       I just don't understand what you're
4   trying to say there. What is she asking
5   you?
6   A   She was trying to ask me if I was
7   getting paid or not.
8   Q   For your time off?
9   A   For my time off.
10  Q   I see.
11  A   Yes.
12  Q   For example, using your situation,
13  ten work days really reduced down to seven
14  so you could go with your husband, was she
15  trying to find out if you were getting paid
16  for those three days?
17  A   The three days off; yes.
18  Q   Got it.
19      Did you ever tell her one way or the
20  other?
21  A   No.
22  Q   And Ms. Hahn is white, I take it?

Page 257

1   A   Yes.
2   Q   Did you ever tell anyone in
3   management what Ms. Hahn was asking you
4   about your modified schedule?
5   A   I mentioned it to -- well, not
6   management - but I mentioned it to Mr.
7   Henck.
8   Q   Did you ask him to do anything about
9   it?
10  A   I just -- At that point, I just told
11  him I was tired of staff members -- Yes, I
12  did ask him to do something about it.
13  Q   What did you ask him to do?
14  A   I asked him, you know, could someone
15  tell some staff members to mind their
16  business.
17  Q   And do you know if he did anything
18  about it? Did he report back to you, or did
19  you see him do anything about it?
20  A   He didn't report back to me after I
21  asked him; no.
22  Q   So, you don't know one way or the

Page 258

1   other if he did something?
2       A   Or not. No.
3       Q   All right, next sentence.
4       She disclosed to you that she
5   believed you were being treated differently
6   than others, especially Ms. Craig when she
7   was out with her mother and out with her
8   husband when they were ill.
9       Okay. I just need a little flesh to
10  these bones. What did she say you were --
11  Strike that.
12      How did she say the treatment was
13  different?
14      A   She was basically saying how can
15  Janet get paid for being out with her
16  husband and her husband is not an employee
17  of Ballard Spahr.
18      Q   Just so I can get it, she's
19  complaining that when Ms. Craig had to go
20  attend to business with family members, she
21  was getting paid?
22      A   Exactly.

Page 259

1       Q   But it is true that when you were
2   out attending to your husband's chemotherapy
3   and vaccinations, you were getting paid,
4   too?
5       A   No. I got paid when I had leave to
6   cover it. When I didn't have leave to cover
7   it, I was put on leave without pay.
8       Q   So, Ms. Hahn believes that Ms. Craig
9   was actually getting paid even after she
10  used up all her leave?
11      A   Ms. Craig was salary. But her
12  complaint was it's not Janet that's sick,
13  it's her husband. And from what I
14  understand and from what Ms. Craig told me
15  herself, they put her on sick leave, and she
16  wasn't the one sick.
17      Q   Ms. Hahn was complaining about
18  comparing her situation to Craig's
19  situation?
20      A   And mine, but I just sort of just
21  walked away from it.
22      Q   Okay. Let's start over again.

Page 260

1       A   Okay.
2       Q   Hahn is sick. She's a cancer
3   patient.
4       A   Yes.
5       Q   And what does she say happens to her
6   when she's out? That she doesn't get paid?
7       A   She just felt that Ms. Craig got
8   more leeway than what we did as far as --
9   You know, when Ms. Craig's husband's was
10  sick, from the day she left, she didn't come
11  back until after his passing.
12      Q   Right.
13      A   Maybe three -- close to a month
14  after he passed.
15      Q   Right.
16      A   So, she was looking at so why, you
17  know, do you have to come in here all these
18  different hours and a couple of times I came
19  in on Saturdays and there wasn't work left
20  for me or whatever. She would see where I
21  signed in on a weekend or whatever. So, she
22  was just saying, why are they treating you

Page 261

1   different from her?
2       Q   Which of Ms. Craig's relatives
3   passed, the mother or the husband?
4       A   Her mother passed first, and then
5   her husband passed next.
6       Q   Ms. Hahn believed that Ms. Craig,
7   when she went off to attend to these two
8   situations, still got her full pay?
9       A   Well, Ms. Craig had even stated
10  herself -- she even told me that she was
11  placed on sick leave and that no FMLA
12  paperwork was ever done on her.
13      So, I'm just saying, it was like --
14  I don't know if Ms. Hahn expressed that to
15  Ms. Craig, but I didn't feel that I wanted
16  to get into it with her.
17      Q   When I ask you about what Ms. Hahn
18  says --
19      A   Okay.
20      Q   -- it confuses everything to go over
21  to say what Ms. Craig told you.
22      A   Okay.

McFadden

Page 262

1  Q    The question and answer don't match
2  up.
3  A    Okay.  Ask me the question again,
4  sir.
5  Q    Ms. Hahn was concerned that she
6  thought Ms. Craig was getting her regular
7  pay even when she was out with these
8  relatives?
9  A    Yes.
10  Q    Does Ms. Hahn know how much leave
11  Ms. Craig had?
12  A    At the time, Ms. Hahn was in charge
13  of the leave.
14  Q    So, she knew how much leave as far -
15  -
16  A    As far as I know, yes.
17  Q    She was saying she knew how much
18  leave she had?
19  A    Well, she took care of the leave, so
20  --
21  Q    All right.  All right.
22       Number B, "Ms. Riley-Jamison

Page 263

1  remarked to me" -- Oh, this is the statement
2  about healthy people.  We talked about that
3  earlier today.
4  A    Yes.  We talked about that earlier;
5  yes.
6  Q    It's the same thing?
7  A    Yes.
8  Q    C, where Ms. Riley-Jamison is
9  suggesting that you take your daughters out
10  of college to care for their father "so I
11  can come to work every day."
12       When did this -- How frequently did
13  she mention this to you?
14  A    Maybe once a week.
15  Q    Was this back when you were taking
16  care of your -
17  A    My husband.
18  Q    So, it started --
19  A    It started when my husband started
20  his chemo treatment.
21  Q    January of '03?
22  A    Yes.

Page 264

1  Q    And did you ever write down the date
2  and time and the words she used when she
3  said these things in subparagraph C?
4  A    No.
5  Q    "She constantly suggested that I
6  find someone else to take care of my husband
7  so I could report to work."
8       What do you mean by "constantly"?
9  How often?
10  A    It was a weekly thing.
11  Q    "She also told me that my modified
12  schedule was causing turmoil with these
13  staff members and others she would not
14  mention."
15       Who do you mean by "these staff
16  members"?
17  A    From what she had told me, other
18  staff members were complaining about my
19  modified leave schedule.
20  Q    But did she say who it was?
21  A    Betty Ann Hahn.  Somebody -- I can't
22  think of her name.  I don't even think she's

Page 265

1  there anymore.  Can I get back -- I can't
2  think of her name right off.  Oh, one young
3  lady's name was Sevonne Parker.
4  Q    Is she still there?
5  A    Ms. Parker?  I assume.  I'm not
6  sure.
7  Q    When you would discuss with Ms.
8  Riley-Jamison your issues, did you discuss
9  with her the conflict you were having, the
10  tension you were having between wanting and
11  needing to take care of your husband and
12  yourself, but also being the sole
13  breadwinner, that there was some friction
14  between those two concepts?
15  A    Could you please rephrase that?
16  Q    Yes.
17       Did you talk to her about it was
18  hard for you to resolve in your mind the
19  need to spend more time with your husband,
20  but you had to come to work because you
21  needed the money?  Did you ever talk about
22  those issues with her?

Page 266

1     A    I mean, at one point, we talked
2   about it.  You know, I told her I was the
3   only income, so I didn't have any choice but
4   to come to work.
5           And that's when she was like, well,
6   you know, the firm is doing you a favor
7   giving you this modified leave schedule.
8   So, basically, I feared for my job.  If I
9   went out of that mode of that schedule, that
10  I just wouldn't have a job.
11    Q    Well, okay.  Which is sort of to my
12  point, which is, obviously, Ballard Spahr
13  isn't in the business of just paying people
14  for no work -- for not coming to work;
15  right?  Do you agree with that?
16    A    Yes, I agree with that.  Yes.
17    Q    Would you agree that there comes a
18  point where Ballard Spahr's management
19  people have to decide how much leeway they
20  can give you versus being fair to the
21  regular work force or fair to the partners,
22  et cetera?  They can't just let you not come

Page 267

1   to work.
2     A    I don't think that's a fair question
3   when other people that I know of, like Ms.
4   Riley, who was on a 90-day promotion and
5   she's in management, that she got paid when
6   her husband was sick during her 90-day
7   probationary period.  I don't think that's
8   fair.
9           And I had been there 15 years.  She
10  has been there less than a year.  Like I
11  said, the young lady I sat by, Kathy Hanna,
12  I covered for her for two and a half years.
13          We had one young lady, Kristine
14  Hearn.  She was allowed a modified schedule
15  to go to school.  Judy Mintz, she works for
16  one of the partners.  She takes off every
17  summer from June to Labor Day.  She goes to
18  Martha's Vineyard.  Brenda Dillman, another
19  employee that works for Ballard.
20          All these people are Caucasians, and
21  their schedules were modified to accommodate
22  their needs that really, in a lot of cases,

Page 268

1   didn't have to do with illness or a family
2   member.  So, I don't know if that falls up
3   under FMLA or just favoritism.
4     Q    All right.  Well, we'll talk about
5   it here in a moment.
6     A    Okay.
7     Q    But you agree that everybody's needs
8   and what the accommodation should be or what
9   the leeway should be is going to be
10  different?  You can't just compare them
11  apples to apples?
12          That wasn't a very good question,
13  I'll give you that.
14          You would agree that it's impossible
15  to make sure that every accommodation or
16  leeway that an employer gives one employee
17  matches up exactly with the accommodation or
18  leeway given to another employee?
19    A    Are you asking me -- Please rephrase
20  that another way.
21    Q    Well --
22    A    Because what you're saying is

Page 269

1   favoritism.
2     Q    But why are you --
3     A    That's the way I'm receiving it, so
4   could you please explain it another way.
5     Q    Are you saying that the employer is
6   required, in order to avoid favoritism, to
7   make sure that what one employee needs,
8   because they have children who got ill,
9   should be the same thing that the next
10  employee needs, because they've got a parent
11  who's ill, that the next employee needs
12  because of some other personal emergency?
13  That the employer is supposed to make sure
14  that the benefit is equal to everybody?
15    A    Okay.  Back to Ms. Hearn, Kristine
16  Hearn.  She was able to go to G.W. during
17  working hours.  An African-American young
18  lady, Shelby Green, who wanted to do the
19  same thing, was denied.  She was Caucasian.
20  She was black.  So, that's why I need you to
21  explain it to me a little better.
22    Q    Well, I'm asking you generally in

Page 270

1  the abstract.
2      Does the employer need to make sure
3  that every employee's accommodation, whether
4  it's for school or for children or for
5  parents passing away, that each of those
6  things or accommodations that the employer
7  does for the employee, that they have to be
8  equal from employee to employee?
9      A   Well, the way Ballard used to do it
10  before it came to me was by seniority.
11     Q   By what?
12     A   Seniority.  And at the time, I was
13  the senior support staff member.
14     Q   But I'm really asking a different
15  question which is every --
16     A   That's why I'm not understanding --
17  I'm seriously not understanding what you're
18  saying.
19     Q   Okay.
20     A   I mean, if you can allow a person to
21  work one day a week because she wants to
22  improve her Mary Kay business, is that fair

Page 271

1  to a person that wants to spend time with
2  someone that's terminally ill?
3      See, like you said, you asked me
4  about apples and oranges, so you want me to
5  give you an answer on your apples, but not
6  on the oranges, so I'm doing the best I can.
7  So, the --
8      Q   Well, let me ask you this way.
9      A   The bottom line is, since I've been
10  at Ballard -- I understand what you're
11  saying, -- I didn't care what they did for
12  nobody else.  Didn't care.  It didn't matter
13  to me; okay?
14     Q   Right.
15     A   Once it came to me, I just wanted to
16  be treated fairly.
17     Q   Okay.  Well, do you think that they
18  didn't give you enough leeway?
19     A   No.  I was not treated fairly.
20     Q   How much longer did you want them to
21  keep you on -- your job protected or how
22  much more pay did you want them to give you

Page 272

1  to treat you fairly?
2      A   No.  All I'm saying is that once my
3  husband's schedule -- and I took him to
4  Florida, after that I was going to work
5  every day.  I was on a modified schedule.
6      Q   Right.
7      A   I went to work sick or not sick.
8      Q   Right.  And then October 15th came,
9  and you went on long-term disability.
10     A   I went out on long-term disability
11  because I didn't have any other choice.
12     Q   So, what I'm really asking is, come
13  May 14th, 2004, what else did you want them
14  to do?
15     A   The same thing they did for other
16  employees.
17     Q   Well, but how does that translate
18  into you?
19     A   I mean, as far as job protection,
20  having job protection, hiring temps to cover
21  these individuals.
22     Q   But what Ballard Spahr does for

Page 273

1  somebody because they need a day off for a
2  funeral or they need --
3      A   No.  I'm not talking about a day off
4  for a funeral.
5      Q   Ma'am, please --
6      A   I'm talking about --
7      MS. MURRAY:  Just let him ask his
8  question.
9      THE WITNESS:  All right.
10     BY MR. DiMURO:
11     Q   Tell me precisely in your context
12  and what you need.
13     Come May 14th, 2004, what else did
14  you want them to do for you on May 14th,
15  2004 to make it fair?
16     A   I mean, basically, at that point, I
17  just wanted to know what was going on
18  because no one contacted me one way or the
19  other.
20     Q   But in order for you to feel like
21  they're treating you fairly on May 14th,
22  2004, what would you have had them say to

Page 274

1    you, told you, done for you?
2        A    I mean, the thing of it is I just
3    wanted to be treated fairly.
4        Q    But what does that mean? What do
5    you think they should have done on May 14th,
6    2004?
7        A    As far as I'm concerned, you treat
8    employees -- if you treat one one way,
9    regardless if they're white, black,
10    Hispanic, you have to treat everybody the
11    same way across the board.
12        Q    So, what does that mean for you? On
13    May 14th, 2004, what should they have done
14    for you?
15        A    Basically, they could have -- I
16    mean, they could have at least offered me
17    the receptionist job and see if it would
18    have worked out until Ms. Hahn came back.
19        If she came back, if there wasn't a
20    job for me, I would have understood that.
21    There was no provisions made for me at all.
22    None at all.

Page 275

1        Q    All right. Let's go --
2        A    Don't you think that's a fair
3    answer?
4        Q    May 14th, 2004, who called whom on
5    that day?
6        A    I called Ms. Riley.
7        Q    Why were you calling her?
8        A    Because I didn't get a response to
9    the leave request form that they told me I
10    had to fill out.
11        Q    Does this go back to the attachment
12    to the March letter?
13        A    Yes.
14        Q    So, a couple of days before that,
15    you did or did not have a phone call with
16    Ms. Forman?
17        A    I called Fern Forman the day before.
18        Q    Right. And did you actually talk to
19    her?
20        A    Yes.
21        Q    And she said she'd get back to you?
22        A    No. She said, why don't you do all

Page 276

1    of us a favor and resign.
2        Q    What did she say, if anything, about
3    the --
4        A    She hung up the phone. She said
5    nothing. She hung up on me.
6        Q    Did you report that to anybody?
7        A    That's why the next day I called Ms.
8    Riley.
9        Q    Okay. And did you tell her --
10        A    And I told her what happened. She
11    said, Vanessa, you know, you are the first
12    FMLA situation I've had to deal with, so I
13    need to call Fern and John to see what's
14    going on.
15        Q    Okay.
16        A    And she told me she would get back
17    with me.
18        Q    And --
19        A    And we had a call later on in the
20    evening about four o'clock.
21        Q    They called you, obviously?
22        A    At four o'clock; yes.

Page 277

1        Q    Did you know it was coming?
2        A    Yes.
3        Q    Do you have any notes from that
4    conversation with Riley-Jamison that morning
5    of the 14th?
6        A    No. I don't think so; no.
7        Q    All right. What happened on the
8    call on the 14th?
9        A    We discussed my employment, which
10    they told me, as of February the 9th, I had
11    no more job protection. They had me fill
12    out a form called "Leave of Absence," which
13    was only for 90 days.
14        So, I was calling to see if I was a
15    Ballard employee or not, which I was told
16    that I was not. Then it came to them
17    offering me something to do with my
18    husband's life insurance. But if you read,
19    it's all in the letter of May the 14th.
20        Q    A letter or notes?
21        A    No. It was a letter.
22        Q    Let me show you Exhibit 70. That's

Page 278

1  the letter you mentioned that you got in
2  March of '04?
3      A   Uh-huh.
4      Q   You have to say yes or no, ma'am.
5      A   Oh, yes.
6      Q   It advises you that you are entitled
7  to 16 weeks of protected leave during any
8  24-month period; right?
9      A   Yes.
10     Q   And it advises you that the firm
11 does permit a non-FMLA-covered leave of
12 absence for up to an additional three months
13 of time; is that right?
14     A   I assumed, you know, after they sent
15 me the letter, that that was their policy.
16     Q   And then the letter says "the
17 request for this type of leave of absence
18 form is attached." That's what the letter
19 says; right?
20     A   Uh-huh.
21     Q   You have to say yes or no, ma'am.
22     A   Oh, yes.

Page 279

1      Q   Oh, and there it is. It is actually
2  attached. So, you actually filled out the
3  form?
4      A   Yes.
5      Q   We'll attach Page 102 to this
6  exhibit.       So, you actually filled in
7  the form and sent it in?
8      A   Yes.
9      Q   And the 90 days would run sometime
10 in early May if all their calculations are
11 right; right?
12     A   I question that.
13     Q   Why is that?
14     A   Because if my FMLA expired February
15 the 4th -- March, April, May -- it's like
16 they didn't give me an answer one way or the
17 other if this was approved or not. I never
18 received anything from Ballard. Nothing.
19     Q   And that's why you called Ms. Forman
20 on the 11th?
21     A   The day before the 14th or whatever;
22 yes. That's why I called her. I never

Page 280

1  received the answer one way or the other.
2      Q   And Ms. Forman didn't give you an
3  answer in addition to whatever else she
4  said?
5      A   No.
6      Q   And the next morning Ms. Riley-
7  Jamison said this is the first FMLA case
8  I've handled, so she'd have to get back to
9  you?
10     A   Yes.
11     Q   The letter of March 9th did indicate
12 that if you are still unable to return to
13 your employment at the end of the extended
14 leave of absence, Ballard Spahr will
15 terminate you; right?
16     A   Yes.
17     Q   And you did write some notes on the
18 14th. Let me find those. All right.
19 Exhibit 68 is your handwritten notes from
20 the 14th; right?
21     A   Yes.
22     Q   And you've dated it May 14th, '04 at

Page 281

1  4:08 p.m. I presume that's the time of the
2  call?
3      A   Yes.
4      Q   Did you write these notes as the
5  call was going on or sometime thereafter?
6      A   After the call.
7      Q   Within the same hour -- or that
8  evening, I should say?
9      A   Oh, yes. Definitely.
10     Q   And I think I can read your
11 handwriting, but what you've written here is
12 they offered you a position in the word
13 processing center, and you said that the
14 doctors had found you to be mentally and
15 physically disabled permanently; right?
16     A   Yes.
17     Q   And then the Point Number 2
18 basically boils down to any salary advances
19 you had been given and any benefits they
20 paid, they were not going to ask you to pay
21 those back; right?
22     A   Yes.

Page 282

1    Q    And then I think Point Number 3
2  boils down to the following. Somebody said
3  they had a new supplement to their policy
4  that permitted you to draw out half of your
5  husband's life insurance policy under
6  certain conditions?
7    A    I can't answer that one with one
8  answer. I have to answer with two.
9    Q    Okay.
10    A    The policy already existed. They
11  didn't present it to me until May the 14th.
12    Q    Well, that's right. They said that
13  they had gotten some sort of new rider that
14  permitted you to apply to take out half of
15  the money before your husband passed away.
16    A    My husband's still living.
17    Q    Well, I understand. But didn't you
18  understand what they were saying on May 14th
19  was that --
20    A    No. They told me that they had
21  gotten an addendum just for me.
22    Q    Right.

Page 283

1    A    But I found paperwork where it
2  existed before then, and it wasn't ever
3  offered to me. But this here existed before
4  they said they did this rider, and you have
5  that information.
6    Q    Let's back up. Let's make it clear.
7    A    Okay.
8    Q    Point Number 3 relates to statements
9  made by the Ballard Spahr people on May 14th
10  about what they said was a new -
11    A    Oh, okay. Rider.
12    Q    -- what they said was a new rider --
13    A    Yes.
14    Q    -- to life insurance policies
15  including your husband's?
16    A    Yes.
17    Q    They said that?
18    A    They said that; yes.
19    Q    And they said that this new rider
20  was gotten for you; right?
21    A    Just for me.
22    Q    It might have applied to other

Page 284

1  people --
2    A    No. Well, I'm telling you the
3  truth, sir. They told me they did it just
4  for me; okay? So --
5    Q    Whether or not it applies to other
6  people --
7    A    No matter. No. I'm just saying,
8  I'm answering you truthfully; yes.
9    Q    And did you understand what they
10  said was that this new rider -- Strike that.
11    To state the obvious, life insurance
12  policies are never paid until the person
13  passes away. That's the normal policy;
14  right? That's what a life insurance policy
15  is about.
16    A    Depending on what type you have. If
17  you have one on a cash value, you can pull
18  the cash value out.
19    Q    Okay.
20    A    So --
21    Q    What they were saying to you on May
22  14th was this new rider, they were saying,

Page 285

1  had a provision that you could take out
2  half, or $50,000, before your husband passed
3  away?
4    A    Yes.
5    Q    That you would have to apply and
6  qualify; right?
7    A    Yes.
8    Q    Now, what did you -- This Exhibit 68
9  is one page of notes. Is this all the notes
10  you wrote on May 14th about the May 14th
11  call?
12    A    Yes.
13    Q    And how long did the call last
14  roughly? Just roughly. I'm not going to
15  hold you to it.
16    A    It was about 30, 35 minutes long.
17  I'm not sure.
18    Q    Sometime before five o'clock it was
19  over?
20    A    Oh, of course. People were going
21  home on Friday. Yes.
22    Q    A couple of true statements today.

Page 286

1  You know when you got your colonoscopy. I
2  will never forget that. I will never forget
3  that.
4      A   You never forget what?
5      Q   When you get your colonoscopy.
6      A   Oh, okay.
7      Q   Never mind.
8      A   Have you had yours yet?
9      Q   Yes, ma'am. Now, see I've lost -- I
10 did it to myself.
11     A   Yes, you did. You can't blame that
12 one on me.
13     Q   So, did you get the notes done
14 before dinner that night or later in the
15 evening or you don't --
16     A   It was right after I got off the
17 phone.
18     Q   Okay, great.
19         So, you said something to me that
20 you now have seen some paperwork or since
21 that time have seen some paperwork to
22 suggest that the rider that they talked

Page 287

1  about had already existed?
2      A   Yes.
3      Q   What paperwork was that? I don't
4  recall it, or maybe I didn't understand what
5  it was.
6      A   I don't have it with me. It was
7  sent in the package that you sent to the --
8      Q   What is it? Is it something from
9  the insurance company?
10     A   No. It's something saying, you
11 know, basically when -- Like I said, if you
12 have a loved one and you're going through a
13 financial issue or a financial problem
14     Q   Right.
15     A   -- that you're able to take out half
16 of the money to help with your finances or
17 whatever.
18     Q   Right.
19     A   Yes.
20     Q   But what was it about the document
21 that said that this rider had existed before
22 your situation or earlier and that that led

Page 288

1  you to believe that they didn't get it just
2  for you?
3      A   Because I got it from out of -- The
4  information, I think, is dated in 2000 and
5  2002 or even before that. It's like the
6  insurance policy itself. It's what Ms.
7  Iversen sent me.
8      Q   And it looks like an addendum to the
9  insurance policy?
10     A   No, no, no. It shows that it was in
11 existence before the addendum that they got
12 just for me.
13     Q   I understand. But where does this
14 document come from that --
15     A   It's a Ballard document.
16     Q   Does it look like a policy memo?
17 Does it look like something they got from
18 the insurance company?
19     A   No. It's a copy of a policy. It's
20 a booklet, but it was copied.
21     Q   All right. A booklet that would
22 come from an insurance company or a booklet

Page 289

1  from Ballard Spahr?
2      A   I assume Ballard Spahr because Ms.
3  Iversen sent it to me, and she's an employee
4  of Ballard Spahr.
5      Q   So, as you read the document that
6  you're talking about, you think it proves
7  that this rider provision was in place for a
8  couple of years at least?
9      A   Yes.
10     Q   Did you not apply for the $50,000 --
11 It's called an "accelerated withdrawal."
12 Did you apply for it?
13     A   When it was offered to me at that
14 point, yes.
15     Q   And you applied for it sometime
16 later?
17     A   Yes. Sometime later; yes.
18     Q   And you did get it, I think?
19     A   I did receive it; yes.
20     Q   And so you declined the word
21 processing position, as you've written here;
22 right?

Page 290

1    A    Uh-huh.
2    Q    You have to say yes or no, please.
3    A    Yes.
4    Q    And then the notes don't say
5    anything about the receptionist position.
6    Why is that?
7    A    The way that it was -- When I asked
8    about the receptionist position, they told
9    me that that was about Ms. Betty Ann. It
10   had nothing to do with me. So, I was like,
11   okay.
12   Q    Well, what did you say to bring up
13   the receptionist issue?
14   A    Because I knew Ms. Hahn was out on
15   disability also.
16   Q    But what did you say to these three
17   people?
18   A    I told them, I said, well, I think I
19   can do the receptionist job.
20   Q    And who responded on that point?
21   A    John DiBattista.
22   Q    And what did he say about the

Page 291

1    receptionist job?
2    A    And Ms. Iversen. They were saying,
3    no, Betty Ann is still on the payroll.
4    Q    All right.
5    A    So, my question was, well, how come
6    she got job protection and she had been
7    there ten years, and I didn't have any job
8    protection and I've been there 15 years, and
9    why is there a temp working in her place
10   when the temp that was working in my place
11   was hired as of April the 1st?
12   Q    And what did they say in response to
13   those comments by you?
14   A    I think that's when the confusion
15   came in.
16   Q    Well --
17   A    It was like, at that point, all
18   three of us were talking at the same time.
19   Q    Do you recall anything that any
20   specific person said thereafter?
21   A    No. Basically, it was like, okay,
22   we've got a wonderful idea here, we created

Page 292

1    this just for you, and it was this insurance
2    policy thing. That's the only reason why I
3    accepted it.
4    Q    So, who said the words -- When you
5    raised the receptionist issue, who said the
6    words about, no, that's for Betty Ann and
7    it's not for you or whatever they said? Who
8    said that? Battista or Iversen?
9    A    Jamison. Ms. Riley-Jamison and Ms.
10   Iversen.
11   Q    Well, I thought it was Battista and
12   Iversen before.
13   A    No. Battista was saying, well, if
14   you don't take the word processing position,
15   there's no other jobs available. And I
16   explained to him, how could you put me in a
17   job where I have to wear hand braces and do
18   word processing that's more typing than when
19   I was a legal secretary?
20   Q    We're not talking about that topic
21   right now.
22   A    Okay.

Page 293

1    Q    We're talking about when you said,
2    how about the receptionist, and then
3    somebody said, no, that's held for Betty
4    Ann. Who said that?
5    A    Ms. Iversen.
6    Q    Okay. Did Ms. --
7    A    And then I was, like, pardon me?
8    And Ms. Jamison was, like, well, that's
9    Betty Ann's job. So, I came back with,
10   well, so why is there a temp in that
11   position if I could be working in that
12   position?
13   Q    And who said what next?
14   A    Then Mr. DiBattista said, well, you
15   know, Betty Ann plans to come back to work.
16   Q    Right.
17   A    And that's how we got into the
18   conversation when I said, so, how could she
19   get job protection and I can't and I'm the
20   senior support staff person?
21   Q    The FMLA does not -- Strike that.
22       The FMLA gives people a certain

Page 294

1 amount of job protection by week. It isn't
2 calculated by seniority; isn't that right?
3    A    Okay. But when I said that at that
4 point, Ms. Betty Ann and I have been out the
5 same amount of time.
6    Q    But you really don't know from your
7 personal knowledge how much time she had
8 come back to work --
9    A    The only thing I can say is --
10    Q    Wait, wait, wait, wait, wait.
11    A    Okay. Go ahead, sir. I'm sorry.
12    Q    This is a yes or no question. You
13 don't know from your own personal knowledge
14 whether Ms. Hahn had come back to work after
15 she went out on leave and how much FMLA
16 leave she actually had left. You don't know
17 that, do you?
18    A    I know what she told me.
19    Q    Well, first of all, do you know from
20 her personal records what leave she had?
21    A    No.
22    Q    Okay. What did she tell you on that

Page 295

1 topic?
2    A    Now, when I called to speak to Mr.
3 Henck around the 15th of December, Ms. Hahn
4 answered the phone.
5    Q    December of '03?
6    A    Yes.
7    Q    Okay.
8    A    And she said, oh, you know, how are
9 you doing? I said, everything's okay. I
10 said, I thought you were out on disability.
11 She said, no, I figured I'd try to work a
12 week or two to get the Christmas bonus, and
13 then I'm going back out on disability.
14    Q    Did you talk to her thereafter up to
15 May 14th about when she went back to work,
16 when she didn't go back to work?
17    A    I called her, and I was told that
18 she was out on disability.
19    Q    When was that?
20    A    I called her February, and I talked
21 to Laura Swanson, which was a friend of
22 hers, in April. Because I told her, I said,

Page 296

1 something's telling my heart that Betty Ann
2 is terminally ill.
3    Q    In February, you called in to speak
4 to Betty?
5    A    Betty Ann; yes.
6    Q    And you were told --
7    A    That she was out on disability.
8    Q    And who told you that?
9    A    The temporary receptionist, whoever
10 that was.
11    Q    And she would tell you that she's
12 out on disability?
13    A    She said she was out on disability.
14    Q    And who did you call in April?
15    A    Laura Swanson.
16    Q    And for what purpose?
17    A    Because her and Betty Ann were real
18 close friends, and they lived near each
19 other.
20    Q    And what --
21    A    It was more for me out of concern.
22    Q    And what did you say?

Page 297

1    A    And I asked her, I said, you know,
2 what's wrong with Betty Ann? She said,
3 well, Betty Ann won't be coming back to the
4 firm. And I said, okay.
5    Q    Besides those two phone calls --
6    A    Yes.
7    Q    -- and your phone call in December
8 of '03, do you have any other knowledge
9 about how much time Betty Ann worked in '04
10 and how much FMLA leave she had as of May
11 14th, '04?
12    A    No. All I know is that -- No, I
13 don't.
14    Q    I'm sorry. I didn't understand your
15 statement about why the discussion about the
16 receptionist is not in your Exhibit 68, your
17 notes of that day.
18    A    Because, basically, when I asked
19 about it, they said, no, that's Betty Ann's
20 job. And I was like, well, but how can she
21 get job protection and I can't? If she's
22 still out on disability, why can't I do this

Page 298

1 job?
2    Q   You were questioning whether or not
3 they were right?
4    A   Yes.
5    Q   So, I'm wondering why you didn't
6 write it down?
7    A   I felt it was more important for me
8 to put down that they've offered me a
9 position in word processing knowing that I
10 have to wear these. So, why would you offer
11 me a position that you knew I couldn't do?
12    Q   So, you felt they were being
13 discriminatory by offering you a position
14 they should have known you couldn't handle;
15 right?
16    A   I mean, that was more like one plus
17 one equals two.
18    Q   Well --
19    A   I mean, if you were a word
20 processor, your typing speed is anywhere
21 from 80 words to 100 words a minute. I
22 don't think, with rheumatoid arthritis and

Page 299

1 wearing these, that I could have done that,
2 sir. So, like I said, as far as I'm
3 concerned, I was discriminated against.
4    Q   But that's why you wrote down the
5 word processing part of the conversation?
6    A   Yes.
7    Q   But you felt that they weren't being
8 forthright with you on Betty Ann's -- saving
9 the job for Betty Ann? They weren't --
10 Strike --
11    A   Oh, no, they weren't. Because, as a
12 matter of fact, she died on my anniversary.
13 I'll never forget it.
14    Q   So, you felt that they were treating
15 you unfairly by this story about Betty Ann
16 on May 14th?
17    A   No. I'm just saying, what makes her
18 different from me is because she's white and
19 I'm African-American.
20    Q   Oh, I see. So, you thought it was
21 another --
22    A   So, it's discrimination.

Page 300

1    Q   And that's my point. Why didn't you
2 write it down?
3    A   What did I have to write down, oh,
4 the white man is discriminating against me?
5    Q   Well, why did you keep these notes
6 then? What's the point of these notes if
7 you're not keeping track of --
8    A   No. Just to show a pattern. I
9 mean, if my memory was a hundred percent,
10 sir, I wouldn't have to write any notes at
11 all. I did it for that reason.
12        (Whereupon, a brief discussion was
13 held off the record.)
14    BY MR. DiMURO:
15    Q   Earlier, I wrote down some names
16 when you were giving me a list of people who
17 you thought got benefits or accommodations
18 that showed that you should have gotten
19 something better or something.
20        They're called "comparatories."
21 Lawyers call them "comparatories," but we
22 won't use that term.

Page 301

1    A   Please don't.
2    Q   Okay. Kathy Hanna. No, I'm sorry.
3 Let's start with Ms. Riley-Jamison. I don't
4 understand what the issue is during her
5 probation period.
6        Staying just with her, what is the
7 issue there? What is the concern with Ms.
8 Riley-Jamison getting better treatment than
9 you or somebody else?
10    A   In the employee handbook, it states
11 -- and I believe that goes for all Ballard
12 Spahr employees -- during the 90-day
13 probation period, if you're off for any
14 period of time, that you would not get paid
15 for time off.
16    Q   And it's your understanding that she
17 took time off during her probation period?
18    A   And she had a modified schedule.
19    Q   And what did she have to take time
20 off during her probation period for?
21    A   For her husband. He had surgery.
22 What kind, I don't know.

Page 302

1    Q    And how do you know that he had
2  surgery? Was that just generally known in
3  the office?
4    A    I think I can say this freely.
5  Ballard Spahr is not the place to work if
6  you want anything kept confidential. It's
7  like a loud speaker went off.
8    Q    How long was she gone roughly
9  according to your information?
10    A    He had to have surgery twice, so I
11  guess around two or three weeks the first
12  time around and maybe a week and a half the
13  next time around.
14    Q    Both within her probationary period?
15    A    Yes.
16    Q    How do you know she got paid?
17    A    Ms. Briscoe did the leave.
18    Q    So, your information comes from Ms.
19  Briscoe?
20    A    Yes. Who used to be -- She was Ms.
21  Riley's assistant - Ms. Riley-Jamison's
22  assistant.

Page 303

1    Q    It doesn't sound like she's keeping
2  her mouth shut either, does it? Why is Ms.
3  Briscoe telling you this information?
4    A    Because they also terminated her
5  when they terminated me.
6    Q    So, she got upset?
7    A    No. They terminated her on,
8  basically, discrimination. She had been
9  with the firm for 20 years.
10    Q    But why did that cause her to tell
11  you about Ms. Riley-Jamison's situation?
12    A    I asked her. I mean, it was like,
13  okay, what's going on here, I'm not crazy.
14    Q    So, you asked her, and she told you
15  about Ms. Riley-Jamison's situation?
16    A    Yes.
17    Q    Have you ever seen Ms. Riley-
18  Jamison's personnel file?
19    A    No. I don't work at management; no.
20    Q    Have you seen any documents that
21  show what she did or did not get paid in her
22  90 day probationary period?

Page 304

1    A    No.
2    Q    When you say somebody doesn't get
3  paid for time off on their probationary
4  period, does that mean they also don't get
5  any sick leave or vacation leave?
6    A    You don't get any leave or anything.
7    Q    So, if you have to take a day off in
8  the first 90 days --
9    A    It's leave without pay.
10    A    It's without pay; okay.
11    A    Regardless if it's attorneys,
12  secretaries, or management, it's leave
13  without pay.
14    Q    If Ms. Briscoe does the leave --
15    A    Yes.
16    Q    -- how does she know Ms. Riley-
17  Jamison actually got paid?
18    A    Because she's the one that submitted
19  the information to payroll. That's what she
20  did, you know, she submitted the information
21  to payroll.
22    Q    Oh, so she just submitted to payroll

Page 305

1  that Ms. Riley-Jamison was here every work
2  day for her 90 days?
3    A    Because that's what she was
4  instructed to do.
5    Q    Did she say who instructed her to do
6  that?
7    A    Mr. Panagopoulos.
8    Q    Anyone else?
9    A    That's all I know. Mr.
10  Panagopoulos.
11    Q    Does that exhaust your knowledge or
12  information about Ms. Riley-Jamison getting
13  paid during the 90-day probationary period?
14  Is that all you know about this issue?
15    A    Yes. I mean, like I said before,
16  sir -- I mean, I didn't care how it -- I
17  guess that's why I felt they discriminated
18  against me so badly.
19    I saw a lot of things. But I was
20  the type, I never commented on anything.
21  So, why did my personal life have to be an
22  open book?

Page 306

1    Q    So, Ms. Riley-Jamison might have
2    gotten two or --
3    A    Three weeks of pay.
4    Q    -- three weeks of pay. Did you not
5    get things from Ballard Spahr for --
6    A    I didn't get paid for my husband.
7    Q    You got --
8    A    My husband had cancer. I didn't.
9    Ms. Riley-Jamison got paid because her
10   husband was sick, not her. The same thing
11   with Ms. Craig.
12   Q    Well, hold on. Let's stay with one
13   at a time.
14   A    Okay. With Ms. Riley-Jamison, I'm
15   just saying --
16   Q    Your husband is sick. Ms. Riley-
17   Jamison's husband is sick.
18   A    Right.
19   Q    She gets paid. You get a modified
20   work schedule at your full salary.
21   A    But I didn't get paid. I had a
22   modified work schedule, but I didn't get

Page 307

1    paid. Does that make any sense? All I'm
2    saying is, for one thing, her husband is not
3    a Ballard Spahr employee, nor is my husband.
4    Q    Right.
5    A    So, therefore, as far as pay, she
6    wasn't sick. Her husband was. So,
7    therefore, if she got paid because her
8    husband was sick, don't you think I should
9    get paid since my husband was sick?
10   Q    And you don't agree that there were
11   times you were not there that HR did not
12   dock you for?
13   A    I haven't looked at my pay stubs
14   lately. To tell you the honest to God
15   truth, I didn't know what I was getting
16   paid when I got my pay stub.
17   Q    Kathy Hanna. What's the issue
18   there?
19   A    Ms. Hanna had a stroke. She was out
20   for six months. She kept her job. But for
21   two years, she worked a modified schedule,
22   schedule, and 90 percent of the time I was

Page 308

1    the one covering for her. And she's also
2    Caucasian.
3    Q    All right. She --
4    A    I hate using that word. Can't I say
5    "white"?
6    Q    You can "white." I don't care.
7    A    "Caucasian" is hard. I'm sorry. I
8    can't even spell it.
9    Q    So, she had a stroke, was out for
10   six months, kept her job on a modified leave
11   schedule.
12   A    For two years.
13   Q    Do you know if she got paid for a
14   full-time schedule versus just getting paid
15   for her modified time?
16   A    No. What she told me was, she said
17   -- She told me not to fill out -- When I
18   called her about the form that came with
19   this letter, I asked her, I said, Kathy, did
20   you have to fill this out? She went, no,
21   what is that for?
22   Q    "This form" you're talking about is

Page 309

1    the attachment --
2    A    Leave of Absence Request Form.
3    Q    Okay. You've got to slow down.
4         The form you're talking about is the
5    one attached to the March 9th, '04 letter,
6    Exhibit 70; right?
7    A    Uh-huh.
8    Q    You have to say yes or no.
9    A    Okay.
10   Q    Yes or no?
11   A    Yes or no what?
12   Q    The form you're talking about is the
13   form attached to the March 9th letter?
14   A    Yes.
15   Q    So, she said she never had to fill
16   that out; right?
17   A    Right.
18   Q    Now I'm asking you, do you know,
19   when she was on modified leave -- I'm sorry.
20   Was it modified leave or modified work?
21   A    Modified leave and modified work
22   because she had had a stroke. So,

Page 310

1  basically, even the days she was there, I
2  would do her walking like her Xeroxing or
3  whatever I could do to help her.
4     Q   So, when she's on modified work
5  schedule -- she's back and she's now on
6  modified work --
7     A   Yes.
8     Q   -- do you know if she's just getting
9  paid for the time she works or if she's
10  getting her regular full-time pay?
11     A   Okay. The way --
12     Q   Do you know one way or the other?
13     A   Like she told me, the way it worked
14  and she couldn't understand why they
15  didn't work this way with me -- on the days
16  she worked for Ballard, she got paid from
17  Ballard.
18        The other days, for two years, Unum
19  paid her 60 percent of her salary. So, she
20  couldn't understand, well, why didn't they
21  do you like that to see if you would get
22  better as far as your situation?

Page 311

1     Q   Did she say that she got this 60
2  percent pay on the days she didn't work
3  right away, or was there a waiting period?
4     A   When she first came back from off
5  for six months. No, there wasn't a waiting
6  period.
7     Q   That's what she told you?
8     A   That's what she told me; yes.
9     Q   Now, while she was out for roughly
10  six months because of the stroke, did she
11  get any money or accommodation there?
12     A   Yes. She got short term disability.
13  Then, after 90 days, she fell under long-
14  term disability.
15     Q   But you got that. You got the
16  short-term provisions and then you got the
17  long-term provisions. I mean, there were
18  lots of problems --
19     A   Not without a fight.
20     Q   I understand. But that's Unum's
21  fault. That's Unum's fault.
22     A   Well --

Page 312

1     Q   Let's not go there.
2     A   Okay. You're right. That's Unum's
3  fault. Let's not go there.
4     Q   Right. So, you got whatever the
5  short-term provisions are followed by the
6  long-term provisions, and, I agree, you had
7  to fight with Unum to get that; right? But
8  you got that.
9     A   I almost lost my home. I'm sorry.
10     Q   But that's Unum's fault, not Ballard
11  Spahr's.
12     A   Okay. But what I don't understand
13  is, everybody white that I talked to that
14  had to go through Unum, all their stuff was
15  done in a timely manner. They got their
16  benefits within -- just like that.
17     Q   Well, you know, when you start
18  saying "everybody I talked to," I'm going to
19  start asking you who all these people are.
20     A   No, no, no. I'm just saying, as far
21  as -- I wasn't close to a lot of people, but
22  I did have white -- I mean, the office was

Page 313

1  predominantly white. So, all I'm saying is,
2  you know --
3     Q   Ma'am, you need to answer my
4  question.
5     A   Okay. What do you want me to
6  answer?
7     Q   Ms. Hanna got whatever the firm
8  provided for the short term leave --
9     A   And the long-term.
10     Q   -- and the long term leave, the
11  long-term leave being paid by Unum.
12     A   Yes.
13     Q   You got both, but you had a much
14  more difficult time with Unum than
15  apparently Ms. Hanna did.
16     A   Yes.
17     Q   And I presume you've never seen Ms.
18  Hanna's personnel or pay records that would
19  show all this in documents?
20     A   No. But --
21     Q   Do you know anything else about Ms.
22  Hanna's situation, her pay, her leave?

Page 314

1     A    No.
2     Q    I mean, what you know is what she
3  told you of something?
4     A    Yes.
5     Q    Kristine Hearn. What's her
6  situation?
7     A    She worked with the firm maybe a
8  year at that, and she was able to have a
9  modified work schedule to go to George
10  Washington University.
11     Q    What type of work did she do at the
12  firm?
13     A    She was a floater.
14     Q    Was she a typist or –
15     A    Like sitting when somebody's out or
16  whatever.
17     Q    So, she was permitted to drop from
18  full-time to some sort of modified work
19  schedule to go to school?
20     A    To go to school; yes.
21     Q    She only got paid for the time she
22  worked; right? She didn't get a full week's

Page 315

1  salary while she was on modified work
2  schedule, did she?
3     A    I don't know.
4     Q    And what's wrong about her getting a
5  modified work schedule so she can go to
6  school?
7     A    Because when Shelby Green wanted to
8  do it, who had been there longer than her
9  and who was African-American, she was told
10  no.
11     Q    Ms. Green –
12     A    Shelby Green; yes.
13     Q    – what position did she hold?
14     A    Floater.
15     Q    Where do you get the information
16  that Ms. Green asked and was rejected? From
17  Ms. Green, I'm guessing.
18     A    When she saw that kind of light, she
19  came out of the office unappropriately
20  (sic).
21     Q    She what?
22     A    I mean, she was very upset about it,

Page 316

1  so she was very vocal about it.
2     Q    But what I'm asking you is you got
3  it from her?
4     A    I got it from her arguing with Ms.
5  Riley.
6     Q    All right. Where?
7     A    They was in the hallway near my
8  desk.
9     Q    So, were you listening in on the
10  yelling, I guess?
11     A    I couldn't help it, sir.
12     Q    Okay.
13     A    Okay? I mean, I'm just saying, just
14  like Brenda Dillman. She worked for the
15  accounting department --
16     Q    Wait. One thing at a time, ma'am.
17     A    Okay.
18     Q    When you do that –
19     A    Okay. I know, I know. I'm jumping
20  the gun.
21     Q    Anything you know about Ms. Green's
22  request for a modified schedule to go to

Page 317

1  school, you know from what you heard from
2  Ms. Green?
3     A    Ms. Green; exactly.
4     Q    Now, you heard her speaking to Ms.
5  Riley-Jamison out in the hall; right?
6     A    Uh-huh.
7     Q    Yes or no, please.
8     A    Yes.
9     Q    Thank you.
10          Did you talk to her about it later
11  after that?
12     A    The only thing she said to me about
13  it was, how come everybody up here white can
14  do whatever they want to do. And there
15  wasn't that many minorities at Ballard. How
16  come, if we ask for anything, we don't get
17  it?
18     Q    Okay. Do you know what --
19     A    And I told her I did not know.
20     Q    Do you know any of the specifics of
21  what she proposed -- you know, I go to
22  school on these days, I work these days? Do

Page 318

1 you know anything about the specifics that
2 she suggested?
3     A    She just said that the days that she
4 wanted to do it or whatever, they said that
5 that's the time when they really needed her;
6 okay?
7     Q    And that was Ms. Riley-Jamison who
8 told her that?  Is that your understanding?
9     A    Yes.  And that those two could not
10 be out at the same time.
11     Q    Do you know anything else about Ms.
12 Green's situation?
13     A    No.
14     Q    Do you know anything else about Ms.
15 Hearn's situation?
16     A    Kristine Hearn?  No.
17          (Whereupon, there was a brief pause
18 in the deposition.)
19          BY MR. DiMURO:
20     Q    Judy Mintz.  What was her situation?
21     A    Well --
22     Q    I presume Ms. Hearn is white as

Page 319

1 well?
2     A    Yes.
3     Q    Okay.  Judy Mintz?
4     A    She's white.
5     Q    And what's her situation in terms of
6 leave or accommodation or whatever?
7     A    She takes off around the middle of
8 June --
9     Q    Oh, that's right.
10     A    -- and she's off until September
11 where she resides at Martha's Vineyard.
12     Q    What type of position does she have?
13     A    Secretary.
14     Q    For whom?
15     A    The managing partner.
16     Q    And does she get paid while she's
17 gone?
18     A    I'm not sure.  I can't answer that.
19 No.  I don't know.
20     Q    And what's wrong with her being a
21 nine-month employee?  Why is it unfair or
22 discriminatory?

Page 320

1     A    Why is it unfair and discriminatory?
2     Q    Yes.  Why is it discriminatory for
3 Ms. --
4     A    Okay.  You asked me why is this
5 discriminatory.  I mean, maybe people think
6 of things in life and take things more
7 seriously than others.  I mean, I just look
8 at it  I don't how to answer that.
9     Q    But you're the one who said to me
10 these things show discrimination.
11     A    No.  I mean, these things show the
12 pattern of discrimination.
13     Q    Okay.
14     A    If I was white, I wouldn't be
15 sitting here talking to you now.  That's the
16 way that I feel.
17     Q    But if these examples of people's
18 leave histories or pay histories show
19 discrimination, why does Judy Mintz's
20 situation show discrimination?  Why can't
21 she just negotiate with the company to be a
22 nine-month employee?

Page 321

1     A    Okay.  I don't know the answer to
2 that.
3     Q    All right.  Is that everything you
4 know about Ms. Mintz?
5     A    Yes.
6     Q    And I presume you only know this
7 because it's general knowledge about the
8 office that she takes off three months;
9 right?
10     A    (No response.)
11     Q    Is that right?
12     A    Uh-huh.
13     Q    You have to say yes or no, please.
14     A    Yes.
15     Q    Have you ever talked to her about
16 it?
17     A    Oh, yeah.  I mean, she takes off in
18 December to go to Paris, so, I mean, I wish
19 I could do it.
20     Q    Brenda Dillman.  What is her
21 situation?
22     A    She used to be a Ballard Spahr

McFadden

Page 322

1  employee and she worked in accounting, so
2  she had a modified leave schedule to get her
3  degree in accounting.
4      Q   She's white, I take it?
5      A   Yes.
6      Q   And what is it about her modified
7  leave schedule that's unfair or
8  discriminatory?
9      A   I guess maybe -- maybe -- maybe I'm
10 missing something. When you work in an
11 office and you see everybody getting treated
12 different that's of a specific color, and
13 then when it comes to you, it's like you're
14 not getting treated the same, there is a
15 difference, sir. I don't know how else to
16 explain it. There is a difference.
17     Q   Well, but you got a modified work
18 schedule, you got the short-term benefit,
19 you got the long-term benefit eventually,
20 you got the extended leave, the three
21 months, and you got the 16 weeks.
22     A   Not when my husband was sick; no. I

Page 323

1  barely took ten months.
2      Q   But you didn't ask for it back then
3  when your husband was sick.
4      A   No. I'm just saying, it was
5  basically they gave me -- Basically, they
6  knew what they were doing. I went by what
7  they did in fear of losing my job. That's
8  all I'm -- I mean, that's --
9      Q   Who ever said to you you're going to
10 lose your job?
11     A   I mean, if you're constantly telling
12 me that you're doing me a favor.
13     Q   And what does that mean to you?
14     A   I mean, she don't go around telling
15 white employees that she's doing them a
16 favor.
17     Q   Well, how do you know that?
18     A   No. I mean, come on now, let's be
19 realistic.
20     Q   Well, how do you know that?
21     A   If she did it all day long, then
22 when would she have time to do anything

Page 324

1  else?
2      Q   So, you really don't know what she
3  says or does --
4      A   No, no, no. I'm just saying, you
5  know, I don't know if it's the way that she
6  treats her loved ones or -- I don't know.
7      But for as long as I've been with
8  that firm, anything they asked me to do, I
9  accommodated regardless. And when it came
10 to me, as far as I'm concerned, I was
11 treated like a refugee.
12     I mean, I wasn't even treated -- I
13 mean, the whole format changed as fast as I'm
14 concerned. That's how it mentally affected
15 me. I felt like, you know, like I said.
16     And the reason why we're here is
17 because I was discriminated by race,
18 retaliation, disability. You know, I mean,
19 that's why we're here.
20     And I just -- I'm trying to answer
21 your questions as best as I can. Okay.
22 Yes, don't answer, whatever. But I mean,

Page 325

1  maybe you need to -- Can I ask you a
2  question? Could you tell me what
3  "discrimination" means?
4      Q   Ma'am --
5      A   Then maybe we can be on the same
6  page.
7      Q   It's your lawsuit, not mine.
8      A   This is what I know. So, therefore,
9  I feel that they discriminated against me by
10 race, disability, retaliation, and whatever.
11 So, therefore, my thing is, why didn't they
12 just -- Why did they treat me different?
13     Q   Okay. That's what I'm trying to get
14 at. That's what I'm really trying to
15 understand.
16     A   No, no, seriously. Seriously.
17     Q   You got a modified leave schedule,
18 you got salary advances, you got the short-
19 term benefit, you got the long-term benefit,
20 you got the three month extended leave, and
21 you got the FMLA leave.
22     What is it that you didn't get that

Page 326

1  somebody else got?
2      A   I didn't have any job protection.
3  When I walked out that door on October the
4  15th, Ms. Iversen told me, you can always
5  come back here to Ballard at any time.
6      Q   Regardless of what position is
7  available?
8      A   Regardless -- Exactly.
9      Q   Regardless if your doctors and you
10 are certifying to insurance companies --
11     A   No.  I'm saying --
12     Q   -- the Social Security
13 Administration --
14     A   She said regardless.
15     Q   You've got to --
16     A   Mr. Henek told me the same thing.
17     Q   You've got to listen to my question.
18     A   Okay.  I'm listening to your
19 question.
20     Q   Regardless of whether or not you and
21 your doctors are certifying that you are
22 incapacitated and unable to resume gainful

Page 327

1  employment, you think they should have held
2  a job for you?
3      A   No.  I would have thought that they
4  would have treated me differently, some of
5  the mental and some of the stress.  Some of
6  the things I went through, I wouldn't have
7  had to went through.
8      Q   All right.  Let's keep going.
9          Brenda Dillman.  What was -- Oh, she
10 was the accounting person?
11     A   Right.
12     Q   Do you know what modified work
13 schedule she got?
14     A   I think she only worked on Tuesdays
15 and Thursdays.
16     Q   And she was in accounting?
17     A   Accounting; yes.
18     Q   Do you know, one way or the other,
19 if that adversely affected the accounting
20 department?  Did they need her or --
21     A   What they would do is, Ms. Briscoe,
22 on the days that she wasn't there, Ms.

Page 328

1  Briscoe handled the accounting needs with
2  her other duties.
3      Q   And do you know if she got paid more
4  than for the time she actually worked?
5      A   Ms. Dillman?
6      Q   Yes.
7      A   No.  I don't know.
8      Q   Do you know if she accrued vacation
9  and sick leave at full-time status or part-
10 time status?
11     A   From my understanding, she was part-
12 time.
13     Q   Do you know if Ms. Mintz accrues
14 sick leave or vacation leave on those months
15 that she's out?
16     A   I don't know.
17     Q   Do you know if Ms. Hanna or Ms.
18 Hearn accrued sick leave or vacation leave
19 on their modified schedules at full rates or
20 at modified rates?
21     A   I don't know.
22     Q   Ms. Betty Ann Hahn, she got treated

Page 329

1  better for reasons you've discussed?  You've
2  already told me about that; right?
3      A   Yes.
4      Q   Yvonne Parker, what's her issue?
5      A   Who?
6      Q   I wrote down Yvonne Parker.  Maybe -
7  -
8      A   Oh, Sevonne Parker.
9      Q   I'm sorry.
10     A   No.  I think she was one of the
11 young ladies that confronted Ms. Riley, and
12 I can't think of the other young lady's
13 name.
14         They were support staff members that
15 would go to Ms. Riley and ask her, you know,
16 what is her modified schedule, is she
17 getting paid, this and that.
18         My belief is, if you're the human
19 resources manager, that some things are
20 confidential.  You don't have to tell a
21 support staff member.
22         MR. DiMURO:  Let's mark this as the

Page 330

```
 1   next one.
 2              (Whereupon, the document
 3              was marked as Deposition
 4              Exhibit No. 77, for
 5              identification.)
 6   BY MR. DiMURO:
 7   Q   I'm showing you Exhibit 77.
 8   A   Okay. Yes.
 9   Q   Do all these pages go together, the
10   fax followed by --
11   A   No. This is someone that took care
12   of this fax for me that worked for the
13   Justice Department.
14   Q   So, you're sending a fax from
15   yourself through this friend at Department
16   of Justice?
17   A   No. She sent it -- A previous
18   attorney that I had, I had her fax it to her
19   because I had no other way of sending it.
20   Q   Right. So, Ms. Giles is helping you
21   send something to Ms. Maxi?
22   A   Yes.
```

Page 331

```
 1   Q   And the next page is your
 2   handwritten note to Ms. Maxi?
 3   A   Yes.
 4   Q   And who is Ms. Maxi?
 5   A   She works for a previous attorney I
 6   had, Joan Wilbon.
 7   Q   Okay.
 8   A   A lot of pages are not here of this
 9   document.
10   Q   And the first handwritten note says
11   -- You're making the point that, the way you
12   read the attached document, the accelerated
13   benefit was in effect in 2002 and 2003?
14   A   Yes.
15   Q   "If Ballard Spahr is willing to pay
16   the full amount of my husband's insurance
17   policy, I will agree to that. Otherwise, I
18   will accept the accelerated amount."
19        What was your thinking? Why should
20   they pay the full amount?
21   A   The full amount?
22   Q   Right.
```

Page 332

```
 1   A   I mean, since I was so special and
 2   they claimed that they did the addendum for
 3   me.
 4   Q   Well, what's that got to do with --
 5   A   No, no. I'm just saying it's just a
 6   note to Ms. Wilbon to her assistant. It was
 7   just something that I was writing.
 8   Q   I don't understand why you think
 9   Ballard Spahr should pay the --
10   A   No. I'm just saying that because,
11   if you're telling me that, in the other
12   document that we looked at, that the
13   addendum -- They're telling me that you paid
14   Unum, which is Ballard -- Ballard pays Unum.
15
16        You're telling me that you spent all
17   these thousands of dollars just to make me
18   feel special, and it doesn't make sense.
19   Not when I have proof of where it was in
20   effect in 2002 and 2003. So --
21   Q   What does that have to do with them
22   paying you $100,000?
```

Page 333

```
 1   A   No. I'm just saying, hey, they're
 2   trying to tell me that, when they told me
 3   about the addendum, that was a typographical
 4   error, it was not.
 5   Q   Now, the document that we're --
 6   A   A lot of this is missing. You have
 7   all this.
 8   Q   All right. We'll look for it.
 9   A   There's two of them.
10   Q   We'll look for it.
11   A   Okay. That's fine.
12   Q   But this is the fax.
13   A   Yes.
14   Q   And if we get all the attachments,
15   you're saying that will show that the
16   benefit was in effect -- Rider A was in
17   effect in 2002?
18   A   And 2003; yes, sir.
19        MR. DiMURO: All right. We're going
20   to quit for today. We all have to resume.
21   I would like to resume in the morning, but I
22   understand -- Ms. Murray and I had a
```

Page: 334

1  conversation about this off the record.
2        She consulted with her client, and I
3  think her client is going back to Florida
4  tomorrow, so we would like to know -- not
5  right now -- but sometime in the near future
6  when we can resume.
7        MS. MURRAY:  (To the witness) Do you
8  want to consult for a minute on that?  Maybe
9  we should talk for a minute.
10        THE WITNESS:  Yes.
11        (Whereupon, a discussion was held
12  off the record.)
13              *      *      *
14        (Whereupon, at approximately 5:42
15  o'clock p.m., the taking of the deposition
16  was concluded for the day, to be resumed on
17  May 17, 2007 at 10:00 a.m.)
18              *      *      *
19
20
21
22

Page: 335

1  DATE: June 1, 2007
2  RE: McFadden v. Spahr Riley Jamison
3  DEPONENT: Vanessa A. McFadden
4  DEPOSITION DATE: May 16, 2007
5        Under the Rules of Court, you have the right to
6  read and review the transcript of your deposition.  If you
7  are represented by counsel and he/she has obtained a copy of
8  the transcript, you may review his/her copy and (1) complete
9  the original Correction/Change Form if you feel there has
10  been an error in the transcription, and (2) sign the
11  Correction/Change Form.  The form should then be forwarded to
12  our office at 1325 Cameron Street, Alexandria, Virginia 22314
13  so that we may incorporate it into the original transcript.
14        If you do not have a copy of the transcript
15  available for your review, please contact this office at
16  (703) 837-0076 and make an appointment to come in and read
17  the original.  The Rules allow 21 days for this review.
18  However, if a court date is pending, it should be done right
19  away.  If you choose not to read your transcript, the
20  original may be filed at the request of counsel without your
21  signature at the time of trial or hearing this matter.
22        Thank you.

Page: 336

1  RE:  McFadden v. Spahr Riley Jamison
2  DEPONENT: Vanessa A. McFadden
3  DEPOSITION DATE: May 16, 2007
4        I have read the entire transcript of my deposition
5  taken on the 16th day of May, 2007, or the same has been read
6  to me.  I request that the following changes be entered upon
7  the record for the reasons indicated.  I have signed my name
8  to the signature line below and authorize you to attach the
9  same to the original transcript.
10  Page/Line  Correction or change and reason
11  _____  _____
12  _____  _____
13  _____  _____
14  _____  _____
15  _____  _____
16  _____  _____
17  _____  _____
18  _____  _____
19  _____  _____
20  _____  _____
21  Signature  _____
22  Date:

Page: 337

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Patricia D. Staffa, the officer before whom the
3  foregoing deposition was taken, do hereby certify that the
4  witness whose testimony appears in the foregoing deposition
5  was duly sworn by me; that the testimony of said witness was
6  taken by me stenographically, and that I thereafter reduced
7  it to typewriting; that the foregoing is a true record of the
8  testimony given by said witness; that I am neither counsel
9  for, related to, nor employed by any of the parties to the
10  action in which this deposition was taken and, further, that
11  I am not a relative or employee of any attorney or counsel
12  employed by the parties thereto, nor financially or otherwise
13  interested in the outcome of the action.
14
15
16        PATRICIA D. STAFFA
17        Notary Public in and for
18        the Commonwealth of
19        Virginia at Large
20
21  My Commission expires:  March 31, 2008
22

**A**
abilities 167:19
ability 7:4 8:2
  40:12 143:11
  146:1 168:1
  203:3,19
able 67:9 142:22
  143:1 145:8
  150:2 170:8
  174:16 177:14
  197:20 198:14
  199:9 200:4
  206:14 214:16
  215:6,20
  216:11 220:12
  269:16 287:15
  314:8
abnormal 130:4
absence 66:20
  66:22 277:12
  278:12,17
  280:14 309:2
Absolutely
  35:10 39:17
abstract 270:1
accelerated
  289:11 331:12
  331:18
accept 167:4
  331:18
accepted 292:3
accidental 42:8
accommodate
  47:8 92:9
  177:15 267:21
accommodated
  324:9
accommodation
  268:8,15,17
  270:3 311:11
  319:6
accommodatio...
  270:6 300:17
account 43:1
accounting

316:15 322:1,3
327:10,16,17
327:19 328:1
accrued 160:15
328:8,18
accrues 328:13
accurate 17:16
  17:16 119:15
acted 171:21
acting 134:15
action 1:4
  337:10,13
actions 62:4,7
activities 144:9
  145:15 147:1,6
activity 151:12
  152:16
Adams 4:13
add 247:1
addendum
  282:21 288:8
  288:11 332:2
  332:13 333:3
addition 280:3
additional
  278:12
address 12:12
  12:17 14:13,21
  15:4
addressed 247:9
Administration
  119:20 120:10
  120:16 127:20
  144:8 146:1
  147:5 148:10
  153:8 326:13
administrator
  31:8 227:9
admission
  240:14
admitted 240:14
Adult-Third
  148:11
advanced 86:6
  86:18 97:8
advances 82:16

83:7 86:12
87:7 95:14
281:18 325:18
adverse 40:11
adversely
  327:19
advises 278:6,10
affect 5:14 6:6
  40:11
African 225:3
African-Amer...
  195:12 207:8
  222:7 269:17
  299:19 315:9
African-Amer...
  220:8
afternoon 19:13
  59:5
ago 8:15 49:19
  85:1
agree 22:6,17
  24:1 33:7
  36:17 61:22
  94:15,21 98:3
  128:7,7 172:18
  198:12,15
  199:6 200:2,9
  201:21 266:15
  266:16,17
  268:7,14
  307:10 312:6
  331:17
agreed 90:3 93:7
  156:20 167:13
  215:17
ahead 26:9 41:1
  64:1 66:5
  106:15 188:19
  199:20 294:11
aid 149:16
air 203:7
Alexandria 1:9
  1:17 2:15
  335:12
allegations
  253:20

allow 270:20
  335:17
allowed 117:12
  267:14
altering 217:5
American 225:4
amount 85:12
  174:9 194:18
  294:1,5 331:16
  331:18,20,21
amounts 85:20
ANDREWS 1:5
angry 59:9 62:6
  62:9,11 80:17
Ann 191:6
  224:22 264:21
  290:9 291:3
  292:6 293:4,15
  294:4 296:1,6
  296:17 297:2,3
  297:9 299:9,15
  328:22
anniversary
  299:12
Ann's 293:9
  297:19 299:8
answer 10:8
  20:13,16 21:2
  22:15,21 23:16
  24:18 25:10
  26:10 32:5
  36:12 37:4,20
  38:7,20 40:21
  41:1 47:13,13
  51:5 63:2 65:5
  68:5 76:3
  81:13 89:18
  91:7,19 92:2
  109:5,13
  110:18,20,21
  111:8,12 112:8
  114:2,10 116:6
  117:9 139:15
  144:13 159:1
  164:2,9 171:12
  173:1 177:5,20

178:6,17
182:22 183:2
188:19 193:17
194:5 195:14
199:19 200:13
205:2 208:22
212:21 218:5
218:21 222:3
222:22 225:11
228:19 229:3
231:21 232:22
235:12 244:9
249:6 251:18
253:11 262:1
271:5 275:3
279:16 280:1,3
282:7,8,8
313:3,6 319:18
320:8 321:1
324:20,22
answered 20:11
  20:22 21:1
  96:14 149:11
  149:13 182:6,8
  195:9,16 211:2
  211:4 229:6,7
  245:10 250:11
  295:4
answering 36:3
  37:15 38:2,22
  39:19 112:19
  194:7 202:3,4
  204:2 208:14
  208:19 222:10
  225:17 226:11
  251:3,19 284:8
answers 5:6
  47:19 100:10
  180:13 181:22
  254:15,22
anti 175:13
  176:3
anti-depressant
  6:12 166:4
anti-depressa...
  6:16 7:21

175:13 176:7
176:16
**anxiety** 124:12
130:18 175:19
**anybody** 27:4,12
27:18 28:18
29:11,20,22
53:22 57:15
81:1 90:11
225:18,21
232:17 235:3
276:6
**anymore** 8:5,11
30:18 169:16
215:3 265:1
**anytime** 107:18
**anyway** 104:15
106:8 215:9
**apartment** 10:15
12:21
**apologized**
107:7
**apparently**
313:15
**appeal** 184:2,4,7
184:14,15
185:12 189:10
189:19
**appealed** 183:20
186:5
**appears** 337:4
**apples** 268:11,11
271:4,5
**application** 22:7
22:18 23:19
28:17 29:19
34:8,10,15
35:3 44:11
45:9 53:8
54:14 62:15
63:6,11 119:22
120:8 121:14
141:1 153:5
154:19 188:5
198:4 212:11
214:20 241:5

**applied** 15:12
16:1,11 17:1
17:10 25:14,17
49:3 117:21
120:4 121:3,9
180:20 283:22
289:15
**applies** 195:8
284:5
**apply** 19:6 21:17
21:18 26:14,18
27:6 41:12
48:22 49:11,16
52:4 79:15
282:14 285:5
289:10,12
**applying** 20:8,20
24:9 25:1
48:19
**appointment**
335:16
**appreciate** 5:5
80:4 91:5
204:18
**approach** 228:6
**appropriate**
67:22 203:15
**approved** 19:11
19:15,17 58:6
58:12,22 59:1
59:8,20 60:13
61:11,13 62:21
62:22 79:18
83:9 121:10,15
121:17 145:14
181:5 185:21
185:22 216:5
279:17
**approximate**
68:18
**approximately**
1:18 11:11
68:10 69:9,13
334:14
**April** 55:4,18
56:3,9,16

57:21 74:16
141:3 180:14
212:9 213:16
213:19 214:11
214:14 279:15
291:11 295:22
296:14
**argue** 70:18
**arguing** 316:4
**Arizona** 11:20
**arthritis** 123:15
133:6,10 134:2
134:14 137:5
137:10,12
141:7 163:8,9
164:13 298:22
**asked** 20:22
38:12 44:10
46:18 47:6
51:18 58:17
60:7 61:4,20
66:16 67:2,8
85:4 86:21
87:4 91:16,17
96:14 100:13
109:5 110:17
112:9 115:22
142:16 149:10
158:11 159:5
177:18 184:13
196:18 202:14
207:15 218:4
226:10,12
247:2 253:15
255:11,13,22
257:14,21
271:3 290:7
297:1,18
303:12,14
308:19 315:16
320:4 324:8
**asking** 16:4
17:18 18:2
21:17 26:1
27:8 29:14
31:16,17,19

36:3,9 37:1,18
38:1,6,7 39:4
39:12,13 40:14
47:7,20 51:6,9
54:9 61:7
63:14 91:2,3
99:1 100:15
105:9 109:6
110:8 111:7
114:11 117:2
126:17 129:8
152:12 154:5
157:22 166:15
180:12 185:3
186:20 188:20
188:22 189:11
193:4 199:1,5
199:12,13,14
201:8,10,11
202:6,7,9,11
212:14 217:1
217:21 220:6
220:19 221:1,7
221:21 222:2
223:15 224:7
242:21 244:15
248:14 251:4
256:4 257:4
268:19 269:22
270:14 272:12
309:18 312:19
316:2
**asks** 120:16
159:16 254:21
255:5
**assist** 95:13
**assistant** 302:21
302:22 332:6
**assistants** 55:11
**assume** 31:7
76:14 232:3,6
238:15 265:5
289:2
**assumed** 278:14
**assuming** 30:19
197:13

**assumption**
86:22 164:11
**asthma** 225:5
**attach** 279:5
336:8
**attached** 213:14
240:13 278:18
279:2 309:5,13
331:12
**attachment** 66:2
66:8,11 79:3
275:11 309:1
**attachments**
333:14
**attack** 138:5
175:19
**attacks** 124:13
130:18 141:8
**attempted** 10:2
**attend** 89:11
258:20 261:7
**attending**
135:22 259:2
**attorney** 9:10
80:4 124:5
330:18 331:5
337:11
**attorneys** 304:11
**attorney's** 24:19
25:10 27:2
28:13 29:4
32:9 49:9 52:4
76:8 201:15
212:20
**August** 13:2,4
13:14,20 85:9
224:17
**authentic** 240:15
**authorize** 336:8
**Auto** 236:11,15
236:22 237:15
238:1
**automatic** 38:16
**automatically**
42:22
**available** 292:15

326:7 335:15
**Avenue** 2:4
  12:18 13:9,19
  14:4,13,21
  15:3
**avoid** 269:6
**awarded** 185:14
  186:6
**aware** 35:12
  49:5 64:17
  82:14 95:1,4,6
  95:12 213:4
**a.m** 1:18 98:9
  334:17

**B**
**B** 3:6 262:22
**back** 15:7,10
  19:13,21 20:1
  23:7 27:19
  28:20 29:12,22
  34:22 44:1
  49:6 58:7,10
  61:12 62:21
  65:4 70:13,20
  76:17 82:6,9
  82:20 85:19
  86:12,21 87:6
  87:17 88:7,15
  95:20 105:21
  108:2 117:18
  122:12 134:10
  138:18 141:3
  143:2 150:19
  154:18 158:9
  160:1 161:5,9
  165:1,3,15,21
  166:10 169:14
  170:5 172:6
  174:12,13,15
  175:2,3,8,14
  177:22 182:17
  185:17,21,22
  186:19 187:4
  190:11,11
  192:8,21

193:20 195:5
202:21 205:2,4
207:2 209:5
210:7 211:10
211:15 213:15
213:18 226:5
226:10,14
234:8 253:3
257:18,20
260:11 263:15
265:1 269:15
274:18,19
275:11,21
276:16 280:8
281:21 283:6
293:9,15 294:8
294:14 295:13
295:15,16
297:3 310:5
311:4 323:2
326:5 334:3
**back-dated**
  121:16
**bad** 133:13
  135:3,12
  141:20,21,22
  206:13
**badgered** 109:17
**badly** 150:11
  305:18
**balance** 134:12
**Ballard** 1:5 9:2
  15:13 16:2
  22:4 26:13,17
  27:4,12,18
  28:19 29:2,11
  29:21 31:4
  32:12 38:15
  49:4 57:15,18
  57:20 64:14
  67:11 71:9
  72:2 73:14,20
  74:7,9 82:9
  86:5 133:21
  140:3 168:7
  178:19 192:14

205:10,20
207:21 209:6
211:10,15
258:17 266:12
266:18 267:19
270:9 271:10
272:22 277:15
279:18 280:14
283:9 288:15
289:1,2,4
301:11 302:5
306:5 307:3
310:16,17
312:10 317:15
321:22 326:5
331:15 332:9
332:14,14
**Ballard's** 25:8
**Baltimore** 249:3
  250:16
**bank** 42:22
**barely** 323:1
**based** 121:21
  122:2 199:5
  221:22
**basically** 7:21
  22:3 28:6
  30:19 47:7
  61:8 66:21
  88:21 104:21
  106:7,11 109:3
  133:7 135:6
  139:19 156:19
  160:4 164:4
  165:10 166:13
  166:19 169:18
  179:4 181:11
  181:22 183:7
  187:16 222:18
  246:9 258:14
  266:8 273:16
  274:15 281:18
  287:11 291:21
  297:18 303:8
  310:1 323:5,5
**basis** 176:8

**bathe** 210:16
**bathroom** 81:22
  182:12
**Battista** 292:8
  292:11,13
**bed** 138:1,8
  139:4,10 142:1
  142:9,10
  143:13 145:11
  179:22
**bedroom** 164:5
**beginning** 1:17
  58:3 118:4,5
  142:7 170:4
  177:19
**behalf** 1:14,22
  2:1,8 4:5,8
**belief** 111:17
  112:13 329:18
**believe** 5:14 7:19
  20:10 30:4
  31:11,19 32:20
  35:3 37:9 38:2
  40:10 75:19
  80:1 110:13
  111:8 119:1
  136:7 191:8
  234:5 288:1
  301:11
**believed** 258:5
  261:6
**believes** 259:8
**bend** 163:13
**beneficial** 11:22
**benefit** 80:9,11
  269:14 322:18
  322:19 325:19
  325:19 331:13
  333:16
**benefits** 18:14
  31:8 94:5
  119:19 120:5
  121:2 122:5,15
  123:3 148:16
  160:15 181:6,7
  183:8,14,21

184:20 185:13
185:14 186:7
187:9 188:6,14
189:9,13,18
195:11 198:5
214:21 215:10
228:2 281:19
300:17 312:16
**BERNARD** 2:9
**best** 7:20 39:10
  68:2 76:3
  89:18 91:7
  111:12 174:7
  228:19 251:3
  271:6 324:21
**better** 11:16
  29:1 87:1
  116:7 168:2
  169:21 172:3
  176:19 195:11
  221:18,19
  224:1 269:21
  300:19 301:8
  310:22 329:1
**Betty** 46:20
  191:5,6 224:22
  255:13 264:21
  290:9 291:3
  292:6 293:3,9
  293:15 294:4
  296:1,4,5,17
  297:2,3,9,19
  299:8,9,15
  328:22
**bias** 222:15,16
  223:6
**big** 88:18 179:3
**bigger** 6:4
**birthday** 13:14
  13:18
**black** 209:14
  269:20 274:9
**blame** 286:11
**blisters** 129:1,4
  129:9 134:20
  134:21

block 63:6 208:2
blood 124:19
blurry 130:22
board 274:11
body 132:5
  137:1 147:11
  176:1
boils 281:18
  282:2
bones 258:10
bonus 193:1
  295:12
book 305:22
booklet 288:20
  288:21,22
boss 103:6
  230:16,16
  235:6
bottle 6:4
bottom 41:5
  43:21 105:20
  118:20 197:18
  271:9
box 42:12 45:22
  48:16
brace 174:15
  175:2
braces 292:17
breadwinner
  265:13
break 14:7 35:8
  35:15 82:1
  90:21 92:8
  127:17 171:8,9
  174:19 177:10
  201:11 223:10
breaks 170:13
  170:14,15
  182:19,21
breath 43:15
  130:7
Brenda 267:18
  316:14 321:20
  327:9
brief 35:19 82:3
  161:6 204:19

253:1 300:12
  318:17
bring 138:1
  139:3 142:1,14
  204:9 290:12
bringing 115:3
Briscoe 88:3
  90:9 224:7
  225:1 231:1
  242:8 244:11
  248:12 251:11
  252:10 302:17
  302:19 303:3
  304:14 327:21
  328:1
broke 99:14
  160:4
bronchitis 125:4
  125:9
brought 206:11
bunch 28:4
burden 115:7
business 8:7
  231:16 257:16
  258:20 266:13
  270:22
button 168:22
  250:2
buttons 252:2

C

C 3:1 4:1 263:8
  264:3
calculated 294:2
calculations
  279:10
call 46:17 49:20
  50:2 59:2,12
  62:20,21 64:6
  65:7,16 81:12
  112:17 115:13
  140:1 153:2,20
  179:17 180:3
  187:17 220:19
  222:4 231:4
  236:5 275:15

276:13,19
  277:8 281:2,5
  281:6 285:11
  285:13 296:14
  297:7 300:21
called 1:13 4:4
  17:22 18:5
  19:9,13 28:1
  58:2,4,7 61:10
  61:12 64:20
  78:1 80:17
  104:8 105:18
  107:3,6,9
  115:19 116:3
  139:21 179:16
  192:21 225:4
  233:20 275:4,6
  275:17 276:7
  276:21 277:12
  279:19,22
  289:11 295:2
  295:17,20
  296:3 300:20
  308:18
calling 59:18
  187:17 222:1
  275:7 277:14
calls 48:7 58:10
  58:20 179:5
  188:16,22
  297:5
Cameron 335:12
cancer 91:10,12
  91:19 92:14
  94:16 108:13
  191:8,9 229:19
  231:10 233:22
  234:10,16,20
  235:4,11,14
  260:2 306:8
cane 145:13
capable 230:8
capacity 156:15
car 161:21
card 218:3,3
care 8:10,10

17:4 30:17
  47:16 57:13
  80:22 104:16
  106:10 108:19
  109:18,21
  110:4,6,12
  111:6,15,20
  112:2 115:15
  116:9,19,22
  117:16 162:22
  183:3 213:1
  228:4 236:17
  262:19 263:10
  263:16 264:6
  265:11 271:11
  271:12 305:16
  308:6 330:11
carefully 29:8
caregiver 8:9
  12:4
caregivers 15:7
case 133:13
  171:22 255:4
  280:7
cases 267:22
cash 284:17,18
Cassandra
  224:22 242:7
  252:10
cat 10:22
Caucasian 89:1
  89:7 195:12
  269:19 308:2,7
Caucasians
  89:10 267:20
cause 36:22
  127:9 165:1
  166:16 176:20
  303:10
caused 128:22
  132:2,3
causes 131:22
  165:1,3 176:18
causing 264:12
cell 105:18
  163:21

center 281:13
certain 18:11
  87:16 90:19
  94:17 282:6
  293:22
certainly 35:6
  86:11 112:12
  166:1
CERTIFICATE
  337:1
certify 337:3
certifying
  326:10,21
cetera 266:22
chair 165:20
  174:13
change 215:19
  336:10
changed 14:7
  103:14 107:5
  145:7,21 188:8
  324:13
changes 336:6
changing 217:3
channels 209:17
charge 90:9
  217:10 262:12
charges 217:17
  218:2
charging 218:15
Charles 82:18
check 146:15
checked 45:22
checking 42:21
  48:16
chemo 90:4
  93:12 210:1
  263:20
chemotherapy
  93:4 259:2
children 14:17
  269:8 270:4
choice 11:15
  117:5 139:12
  266:3 272:11
choose 36:6

335:19
chores 146:22
  162:12
Christmas 193:1
  295:12
chronic 11:18
  125:21 126:10
  133:18 147:11
  149:19 150:17
chronology 9:18
circle 88:18
circumstances
  111:6
cities 162:5
Civil 1:4
claim 41:8 48:15
  56:5 87:10
  121:21 122:2
  148:16 211:22
claimed 332:2
claiming 133:17
claims 254:14
clarify 5:11
  54:19
clarity 26:6
Clark 186:12,16
  186:18 187:22
  188:21 189:22
  190:5,13,19
  196:2,8 197:8
  198:8 203:2,18
  205:7 209:4
  211:8,20 212:4
  213:5 214:3,11
  214:14 215:1
  215:22
Clark's 197:11
  197:16 199:1
  212:10
clean 210:9
cleaning 162:13
  210:3
clear 5:8 10:6
  114:18 150:5
  283:6
cleared 254:2

client 36:1 201:1
  204:22 334:2,3
climate 165:13
close 260:13
  296:18 312:21
closed 256:2
clothes 163:1
cluster 136:9
  141:20 179:20
clusters 136:10
  180:9
coincidentally
  228:17
collaborate
  245:11
college 14:15
  68:1,3 206:14
  263:10
colon 91:12,19
  234:1
colonoscopy
  97:20 98:1,8
  98:13 286:1,5
color 322:12
Columbia 1:1
  70:9
comb 210:18
combined 16:20
come 28:20
  29:12,22 82:10
  87:17 88:15
  94:17 108:14
  112:2 114:17
  117:18 146:11
  154:11,18
  160:22 195:5
  206:5 210:4,9
  224:4 226:10
  228:13 243:3
  248:1 260:10
  260:17 263:11
  265:20 266:4
  266:22 272:12
  273:13 288:14
  288:22 291:5
  293:15 294:8

294:14 317:13
  317:16 323:18
  326:5 335:16
comes 220:2
  266:17 302:18
  322:13
comfortable
  37:15 164:15
comfortably
  37:4
coming 27:19
  120:20 266:14
  277:1 297:3
comment 35:22
  102:5 225:19
  225:22
commented
  305:20
comments 90:1
  219:17,20
  254:14 255:6
  291:13
Commission
  337:21
Commonwealth
  1:20 337:18
communicating
  244:5
companies
  326:10
company 15:21
  27:14 58:8,18
  60:8,17,18
  61:5,15,16,18
  287:9 288:18
  288:22 320:21
comparatories
  300:20,21
compare 268:10
comparing
  259:18
compensate
  94:13
complain 225:21
complained
  126:10

complaining
  129:13 258:19
  259:17 264:18
complaint 72:5
  72:6,8,10,14
  72:20 254:13
  259:12
complete 56:5
  117:9 335:8
complicated
  18:12 168:19
compound 36:11
comprehend
  8:18,20 158:19
comprehended
  185:20
computer
  241:12 245:16
  249:2 250:19
computers
  227:10
concentrate 40:8
concentration
  43:15 129:13
  129:15 166:17
  177:3,7 178:10
concepts 265:14
concern 110:1
  115:5 296:21
  301:7
concerned 24:4
  74:2 88:19
  103:11 109:16
  113:5 133:4
  262:5 274:7
  299:3 324:10
  324:14
concerning
  203:3
concluded
  334:16
conclusion
  216:6 242:22
condition 40:4
  48:20 123:11
  123:18,22

124:3,12,15,19
  125:4,13,21
  126:2 131:21
  139:2,22 140:6
  148:21 169:14
  169:19 170:17
  172:3,11,19
  174:1 181:15
  201:22 202:21
  208:6 226:17
  227:14,20
  229:15 230:12
  230:18,21
  231:2 232:7,17
  233:4,10 234:7
  235:19
conditions 35:14
  123:6 127:3,9
  127:18,22
  138:21 141:5
  141:22 142:7
  150:11 161:12
  167:14,18
  215:3 242:12
  282:6
conduct 36:5
conference
  46:17 49:20
  50:2 64:6
  81:12 187:15
conferred 124:7
confidential
  46:7 203:14
  206:4 212:14
  230:1 232:12
  232:19 302:6
  329:20
confined 142:12
confirm 84:16
conflict 265:9
confront 231:17
confronted
  105:21 329:11
confused 64:19
  69:21 75:15
  76:1 78:2

188:9 223:14
confuses 261:20
confusing 17:13
  19:8 27:22
confusion 88:19
  291:14
connected 164:7
Connecticut 2:4
connotation
  219:20,21
consecutive
  250:6
consider 27:14
  27:18 28:19,20
  29:12,21 96:3
  96:11
consideration
  198:6
considered 94:7
  222:14 223:8
constant 150:22
Constantinos
  2:20
constantly 96:8
  109:16 149:19
  264:5,8 323:11
consult 204:13
  334:8
consulted 36:1
  204:21 334:2
contact 45:14
  54:16 72:16
  335:15
contacted 56:16
  58:8 273:18
contains 28:4
contend 32:11
  168:12
context 273:11
continually
  168:2
continue 201:19
  212:22
continued 103:4
  120:14 127:4
continues 123:2

continuous
  176:8
continuously
  121:2 122:16
conversation
  58:20 65:11
  67:21 77:4,6
  78:18,20 79:7
  79:12,19 80:2
  80:20 81:3,14
  105:10,13,15
  107:5 277:4
  293:18 299:5
  334:1
conversations
  55:22 59:22
  78:12
convincing
  188:13
cook 161:18
cooking 161:18
copied 288:20
copy 45:17
  53:11 61:16
  187:14 288:19
  335:7,8,14
copying 217:10
  217:17 218:2
correct 19:17
  30:10 32:4
  33:20 45:15
  46:8 54:17
  94:1 97:12
  120:17 123:16
  124:4,13,20
  125:5,8,14
  148:17 157:7
  190:2 192:11
  233:18
Correction
  77:16 336:10
Correction/Ch...
  335:9,11
correctly 143:6
  146:9
costs 24:19

238:5
counsel 1:14 4:5
  124:8 240:13
  253:2 335:7,20
  337:8,11
couple 30:3
  84:17 156:7
  260:18 275:14
  285:22 289:8
course 35:10
  116:2,12
  285:20
court 1:1 23:6
  205:3 254:2
  335:5,18
cover 37:20
  98:12 158:5
  196:1,8,18
  197:7 259:6,6
  272:20
covered 67:5
  267:12
covering 308:1
Craig 89:6
  115:13,18,19
  116:9,13,15
  206:3,6 227:9
  230:20 232:2,8
  234:13 235:7,9
  235:13,18
  236:5 258:6,19
  259:8,11,14
  260:7 261:6,9
  261:15,21
  262:6,11
  306:11
Craig's 259:18
  260:9 261:2
cramp 163:7
crazy 303:13
created 291:22
credit 95:10
  218:3 219:3
crippling 137:14
criteria 24:2,9
  24:22 25:14

criticism 7:11
criticizing 60:21
cross 112:16
  218:11,20
cruel 111:21
  112:3 206:20
culture 222:5,9
cured 129:5
currently 11:5
Curry 225:3

D
D 1:19 4:1 337:2
  337:16
daily 144:9
  145:15 147:1,6
date 13:15 30:14
  32:20 33:4,5
  34:6 38:19
  51:17 67:20
  68:10,11,18
  72:9,12 84:6
  84:11 102:11
  115:12 121:4
  122:9 127:5
  147:22 150:22
  151:1 154:2,3
  154:4,11
  155:18,19,19
  156:4,5 167:6
  170:2 179:16
  191:1,2 224:11
  224:15 245:19
  264:1 335:1,4
  335:18 336:3
  336:22
dated 21:9 30:13
  34:22 43:19
  64:14 148:12
  183:22 280:22
  288:4
dates 15:19
  69:19 75:20
  77:21 78:3
  84:15 177:11
daughter 8:6,9

10:18 11:8
  118:8 119:13
  144:20 149:3,9
  155:1 162:22
  163:4
daughters 14:14
  15:6 68:2
  109:4 115:4
  263:9
day 6:13,14 10:1
  19:12 28:1
  40:5 61:10,19
  64:5 78:7
  87:20,22 90:12
  97:18 98:11
  116:3 123:3
  126:16 127:2
  133:12 137:1,1
  137:18,18
  143:12 150:17
  156:6 157:9
  163:11 165:17
  170:14,15
  171:21 174:6
  174:20 175:1
  175:15 176:10
  180:1 225:1,6
  228:14 241:17
  243:8,9 245:7
  247:8,10,11,12
  247:12,14,18
  247:19 248:2,5
  248:8 249:4,8
  249:19,21,22
  253:21 260:10
  263:11 267:17
  270:21 272:5
  273:1,3 275:5
  275:17 276:7
  279:21 297:17
  304:7 305:2
  323:21 334:16
  336:5
days 9:8 15:17
  65:8 75:21
  78:3,19 79:8

93;18,19,20
94;9,13,15
97;4,12 98;8
98;15 99;5
100;2,17,19
101;6,7,11,20
136;4,5 137;22
139;3,9 141;10
142;22 157;9
157;16,19,21
159;11,21
160;5,22 172;1
172;9,19
173;22 174;10
178;3 180;4
210;10 231;14
256;13,16,17
275;14 277;13
279;9 304;8
305;2 310;1,15
310;18 311;2
311;13 317;22
317;22 318;3
327;22 335;17
deal 105;3
107;13 276;12
dealing 16;21
22;11 23;12
130;3 205;19
207;21
dealt 68;22
227;10
Debilitating
134;6
December 15;5
15;6,8 75;6
145;17 146;5
147;5,19
148;12 150;19
295;3,5 297;7
321;18
decide 108;17
207;13 266;19
deciding 56;5
decision 19;5
33;19 34;3

108;17
declined 289;20
decreased
129;12,15
defendants i;7
1;14 2;8 4;5,9
defendant's
242;22
define 34;16
Definitely 281;9
degraded 208;10
degree 322;3
delay 24;19
33;18,21
delayed 63;10
denial 183;20
185;13 189;8
189;12
denied 63;12
105;22 186;4
269;19
deny 34;3 233;3
department
18;14 64;20
70;17 227;5
238;21 252;5
316;15 327;20
330;13,15
depending 33;9
284;16
depends 171;19
172;13 180;7
DEPONENT
335;3 336;2
depositing 42;22
deposition 1;11
3;11,12,13,14
3;15 4;15,18
4;22 5;2 9;9
24;20 25;20
36;5 40;17
50;21 52;6
118;12 144;3
148;5 151;7
213;1,9 229;2
318;18 330;3

334;15 335;4,6
336;3,4 337;3
337;4,10
depressant
175;14
depressants
176;4
depression 7;22
43;16 124;1
depressive
133;19 205;20
derogatory
219;19 223;18
224;3
describe 7;18,20
8;1 39;5 43;12
146;7 147;7
described 47;12
114;16 136;9
137;4,5 145;22
describing 49;20
165;14
description
145;14 146;6
desk 88;1 168;16
182;11,18
241;12,17
243;8 245;8,15
245;20 246;19
247;2,14 316;8
detail 202;12
details 226;18
233;9
determines
175;22 176;1
determining
25;14
diagnosed 91;9
91;11,19 92;14
94;16 123;11
123;19 124;4
124;16,22
125;7,16 126;3
diagnosis 106;14
DiBattista 46;18
49;21,22

290;21 293;14
died 235;10
299;12
difference 137;8
193;9 322;15
322;16
different 8;20
14;10 89;15
126;4 131;21
144;14 158;7,8
181;10 207;10
208;13 218;7
258;13 260;18
261;1 268;10
270;14 299;18
322;12 325;12
differently
258;5 327;4
difficult 36;13
313;14
difficulty 8;14
36;2,8,11 38;2
39;9 40;2
134;16 164;19
217;8
Dillman 267;18
316;14 321;20
327;9 328;5
DiMURO 1;16
2;9,12 3;4 4;10
5;4,12,21 6;10
6;15,19 7;2
16;8 20;12
21;5 22;14,16
23;4,15,17
24;17,21 25;9
25;12 26;8,22
27;3 28;12,15
29;3,6,15 32;7
32;10 34;17,21
35;2,6,10,21
36;15,16 41;3
48;9 49;8,10
51;20 52;3,7
54;11,20 68;4
68;7,9,17 71;7

71;10,12,14
73;11,13 76;7
76;10 82;2,5
96;15 109;20
111;1,4,16,18
111;22 112;4,7
112;10,12,18
112;22 113;8
113;12,15,20
114;5,7,9,13
117;18,20
118;9,15,19,22
119;6,9 124;10
127;12,16
143;22 144;6
144;17 148;2,8
151;4,10
152;18,21
153;9 159;19
161;3,8 173;17
188;17 189;2,3
197;6 199;3,4
199;12,15,20
200;1,17 201;2
201;14,18,20
205;5 209;3
211;7,13,16,19
212;19 213;3
213;12 214;1,6
214;9 218;7,9
219;2 223;2
229;10 236;8
240;12,18
243;2,12 246;6
246;13 252;15
252;21 253;3,9
253;14 254;3
273;10 300;14
318;19 329;22
330;6 333;19
DiMuro's 3;9
dinner 286;14
Dino 228;2
233;11,12
direct 20;13,15
disabilities

167:17 223:19
**disability** 15:13
15:16,21 16:1
16:11,13,20
17:2,3,11,12
18:9,17,22
19:4,6,11,15
20:8,19,21
21:20,22 22:1
22:7,12,19
23:10,12,20
24:3,10 25:1,3
25:6,7,16
26:14,18 27:7
27:15 28:18
29:20 30:5,18
31:6,13 32:14
32:17 33:4,6,8
33:9,16,20
34:3,8 38:13
41:12 44:12
49:4,6 53:8
54:15 58:6,12
58:21 59:7,19
60:13 61:1,11
62:16 63:7,11
66:17 67:1
79:16,17 83:8
117:22 119:19
119:21 120:20
121:11,15,22
122:16,21
140:2,21
167:13 181:7
183:16 185:20
186:4,7 188:6
188:14 189:9
189:15,18
190:15 191:4,7
198:5 207:22
211:22 212:10
214:21 215:10
215:12 216:5
241:5 272:9,10
290:15 295:10
295:13,18

296:7,12,13
297:22 311:12
311:14 324:18
325:10
**disabled** 122:9
140:7,19
150:16 183:18
188:15 281:15
**disables** 127:1
**disabling** 123:6
123:22 124:12
124:19 125:4
125:13,21
**disagree** 19:5
**disclosed** 258:4
**discovery** 9:16
**discriminated**
205:11 299:3
305:17 324:17
325:9
**discriminating**
300:4
**discrimination**
117:15.17
299:22 303:8
320:10,12,19
320:20 325:3
**discriminators**
223:4
**discriminatory**
87:11,14 88:6
88:9,14 89:21
90:14 103:3
105:17 115:11
116:16,17
298:13 319:22
320:1,2,5
322:8
**discuss** 65:22
203:16,18
209:4 233:10
265:7,8
**discussed** 50:3,5
92:14 139:1
167:15 168:11
190:5 202:13

206:8 209:12
209:15 211:8
232:16 235:9
277:9 329:1
**discussing** 167:8
**discussion** 47:1
47:5,14,21
52:11 82:18
203:7 253:1
297:15 300:12
334:11
**discussions**
34:11
**disease** 104:2,11
128:5,6,11,12
128:18 136:17
**disorder** 133:19
**distances** 145:12
**District** 1:1,1
64:21 70:9,12
**disturbed**
206:19
**divert** 230:6,7
**diverted** 230:8
**dock** 94:19
242:15 243:5
248:4 307:12
**docked** 94:20
95:3 157:12
161:1 245:18
**docking** 95:8
96:16 243:9
244:3 246:16
247:6 248:8
**doctor** 11:18
12:2 18:16
21:13 30:11,21
46:7 47:2,6,17
104:10 108:9
132:20 139:20
151:18 152:3
153:1 165:12
186:15 187:15
190:3 196:21
197:22 204:6
217:19 228:11

**doctors** 33:10
34:12 55:6,7
55:11 56:12,17
56:21 57:7
107:22 108:3,7
126:10 129:14
130:6,10,17,21
131:2,7,12,16
132:16 133:3
135:14,18,21
136:8 138:17
146:15,17
180:8 183:6
198:8 217:8,15
281:14 326:9
326:21
**document** 9:22
16:21 23:13
41:7 69:12,15
69:19 70:2
97:17 118:11
118:18 119:3
144:2,16 146:4
148:4,9 151:6
151:11,12
196:12,21,22
197:4,7 241:18
287:20 288:14
288:15 289:5
330:2 331:9,12
332:12 333:5
**documents** 9:14
9:15 55:12
224:14 303:20
313:19
**doing** 5:1 55:20
88:12 96:8,21
98:19 109:9
146:21,21,22
170:11 176:12
188:8 193:4
203:12,21
244:11 266:6
271:6 295:9
323:6,12,15
**dollars** 84:3

216:10 332:17
**Donna** 219:11
**door** 210:20
326:3
**doped** 172:22
**double** 132:9
**Dr** 12:3 43:20
44:6,7,18
45:18 47:1,14
47:16,19,22
48:3,10 50:1
50:11,15,21
51:14 52:8
53:4,10,17
125:17,19
129:17,19
140:5,17 152:1
186:12 187:21
188:20 189:21
190:5,13,19
196:2,8 197:8
197:11,15
198:8 199:1
203:2,18 205:6
209:4 211:8,20
212:4,9 213:5
214:3,11,14
215:1,22
228:17 229:12
240:11
**drag** 143:12
**draw** 282:4
**drive** 161:20,20
161:21 162:5
162:10 177:4
**driven** 162:2
**driver** 162:7
**droggy** 8:4
178:11,12
**drop** 314:17
**drowsy** 166:16
166:18
**due** 129:18
**duly** 4:6 337:5
**duties** 328:2
**dying** 106:8

**D.C** 2:6 12:11
  249:4

**E**
**e** 3:1,6 4:1,1
  249:13 250:5
**ear** 7:15
**earlier** 78:20
  122:9 154:20
  190:6,22 191:1
  191:2 235:17
  236:1,4 241:11
  248:22 263:3,4
  287:22 300:15
**early** 44:2 55:18
  79:1 81:2,15
  84:13 94:18
  130:6,10,16,20
  131:3,11,15
  132:16 134:15
  134:18 135:13
  135:20 137:17
  137:21 138:17
  141:4 160:1
  205:7 242:6
  279:10
**easier** 14:6 64:9
**easy** 223:11
**edgy** 253:5
**EEOC** 72:8,10
  72:14,20
  184:22
**effect** 7:4,18 8:2
  21:16 331:13
  332:20 333:16
  333:17
**Effexor** 6:11
**effort** 22:17 26:2
  26:5 52:5
  236:19,21
  237:3,3,4
  239:14,17
**efforts** 55:5
  57:21 82:15
  95:12 238:13
**eight** 170:9

**either** 11:19
  85:13 138:11
  141:6 146:10
  151:15 163:2,5
  166:2 242:15
  244:3 303:2
**electronic**
  244:16,17
  254:10
**electronically**
  243:16 246:15
**eleven** 13:3
**eligible** 25:15
**emergency**
  269:12
**emotional**
  215:15,17
**emotionally**
  205:19
**empathetic**
  150:10
**employed** 337:9
  337:12
**employee** 9:2
  22:5 38:15
  60:1 94:8
  112:15,17
  151:13 160:17
  180:2 205:17
  243:3 245:1,4
  258:16 267:19
  268:16,18
  269:7,10,11
  270:7,8,8
  277:15 289:3
  301:10 307:3
  319:21 320:22
  322:1 337:11
**employees** 33:1
  33:2 38:14
  64:22 181:15
  206:6 243:17
  244:3,6,18
  246:14 272:16
  274:8 301:12
  323:15

**employee's**
  270:3
**employer** 49:17
  50:19 51:19
  268:16 269:5
  269:13 270:2,6
**employment**
  187:2 190:1,20
  197:20 198:15
  199:10 200:11
  202:1,20 203:4
  203:20 205:8
  208:8 214:17
  216:12,19
  277:9 280:13
  327:1
**enables** 147:11
**ended** 219:11
**endocrine** 128:4
**English** 201:5
**entered** 336:6
**entire** 336:4
**entitled** 65:3
  70:7,11 73:21
  74:6,10 77:1
  96:7 144:8
  148:10 151:12
  188:13 193:16
  278:6
**envelope** 95:18
**epithets** 220:3
**equal** 269:14
  270:8
**equals** 298:17
**equate** 128:6
**equilibrium**
  166:18
**equipment**
  179:2 252:3
**error** 333:4
  335:10
**especially** 162:5
  164:10 258:6
**ESQUIRE** 2:2,9
  2:10,11
**et** 266:22

**evaluation** 182:3
**evening** 61:13
  62:21 171:9
  276:20 281:8
  286:15
**event** 25:21 70:1
  145:4
**events** 5:10 9:1,8
  9:18 10:2
**eventually**
  322:19
**everybody** 64:2
  64:10 65:14
  79:14 90:17
  117:3 207:9
  234:9 269:14
  274:10 312:13
  312:18 317:13
  322:11
**everybody's**
  268:7
**everyday** 221:8
**everything's**
  295:9
**exact** 13:15
  15:19 30:14
  34:6 67:20
  72:11 84:6,11
  84:15 85:12
  101:7 115:12
  248:9 250:21
**exactly** 13:13
  19:12 21:7
  50:13 72:11
  106:3 126:11
  258:22 268:17
  317:3 326:8
**examination**
  1:13 3:4 4:4,8
**examined** 4:7
**example** 54:4
  99:17 115:10
  142:3 219:22
  256:12
**examples** 320:17
**Excuse** 35:4

**exemplary**
  205:17
**exercise** 145:8
**exercised** 49:3
**exhaust** 305:11
**exhibit** 3:8,11,12
  3:13,14,15
  40:20 41:4
  42:7 50:12
  53:7,22 54:7
  118:10,13
  123:5,14,21
  124:11,18
  125:3,12,20
  127:4,18
  128:10 138:22
  144:1,4 146:5
  148:3,6,9
  151:5,8,11,16
  155:2,9 156:12
  186:11 187:21
  189:5 195:22
  196:7 213:15
  213:22 240:10
  254:18 277:22
  279:6 280:19
  285:8 297:16
  309:6 330:4,7
**Exhibits** 3:7
**exist** 30:18 80:12
**existed** 167:11
  282:10 283:2,3
  287:1,21
**existence** 96:10
  288:11
**exists** 41:18
**exited** 213:9
**expect** 87:6 89:3
  200:11 201:22
**expectation**
  199:2
**expected** 197:19
  198:14 199:8
  199:18 200:4
  214:15 216:11
**experienced**

36:2
**expired** 64:18
  74:3,21 279:14
**expires** 337:21
**explain** 14:10
  49:13 66:5
  137:2 154:17
  160:9 207:16
  208:17 221:17
  224:8 248:18
  269:4,21
  322:16
**explained** 37:17
  46:9 60:11
  79:16 140:14
  210:21 292:16
**explaining** 171:4
**express** 95:17
  108:13 156:11
**expressed** 64:21
  205:22 208:9
  261:14
**expression** 110:1
  115:5
**extend** 253:15
**extended** 212:22
  280:13 322:20
  325:20
**extent** 36:10,12
  38:5 231:8
**extremities**
  126:11
**e-mail** 179:8
  243:20 247:18
  250:7,10 252:1
**e-mails** 87:20,21
  241:13,20
  245:2,7,14,17
  247:5 248:7,11
  249:8,22 250:1
  250:3,6,22
  251:11,15
  252:14 254:5,8
  254:9

**F**

**face** 131:17,19
  132:2,7
**facilities** 114:22
**facility** 111:20
  114:16,20
  115:15 116:11
**fact** 35:11 50:22
  57:19 75:10
  96:9 105:17
  122:8 207:7
  209:5 211:9,21
  215:2 299:12
**facts** 63:4
  233:15
**fair** 5:6 12:5
  139:15 141:9
  164:11 171:12
  192:19 266:20
  266:21 267:2,8
  270:22 273:15
  275:2
**fairly** 271:16,19
  272:1 273:21
  274:3
**fairness** 182:5
**fall** 91:10,18
  169:16
**falls** 268:2
**familiar** 9:4
**family** 115:6
  258:20 268:1
**far** 9:1 15:10
  24:4 38:5 43:8
  45:7 46:6 74:2
  88:19,22
  103:11 109:15
  110:12 111:19
  112:1 113:4
  133:3,5 162:18
  164:1 175:18
  193:9 203:22
  208:7 220:10
  228:3 233:8
  234:10 237:2
  238:5 249:20
  260:8 262:14

262:16 272:19
  274:7 299:2
  307:5 310:22
  312:20 324:10
  324:13
**Fargo** 60:19,20
**faster** 150:16
  159:8
**father** 263:10
**fault** 311:21,21
  312:3,10
**favor** 65:14
  79:14 88:12
  95:9 96:9,21
  266:6 276:1
  323:12,16
**favoritism** 268:3
  269:1,6
**fax** 196:1,7
  197:7 330:10
  330:12,14,18
  333:12
**faxed** 44:22
  53:11,16,17
  55:12 61:16
  213:17
**fear** 323:7
**feared** 266:8
**February** 18:6
  24:14 28:7,10
  43:19 44:2
  45:14 47:22
  48:15 50:10
  51:2,17 52:9
  52:12,17 53:4
  55:4,17 56:3,9
  56:15 57:20
  58:3 64:16
  74:3,16,21
  75:7,12 76:12
  170:3 177:20
  212:8 213:15
  213:19 214:10
  214:13 277:10
  279:14 295:20
  296:3

**feces** 210:3,7
**Federal** 95:17
**feel** 31:9 37:18
  38:6 39:11
  40:14 48:13
  90:17 110:9,15
  111:7 127:8
  133:12 134:4
  137:9,19
  150:11 168:12
  174:8,11 178:9
  181:14 202:11
  204:6 261:15
  273:20 320:16
  325:9 332:18
  335:9
**feeling** 176:13
  176:14
**feelings** 156:17
**fees** 24:19 25:11
  27:2 28:14
  29:5 32:9 49:9
  52:4 76:9
  201:15 212:20
**feet** 133:2 135:2
  135:11 181:16
**fell** 134:9 311:13
**felt** 37:14 57:12
  88:9 105:16
  140:1,17 167:9
  167:17 205:10
  205:15,22
  206:1,2,2,10
  206:19,22
  209:14 215:6
  221:15 260:7
  298:7,12 299:7
  299:14 305:17
  324:15
**Fern** 18:14
  24:13 46:17
  49:22 97:17
  275:17 276:13
**fibromyalgia**
  123:7 132:1,22
  133:6 136:15

137:7,9,20
  141:7,21
  163:10 164:12
  171:20 179:21
**fight** 253:17
  311:19 312:7
**figure** 103:17
  253:21
**figured** 295:11
**file** 72:14,19
  216:2 254:22
  303:18
**filed** 4:15 72:4,8
  72:9,22 121:13
  148:15 184:2
  184:14,15
  185:3,12
  335:20
**fill** 22:11 23:11
  44:10 65:18
  66:13,18 67:3
  118:6 120:15
  144:12,19,20
  146:14 153:20
  154:18 155:1
  163:4 237:9
  275:10 277:11
  308:17,20
  309:15
**filled** 17:11
  24:12 44:5,5,7
  45:18 51:15
  53:18 118:6
  119:12 149:9
  149:13 151:13
  151:18 152:1,3
  152:16 153:6,7
  279:2,6
**filling** 50:12
**finances** 8:5
  183:12 287:16
**financial** 177:15
  287:13,13
**financially**
  337:12
**find** 8:14 56:17

62:19 88:13
107:12 110:16
256:15 264:6
280:18
**fine** 14:8 27:10
69:8 92:4,7
112:10 113:14
142:19 208:18
333:11
**fingers** 163:11
**finish** 253:11
**fire** 156:14
157:1
**firm** 4:21 15:17
20:18 21:4
22:4 24:6,7
25:6 46:15
48:20 49:1
65:3 66:12
82:16 83:7,13
83:17 86:5,12
86:16,20 87:3
87:6 88:12
92:15 93:8
94:3 96:4,8,12
96:20 109:19
117:14 140:22
205:15 216:21
227:2,12
232:14 235:4
238:19 242:14
246:10 266:6
278:10 297:4
303:9 313:7
314:7,12 324:8
**firm's** 21:19
100:12
**first** 15:17 18:18
34:2,9 41:18
53:21 54:6
84:17 85:7,8
110:19 120:5
121:2 122:15
123:18 124:3
124:15,22
125:7,16 126:3

128:4 134:11
138:4,13
142:21 143:9
144:18 161:11
187:13 196:1,7
200:21 217:10
261:4 276:11
280:7 294:19
302:11 304:8
311:4 331:10
**five** 7:3 8:15
145:9 198:22
210:8 285:18
**five-minute** 35:8
**fix** 35:1
**fixing** 238:1
**flesh** 258:9
**flight** 253:16
**floater** 314:13
315:14
**floaters** 90:10
**floored** 249:17
**Florida** 10:13
11:10,13,15,19
12:10,13,17
13:11,21 253:7
272:4 334:3
**flu** 133:13
**fluid** 163:10,13
**FMLA** 16:21
64:18 67:16
68:20 69:11,20
70:4,11 71:16
71:21 72:3
73:15,19,22
74:3,11,15,21
75:11,21 76:13
76:19 77:2,10
77:15 78:6,14
96:7,10,16
97:1,3,7,11,18
98:10 191:11
191:17 192:4,6
192:15 193:12
193:22 194:9
194:19 195:1

195:18 261:11
268:3 276:12
279:14 280:7
293:21,22
294:15 297:10
325:21
**focus** 171:13
177:2,6 178:10
**followed** 312:5
330:10
**following** 91:17
282:2 336:6
**follows** 4:7
**Food** 162:19,20
**force** 266:21
**foreclosure** 58:9
**foregoing** 337:3
337:4,7
**foreseeable**
187:3 190:2,20
**forget** 176:22
286:2,2,4
299:13
**form** 16:12
22:10,12 34:22
43:19 44:1,4
44:11,17,20
45:17 48:12
51:15 52:9
66:18,19,22
67:3 118:6,16
119:12 123:5
124:11,18
125:3,12
127:19 128:9
153:21,22
154:17 198:17
199:17 275:9
277:12 278:18
279:3,7 308:18
308:22 309:2,4
309:12,13
335:9,11,11
**Forman** 17:4
18:14 21:8
23:11 24:13

25:4 26:20
30:12,13 31:22
33:12 38:19
46:17 49:22
54:9 58:17
60:7,17,22
61:14,17,22
62:7 63:10,18
65:1,8 67:14
69:10 70:2,20
71:1,4,15
75:16 76:22
77:9,14,16
78:1,6,13 79:4
79:7 80:14
81:3,15 97:17
99:14 275:16
275:17 279:19
280:2
**format** 324:13
**forms** 163:4
**forth** 138:22
237:2
**forthright** 299:8
**Forty-five** 84:3
**forum** 203:16
**forwarded**
335:11
**found** 11:22
19:16 122:8
233:22 281:14
283:1
**four** 13:6 61:12
93:18,20
113:19 131:8
157:19 170:14
170:15 182:8
184:5 198:21
206:14 276:20
276:22
**frame** 173:4
213:16 214:14
224:12,19
255:12
**freely** 302:4
**free-standing**

12:20
**frequently**
255:12 263:12
**friction** 265:13
**Friday** 98:9
104:10 285:21
**friend** 295:21
330:15
**friends** 229:16
229:16 296:18
**front** 41:5 43:4
52:9 182:3
187:12 221:12
224:6
**frustrated** 57:5
57:9
**full** 4:12 5:6
156:15 158:1
158:12 261:8
306:20 314:22
328:19 331:16
331:20,21
**full-time** 94:4,8
96:13 157:6,8
160:8,17
308:14 310:10
314:18 328:9
**function** 90:6
148:11 156:15
168:1 210:15
**funds** 83:17
**funeral** 273:2,4
**further** 49:14
119:2 206:10
224:8 337:10
**future** 187:3
190:2,21 202:7
334:5

**G**
**G** 2:20 4:1
**gainful** 197:20
198:15 199:9
200:11 202:1
202:20 203:4
203:20 205:8

208:8 214:16
216:12,19
326:22
**general** 244:16
321:7
**generally** 231:11
234:15,19
247:3 269:22
302:2
**George** 314:9
**Georgetown**
104:3,6 108:9
**getting** 34:11
36:12 55:20
57:4 60:14
93:15 95:14
121:18 122:15
134:1 145:9
149:17 158:11
180:21 198:10
209:22 216:9
225:13 236:9
256:1,7,15
258:21 259:3,9
262:6 301:8
305:12 307:15
308:14 310:8
310:10 315:4
322:11,14
329:17
**Giles** 330:20
**GINSBERG**
1:16 2:12
**gist** 79:18
**give** 17:15 37:20
68:10 81:8,9
85:6 90:10
127:9 158:22
180:13 200:17
201:1 204:17
219:22 228:1
233:14 252:6
254:16 266:20
268:13 271:5
271:18,22
279:16 280:2

**given** 4:18 46:14
51:3 81:14
89:10,17
135:15 164:11
172:19 201:22
202:20 253:19
268:18 281:19
337:8
**gives** 195:1
268:16 293:22
**giving** 4:14
200:22 208:16
210:1 217:8
266:7 300:16
**go** 26:9 33:8
41:1 64:1 66:5
82:9 87:15
106:13,15,20
107:1,10,14,18
107:20 111:1
112:18,21
117:14,15
118:22 127:13
136:21 141:8
155:13 159:1
162:17 163:1
165:6 167:13
174:21 180:14
181:12 182:12
182:19 188:19
199:20 202:12
203:12 209:5
211:10 228:14
229:8 240:16
253:13 254:1
255:7 256:14
258:19 261:20
267:15 269:16
275:1,11
294:11 295:16
312:1,3,14
314:9,19,20
315:5 316:22
317:21 321:18
323:14 329:15
330:9

**God** 111:8
249:15 307:14
**goes** 40:17
204:10 267:17
301:11
**going** 5:4 6:20
8:19 19:19
28:3 39:7
40:20 51:22
52:3 58:9 82:6
90:2,4 92:15
98:5 99:20
106:8 112:20
113:3 117:6
127:12,21
130:1 136:19
137:1,16
140:11 143:1
143:14,16
144:12 161:3
161:13 169:21
170:8,19 176:1
179:12 202:20
204:6 206:18
208:2 210:6,8
210:11 211:15
220:1 227:22
228:8,12,14
229:1 231:4
245:17 252:19
252:21 253:10
253:11,12,20
254:1,16 255:7
268:9 272:4
273:17 276:14
281:5,20
285:14,20
287:12 295:13
303:13 312:18
323:9 327:8
333:19 334:3
**good** 15:11 58:5
176:13,14
214:4 268:12
**gotten** 167:12,19
183:8,14 228:7

282:13,21
283:20 300:18
306:2
**grad** 14:15
184:8
**granted** 184:20
**gratuitous** 68:12
**Graves** 104:2,11
106:14 128:6
128:11,12,18
**great** 151:22
286:18
**greatly** 91:5
**Green** 269:18
315:7,11,12,16
315:17 317:2,3
**Green's** 316:21
318:12
**groom** 147:17
**grooms** 149:16
149:22
**grounds** 238:11
**grouped** 14:5
**grown** 226:9
**guarantee**
113:13
**guess** 23:10
84:20 85:9
138:15 164:2
192:19 195:10
242:6 302:11
305:17 316:10
322:9
**guessing** 11:21
315:17
**gun** 316:20
**guy** 17:22
**G.W** 269:16

**H**

**H** 3:6
**Hahn** 46:20
191:6 192:3
193:9,12
194:20 195:18
224:6.22

230:17 255:13
256:22 257:3
259:8,17 260:2
261:6,14,17
262:5,10,12
264:21 274:18
290:14 294:14
295:3 328:22
**Hahn's** 46:20
**hair** 210:18
**half** 74:2,5
134:11 138:4,6
138:13,14
142:20,21
143:9 161:11
170:20,22
171:18 174:19
174:21 175:10
196:16 242:2
267:12 282:4
282:14 285:2
287:15 302:12
**half-hour**
171:17
**hall** 317:5
**hallway** 316:7
**hand** 5:18
292:17
**handbook** 22:5
33:1,3 38:14
301:10
**handle** 298:14
**handled** 280:8
328:1
**hands** 131:13,19
132:2,8,17
133:2,7,10
134:3 163:6
**handwriting**
41:17,18,20,21
42:4,7,11,13
42:17,19 43:7
43:10 98:15
99:4 100:2,17
101:10,19
144:22 145:1

153:12,13,16
281:11
handwritten
197:11 280:19
331:2,10
Hanna 66:14
67:2 267:11
301:2 307:17
307:19 313:7
313:15 328:17
Hanna's 313:18
313:22
happen 15:8
138:3 167:5
183:19 224:10
happened 9:1
44:17,20 100:5
102:12 105:19
151:18 185:1
205:13 213:2
251:5 276:10
277:7
happening
165:18
happens 153:19
260:5
happy 7:16 92:9
harass 206:21
harassed 89:16
harassing
254:14 255:6
harassment 60:6
207:5 247:20
hard 89:17
185:8 223:13
265:18 308:7
hardship 238:11
hate 308:4
head 138:7,9
142:4 172:5
Headache
136:10
headaches 136:1
136:9 141:6,20
143:14 179:20
180:9

headset 168:16
health 11:14,16
104:14 130:2,3
219:13 224:1
228:1 233:19
healthy 263:2
hear 207:10
210:17,17
220:17 224:20
228:14
heard 7:12
25:19 178:16
186:2 190:21
220:6,9 221:11
232:10 317:1,4
hearing 7:15
335:21
Hearn 267:14
269:15,16
314:5 318:16
318:22 328:18
Hearn's 318:15
heart 130:13
296:1
heat 11:21
held 253:2 293:3
300:13 327:1
334:11
help 12:1 36:4
57:22 61:18
62:1 89:3
112:2 115:4,6
145:9,11 149:2
181:17,18
218:19 236:9
236:14,21
239:21 240:4
287:16 310:3
316:11
helped 144:20
228:3
helpers 114:17
helpful 20:3
helping 330:20
Henck 28:1,9
82:18,21 83:5

83:12 85:6,15
86:15 87:11,13
88:5,14 89:3
89:20 95:21
102:2,20 103:2
103:6,12,18
105:16 106:1
106:15 107:4,6
107:9,19
109:16 113:6
115:9,11,18,22
116:3,13 140:1
156:20 167:15
205:22 207:1
207:11 209:15
226:1 230:13
230:14 232:1
235:5 236:5,17
237:10 239:4
242:7 248:13
251:10 257:7
295:3 326:16
Henck's 84:12
108:18
hey 333:1
he/she 335:7
high 124:18
hire 208:6
hired 291:11
hiring 218:11
272:20
Hispanic 274:10
histories 320:18
320:18
his/her 335:8
hitting 168:22
hold 18:7 112:18
163:21 215:6
230:2 243:13
244:13 285:15
306:12 315:13
holding 57:15
164:14
holiday 159:12
184:11
Holidays 14:19

home 10:16,17
11:9 12:20,22
13:3,8,10,13
13:20 14:4
15:7 79:10
100:17,20
101:10 110:15
112:2,17
114:17 115:4
115:14,19
116:10,18
159:1 161:18
161:18 180:14
210:2,7 236:6
253:13 285:21
312:9
honest 59:14
75:14 249:15
307:14
honestly 168:12
hoped 189:17
hospice 104:15
104:18,18
105:7 108:1,5
108:15,19
109:17,21
110:4,6,14
111:5,15,20
112:2 114:15
114:16,20
115:15 116:11
116:21
hospital 104:4,6
234:3
hour 6:8 94:17
170:14,20,22
171:17,17
174:4,18,21
175:9 281:7
hours 5:20 94:11
94:13 126:16
127:2 131:8
150:17 170:9
170:11 171:18
260:18 269:17
house 10:15 11:7

58:9 146:11
164:14 166:22
household
146:22 162:12
HR 243:17
244:17 246:15
249:1 307:11
human 219:13
227:5 228:21
229:22 230:15
232:13 243:20
250:8,12
251:16,21
252:4,8,18
329:18
humiliated
206:11
hundred 84:3
300:9
hung 276:4,5
hurt 59:11,18
62:15 135:5
205:18
hurting 113:21
114:1,4
husband 10:18
14:16,22 68:22
70:10 75:20
77:1 89:14
90:4,16 91:9
91:18 93:3
94:16 96:7,22
97:19 98:9
104:15,17,21
107:16 108:1,4
108:17,18
109:17 113:7
113:10 115:15
116:10,18,19
117:13 148:15
148:19 157:17
157:18 210:1,6
228:1 229:18
231:5,10 233:6
233:21 234:9
234:15,19

235:4,10,13
237:17 239:22
242:12 256:14
258:8,16,16
259:13 261:3,5
263:17,19
264:6 265:11
265:19 267:6
282:15 285:2
301:21 306:6,8
306:10,16,17
307:2,3,6,8,9
322:22 323:3
**husband's** 99:15
102:15 105:4
106:8 130:3
206:4 226:17
227:14,19
228:4 229:15
230:12,18,21
231:2 232:6,16
233:4,9,13
234:6 235:19
236:10,15,21
237:15 239:5
259:2 260:9
272:3 277:18
282:5,16
283:15 331:16
**hyperthyroidi...**
125:13 128:10

**I**

**ibuprofen** 6:3,18
165:8 166:4
**idea** 48:10
291:22
**identification**
3:8 118:14
144:5 148:7
151:9 330:5
**identified** 36:7
**identifies** 125:12
**identify** 199:18
**ill** 104:22 110:13
258:8 269:8,11

271:2 296:2
**illness** 33:14
125:21 238:12
268:1
**illnesses** 11:17
11:18 47:9
53:1,1 133:18
171:20
**imagination**
209:18
**Immediately**
12:16
**important** 298:7
**impossible**
268:14
**impression**
93:22 191:15
**improve** 270:22
**inappropriate**
113:5
**incapable** 187:2
189:22
**incapacitated**
240:22 241:9
326:22
**included** 189:10
**including** 5:6
123:6 283:15
**income** 31:3,4
41:8 63:20
139:13 143:3
180:16,21
184:12 266:3
**incorporate**
335:13
**increased**
129:17
**indicate** 280:11
**indicated** 336:7
**indicating** 41:20
41:21 45:22
53:15 132:6,11
169:4
**individual** 32:6
**individuals**
272:21

**influence** 177:4
**information**
57:14 60:12
62:13 120:17
153:3 155:16
204:7 244:5
246:14 255:9
283:5 288:4
302:9,18 303:3
304:19,20
305:12 315:15
**informed** 64:15
**INGERSOLL**
1:5
**instance** 38:11
104:1 117:3
138:5 228:8
**instructed** 44:16
115:14 236:5
239:4 249:5
305:4,5
**instructing**
201:1
**insult** 212:17
**insulted** 212:6
**insurance** 18:10
25:1 27:13
63:7 236:10,15
236:22 237:18
238:1,6 239:15
277:18 282:5
283:14 284:11
284:14 287:9
288:6,9,18,22
292:1 326:10
331:16
**intentional**
59:11
**intentionally**
59:18 254:9
**interchange**
227:11
**interested** 14:9
337:13
**intern** 219:11
**Interrogatories**

9:15
**interrogatory**
100:9 254:15
254:20
**interview** 18:1
24:15 146:11
153:20 154:3,8
155:4,19 156:5
156:6
**issue** 128:11
176:5 287:13
290:13 292:5
301:4,7 305:14
307:17 329:4
**issues** 104:14
245:2,3 265:8
265:22
**Iversen** 209:15
252:9 288:7
289:3 291:2
292:8,10,12
293:5 326:4

**J**

**J** 2:9 255:7
**Jacksonville**
10:12
**Jamison** 59:10
76:16 82:15
89:12 102:21
103:13 219:4
249:19 280:7
292:9 293:8
304:17
**Jamison's**
303:18 306:17
**Janet** 115:13,19
116:7 206:2,6
227:8 258:15
259:12
**January** 18:18
18:20 19:6
20:8,21 21:6,9
22:2,8,19
23:19 24:1,10
25:2,16 26:12

26:16 27:5,15
27:17 28:16
29:10,16,18
30:10,14,17
34:1,17,18,22
41:14 44:2
68:21 69:1,2
74:16 75:6
76:17,21 77:3
78:9,10,12,16
84:10 85:2
92:22 122:12
155:18 157:4,5
170:3 255:15
263:21
**Jeff** 238:18
**Jeffrey** 238:20
**JENNIFER** 2:11
**Joan** 331:6
**job** 21:18,19
24:5,7 28:7
29:1 31:15
38:19 46:13,19
46:19,20 47:8
47:21 48:6,15
48:21 49:1,11
50:18,19 51:1
51:18 52:20
64:17 67:11
87:2 89:8
112:10 156:13
156:15 168:6,8
168:13 169:1,8
169:11,15
170:9 171:6
175:16,17
176:12 177:19
178:1 182:4.7
183:10 190:7
190:10,12,14
191:1,5 192:6
194:1,19 195:2
195:4 215:7
216:1 218:20
220:12 266:8
266:10 271:21

McFadden

272:19,20
274:17,20
277:11 290:19
291:1,6,7
292:17 293:9
293:19 294:1
297:20,21
298:1 299:9
307:20 308:10
323:7,10 326:2
327:2
**jobs** 292:15
**John** 46:18
49:22 276:13
290:21
**joint** 43:14
179:21
**joints** 126:11
**joking** 166:12
**JONATHAN**
2:10
**judgment** 176:5
**Judy** 267:15
318:20 319:3
320:19
**July** 170:3
**jumping** 316:19
**June** 102:14
172:1 200:6
255:16 267:17
319:8 335:1
**Justice** 330:13
330:16

**K**
**Kathy** 66:14
267:11 301:2
307:17 308:19
**Kay** 270:22
**keep** 45:17
68:11 81:6
99:3 109:10
113:13 120:19
228:22 229:1
230:1 271:21
300:5 327:8

**keeping** 96:13
122:21 300:7
303:1
**kept** 55:9 75:16
98:15,17 99:9
99:11 157:6
302:6 307:20
308:10
**KESSLER** 2:11
**kids** 14:22
206:14
**kind** 4:11 10:6
68:14 158:11
177:10 301:22
315:18
**King** 1:16 2:13
**kitchen** 163:22
164:14
**knee** 135:15,16
**knees** 133:7,9
134:3
**knew** 33:13 45:7
104:2 116:18
157:1 164:1
189:21 191:21
192:4 199:6
212:8,16
214:10,13,19
226:18 227:18
227:22 231:9
233:5,7 262:14
262:17 290:14
298:11 323:6
**know** 5:2,7 8:22
9:13 10:8
15:19 17:19,22
19:3 21:7,7,20
31:14,22 32:1
34:5,15 39:6
40:7,16 43:4
44:8 51:6 53:7
53:21 54:5,6,9
54:10 57:19
60:12,22 62:3
63:13,15,21
67:13,20 70:13

70:15 72:12
80:8,10 82:19
83:16 84:5,15
88:20 90:2,2
90:18 92:9
93:11 95:19
97:2,4,6,8,10
97:13,22 98:4
98:5,19,21
100:19 101:7
101:16 104:9
104:13,13
105:3 109:4
111:8,14 117:2
122:10 126:5
130:1,11
136:18,22
137:12,15,18
139:15 143:16
146:14 149:1
151:13,15
153:14 154:16
159:11 160:11
162:4 164:6
166:19 173:7,8
173:18 175:22
176:4,21 177:1
181:11 182:14
184:7 185:8
187:14 190:4
191:10,19
192:17 193:11
193:13,15,17
193:19,22
194:2,4,13
195:21 197:17
199:13 203:17
203:22 205:21
206:3,12,15,17
206:22 207:3,5
207:9,12,14
208:4,5,15
209:9,9,13
210:20 215:22
221:2,10 222:6
223:4 224:13

225:20 228:11
229:12,13
230:1,9 232:3
232:4 236:19
243:17,18
244:8,9 246:1
246:21 248:15
249:13,21
250:2,5,7,9,21
250:22 251:8
251:15,20
252:2,13 254:4
254:7 257:14
257:17,22
260:9,17
261:14 262:10
262:16 266:2,6
267:3 268:2
273:17 276:11
277:1 278:14
286:1 287:11
293:15 294:6
294:13,16,18
294:19 295:8
297:1,2
301:22 302:1
302:16 304:16
304:20 305:9
305:14 307:15
308:13 309:18
310:8,12
312:17 313:2
313:21 314:2
315:3 316:19
316:19,21
317:1,18,19,20
317:21 318:1
318:11,14
319:19 321:1,4
321:6 322:15
323:17,20
324:2,5,5,6,15
324:18 325:8
327:12,18
328:3,7,8,13
328:16,17,21

329:15 334:4
**knowing** 298:9
**knowledge**
193:14 194:9
194:18 195:19
195:20 225:18
250:10 251:22
254:5 294:7,13
297:8 305:11
321:7
**known** 231:11
234:15,19
298:14 302:2
**Kristen** 125:19
139:20 228:9
228:15
**Kristine** 267:13
269:15 314:5
318:16

**L**
**Labor** 64:20
70:16 267:17
**lack** 43:15
166:16 176:19
**ladies** 329:11
**lady** 153:15,16
156:16 171:14
191:3 218:15
229:16 249:3
267:11,13
269:18
**lady's** 265:3
329:12
**Lane** 203:12
**lapsed** 237:15,20
**Large** 1:21
337:19
**Larroca** 238:18
238:20 239:10
239:21
**lasted** 138:6
**late** 15:21 21:15
24:12 30:5,22
31:2 34:1,17
34:22 44:1

63:14,17,19
74:2 161:9
183:6 205:7
210:6 237:14
**lately** 307:14
**laundry** 162:15
**Laura** 295:21
296:15
**law** 1:15 2:3
4:21 70:12
86:5,20 87:3,6
96:6,10 98:7
98:10 100:12
195:3 232:14
246:10
**lawsuit** 4:15
204:9 251:8
325:7
**lawyer** 39:1,20
238:19
**lawyers** 81:9
300:21
**laying** 210:7
**learned** 162:5
**leave** 66:20,21
74:15,21 75:11
76:13,19 78:6
78:14 87:22
89:12 90:11
94:6,18,19
95:3,5,7 97:20
98:7,12,19
141:13 158:5
160:16,16,20
161:10 167:20
182:11,18
191:11 192:15
193:12 194:9
194:13,19
195:18 210:6
229:8 233:17
241:14,16,21
242:15 243:18
243:19 244:4,4
244:18,20
245:2,18

246:16 251:1
259:5,6,7,10
259:15 261:11
262:10,13,14
262:18,19
264:19 266:7
275:9 277:12
278:7,11,17
280:14 294:15
294:16,20
297:10 302:17
304:5,5,6,9,12
304:14 307:21
308:10 309:2
309:19,20,21
313:8,10,11,22
319:6 320:18
322:2,7,20
325:17,20,21
328:9,14,14,18
328:18
**led** 234:4 287:22
**leeway** 260:8
266:19 268:9
268:16,18
271:18
**left** 86:1 135:16
195:18 227:3
260:10,19
294:16
**leg** 134:7,8
**legal** 28:4 169:3
242:22 292:19
**legitimate** 243:3
**legs** 133:8,10
134:3
**lend** 84:4
**length** 164:20
**lent** 82:21 83:20
84:1
**letter** 18:13 19:2
21:8,11 25:5
27:21,22 28:4
28:6 30:11,12
30:20 58:18
60:8,16 61:9

61:14 64:13
65:17,22 66:7
73:16,21 74:1
74:5,8,10,20
78:22 79:2
81:4 99:13
140:12 183:22
185:19 186:12
186:14,19
187:7,13,17,21
188:10,21
189:4 190:9
197:16 198:2,3
199:21 212:6
213:14 214:3,8
214:19 216:2
216:17,20
217:2 238:15
239:9,14,17
240:5,7 275:12
277:19,20,21
278:1,15,16,18
280:11 308:19
309:5,13
**letters** 18:16
179:15 182:2
**letting** 29:12,21
**let's** 8:16 13:5
19:21 35:1,7
41:22 65:4
71:10,12 82:20
85:4 90:21
118:9 127:13
144:18 151:4
151:14 153:10
169:6 197:14
220:14 237:12
259:22 275:1
283:6,6 301:3
306:12 312:1,3
323:18 327:8
329:22
**level** 7:22 133:5
183:17
**lie** 165:6
**life** 8:8 37:6,14

145:7,15 147:1
147:6 206:4
208:12 221:9
227:11 236:10
236:15,22
237:17,22
238:5 239:15
277:18 282:5
283:14 284:11
284:14 305:21
320:6
**lift** 145:8
**lifting** 52:21
**light** 315:18
**limitations**
168:11
**line** 112:16
179:3 271:9
336:8
**lines** 65:12
178:18
**list** 3:8 123:6,14
123:21 127:4
129:12 255:6
300:16
**listed** 127:18
**listen** 29:7 37:8
73:9 154:14
173:14 326:17
**listening** 29:9
316:9 326:18
**lists** 124:11,18
125:3,20
129:17
**litigation** 227:4
238:21
**little** 7:9,17
36:13 49:13
90:1 152:19
168:22 225:15
253:5 258:9
269:21
**live** 5:9 10:11
11:5,19 12:9
12:12,17
**lived** 9:6 13:1

14:3,12,20
15:2 296:18
**liver** 91:13
**lives** 10:14,17
206:13
**living** 11:4 144:9
282:16
**LLP** 1:5
**loan** 83:6,12
85:7,8,14
**loans** 84:12
**long** 12:7 13:1
20:18 21:21
44:11 46:15
66:22 92:2,8
164:17 165:15
166:1 183:15
186:6 285:13
285:16 302:8
311:13 323:21
324:7
**longer** 92:6
99:20 156:21
241:8 253:18
271:20 315:8
**long-term** 15:13
16:1,11,12
17:1,3,12 18:9
18:22 19:4,6
20:8,20 21:20
22:1,7,18
23:10,20 24:2
24:9 25:1,3,6
25:15 26:14,18
27:6,14 28:17
29:19 30:5
31:6,12 32:13
33:3,9,16,19
34:3,8 38:12
38:17 41:12
53:8 54:14
58:21 62:15
63:7,11 66:17
121:11 186:4
187:9 188:5,14
189:9,17 198:5

211:22 212:10
214:21 215:10
215:12 241:5
272:9,10
311:17 312:6
313:9,10,11
322:19 325:19
**look** 43:18 80:3
90:15 144:11
149:8 169:14
186:22 187:12
192:20 199:21
247:20 254:17
288:16,17
320:7 333:8,10
**looked** 307:13
332:12
**looking** 53:14
152:10 153:13
180:12 260:16
**looks** 144:9
148:14 288:8
**lose** 177:2,6
178:9 323:10
**losing** 323:7
**lost** 286:9 312:9
**lot** 67:6 92:6
99:20 149:18
170:16 176:4
267:22 305:19
312:21 331:8
333:6
**lots** 311:18
**loud** 220:2 302:7
**louder** 7:10,17
**loved** 287:12
324:6
**low** 138:18
**lower** 165:3,15
**loyal** 207:1
**loyalty** 205:16
**lunch** 127:13,14
170:14 171:9
**lupus** 225:5

**M**

**machine** 254:10
**mail** 250:6
**mailed** 25:4 45:1
61:14
**mails** 249:14
**main** 198:22
**maintain** 208:1
**maintained**
74:13
**major** 133:19
154:12
**making** 33:19
57:21 59:11
111:11 154:6
194:21 331:11
**male** 229:16
**man** 226:9 300:4
**management**
257:3,6 266:18
267:5 303:19
304:12
**manager** 227:6
228:21 229:22
229:22 232:13
243:21 248:21
250:8,12
251:17,21
252:18 329:19
**managing**
319:15
**manner** 21:14
31:10 36:5
232:12 312:15
**March** 11:12
13:11,21 19:10
19:13 28:1
55:4,18 56:3,9
56:16 57:20
58:3,13,15
64:15 65:17,21
65:22 66:6,7
73:17,17 74:7
74:9,16 78:22
79:2,20,22,22
81:4 84:10
85:2 115:13

138:15 170:3
177:20 197:22
198:13 199:7
200:2,3,5,7,8
200:10 201:21
202:18 212:8
213:15,19
214:10,13
216:3 217:2
275:12 278:2
279:15 280:11
309:5,13
337:21
**MARGARET**
1:6
**mark** 118:9
134:8 148:2
151:4 329:22
**marked** 42:13
118:12 143:22
144:3 148:5
151:7,11 330:3
**Martha's** 267:18
319:11
**Mary** 270:22
**Massachusetts**
12:18 13:9,19
14:3,13,21
15:3
**match** 262:1
**matches** 268:17
**maternity** 251:1
**matter** 83:18
109:18,19
112:12 168:19
182:5 271:12
284:7 299:12
335:21
**Maxi** 330:21
331:2,4
**ma'am** 31:21
32:16 39:17
69:4 71:18
74:8 75:22
76:2 80:22
87:3 99:17

101:4 107:17
113:12,20
118:16 123:9
126:18 149:5
150:7,15
152:11 153:10
154:21 159:15
160:1 173:11
180:17 184:13
186:11 187:18
188:2 193:2,2
193:6 194:5
195:17 196:11
209:11 222:17
223:3 225:9
227:17 228:22
231:21 232:20
234:18 235:12
235:17 237:19
240:10,20
245:6 246:20
247:21,21
249:12 250:1,5
251:18 253:9
273:5 278:4,21
286:9 313:3
316:16 325:4
**McFADDEN**
1:2,12 3:3 4:3
4:13,14 10:20
16:9 20:2
36:18 91:14
109:14 111:13
113:1 117:10
121:7 149:16
150:14 187:1
189:22 218:22
240:21 335:2,3
336:1,2
**mean** 8:17,22
20:15,18 31:15
37:17 46:8,9
51:9 79:9
80:21 90:15
95:17 96:17
100:6 101:3

102:14 105:11
109:6 112:14
116:17 117:3
135:5 136:22
137:11 142:14
143:20 158:5
162:18 164:4
168:21 170:2
170:13 171:20
177:9 178:5,16
180:11 181:9
181:11,12
182:14 189:14
192:1 202:5
203:11 219:18
222:16 228:18
232:18 233:16
236:19 240:3
246:21 249:16
264:8,15 266:1
270:20 272:19
273:16 274:2,4
274:12,16
298:16,19
300:9 303:12
304:4 305:15
305:16 311:17
312:22 314:2
315:22 316:13
320:5,7,11
321:17,18
323:8,11,13,14
323:18 324:12
324:13,18,22
332:1
**means** 149:21
160:11 200:6
221:3 222:6
223:5 325:3
**meant** 35:12
59:18 91:2
104:19 147:13
156:19 192:5
208:7 221:13
**mean-spirited**
219:19

medical 34:11
35:13 40:4
55:5,8,20 56:6
56:13,18 57:16
57:22 126:9
128:1,5 129:12
138:21 139:2
146:18 161:12
168:10 169:14
170:17 212:1
215:3 217:15
220:13 226:17
228:4 232:17
233:10
medication 5:13
5:16 7:19 8:2
40:3,11 128:17
135:1 137:12
165:11 166:3
173:3,8,19,20
175:4,6,18
176:14
medications
6:21 35:5 40:5
149:18 173:6
medicine 133:14
meet 162:3
meeting 212:12
Meg 2:19 88:16
Meg's 87:18
member 268:2
270:13 329:21
members 115:6
229:15 230:11
257:11,15
258:20 264:13
264:16,18
329:14
memo 79:6
212:4 288:16
memory 5:14
6:6 7:19 15:9
16:22 17:17
18:4,8 98:22
129:18 203:12
217:14 300:9

memos 182:1
mental 204:5
215:14,17
327:5
mentally 205:18
207:17,20
208:4 215:6,20
240:22 241:8
281:14 324:14
mention 35:12
263:13 264:14
mentioned 30:3
67:14 108:6,7
135:18 228:10
241:11 257:5,6
278:1
mentioning
135:21
mess 93:11
207:18 210:16
message 179:7,8
179:10,11
messages 179:6
met 24:2
metastasized
91:12
middle 11:12
16:15 43:12
139:9 141:19
161:17 162:10
192:18 200:3,5
200:6,7,8,9
255:15,16
319:7
milligrams 6:13
6:14
mimic 201:3
mind 26:7 90:13
170:6 199:15
202:19,22
220:2 224:4
253:7 257:15
265:18 286:7
mind-wise 177:1
mine 145:2
259:20 325:7

minorities
317:15
Mintz 267:15
318:20 319:3
321:4 328:13
Mintz's 320:19
minute 161:4
196:15 204:17
298:21 334:8,9
minutes 85:1
167:8 172:2,11
172:21 173:4
174:2,3,3
285:16
misreading 5:10
misrepresenta...
48:11
missing 322:10
333:6
mistake 19:14
58:11 59:4,15
59:21 181:4
247:17
mistakes 129:17
mix 154:14
mode 266:9
modification
93:10
modified 67:10
88:11 89:10,12
92:15 93:6
94:10 95:22
96:12 102:1,3
102:12,16,17
102:22 103:1,5
103:15 157:3
157:14 160:3
231:9,19
255:13,20
257:4 264:11
264:19 266:7
267:14,21
272:5 301:18
306:19,22
307:21 308:10
308:15 309:19

309:20,20,21
309:21 310:4,6
314:9,18 315:1
315:5 316:22
322:2,6,17
325:17 327:12
328:19,20
329:16
modifying 217:3
moment 6:21
59:19,20
171:14 268:5
moments 49:19
Monday 93:13
93:16 98:11
104:9
money 83:6
185:21 186:1
265:21 282:15
287:16 311:11
monies 83:12,14
86:17 121:19
month 60:14
74:1,4 159:13
180:9 210:16
219:10 260:13
months 33:14
45:6,13 67:5
84:17 129:5
142:12 184:5
185:17 237:6
278:12 307:20
308:10 311:5
311:10 321:8
322:21 323:1
328:14
MOOK 2:10
Morgan 129:17
129:19,20
morning 58:4
137:19 171:9
277:4 280:6
333:21
mortgage 58:8
58:18 60:8,17
60:18 61:5,15

61:16,18
mother 258:7
261:3,4
motion 25:20
mouth 303:2
move 11:10,13
22:14 23:15
24:17 25:9
26:22 28:12
29:3 32:7 49:8
51:20 68:4,7
76:7 165:12
212:19 246:6
moved 12:9,13
13:8,11,14,15
13:21 15:6,10
13:21 15:6,10
moving 12:16
mumbo-jumbo
28:5
Murray 2:2,3
5:17 6:5,22
16:3,5 20:10
20:22 21:2
22:22 25:18
29:13 34:13,19
35:9,21 37:18
40:22 48:7
54:8,18 68:14
71:6 73:9 81:9
81:15,22 96:14
109:11,13
110:17 111:10
111:12 114:2,5
114:6.10 117:9
152:12 159:16
173:12,16
188:16,20
198:17,21
199:11,13,16
200:12,14,21
201:8,15,16,19
204:8,12,15,17
204:21 208:21
209:1 211:4,12
213:21 218:6
218:21 222:22

229:5 235:21
236:2 242:18
242:21 252:15
252:19 273:7
333:22 334:7
muscular 43:14
Mussenden 12:3
43:20,22 44:6
44:7 45:18
47:1,15,16,20
47:22 48:3,11
50:2,15,22
51:14 52:8
53:4,11,17
152:1,4 240:11
Mussenden's
44:18 50:11

N

N 3:1,1 4:1
220:2
name 4:12 10:19
24:15 222:1
252:6 264:22
265:2,3 329:13
336:7
names 89:21
300:15
nature 175:20
204:9 232:19
234:11
near 296:18
316:7 334:5
necessary 92:6
99:21 143:4
164:9 181:3
neck 132:17
133:1 165:4
need 14:10
19:22 20:1,2
21:13 35:4,14
35:15 81:11,22
109:4 113:17
145:9 150:12
171:13 173:2
177:15 178:6

182:10 194:15
199:21 220:11
220:22 221:17
222:2 240:16
246:1,4 251:8
255:8 258:9
265:19 269:20
270:2 273:1,2
273:12 276:13
313:3 325:1
327:20
needed 93:3
108:15 167:20
211:21 212:1
223:22 238:1
253:19 265:21
318:5
needing 265:11
needs 267:22
268:7 269:7,10
269:11 328:1
negative 128:16
negotiate 320:21
neither 140:10
337:8
never 5:3 7:12
25:19 40:17
66:12 86:20
87:3 162:4
164:1 168:1
196:22 217:19
226:12 231:18
232:10,15
279:17,22
284:12 286:2,2
286:4,7 299:13
305:20 309:15
313:17
new 282:3,13
283:10,12,19
284:10,22
news 58:5
Nicale 10:20
nice 96:4,11
166:14
nigger 220:20

night 98:10
131:8 136:22
286:14
nine 33:14
nine-month
319:21 320:22
non 26:5 29:3
49:8 51:20
68:7
non-FMLA-co...
278:11
non-responsive
23:16 24:18
25:10 26:3
27:1 28:13
32:8 76:8
246:7
normal 130:4
166:20 246:10
284:13
notary 1:20 4:6
337:1,17
notation 80:15
note 197:11
331:2,10 332:6
notes 79:6,11,20
79:21,21 80:1
80:6,12,19
81:2,6,8,14
277:3,20
280:17,19
281:4 285:9,9
286:13 290:4
297:17 300:5,6
300:10
notice 1:15
notify 244:2,18
November 69:16
75:6 77:17
118:3,4,5
120:5,7 121:10
156:9 189:20
192:20
number 14:5
35:13 42:20
77:14 164:7,8

195:7 262:22
281:17 282:1
283:8
numbers 118:19
118:20 119:7
numbness
131:13,16
132:3
N.W 2:4
N/A 42:16

O

O 3:1 4:1
object 68:14
198:17 199:11
199:17
objection 25:19
34:14 48:7
201:3 236:2
242:19
objects 145:8
observes 148:20
obstructionist
52:5
obtained 335:7
obvious 284:11
obviously
247:16 266:12
276:21
occasion 14:18
occasions 105:12
occupation 46:2
46:2 48:5,17
occur 64:3 85:22
86:2 92:19
142:8
occurred 65:16
92:21 165:16
250:22
October 16:15
16:16 75:3,5
75:11 76:11
82:7,11 91:11
139:6,7,8
141:13,18
143:8 155:21

161:10,16
162:9 163:16
164:13,18
165:16,22
167:11,12
168:7,14 184:7
184:16,17
186:19 187:5
189:20 192:18
192:19 203:22
214:4 233:20
272:8 326:3
offended 106:4,6
221:12
offense 150:2,6
offer 298:10
offered 24:6
169:1 274:16
281:12 283:3
289:13 298:8
offering 277:17
298:13
office 2:3 3:9
44:18 50:11,11
53:12 82:10
107:2 155:13
155:14,20
156:5,7 182:3
229:17,21
248:21 249:8
302:3 312:22
315:19 321:8
322:11 335:12
335:15
officer 337:2
offices 1:15
oh 8:4 13:7
16:14 17:19
19:14 49:2
58:11 59:7
61:2 69:7
81:19 82:2
105:8 106:15
108:22 135:10
137:11 160:14
163:17 167:2

170:16 171:15
187:20 193:15
201:4 228:14
263:1 265:2
278:5,22 279:1
281:9 283:11
285:20 286:6
295:8 299:11
299:20 300:3
304:22 319:9
321:17 327:9
329:8
**okay** 5:4 6:22
7:8,11,13,16
11:1 13:17
16:14 18:2,5,7
18:20 19:1,21
20:2,6 22:14
23:15 34:21
35:9,16,17
36:15 37:12
38:13 39:15,18
41:2 42:2,15
49:6 50:9
51:13 53:13
55:15 57:4,11
61:4,6 62:6
65:4,6 66:5
67:3 74:22
75:10 76:6
77:13,20,22
78:1 79:5 81:6
81:18 82:7,8
83:4,10,11,18
83:19 84:19
87:9,19 90:8
91:1,14 92:1,4
92:7,12,19
96:21 98:1,2
99:2,18,22
101:15 105:14
108:10,11
109:8,15
111:22 112:4
112:11,20
113:2,8,14

116:2 119:10
121:8 122:5,7
128:3,14
130:14 135:10
136:13,16
139:14 141:17
143:7,10
149:12 150:4,5
150:13 151:20
151:22 152:5
152:18 153:11
153:19 154:8
156:2 158:14
158:15,16,21
159:9,18
160:19 161:3
162:6 164:3
167:2,3 168:4
168:22 171:7,8
171:11,15
172:17 175:21
177:13,17,22
180:19 181:13
181:20 182:22
183:5 184:9,15
185:5,10,11
186:10 187:20
189:11 190:18
191:22 193:5
194:15 195:6,9
197:1,2,5,14
200:8 207:12
209:2,8,22
210:1,5 219:3
219:14,15
220:16 221:22
222:4,11
223:13 225:17
227:3,5 229:3
229:7,20 230:4
230:14 234:10
236:6 238:9,22
239:7,8,19,20
240:2 242:5
243:15 244:1
244:13 245:9

247:3,4 250:20
251:6,9,13
253:4,8 254:19
255:10 258:9
259:22 260:1
261:19,22
262:3 266:11
268:6 269:15
270:19 271:13
271:17 276:9
276:15 282:9
283:7,11 284:4
284:19 286:6
286:18 290:11
291:21 292:22
293:6 294:3,11
294:22 295:7,9
297:4 301:2
303:13 304:10
306:14 309:3,9
310:11 312:2
312:12 313:5
316:12,13,17
316:19 317:18
318:6 319:3
320:4,13 321:1
324:21 325:13
326:18 330:8
331:7 333:11
**old** 224:2
**once** 162:3
263:14 271:15
272:2
**ones** 5:19 6:5
80:13 324:6
**one-page** 23:13
**open** 305:22
**opened** 210:19
**opinion** 212:10
**oppose** 201:17
**opposed** 110:4
114:21
**option** 51:3
**oranges** 271:4,6
**order** 10:3 269:6
273:20

**original** 335:9
335:13,17,20
336:9
**outcome** 337:13
**owe** 185:21,22
**o'clock** 1:18
58:10 210:8
276:20,22
285:18 334:15

**P**
**P** 4:1
**package** 189:16
287:7
**pad** 79:10 80:8
80:21 100:7
179:10,11
**page** 3:2,10 41:5
41:18 42:7,18
43:6,9,12,19
53:13,18,21
54:6 118:22
119:4 144:10
149:5,6,16
152:7,10,12
156:12 187:1
187:12 196:1,7
197:10 240:19
240:19 254:18
279:5 285:9
325:6 331:1
**pages** 330:9
331:8
**Page/Line**
336:10
**paid** 15:16 52:4
67:10 85:19
117:12 122:4
157:7 158:1,7
159:13 160:21
185:17 217:10
217:17,19
256:1,7,15
258:15,21
259:3,5,9
260:6 267:5

281:20 284:12
301:14 302:16
303:21 304:3
304:17 305:13
306:6,9,19,21
307:1,7,9,16
308:13,14
310:9,16,19
313:11 314:21
319:16 328:3
329:17 332:13
**pain** 6:1,2,8 7:22
43:14 125:20
126:10,16,21
127:2,8 133:5
134:5,6 138:18
141:6 143:13
147:11 149:19
150:17 159:3
165:3,15 166:5
167:10 175:22
176:14 177:1
179:21 183:17
208:5 215:4
**painful** 134:13
135:2,12
**palpitations**
130:11,13
**Pam** 225:2
**Panagopoulos**
2:20 206:1,6
213:9 219:1,5
226:16 227:1,3
227:13,18
228:2,5,10,13
229:11 233:4,5
236:9,20 239:3
305:7,10
**panic** 124:12
141:8 175:19
**paper** 23:9,21
24:13 62:17
**paperwork** 11:3
15:20 16:14,17
17:3,6,12,14
17:19 18:9,15

[8:19,21 21:4
21:15 23:18
24:11 27:9
30:4,8,22 31:2
31:6,12 32:14
32:20 33:12
63:14,17,19
119:18 120:15
122:10 146:13
154:12 237:9
239:18 261:12
283:1 286:20
286:21 287:3
**Paragraph**
45:22 145:6
**pardon** 99:8
186:17 293:7
**parent** 269:10
**parents** 270:5
**Paris** 321:18
**Parker** 265:3,5
329:4,6,8
**part** 9:3 17:5
22:11 23:11
26:2 38:3,10
39:21 44:11
50:12 59:15
84:13 87:10
119:18,22
120:8 122:20
189:7,16 221:8
242:6 251:7
254:13 299:5
328:9,11
**participated** 5:3
**particular** 37:6
92:17 145:16
153:22 244:7
255:5
**particularly**
213:1
**parties** 1:22
337:9,12
**partner** 227:4
319:15
**partners** 266:21

267:16
**parts** 5:1 36:21
37:5,16 38:22
144:14
**Party** 148:11
**part-time** 94:4
160:12
**passed** 260:14
261:3,4,5
282:15 285:2
**passes** 284:13
**passing** 260:11
270:5
**patient** 108:14
110:5 191:8,9
260:3
**Patricia** 1:19
337:2,16
**pattern** 300:8
320:12
**pause** 318:17
**pay** 18:18 86:12
86:21 87:6,22
94:6 157:6
158:6,12
185:18 241:17
241:22 243:6
244:3 245:2,19
246:16 247:6
248:5,8 259:7
261:8 262:7
271:22 281:20
304:9,10,13
306:3,4 307:5
307:13,16
310:10 311:2
313:18,22
320:18 331:15
331:20 332:9
**paying** 218:2
237:5 266:13
332:22
**payments** 84:7
120:20 122:21
**payroll** 291:3
304:19,21,22

**pays** 332:14
**peace** 206:19
**pencil** 168:21
**pending** 202:18
335:18
**people** 14:6
57:20 67:6
89:7,16 90:19
146:10 162:4
167:6 176:4
179:5 206:5
208:11 220:11
222:18 223:3
223:18 224:1,2
227:11 231:7
231:13 243:18
244:17 263:2
266:13,19
267:3,20 283:9
284:1,6 285:20
290:17 293:22
300:16 312:19
312:21 320:5
**people's** 320:17
**perceived** 86:15
**percent** 7:14
160:13 300:9
307:22 310:19
311:2
**perfect** 201:5
**perform** 236:18
**performed**
182:4
**period** 12:7
33:22 34:16
89:13 101:17
128:1 156:18
157:20 159:6
159:10,20
162:1 164:17
174:3 246:16
267:7 278:8
301:5,13,14,17
301:20 302:14
303:22 304:4
305:13 311:3,6

**periods** 141:19
166:2
**permanently**
281:15
**permit** 278:11
**permitted** 282:4
282:14 314:17
**person** 18:13
45:8 54:21
110:11 112:5
150:16 153:2
179:16,18
188:8 195:1
209:10 222:1
228:6 247:17
250:9,15 252:6
254:7 270:20
271:1 284:12
291:20 293:20
327:10
**personal** 8:8
83:14,15,16
84:12 85:7,8
85:14 109:18
111:17 112:13
112:14 117:5
146:21 193:13
194:9,13,18
195:19,20
202:16 206:7
212:15 233:9
250:10 251:22
254:4 269:12
294:7,13,20
305:21
**personally** 83:13
83:21 84:2
103:3 110:9
111:5 114:21
231:15
**personnel**
303:18 313:18
**person's** 179:18
**Philadelphia-...**
65:2
**Phillip** 12:3

152:1,4
**phone** 18:1
49:20 59:2,11
64:12 65:7,16
105:18 146:12
153:4 154:9
155:4 163:21
163:22,22
164:2,4,5,14
164:15 178:16
178:18 179:3
182:6 275:15
276:4 286:17
295:4 297:5,7
**physically** 82:10
240:21 241:8
281:15
**piece** 179:2
**pills** 163:11,14
**pinpoint** 38:18
**place** 96:1
246:11 289:7
291:9,10 302:5
**placed** 19:4
105:6 108:18
114:15,20
241:16,21
261:11
**places** 132:4
**plaintiff** 1:3,13
2:1 4:4 34:14
**plans** 293:15
**please** 16:5
20:14 23:5
43:19 45:12
50:7 58:17
69:17 81:18
113:20 114:5
119:11 144:11
194:6 204:18
212:21 219:22
229:9 230:5
265:15 268:19
269:4 273:5
290:2 301:1
317:7 321:13

335:15
pleasure 166:9
plus 298:16
point 11:5 13:10
  16:2 17:1 37:3
  37:10 40:13
  58:7 67:15
  69:21 75:2,10
  78:11 80:9
  82:1 83:5 91:8
  92:5 102:2
  108:4 126:5
  133:16 137:14
  137:15 143:18
  159:3,14 162:7
  167:12,19
  169:13 170:1
  173:5 177:9
  179:9 188:7
  197:14 202:15
  207:4,5 209:22
  211:12 216:22
  226:6 229:20
  233:16 237:19
  238:2 242:10
  249:11 257:10
  266:1,12,18
  273:16 281:17
  282:1 283:8
  289:14 290:20
  291:17 294:4
  300:1,6 331:11
pointing 92:10
  109:10
points 56:15
policies 283:14
  284:12
policy 25:7
  236:22 237:15
  237:18 238:6
  239:16 278:15
  282:3,5,10
  284:13,14
  288:6,9,16,19
  292:2 331:17
posed 36:6 205:1

position 28:20
  30:6 46:5,14
  49:17 190:16
  227:2 281:12
  289:21 290:5,8
  292:14 293:11
  293:12 298:9
  298:11,13
  315:13 319:12
  326:6
positions 227:12
possible 21:14
  173:1 232:1
potential 49:16
pounds 145:9
practice 22:4
  246:10
precise 32:20
precisely 273:11
predict 142:22
  143:12 202:7
predictability
  142:6,9
predictable
  143:19,20,21
predominantly
  313:1
preference
  112:15
premium 239:15
premiums 238:7
prepare 9:9
presence 45:19
  222:13 223:8
present 1:21
  2:18 50:19
  51:19 116:12
  121:4 123:2
  126:3,15 127:5
  147:22 151:1
  165:17,19
  224:20 232:15
  232:21 233:2
  282:11
presented
  155:12

presently 10:11
  10:12
pressure 124:19
presume 281:1
  313:17 318:22
  321:6
previous 59:22
  330:17 331:5
previously
  205:13 216:8
pre-marked 3:7
primary 12:4
  45:8,14 47:16
  54:16,21
print 119:11
prior 12:16
  72:16 167:11
  211:13 218:18
  242:10
privileged 46:8
  204:7
probably 12:1
  52:20 93:11
  133:16 142:12
  172:22 174:14
  174:16
probation 301:5
  301:13,17,20
probationary
  89:13 267:7
  302:14 303:22
  304:3 305:13
problem 25:21
  36:22 39:19
  55:7 56:1,18
  61:5 81:21
  83:8 102:21
  103:3,7,9
  165:1 237:22
  254:11 287:13
problems 38:21
  130:2 161:12
  165:2 198:22
  220:13 311:18
procedure 25:8
proceed 10:5

process 95:13
  120:1,9 122:20
  254:21
processed 17:15
processing 169:2
  169:2 281:13
  289:21 292:14
  292:18 298:9
  299:5
processor 169:5
  298:20
program 15:14
  18:10 140:2,21
progressed
  168:2
progression
  169:13
progressive
  169:19
projects 7:12
prolonging
  92:11
promotion 267:4
proof 55:8 57:2
  62:18 63:4,8,9
  332:19
proper 209:16
  232:14 239:18
properties
  115:16
property 13:16
proposed 317:21
protect 88:22
protected 192:7
  271:21 278:7
protection 28:7
  41:8 64:17
  67:12 190:12
  193:12 194:1
  194:10,19
  272:19,20
  277:11 291:6,8
  293:19 294:1
  297:21 326:2
protocol 232:14
proud 209:10

proves 289:6
provided 3:9
  313:8
provision 285:1
  289:7
provisions
  274:21 311:16
  311:17 312:5,6
psychiatrist 50:6
  186:21 187:16
  202:13,17
  203:1,14
public 1:20 4:6
  337:1,17
pull 284:17
pulling 88:11
  94:6
purpose 41:9,10
  188:12 189:11
  296:16
purposes 187:8
  216:9 241:4
purse 5:18
pursuant 1:15
pushed 49:5
  250:2 252:2
put 10:3 20:18
  21:4,19 25:5
  42:14 43:5
  66:22 69:12,19
  70:2 75:20
  78:3 94:3,7,19
  95:2 96:12
  97:4,19 98:7
  106:11,12
  109:17 115:15
  138:20 150:9
  154:4 156:22
  160:12 166:14
  168:18 172:5
  179:5,17
  189:19 205:20
  207:16 259:7
  259:15 292:16
  298:8
puts 117:16

putting [11:19
237:2
P.C 1:16 2:12
p.m 281:1
334:15

**Q**

quack 187:17
212:5,18
qualified 97:1
qualify 285:6
question 8:18,19
15:22 20:4,5,7
20:14 23:5
26:7,10 27:10
28:9 29:8 32:5
32:11 36:11
37:2,2,5,8,19
37:21 38:12
39:8 40:15,21
51:5,12 52:1
52:14 54:19
55:15 63:1,2,3
65:5,7,19 68:6
68:15 73:7,10
89:18 91:4,6
91:18,20 99:19
106:17 109:5,9
109:14 112:19
113:18 114:7
124:5 143:6
144:18 159:7,9
159:17 168:5
173:13,16
178:6 183:1
186:3 187:19
193:5,5 194:6
195:10,15,16
195:17 198:18
198:19 199:17
199:22 200:13
201:5,7,9,11
201:13 202:3,4
202:14,18
204:2 205:1,1
207:14 208:14

208:20,22
211:2,5 218:5
218:8,22 222:2
222:10 223:1
223:11 225:11
225:17 226:13
228:19 229:4,9
230:3,5,9,10
231:21 233:1
235:12 236:3
239:7 245:11
250:11 251:12
251:18,19
252:12 255:5
262:1,3 267:2
268:12 270:15
273:8 279:12
291:5 294:12
313:4 325:2
326:17,19
questioned
63:21
questioning
298:2
questions 5:5
36:3,6,20,21
37:15 38:3,10
38:22 39:4,12
39:20 40:3,12
40:15 51:10
91:3 96:17
109:7 110:18
112:9 113:19
149:10 150:12
161:14 182:9
212:21 223:15
254:22 324:21
quickly 21:14
253:12
quit 333:20
quite 31:1
quote 145:7
150:16 197:18
256:1,2

**R**

R 2:10 4:1
race 205:11
324:17 325:10
racial 219:20
220:3 222:14
222:16 223:4,5
223:9
racism 221:22
221:22
racist 218:16
219:17,18,21
220:8,14 221:2
221:4,12,15,16
222:14 223:5,9
raised 292:5
ran 18:17 25:7
32:17
Randall 186:16
186:18
rash 129:4,9
rashes 128:22
rates 328:19,20
react 137:1
176:2
reaction 128:16
read 4:22 9:7
23:6 38:13
129:3 155:15
196:12 205:2,3
252:1 277:18
281:10 289:5
331:12 335:6
335:16,19
336:4,5
reading 100:9
156:1
readings 191:16
Ready 73:11
real 296:17
realistic 323:19
really 17:15 40:8
57:10 129:8
135:6 168:12
169:7 179:13
180:17 193:19
193:21 215:2,9

225:13 256:13
267:22 270:14
272:12 294:6
318:5 324:2
325:14
reason 64:11
208:15,16
248:4,16 292:2
300:11 324:16
336:10
reasonable
177:5 200:10
reasons 11:14
105:15 181:13
233:19 241:6
243:4 329:1
336:7
recall 5:1,7 8:13
10:9 15:12,18
15:22 16:10,18
17:5,9 20:7,20
23:9,14 24:8
24:11,22 25:13
26:19 27:20
30:8,14 33:11
34:2,6,7 42:21
42:21 44:22
52:19 53:3,10
54:1 58:1
69:13,18 70:3
76:18 129:13
129:18 130:5,9
130:16,20
131:2,6,11,15
132:15 135:14
135:20 138:16
144:19 146:9
146:12 178:22
213:14 217:11
217:17 218:1
218:10,12
221:14 224:15
236:7 249:18
287:4 291:19
receive 28:3
31:4 54:2

55:10,14 57:14
89:9 116:7
192:22 289:19
received 18:13
21:8 23:9
27:21,22 64:22
65:17 69:15
73:16 74:3
89:6,8 121:1
185:19 195:10
216:21 241:20
279:18 280:1
receives 89:7
receiving 56:1
269:3
receptionist
46:13,19,21
48:6,14 49:12
50:19 51:1
168:8,13,15
169:6,8,11,15
170:7,10
175:15,16
176:12 178:1
178:20 179:19
180:1 181:21
181:22 182:10
182:17,18,20
183:10 190:7
190:10,14
191:1,5 192:7
216:1 274:17
290:5,8,13,19
291:1 292:5
293:2 296:9
297:16
receptionists
183:4
recess 35:19
82:3 127:14
161:6 204:19
recognize
118:16
recollection
21:11
reconsider 189:8

189:12
reconsidered
185:14 186:6
reconsidering
187:8
record 5:10 23:7
35:11,22 36:14
124:8 127:13
196:13 205:4
252:20,22
253:2,3 300:13
334:1,12 336:7
337:7
records 34:11
55:5,8,20 56:6
56:13,19 57:1
57:6,16,22
97:14 98:14,17
99:3,12 100:5
100:10,12,16
100:20 101:2,5
126:9 128:1,5
129:3,12 136:7
168:10 194:14
198:10 217:9
217:16,20
240:11,15,15
294:20 313:18
Red 218:11,20
reduced 256:13
337:6
refer 220:7
referring 60:3
212:5,18
213:21
reflect 136:7
196:13
reflecting
101:11,20
refresh 217:13
refugee 324:11
regard 204:11
regarding 22:5
regardless 111:6
274:9 304:11
324:9 326:6,8

326:9,14,20
regular 94:11,12
164:14 262:6
266:21 310:10
reinstated
236:10,15,22
rejected 33:15
34:10 315:16
related 337:9
relates 283:8
relative 110:12
337:11
relatives 115:1
261:2 262:8
released 46:1
relieve 165:6
167:10 170:22
rely 100:12
remaining 86:9
194:1,10,20
remains 147:21
remark 224:3
225:1
remarked 263:1
remember 7:4
8:3 10:7 22:9
22:13 43:9
54:2 80:11
122:11 198:2
217:7,12 219:9
219:9 241:15
249:20 254:20
remembered
77:18
remembering
8:15,21
remind 9:8
240:12
rental 115:16
repaid 83:2
repayment
85:22 86:2
repeat 8:19
12:14
repeated 226:21
232:11

repeating
232:18
rephrase 16:6
19:22 26:15
45:11 68:15
121:6 265:15
268:19
report [48:11,14
151:12 213:5
257:18,20
264:7 276:6
reported 23:6
131:6 217:14
reporter 1:19
205:3 254:2
reporting
131:12 138:16
180:8
represented
335:7
request 121:11
187:9 189:8
275:9 278:17
309:2 316:22
335:20 336:6
requests 240:14
require 52:13
required 269:6
requirements
25:2
requiring 52:21
reside 10:12
residence 13:10
13:20
resident 70:10
193:17
resides 319:11
resign 64:1
65:13,15 79:14
276:1
resigned 64:10
resigning 64:8
resolve 265:18
resolved 129:4
134:22
resources 227:6

228:21 229:22
230:15 232:13
243:21 250:8
250:12 251:16
251:21 252:5,9
252:18 329:19
respect 54:18
respective 1:22
respond 25:19
26:4 212:4
227:15
responded 66:12
290:20
response 50:17
63:22 104:12
121:5 148:18
159:22 194:12
196:4,6,10
204:22 239:5
275:8 291:12
321:10
responsive 26:6
29:4 49:9
51:21 68:8
restrictions
167:18,22
168:11
resume 190:20
197:20 198:15
199:9 200:11
202:1,20 203:3
203:20 214:16
216:12 253:20
326:22 333:20
333:21 334:6
resumed 334:16
resuming 187:2
190:1 205:8
retaliation
205:12 324:18
325:10
retract 216:7,16
retracting 216:3
return 280:12
review 9:12,14
184:20 335:6,8

335:15,17
reviewed 118:17
119:3 144:15
197:3
re-ask 140:16
159:7,9
re-read 23:4
rheumatoid
123:15 133:6
133:10 134:2
134:14 137:5
137:10,11
163:9 164:12
298:22
rhyme 208:15
208:16 248:16
rid 224:2
rider 282:13
283:4,11,12,19
284:10,22
286:22 287:21
289:7 333:16
right 5:19 6:2,10
6:20 9:5 10:9
13:12,22 17:21
19:18 30:15
35:17 38:14
40:6,10,18
41:9,22 43:2
44:14 45:4
47:13 48:1
49:3 50:4,7
51:8 52:2,6
53:17,19,20
55:6,21 56:7
56:11,13 57:1
57:8,19 58:13
58:19 59:6
60:3,8 62:10
63:16 65:9
66:9 69:2 70:1
70:18 71:10,12
72:19 73:22
75:1,3 77:7,11
77:18 79:5,11
80:12 81:16

83:6,21 85:3
86:17 87:9,13
88:2,13,18
89:2 90:7,21
91:10 92:13,16
94:11 95:16
99:1,11 101:12
103:1 104:7,17
105:1 106:14
106:20,22
107:1,11
108:10 109:12
111:3 112:7
114:12 115:1,9
116:5,13
119:16 120:2,6
120:11,14
121:4,15,18,22
122:3,4,18,22
125:11,18
126:7,12,15
127:10 128:14
135:4,15,16
136:20 137:8
140:9 141:16
142:17 146:18
147:2 150:1,20
151:1,17
152:21 154:5
154:10 155:3,5
155:8,10,22
158:1 159:2,4
159:12,21
160:5 161:4
165:9,22 166:6
168:17 169:20
172:7 173:2,4
173:7 175:5
176:11,16
177:12 178:4
182:13,22
183:11,22
184:6,21,22
185:15 186:7
187:22 188:6
188:15 189:13

189:18 190:17
191:1,11,20
192:8,10 195:1
195:3 196:9
197:8,12 198:6
201:14 202:1
203:21 205:6
208:4 211:1,3
212:11 213:18
214:6,21
215:13 216:14
220:14,21
221:6 222:8
227:7 228:22
232:17,22
233:7 234:16
235:14 237:16
239:10,16,22
240:8 241:19
242:12,14,16
243:1,13,19,22
244:6 245:3,13
246:17 247:7
249:9 253:7
255:1 258:3
260:12,15
262:21,21
265:2 266:15
268:4 271:14
272:6,8 273:9
275:1,18 277:7
278:8,13,19
279:11,11
280:15,18,20
281:15,21
282:12,22
283:20 284:14
285:6 286:16
287:14,18
288:21 289:22
291:4 292:21
293:16 294:2
298:3,15
306:18 307:4
308:3 309:6,16
309:17 311:3

312:2,4,7
314:22 316:6
317:5 319:9
321:3,9,11
327:8,11 329:2
330:20 331:22
333:8,19 334:5
335:5,18
**rights** 72:18
90:17 96:9
191:16 204:11
**Riley** 26:21
46:16 59:9
64:21 65:1
71:3 75:16
76:15 78:8
80:18 82:14
87:17 89:6,11
102:20 103:12
104:8 105:22
105:22 139:21
205:13 206:2,8
206:19 209:18
219:3,6 226:21
227:5,16
228:11 233:20
244:8 249:18
251:1 252:8
267:4 275:6
276:8 280:6
303:17 304:16
306:16 316:5
329:11,15
**Riley's** 104:12
108:16 250:18
302:21
**Riley-Jamison**
1:6 2:19 19:9
32:12 49:21
58:2,19 60:5
61:10,21 62:14
63:5 67:15,18
68:19 71:20
77:7 78:13
88:7 94:18
95:8,13 102:6

103:8,20
106:19 107:10
107:17 114:14
213:8 218:1,10
219:16 220:7
220:17 221:14
222:12 223:17
228:7 232:5,9
232:16 234:5
234:21 235:15
248:19 249:5,7
250:4,14
262:22 263:8
265:8 277:4
292:9 301:3,8
305:1,12 306:1
306:9,14 317:5
318:7 335:2
336:1
**Riley-Jamison's**
249:2 302:21
303:11,15
**ring** 178:17
**Robert** 45:2,16
53:11 55:2
**rocket** 243:4
245:13,21
**room** 213:9
**Rough** 224:12
**roughly** 72:10
84:8 85:11
157:4 224:16
242:1 285:14
285:14 302:8
311:9
**round** 224:11
**row** 247:11
**Rules** 335:5,17
**run** 104:10
279:9

**S**

**S** 2:11 3:1,6 4:1
**salary** 82:16
86:6,12 87:7
95:14 158:1

160:8,13
259:11 281:18
306:20 310:19
315:1 325:18
**sat** 66:14 67:4
248:10 267:11
**Saturdays**
260:19
**save** 64:1 89:4
**saves** 195:4
**saving** 299:8
**saw** 11:3 12:7
32:22 34:21
44:4 45:21
87:20 181:16
186:19 213:18
249:13,20
305:19 315:18
**saying** 9:20 17:8
25:5 30:16,20
38:11 39:3,6
40:9,14 42:12
56:4,7 57:7
59:19,20 61:8
74:10 83:4
87:18 88:5
91:1 96:19
98:5 103:9
106:7 107:7,16
110:22 113:4
117:8,11 130:1
133:17 139:18
140:5,20
148:20 157:11
158:17,20
171:4 173:15
174:20 181:3
183:7 192:1
193:7 197:15
198:9 207:15
207:20 208:3
208:12 209:18
209:21 214:11
216:17 217:2
223:14 224:6,8
234:2,17

236:20 237:1,8
239:1,2 241:20
245:12 246:2,9
247:16 248:5
248:15 250:17
251:9,10
258:14 260:22
261:13 262:17
268:22 269:5
270:18 271:11
272:2 282:18
284:7,21,22
287:10 291:2
292:13 299:17
306:15 307:2
312:18,20
313:1 316:13
323:4 324:4
326:11 332:5
332:10 333:1
333:15
**says** 33:5 34:14
110:11 119:7
119:11 128:9
145:6 147:10
149:15 150:14
152:14 156:12
182:3 187:1
190:19 197:18
261:18 278:16
278:19 324:3
331:10
**schedule** 67:10
88:11 89:13
90:3 92:15
93:6 94:10
96:1,13 102:1
102:3,13,16,18
102:22 103:1,5
103:15 157:4
231:10,19
255:14,20
257:4 264:12
264:19 266:7,9
267:14 272:3,5

301:18 306:20
306:22 307:22
308:11,14
310:5 314:9,19
315:2,5 316:22
322:2,7,18
325:17 327:13
329:16
**scheduled**
141:11
**schedules** 89:11
267:21 328:19
**school** 14:15
15:1 89:11
184:8 267:15
270:4 314:19
314:20 315:6
317:1,22
**science** 243:4
**scientist** 245:13
245:22
**scope** 253:19
**scribbled** 100:7
**second** 30:9
43:18 53:13
85:14 92:22
138:13 142:20
144:10 186:22
197:10 212:6
214:7 230:2
242:2 252:16
**secret** 157:2
229:18
**secretaries**
225:4 304:12
**secretary** 169:3
182:3 219:12
292:19 319:13
**Section** 42:3,9
42:10 145:6
146:6 147:8,10
149:15 150:14
**secured** 192:7
**security** 22:12
23:12 49:4,5
79:15,17

117:21 119:20
119:21 120:4,9
120:15,20
121:1,10,14
122:5,15,21
127:19 144:7
145:22 146:10
147:5 148:10
148:16 152:17
153:3,8,15,17
194:19 195:2
326:12
**see** 3:8 9:17,22
13:5,7,17 43:8
44:1 48:19
50:18 81:11
103:9 106:13
109:5 119:1,8
123:7 128:4
132:7 136:6
147:12 151:14
153:19 163:12
164:6,8 169:4
186:14 187:4
196:2,5 197:9
208:12 209:21
214:3 217:8
222:20 227:8
227:10 228:15
241:2 242:17
246:2 253:14
256:10 257:19
260:20 271:3
274:17 276:13
277:14 286:9
299:20 310:21
322:11
**seeing** 198:2
213:14 249:18
**seek** 24:18 25:10
27:1 28:13
32:8 76:8
**seeking** 212:9
**seen** 80:6 140:12
181:15 196:22
286:20,21

303:17,20
313:17
**sell** 115:16
**send** 18:15,18
44:19 60:7
74:5 146:13
153:4,21
206:14 239:17
245:14,17
330:21
**sending** 55:8
56:18 196:1
217:9,15
247:17 254:9
330:14,19
**senior** 68:1
270:13 293:20
**seniority** 270:10
270:12 294:2
**sense** 39:16
111:11 137:3
154:6 166:21
194:21 307:1
332:18
**sent** 18:15 22:10
23:22 24:13
30:20 41:13
53:9,22 54:7
56:2,12,22
57:8 61:9
63:13,17,18
64:13 74:7,9
187:16,21
188:21 212:4
248:11,19
250:1,5,7,9
251:15 254:5,8
278:14 279:7
287:7,7 288:7
289:3 330:17
**sentence** 147:12
240:21 258:3
**separate** 84:6
248:11
**separated**
131:19

**September**
84:20 125:10
186:8 192:22
224:18 242:7
319:10
**series** 161:13
203:5 254:13
**seriously** 201:12
270:17 320:7
325:16,16
**Services** 219:13
**set** 138:21 160:7
199:15 202:19
202:22 243:16
**Seth** 129:20
**seven** 87:20,21
160:5 170:8,11
241:13,20
245:7,14,17
247:5,9,11
248:7,11 249:8
249:13,22
250:1,6 251:11
251:15 254:5,8
254:9 256:13
**severe** 43:13,15
128:22 135:22
179:22
**Sevonne** 265:3
329:8
**Shalala** 219:12
**sheet** 23:9,21
24:13 152:16
196:1,8,19
197:7 225:2
**Shelby** 269:18
315:7,12
**she'd** 275:21
280:8
**shoe** 135:6
**shopping** 162:17
162:19,20
163:1
**short** 102:7
174:2 180:13
325:18

McFadden

Page 364

**shortly** 59:3
**shortness** 43:14
  130:7
**short-term**
  17:10 18:17
  25:7 30:18
  32:17 33:6,8
  38:17 311:12
  311:16 312:5
  313:8 322:18
**short-term/lon...**
  16:19
**shoulders**
  132:18 133:2
**show** 40:20 63:5
  126:9 149:5
  150:15 152:7
  168:4 205:16
  222:14 277:22
  300:8 303:21
  313:19 320:10
  320:11,18,20
  333:15
**showed** 57:2
  154:20 158:7
  216:20 242:8
  300:18
**showing** 55:11
  186:11 195:22
  240:10 254:18
  330:7
**shows** 288:10
**shut** 303:2
**sic** 8:4 315:20
**sick** 89:14 96:22
  96:22 98:9
  113:10 117:13
  134:1 139:19
  157:2 160:16
  180:3,4 225:4
  244:4,20
  259:12,15,16
  260:2,10
  261:11 267:6
  272:7,7 304:5
  306:10,16,17

  307:6,8,9
  322:22 323:3
  328:9,14,18
**sickness** 42:10
  42:13
**side** 52:5 81:10
  90:8 132:5,11
  132:11 138:7,7
  138:10,10
  254:21
**sides** 255:3
**sign** 17:6 23:18
  41:14 52:8
  144:13 151:20
  153:7 154:2
  335:10
**signature** 41:4
  43:3 119:1,10
  149:4,6 151:17
  153:18 155:10
  155:12 335:21
  336:8,21
**signed** 17:11
  41:11 43:20
  44:6,20 45:18
  53:19 119:14
  144:10 145:4,5
  146:4 151:21
  152:2,6,17
  155:16,17
  260:21 336:7
**signing** 18:8
  153:22
**sign-in** 225:2
**simple** 179:2
  221:20 222:17
**single-family**
  12:22
**sir** 29:9 39:12
  42:10 60:20
  62:9 68:16
  73:6 98:1
  119:5 141:15
  142:16 173:1
  191:9 193:7
  201:12 203:10

  203:16 208:14
  209:21 218:4
  221:9 231:22
  247:15,22
  251:2 262:4
  284:3 294:11
  299:2 300:10
  305:16 316:11
  322:15 333:18
**sit** 166:1 170:8
  170:11,19,21
  171:16 172:2
  172:11,21
  173:4,19,20
  174:2,10,18
**sitting** 88:1
  164:19,22
  165:15 241:11
  243:7 245:8,15
  245:19 246:19
  247:1 314:15
  320:15
**situation** 72:17
  104:9,16 105:4
  107:13 133:20
  133:22 146:7
  147:7 205:19
  207:21 235:10
  256:12 259:18
  259:19 276:12
  287:22 303:11
  303:15 310:22
  313:22 314:6
  318:12,15,20
  319:5 320:20
  321:21
**situations** 261:8
**six** 5:20 7:14
  67:5 142:11
  170:8,11
  307:20 308:10
  311:5,10
**size** 163:12
**sleep** 131:8
  136:21 166:7
**sleeping** 131:4

**sleeps** 149:18
**slow** 62:14 309:3
**slowed** 63:5
**slur** 223:9
**small** 145:12
**smart** 224:9
**Social** 22:11
  23:12 49:4,5
  79:15,17
  117:21 119:20
  119:21 120:4,9
  120:15,19
  121:1,10,14
  122:5,15,21
  127:19 144:7
  145:22 146:10
  147:4 148:10
  148:16 152:16
  153:3,8,15,17
  326:12
**socks** 135:7,11
**sole** 265:12
**solely** 221:22
**solve** 61:5
**somebody** 10:1
  44:19 45:3
  73:5 79:2
  105:3 107:12
  108:13 128:17
  155:14 221:11
  248:10 264:21
  273:1 282:2
  293:3 301:9
  304:2 326:1
**somebody's**
  314:15
**something's**
  296:1
**son** 11:4,8 14:15
  68:1 164:7
  184:4,8 218:12
  218:20
**sorry** 19:14 69:7
  99:18 104:5
  115:17 121:8
  121:12 142:14

  143:5 155:22
  185:2 203:16
  240:3 294:11
  297:14 301:2
  308:7 309:19
  312:9 329:9
**sort** 36:8 131:20
  176:18 178:9
  190:12 202:7,9
  223:9 254:10
  259:20 266:11
  282:13 314:18
**sorts** 220:3
**sought** 63:10
**sound** 6:16
  98:18 303:1
**sounded** 129:1
**sounds** 163:3
**source** 133:3
**Southeast** 11:7
  12:19 206:13
**space** 176:19,21
**Spahr** 1:5 15:14
  16:2 22:4
  26:13,17 27:5
  27:13,18 28:19
  29:11,21 32:12
  38:15 49:5
  57:15,18,20
  72:2 73:14,20
  74:7,9 82:10
  86:5 140:3
  168:7 178:19
  209:6 211:10
  211:15 258:17
  266:12 272:22
  280:14 283:9
  289:1,2,4
  301:12 302:5
  306:5 307:3
  321:22 331:15
  332:9 335:2
  336:1
**Spahr's** 266:18
  312:11
**spasms** 132:17

132:21 165:4
speak 7:16,17
  39:13 77:9,13
  78:5,12 80:5
  116:4 295:2
  296:3
speaker 164:5
  302:7
speaking 55:19
  64:12 201:2
  317:4
special 332:1,18
specific 83:10
  167:6 170:2
  291:20 322:12
specifically
  254:18
specifics 317:20
  318:1
speculation 48:8
  188:16,18,22
speed 298:20
spell 308:8
Spellman 24:16
  45:1,2,3,7,15
  45:16 53:11,18
  54:12,16 55:2
  55:3,9,13,19
  56:4,10 186:12
  187:22 188:4
  196:2,8 197:8
  198:4,9 213:17
Spellman's 57:5
spend 265:19
  271:1
spent 332:16
spoke 54:22 55:3
  76:18,21,22
  77:16 78:7
  79:1 80:14
  107:19 116:13
  139:22 194:2
  219:5
spoken 66:14
spot 164:19
spread 234:10

SSA 156:16
SSA-18 119:7
SSA-49 149:6
SSA-68 152:7
  153:12
SSA-69 151:16
  153:16
stability 215:15
staff 102:7
  220:10 229:15
  230:11 234:14
  257:11,15
  264:13,15,18
  270:13 293:20
  329:14,21
Staffa 1:19
  337:2,16
stage 172:20
stages 126:4
stall 62:15
stalled 63:6,10
stand 134:7
standards 25:13
start 37:11
  71:12 85:5
  144:18 220:14
  253:4 259:22
  301:3 312:17
  312:19
started 97:18
  98:10 121:18
  122:14 263:18
  263:19,19
state 4:11 25:18
  34:13 36:14
  205:20 215:15
  215:18 242:18
  284:11
stated 28:6 61:2
  74:20 261:9
statement 12:6
  17:16 68:15
  141:9 147:18
  147:22 149:20
  151:2 187:4
  197:21 198:13

199:7 202:2
  216:3,16
  224:21 225:7
  263:1 297:15
statements 57:5
  68:12 89:22
  98:20 283:8
  285:22
states 1:1 301:10
stating 212:7
stationery
  197:11,13
status 94:4
  96:13 204:5
  241:14 243:19
  328:9,10
stay 11:9 50:7
  99:19 105:13
  105:14 106:17
  169:6 251:12
  306:12
stayed 20:3
  102:17 181:7
  183:15
staying 177:12
  301:6
steno 80:8,21
  100:7
stenographica...
  337:6
step 26:21 33:6
  134:9 161:4
stood 207:2
stop 114:6
  127:12 218:6
  229:5
stopped 63:20
  139:5 163:18
story 299:15
straight 158:22
strange 62:19
  98:18
Street 1:16 2:13
  335:12
stress 53:1
  133:20 176:1

327:5
stressed 129:16
stressful 52:22
  175:17
strictly 171:8
strike 8:13 22:14
  23:15 24:17
  25:9,20 26:22
  28:12 29:3,17
  32:7 34:1
  37:10 49:8
  51:20 54:12
  55:16 68:4,7
  70:19 73:1,3
  74:14 76:7
  86:1,9 87:4
  94:22 108:2
  166:9 212:20
  214:12 235:2
  246:6 258:11
  284:10 293:21
  299:10
striking 73:6
stroke 66:15
  67:4 307:19
  308:9 309:22
  311:10
stub 307:16
stubs 158:6
  307:13
stuck 102:16
stuff 146:22
  200:18 212:13
  312:14
subject 206:11
submission 22:6
submit 22:18
  23:19 27:9
  31:5,15
submitted 9:16
  15:21 16:12,14
  16:18 17:2
  24:12 28:18
  29:20 30:5,9
  30:22 31:2,12
  32:13,15,21

33:12 34:9,15
  127:19 158:6
  187:7 189:4,7
  198:3 304:18
  304:20,22
submitting 33:3
subparagraph
  264:3
subsequent 59:2
subsequently
  184:2
sub-part 36:20
  51:10,11
sub-parts 36:7
  36:13 37:21
  91:3
sudden 75:18
sue 185:1
sued 222:18,19
  223:3
suffer 43:13
  123:15,22
  129:9
suffered 130:17
  132:12,17
suffering 130:22
  138:17
suggest 286:22
suggested 108:1
  108:3 114:19
  122:10 165:12
  264:5 318:2
suggesting 105:6
  114:14 263:9
suggestion 110:1
suicidal 208:11
  208:19 210:14
Suite 1:17 2:5,14
summarize 10:2
summary 9:18
summer 169:16
  267:17
supplement
  282:3
supplemental
  216:17

support 102:7
  148:15 175:3
  211:21 212:1
  214:20 220:10
  270:13 293:20
  329:14,21
supportive
  106:21
supposed 160:22
  225:8 269:13
sure 5:18 9:21
  12:15 14:11,17
  19:12 49:15
  72:11 78:22
  80:4 81:19
  82:2 84:11
  85:12 98:2
  102:10 115:12
  124:6 146:16
  146:17 156:11
  160:10 190:3
  196:20 224:11
  241:13 249:10
  249:15 251:2
  265:6 268:15
  269:7,13 270:2
  285:17 319:18
surgery 99:16
  104:21 233:6
  233:13,14,15
  233:21 301:21
  302:2,10
survive 183:13
Swanson 295:21
  296:15
swell 133:11
  135:2
swelling 135:12
swift 7:5,7
swiftly 253:12
swollen 181:17
sworn 4:6 337:5
sympathetic
  150:10
symptoms 127:8
system 98:19

168:19 179:8
  243:13,16
  244:2,8,12,15
  244:16,17
  247:2
systems 227:9

T

T 3:1,1,6
take 5:20 6:3,8,9
  6:11,12,13
  8:10 13:5
  28:10 35:5,7
  40:5 44:18
  68:2 94:4
  104:1,16 105:5
  106:9,10,16
  109:4,22 115:5
  116:15 137:12
  149:8 153:3
  175:11,12,18
  176:3,6,7,8,10
  176:14 179:7
  223:10 242:11
  245:21,22
  256:22 263:9
  264:6 265:11
  282:14 285:1
  287:15 292:14
  301:19 304:7
  320:6 322:4
taken 1:15 30:16
  35:20 82:4
  127:15 150:7
  161:7 166:2
  181:7 204:20
  236:17 336:5
  337:3,6,10
takes 8:9 149:17
  207:9 267:16
  319:7 321:8,17
talk 7:9 20:4
  50:14 66:7
  87:16 155:3
  203:2 205:6
  221:7 226:3

229:14 230:10
  230:17,20
  231:1,3 252:16
  265:17,21
  268:4 275:18
  295:14 317:10
  334:9
talked 50:21
  64:7 66:10
  76:16 78:20
  107:3 168:9
  205:9,15,21
  211:20 213:13
  215:1,21 235:5
  235:7,18 263:2
  263:4 266:1
  286:22 295:20
  312:13,18
  321:15
talking 8:22
  42:15 60:4
  72:6 77:4 80:2
  103:21 113:13
  126:20 134:10
  137:7 141:12
  142:20 155:8
  168:21 170:2
  182:16 183:4
  216:18 229:1
  237:3 241:15
  273:3,6 289:6
  291:18 292:20
  293:1 308:22
  309:4,12
  320:15
Tapazole 128:20
telephone 24:14
  155:4 182:1
tell 21:21 22:22
  26:12,16 27:4
  27:8,12 28:11
  38:18 40:18
  46:4 48:16
  62:20,22 67:22
  68:18 69:10
  71:16,21 73:14

87:15,17 88:16
  91:8 98:21
  101:1,4 103:19
  106:1,19
  107:17,20
  113:6 115:14
  115:21 131:20
  132:20 154:11
  194:3,4 204:4
  204:8 220:22
  226:16 227:13
  228:9 231:5
  233:12,13,21
  235:3 255:12
  255:19 256:19
  257:2,15
  273:11 276:9
  294:22 296:11
  303:10 307:14
  325:2 329:20
  333:2
telling 5:19
  50:20 52:19
  53:4 55:9
  56:10,11,22
  73:18 74:5
  75:15,17 87:21
  96:20 98:20
  103:7,8 107:14
  108:20 113:10
  129:19 130:5,9
  130:17,21
  131:2,16
  132:15 135:14
  155:7 167:7
  173:18 201:3
  210:5 233:3
  252:14 284:2
  296:1 303:3
  323:11,14
  332:11,13,16
tells 58:20
  142:11
temp 190:15
  291:9,10
  293:10

temporary
  296:9
temps 272:20
ten 159:10,20
  160:5 180:5,6
  231:14 256:13
  291:7 323:1
tens 216:9
tension 265:10
TERESA 2:2,3
term 20:19
  21:22 44:12
  67:1 183:16
  186:7 221:2,12
  221:15,15
  222:13 223:5,7
  223:9,18
  300:22 311:14
  325:19
terminally
  104:22 271:2
  296:2
terminate
  280:15
terminated
  72:15 86:3
  303:4,5,7
terms 161:11
  220:8,15
  223:21 319:5
terrible 134:13
  138:20
test 106:13,20
  107:1,11,15,18
testified 4:7
  235:17 236:1,4
testify 181:16
testimony 102:2
  337:4,5,8
tests 104:3,6,10
Thank 35:18
  69:6 76:5
  81:20 114:9
  189:2 201:18
  211:6 242:20
  317:9 335:22

Thanks 41:2
186:9
thereto 337:12
thin 203:7
thing 22:9 58:1
89:5 96:4,11
96:18 111:14
134:12 165:7
165:20 179:3
180:11,19
183:12 209:13
220:9 227:21
241:21 263:6
264:10 269:9
269:19 272:15
274:2 292:2
294:9 306:10
307:2 316:16
317:12 325:11
326:16
things 7:4 8:3,13
8:15 20:4
43:13 54:3
60:4 80:10
87:16 90:19
93:22 100:6
127:7 138:22
146:2 158:7
167:5,7 168:4
181:18 203:5
205:9,12 206:3
206:7,16,20
207:10,10
208:13 209:19
210:13,19
226:20 227:18
228:4 232:11
234:4,10
246:17 264:3
270:6 305:19
306:5 320:6,6
320:10,11
327:6 329:19
think 6:6 7:3
24:15 25:21
26:6 31:2 36:4

36:22 37:3,13
37:22 38:21
40:1 44:21,22
46:7 57:9
58:14 59:10,14
63:18 64:14
69:15 72:9
82:21 85:3
89:17 92:21
93:11 98:4
108:12,16
109:2 110:5
111:21 125:17
127:22 128:20
133:20 137:3
140:12 146:9
147:13 148:19
149:21 150:8
156:9 158:6
166:13 167:6
169:7,10 174:6
174:8,12,13
175:17 176:22
177:11,14
179:14,15
181:12 182:7,9
183:21 184:10
186:2 202:16
203:15 210:21
231:15 235:1
240:16,20
243:2,4 245:4
245:10 248:10
252:12 253:18
255:4 264:22
264:22 265:2
267:2,7 271:17
274:5 275:2
277:6 281:10
282:1 288:4
289:6,18
290:18 291:14
298:22 302:4
307:8 320:5
327:1,14
329:10,12

332:8 334:3
thinking 32:1,6
68:11 206:17
331:19
thinks 104:11
third 30:9
240:19
Thomas 125:17
125:19 139:20
140:5,17 228:9
228:15,17
229:12
thought 11:3
19:3 52:18
67:21 87:1
108:13 116:6
152:15 176:6
190:6,22 207:7
208:18 236:17
250:15 262:6
292:11 295:10
299:20 300:17
327:3
thoughts 208:11
210:14
thousands 216:9
332:17
three 6:14,15
14:9 37:16
40:15 58:10
61:12 93:17
109:7 112:9
113:18 130:5
136:4,5 157:20
170:13,15
182:8 184:5
231:14 237:6
256:16,17
260:13 278:12
290:16 291:18
302:11 306:3,4
321:8 322:20
three-month
325:20
throwing 210:2
231:6

Thursdays
327:15
time 9:2 11:5
12:7 14:14
15:3 16:10
17:9 19:3 24:5
25:5 33:22
34:7,9,16
35:14 37:6,10
37:13,19 39:8
42:1 45:21
54:3 66:13
73:18 80:19
83:13 88:10
89:17 91:6
92:17 95:10
96:20 97:3,7
97:11 102:14
104:1 106:9
108:14 109:8
120:5,12 121:2
122:14 128:2
139:21 140:2
141:19 143:2
145:12,16
151:2 153:10
156:10,18,20
156:22 162:1
164:17,20
166:2 172:20
173:3 174:3,9
174:19 177:9
177:16 179:9
179:16 180:20
189:21 193:8
193:20,20
198:4 199:1
207:17 208:19
210:11 211:12
213:10,16
214:14 215:7
215:15,16,18
216:4,13
219:12 223:16
224:12,18,19
225:2 227:22

237:19 242:10
244:7 246:15
247:19 248:1
249:2,16
250:21 255:12
256:1,8,9
262:12 264:2
265:19 270:12
271:1 278:13
281:1 286:21
291:18 294:5,7
297:9 301:14
301:15,17,19
302:12,13
304:3 306:13
307:22 308:15
310:9 313:14
314:21 316:16
318:5,10
323:22 326:5
328:4,10,12
335:21
timely 31:10
312:15
times 6:14 30:3
94:21 95:1,4,6
134:18 136:1
158:8 180:9
182:18 242:11
249:4 260:18
307:11
tired 225:15
257:11
today 4:15 5:13
9:10 10:5
37:14 169:11
177:19 194:3
218:14 241:22
263:3 285:22
333:20
toilet 145:10
token 172:14
told 19:10,19
22:10 23:11
26:20 28:22
44:15 46:7,16

46:19 47:2
48:5 50:1
56:14 61:11,21
65:1 66:13
68:19 71:22
72:2,17,18
73:20 76:22
77:20 85:1
87:5 88:10
90:18 96:8
102:6 104:8
105:8,11,19
106:3,15 107:3
107:12,22
108:22 109:3
115:18 120:9
122:17 125:9
129:22 130:14
133:15 136:8
137:13 140:8
190:13 205:17
206:18 209:9
212:3,13 215:8
215:13,22
218:4 226:1,21
227:16 228:18
231:18 232:12
234:4 235:13
236:18 237:10
257:10 259:14
261:10,21
264:11,17
266:2 274:1
275:9 276:10
276:16 277:10
277:15 282:20
284:3 290:8,18
294:18 295:17
295:22 296:6,8
303:14 308:16
308:17 310:13
311:7,8 314:3
315:9 317:19
318:8 326:4,16
329:2 333:2
**tolerant** 156:13

**tomorrow** 113:1
113:3,16 117:4
117:6,6,7
253:15,16
334:4
**topic** 292:20
295:1
**total** 119:19
121:14,21
122:16 148:16
195:6
**totally** 140:6,18
**town** 105:18
**townhouse**
12:21
**track** 99:9 300:7
**trail** 62:17
**transcript** 335:6
335:8,13,14,19
336:4,9
**transcription**
335:10
**transfer** 57:16
179:4
**transferred**
57:22
**translate** 272:17
**treat** 272:1
274:7,8,10
325:12
**treated** 60:2
171:5,5 208:10
210:12 229:11
258:5 271:16
271:19 274:3
322:11,14
324:11,12
327:4 328:22
**treating** 260:22
273:21 299:12
**treatment**
102:15 146:18
205:10 258:12
263:20 301:8
**treatments** 93:4
93:4

**treats** 324:6
**tremendously**
145:7
**trial** 335:21
**tried** 37:22
62:14 63:6
128:17 238:22
239:21
**trouble** 64:2
131:4
**true** 38:4 46:5
54:22 55:1,17
66:1,3 72:1
74:8,11,17
75:13 76:13
86:7,13 87:7
117:22 119:15
120:21 123:12
123:19 124:1
125:1,22
134:15 137:22
139:1 147:18
147:21 149:20
150:19 151:2
160:8 172:8,12
173:21 175:15
182:19 187:10
187:11 194:11
197:21 198:12
202:2 211:9,11
212:2 213:4,6
213:20 214:17
215:4 227:19
231:7 234:18
237:2,20
251:14 259:1
285:22 337:7
**truly** 95:18
173:1 196:21
**truth** 249:16
284:3 307:15
**truthfully** 284:8
**try** 16:9 94:13
107:12 222:10
225:17 226:11
227:15 228:1

230:5 232:22
236:14 244:10
295:11
**trying** 40:8 62:1
68:5 76:3
83:15 84:16
88:13 89:18
91:14 95:20
103:17 109:7
110:16 133:21
134:4 154:16
158:19 166:13
170:5 172:5
173:1,14
174:12,13,22
178:1 183:2
193:3 204:3
207:22,22
224:9 229:3
230:7 238:2
256:4,6,15
324:20 325:13
325:14 333:2
**tub** 145:10
149:17
**Tuesday** 210:4
**Tuesdays**
327:14
**turmoil** 264:12
**turn** 138:7,9
142:4 154:12
**turned** 15:20
54:9,15 208:1
**turning** 241:12
**TV** 164:8
**twice** 6:13
159:13 163:12
250:18 302:10
**twisted** 152:20
**two** 6:13 36:21
37:5,15 38:22
40:15 47:19
64:5 84:6
93:22 97:8
98:8 99:14
109:7 110:17

112:8 129:5
130:5 131:7
136:3,5,6
157:9,15
171:18 223:15
225:3 249:4
261:7 265:14
267:12 282:8
295:12 297:5
298:17 302:11
306:2 307:21
308:12 310:18
318:9 333:9
**two-week**
157:20 159:6
159:10,20
**type** 24:6 48:20
50:16 52:12,17
53:5 60:4
126:20 128:13
128:15 136:17
137:13,14
174:13,15
175:2,3,13
179:8 180:21
182:1 205:16
233:14 244:5
278:17 284:16
305:20 314:11
319:12
**typed** 99:4
**types** 43:13
89:22 114:22
169:2
**typewriting**
101:19 337:7
**typing** 101:10
241:18 292:18
298:20
**typist** 314:14
**typographical**
333:3

**U**
**Uh-huh** 47:11
69:3 123:8

145:18 188:1
191:12 239:11
278:3,20 290:1
309:7 317:6
321:12
**ultimately** 33:15
184:19 185:13
186:5
**unable** 120:2,10
120:12 122:2
122:17 127:10
147:15,16
280:12 326:22
**unacceptable**
10:8
**unappropriat...**
315:19
**uncalled** 207:6
**understand** 4:16
9:19 16:4 17:7
22:20 23:1,2
29:14 31:1
40:12,19 41:10
67:9 69:22
83:3 104:19
115:17 116:9
122:6 139:17
150:4 171:2,3
180:17,18
181:1,19
191:16 195:2
199:19 200:14
200:16,18,20
201:4,7,13
203:10 234:2
253:16 256:3
259:14 271:10
282:17,18
284:9 287:4
288:13 297:14
301:4 310:14
310:20 311:20
312:12 325:15
332:8 333:22
**understanding**
15:15 25:22

26:1 36:9 40:2
70:7 82:17
202:10 270:16
270:17 301:16
318:8 328:11
**understood**
274:20
**unfair** 319:21
320:1 322:7
**unfairly** 299:15
**unfortunately**
220:4 229:21
**UNITED** 1:1
**University**
314:10
**unnecessary**
207:6
**unpredictability**
172:10
**unsuccessful**
239:1
**Unum** 17:22
18:10 24:16
33:16,18 34:4
34:9,12 45:4,8
45:15 53:9
54:7,12,15,22
67:11 180:22
181:6 183:9,15
183:21 184:12
186:4 187:8,16
188:4,11,12,13
189:4 196:9
211:22 212:7,9
213:5 216:2,4
216:8 217:14
310:18 312:7
312:14 313:11
313:14 332:14
332:14
**Unum's** 185:12
311:20,21
312:2,10
**unusual** 108:12
**updated** 120:16
**updates** 146:6

**upset** 249:10
303:6 315:22
**upside** 156:1
**urgency** 30:21
**use** 145:12
168:20 219:16
222:12 223:7
223:17,21
242:15 243:18
244:8 246:16
300:22
**usually** 7:12
163:11
**U.S** 64:20

**V**
**v** 335:2 336:1
**vacation** 97:9
160:16 244:4
304:5 328:8,14
328:18
**vaccination**
93:15 157:17
**vaccinations**
259:3
**value** 284:17,18
**Vanessa** 1:2,12
3:3 4:3,13 58:5
58:11 67:13
276:11 335:3
336:2
**various** 93:3
105:12 142:7
183:6 241:6
**Verbatim** 1:19
**verified** 155:16
**verifying** 119:14
**versus** 266:20
308:14
**Vicodin** 5:20 6:9
165:7 166:3,8
166:11 175:8
175:11 176:15
176:18 177:7
178:4,8,13
185:9

**view** 209:22
**Vineyard** 267:18
319:11
**Virginia** 1:9,17
1:21 2:15
193:16 335:12
337:19
**Visa** 218:3
**vision** 130:22
132:10
**visited** 14:17
51:1
**vocal** 316:1
**voice** 7:12
**voicemail** 179:5
179:18
**vs** 1:3

**W**
**W** 2:2,3
**wait** 47:4 51:22
159:16 173:16
185:7 294:10
294:10,10,10
294:10 316:16
**waited** 65:21
66:6
**waiting** 311:3,5
**waive** 204:10
**waiver** 236:13
237:10 238:3,4
238:14,22
239:5,15
**wake** 136:18,19
143:16,17
172:9 173:22
176:13
**walk** 134:7,13
134:19 145:11
166:19 167:1
182:11
**walked** 259:21
326:3
**walking** 134:16
166:22 310:2
**wall** 166:20

167:1
**want** 5:18 9:13
21:21 22:1
26:14,18 27:6
27:13 32:4,5
37:19 89:2
96:18 158:22
159:1 166:12
170:7 172:16
180:13,14
182:15 196:13
196:20 202:5
203:11,17,22
204:4 208:17
209:5 210:17
211:9 215:2,5
215:9 219:9
244:9 245:11
252:12,13
253:17 271:4
271:20,22
272:13 273:14
302:6 313:5
317:14 334:8
**wanted** 36:14
89:5 104:10
150:5 208:15
215:9,11 217:9
217:16 261:15
269:18 271:15
273:17 274:3
315:7 318:4
**wanting** 265:10
**wants** 270:21
271:1
**warmer** 165:12
**Washington** 2:6
11:8 12:11
206:13 314:10
**wasn't** 21:18
24:6 31:14,15
31:17 51:4,11
61:13 64:17
71:8 94:7
102:3,5 106:21
108:20 109:19

124:16 140:14
143:18 157:2
164:9 168:19
173:5 175:16
178:22 179:3
180:21 181:14
181:15 185:22
189:14 192:14
193:9 198:9
202:22 211:14
214:4 215:6,11
223:13 224:9
229:18 230:2
233:16 234:1,2
242:3 248:19
249:7 259:16
260:19 268:12
274:19 283:2
307:6 311:5
312:21 317:15
324:12 327:22
**waste** 106:9
**way** 8:12 15:15
17:14 38:6
39:4,5 60:1
77:21 86:14
90:15 105:2
106:11 110:15
114:18 117:2
129:3 137:2
140:15 150:8
158:9,13
163:15 166:14
171:5 181:4,10
181:11,12
185:1 191:3
194:22 202:8
206:21 210:12
210:13 221:13
240:1 244:4
246:2,5 248:17
256:19 257:22
268:20 269:3,4
270:9 271:8
273:18 274:8
274:11 279:16

280:1 290:7
310:11,12,13
310:15 320:16
324:5 327:18
330:19 331:11
**wayside** 204:10
**wear** 135:6
292:17 298:10
**wearing** 169:3
299:1
**Wednesday** 1:10
**Wednesdays**
93:13
**week** 30:10
92:22 93:12,14
93:17,18,22
138:6 142:4
157:9,10,15,16
250:18 263:14
270:21 294:1
295:12 302:12
**weekend** 260:21
**weekly** 264:10
**weeks** 64:22,22
65:3 67:16
68:20 69:10,20
70:3,11,21
71:2,16,21
72:3 73:15,18
73:22 74:6,11
75:7,11,17,19
76:12,16,19
77:1,10,14
78:15 97:9
99:15 156:8
192:9,13,15
193:16 195:6,7
278:7 302:11
306:3,4 322:21
**week's** 314:22
**Wells** 60:19,20
**Wendy** 225:3
252:9
**went** 21:12
30:11 32:22
38:16 57:17

61:20 66:17
82:6 103:11
107:2,21 132:7
141:1 155:14
157:3,14
158:10 181:10
181:10 185:16
188:11,12
192:17,18
193:8 206:10
207:2 209:14
209:16 234:8
238:15 239:9
261:7 266:9
272:7,9,10
294:15 295:15
302:7 308:20
323:6 327:6,7
**weren't** 46:13
97:12 158:3
245:1 299:7,9
299:11
**we'll** 92:5
117:18 159:8
253:14,21
268:4 279:5
333:8,10
**we're** 35:11
99:20 112:20
113:2 117:6
126:20 127:12
141:12 170:5
177:12,22
181:13 218:14
229:1 241:15
252:21 253:10
253:12 254:1
255:7 292:20
293:1 324:16
324:19 333:5
333:19
**we've** 167:7
168:9 291:22
**wheelchair**
133:16 137:16
142:13

**white** 256:22
274:9 299:18
300:4 308:5,6
312:13,22
313:1 317:13
318:22 319:4
320:14 322:4
323:15
**Wilbon** 331:6
332:6
**willing** 331:15
**wipe** 150:2
**wish** 321:18
**withdrawal**
289:11
**witness** 3:2 5:17
6:7,11,17 16:3
21:1,3 22:20
23:2,8 25:22
26:5,7 29:13
34:20 35:4,7
35:17 36:4
41:2 52:2 54:8
68:5 71:8,11
73:12 109:11
109:15 110:21
111:3,10,14,17
111:19 112:1,5
112:8,11,14,20
113:2,9,14,17
113:22 114:3
114:12 117:11
118:17,21
119:2,4,8
124:7,9 144:15
152:14,19,22
159:18 173:14
197:3,5 198:19
200:12,15,19
201:6,10
204:14,16
208:21 209:2
211:6,14,18
214:2,7 219:1
222:20 229:7
235:22 236:4

242:20 243:7
246:8 252:17
253:4,10 273:9
334:7,10 337:4
337:5,8
**witnessed** 88:3
140:4 224:5
242:8 248:13
251:11
**wonder** 206:15
**wonderful** 165:7
291:22
**wondering**
298:5
**word** 57:10,11
128:11 130:12
130:12 136:11
136:11,12
169:1,2,5
176:19,22
220:2 222:17
281:12 289:20
292:14,18
298:9,19 299:5
308:4
**words** 43:11
89:20 220:4
264:2 292:4,6
298:21,21
**wore** 135:7,11
**work** 27:19
28:21 29:12,22
46:1,5,10 48:4
48:17 50:16
52:13,17 53:5
67:9 70:16
75:2 78:4
82:11 88:20
90:3,11 93:6
93:13,17,18
94:10,12 95:22
98:16 99:6
100:3,11,18
101:6,21 102:3
102:13,22
103:1,4,5,15

103:15 117:13
120:2,11,12
122:3,17
127:10 129:18
135:7,8 139:12
139:18 140:7
140:19 141:8
141:11 143:1
145:8 151:12
152:16 156:21
157:15,19
159:11,21
160:3,4 165:21
167:20 168:1
168:20 179:2
192:21 193:21
215:2,9,18,20
219:10 233:17
234:1,8 243:3
243:8 247:7
248:1 256:13
260:19 263:11
264:7 265:20
266:4,14,14,21
267:1 270:21
272:4,7 293:15
294:8,14
295:11,15,16
302:5 303:19
305:1 306:20
306:22 309:20
309:21 310:4,6
310:15 311:2
314:9,11,18
315:1,5 317:22
322:10,17
327:12
**worked** 4:21
15:16 16:2
49:7 67:6
69:21 94:10,11
98:16 99:5
100:2,11,18
101:6,8,11,20
102:22 141:10
141:14 159:5

193:21 207:17
210:11 274:18
297:9 307:21
310:13,16
314:7,22
316:14 322:1
327:14 328:4
330:12
**working** 45:8
71:9 75:21
84:15 88:1
96:1 102:4,6
127:1 135:9
139:5 143:3
157:1 163:18
188:5 190:16
245:8,16 249:3
269:17 291:9
291:10 293:11
**works** 45:4
133:14 165:11
238:20 267:15
267:19 310:9
331:5
**worried** 183:10
**worry** 28:5
**worse** 53:2
132:10 146:3,7
147:8 168:3
**worst** 174:6,8,11
174:20 175:1
178:3
**wouldn't** 57:17
90:10 137:18
156:14,22
177:4 181:3,8
181:9 183:9
190:3 221:11
237:5 266:10
300:10 320:14
327:6
**write** 43:11 48:3
95:9 100:1
163:5,19 179:9
179:11,12,13
179:15 203:6

214:3 216:17
217:1 240:5,6
255:22 264:1
280:17 281:4
298:6 300:2,3
300:10
**writing** 80:10
97:15,16
101:14,17
155:6 179:15
213:5 241:7
332:7
**written** 42:3
72:20 79:9
99:7 100:16,20
101:2,5 189:22
214:8,15
254:21,22
281:11 289:21
**wrong** 32:5
48:18 70:6,21
109:12 126:5
158:18 297:2
315:4 319:20
**wrote** 10:1 80:8
88:15 99:9
140:11 156:16
198:1 217:2
241:1,4,6
285:10 299:4
300:15 329:6

**X**
X 1:2,8 3:6
42:12,14 43:3
**Xanax** 6:13
**Xeroxing** 310:2

**Y**
**yeah** 243:5
321:17
**year** 13:4 14:7,8
15:14 49:17
69:17 71:6,15
142:12 161:17
180:5,6 184:3

200:6 255:17
267:10 314:8
**years** 4:22 8:15
12:5 13:3 14:2
14:6,9 31:8
38:16 88:20
207:2 267:9,12
289:8 291:7,8
303:9 307:21
308:12 310:18
**yelled** 80:17
**yelling** 316:10
**yesterday** 9:11
**young** 153:15
249:3 265:2
267:11,13
269:17 329:11
329:12
**younger** 220:11
224:1
**Yvonne** 329:4,6

**Z**
**Zoloft** 6:12
**Zone** 236:11,16
237:1,16 238:1

**$**
**$1,350** 237:6
**$100,000** 332:22
**$2,000** 82:21
83:20 85:13
**$2,500** 85:13
**$4,500** 83:1 84:4
**$40** 217:10
218:2
**$50,000** 285:2
289:10

**0**
**0** 3 76:17 77:3
84:13 131:8
135:8,9 138:11
139:6,7,8
142:21 143:8
150:20 155:18

157:4 160:1
161:9 169:16
169:17 180:15
183:6 191:21
227:2 242:2,4
263:21 295:5
297:8
**04** 15:9 19:7
20:9,21 21:6
22:2,8,19
23:19 24:1
25:16 27:15
30:10 34:1
43:20 48:1,15
50:10 72:15
131:9 138:4,11
138:12,13,14
138:15 139:9
142:8,21 143:9
160:1 161:11
170:5,6 171:16
172:1,3,6,7,8
172:19 173:3
173:21 174:5,7
174:9,11 175:9
175:14 176:11
177:12,13,13
177:22 179:13
179:20 180:20
181:6 182:17
183:9 186:5,20
187:5 189:20
191:4,19 192:5
192:12 197:22
201:21 211:13
213:16,19
214:11,14
217:2 227:2
242:2,3 278:2
280:22 297:9
297:11 309:5
**05** 13:12,22
170:1,4 177:20
184:17

**1**

**1** 3:7 42:7
  147:10 335:1,8
**1st** 58:15 69:16
  291:11
**1:00** 98:9
**1:05CV02401**
  1:4
**10th** 80:13
**10:00** 334:17
**10:27** 1:18
**100** 6:12 298:21
**1000** 2:5
**1010** 335:12
**102** 279:5
**1025** 2:4
**11th** 34:4 80:13
  183:21,22
  184:1 279:20
**113** 3:11
**12** 64:22 65:3
  67:16 68:19
  69:10,20 70:3
  71:2,16,21
  75:17 76:16,19
  77:1,10 78:15
  193:16 195:6
**12th** 28:10 64:15
  73:17 80:13
**12/15/03** 145:5
**12/22/03** 241:1
**13** 195:22 196:7
  213:15,22
**13th** 18:6
**138** 3:12
**14th** 30:17 65:8
  72:21,22 74:17
  78:19 79:8,21
  81:12 82:12
  192:12,16
  193:11,22
  194:8,17
  195:19 215:19
  272:13 273:13
  273:14,21
  274:5,13 275:4
  277:5,8,19

279:21 280:18
  280:20,22
  282:11,18
  283:9 284:22
  285:10,10
  295:15 297:11
  299:16
**142** 3:13
**145** 3:14
**15** 38:15 88:20
  207:1 267:9
  291:8
**15th** 13:2,4,14
  13:20 75:3,5,6
  75:6,6,12
  76:11 82:7,11
  141:13,18
  143:8 145:17
  146:5 147:5,19
  161:10,16
  162:9 163:16
  164:13,18
  165:16,22
  167:11,13
  168:7,14 272:8
  295:3 326:4
**16** 1:10 64:22
  70:11,21 72:3
  73:15,18,21
  74:6,11 75:7
  75:11,19 76:12
  150:14 179:1
  192:9 278:7
  322:21 335:4
  336:3
**16th** 148:12
  336:5
**17** 216:3 334:17
**17th** 97:19
  198:13 199:7
  200:2,5
**18** 119:1,4
  240:10
**18th** 97:19
**1996** 13:8,11,21

**2**

**2** 42:3 149:16
  281:17 335:10
**20** 12:5 40:5
  303:9
**200** 1:17 2:14
**2000** 13:6 288:4
**2002** 8:16 14:2
  14:13 69:18
  70:2,13,21
  77:17 91:10,11
  91:18 97:2,6,8
  97:10,22 98:16
  99:3 100:1,14
  100:15 101:5,8
  101:11 288:5
  331:13 332:20
  333:17
**2003** 8:16 14:2
  14:20 16:15,16
  69:1,2 71:11
  71:22 75:4,5
  75:12 76:11,20
  77:10,13 78:2
  78:5,9,10,11
  78:16 82:7,11
  84:11,17,18
  85:3,10 86:6
  86:11,20 93:1
  93:2 95:14
  97:21 100:13
  101:21 102:9
  118:4 120:6
  121:3,10
  122:13 123:12
  123:19 124:4
  124:16 125:1,7
  125:11,17
  126:3,14
  129:14 130:6
  130:10,16,20
  131:3,11,15
  132:12,16
  134:10,15,18
  135:13,20

137:17,21
  138:17 139:1
  140:18 141:3,4
  141:13,18
  145:17 146:5
  147:6,19
  148:12 161:10
  161:16 162:9
  163:16 164:13
  164:18 165:16
  166:1 168:7,14
  203:19 205:7
  224:18 251:5
  255:18 331:13
  332:20 333:18
**20036** 2:6
**2004** 8:16 14:2
  15:2,6 24:10
  25:2 26:13,16
  27:5,17 28:16
  29:11,16,18
  34:4 41:15
  44:2 45:14
  49:1,12,17
  51:2 52:9,12
  52:17 53:4
  55:4,18 56:4
  56:10,16 57:21
  65:9 71:1,5,7,8
  71:9,15,17,20
  72:1,21,22
  73:14,19,20
  74:7,9,13,15
  75:12 76:12
  79:8 81:15
  82:12,16 84:22
  85:16,17,18
  86:6,11 87:5
  95:14 129:10
  129:14 130:7
  130:10,16,20
  131:3,11,16
  132:13,16
  134:11,15,19
  135:13,20
  137:17,21

138:17 139:1
  141:4,19
  161:17 162:10
  169:8 192:16
  193:11,22
  194:8,17
  195:19 198:13
  199:8 200:3,10
  202:19 203:4
  203:19 205:7
  212:9 215:19
  216:3 272:13
  273:13,15,22
  274:6,13 275:4
**2005** 11:12
  169:18
**2007** 1:10 13:5
  251:5 334:17
  335:1,4 336:3
  336:5
**2008** 337:21
**202** 2:7
**21** 335:17
**22** 314 2:15
  335:12
**23** 155:18
**23rd** 91:11
  155:21 233:20
**24** 126:16 127:2
  150:17
**24-month** 278:8
**26th** 21:9
**27th** 41:14
**28** 254:18

**3**

**3** 45:14,22
  186:11 187:21
  189:5 282:1
  283:8
**3rd** 43:20 51:2
  51:17 52:9,12
  52:17 53:4
**30** 172:2,11,21
  173:4 174:2,3
  285:16

McFadden

31 337:21
316 3:15
327-5477 2:7
3457 12:18
35 285:16

**4**
4 3:4 42:9,10
4th 279:15
4:08 281:1
40 174:3

**5**
5th 79:20
5:30 254:1
5:42 334:14
51 40:20 41:4
  42:7 50:12
  53:7,22 54:7

**6**
6th 120:7 156:10
60 310:19 311:1
639 240:19
68 152:13
  280:19 285:8
  297:16
684-4333 2:16
69 156:12

**7**
7 254:18
7th 214:4
70 160:13
  277:22 309:6
703 2:16 335:16
72 3:7
73 3:11 118:10
  118:13 123:5
  123:14,21
  124:11,18
  125:3,12,20
  127:4,18
  128:10 138:22
  155:2
74 3:12 144:1,4

146:5
75 3:13 148:3,6
  148:9
76 3:14 151:5,8
  151:11,16
  155:9 156:13
77 3:15 330:4,7

**8**
8 42:20 149:15
8th 79:22
80 298:21
837-0076 335:16

**9**
9 145:6,6 146:6
  147:8
9th 28:8 64:16
  74:4,22 75:7
  75:12 76:12
  79:22 277:10
  280:11 309:5
  309:13
90 15:17 277:13
  279:9 304:8
  305:2 307:22
  311:13
90-day 267:4,6
  301:12 303:22
  305:13
908 1:16 2:13
94 75:7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - X
VANESSA A. McFADDEN,
                Plaintiff,
        -vs-
                                    Civil Action No.
                                        1:05CV02401

BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
AND
MARGARET RILEY-JAMISON,
                Defendants.
- - - - - - - - - - - - - - X
                            Alexandria, Virginia
                            Thursday, May 17, 2007

Continued Deposition of:


            VANESSA A. McFADDEN

the plaintiff, recalled for further

examination by counsel on behalf of the

defendants, pursuant to notice, taken in the

law offices of DiMURO GINSBERG, P.C., 908

King Street, Suite 200, Alexandria,

Virginia, beginning at approximately 10:13

o'clock a.m., before Patricia D. Staffa, a

Verbatim Reporter and Notary Public in and

for the Commonwealth of Virginia at large,

when there were present on behalf of the

respective parties:

Page 2

On Behalf of the Plaintiff:
    TERESA W. MURRAY, ESQUIRE
    THE LAW OFFICE OF TERESA W. MURRAY
    1025 Connecticut Avenue, N.W.
    Suite 1000
    Washington, D.C.  20036
    (202) 327-5477
On Behalf of the Defendants:
    BERNARD J. DiMURO, ESQUIRE
    JENNIFER S. KESSLER, ESQUIRE
    DiMURO GINSBERG, P.C.
    908 King Street
    Suite 200
    Alexandria, Virginia  22314
    (703) 684-4333
Also Present:
    Meg Riley-Jamison

Page 3

CONTENTS

1
2   WITNESS                          PAGE
3   Vanessa A. McFadden
4       Examination by Mr. DiMuro     326, 485
5       Examination by Ms. Murray     463
6
7
8
9              EXHIBITS
10  (Exhibits 1 through 77 were pre-marked for
11  identification.  See exhibit list to be
12  provided by Mr. DiMuro's office.)
13                                    PAGE
14  Deposition Exhibit No. 78     326
15  Deposition Exhibit No. 79     335
16  Deposition Exhibit No. 80     336
17  Deposition Exhibit No. 81     340
18  Deposition Exhibit No. 82     341
19  Deposition Exhibit No. 83     347
20  Deposition Exhibit No. 84     350
21  Deposition Exhibit No. 85     356
22

Page 4

1               P R O C E E D I N G S
2   Whereupon,
3               VANESSA A. McFADDEN
4   the plaintiff, was recalled for further
5   examination by counsel on behalf of the
6   defendants, and, having been previously duly
7   sworn by the notary public, was further
8   examined and testified as follows:
9               (Whereupon, the document
10                  was marked as Deposition
11                  Exhibit No. 78, for
12                  identification.)
13      EXAMINATION ON BEHALF OF
14      THE DEFENDANTS
15      BY MR. DiMURO:
16      Q    Ms. McFadden, I have marked as
17  Exhibit 78 a series of e-mails, and I'm
18  guessing -- I don't know -- if these are the
19  seven e-mails that you were referring to
20  before that you got on one day?
21      A    No.
22      Q    Well, let's do them page by page.

Page 5

1       Ballard Spahr 1302, the first one, is
2   that -- Well, let me ask you this way.
3   Maybe it will make it faster.
4       Do you recall the date that these
5   came out or roughly the date?
6       A    Not the exact date.
7       Q    Do you have any memory of when
8   roughly it was?
9       A    It was around the end of June --
10  around the end of June or July.
11      Q    Of '03?
12      A    Yes.
13      Q    So, the first one is dated September
14  23, '03, so you're confident that wasn't one
15  of the seven?
16      A    No.  No.
17      Q    Let's look at the second page.  This
18  one is Ballard Spahr 1303, and that's from
19  April '03.  Does that look like it was one
20  of the seven e-mails?
21      A    No, it's not.
22      Q    The third page is Ballard Spahr

Page 6

1   1304. It's January '03, so that was not one
2   of them, was it?
3       A   No.
4       Q   The next one is Ballard Spahr 1305.
5   That's from August '03. Is that one of
6   them?
7       A   No.
8       Q   The next one is Ballard Spahr 1306
9   from May '03. Do you think that was one of
10  the seven?
11      A   No.
12      Q   And the next one is Ballard Spahr
13  1307 from April '03. Do you think that was
14  one of the seven?
15      A   No.
16      Q   And the last one, is that one of
17  them?
18      A   No.
19      Q   Do you recall at any time that
20  someone in HR at Ballard Spahr told you that
21  they were not going to charge you with FMLA
22  time for one of your hospital visits?

Page 7

1       A   I don't understand -- What do you
2   mean by one of my hospital visits?
3       Q   Well --
4       A   I just want to know --
5       Q   Sure.
6           Specifically, do you remember being
7   seen at Providence Hospital in September of
8   '03 for a panic attack?
9       A   No. What happened was, back then,
10  the Friday Mr. Henck had a filing to do with
11  the Internal Revenue Service, and Mr. Henck
12  didn't meet the deadline. So, I told him
13  that I would, on Monday, take care of it.
14          At that point, I was taken that
15  Saturday to Providence Emergency Room. I
16  had walking pneumonia and congestive heart
17  failure.
18          Okay. So, from what the doctor said
19  on here, I was not supposed to go back to
20  work, I think it was, for like four days or
21  something to that nature.
22          But in the interim, I said if this

Page 8

1   filing doesn't get filed -- and I knew that
2   Mr. Andrews didn't come in until twelve -
3   so what I did was, when my sister dropped me
4   off, I went upstairs, I got the filing, and
5   I went back to Internal Revenue Service.
6           I did the proper thing. I did Mr.
7   Henck's filing or whatever. So, by the time
8   I had walked back from Internal Revenue
9   Service back to the Homer Building, Mr.
10  Henck asked me what was wrong.
11          I told him I just, you know, felt a
12  little under the weather. He said, no, you
13  don't look right. So, I showed him the
14  documentation from Providence Hospital
15  saying that I had walking pneumonia and
16  congestive heart failure.
17          He said, so, why are you here? I
18  said, I knew I had to do this filing. So,
19  from the way he presented it, he and Ms.
20  Briscoe put me in a taxi. He said, I want
21  you to stay home the rest of the week, don't
22  worry about getting paid, you will get paid.

Page 9

1       Q   Okay.
2       A   Which did not happen. And these are
3   these dates here that you see here.
4       Q   Looking on --
5       A   Some of them. These are these dates
6   here (indicating).
7       Q   -- Exhibit 78, Page 1302, the 9/9,
8   9/10, 9/11, 9/12 --
9       A   That's the date that I filed the
10  filing for him was on 9/8. When I came back
11  to the office, he instructed Ms. Briscoe to
12  get me a taxi.
13          And I was like, well, Charlie, you
14  know my situation, I can't financially
15  afford to take off. He said, well, you
16  shouldn't have -- I mean, it was like I
17  feared for my job, so I did my job. Mr.
18  Henck told me that these days I would get
19  paid for.
20          He said, because if you had enough
21  to come in here and do this filing, knowing
22  you had walking pneumonia and congestive

Page 10

1  heart failure, he said, I will make sure
2  that you get paid. And I didn't.
3      Q.  Okay. Let's back up then.
4      A.  Okay.
5      Q.  On Saturday, September 6th, it looks
6  like, 2003, you were seen at Providence
7  Hospital?
8      A.  No. The paramedics came and picked
9  me up because I had passed out.
10     Q.  Okay. But you were seen at
11 Providence Hospital?
12     A.  At Providence Hospital; yes.
13     Q.  Okay. We don't need to go through
14 every --
15     A.  Okay, okay.
16     Q.  -- I woke up, I had breakfast. That
17 sort of stuff takes time.
18     A.  Okay.
19     Q.  And the doctors told you at that
20 time that you shouldn't go to work for about
21 four days?
22     A.  Yes.

Page 11

1      Q.  But you came to work on Monday
2  morning because you felt the need to get the
3  IRS filing done?
4      A.  Yes.
5      Q.  Mr. Henck saw you and expressed some
6  concern about your physical well-being,
7  right?
8      A.  Yes.
9      Q.  You told him about the hospital
10 visit and the diagnosis of walking
11 pneumonia; right?
12     A.  Yes. I showed him the paperwork.
13     Q.  And he told you to go home; right?
14     A.  Yes.
15     Q.  Did anybody from HR get involved in
16 that process that day about asking you to go
17 home or calling you a cab?
18     A.  No. Mr. Henck instructed Ms.
19 Briscoe to get me a cab right away, take me
20 downstairs, put me in the cab.
21     Q.  Did you talk to anybody with HR that
22 day?

Page 12

1      A.  Well, at that point, Ms. Briscoe was
2  part of HR.
3      Q.  Okay. I had forgotten that. I'm
4  sorry.
5      A.  Right.
6      Q.  And when did Mr. Henck say that you
7  would get paid for the week?
8      A.  He said, don't worry about it. I
9  said, Charlie, I can't afford to not have an
10 income. He was like, but, Vanessa, don't
11 worry about it.
12         He said, if you had enough to do
13 this filing for me, then I will make sure
14 you get paid for the week, do not worry
15 about it.
16     Q.  Where was that said to you? In his
17 office, your cubicle or office, or --
18     A.  By my cubicle where him and Ms.
19 Briscoe was there together.
20     Q.  Did she hear?
21     A.  Yes.
22     Q.  So, the next paycheck, you didn't

Page 13

1  see pay for those three or four days?
2      A.  I was docked.
3      Q.  Did you say something to anybody?
4      A.  I mean, I just figured that he
5  didn't keep his word.
6      Q.  So, you don't know if he talked to
7  HR or the payroll people about that issue?
8      A.  No, I don't know if he did.
9      Q.  But you didn't ask him about it
10 after you got your next payroll?
11     A.  No.
12     Q.  Did you have any discussion with HR
13 about whether or not the days that you were
14 off that week should or should not be
15 counted against FMLA?
16     A.  No, I did not.
17     Q.  Do you know if those three or four
18 days you were off were counted against FMLA?
19     A.  No. I'm not sure.
20         MR. DiMURO:  Let's mark this as
21 Exhibit 79.
22         (Whereupon, the document

Page 14

```
1         was marked as Deposition
2         Exhibit No. 79, for
3         identification.)
4     BY MR. DiMURO:
5     Q    Now, Exhibit 79 is a memo dated
6  October 30, 2002, Request for Leave of
7  Absence.        This would be about the time
8  of your husband's diagnosis?
9     A    Yes.
10     Q    Do you recall getting this document?
11     A    Yes.
12         MR. DiMURO: We'll mark this as
13  Exhibit 80.
14         (Whereupon, the document
15         was marked as Deposition
16         Exhibit No. 80, for
17         identification.)
18     BY MR. DiMURO:
19     Q    Exhibit 80 is a memo dated November
20  1, 2002 concerning vacation and sick time.
21  Do you recall receiving this document?
22     A    Yes.
```

Page 15

```
1     Q    And you signed it on November 5th,
2  '02; right?
3     A    Yes.
4     Q    Did you double-check the
5  calculations of leave days against FMLA
6  days?
7     A    When I received this from Ms.
8  Forman, that's when we were discussing from
9  another document that she gave me.
10         And I asked her, I said, when you're
11  a D.C. resident, aren't you entitled to 16
12  weeks? She said, no, Vanessa, because we
13  are Philadelphia-based, you are only
14  entitled to 12 weeks.
15     Q    So, you had that discussion with her
16  around the time of this memo?
17     A    Ms. Forman; yes.
18     Q    Okay.
19     A    Yes. Before I signed it.
20     Q    And did you have any other
21  discussion about the calculations in the
22  memo, Exhibit 80?
```

Page 16

```
1     A    No.
2     Q    Do you have a memory of whether or
3  not you -- Putting aside the 12 versus 16
4  week issue for a moment, just put that
5  aside, did you have any other questions or
6  concerns about the accuracy of the numbers
7  on the sheet?
8     A    Another thing that I said to her was
9  how can I be put on FMLA on the 17th when I
10  have put in leave for my colonoscopy on the
11  17th and 18th? So, I said, so, therefore,
12  my FMLA shouldn't have started until that
13  Monday.
14     Q    The 19th or 20th or something like
15  that?
16     A    Whatever day that Monday was. And I
17  questioned her about that.
18     Q    The Monday after the 17th?
19     A    Yes.
20     Q    And what did she say?
21     A    She said, from the information that
22  Ms. Riley gave her, my FMLA started on the
```

Page 17

```
1  17th. I said, but I put in a leave request,
2  so how did it get confused?
3         And her response was, I'm only going
4  by what Ms. Riley told me and that's the day
5  she gave me. I told her, fine.
6     Q    Yesterday we talked about the 16
7  weeks of FMLA from October 15th to the early
8  -- Strike that.
9         Yesterday we talked about FMLA leave
10  in the period of time October 15th, '03 to
11  early February '04.
12     A    Yes.
13     Q    Now, I just want to shift to the
14  concept of FMLA in 2002 and early 2003.
15     A    Okay.
16     Q    It's not clear to me from the
17  paperwork if you're saying that you did not
18  get all of your FMLA leave in the late '02,
19  early '03 time period.
20     A    Pertaining to my husband, no.
21     Q    What's your position on what you did
22  not receive?
```

Page 18

1    A    From my calculations, I only got ten
2  weeks.
3    Q    Did you come back to work?
4    A    I was still working.
5    Q    And you only got ten weeks. Why
6  didn't you get at least another two weeks?
7    A    I guess that's -- Without being
8  sarcastic, but I guess that's a question you
9  could ask Ms. Riley.
10   Q    I see. Okay.
11        So, was there a time when somebody
12 said you had to return to work in '02, '03?
13   A    From the document that was given to
14 me, that was also given to me the same time
15 I received this document where it had the
16 time starting on the 17th of October, which
17 ended, I think, sometime in January.
18   Q    Right.
19   A    And I questioned Ms. Forman about
20 that. I said, how can you put these dates
21 here when we don't know what days I will be
22 able to work and what days I won't be able

Page 19

1  to work?         That was before I was
2  pulling a modified leave schedule. So, on
3  that document, the time was already put
4  there when my FMLA was up, which was 12
5  weeks.
6        MR. DiMURO: Let's mark this 81.
7        (Whereupon, the document
8        was marked as Deposition
9        Exhibit No. 81, for
10       identification.)
11       BY MR. DiMURO:
12   Q    I'm showing you Exhibit 81, a memo
13 from Ms. Forman to you dated November 1,
14 2002. Did you receive that memo?
15   A    Yes.
16   Q    It looks like it comes as --
17   A    It came as a package.
18   Q    -- a package with Exhibit 80?
19   A    Yes.
20       (Whereupon, the document
21       was marked as Deposition
22       Exhibit No. 82, for

Page 20

1        identification.)
2        BY MR. DiMURO:
3    Q    Exhibit 82, is that an e-mail that
4  you sent to Ms. Riley-Jamison and Mr. Henek?
5    A    Yes.
6    Q    And it basically sets forth what you
7  anticipate to be your schedule given your
8  need to be with your husband during his
9  treatments?
10   A    During his treatments; yes.
11   Q    Do you have a recollection that that
12 was pretty much followed, the dates that you
13 set out there?
14   A    Yes. But then in April -- I don't
15 know the exact date -- I started having my
16 own medical problems. But this is still the
17 original schedule that I had gave to Ms.
18 Riley and Mr. Henek.
19   Q    Now, shifting to the position of
20 receptionist as you understand it in May of
21 2004; okay?
22   A    Okay.

Page 21

1    Q    I'm just trying to get you    We're
2  jumping around from time period to time
3  period. That's why I'm just asking you to
4  think about it in early 2004.
5        Did the position of receptionist
6  have any typing requirements that you were
7  aware of?
8    A    No.
9    Q    Did the position of receptionist
10 have any Internet-type requirements where
11 you would go onto, oh, I don't know, Google
12 or any of the search engines?
13   A    No.
14   Q    Did it have any computer
15 requirements, the ability to manipulate the
16 computer, to your knowledge? I don't mean
17 the switchboard, I mean a computer.
18   Q    From what I can recall, on occasion
19 Ms. Hahn did time slips.
20   Q    So, you would have to do the time
21 slips if you were the receptionist?
22   A    Like I said, she did it at times.

Page 22

1   It wasn't a daily routine.
2      Q   Right. But even if she didn't do it
3   on a daily routine, the receptionist did do
4   time slips on occasion; right?
5      A   On occasion, maybe once or twice a
6   month.
7      Q   I know how we do time slips here.
8   How did they do time slips at Ballard Spahr?
9      A   You entered the client's number, you
10  entered a time, and a brief description.
11     Q   You do it on a computer?
12     A   Yes, on a computer.
13     Q   Did the receptionist job require the
14  receptionist to be punctual, on time, every
15  day?
16     A   Yes.
17     Q   Did the receptionist position
18  require that person to be there every day
19  except for sick or vacation days?
20     A   Yes.
21     Q   Did the receptionist job require the
22  receptionist to direct people to various

Page 23

1   offices and conference rooms and things like
2   that?
3      A   From what I can recall, the library
4   assistant was the one that set up the
5   conference rooms for meetings or what have
6   you.      All Ms. Hahn did was direct them
7   that you either go to this conference room
8   over here or you go to that conference over
9   there. But as far as setting up for the
10  meetings, Mia did that.
11     Q   Did the receptionist job have
12  requirements to be flexible for overtime
13  availability?
14     A   We had a night receptionist.
15     Q   So, you don't recall any overtime
16  requirements in that job?
17     A   No. Not that I knew of; no.
18     Q   Did the receptionist job require the
19  accepting and handling of deliveries,
20  whether it's a FedEx package or a box or
21  anything like that?
22     A   When the mail came in, Federal

Page 24

1   Express or UPS, she had to log them in.
2      Q   Do you know what the receptionist
3   position paid in 2004?
4      A   No, I don't know.
5      Q   It would have paid less than what
6   you were making as a secretary for Mr.
7   Henck; right?
8      A   I assume so.
9      Q   Now, Mr. Henck, do you agree that he
10  was a fairly easy person to work for?
11     A   Oh, Mr. Henck and I didn't really
12  have any problems until it came to my
13  husband's situation near the end of what I
14  should to with my husband. But before then,
15  the other time I worked with him, was my
16  pleasure.
17     Q   And what type of things would you do
18  for him? I'm not a tax attorney. I know
19  what I need. What did Mr. Henck need you to
20  do?
21     A   I would type his documents, enter
22  his time, do his billing. I took care of

Page 25

1   paying. He trusted me enough to take his
2   checks while he was on travel, deposit them
3   in the bank.
4      I paid -- I made sure that his American
5   Express, Citi Club, different things were
6   paid. He trusted me with that.
7      Q   And it is my sense -- tell me if I'm
8   wrong -- that Mr. Henck's typing needs were
9   less than other types of lawyers like
10  litigation lawyers or merger and acquisition
11  lawyers. Do you agree with that or not?
12     A   Yes. I mean, he was a tax attorney.
13  I mean, a litigation attorney, you're
14  whacking out documents all the time. Not a
15  tax attorney; no.
16     Q   How about in terms of flexibility of
17  having you come in late or leave early? Was
18  Mr. Henck able to let you have more of a
19  flexible schedule than maybe an assistant to
20  litigation lawyers?
21     A   Well, for the years I worked for Mr.
22  Henck, our hours were from nine to five, and

Page 26

1 in all the years I got there at a quarter to
2 eight.
3         And if Mr. Henck came out at 5:15
4 and said, okay, we need to get this done,
5 even though my husband would be outside
6 waiting for me to take me home, some
7 evenings I might not leave until seven
8 o'clock. But I never put in for any
9 overtime.
10                (Whereupon, the document
11                was marked as Deposition
12                Exhibit No. 83, for
13                identification.)
14 BY MR. DiMURO:
15    Q    I'm showing you Exhibit 83.
16    A    Yes.
17    Q    This is a position description for
18 the receptionist job. Had you seen that
19 position description before May 14th, 2004?
20    A    Never. I didn't even have a
21 position description, so no.
22    Q    As I handed it to you today, is this

Page 27

1 the first time you've seen this document?
2    A    This is the first time I've seen
3 this.
4    Q    All right. I'm going to shift time
5 periods again on you.
6         November 2003, you've now been out
7 on disability for about 30 days.
8    A    Yes.
9    Q    That's the time period I'm looking
10 at.
11    A    Okay.
12    Q    You did get 60 percent of your pay
13 from the 31st day you were out until the
14 90th day you were out. That would be
15 roughly November 15th, '03 to January 15th,
16 '04.
17    A    The first check that I received was
18 the pay before Thanksgiving, so that was
19 towards, I guess -- Because, at that time, I
20 think we had switched to twice a month.
21    Q    Okay.
22    A    So, I didn't receive a check from

Page 28

1 Ballard until the end of November.
2    Q    Let me back up.
3         You understood back in late '03 that
4 when you go out on disability, that the
5 first 30 days are unpaid?
6    A    Yes.
7    Q    This is what the program says?
8    A    Yes.
9    Q    Then the program says that the 31st
10 to the 90th day, the next two months, the
11 firm will pay you 60 percent. Is that your
12 memory that that's what the program says?
13    A    Well, this is something that I had
14 discussed with Ms. Forman. When I first
15 came to Ballard, we had the option of
16 filling out a form that we could apply at
17 our disability of 70 percent. You had to
18 pay the difference from that; okay?
19         When I asked Ms. Forman, I said,
20 well, when did it change to 60 percent, she
21 said, well, Vanessa, it changed a couple
22 years ago. I said, so, why wasn't staff

Page 29

1 informed that it went from 70 to 60 percent?
2    Q    All right.
3    A    And her response was I don't know.
4 I was assuming that I would get paid at 70
5 percent, not 60 percent.
6    Q    I see. In the second and third
7 month you were out?
8    A    On short-term and long-term
9 disability; yes.
10    Q    You did get, however, paid the 60
11 percent for the second and third month?
12    A    Sixty percent; yes, sir.
13         THE WITNESS: Can we take a small
14 break?
15         MR. DiMURO: Sure.
16         (Whereupon, a brief recess was
17 taken.)
18                (Whereupon, the document
19                was marked as Deposition
20                Exhibit No. 84, for
21                identification.)
22 BY MR. DiMURO:

Page 30

1   Q   Exhibit 84, have you ever seen this
2   type of record? It's obviously a leave
3   record for you for 2002. I should say
4   attendance/vacation record.
5   A   I have seen this. But some of the
6   stuff on here, no, I have never seen.
7   Q   Okay. But --
8   A   I mean, I know what the document is.
9   But some of the information on there is not
10  the same that's on the one that I have.
11  Q   Where did you get the one you have?
12  A   From Ms. Riley-Jamison.
13  Q   When approximately?
14  A   November the 6th, 2003.
15  Q   So, that's after you've now started
16  your leave, your disability leave?
17  A   Right.
18  Q   And what caused you to get a copy of
19  it?
20  A   Social Security requested it.
21  Q   I have another copy of that.
22  Unfortunately, it's very light. That's why

Page 31

1   I didn't use it. It doesn't -- A lot of the
2   markings don't show up on the copy.
3       Can you tell from just looking at
4   it, what you can see, if that's the copy you
5   have at home?
6   A   No, that is not the copy.
7   Q   What's different about the one you
8   have at home that you got from Ms. Riley-
9   Jamison than this one, Exhibit 84?
10  A   The things that are scratched out in
11  December. I don't know why.
12  Q   The far right column?
13  A   Yes.
14  Q   What else? So, they're not
15  scratched out in your copy?
16  A   No.
17  Q   Anything else that's different?
18  A   I don't know what VO3 means.
19  Q   All right.
20  A   That wasn't on mine.
21  Q   If I were to suggest to you that VO3
22  means that -- it shows the vacation that you

Page 32

1   were advanced from '03, would that jog your
2   memory?
3   A   No. That's not - No. This is not
4   the copy that I have.
5   Q   Oh, I understand. But now that
6   you're looking at it, VO3, does that make
7   some sense to you that it would be -
8   A   Not at all.
9   Q   Anything else that's different from
10  the copy you have at home?
11  A   The leave without pay is not on
12  there. The days that I was charged leave
13  without pay is not on there at all.
14  Q   Show me an example of what you see
15  on Exhibit 84 in that vein.
16  A   What do you mean by show you an
17  example?
18  Q   You say that leave without pay --
19  A   Like, say, the days in September --
20  Q   Right.
21  A   -- when I came in on the 8th to file
22  that document for Mr. Henck, I was paid for

Page 33

1   a half a day, and then the rest it had leave
2   without pay.
3   Q   On the form you have at home?
4   A   On the form that my attorney has.
5   Q   Didn't the issue with Providence
6   Hospital on September 8th, 9th and 10th,
7   11th, 12th, et cetera, occur in 2003?
8   A   Isn't this 2003?
9   Q   No. It's 2002.
10  A   Oh, I've never seen this in my life.
11  Q   Okay.
12  A   I thought you said 2003. I've never
13  seen this in my life.
14  Q   All right. Well, let's start over
15  again.
16  A   I've never seen it.
17  Q   Exhibit 84 is -
18  A   I've never seen the document.
19  Q   Ma'am, just wait for me, please.
20  A   Okay. I'm sorry.
21  Q   Exhibit 84 is an attendance/vacation
22  record for you for 2002. Have you ever seen

Page 34

1 this one before?

2    A   Never.

3    Q   Can you, therefore, tell me one way

4 or the other if any of the numbers or

5 symbols or markings are correct or

6 incorrect?

7    A   I have no idea.

8    Q   And you don't have at home any

9 writings about the days you were at work or

10 not at work in 2002, do you?

11    A   The only thing that I have is the

12 days that I gave to my attorney.

13    Q   Right.

14    A   I've never seen this document

15 before, but I know exactly what days I was

16 off in 2002.

17    Q   Okay. Let me ask it this way.

18    A   Okay.

19    Q   You could, by knowing dates of

20 appointments, figure out what days you were

21 or were not at work in 2002?

22    A   Because it wasn't that many.

Page 35

1    Q   But you could do it by referring to

2 appointments and doctors' appointments and

3 things like that?

4    A   Of my husband's, yes.

5    Q   But you don't have a piece of paper

6 where you were specifically keeping track of

7 the days you were at work versus the days

8 you were not at work?

9    A   No.

10        (Whereupon, the document

11         was marked as Deposition

12         Exhibit No. 85, for

13         identification.)

14    BY MR. DiMURO:

15    Q   Let me show you Exhibit 85, which is

16 your attendance record from 2003.

17    A   Yes.

18    Q   You say you have a copy of this one

19 at home?

20    A   This is the one that I gave my

21 attorney.

22    Q   So, this one looks like the one you

Page 36

1 have at home; right? Because you'll see in

2 the week of September 8th, the words "dock"

3 exist?

4    A   It looks different.

5    Q   Can you tell me how it looks

6 different?

7    A   Things are scratched off. I don't

8 know what these arrows are. I don't know

9 what they represent.

10    Q   All right.

11    A   On the one that I have that I gave

12 my attorney, it shows how many FMLA days

13 that I used, how many sick days I used, or

14 what have you. In the bottom part, none of

15 this is written down there at all from what

16 I can recall.

17    Q   Going back now to the first 90 days

18 of short-term disability leave -- are you

19 with me? --

20    A   For my husband?

21    Q   -- no, for you --

22    A   Oh, 2003; yes.

Page 37

1    Q   - going to that topic --

2    A   Yes.

3    Q   -- the first 30 days are unpaid

4 unless the person has leave to apply; is

5 that correct?

6    A   Yes.

7    Q   You were advanced ten days of leave

8 from 2003 in the year 2002; is that right?

9    A   Yes.

10    Q   And were you advanced leave from

11 2004 for purposes of 2003 as well?

12    A   I mean, I'm looking at the sheet. I

13 don't -- I don't remember seeing that.

14    Q   Okay.

15    A   I'm not sure.

16    Q   I will show you Exhibit 1, a memo to

17 file by a Dr. Voss about you. It's your

18 understanding that this was done by a Dr.

19 Voss who worked with Umm? Is that your

20 understanding?

21    A   Yes. But he wasn't a psychiatrist.

22    Q   Is that your handwriting under the

Page 38

1    second paragraph and at the bottom?
2       A    Yes, it is.
3       Q    What's the point of the notation at
4    the bottom?  I don't understand what issue
5    you're addressing.
6       A    Okay.  Dr. Voss had told my
7    psychiatrist that he would forward him his
8    memo to Dr. Clark to make changes and
9    another form to fill out on my physical
10   disability.  This never was sent.  It was
11   never sent to Dr. Clark.
12      Q    Okay.  We're going to do this rather
13   quickly.
14      A    Okay, sure.
15      Q    As long as you can keep up, that's
16   fine.  These are a number of documents
17   you've already seen in admission requests.
18      Exhibit 2 is a handwritten note
19   written by Dr. Mussenden on December 22,
20   2003.  Do you see that?
21      A    Yes.
22      Q    Did you see this note back in 2003?

Page 39

1       A    Yes.
2       Q    It was sent by Dr. -- Strike that.
3       It was written by Dr. Mussenden as
4    part of the submission for your long-term
5    disability to Unum; is that correct?
6       A    But it was also used for my Social
7    Security disability.
8       Q    Okay.  It had two purposes.
9       A    Two purposes.
10      Q    Any other purpose?
11      A    That's it; no.
12      Q    Exhibit 4 is something called a
13   Medical Certification, Section 2 with a
14   Ballard Spahr title.  You've seen this
15   document before, haven't you?
16      A    Yes.
17      Q    This was a document filled out and
18   signed by Dr. Mussenden in October of 2003?
19      A    October 14th, if I'm correct, 2003.
20      Q    You are.
21      A    Yes.
22      Q    And this document was filled out and

Page 40

1    signed by Dr. Mussenden for purposes of
2    submitting it for your long-term disability
3    benefit; is that true?
4       A    No.  At the time, I sent it to Fern
5    Forman when I went out on short-term
6    disability.
7       Q    Okay.  But it was also to be used
8    for your long-term disability application?
9       A    I assume.
10      Q    These documents, I believe, are from
11   Dr. Thomas, and when I sent them to your
12   attorney and asked you to agree that they
13   were authentic records of Dr. Thomas, you
14   didn't agree with that statement.  Can you
15   tell me why that is?
16      MS. MURRAY:  Let me state an
17   objection.  The objection has already been
18   stated in response to the document
19   production request, and I incorporate in
20   this deposition an objection, which is a
21   legal one in part to the request, that Ms.
22   McFadden agree to documents that she has not

Page 41

1    seen.
2       MR. DiMURO:  Okay.  There's no trick
3    up my sleeve, Ms. Murray.
4       MS. MURRAY:  No, I understand.  And
5    that's not a trick either.  I'm just stating
6    for the record.
7       You're asking her to respond to a
8    discovery request which has already been in
9    writing, which is still before the court,
10   which we've objected to this, and I'm just
11   making a clean record that we again object
12   to asking her to verify records that don't
13   belong to her that should be posed to her
14   doctors.
15      MR. DiMURO:  Okay.
16      MS. MURRAY:  You can answer if you
17   remember the question.
18      MR. DiMURO:  I was going to ask you
19   if you could help clarify something --
20      MS. MURRAY:  Sure.
21      MR. DiMURO:  -- and maybe we can
22   jump over this.

Page 42

1    MS. MURRAY: Okay.
2    MR. DiMURO: If you could just tell
3  me the basis for not admitting Exhibit 5 as
4  a true and accurate copy of plaintiff's
5  medical records with Dr. Kristen Thomas. If
6  you can just tell me the reason it wasn't
7  done, maybe we can jump over the question.
8    MS. MURRAY: Right. The reason, as
9  stated in our objection, is that Ms.
10  McFadden has never seen these records
11  before. What she has seen, she has admitted
12  to in response to your request for
13  admissions.
14    Therefore, she can't verify whether
15  these are Dr. Thomas', yours, or anyone
16  else's records. She has never seen them
17  before. But those that she has, she can,
18  under oath, identify.
19    As to those that she has seen and
20  understands them to have been prepared by
21  these physicians, she will state. But,
22  otherwise, if the facts are different with

Page 43

1  respect to her recognition of the documents,
2  she will state that.
3    MR. DiMURO: Okay.
4    BY MR. DiMURO:
5    Q    Do you understand what's going on,
6  Ms. McFadden?
7    A    I don't recognize this document.
8    Q    Okay. You don't think you've ever
9  seen Dr. Thomas' records?
10    MS. MURRAY: Are you referring to
11  Exhibit 5 or records in general?
12    MR. DiMURO: Exhibit 5.
13    MS. MURRAY: Go ahead and flip
14  through Exhibit 5 and identify any documents
15  that you believe you've seen before and that
16  you can testify to that belong to or were
17  created by Dr. Thomas.
18    (Whereupon, the witness reviewed the
19  documents.)
20    THE WITNESS: See, I'm not sure,
21  because this was something that was done by
22  the lab in the office.

Page 44

1    MS. MURRAY: What pages are you
2  referring to? These three?
3    THE WITNESS: Nine, ten, eleven, and
4  twelve.
5    BY MR. DiMURO:
6    Q    Can we agree, then, that Pages 9,
7  10, 11, and 12 of this exhibit, you do
8  recognize as Dr. Thomas' records?
9    A    I've seen.
10    Q    All right.
11    A    These are documents from Social
12  Security. I remember signing this giving
13  permission for her to --
14    Q    What page is that?
15    A    Fourteen. Those two came together.
16    Q    Pages 14 and 15 came together?
17    A    Because I had to sign them. Yes.
18    Q    And Page 16, is that a Dr. Thomas
19  record?
20    A    Yes, this is hers. But anything
21  else, I've never seen before.
22    Q    Okay. That's fine. Thank you.

Page 45

1  We're going to move this along.
2    A    Okay.
3    MR. DiMURO: Exhibit 6 is Dr.
4  Berberian's -- or purports to be Dr.
5  Berberian's records. And, Ms. Murray,
6  similarly, in the request for admissions,
7  they were denied.
8    Is the reason because Ms. McFadden,
9  to your knowledge, had never seen Dr.
10  Berberian's records before?
11    MS. MURRAY: Correct. And could not
12  verify that they were in fact created by Dr.
13  Berberian.
14    MR. DiMURO: If you could help me,
15  Ms. Murray, the admission request for
16  Exhibit 7, Admission Request 32, says, "In
17  Exhibit 7 on Bates Number HCP 53, Dr. Morgan
18  states that Ms. McFadden feels that her
19  memory is 'not too good.'"
20    I'm just looking for the basis of
21  the denial because I think it comes right
22  out of that document.

Page 46

1     THE WITNESS: On what page?
2     MR. DiMURO: Page 53.
3     MS. MURRAY: Just a minute before we
4  respond. Let me find my request for
5  admissions.
6     MR. DiMURO: I can show it to you.
7  Here, I'm giving you the request for
8  admissions which have previously been marked
9  as 31.
10    Ms. McFadden, I'm trying to work
11 this through with Ms. Murray to move things
12 along.
13    It's Page 8. If you look right in
14 the middle of the page.
15    MS. MURRAY: Where is the sentence?
16    MR. DiMURO: The fourth paragraph
17 right in the middle. I'm happy to have the
18 lawyer's response.
19    MS. MURRAY: I'll read. I'm reading
20 from Exhibit 7. That Bates Stamp is HCP 55.
21 The fourth paragraph midway down, the
22 sentence reads, "She feels that her memory

Page 47

1  is 'not too good,' noting that this all
2  changed at the start of this year with
3  increased mistakes at work leading to her
4  employer asking her to seek medical
5  attention."
6     The question in the request for
7  admission is, "Dr. Morgan states that Ms.
8  McFadden feels that her memory is not good,"
9  and we denied that statement.
10    The question is, why did we deny
11 that?
12    MR. DiMURO: Yes. And I'm happy to
13 have your response.
14    MS. MURRAY: Okay. It's actually a
15 question for her whether or not that he
16 states that in his record?
17    MR. DiMURO: Yes. That's all.
18    MS. MURRAY: That's not what I
19 recall this request asking.
20    MR. DiMURO: How about this. If you
21 just take under consideration whether or not
22 you are going to amend the answer?

Page 48

1     MS. MURRAY: I will consider it --
2     MR. DiMURO: All right. Thank you.
3     MS. MURRAY: -- because I'll have to
4  verify that that's what my copy says because
5  I really don't remember the request saying
6  that.
7     MR. DiMURO: Would you do the same,
8  please, with Exhibit 13, which I gave you
9  yesterday?
10    In Request Number 34, we asked Ms.
11 McFadden to admit that Dr. Clark wrote in
12 his report a specific statement, and you
13 denied it. We believe we took it right out
14 of the record.
15    MS. MURRAY: Okay. If we can back
16 up to this one, if you don't mind me asking
17 her a question on the record, which is, had
18 you seen the first three pages of Exhibit 7
19 before?
20    THE WITNESS: Yes.
21    MS. MURRAY: Then I will consider
22 amending Request Number 32.

Page 49

1     MR. DiMURO: All right.
2     MS. MURRAY: Now, you're referring
3  to Request Number --
4     MR. DiMURO: Thirty-four, with
5  respect to Exhibit 13, which is Dr. Clark's
6  letter of March 17.
7     MS. MURRAY: And that was a document
8  from yesterday, you said?
9     MR. DiMURO: Yes. I'm trying not to
10 cause you to do this work right now. I'm
11 just pointing out to you that --
12    MS. MURRAY: Well, my recollection
13 from her testimony is that she had not seen
14 this document before, so that's the basis of
15 the denial. But I'll --
16    MR. DiMURO: Reconsider.
17    MS. MURRAY: -- reconsider that, and
18 you'll get a letter to that effect.
19    MR. DiMURO: Thank you.
20    Let's keep going. You and I can do
21 this.
22    MS. MURRAY: Okay.

Page 50

1    MR. DiMURO: Exhibit 10 is what we
2  thought, and asked you to admit, is a true
3  and accurate copy of Dr. Dashottar's medical
4  records. That was in Request Number 10.
5    If you take my representation as
6  true, that that's what the admission request
7  is and that you denied it, I'm assuming the
8  basis is that Ms. McFadden told you that she
9  had never seen Dr. Dashottar's records
10 before?
11    MS. MURRAY: That is my
12 recollection, but we can ask her now that we
13 have her here.
14    MR. DiMURO: All right.
15    MS. MURRAY: Do you want to give her
16 10, or she can look at my copy?
17    MR. DiMURO: Look at your copy.
18    MS. MURRAY: Okay. Let the record
19 reflect that in front of the witness is a
20 document that has been marked by defendant
21 as Exhibit 10, and it's Bates Stamped Unum
22 107 through 122.

Page 51

1    If you want to flip through this,
2  Ms. McFadden, and I'll be sure to help you,
3  you can tell me if you recognize any of
4  these documents as I go through them. You
5  can tell me when to flip the page.
6    MR. DiMURO: Well, you know, Ms.
7  Murray, I'm trying to shorten this for you.
8  All I need from you is a representation that
9  that was the basis of our denial.
10    MS. MURRAY: That's what my
11 recollection is. But rather than relying on
12 counsel's recollection, the witness is here
13 to say one way or the other. That is my
14 representation. That's what I recall.
15    MR. DiMURO: Okay. I will accept
16 that.
17    MS. MURRAY: Okay.
18    MR. DiMURO: Exhibit 11, in Request
19 Number 11, we asked for an admission that
20 Exhibit 11 is a true and accurate copy of
21 Dr. Calvin Griffin's medical records faxed
22 on March 8th, 2004, and there was a denial

Page 52

1  there.
2    If you could just tell me what the
3  basis of the denial was, I'm happy to have
4  that representation.
5    MS. MURRAY: I do not have with me
6  my notes or communication that I may have
7  had with counsel, which I believe is
8  correspondence. But based on my
9  recollection, and only that, I do believe
10 that Exhibit 11 was denied because Ms.
11 McFadden had not before seen this exhibit.
12    But I am relying on incorporating my
13 answer in our responses to defendants'
14 pending motion, a motion to test the
15 sufficiency of the answer. So, whatever I
16 indicated in that document as the basis for
17 the denial is what in fact that is.
18    MR. DiMURO: Okay. And I'm showing
19 you Exhibit 12. We asked in Request
20 Admission Number 12 for a verification that
21 Exhibit 12 is a true and accurate copy of
22 Dr. Mussenden's medical records of Ms.

Page 53

1  McFadden, and there was a denial.
2    All I need from you, you know, is a
3  representation of the basis of your denial.
4    MS. MURRAY: The same answer I gave
5  in response to Exhibit 11 is the same answer
6  I give in response to Exhibit 12.
7    MR. DiMURO: All right. Thank you.
8    I would ask you to go back and
9  reconsider the ones we've discussed here
10 where you've denied, because I think the
11 admission rules require a reasonable
12 inquiry, and so I would ask you to look and
13 consider that. Because I think
14 these records were also part of her appeal
15 to Unum, so that she would have had those
16 records, or at least some of them. I would
17 just ask you to take a look at those.
18    MS. MURRAY: Okay.
19    MR. DiMURO: All right. Thank you.
20 BY MR. DiMURO:
21    Q   Exhibit 19 -- and I'll give you the
22 original, Ms. McFadden -- is a document

Page 54

1  signed by Dr. Mussenden and you for purposes
2  of submitting to Unum; is that correct?
3      A    Yes.
4      Q    Admission Request Number 26 asks for
5  an admission as to Page 828.  If you would
6  look at 828 of Exhibit 19.
7      MR. DiMURO:  Ms. Murray, the
8  admission request asks on Page 828, "Ms.
9  McFadden states that she will never return
10  to work on a part-time or full-time basis,"
11  and answered yes in response to the question
12  of how does her injury or sickness continue
13  to impede her ability to perform her
14  occupational duties, and that was denied.
15      Can you tell me the basis of that
16  denial when I believe we took those words
17  right off the form?
18      MS. MURRAY:  What request number are
19  you referring to?
20      MR. DiMURO:  Request 26.
21      MS. MURRAY:  I again state that
22  these are not objections which the attorney

Page 55

1  should not be answering, but the actual
2  witness who signed the requests.  I'm not
3  here testifying.
4  --
5      MR. DiMURO:  Okay.
6      MS. MURRAY:    so it's really not a
7  question to be posed to me.
8      MR. DiMURO:  Okay.  Give it to her,
9  Exhibit 19.
10      MS. MURRAY:  Let the record reflect
11  that before the witness is Exhibit 19 at
12  Unum 828 as well as Exhibit 31, and ask your
13  question.
14      MR. DiMURO:  Okay.
15      BY MR. DiMURO:
16      Q    If you would look at Exhibit 19,
17  Page 828, that is a page you filled out;
18  isn't that true?
19      A    Yes.  My daughter and I.
20      Q    Right.  I understand that somebody
21  might have helped you fill out the form.
22  But you signed it at the bottom; right?

Page 56

1      A    What's the date?  It looks like --
2      Q    7/15/05.  It looks like 7/15 or
3  7/18/05.
4      A    Yes.  I signed the document.
5      Q    Up in the middle part of the form,
6  you write down -- They ask you, "If you have
7  not returned to work, when do you expect to
8  return to work?"  You write down, "Part-
9  time, never, full-time, never"; right?
10      A    Yes.  That was in 2005.  So, I think
11  if you ask me the question within a time
12  period --
13      Q    Okay.  I understand what time period
14  it is.  I really do.
15      A    Oh, okay.
16      Q    And then it says, "How does your
17  injury or sickness continue to impede your
18  ability to perform your occupational
19  duties," you mark "Yes."  Do you see that?
20      A    Which question is it?
21      Q    There (indicating).
22      A    Yes.

Page 57

1      Q    Now, if you would look at Exhibit
2  31, Request Number 26 --
3      A    Yes.
4      Q    it says, "In Exhibit 19," which
5  we just looked at, "on Page 828," which we
6  just looked at --
7      A    Yes.
8      Q    -- you state that you will never
9  return to work on a part-time or full-time
10  basis, and you marked "Yes" in response to
11  the question "How does your injury or
12  sickness continue to impede your ability to
13  perform your occupational duties?"
14      We took it right off the form.  I
15  want to know why you denied Request Number
16  26.
17      A    I don't recall.
18      MR. DiMURO:  Okay.  Ms. Murray,
19  notwithstanding that answer, I still think
20  it's your burden and responsibility to get
21  us a reconsidered response given the fact
22  that you've now seen that it's virtually

Page 58

1  verbatim off of the form.
2      THE WITNESS:  Can we take a short
3  break?
4      MR. DiMURO:  Sure.
5      (Whereupon, a brief recess was
6  taken.)
7      BY MR. DiMURO:
8   Q   So, you have a claim for damages in
9  the case.  You're aware of that; right?  You
10 have money damages?
11  A  Yes.
12   Q   And let's talk about the back pay
13 portion of it now.
14      The paperwork I see has you
15 calculating your back pay, your wages, on
16 the basis of your legal secretary salary.
17      Would you agree with me that if what
18 you could have done in May of '04 was the
19 receptionist job, that your back pay should
20 have been calculated at the receptionist
21 salary?
22      MS. MURRAY:  I object to that.

Page 59

1  That's a legal question and it calls for a
2  legal answer.
3      BY MR. DiMURO:
4   Q   Go ahead.
5   A   Well, I guess the only thing I can
6  say is I don't know how much the
7  receptionist made.  From my understanding
8  from what she told me, she was being paid as
9  a front office secretary.  So --
10   Q   But whatever the number is, do you
11 agree that your wage claim should be limited
12 to what the receptionist makes as opposed to
13 what you were making?
14      MS. MURRAY:  Same objection.
15      BY MR. DiMURO:
16   Q   Go ahead.
17   A   No.
18   Q   And we talked about yesterday that
19 there was a point in time after May of '04
20 that you agreed you couldn't work in any
21 job?  We'll just let the record reflect what
22 that discussion was, what date you said

Page 60

1  that.  Do you recall that general
2  discussion?
3   A   No, I did not say I could not work
4  in any job.  I stated that the job that was
5  offered to me, which was word processing,
6  was a job I could not do.
7   Q   I'm sorry.  I wasn't clear.
8      Do you recall the discussion
9  yesterday where we discussed was there a
10 date after May 14th, '04, a date in the
11 future, that you agree that your condition
12 had gotten so bad that you couldn't even do
13 the receptionist job?
14   A   And I think, as I said yesterday, if
15 I was given the breaks and the things that
16 she was given, yes, I could have done it.
17   Q   On May 14th; right?
18   A   (No response.)
19   Q   Ms. McFadden, don't you recall --
20   A   Sir, I'm just trying to think.  But
21 you can -- Go ahead.
22   Q   Don't you recall the discussion

Page 61

1  yesterday where we discussed the fact that,
2  as time went on, there did come a time that
3  your condition became so bad that you agree
4  you could not have continued in the
5  receptionist job if you had been given it?
6   A   Not as of May the 14th, because
7  during the conference call, I told them that
8  -- I asked about the receptionist job.  So -
9
10   Q   I'm not asking about May 14th.  I'm
11 talking about as the months went by --
12 you've now lived through those months after
13 May 14th.
14
15   A   Yes.
16   Q   -- as the months went by, there did
17 come a time when your condition --
18   A   Past 2004.  Is that what you're
19 talking about?
20   Q   Past May 14th, 2004, some point in
21 time past that --
22   A   Yes.

Page 62

1    Q    -- that even you agree your
2 condition got so bad that even you could not
3 have kept doing the receptionist job. We
4 had that discussion yesterday.
5    A    Yes. But at that time --
6    Q    I'm not saying at that time.
7    A    Okay. Yes. Okay.
8    Q    I'm saying sometime after that.
9    A    Okay.
10    Q    So, do you believe that your back
11 pay claim, your claim for lost wages, should
12 be cut off as of the date in which even you
13 agree you couldn't do the job?
14    A    No.
15        MS. MURRAY: I object. That's a
16 legal question.
17        BY MR. DiMURO:
18    Q    Why is that? Why do you say no to
19 that question?
20    A    That's my answer, no.
21    Q    Do you have a reason why it's not?
22    A    I thought if I was treated -- and

Page 63

1 not discriminated against by the firm
2 because of my race, religion, disability, if
3 the stress factor wasn't put there on me,
4 that I think I wouldn't be in the shape that
5 I'm in today, because stress contributes to
6 the illnesses that I have.
7    Q    All right. So, you're saying if you
8 had gotten the --
9    A    So, therefore, if I was treated like
10 other employees and given the leeway that
11 other employees got and they weren't
12 harassed mentally constantly about what I
13 should do about my husband, my family, or
14 they didn't have to hear, oh, your husband's
15 going to die anyway, you know, that's
16 stress. That's emotional stress.
17        So, therefore, if my situation was
18 treated different by Ms. Riley, if I was
19 treated as, like I said, a valued employee
20 instead, as far as I'm concerned,
21 discriminated against because of my race --
22    Q    Then?

Page 64

1    A    -- disability, discrimination, and
2 religion -- Basically, stress made my
3 illnesses worse, and that's the position I
4 was put in by the firm.
5    Q    But what has that got to do with --
6 There came a day in either 2004 or 2005 that
7 you couldn't even do the receptionist job.
8        And all I'm asking is, don't you
9 agree that your claim should be cut off
10 whatever date --
11    A    No.
12    Q    -- somebody decides
13    A    I answered that.
14    Q    -- you can't do it?
15    A    No. I answered that. No.
16    Q    And then I asked you why is that?
17 Why shouldn't your claim be cut off the day
18 that somebody decides or you agree you
19 couldn't even do the job?
20    A    Why should it?
21    Q    I'm asking what your reason is, why
22 it should go on beyond that.

Page 65

1        MS. MURRAY: Objection; asked and
2 answered.
3        THE WITNESS: I mean, I already
4 answered that.
5        BY MR. DiMURO:
6    Q    You have a claim for lost rental
7 income; is that right?
8    A    Yes.
9    Q    What are you talking about there?
10    A    Without having an income and the way
11 I was treated --
12    Q    No. I'm sorry. It's very specific.
13    A    Okay.
14    Q    What property are you talking about?
15    A    The two rental properties that I
16 sold.
17    Q    These are two rental properties that
18 you own as of the first of 2004? You
19 already owned them?
20    A    I've owned them for years.
21    Q    Okay. And they're in D.C.? Or they
22 were in D.C.?

Page 66

1    A    They were in D.C.
2    Q    And what were the addresses?
3    A    One was 1815 M Street, Northeast.
4    Q    All right.
5    A    The other one was 3345 Crawford
6    Place, Southeast.
7    Q    Roughly, how long had you owned
8    these?  Just roughly.
9    A    Since    Let's see.  I'm trying to
10   think when I moved into the house on
11   Massachusetts Avenue.  This is 2007.  Nine
12   years; yes.
13   Q    Did these properties generate a
14   profit every year?
15   A    Yes.
16   Q    Before your husband's diagnosis,
17   were these properties ever in financial
18   distress, meaning that you were in default
19   of your loan?
20   A    No.
21   Q    So, when did you sell the M Street
22   property?

Page 67

1    A    February of '05, I think.  Around
2    February of '05.
3    Q    And when did you sell the Crawford
4    Street property?  Roughly.
5    A    I'm not sure if it was '05 or '06.
6    Q    Okay.
7    A    But -- It might have been January of
8    -- No.  It had to be around, I guess, June
9    of '05.  Somewhere around there.
10   I'm not absolutely sure.
11   Q    In 2003, 2004, or 2005, were you in
12   default of the loans on either of these
13   properties?
14   A    As far as late payments?
15   Q    Yes.
16   A    Between what years?
17   Q    In '03 and '04.
18   A    Yes.  I was late at times; yes.
19   Q    All right.  But had it gotten to the
20   point of
21   A    Of foreclosure?
22   Q    Right.

Page 68

1    A    No.
2    Q    In fact, you were able to get a
3    salary advance from the firm to help with
4    one of the mortgages?
5    A    No.  I did not get a salary advance
6    from the firm.
7    Q    Did you get a salary advance from
8    the firm in '04 for any reason?
9    A    Mr. Henek asked me about my
10   husband's life insurance policy, and he
11   asked me --
12   Q    No.  I'm sorry.
13   A    I mean
14   Q    Salary advance.
15   A    No.  Not for nothing dealing with my
16   properties; no.
17   Q    Now, the simple question is, did you
18   get a salary advance in 2004?
19   A    Yes.
20   Q    Did you get a salary advance in
21   2003?
22   A    From what I can recall, no.

Page 69

1    Q    And these properties generated a
2    profit in '03 and '04 as well?
3    A    Yes.
4    Q    And by late '04, your disability
5    benefits had been approved; is that right?
6    A    No.
7    Q    Okay.  I've forgotten what that
8    precise date is.  When did they approve your
9    disability?
10   A    September '05.
11   Q    Do you remember you appealed in
12   October of '04?
13   A    I made the appeal to Unum in October
14   of '04.
15   Q    When did they grant the appeal and
16   give you your benefits?
17   A    In September of '05.
18   Q    Okay.  Eleven months later?
19   A    Yes.
20   Q    And why should the law firm pay for
21   your rental properties that you sold?
22   A    Because I feel if I was treated as

Page 70

1    everyone else at the firm through my
2    disability with Unum and with our rental
3    properties, we could have relocated to
4    Florida without selling them.
5        Q    And what would the firm have done
6    that would have helped you to be able to do
7    that?
8        A    Well, I feel like this. Everyone
9    that was white that went out on disability
10   didn't have the problems that I had and
11   getting approved.
12       Q    All right.
13       A    You're asking me a question. I'm
14   trying to give you an honest answer.
15       Q    Oh, you would have gotten approved
16   by Unum is what you're saying?
17       A    I feel if I was white and wasn't
18   being discriminated against, yes.
19       Q    That Unum would have approved you
20   earlier and it wouldn't have put you under
21   financial distress?
22       A    Exactly.

Page 71

1        Q    And because of that, you lost the
2    two rental properties?
3        A    No. Because of the input from
4    Ballard. I have a letter -- and I don't
5    know which letter it is -- when my
6    disability was approved, which I didn't have
7    any knowledge of, John DiBartista of Ballard
8    and Unum decided how much I should get and
9    what should be deducted from my check. I
10   wasn't confronted -- Nobody talked to me
11   about anything.
12       Q    All right.
13       A    So --
14       Q    Let's go back and make sure I
15   understand this.
16       A    Okay.
17       Q    If your Unum amount -- Strike that.
18            If your Unum disability had been
19   approved earlier in '04, you feel you would
20   not have been under the financial distress
21   causing you to sell the two rental
22   properties?

Page 72

1        A    Exactly.
2        Q    Do you agree that the delay in
3    approving your Unum disability was Unum's
4    responsibility?
5        A    No. Not solely; no.
6        Q    You believe that Ballard Spahr had a
7    contribution to the delay in approving your
8    Unum disability?
9        A    Yes.
10       Q    Tell me precisely the facts that you
11   have that Ballard Spahr contributed to the
12   delay in the approval of your Unum
13   disability.
14       A    Well, the only thing I can think of,
15   I just found it ironic that once the EEOC
16   gave me the right to sue, then, less than a
17   week or so, all of a sudden my disability
18   was approved from out of nowhere.
19       Q    And that's the only fact you have to
20   show that Ballard Spahr participated or
21   contributed in the delay in getting your
22   disability from Unum approved? That's the

Page 73

1    only basis you have to say that?
2        A    I mean, I just look at it where they
3    went to bat for other people. What made me
4    different?
5            Okay. Mr. Henck, at one point in
6    March of '04 -- I don't know exactly the
7    date
8    -- he asked Ms. Forman, well, why can't I
9    talk to Unum? She's sick. She needs to be
10   paid. She has bills to be paid.
11           He was told that he could not
12   interfere with that because Unum was
13   Ballard's client.
14       Q    How do you know that, that a
15   discussion like that occurred?
16       A    There was a conference call between
17   Fern Forman, Mr. Henck, and I.
18       Q    And you?
19       A    And I. Yes. Me. I, me.
20       Q    Is there anything else that you can
21   say proves that Ballard Spahr contributed to
22   the delay of your Unum approval?

McFadden

20 (Pages 74 to 77)

Page 74

1    A    As far as I'm concerned, yes. I was
2    discriminated against.
3    Q    But I'm asking anything else? Is
4    there anything else that you can tell me
5    that you believe proves that point?
6    A    Besides discrimination, retaliation,
7    race, and religion, no.
8    Q    But those are just general words.
9         Do you have any facts that show that
10   Ballard Spahr affected the Unum decision
11   against you?
12   A    Yes. If at any time the human
13   resources manager had called me and said,
14   oh, Vanessa, your disability has been
15   approved in the morning, and she can call me
16   back at four o'clock and say, oh, it was a
17   boo-boo, I made a mistake, I don't
18   understand that. If Ms. Forman in fact told
19   her that. So, she had to be told by Ms.
20   Forman if my disability was approved.
21   Q    Okay.
22   A    So, therefore, it's like, okay,

Page 75

1    we're playing a game now.
2    Q    All right. Anything else that
3    proves that Ballard Spahr made Unum delay or
4    deny your coverage? Anything else?
5    A    Just discrimination.
6    Q    Okay.
7    A    Okay.
8    Q    And are you aware that someone from
9    Ballard Spahr called the sales agent for the
10   insurance program and tried to ask the sales
11   agent's help in getting the benefit
12   approved?
13   A    No.
14   Q    Are you aware that anybody from
15   Ballard Spahr contacted Mr. Spellman to help
16   urge him to expedite the review?
17   A    No.
18   Q    Are you aware that anyone from
19   Ballard Spahr paid one of the doctors'
20   requests for copying fees in order to
21   expedite the process of getting the Unum
22   disability approved?

Page 76

1    A    No.
2    Q    And on that conference call, was it
3    not explained to Mr. Henck that it wouldn't
4    help to have him call because other steps
5    had already been taken to try to persuade
6    Unum to expedite the review?
7    A    No.
8    Q    Do you have any notes from that
9    conversation?
10   A    Like I said, in a steno pad that I
11   have at home.
12   Q    You think you have notes or you
13   don't?
14   A    I'm not sure.
15   Q    Okay. I don't have them, so get
16   them for me if you've got them.
17   A    Okay.
18   Q    Now, you bought the Florida
19   property, according to my notes, in March of
20   '05. Does that sound about right?
21   A    Yes, sir.
22   Q    Did you use any of the proceeds from

Page 77

1    the sale of the rental properties to put it
2    into the Florida property?
3    A    Yes.
4    Q    You didn't have enough money saved -
5    - You didn't have any money saved -
6    A    I didn't have any money, so --
7    Q    Right. So, you needed the sale of
8    the rental properties to put a down payment
9    on the Florida property; right?
10   A    Not -- I mean, I used a portion from
11   one sale, but not both; no.
12   Q    Right. But you needed some of the
13   money from the rental property sales to come
14   up with the money for a down payment on the
15   Florida house?
16   A    Yes. Because I wasn't receiving my
17   benefits.
18   Q    All right. So, how much was the
19   down payment on the Florida house?
20   A    With closing costs and everything, I
21   don't know the exact amount.
22   Q    And you needed the rest of the

Page 78

1  monies from the sale of the rental
2  properties to use for living expenses
3  because your benefits hadn't been approved;
4  isn't that true?
5      A   Yes. It was for medical reasons.
6      Q   Yes. And to make the mortgage
7  payment on the Florida house; right?
8      A   And also the house on Massachusetts
9  Avenue; yes.
10     Q   Right. Until you sold that.
11     A   No. I still have my house on
12 Massachusetts Avenue.
13     Q   Oh, that's right. I'm sorry.
14         And did you keep paying the mortgage
15 on the Massachusetts property? You
16 personally.
17     A   With the help of my children and
18 family and friends.
19     Q   How much is your share on a monthly
20 basis now, now that your children are living
21 there and sort of sharing it with you?
22     A   They've always lived there. The

Page 79

1  only thing that I pay for is the electric,
2  the gas, and the water bill.
3      Q   So, just roughly, how much do you
4  contribute to the Massachusetts property?
5      A   As far as the mortgage?
6      Q   On a monthly basis for anything.
7      A   For Massachusetts Avenue?
8      Q   Yes, ma'am.
9      A   Do you have a pad so I can add it
10 up?
11     Q   Here you go. You can use the back
12 of that. Ma'am, I'm must looking for a
13 rough number.
14     A   No. Sir, I'm trying to think.
15         I contribute about $850 a month.
16     Q   All right. I've got here the
17 complaint that was filed in this lawsuit
18 the lawsuit that you filed originally.
19         I presume you read a draft of it
20 before it was filed?
21     A   Yes.
22     Q   Jumping to Paragraph 32, the

Page 80

1  complaint sets forth some statements by Ms.
2  Riley-Jamison such as your daughters should
3  quit college to care for their father, that
4  she should just put her husband in hospice.
5          Do you see those statements?
6      A   In Number 32?
7      Q   Yes.
8      A   Okay. I -- Okay. I'm with you now;
9  yes.
10     Q   You say those were made by Ms.
11 Riley-Jamison; is that right?
12     A   Ms. Riley-Jamison and also by Mr.
13 Henek.
14     Q   In the first sentence, you say "Ms.
15 Riley-Jamison and other Ballard Spahr
16 partners and employees."
17         Is there anybody else besides Ms.
18 Riley-Jamison and Mr. Henek who made such
19 statements?
20     A   As far as my husband should be put
21 in hospice care? I'm trying to understand
22 what you're asking me.

Page 81

1      Q   Well, Paragraph 32 says --
2      A   Yes.
3      Q   -- while you were working part-time,
4  Ms. Riley Jamison and other Ballard Spahr
5  partners/employees subjected you to
6  harassing comments, and then you go on to
7  describe those comments.
8      A   Yes.
9      Q   I'm asking, is there anybody else
10 besides Ms. Riley-Jamison and Mr. Henek who
11 made such comments? Who else is the "other
12 Ballard Spahr partners and employees," if
13 anyone?
14     A   Dino Panagopoulos was one.
15     Q   What did Dino say?
16     A   Well, they would call me "V." That
17 was my nickname at work.
18     Q   Right.
19     A   He was saying, you know, you have to
20 also take care of yourself, and, you know,
21 make sure your children are taken care of,
22 so hospice might be the right place for

Page 82

1  Mack.
2     Q    All right.  Did anybody else make
3  statements that you found harassing?
4     A    Ms. Janet Craig.
5     Q    And you described that she made the
6  call on behalf of Mr. Henck?
7     A    Yes.
8     Q    Okay.  Anything else?
9     A    As far as what to do with my
10 husband?
11    Q    No.  Harassing comments.  The whole
12 paragraph.  Harassing comments.  Do you
13 recall any other harassing comments?
14    A    From Ms. Pamela Mitchell.
15    Q    What did she say?
16    A    She made the comment, well, since
17 your husband is dying, you know, why don't
18 you just put him in a hospice program.  That
19 would take a lot of burden off of you.
20    Q    What's her position at this company?
21    A    From what I can recall, she worked
22 for a partner by the name of Mary Jo.

Page 83

1     Q    Is she an assistant, a secretary, a
2  --
3     A    Secretary.
4     Q    Did anyone else make harassing
5  comments as set forth in Paragraph 32?
6     A    Fern Forman.
7     Q    All right.  What did she say?
8     A    As she was saying, you know, you
9  have to think of yourself, so Mack needs to
10 be put in a hospice care facility.
11    Q    Anyone else?
12    A    Those are the only names that I can
13 recall.
14    Q    Did these comments all happen before
15 March of '03 -- either in March of '03 or
16 before March of '03?
17    A    Some of them, before March of '03;
18 yes.
19    Q    Did any of them happen after March
20 of '03?
21    A    Yes.
22    Q    All right.  Paragraph 33.

Page 84

1     A    Okay.
2     Q    You're saying that Ms. Riley Jamison
3  required you to call in, even on the days
4  you were off, under the modified work
5  schedule.
6     A    Yes.
7     Q    Did she say why?
8     A    No.
9     Q    Paragraph 34.  "From November 2002
10 to March 2003, Ms. McFadden complained to
11 partner Henck and another legal secretary
12 that she believed that Ms. Riley-Jamison was
13 mistreating her due to her race."
14    A    Yes.
15    Q    Did you complain -- I don't see it
16 anywhere here in the complaint, so I just
17 want to make sure the time period is right.
18       Did you complain to any partner or
19 manager about Ms. Riley Jamison after March
20 of 2003?
21    A    Yes.  Mr. Henck and also Allen Winn.
22    Q    All right.  Let's stick with

Page 85

1  Paragraph 34.
2     A    Okay.
3     Q    What were you complaining about from
4  November '02 to March of '03?
5     A    Just about once a week during that
6  my husband only had four to six months to
7  live that he should be put in a hospice care
8  facility, I should take my daughters out of
9  school, why wasn't my family, friends,
10 church members doing more to help me.  You
11 know, just constant.
12    Q    All right.
13    A    And I'm thinking to myself, I mean,
14 in her position, I don't think that gave her
15 the right to determine what to do with my
16 husband.
17    Q    But it is those types of comments
18 that you contend constitute mistreatment by
19 Ms. Riley-Jamison?
20    A    Definitely.
21    Q    And you say she did it to you
22 because of your race.

Page 86

1    What makes you think whatever she
2  said to you was because you're African-
3  American versus --
4    A   Why would I think that?
5    Q   Yes. About her.
6    A   I feel she's a racist.
7    Q   And what precisely is the basis for
8  saying that? What facts do you have to say
9  that?
10    A   Comments of other minorities and
11  things that she would say to them that was
12  just out in left field.
13    Q   All right. What did she say about
14  other minorities or other --
15    A   I mean, basically, it was an
16  atmosphere where, you know, when she came
17  around, the tension just came.
18    Q   Ma'am, calling somebody a racist is
19  a pretty serious charge.
20    A   Okay.
21    Q   Tell me exactly what she said that
22  would cause you to say the lady sitting next

Page 87

1  to me is a racist.
2    A   Okay. If you can tell me I need to
3  do all these things, but then someone I was
4  sitting beside, you could tell her, well,
5  you don't need to worry about taking off for
6  your doctors' appointments, you know, you
7  need to do this, you need to do this, you
8  need to do that, and she was white, what
9  else would I think?
10    Q   I have no idea what you're talking
11  about.
12    A   I'm just saying with Ms. Kathy
13  Hanna.
14    Q   What statements did -- Let's start
15  with what you said --
16    A   Okay.
17    Q   -- which is, tell me what Ms. Riley-
18  Jamison said about minorities or to
19  minorities that you considered racist.
20    A   It's not what she said. It was her
21  actions --
22    Q   All right. What were her actions

Page 88

1  that --
2    A   -- which I think would be considered
3  "racial bias," if that's the correct term
4  for it.
5    Q   All right. Tell me what she did.
6    A   She treated white employees
7  different from minority employees.
8    Q   And how so?
9    A   Modified leave schedules. Different
10  things from going to school to -- We had one
11  young lady that went out -- I think her name
12  was Erika -- I mean, she was allowed to take
13  off two months to get married. Then she was
14  allowed to take another month to go on
15  vacation; okay?
16    Q   All right.
17    A   Then she -- You know, I mean, she
18  was allowed to take off to do whatever she
19  wanted to do. And I'm thinking -- And she
20  was white.
21    Q   And we discussed yesterday the
22  number of white --

Page 89

1    A   That's what I call "racial bias."
2    Q   All right. And we --
3    A   I mean, I think I'm   You correct
4  me if that's not called "racial bias."
5    Q   Ma'am, don't try to put words in my
6  mouth.
7    A   Okay.
8    Q   You're here to answer questions, and
9  that's it; okay?
10    A   Okay.
11    Q   You can't think of one racial slur
12  or racist statement that Ms. Riley-Jamison
13  ever said; right?
14    A   Made to me personally?
15    Q   Or in your presence.
16    A   No.
17    Q   Anything else that you can tell me
18  to prove that Ms. Riley-Jamison was
19  mistreating you because of your race?
20    A   There was an incident that happened
21  that I wasn't even aware of what had
22  happened. Ms. Janet Craig took it upon

Page 90

1 herself to confront the office manager, who
2 was Wendy Iversen.
3      My understanding of the conversation
4 was, which I didn't know anything about, Ms.
5 Craig went to Ms. Iversen to find out why
6 the firm and Ms. Riley was treating me the
7 way they were, which I didn't know anything
8 about.
9      So, at the time, I was on
10 medication. From my understanding, she went
11 to the word processing center. She asked
12 Ms. Harriette Anderson, have you seen
13 Vanessa? Harriette said, I think she's in
14 the kitchen taking her medication.
15      She comes in the door in an outrage.
16 She's hollering and she's screaming. She
17 had, as far as I'm concerned, no control
18 over what she's saying.
19      She's going, you know, what do you
20 mean I'm mistreating you? And I'm like,
21 what are you talking about? She said, well,
22 Janet went to Wendy and told her that you

Page 91

1 were being mistreated.
2      I said, I still don't know what
3 you're talking about. She said, well,
4 you've just got to remember the firm is
5 doing you a favor and you don't need to go
6 around telling people you're being
7 mistreated.
8      I said, but I don't know what you're
9 talking about. And I didn't. I didn't know
10 what she was talking about.
11      Q    Why does that prove she's doing it
12 because of your race?
13      A    No. I'm just saying --
14      Q    But that was the question.
15      A    Okay. Then --
16      Q    I know you say a lot, but I asked
17 you, what facts do you have to show that
18 she's mistreating you because of your race
19 as opposed to any other reason?
20      A    I think I gave you several examples
21 yesterday of white employees that were able
22 to do things that didn't deal with their

Page 92

1 loved ones or anything.
2      Q    So, you complained to Mr. Henck
3 about these statements that -- Well, what
4 did you tell Mr. Henck when you complained
5 about Ms. Riley-Jamison?
6      A    I asked him, I said, why is she only
7 -- why is she picking with me?
8      Q    I see.
9      A    I said, you know, why is she
10 treating me this way? I've never done
11 nothing to her.
12      Q    The questions about the children
13 coming home from college, the hospice, those
14 type of things?
15      A    Yes.
16      Q    Did you tell Mr. Henck, in
17 accordance with Paragraph 34 where you say
18 you've complained to him, did you tell Mr.
19 Henck that she was treating you differently
20 than other white employees? Did you go
21 through all the floaters and the legal
22 secretaries that we discussed yesterday?

Page 93

1      A    Oh, definitely.
2      Q    And what did he say?
3      A    He said that he would talk to her
4 about that and get back with me.
5      Q    Did he ever get back to you?
6      A    No, he didn't.
7      Q    After March of '03, what did Ms.
8 Riley-Jamison say to you that you thought
9 was mistreatment?
10      A    It was the same old scenario until
11 she went on maternity leave.
12      Q    Did she ever come back from
13 maternity leave and you were still there, or
14 had you already gone out?
15      A    She came back on October the 13th.
16 I left on October the 15th.
17      Q    So, I'm assuming you didn't have
18 much interaction -- Well, did anything
19 happen in those two or three days where she
20 mistreated you?
21      A    No. I just stayed out of her way.
22      Q    In Paragraph 49, you talk about the

Page 94

1  fact that you were not approved for long-
2  term disability benefits until September
3  22nd, 2005.     "After nearly two years
4  of haranguing and misinformation provided by
5  Ballard Spahr and Unum." What are you
6  talking about with respect to Ballard Spahr
7  there?
8        Are you talking again about the
9  statements by Ms. Riley-Jamison, or is it
10  something different?
11     A   No. What I meant by that was how,
12  when the information was submitted to Unum,
13  it wasn't submitted to them on a timely
14  manner.
15     Q   All right.
16     A   Things weren't submitted on a timely
17  manner.
18     Q   Is that the only haranguing
19  information provided by Ballard Spahr that
20  you refer to in Paragraph 49?
21     A   That's the only written proof that I
22  have.

Page 95

1     Q   Paragraph 53, this is your race
2  discrimination count. In Paragraph 53, you
3  say, "Ms. Riley-Jamison denied Ms. McFadden
4  leave and schedule modification."
5        Could you tell me any instance where
6  you needed leave and you didn't get it?
7     A   I'm trying to think -- I'm going to
8  word this very shortly.
9        If the managing partner and Mr.
10  Henck, who was the partner I was working
11  for, gave me a modified leave schedule which
12  Ms. Riley-Jamison received a copy of, I
13  mean, that I have to call her on days that
14  she was already aware that I had to be with
15  my husband or for anything else or did I
16  have to call her on the days that was under
17  that modified schedule, I thought was
18  ridiculous.
19     Q   But you still took the day off;
20  right?
21     A   No. Because you're asking me two
22  different -- Basically --

Page 96

1     Q   All right. Well, because you didn't
2  answer my question, I'll re-ask my question
3  then.
4        Tell me a day, an instance, in which
5  you wanted or needed leave and Ms. Riley-
6  Jamison denied you the leave.
7     A   At that point, I just would talk to
8  Mr. Henck. Because I felt, at that point, I
9  wasn't dealing with her.
10     Q   Wait a second.
11        Tell me a day, an instance, an hour,
12  anything, a period of time in which you
13  needed leave and you didn't get it.
14     A   I don't understand the question.
15     Q   Well --
16     A   No. Seriously, I don't understand
17  the question.
18     Q   It says right here, you suffered the
19  following adverse employment actions.
20  "Ballard Spahr and Ms. Riley-Jamison denied
21  Ms. McFadden leave and schedule
22  modification."

Page 97

1        Tell me when you were denied leave.
2  Tell me when you didn't get leave that you
3  felt you needed. Maybe the answer is there
4  is no such time.
5     A   No, that's not an answer. Like I
6  said, as far as FMLA. I mean, if you
7  constantly have someone telling you -- I
8  mean
9  -- Okay.
10        I took off only when necessary.
11  When you have someone constantly telling you
12  they're doing you a favor, but it's really
13  not a favor, it's your right as an employee,
14  you ask for as little time off as possible
15  when you're in fear of your job and you're
16  the only income, and that's my answer.
17     Q   Is there a day or time that you
18  didn't take leave -- Strike that.
19        Is there a day or a time that you
20  asked for leave and you didn't get it?
21     A   I was afraid to ask for too much of
22  anything.

Page 98

1    Q    Is there a day or a time that you
2  asked for leave and you didn't get it?
3    A    I'm still not understanding what
4  you're asking me.
5    Q    Is there a day or a time in which
6  you asked for leave from Ballard Spahr and
7  you did not get the leave for that day or
8  period of time?
9    A    Can we take a break?
10    Q    No.
11    A    Why not?
12    Q    Because I want an answer to that
13  question.
14    A    No. I need to take a break.
15    Q    Ma'am --
16    MS. MURRAY:  There's a pending
17  question.  You have to answer the question -
18  -
19    THE WITNESS:  No, no.  I'm answering
20  the question.
21    MS. MURRAY:  -- before your break --
22  before you request a break.

Page 99

1    THE WITNESS:  Oh, okay.  Not that I
2  can recall.
3    MR. DiMURO:  Do you need a break
4  now?
5    THE WITNESS:  Yes.
6    (Whereupon, a brief recess was
7  taken.)
8    BY MR. DiMURO:
9    Q    Still on Paragraph 53, it says,
10  "Ballard Spahr and Ms. Riley-Jamison denied
11  Ms. McFadden schedule modification."
12    Tell me a schedule modification that
13  you asked for that you didn't get.  Maybe
14  there aren't any.
15    A    I was given a schedule modification.
16  The e-mail that you presented earlier.  I
17  forgot which exhibit it was.
18    Q    Right.  It's the one where you list
19  the things you need to --
20    A    Yes, sir.  Even with that schedule
21  modification, she still constantly harassed
22  me.

Page 100

1    Q    But the schedule modification we're
2  talking about is three days --
3    A    My husband was getting his
4  chemotherapy.
5    Q    I understand.
6    A    Okay.
7    Q    The schedule modification we're
8  talking about is four days one week, three
9  days the next, and it keeps alternating?
10    A    Yes.
11    Q    And did you agree to that schedule
12  modification, the seven days out of ten
13  days?
14    A    Yes.
15    Q    Did you ask for it to be changed
16  even further -- Strike that.
17    Did you ever ask that your schedule
18  be modified in a different way and it was
19  denied?
20    A    No.
21    Q    And then in Paragraph 53, you talked
22  about Ms. Riley-Jamison and the law firm

Page 101

1  treating you disparately, or differently,
2  with regard to leave procedures and job
3  protection.    I'm assuming that that
4  is the same issue as the six or seven
5  employees we talked about yesterday?
6    A    Yes.
7    Q    And, in fairness, I think you
8  mentioned somebody else today.  Erika?  I
9  thought it was Erika.
10    A    Yes, Erika.  Maybe Ms. Riley can
11  help me with that.
12    Q    Well, something about two months for
13  a wedding and --
14    A    Oh, a wedding, and then another
15  month off to go spend with her father.
16    Q    But if we add that person to the
17  list of people you --
18    A    She was white.
19    Q    If you add that person --
20    A    To the list.
21    MS. MURRAY:  Let him ask the
22  question.

McFadden

Page 102

1    THE WITNESS:  Okay.
2    BY MR. DiMURO:
3    Q    If you add that person to the list
4  of people we discussed yesterday, that would
5  be what you're talking about how you're
6  treated differently?
7    A    Yes.
8    Q    Now, Paragraph 56, you mention about
9  Ballard Spahr and Ms. Riley-Jamison
10  interfering with your intermittent leave to
11  care.
12        What you mean there, I think -- and
13  I'm not trying to put words in your mouth,
14  I'm just trying to get through this -- is
15  the statements that Ms. Riley-Jamison and
16  Mr. Henck made like hospice care, taking
17  your children out of school, having family
18  and friends help you more.
19        Is that what you're talking about
20  there?
21    A    Yes.
22    Q    Anything else?

Page 103

1    A    Basically, she was irritated.  Say
2  if it was a Tuesday after my husband got his
3  chemo --
4    Q    Right.
5    A    -- sometimes I would be running
6  late.  Because if he was throwing up and I
7  had to clean his body because he couldn't
8  control his feces, I might get to work at
9  eleven o'clock.        I was questioned
10  about that of why wasn't I there at nine
11  o'clock.  But from Ballard's time slips, I
12  made up that two hours later on that day.
13  So --
14    Q    Did you call in and say I'm running
15  late today because my husband --
16    A    Oh, yes.
17    Q    -- needs me?
18    A    Yes.  I would tell Ms. Riley that.
19  On a couple of occasions, Ms. Riley had
20  complained to Mr. Henck that I did not call
21  to tell her I was running late or whatever.
22        Then she would come back around the

Page 104

1  corner and go, oh, it's my mistake, I didn't
2  listen to my voicemail.
3        And like I told Mr. Henck, I said,
4  well, she couldn't have read them at nine
5  o'clock if she didn't get to work until 9:20
6  or 9:30 herself because of her children.
7    Q    In Paragraph 56 and elsewhere,
8  there's a reference to "Caucasian legal
9  secretaries, information technology
10  administrator, and receptionist."
11    A    That should have been systems
12  administrator.
13    Q    Okay.  Systems administrator.
14    A    Ms. Craig.
15    Q    But that phrase identifying those
16  three categories of people --
17    A    Yes.
18    Q    -- are the people we talked about
19  yesterday?
20    A    (No response.)
21    Q    When you talk about those three
22  types of people being treated differently --

Page 105

1    A    Differently; yes.
2    Q    Okay.
3        In Paragraph 57, Ballard Spahr and
4  Riley-Jamison placed additional requirements
5  upon you for requesting leave, reporting
6  absences, and certifying medical conditions
7  or treatment, that's the same people as we
8  talked about yesterday?
9    A    Yes.
10    Q    Paragraph 59, where you talk about
11  the legal secretaries, the systems
12  administrator, and the receptionist, again,
13  the same people as we talked about
14  yesterday?
15    A    Yes.
16    Q    Page 15, please, Paragraph 76 --
17  this is your disability discrimination claim
18  -- you requested a reasonable accommodation
19  for your disability.  I believe what you're
20  talking about here is your request to be
21  made a receptionist.
22        Is there any other accommodation you

Page 106

1  asked for for your disability?
2      A   The conversation I had with Mr.
3  Henck where --
4      Q   Right.
5      A   -- our copy center was like on the
6  other side of the building, and, I was
7  telling him, you know -- You know, he would
8  ask me, well, what took you so long?
9           I said, well, because my feet are as
10 swollen and blistered up as they are, I
11 think I made pretty good time.  Because the
12 way the office was made, it's like a block
13 long.
14     Q   I understand.
15     A   So, you know, I just thought it was
16 unfair.  Because, I mean, I still came to
17 work knowing I was sick.
18     Q   When you mentioned blisters, I'm
19 guessing you're talking about the June '03
20 time frame when you had the negative
21 reaction to the medication?
22     A   Right.

Page 107

1      Q   Okay.  But that cleared up.
2      A   Yes.  But it took two months to
3  clear up.  At some point, I was at work.
4      Q   What did you want Mr. Henck to do
5  about that?
6      A   You know, I asked for assistance
7  like, you know, can I get someone to help me
8  as far as the walking part or whatever.
9      Q   And he didn't get you any?
10     A   Basically, he told me he spoke to
11 Ms. Riley, and Ms. Riley said that we were
12 short of floaters and short of help, and
13 that was the answer that I got.
14     Q   But that accommodation went away
15 once your feet got better -- once they
16 figured out that the medication was causing
17 blisters?
18     A   Yes.  But I had the blisters for two
19 and a half months.
20     Q   I understand.
21     A   Okay.  But --
22     Q   But you didn't need that help

Page 108

1  anymore, that accommodation, after that
2  point in time?
3      A   No.
4      Q   So, Paragraph 76 and 77, it says the
5  law firm failed to provide you a reasonable
6  accommodation for disability.  "The firm
7  declined to reassign her to the position of
8  receptionist."
9           I think the answer to the question
10 is that the accommodation you asked for in
11 May of '04 was to be made the receptionist.
12 Was there any other accommodation you asked
13 for in May of '04?
14     A   In May of '04, are you referring to
15 the conference call?
16     Q   Well --
17     A   That's just what I'm asking you,
18 sir.
19     Q   Sure.
20     A   Okay.  Because I felt that's the
21 only job that I could have done at that
22 time.

Page 109

1      Q   Did you ever ask Ballard Spahr for
2  any other accommodation so that you could go
3  back to work or continue to work?
4      A   Yes.  The receptionist position.
5      Q   Was there any other accommodation
6  you asked for was the question.  Your answer
7  is probably no, but --
8      A   But, I mean, that was the only job
9  that was available.
10     Q   So, you don't recall asking them to
11 place you in any other position?
12     A   The position they offered me was
13 word processing.
14     Q   Do you recall asking them to place
15 you in any other position except the
16 receptionist job?
17     A   Pantry, stocking shelves.
18     Q   When did you ask for that?
19     A   No, no, no.  This is what was
20 offered to me.
21     Q   Ma'am, listen to my question.
22     A   Okay.  I'm listening to your

Page 110

1  question, sir.
2      Q   Did you ever request -- you ever
3  request -- to be placed in any other
4  position besides the receptionist job?
5      A   No. Because that was the only one
6  available.
7      Q   Did you ever tell Ballard Spahr that
8  you could perform the duties of any other
9  position besides the receptionist job
10  whether or not the position was available or
11  not?
12      A   Could you rephrase that?
13      Q   Sure.
14      In late '03 or '04, did you ever say
15  to Ballard Spahr I can do a job that the
16  office has, and if it opens up, I'd like
17  that job? Any other job except the
18  receptionist job?
19      A   No.
20      Q   All right. This is in the FMLA
21  count, and you'll notice that these things
22  tend to repeat themselves.

Page 111

1      In Paragraph 91, it says that the
2  FMLA was violated by denying you
3  intermittent family leave between January
4  '03 and May '03.
5      Again, can you recall any leave that
6  you requested that was declined? Earlier,
7  you told me no under the race count. I just
8  want to make sure the answer is the same
9  here.
10      A   Like I said, I felt I was
11  discriminated against.
12      Q   I understand.
13      But you didn't ask for any leave
14  specifically that was denied; right?
15      A   I mean, from the way the situation
16  was, if I had asked for 16 weeks off with my
17  husband, it would have caused a problem. I
18  wouldn't have had a job, because I was told
19  that I wasn't entitled to 16 weeks with my
20  husband.
21      So, therefore, I tried to keep it as
22  simple as possible. I only requested the

Page 112

1  leave to help him with his chemo.
2      Q   Okay. But you got what you
3  requested in terms of leave; right?
4      A   Yes.
5      Q   Paragraph 100, this is your
6  retaliation count. Paragraph 100 says you
7  complained on several occasions between
8  November '02 and March '03 to Ballard Spahr
9  officials that Riley Jamison was treating
10  you disparately and negatively.
11      The Ballard Spahr officials that
12  you're referring to there, is that Mr.
13  Henck?
14      A   Mr. Henck, Allen Winn.
15      Q   That's right. I forgot about Mr.
16  Winn.
17      A   Yes. Winn's a partner.
18      Q   When did you tell Mr. Winn?
19      A   I told him on a couple of occasions.
20  I don't know the exact -- I don't recall the
21  exact dates.
22      Q   Was it between November '02 and

Page 113

1  March of '03?
2      A   Yes. I also spoke with Mr. Henck.
3      Q   What did you tell Mr. Winn? The
4  same things you told Mr. Henck about Ms.
5  Riley-Jamison?
6      A   Yes.
7      Q   And did he ever get back to you?
8      A   No.
9      Q   And I don't know if this refers to
10  this or not.
11      "When I went to Mr. Panagopoulos in
12  February '03 and I asked him about filing a
13  sexual harassment claim against Ms. Riley,
14  he told me that he didn't feel that that was
15  necessary."
16      When was that?
17      A   In February -- I'm not sure of the
18  exact date. In February of '03.
19      Q   A sexual harassment claim?
20      A   Yes. Under sexual harassment; yes.
21      Q   What did she do to sexually harass
22  you?

Page 114

1    A    I mean, no. From my understanding
2    of the meeting that was presented to us by
3    Ballard, sexual harassment came up under
4    harassing an employee.
5    Q    Well, when you say "sexual," it
6    means --
7    A    No, no, not sexual. She wasn't
8    trying to hit on me or nothing.
9    Q    I understand that.
10   A    Okay.
11   Q    But sexual harassment means
12   harassment because you're a woman.
13   A    No.
14   Q    Okay.
15   A    The way the laws are now, my
16   understanding, sexual harassment is broader
17   from the meeting that Jeffrey Larroca did
18   with the staff.
19        It also includes harassing an
20   employee, being mistreated, being
21   discriminated against regardless of male or
22   female. So, I went to Mr. Panagopoulos --

Page 115

1    Q    And asked him --
2    A    -- yes -- and he told me that he
3    didn't think that was necessary, that Ms.
4    Riley would be spoken to.
5    Q    All right. We're moving to the
6    period of time of February, March, and April
7    '04; okay? That's when your Unum
8    application is pending.
9    A    Was pending; yes, sir.
10   Q    Okay.
11   A    Is that on this page?
12   Q    No, ma'am.
13        Did there come a time when Mr.
14   Spellman told you that all the records had
15   been gotten and now they could do their
16   review?
17   A    No.
18   Q    All right.
19   A    Not that I can recall; no.
20   Q    You asked Mr. Spellman for all the
21   notes of telephone conversations he had. Do
22   you recall that?

Page 116

1    A    Yes.
2    Q    And did he send them to you?
3    A    Yes. But he sent me two different
4    sets.
5    Q    Have you given those to Ms. Murray
6    to produce?
7        MR. DiMURO: I don't know, Ms.
8    Murray, one way or the other. Do you know
9    if you produced them over?
10       MS. MURRAY: I don't recall seeing
11   them.
12       BY MR. DiMURO:
13   Q    Do you still have them, Ms.
14   McFadden?
15   A    Yes. And I made like notations of
16   my own. Yes, I do have those.
17   Q    Do you recall reading in there that
18   Ballard Spahr had the sales agent for Unum
19   try to urge Ms. Spellman to try to expedite
20   his review?
21   A    No. I was never told that.
22   Q    Do you recall that it was Dr. Tahata

Page 117

1    who wanted the $40 for copying?
2    A    I didn't -- I wasn't aware of that.
3    I didn't know anything about that.
4    Q    Do you recall calling Ms. Riley
5    Jamison in February or March of '04 telling
6    her you were very upset about how Unum was
7    proceeding?
8    A    Yes. And that came from me talking
9    to Mr. Henck.
10   Q    Is it possible you were even so
11   upset that you were crying when you were
12   talking to Ms. Riley-Jamison?
13   A    Yes.
14   Q    And one of the points you were
15   making was one doctor was not rewriting his
16   notes that nobody could read?
17   A    That's what Mr. Spellman claimed.
18   Q    Right.
19   A    But what was so strange, those same
20   notes I turned in with my appeal, and nobody
21   had a problem reading it.
22   Q    Okay.

Page 118

1    A    So, I thought that kind of odd.
2    Q    And another topic of conversation
3  with Ms. Riley-Jamison when you called very
4  upset was that the pulmonary doctor -- I've
5  forgotten who that is -- was saying he
6  hadn't gotten the request, but he was saying
7  he did.
8    A    They showed me when they faxed it to
9  Mr. Spellman and the fax was received. They
10  did that several times.
11    Q    Right. But you're telling Ms.
12  Riley-Jamison that Unum claims they're not
13  getting some records, but when you ask the
14  doctors, they're telling you they've sent
15  them.
16    A    No. I would be there. When their
17  assistants would fax the documents to Mr.
18  Spellman, the fax sheet would come back
19  completed, but he would turn around and say
20  he never received that.
21    Q    But these are the types of things
22  you were telling Ms. Riley-Jamison during

Page 119

1  the phone call when you were very upset with
2  how Unum was proceeding?
3    A    I don't recall everything that I
4  said to her.
5    Q    Do you recall telling her that,
6  because of the delay, your electricity was
7  going to be cut off?
8    A    Yes.
9    Q    Do you recall telling --
10    A    Because I talked to Mr. Henck.
11  Anything, I talked to Mr. Henck first.
12    Q    Okay.
13    A    So, yes.
14    Q    And do you recall that shortly
15  thereafter, you were sent $1,300, $1,400, or
16  $1,500 in a salary advance?
17    A    That came from Mr. Henck calling my
18  home asking me had my husband's life
19  insurance been paid, which is $1,350 a
20  quarter.
21    Q    Right.
22    A    I told him, no, I was not going to

Page 120

1  worry about it. He went, oh, no, that has
2  to be paid because when Mack dies, you and
3  the children have to have something.
4    Q    Right. Okay.
5    A    But the way it was presented to me
6  was these are salary advances you don't have
7  to worry about, that I did not have to pay
8  back. I explained that I don't want to take
9  anything that I know I can't afford to pay
10  back. Unum and I, we talked about that.
11    Q    Okay, ma'am. I'm just trying to
12  figure out the timing of all this.
13    A    Yes.
14    Q    Shortly after you told Ms. Riley-
15  Jamison that you were upset about, you know,
16  the electricity would be cut off and Unum
17  was delaying, shortly thereafter someone
18  from Ballard Spahr sent you a salary
19  advance; is that true?
20    A    Mr. Henck.
21    Q    Right. And you didn't ask for it.
22  Somebody from Ballard Spahr called you up

Page 121

1  and offered it; right?
2    A    Mr. Henck called and asked me about
3  my husband's life insurance.
4    Q    And that led to an offer of a salary
5  advance so that you could pay your bills;
6  right?
7    A    But as I explained to him --
8    Q    Ma'am -- Ma'am --
9    A    He said -- Okay. He said he had to
10  put it down as a salary advance to keep the
11  accounting books straight.
12    Q    Okay.
13    A    Okay?
14    Q    And you've never had to pay back
15  that salary advance; right?
16    A    No.
17    Q    Okay. I'm just trying to --
18    A    Okay. No.
19    Q    -- get you to agree, if you can,
20  that there were people at Ballard Spahr in
21  '04 who were going out of their way to try
22  to help you.

Page 122

1    You don't agree with that?
2    A    To a point where it -- I mean, as
3  far as Mr. Henek, to a point where it dealt
4  with my husband's life insurance.  But as
5  far as Ms. Riley, no.
6    Q    So, you don't know if Ms. Riley had
7  any participation in urging that you get a
8  salary advance?
9    A    She didn't.  Because when Mr. Henek
10  asked her to issue the check for the life
11  insurance, she made the comment, well, if
12  there's anything else you need, you know,
13  you need to just let us know everything at
14  one time, this is tedious.  And I told her
15  no.
16    MR. DiMURO:  Let me take a break and
17  see what else I have.  I'm just going to
18  look at my notes, and I'll be back.
19    (Whereupon, a brief recess was
20  taken.)
21    BY MR. DiMURO:
22    Q    In your interrogatory answers, I see

Page 123

1  a name, Carolyn Plater-Fox.  I don't recall
2  hearing that name.  Have we discussed her at
3  all today?
4    A    No.
5    Q    Or, I'm sorry, the last few days?
6    A    No.
7    Q    Who is she?
8    A    She used to work also for Ballard.
9    Q    Does she have any personal knowledge
10  about what happened to you there?
11    A    During that period of time, no.
12    Q    When did she leave roughly?
13    A    I'm not sure of the exact year.  But
14  she came back off of disability to work.
15  That day, they terminated her before she
16  started her day back.
17    Q    Did she say to you, when you talked
18  to her, that she has some information that
19  is helpful in this case or not?
20    A    She said that she'll be willing to
21  be a witness in my behalf, yes.
22    Q    Well, what topic would she address?

Page 124

1    A    Discrimination, racism, retaliation,
2  disability.
3    Q    Who did she work for?
4    A    Word processing.
5    Q    Word processing is usually down a
6  separate floor.  Is that true at Ballard
7  Spahr?
8    A    No.  We were all on the same floor.
9    Q    Did she have comments to make about
10  Ms. Riley-Jamison?  Did she have any
11  interaction with her?
12    A    No, not at all.
13    Q    How about Mr. Henek?
14    A    She had interactions with Mr. Henek
15  and also Allen Winn.
16    Q    A section of your interrogatory
17  answers that we talked briefly about
18  yesterday was -- or partially about
19  yesterday was that Ms. Riley-Jamison
20  discussed issues of your husband's health
21  with Mr. Panagopoulos and others that they
22  would then mention to you.

Page 125

1    What topics or information did
2  people repeat to you that you knew only Ms.
3  Riley-Jamison knew?
4    A    For instance, when I went to Dr.
5  Thomas, she's the only person that knew
6  that.  So, the next day after my
7  appointment, Mr. Panagopoulos seen me in the
8  hallway and goes, oh, we have something in
9  common, we go to the same doctor.
10    And I said, what are you talking
11  about?  Aren't you going to Kristen Thomas?
12  And the only person I had mentioned that to
13  was Ms. Riley.
14    Other staff members would come up to
15  me with their eyes teary and stuff.  I
16  didn't realize that your husband was that
17  bad off as far as that you had to clean
18  feces off of him and throw up and -- we
19  didn't realize that he was that sick.
20    Q    Any other things that people would
21  say that you didn't believe were generally
22  known or that you hadn't mentioned?

McFadden

Page 126

1    A    That I hadn't mentioned.  I guess
2    the thing that was more irritating to me
3    than anything was when my husband was in the
4    hospital, I don't think it was Ms. Craig's
5    position to call the hospital to check to
6    see if my husband was there or not since she
7    was the systems administrator.
8        That bothered me.  And she also did
9    it with other African-American employees,
10   which was not in her line of work.  She
11   dealt with computers.
12       So, to make a long story short, if
13   management, Ms. Iversen and Mr. Riley,
14   didn't tell her everything, then certain
15   things in the office would have never got
16   out.
17   Q    Anything else that you can recall?
18   A    Because my thing is confidentiality
19   is confidentiality.
20   Q    Anything else you can recall that
21   was said to you by staff members
22   A    No.  And they were saying, you know,

Page 127

1    well, how are you getting paid?  I said,
2    what do you mean?  Well, how are you and
3    Mack making it?  I said, you know, God is
4    good, we'll be fine.
5        You know, to me, these were all
6    insulting things to me.  It was an insult
7    because my personal life and how I was
8    making it paying my bills and as far as my
9    husband's health as far as him throwing up
10   or cleaning feces off of him, that's a
11   little too much to tell people.
12   Q    Well --
13   A    And I don't feel that other staff
14   members should have known that.
15   Q    Are you telling me that other staff
16   --
17   A    While I'm going down the hallway and
18   staff members are looking at me busting out
19   crying, well, my God, you know, is Mack
20   getting ready to die.  And like I told Ms.
21   Riley, I said, when God sends you a fax and
22   tells you it's time for my husband to leave,

Page 128

1    then I guess you have your answer.
2    Q    Are you telling me that staff
3    members would ask you about cleaning up your
4    husband?
5    A    Yes.  To me, that was very
6    humiliating.
7    Q    Well, did you tell those things to
8    Ms. Riley-Jamison?
9    A    In a confidential nature.
10   Q    I'm asking you if you told her --
11   A    Yes.
12   Q    -- that you had to stay home, for
13   example, because your husband had gotten
14   sick and you had to clean up?
15   A    Yes.  That Tuesday in between that
16   Monday and Wednesday schedule.
17   Q    And do you think that people asking
18   you questions about how Mack is doing when
19   you're crying in the hallway --
20   A    No, no, no.
21   Q    -- is a bad thing?
22   A    They were coming up to me crying.

Page 129

1    Q    Oh, I see.
2    A    Because they didn't realize that he
3    was that sick.  I didn't feel it was
4    nobody's place because what I was trying to
5    do was focus on my job, doing my job,
6    getting through the day, and getting back to
7    my husband.
8    Q    What does Julia Jones know?
9    A    She was the receptionist.
10   Q    When was she a receptionist?
11   A    She was there for a long time.
12   Q    When did she leave roughly?
13   A    It was on Valentine's Day.  I don't
14   recall which year.  No.  She left
15   Valentine's Day of 2003.
16   Q    So, as a receptionist, she would
17   simply know about leave records and
18   attendance records?
19   A    No.  She was the night receptionist.
20   Q    Well, what would she know about that
21   you were treated differently?
22   A    She couldn't understand why -- She

Page 130

1  said, what I don't understand is that they
2  see your illness, so why aren't they
3  accommodating your illness?
4      Q   I see.
5      But does she have any personal
6  knowledge about what Ballard Spahr did for
7  you versus others? Does she have personal
8  knowledge as opposed to something you might
9  have said?
10     A   No. She has personal knowledge as
11  for what other employees have told her.
12     Q   How about Ms. Dixon?
13     A   Okay. Pat Dixon was a word
14  processor. And at the time, Ballard Spahr,
15  I guess, quote, unquote, "was cutting back
16  on staff." Ms. Dixon was African-American.
17     Everyone else that Ms. Riley-Jamison
18  told that they were terminated, Ms. Dixon
19  was the only one that was escorted to her
20  vehicle out of the building.
21     Q   Were you present when that happened?
22     A   What?

Page 131

1      Q   Were you there when that happened?
2      A   I was sitting on the loading dock.
3  Yes.
4      Q   And Ms. Plater-Fox left in '95 or
5  '96?
6      A   It had been a while, but she's
7  familiar with the practices of Allen Winn
8  and Mr. Henck.
9      Q   Ms. Jo Ann Smith, when was she let
10  go?
11     A   It's been a while.
12     Q   Many years?
13     A   But she was like the office manager
14  assistant.
15     Q   What did she provide by way of
16  testimony?
17     A   Their practices on how -- I mean, at
18  the time, she kept the leave where, you
19  know, Ms. Iversen would tell her, you know
20  - Well, when she would put in the leave,
21  say, to dock someone who was white, Ms.
22  Iversen would tell her to change it.

Page 132

1      Q   I'm showing you Exhibit 36, which is
2  a leave of absence page out of the policy
3  book.
4      A   Yes.
5      Q   Had you read that in -- Strike that.
6      Were you familiar with it in '03 and
7  '04?
8      A   Okay. Back to the form --
9      Q   I'm just asking you if you're
10  familiar with that page.
11     A   Yes. I am familiar with that page.
12     Q   Were you familiar with that page in
13  '03 and '04?
14     A   Yes.
15     Q   Thank you.
16     A   Okay.
17     Q   Exhibit 37, a memorandum -- I see
18  that it's dated '06, so I'm not so sure
19  you've seen this one.
20     A   No. Not at all.
21     Q   Exhibit 38 is a page out of the
22  policy manual relating to the ADA, or

Page 133

1  Americans with Disabilities. Were you
2  familiar with this page in '03 and '04?
3      A   From Ballard?
4      Q   Yes.
5      A   No.
6      Q   Exhibit 39 is an EEOC policy from
7  Ballard Spahr. Were you familiar with these
8  pages in '03 and '04?
9      A   It looks like there's something
10  missing.
11     Q   I see that somebody put a Post-It
12  Note on it and copied over the Post-It Note.
13
14     But can you tell me if you were
15  familiar with these pages and the policies
16  they contain in '03 and '04?
17     A   Can I ask what might sound like a
18  stupid question?
19     Q   Sure.
20     A   Why doesn't this document have a
21  date on it?
22     Q   I'm just asking you if you -- I

Page 134

1    don't know the answer to that question.
2        A    I've never seen the document.
3        Q    Exhibit 53 is a letter from Unum to
4    you dated May 11th, 2004.  Did you receive
5    that letter?
6        A    Yes.
7        Q    Exhibit 54 is a letter dated August
8    19th, 2004 from Unum to you.  Did you
9    receive that letter?
10       A    (No response.)
11       Q    Did you receive that letter, ma'am?
12       A    Yes.
13       Q    Exhibit 55 is a letter dated October
14   22nd, 2004 from Unum to you.  Did you
15   receive that document?
16       A    Yes.
17       Q    Exhibit 56 purports to be a
18   handwritten note from you to Unum dated
19   October 15th, 2004.
20       A    Yes.
21       Q    Did you write this?
22       A    Yes.  My son helped me do this; yes.

Page 135

1        Q    Right.  But you signed it; right?
2        A    My son -- Yes.  I'm familiar with
3    that.
4        Q    And you signed it?
5        A    Yes.
6        Q    And we didn't include attachments,
7    but attached to that letter were all the
8    various records you wanted Unum to look at
9    for purposes of reconsidering your long-term
10   disability application; right?
11       A    Yes.
12       Q    Exhibit 57 is a letter from Unum to
13   you dated October 29th, 2004.  Did you
14   receive that letter?
15       A    Yes.
16       Q    Exhibit 58 is a letter from Unum to
17   you dated September 6th, 2005.  Did you
18   receive that letter?
19       A    I think this was the changing of the
20   guard.  Mr. Spellman was my person all the
21   time.  Then all of a sudden, I got Rachel
22   Black.  So, I'm assuming --

Page 136

1        Q    I'm just asking --
2        A    I think I've seen this to the best
3    of my knowledge.
4        Q    Exhibit 59 is a letter from Unum to
5    you dated September 14th, 2005.  Did you get
6    that letter?
7        A    Yes.
8        Q    Exhibit 60 is a letter from Unum to
9    you dated September 22, 2005 approving your
10   benefits.  I'm sure you got that letter;
11   right?
12       A    Yes.
13       Q    Were you aware in '04 and '05 that
14   if your benefits from Unum were approved,
15   they might be adjusted, depending on how
16   much Social Security benefits you got?
17       A    No.  I was never told that.
18       Q    Okay.  You're aware of that now that
19   Unum benefits are affected by your Social
20   Security benefits; right?
21       A    I'm aware of that now, but at the
22   time, no.

Page 137

1        Q    Okay.  It is what it is.  I guess
2    I'm asking, have you ever determined that
3    Unum is not paying you the correct amount
4    because they've miscalculated your Social
5    Security benefits?
6        A    See, you're asking me a two-part
7    question.
8        Q    All right.
9        A    So, basically, what you're asking me
10   is am I accountable because Unum made a
11   mistake?
12       Q    No, no, no.  I'm asking
13       A    I don't understand your question.
14       Q    I'm asking you if you've ever sat
15   down and gathered all the right information
16   to determine whether or not the amount Unum
17   pays you monthly is the correct number?
18       A    I mean, at this point, I guess, if
19   they said I owed them money for what I get,
20   that's what I accept.  I guess that's -- I
21   understand it now.  But at the time, no one
22   explained it to me.

Page 138

1    Q    But Unum has told you that because
2 of your Social Security benefits, there was
3 an overpayment to you and that they need to
4 get that money back.
5    A    Okay.  But that's what they're
6 telling me now.  But at the time when Ms.
7 Forman knew I was applying for my Social
8 Security disability and there was a form
9 that you showed me earlier, and she told me
10 after I filled out that part, to white it
11 out.  She said one doesn't have nothing to
12 do with the other.  So, I was assuming one
13 didn't have nothing to do with the other.
14    Q    Well, I'm just asking you about what
15 you understand now.
16    A    Okay.
17    Q    Do you understand now --
18    A    I understand now.  But where I'm
19 confused at is in letters from Unum, under
20 the reservation of rights, regardless of if
21 my disability is approved or not, that they
22 would not deduct this amount of money from

Page 139

1 my check, and those are the letters that I
2 have --
3    Q    Ma'am --
4    A    Okay.  Yes.
5    Q    -- stay with me.
6    A    Okay.  I'm trying to.
7    Q    Okay.
8    A    I'm staying.
9    Q    Unum has told you that because you
10 received a certain amount of Social Security
11 benefits, that Unum believes they have
12 overpaid you.
13    A    Yes.
14    Q    Unum has said to you we're going to
15 deduct some money from your monthly benefits
16 to help you repay us for that amount.
17 That's the position they've taken.
18    A    That's the position that Unum and
19 John DiBattista of Ballard Spahr took.
20    Q    Well, how do you know that John
21 DiBattista was involved in that decision?
22    A    Because it's in the letter.

Page 140

1    Q    And what does that letter say?
2    A    It mentions his name.
3    Q    It mentions his name.  Does it say -
4 -
5    A    I mean, they didn't even tell me how
6 much they were going to take.
7    Q    All right.
8    A    They just said they conferred with
9 John DiBattista, and that's what they came
10 up with.
11    Q    All right.
12    A    So, I wasn't aware of that.
13    Q    Okay.
14    A    Nobody didn't tell me anything.  I
15 just got it in the mail.
16    Q    Exhibit 63, did you get that letter
17 from Social Security?
18    A    Yes, I did.
19    Q    And I presume you got the money that
20 they mention in the letter?
21    A    Yes.
22    Q    Exhibit 64, did you get that letter

Page 141

1 from Social Security?
2    A    This is referring to my Medicare.
3 Yes.
4    Q    Exhibit 65, is that your statement
5 for purposes of filing an EEOC complaint?
6    A    For filing a what?
7    Q    EEOC complaint.
8    A    Yes.
9    Q    I presume somebody helped you write
10 it, and you signed it?
11    A    What I can recall and whatever, it
12 took me about close to two weeks to write
13 this document.
14    Q    Okay.  But you wrote it for purposes
15 of filing --
16    A    Of filing my EEOC complaint; yes,
17 sir.
18    Q    Exhibit 66 are your notes of a
19 conversation on March 5th, 2004 with Mr.
20 Henck; is that right?
21    A    Yes.
22    Q    Exhibit 67 is a memo from you -- a

Page 142

1  handwritten memo from you about the March
2  9th letter you got from Mr. DiBattista?
3      A   Yes.
4      Q   Something is confusing about that
5  note to me.  It talks about the May 14th
6  conversation.
7          Do you see that in the middle of it?
8      A   "As of May the 14th, I never
9  received a response from Ballard Spahr one
10  way or the other on my leave of absence
11  request form."
12      Q   Right.  It discusses the May 14th
13  conversation.
14      A   Yes.
15      Q   But it's talking about the March 9th
16  letter.  I'm just trying to figure out, did
17  you --
18      A   No, no.  The March 9th letter that I
19  received saying I didn't have any job
20  protection.
21      Q   Right.  So, this note was written on
22  or after May 14th; is that right?

Page 143

1      A   I wrote it on May the 14th.
2      Q   Okay.  I was just confused because
3  the top of the letter or the note says March
4  9th.  That's all.  It was a very simple
5  confusion on my part.
6      A   I put March 9th because that was the
7  date on the letter.
8      Q   I see.  But --
9      A   But I wrote this on May the 14th.
10      Q   Thank you.
11      A   Are you confused?
12      Q   I'm always confused.
13      A   Okay.
14      Q   Exhibit 69 is notes by Dr. Mussenden
15  submitted to the D.C. Department of Human
16  Services.  Is that a true statement?
17      A   Yes.
18      Q   What type of benefits are involved
19  there?  Is that part of the Social Security
20  program, or is that something else?
21      A   At that time, I was trying to get
22  some assistance for my medications, which I

Page 144

1  was turned down because I owned a property.
2      Q   So, this is a different type of
3  program than Social Security or Unum
4  obviously?
5      A   Yes.  I was trying to get Medicaid,
6  but I didn't -- Because I own a property, I
7  didn't qualify.
8      Q   Exhibit 71 is a letter you got from
9  Ballard Spahr; is that correct?
10      A   Yes.
11          MR. DiMURO:  I have no further
12  questions.  Thank you very much.
13          THE WITNESS:  Thank you.  Now,
14  wasn't that easy?
15          MR. DiMURO:  Well, I have one other
16  question now that you say that.
17          THE WITNESS:  Do you want a Vicodin?
18          MR. DiMURO:  You reminded me by
19  saying -- Well, maybe if you asked me that
20  question was it easy on a scale of one to
21  ten.  It's sort of like a pain scale when
22  the doctors ask you for a pain scale.

Page 145

1          There is one other thing I wanted to
2  ask you --
3          THE WITNESS:  Yes, sir.
4          MR. DiMURO:  -- and you have to
5  blame yourself because your comment
6  triggered me about that.
7          BY MR. DiMURO:
8      Q   What doctor was Dr. Griffin?  I've
9  forgotten his specialty.
10      A   He dealt with rheumatology -- He was
11  an internal medicine rheumatology specialist
12  or what have you.
13      Q   I'm just going to show you an
14  example of a type of record out of his
15  chart.  It's part of Exhibit 14, and it's
16  Page 389.
17      A   Yes.
18      Q   Are you familiar with that type of
19  form that Dr. Griffin uses?
20      A   Yes.
21      Q   Did you write "Vanessa McFadden" at
22  the top, or did somebody on the staff write

Page 146

1  that?

2      A   I wrote that, "Vanessa McFadden."

3      Q   Whenever I see a form like that

4  which lists all sorts of symptoms and all

5  sorts of different body parts, do you

6  actually do the circling or does the staff

7  do the circling or the doctor?

8      A   I take my time and I do the

9  circling. It was Dr. Griffin's practice was

10  every time you saw him, you had to fill out

11  this form. That was his practice.

12      Q   Right. So, before you actually got

13  to see him, you had to fill out --

14      A   Before you see him, you had to fill

15  out this.

16      Q   Okay. Thanks.

17          MR. DiMURO:  Don't say anything else

18  to me. I'll think of another question.

19          THE WITNESS:  Oh, no, I'm not

20  talking to you anymore.

21          EXAMINATION ON BEHALF OF THE

22  PLAINTIFF

Page 147

1          BY MS. MURRAY:

2      Q   Yesterday, Mr. DiMuro asked you

3  questions about various representations that

4  were made in documents that were similar to

5  or exactly the following, that you were

6  unable to work.

7          Do you recall those questions posed

8  by him?

9      A   As far as after May 14th, 2004.

10      Q   I'm asking whether you recall

11  questions posed by Mr. DiMuro on that topic.

12      A   On that topic?

13      Q   Irrespective of the time.

14      A   Yes.

15      Q   When those representations were

16  discussed or identified in documents, were

17  you referring to your inability to work in

18  any job?

19          MR. DiMURO:  Form and foundation.

20          THE WITNESS:  No.

21          BY MS. MURRAY:

22      Q   Was there a job in 2004 that you

Page 148

1  could have performed given your limitations?

2      A   The receptionist job.

3      Q   Let's talk about the receptionist

4  job for a few minutes.

5          Mr. DiMuro asked you a question

6  about being able to hold a phone. Did the

7  receptionist manipulate or hold a phone as

8  part of her duties?

9      A   From my recollection, she held the

10  phone, but there was also a headpiece you

11  could use without holding the phone, but she

12  didn't know how to work it.

13          I don't mean to sound rude or

14  anything, but there was a headpiece, so I

15  wouldn't have had to have held the receiver.

16      Q   The headpiece enabled you to answer

17  calls or manage calls without holding an

18  actual phone; is that right?

19          MR. DiMURO:  Leading.

20          THE WITNESS:  Yes.

21          BY MS. MURRAY:

22      Q   What, if anything, did a member of

Page 149

1  management or a partner of Ballard Spahr

2  tell you about the essential functions of a

3  receptionist job?

4      A   None.

5      Q   Was there any discussion that you

6  had with management or a partner of Ballard

7  Spahr regarding the definition of "essential

8  function"?

9      A   No. Not until I saw that document

10  today. I've never seen it before.

11      Q   We'll get to that in a minute.

12      A   Okay.

13      Q   While you were employed at Ballard

14  Spahr, did you have the occasion to observe

15  the receptionist function in that job as

16  receptionist?

17      A   Ninety percent of the time, I was

18  her relief.

19      Q   Is that yes or no?

20      A   Okay. Say it again.

21      Q   When you worked at Ballard Spahr -

22      A   Yes.

Page 150

1    Q    -- did you have the occasion to
2  observe the receptionist functioning in the
3  job as receptionist?
4    A    Yes.
5    Q    You mentioned that you were her
6  relief. What do you mean by being her
7  "relief"?
8    A    When she needed bathroom breaks. I
9  would cover for her to go to lunch. Or,
10  say, if she had a morning break and an
11  evening break.
12    She would call me to go, you know --
13  They called me "V." She'd say, can you come
14  up here, I really need to go to the
15  bathroom, which was not in accordance to the
16  two breaks that she was given.
17    I would go, okay, I will let Charlie
18  know I'm going to relieve the receptionist.
19  Fine. It wasn't no problem.
20    Q    When you were acting as relief, you
21  were actually performing the job of the
22  receptionist; is that right?

Page 151

1    A    I was performing the job of the
2  receptionist; yes.
3    Q    Did you perform those jobs as relief
4  up until the time you left the firm in
5  October of 2003?
6    A    Yes.
7    Q    I'm setting on the table before you,
8  Ms. McFadden, a document that's been marked
9  as Exhibit 83.
10    Do you recall Mr. DiMuro presenting
11  this document to you a short time ago?
12    A    Yes.
13    Q    Do you recall whether or not you had
14  seen this document before he presented it to
15  you?
16    A    No.
17    Q    You just testified that you had, on
18  several occasions, observed the receptionist
19  perform her duties as receptionist when you
20  worked at the firm.
21    A    Yes.
22    Q    If you can, review this document and

Page 152

1  tell me what functions are listed on the job
2  description that you did not see whoever was
3  performing the receptionist job perform.
4    A    She could not type 60 words per
5  minute. She didn't know Advanced Word.
6  Outlook, I'm not sure about. She wasn't
7  familiar with Internet skills.
8    She wasn't organized, because that
9  was one of the things that she kept that
10  area just out of control. Most of the time,
11  I can't honestly say she was on time. I
12  can't say if she was or not. She got in at
13  7:30.
14    A lot of times she would call myself
15  or Ms. Briscoe if she was given a question
16  that she didn't understand. Because at that
17  time, Ms. Briscoe was her supervisor, so she
18  relied on Ms. Briscoe to make decisions for
19  her.
20    A Ms. Mia Phan was the one that set
21  up the conference rooms for meetings. Ms.
22  Briscoe's job was to, who was in management,

Page 153

1  to take care of the pantry. She would have
2  to clean up the business center of the
3  conference rooms for the start of meetings
4  and of business.
5    Ms. Hahn did not make travel
6  arrangements. She didn't have anything to
7  file except for the log that came in from
8  the Federal Express and UPS. She had
9  nothing to do with personal accounts.
10    Q    I believe the rest deals with other
11  issues except for the paragraph on "Others."
12  If there's anything else --
13    A    She did know how to enter time
14  sheets, but she was not familiar with MS
15  Word, documents being opened, or any other
16  desktop software besides Solitaire.
17    Q    Thank you very much.
18    A    Okay.
19    Q    And the individual that you observed
20  performing the receptionist position was
21  who?
22    A    Ms. Betty Ann Hahn.

Page 154

1  Q   When you had the conference call
2  with Ms. Forman, Mr. DiBattista, Ms. Riley-
3  Jamison that has been talked about often,
4  did anyone at any time communicate any of
5  these duties or responsibilities of the
6  receptionist position to you?
7  A   No. I was just told that that was
8  Ms. Betty Ann Hahn's job.
9  Q   Did anyone at any time indicate that
10  they believed that, given your limitations,
11  that you could not perform the receptionist
12  job?
13  A   No.
14  Q   Did you have a discussion with
15  anyone about your ability to perform that
16  job other than what we talked about in that
17  conference call?
18  A   The only thing I asked was why,
19  since she was out on disability, why
20  couldn't I work that position instead of a
21  temp. And I was told, again, that was Ms.
22  Betty Ann's job.

Page 155

1  Q   If you can recall, how long had the
2  temp been serving in the receptionist
3  position at the time you had the conference
4  call?
5  MR. DiMURO: Foundation.
6  THE WITNESS: Do I answer?
7  MS. MURRAY: Yes.
8  THE WITNESS: The temp had been
9  there November -- from my understanding, Ms.
10  Hahn came back to work around the 15th,
11  around that period of time, when it was
12  Christmas bonus time.
13  After she worked, I think it was a
14  week or so -- I'm not sure if it was a week
15  or two - she went back out on disability.
16  She never returned back to the job until --
17  She never returned back to the job, and she
18  passed on October 21st, 2004. From my
19  recollection, the day of her funeral is when
20  her permanent replacement started.
21  BY MS. MURRAY:
22  Q   Mr. DiMuro asked you questions about

Page 156

1  how you felt and/or functioned when you were
2  on Vicodin. Do you remember that exchange?
3  A   At the time, I wasn't taking Vicodin
4  for pain.
5  Q   At the time of your conference call
6  where you requested to work in the
7  receptionist position, you were not on
8  Vicodin?
9  A   No. I was just on ibuprofen, 800
10  milligrams.
11  Q   Did that ibuprofen in your mind in
12  any way interfere with the duties that you
13  believed you could have performed in the
14  position?
15  A   As a receptionist?
16  Q   As a receptionist; correct.
17  A   No.
18  Q   Did anyone at any time engage in
19  discussion with you about what other job you
20  could perform given your limitations?
21  A   No.
22  Yesterday, Mr. DiMuro asked

Page 157

1  questions which solicited an answer from you
2  concerning individuals who spoke with Ms.
3  Riley-Jamison about your modified schedule.
4  Who confronted Ms. Riley-Jamison
5  regarding your pay during your modified
6  schedule that you worked in 2003?
7  A   As far as support staff?
8  Q   Yes.
9  A   Sevonne Parker and Pamela Mitchell.
10  Q   Are you aware of what Ms. Mitchell
11  and Ms. Riley-Jamison discussed in that
12  regard?
13  A   Basically, after, I guess, they
14  confronted her about my schedule if I was
15  getting paid or not, that they felt that it
16  was causing confusion with the support
17  staff.
18  Q   Did either Ms. Mitchell or Ms.
19  Riley-Jamison tell you what was said during
20  their conversation?
21  A   No. Ms. Riley-Jamison never told me
22  that.

Page 158

1    Q    The same question with respect to
2    Ms. Sevonne Parker.
3        Did either Ms. Riley-Jamison or Ms.
4    Parker tell you what they discussed during
5    their conversation about your modified
6    schedule?
7    A    No.  But those are the two people
8    that Ms. Riley-Jamison told me they had a
9    problem with it.
10    Q    Did she tell you what, quote,
11    "problem" they had with your schedule?
12    A    No.
13    Q    Mr. DiMuro showed you two exhibits,
14    and I'll place them on the table in front of
15    you.  Let the record reflect that before the
16    witness are Exhibits 38 and 39.
17    A    Yes.
18    Q    Had you seen either of these
19    documents before today, Ms. McFadden?
20    A    No.
21    Q    Let's look at Exhibit 38.
22    A    Yes.

Page 159

1    Q    When you went out on disability in
2    October of 2003, were you in any way advised
3    of this policy by any member of management
4    or partnership at Ballard Spahr?
5    A    No.
6    Q    Were you given a copy of this policy
7    at that time?
8    A    No.
9    Q    When you had the conference call
10    that they're referring to with Mr.
11    DiBattista and Ms. Forman and Ms. Riley-
12    Jamison, were you advised of this policy?
13    A    No.
14    Q    Were you given a copy of the policy?
15    A    No.
16    Q    Are you aware whether this policy
17    was even in existence in 2004?
18    A    No.
19    Q    Let's look at Exhibit 39.
20        Had anyone in management or a
21    partner of Ballard Spahr given this document
22    to you?

Page 160

1    A    I'm not absolutely sure.  I think
2    it's a document that might have been passed
3    out when we had a meeting on the different
4    types of ways that sexual harassment was
5    sexual harassment, regardless as to
6    discrimination or retaliation not like on a
7    sexual nature, and that was a couple of
8    years ago.  But I don't know if that's the
9    same document.
10    Q    That was my next question.
11        When did that meeting occur?
12    A    Sometime in 2001, 2002.
13    Q    Was there any subsequent meeting
14    where employees were advised of the
15    harassment laws or policy after that meeting
16    to your knowledge?
17    A    No.
18    Q    When you complained to Mr. Henck
19    about your belief that Ms. Riley-Jamison was
20    discriminating against you -- or, rather,
21    mistreating you due to your race
22    A    Yes.

Page 161

1    Q    -- did he give you a copy of this
2    policy?
3    A    No, he did not.
4    Q    When you complained to Mr. Winn
5    about your mistreatment due to your race by
6    Ms. Riley-Jamison, did Mr. Winn give you a
7    copy of the policy?
8    A    No.
9    Q    Did either Mr. Henck or Mr. Winn
10    discuss with you the firm's policy on these
11    matters?
12    A    No, they did not.
13    Q    When you complained to Mr.
14    Panagopoulos that you wanted to file a
15    harassment complaint, did he give you a copy
16    of this policy?
17        MR. DiMURO:  Form and foundation and
18    leading.
19        THE WITNESS:  No, he didn't.
20        BY MS. MURRAY:
21    Q    Did he discuss with you this policy?
22    A    No, he did not.

Page 162

1    Q    Are you aware whether this policy
2    existed, as identified in Exhibit 39, in the
3    years 2002 through 2004?
4    A    Yes, it did. That's why I went to
5    Mr. Panagopoulos. That's who we were
6    instructed to go to, either Jeffrey Larocca
7    or Mr. Panagopoulos, if you thought that you
8    was being mistreated under the sexual
9    harassment law.
10    Q    And what was Mr. Panagopoulos'
11    response when you spoke with him?
12    A    He said, well, let me, you know,
13    talk to Meg about this and I will get back
14    to you, but I don't think it's necessary for
15    you to file that.
16    Q    Did you talk with anyone at Ballard
17    Spahr in management or that was a partner of
18    the firm between November or December of
19    2002 about your FMLA rights?
20    A    The only person I talked to about it
21    was Mr. Henck, and I explained to him that
22    District residents were entitled to 16

Page 163

1    weeks. He said, okay.
2        He said, have you talked to Fern
3    Forman or Meg about this? I said, I tried
4    to. Fern made a phone call. She said she
5    was calling John DiBattista. And because we
6    were a Philadelphia-based law firm, I was
7    not entitled to that 16-week entitlement.
8    Q    Did you have a discussion with Ms.
9    Forman or Ms. Riley-Jamison about
10    intermittent FMLA leave?
11    A    No.
12    Q    Did Ms. Riley-Jamison ever indicate
13    to you that FMLA leave could not be taken
14    intermittently?
15    A    No.
16    Q    In 2002 or 2003, did anyone at
17    Ballard Spahr in management or a partner
18    tell you that you were in fact entitled to
19    16 weeks of FMLA leave?
20    A    No.
21    Q    I'm placing before you a document
22    that has been marked Exhibit 81, and I

Page 164

1    direct your attention to the box midway down
2    the page. Do you see that there?
3    A    FMLA Coverage.
4    Q    Did you read that -- Let me back up.
5    Strike that.
6        Did you receive Exhibit 81 on or
7    about November 1, 2002?
8    A    Yes. I received it in the overnight
9    mail on November the 2nd.
10    Q    Of 2002?
11    A    Yes. As far as I can recall.
12    Q    When you received this document, do
13    you recall reviewing the box in the middle
14    of the page?
15    A    Yes.
16    Q    And reading the text that's in the
17    box, what did you understand that to mean
18    with respect to your FMLA leave entitlement?
19    A    That I calculated it, and it was 12
20    weeks. That's when I called Ms. Forman and
21    asked her, I do not understand this. I
22    thought that you could use FMLA as

Page 165

1    necessary.
2        She told me, no, that is not how the
3    policy worked. So, therefore, I told her,
4    first of all, the date was incorrect. I
5    told her, second of all, I don't understand
6    this, this is confusing to me.
7        She said, well, since we're a
8    Philadelphia-based law firm, you only get 12
9    weeks. I called the U.S. Department of
10    Labor. I spoke to someone in Occupational
11    Safety and Health Administration, and I
12    asked them.
13        I said, what are the FMLA laws when
14    it comes to a District resident? They said,
15    regardless -- They said, if you work in the
16    District, regardless of anywhere else that
17    you live at, you're entitled to 16 weeks of
18    FMLA leave.
19    Q    Did you tell that to anyone at
20    Ballard Spahr about your communication with
21    the Department of Labor?
22    A    I told Ms. Forman, I told Ms. Riley.

Page 166

1  and I told Mr. Henck. And Mr. Henck called
2  Ms. Forman, and she said she would check on
3  that. And it came back with the same
4  answer, we're a Philadelphia-based firm and
5  I'm only entitled to 12 weeks.
6  Q   When you reviewed the text in the
7  box on Exhibit 81, did you believe that you
8  had FMLA leave available to you after
9  January 8th, 2003?
10  A   No.
11  Q   So, is it fair to say that you
12  considered the time period delineated on
13  Exhibit 81 to define the period that you had
14  available for FMLA leave?
15  MR. DiMURO: Form, foundation,
16  leading.
17  THE WITNESS: For my husband, yes.
18  BY MS. MURRAY:
19  Q   During the period that's delineated
20  in this box, October 17th through January
21  8th, 2003, did you work any days in that
22  period?

Page 167

1  A   Yes.
2  Q   What discussions, if any, did you
3  have with Ms. Forman or Ms. Riley about the
4  days that you actually worked being counted
5  as FMLA leave?
6  A   I was told by Ms. Forman and Ms.
7  Riley that that was the period of time that
8  I was allowed regardless if I came to work
9  or not. My understanding is that's the time
10  frame of my FMLA concerning my husband.
11  Even though I came back to work on
12  November 1st, the next time I took off was
13  Mr. Henck told me to take off the Wednesday
14  before Thanksgiving.
15  I took my husband to a doctor's
16  appointment on December the 5th. And from
17  my recollection, the next time I took off
18  was when he started his chemo in January of
19  2003.
20  Q   You stated previously, and I believe
21  you also stated yesterday, that you didn't
22  believe that your FMLA period should have

Page 168

1  started October 17th; is that right?
2  A   Yes.
3  Q   And why do you believe that it
4  should not have started on that date?
5  A   Because that pertained to me. From
6  what Ms. Riley told me, if you're out sick
7  three days, you have to be placed on FMLA
8  leave by law.
9  So, I was asking her, well, the 17th
10  and 18th, that was my health, not my
11  husband's, so why are you starting the day
12  there instead of that Monday?
13  And Ms. Forman's response was, no.
14  And I showed them documentation that I had a
15  colonoscopy, and it was like it doesn't
16  matter, these are the dates that we
17  calculated.
18  Q   Mr. DiMuro asked you questions about
19  the reasons why you sold your rental
20  properties. Do you remember that discussion
21  with him?
22  A   Yes.

Page 169

1  Q   Do you believe that your job loss in
2  any way contributed to your having to sell
3  your rental properties?
4  A   Yes.
5  Q   How so?
6  A   Because I felt that I didn't have
7  the income to -- I mean, family and friends
8  were helping me, but to some point, you
9  know, you can't expect for family and
10  friends to pay for your responsibilities.
11  And, furthermore, I felt if Chura and
12  Ballard would have treated me differently, I
13  wouldn't have never had to sell my
14  properties in the District, which even Mr.
15  Henck said was a gold mine.
16  So, that was lost income from both
17  properties because I had to instruct the
18  renters that they had to leave. But that
19  was a monthly income for my husband and I.
20  MS. MURRAY: Nothing further.
21  MR. DiMURO: I've just got a couple.
22  FURTHER EXAMINATION ON BEHALF OF THE

Page 170

1      DEFENDANTS
2      BY MR. DiMURO:
3      Q    When did you go on Vicodin?
4      A    I thought you were finished.
5      Q    I get to ask a few more questions.
6      A    I want to say -- I'm not exactly
7   sure, but it was sometime in 2004.  I'm not
8   exactly sure of the date.
9      Q    How close to May '04?
10     A    This is 2007.  How do you expect me
11  to remember that?
12     Q    You don't recall?
13     A    No.  I don't recall exactly when I
14  started on it.
15     Q    Well, I'm not asking you exactly.  A
16  rough estimate.  Was it Labor Day, Memorial
17  Day, July 4th?
18     A    I'm not sure.
19     Q    Now, what pain medication were you
20  taking in May of '04?
21     A    Ibuprofen, 800 milligrams, three
22  times a day.

Page 171

1      Q    Anything else for pain?
2      A    Zoloft, which has a pain -- I mean,
3   it's an anti-depressant, but it's also for
4   pain, too.
5      Q    Right.
6      A    I was taking an arthritis medication
7   for my rheumatoid arthritis which also has a
8   sleeping aid in it.
9      Q    Which had a what?
10     A    A sleeping aid.
11     Q    Sleeping aid?
12     A    Yes.
13     Q    Did you take all three of those
14  every day?
15     A    Sometimes twice a day.
16     Q    And you were also taking Vioxx; is
17  that correct?
18     A    Until they took it off the market.
19     Q    Well, I understand.  But in May of
20  '04, you were taking it?
21     A    Yes.
22     Q    In May of '04, you were taking

Page 172

1   Hydrocodone?
2      A    Yes.
3      Q    What is that?
4      A    That's Vicodin.  But at the time
5   that I was taking that, Hydrocodone, it was
6   a lower amount.  It wasn't 10 over 650 like
7   I'm taking now.
8      Q    But it's a type of Vicodin, isn't
9   it?
10     A    I assume.  But like I said, the
11  dosage was so low to where now I take about
12  six a day.
13     Q    But --
14     A    Back then, I only had to take that
15  one pill.
16     Q    In May of '04, you were also taking
17  Flexeril?
18     A    Yes.
19     Q    In May of '04, you were taking
20  Effexor?
21     A    Effexor; uh-huh.
22     Q    Yes?  Is that a yes?

Page 173

1      A    Yes.
2      Q    In May of '04, you were taking
3   Furosenide?
4      A    That's a fluid pill; yes.
5      Q    You were also taking Ambien for a
6   sleep aid?
7      A    Yes.
8      Q    And you were also taking -- I don't
9   know what Nasonex is, but I'm guessing it's
10  a nose thing?
11     A    For your sinuses.
12     Q    Yes.  All right.
13         But when you combine the Hydrocodone
14  and the Flexeril and the Zoloft, you were
15  taking medication in May of '04 that had an
16  effect on your ability to concentrate and
17  stay awake.  It caused drowsiness; right?
18     A    But at the low dosage I was taking
19  of Vicodin at the time, no.  It wasn't -- It
20  didn't have -- It wasn't -- It wouldn't make
21  me like sleep.
22         I mean, it controlled the pain.  As

Page 174

1    I got worse, they increased it to 10 over
2    650, which is very strong.
3        Q    But they increased that within some
4    months after --
5        A    After a period of time; yes.
6        Q    Well, some months after May '04?
7        A    Yes. As my condition got worse.
8        Q    And which doctor gave you the
9    Vicodin?
10       A    Phillip Mussenden.
11       Q    And you're saying that these drugs
12   that you're taking in May of '04 didn't
13   cause you any drowsiness or lack of
14   concentration?
15       A    Oh, I mean, they would cause
16   drowsiness when I took them, but I have a
17   very high tolerance for pain, so -- I mean,
18   I could have still worked that receptionist
19   job because, the truth of the matter, I'm in
20   pain 24 hours.
21       Q    You need to stay with my question.
22       A    Okay.

Page 175

1        Q    Those drugs that you were taking in
2    May of '04 caused drowsiness, didn't they?
3        A    At times.
4        Q    Those drugs you were taking in May
5    of '04 caused lack of concentration; right?
6        A    To what level?
7        Q    Any level.
8        A    I would have still been able to
9    answer a telephone.
10       Q    Ma'am, the drugs you were taking in
11   May of '04 caused you to have lack of
12   concentration; isn't that true?
13       A    Can I say maybe?
14       Q    Well --
15       A    I mean, it all depends on the level
16   of pain.
17       Q    All right. But there are days that
18   they caused you lack of concentration?
19       A    Yes. On days.
20       Q    And in May of '04, there were about
21   100 staff people and 50 lawyers at Ballard
22   Spahr? Is that about right?

Page 176

1        A    No.
2        Q    Okay. What were the numbers as you
3    recall?
4        A    There weren't that many. We never
5    had a support staff of 100 people.
6        Q    Okay. Maybe I have it reversed or
7    maybe -- You were there. I wasn't. How
8    many people do you recall?
9        A    At that time, including attorneys,
10   support staff, paralegals or whatever, I
11   would say maybe 98 people.
12       Q    Okay. Thanks.
13       A    Yes. Around that amount.
14       Q    That's fine. It wasn't a test.
15       A    No, no, no, it wasn't a test.
16       MR. DiMURO: Thanks. I have no
17   further questions.
18       THE WITNESS: Okay.
19       MR. DiMURO: Waive or read?
20       MS. MURRAY: We will read and sign,
21   please.
22       COURT REPORTER: You are ordering

Page 177

1    the original transcript of this deposition?
2        MR. DiMURO: I am.
3        COURT REPORTER: And, Ms. Murray,
4    are you ordering a copy?
5        MS. MURRAY: I would like a copy,
6    miniscript font to a page, and some sort of
7    CD disk.
8                *    *    *
9        (Whereupon, at approximately 2:04
10   o'clock p.m., the taking of the deposition
11   was concluded.)
12               *    *    *
13
14
15
16
17
18
19
20
21
22

Page 178

1  DATE: June 1, 2007
2  RE: McFadden v Spahr and Riley Jamison
3  DEPONENT: Vanessa A. McFadden
4  DEPOSITION DATE: May 17, 2007
5      Under the Rules of Court, you have the right to
6  read and review the transcript of your deposition. If you
7  are represented by counsel and he/she has obtained a copy of
8  the transcript, you may review his/her copy and (1) complete
9  the original Correction/Change Form if you feel there has
10  been an error in the transcription, and (2) sign the
11  Correction/Change Form. The form should then be forwarded to
12  our office at 1919 Cameron Street, Alexandria, Virginia 22314
13  so that we may incorporate it into the original transcript.
14      If you do not have a copy of the transcript
15  available for your review, please contact this office at
16  (703) 837-0076 and make an appointment to come in and read
17  the original. The Rules allow 21 days for this review.
18  However, if a court date is pending, it should be done right
19  away. If you choose not to read your transcript, the
20  original may be filed at the request of counsel without your
21  signature at the time of trial or hearing this matter.
22      Thank you

Page 179

1  
2  RE: McFadden v Spahr and Riley Jamison
3  DEPONENT: Vanessa A. McFadden
4  DEPOSITION DATE: May 17, 2007
5      I have read the entire transcript of my deposition
6  taken on the 17th day of May, 2007, or the same has been read
7  to me. I request that the following changes be entered upon
8  the record for the reasons indicated. I have signed my name
9  to the signature line below and authorize you to attach the
10  same to the original transcript.
11  Page/Line   Correction or change and reason
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  Signature:
22  Date:

Page 180

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Patricia D. Staffa, the officer before whom the
3  foregoing deposition was taken, do hereby certify that the
4  witness whose testimony appears in the foregoing deposition
5  was duly sworn by me; that the testimony of said witness was
6  taken by me stenographically, and that I thereafter reduced
7  it to typewriting; that the foregoing is a true record of the
8  testimony given by said witness; that I am neither counsel
9  for, related to, nor employed by any of the parties to the
10  action in which this deposition was taken; and, further, that
11  I am not a relative or employee of any attorney or counsel
12  employed by the parties thereto, nor financially or otherwise
13  interested in the outcome of the action.
14  
15  
16      PATRICIA D. STAFFA
17      Notary Public in and for
18      the Commonwealth of
19      Virginia at Large
20  My Commission expires   March 31, 2008
21  
22

**A**

ability 21:15
54:13 56:18
57:12 154:15
173:16
able 18:22,22
25:18 68:2
70:6 91:21
148:6 175:8
absence 14:7
132:2 142:10
absences 105:6
absolutely 67:10
160:1
accept 51:15
137:20
accepting 23:19
accommodating
130:3
accommodation
105:18,22
107:14 108:1,6
108:10,12
109:2,5
accountable
137:10
accounting
121:11
accounts 153:9
accuracy 16:6
accurate 42:4
50:3 51:20
52:21
acquisition
25:10
acting 150:20
action 1:4
180:10,13
actions 87:21,22
96:19
actual 55:1
148:18
ADA 132:22
add 79:9 101:16
101:19 102:3

additional 105:4
address 123:22
addresses 66:2
addressing 38:5
adjusted 136:15
**Administration**
165:11
administrator
104:10,12,13
105:12 126:7
admission 38:17
45:15,16 47:7
50:6 51:19
52:20 53:11
54:4,5,8
admissions
42:13 45:6
46:5,8
admit 48:11
50:2
admitted 42:11
admitting 42:3
advance 68:3,5,7
68:14,18,20
119:16 120:19
121:5,10,15
122:8
advanced 32:1
37:7,10 152:5
advances 120:6
adverse 96:19
advised 159:2,12
160:14
afford 9:15 12:9
120:9
afraid 97:21
African 86:2
African-Amer...
126:9 130:16
agent 75:9
116:18
agent's 75:11
ago 28:22
151:11 160:8
agree 24:9 25:11
40:12,14,22

44:6 58:17
59:11 60:11
61:3 62:1,13
64:9,18 72:2
100:11 121:19
122:1
agreed 59:20
ahead 43:13
59:4,16 60:21
aid 171:8,10,11
173:6
Alexandria 1:8
1:16 2:14
178:12
Allen 84:21
112:14 124:15
131:7
allow 178:17
allowed 88:12
88:14,18 167:8
alternating
100:9
Ambien 173:5
amend 47:22
amending 48:22
American 25:4
86:3
Americans
133:1
amount 71:17
77:21 137:3,16
138:22 139:10
139:16 172:6
176:13
Anderson 90:12
Andrews 1:5 8:2
and/or 156:1
Ann 131:9
153:22 154:8
Ann's 154:22
answer 41:16
47:22 52:13,15
53:4,5 57:19
59:2 62:20
70:14 89:8
96:2 97:3,5,16

98:12,17
107:13 108:9
109:6 111:8
128:1 134:1
148:16 155:6
157:1 166:4
175:9
answered 54:11
64:13,15 65:2
65:4
answering 55:1
98:19
answers 122:22
124:17
anticipate 20:7
anti-depressant
171:3
anybody 11:15
11:21 13:3
75:14 80:17
81:9 82:2
anymore 108:1
146:20
anyway 63:15
appeal 53:14
69:13,15
117:20
appealed 69:11
appears 180:4
application 40:8
115:8 135:10
apply 28:16 37:4
applying 138:7
appointment
125:7 167:16
178:16
appointments
34:20 35:2,2
87:6
approval 72:12
73:22
approve 69:8
approved 69:5
70:11,15,19
71:6,19 72:18
72:22 74:15,20

75:12,22 78:3
94:1 136:14
138:21
approving 72:3
72:7 136:9
approximately
1:17 30:13
177:9
April 5:19 6:13
20:14 115:6
area 152:10
arrangements
153:6
arrows 36:8
arthritis 171:6,7
aside 16:3,5
asked 8:10 15:10
28:19 40:12
48:10 50:2
51:19 52:19
61:8 64:16
65:1 68:9,11
73:8 90:11
91:16 92:6
97:20 98:2,6
99:13 106:1
107:6 108:10
108:12 109:6
111:16 113:12
115:1,20 121:2
122:10 144:19
147:2 148:5
154:18 155:22
156:22 164:21
165:12 168:18
asking 11:16
21:3 41:7,12
47:4,19 48:16
61:10 64:8,21
70:13 74:3
80:22 81:9
95:21 98:4
108:17 109:10
109:14 119:18
128:10,17
132:9 133:22

136:1 137:2,6
137:9,12,14
138:14 147:10
168:9 170:15
asks 54:4,8
assistance 107:6
143:22
assistant 23:4
25:19 83:1
131:14
assistants
118:17
assume 24:8
40:9 172:10
assuming 29:4
50:7 93:17
101:3 135:22
138:12
atmosphere
86:16
attach 179:9
attached 135:7
attachments
135:6
attack 7:8
attendance
35:16 129:18
attendance/va...
30:4 33:21
attention 47:5
164:1
attorney 24:18
25:12,13,15
33:4 34:12
35:21 36:12
40:12 54:22
180:11
attorneys 176:9
August 6:5
134:7
authentic 40:13
authorize 179:9
availability
23:13
available 109:9
110:6,10 166:8

166:14 178:15
Avenue 2:4
66:11 78:9,12
79:7
awake 173:17
aware 21:7 58:9
75:8,14,18
89:21 95:14
117:2 136:13
136:18,21
140:12 157:10
159:16 162:1
a.m 1:18

**B**

B 3:9
back 7:9,19 8:5
8:8,9 9:10 10:3
18:3 28:2,3
36:17 38:22
48:15 53:8
58:12,15,19
62:10 71:14
74:16 79:11
93:4,5,12,15
103:22 109:3
113:7 118:18
120:8,10
121:14 122:18
123:14,16
129:6 130:15
132:8 138:4
155:10,15,16
155:17 162:13
164:4 166:3
167:11 172:14
bad 60:12 61:3
62:2 125:17
128:21
Ballard 1:5 5:1
5:18,22 6:4,8
6:12,20 22:8
28:1,15 39:14
71:4,7 72:6,11
72:20 73:21
74:10 75:3,9

75:15,19 80:15
81:4,12 94:5,6
94:19 96:20
98:6 99:10
102:9 105:3
109:1 110:7,15
112:8,11 114:3
116:18 120:18
120:22 121:20
123:8 124:6
130:6,14 133:3
133:7 139:19
142:9 144:9
149:1,6,13,21
159:4,21
162:16 163:17
165:20 169:12
175:21
Ballard's 73:13
103:11
bank 25:3
based 52:8
basically 20:6
64:2 86:15
95:22 103:1
107:10 137:9
157:13
basis 42:3 45:20
49:14 50:8
51:9 52:3,16
53:3 54:10,15
57:10 58:16
73:1 78:20
79:6 86:7
bat 73:3
Bates 45:17
46:20 50:21
bathroom 150:8
150:15
beginning 1:17
behalf 1:13,21
2:1,8 4:5,13
82:6 123:21
146:21 169:22
belief 160:19
believe 40:10

43:15 48:13
52:7,9 54:16
62:10 72:6
74:5 105:19
125:21 153:10
166:7 167:20
167:22 168:3
169:1
believed 84:12
154:10 156:13
believes 139:11
belong 41:13
43:16
benefit 40:3
75:11
benefits 69:5,16
77:17 78:3
94:2 136:10,14
136:16,19,20
137:5 138:2
139:11,15
143:18
Berberian 45:13
Berberian's 45:4
45:5,10
BERNARD 2:9
best 136:2
better 107:15
Betty 153:22
154:8,22
beyond 64:22
bias 88:3 89:1,4
bill 79:2
billing 24:22
bills 73:10 121:5
127:8
Black 135:22
blame 145:5
blistered 106:10
blisters 106:18
107:17,18
block 106:12
body 103:7
146:5
bonus 155:12
book 132:3

books 121:11
boo-boo 74:17
bothered 126:8
bottom 36:14
38:1,4 55:22
bought 76:18
box 23:20 164:1
164:13,17
166:7,20
break 29:14
58:3 98:9,14
98:21,22 99:3
122:16 150:10
150:11
breakfast 10:16
breaks 60:15
150:8,16
brief 22:10
29:16 58:5
99:6 122:19
briefly 124:17
Briscoe 8:20
9:11 11:19
12:1,19 152:15
152:17,18
Briscoe's 152:22
broader 114:16
building 8:9
106:6 130:20
burden 57:20
82:19
business 153:2,4
busting 127:18

**C**

C 3:1 4:1
cab 11:17,19,20
calculated 58:20
164:19 168:17
calculating
58:15
calculations
15:5,21 18:1
call 61:7 73:16
74:15 76:2,4
81:16 82:6

84:3 89:1
95:13,16
103:14,20
108:15 119:1
126:5 150:12
152:14 154:1
154:17 155:4
156:5 159:9
163:4
called 39:12
74:13 75:9
89:4 118:3
120:22 121:2
150:13 164:20
165:9 166:1
calling 11:17
86:18 117:4
119:17 163:5
calls 59:1 148:17
148:17
Calvin 51:21
Cameron 178:12
care 7:13 24:22
80:3,21 81:20
81:21 83:10
85:7 102:11,16
153:1
Carolyn 123:1
case 58:9 123:19
categories
104:16
Caucasian 104:8
cause 49:10
86:22 174:13
174:15
caused 30:18
111:17 173:17
175:2,5,11,18
causing 71:21
107:16 157:16
CD 177:7
center 90:11
106:5 153:2
certain 126:14
139:10
CERTIFICATE

180:1
Certification
39:13
certify 180:3
certifying 105:6
cetera 33:7
change 28:20
131:22 179:11
changed 28:21
47:2 100:15
changes 38:8
179:7
changing 135:19
charge 6:21
86:19
charged 32:12
Charlie 9:13
12:9 150:17
chart 145:15
check 27:17,22
71:9 122:10
126:5 139:1
166:2
checks 25:2
chemo 103:3
112:1 167:18
chemotherapy
100:4
children 78:17
78:20 81:21
92:12 102:17
104:6 120:3
choose 178:19
Christmas
155:12
church 85:10
circling 146:6,7
146:9
Citi 25:5
Civil 1:4
claim 58:8 59:11
62:11,11 64:9
64:17 65:6
105:17 113:13
113:19
claimed 117:17

claims 118:12
clarify 41:19
Clark 38:8,11
48:11
Clark's 49:5
clean 41:11
103:7 125:17
128:14 153:2
cleaning 127:10
128:3
clear 17:16 60:7
107:3
cleared 107:1
client 73:13
client's 22:9
close 141:12
170:9
closing 77:20
Club 25:5
college 80:3
92:13
colonoscopy
16:10 168:15
COLUMBIA
1:1
column 31:12
combine 173:13
come 8:2 9:21
18:3 25:17
61:2,17 77:13
93:12 103:22
115:13 118:18
125:14 150:13
178:16
comes 19:16
45:21 90:15
165:14
coming 92:13
128:22
comment 82:16
122:11 145:5
comments 81:6
81:7,11 82:11
82:12,13 83:5
83:14 85:17
86:10 124:9

Commission
180:20
common 125:9
Commonwealth
1:20 180:18
communicate
154:4
communication
52:6 165:20
company 82:20
complain 84:15
84:18
complained
84:10 92:2,4
92:18 103:20
112:7 160:18
161:4,13
complaining
85:3
complaint 79:17
80:1 84:16
141:5,7,16
161:15
complete 178:8
completed
118:19
computer 21:14
21:16,17 22:11
22:12
computers
126:11
concentrate
173:16
concentration
174:14 175:5
175:12,18
concept 17:14
concern 11:6
concerned 63:20
74:1 90:17
concerning
14:20 157:2
167:10
concerns 16:6
concluded
177:11

condition 60:11
61:3,17 62:2
174:7
conditions 105:6
conference 23:1
23:5,7,8 61:7
73:16 76:2
108:15 152:21
153:3 154:1,17
155:3 156:5
159:9
conferred 140:8
confident 5:14
confidential
128:9
confidentiality
126:18,19
confront 90:1
confronted
71:10 157:4,14
confused 17:2
138:19 143:2
143:11,12
confusing 142:4
165:6
confusion 143:5
157:16
congestive 7:16
8:16 9:22
Connecticut 2:4
consider 48:1,21
53:13
consideration
47:21
considered
87:19 88:2
166:12
constant 85:11
constantly 63:12
97:7,11 99:21
constitute 85:18
contact 178:15
contacted 75:15
contain 133:16
contend 85:18
continue 54:12

56:17 57:12
109:3
continued 1:9
61:4
contribute 79:4
79:15
contributed
72:11,21 73:21
169:2
contributes 63:5
contribution
72:7
control 90:17
103:8 152:10
controlled
173:22
conversation
76:9 90:3
106:2 118:2
141:19 142:6
142:13 157:20
158:5
conversations
115:21
copied 133:12
copy 30:18,21
31:2,4,6,15
32:4,10 35:18
42:4 48:4 50:3
50:16,17 51:20
52:21 95:12
106:5 159:6,14
161:1,7,15
177:4,5 178:7
178:8,14
copying 75:20
117:1
corner 104:1
correct 34:5
37:5 39:5,19
45:11 54:2
88:3 89:3
137:3,17 144:9
156:16 171:17
Correction
179:11

Correction/Ch...
178:9,11
correspondence
52:8
costs 77:20
counsel 1:13 4:5
52:7 178:7,20
180:8,11
counsel's 51:12
count 95:2
110:21 111:7
112:6
counted 13:15
13:18 167:4
couple 28:21
103:19 112:19
160:7 169:21
court 1:1 41:9
176:22 177:3
178:5,18
cover 150:9
coverage 75:4
164:3
Craig 82:4 89:22
90:5 104:14
Craig's 126:4
Crawford 66:5
67:3
created 43:17
45:12
crying 117:11
127:19 128:19
128:22
cubicle 12:17,18
cut 62:12 64:9
64:17 119:7
120:16
cutting 130:15

**D**

D 1:18 4:1 180:2
180:16
daily 22:1,3
damages 58:8,10
Dashottar's 50:3
50:9

date 5:4,5,6 9:9
20:15 56:1
59:22 60:10,10
62:12 64:10
69:8 73:7
113:18 133:21
143:7 165:4
168:4 170:8
178:1,4,18
179:4,22
dated 5:13 14:5
14:19 19:13
132:18 134:4,7
134:13,18
135:13,17
136:5,9
dates 9:3,5 18:20
20:12 34:19
112:21 168:16
daughter 55:19
daughters 80:2
85:8
day 4:20 11:16
11:22 16:16
17:4 22:15,18
27:13,14 28:10
33:1 64:6,17
95:19 96:4,11
97:17,19 98:1
98:5,7 103:12
123:15,16
125:6 129:6,13
129:15 155:19
168:11 170:16
170:17,22
171:14,15
172:12 179:6
days 7:20 9:18
10:21 13:1,13
13:18 15:5,6
18:21,22 22:19
27:7 28:5
32:12,19 34:9
34:12,15,20
35:7,7 36:12
36:13,17 37:3

37:7 84:3
93:19 95:13,16
100:2,8,9,12
100:13 123:5
166:21 167:4
168:7 175:17
175:19 178:17
deadline 7:12
deal 91:22
dealing 68:15
96:9
deals 153:10
dealt 122:3
126:11 145:10
December 31:11
38:19 162:18
167:16
decided 71:8
decides 64:12,18
decision 74:10
139:21
decisions 152:18
declined 108:7
111:6
deduct 138:22
139:15
deducted 71:9
default 66:18
67:12
defendant 50:20
defendants 1:7
1:14 2:8 4:6,14
52:13 170:1
define 166:13
definitely 85:20
93:1
definition 149:7
delay 72:2,7,12
72:21 73:22
75:3 119:6
delaying 120:17
delineated
166:12,19
deliveries 23:19
denial 45:21
49:15 51:9,22

52:3,17 53:1,3
54:16
denied 45:7 47:9
48:13 50:7
52:10 53:10
54:14 57:15
95:3 96:6,20
97:1 99:10
100:19 111:14
deny 47:10 75:4
denying 111:2
Department
143:15 165:9
165:21
depending
136:15
depends 175:15
DEPONENT
178:3 179:3
deposit 25:2
deposition 1:9
3:14,15,16,17
3:18,19,20,21
4:10 14:1,15
19:8,21 26:11
29:19 35:11
40:20 177:1,10
178:4,6 179:4
179:5 180:3,4
180:10
describe 81:7
described 82:5
description
22:10 26:17,19
26:21 152:2
desktop 153:16
determine 85:15
137:16
determined
137:2
diagnosis 11:10
14:8 66:16
DiBattista 71:7
139:19,21
140:9 142:2
154:2 159:11

163:5
die 63:15 127:20
dies 120:2
difference 28:18
different 25:5
 31:7,17 32:9
 36:4,6 42:22
 63:18 73:4
 88:7,9 94:10
 95:22 100:18
 116:3 144:2
 146:5 160:3
differently
 92:19 101:1
 102:6 104:22
 105:1 129:21
 169:12
DiMURO 1:15
 2:9,11 3:4 4:15
 13:20 14:4,12
 14:18 19:6,11
 20:2 26:14
 29:15,22 35:14
 41:2,15,18,21
 42:2 43:3,4,12
 44:5 45:3,14
 46:2,6,16
 47:12,17,20
 48:2,7 49:1,4,9
 49:16,19 50:1
 50:14,17 51:6
 51:15,18 52:18
 53:7,19,20
 54:7,20 55:5,8
 55:14,15 57:18
 58:4,7 59:3,15
 62:17 65:5
 99:3,8 102:2
 116:7,12
 122:16,21
 144:11,15,18
 145:4,7 146:17
 147:2,11,19
 148:5,19
 151:10 155:5
 155:22 156:22

158:13 161:17
166:15 168:18
169:21 170:2
176:16,19
177:2
DiMuro's 3:12
Dino 81:14,15
direct 22:22
 23:6 164:1
Disabilities
 133:1
disability 27:7
 28:4,17 29:9
 30:16 36:18
 38:10 39:5,7
 40:2,6,8 63:2
 64:1 69:4,9
 70:2,9 71:6,18
 72:3,8,13,17
 72:22 74:14,20
 75:22 94:2
 105:17,19
 106:1 108:6
 123:14 124:2
 135:10 138:8
 138:21 154:19
 155:15 159:1
discovery 41:8
discriminated
 63:1,21 70:18
 74:2 111:11
 114:21
discriminating
 160:20
discrimination
 64:1 74:6 75:5
 95:2 105:17
 124:1 160:6
discuss 161:10
 161:21
discussed 28:14
 53:9 60:9 61:1
 88:21 92:22
 102:4 123:2
 124:20 147:16
 157:11 158:4

discusses 142:12
discussing 15:8
discussion 13:12
 15:15,21 59:22
 60:2,8,22 62:4
 73:15 149:5
 154:14 156:19
 163:8 168:20
discussions
 167:2
disk 177:7
disparately
 101:1 112:10
distress 66:18
 70:21 71:20
District 1:1,1
 162:22 165:14
 165:16 169:14
Dixon 130:12,13
 130:16,18
dock 36:2 131:2
 131:21
docked 13:2
doctor 7:18
 117:15 118:4
 125:9 145:8
 146:7 174:8
doctors 10:19
 35:2 41:14
 75:19 87:6
 118:14 144:22
doctor's 167:15
document 4:9
 13:22 14:10,14
 14:21 15:9
 18:13,15 19:3
 19:7,20 26:10
 27:1 29:18
 30:8 32:22
 33:18 34:14
 35:10 39:15,17
 39:22 40:18
 43:7 45:22
 49:7,14 50:20
 52:16 53:22
 56:4 133:20

134:2,15
141:13 149:9
151:8,11,14,22
159:21 160:2,9
163:21 164:12
documentation
 8:14 168:14
documents
 24:21 25:14
 38:16 40:10,22
 43:1,14,19
 44:11 51:4
 118:17 147:4
 147:16 153:15
 158:19
doing 62:3 85:10
 91:5,11 97:12
 128:18 129:5
door 90:15
dosage 172:11
 173:18
double-check
 15:4
downstairs
 11:20
Dr 37:17,18 38:6
 38:8,11,19
 39:2,3,18 40:1
 40:11,13 42:5
 42:15 43:9,17
 44:8,18 45:3,4
 45:9,12,17
 47:7 48:11
 49:5 50:3,9
 51:21 52:22
 54:1 116:22
 125:4 143:14
 145:8,19 146:9
draft 79:19
dropped 8:3
drowsiness
 173:17 174:13
 174:16 175:2
drugs 174:11
 175:1,4,10
due 84:13

160:21 161:5
duly 4:6 180:5
duties 54:14
 56:19 57:13
 110:8 148:8
 151:19 154:5
 156:12
dying 82:17
D.C 2:6 15:11
 65:21,22 66:1
 143:15

**E**

E 3:1,9 4:1,1
earlier 70:20
 71:19 99:16
 111:6 138:9
early 17:7,11,14
 17:19 21:4
 25:17
easy 24:10
 144:14,20
EEOC 72:15
 133:6 141:5,7
 141:16
effect 49:18
 173:16
Effexor 172:20
 172:21
eight 26:2
either 23:7 41:5
 64:6 67:12
 83:15 157:18
 158:3,18 161:9
 162:6
electric 79:1
electricity 119:6
 120:16
eleven 44:3
 69:18 103:9
else's 42:16
Emergency 7:15
emotional 63:16
employed
 149:13 180:9
 180:12

employee 63:19
97:13 114:4,20
180:11
employees 63:10
63:11 80:16
81:12 88:6,7
91:21 92:20
101:5 126:9
130:11 160:14
employer 47:4
employment
96:19
enabled 148:16
ended 18:17
engage 156:18
engines 21:12
enter 24:21
153:13
entered 22:9,10
179:7
entire 179:5
entitled 15:11,14
111:19 162:22
163:7,18
165:17 166:5
entitlement
163:7 164:18
Erika 88:12
101:8,9,10
error 178:10
escorted 130:19
ESQUIRE 2:2,9
2:10
essential 149:2,7
estimate 170:16
et 33:7
evening 150:11
evenings 26:7
exact 5:6 20:15
77:21 112:20
112:21 113:18
123:13
exactly 34:15
70:22 72:1
73:6 86:21
147:5 170:6,8

170:13,15
examination
1:13 3:4,5 4:5
4:13 146:21
169:22
examined 4:8
example 32:14
32:17 128:13
145:14
examples 91:20
exchange 156:2
exhibit 3:11,14
3:15,16,17,18
3:19,20,21
4:11,17 9:7
13:21 14:2,5
14:13,16,19
15:22 19:9,12
19:18,22 20:3
26:12,15 29:20
30:1 31:9
32:15 33:17,21
35:12,15 37:16
38:18 39:12
42:3 43:11,12
43:14 44:7
45:3,16,17
46:20 48:8,18
49:5 50:1,21
51:18,20 52:10
52:11,19,21
53:5,6,21 54:6
55:9,11,12,16
57:1,4 99:17
132:1,17,21
133:6 134:3,7
134:13,17
135:12,16
136:4,8 140:16
140:22 141:4
141:18,22
143:14 144:8
145:15 151:9
158:21 159:19
162:2 163:22
164:6 166:7,13

exhibits 3:10
158:13,16
exist 36:3
existed 162:2
existence 159:17
expect 56:7
169:9 170:10
expedite 75:16
75:21 76:6
116:19
expenses 78:2
expires 180:20
explained 76:3
120:8 121:7
137:22 162:21
Express 24:1
25:5 153:8
expressed 11:5
eyes 125:15
e-mail 20:3
99:16
e-mails 4:17,19
5:20

F
facility 83:10
85:8
fact 45:12 52:17
57:21 61:1
68:2 72:19
74:18 94:1
163:18
factor 63:3
facts 42:22
72:10 74:9
86:8 91:17
failed 108:5
failure 7:17 8:16
10:1
fair 166:11
fairly 24:10
fairness 101:7
familiar 131:7
132:6,10,11,12
133:2,7,15
135:2 145:18

152:7 153:14
family 63:13
78:18 85:9
102:17 111:3
169:7,9
far 23:9 31:12
63:20 67:14
74:1 79:5
80:20 82:9
90:17 97:6
107:8 122:3,5
125:17 127:8,9
147:9 157:7
164:11
faster 5:3
father 80:3
101:15
favor 91:5 97:12
97:13
fax 118:9,17,18
127:21
faxed 51:21
118:8
fear 97:15
feared 9:17
February 17:11
67:1,2 113:12
113:17,18
115:6 117:5
feces 103:8
125:18 127:10
Federal 23:22
153:8
FedEx 23:20
feel 69:22 70:8
70:17 71:19
86:6 113:14
127:13 129:3
178:9
feels 45:18 46:22
47:8
fees 75:20
feet 106:9
107:15
felt 8:11 11:2
96:8 97:3

108:20 111:10
156:1 157:15
169:6,11
female 114:22
Fern 40:4 73:17
83:6 163:2,4
field 86:12
figure 34:20
120:12 142:16
figured 13:4
107:16
file 32:21 37:17
153:7 161:14
162:15
filed 8:1 9:9
79:17,18,20
178:20
filing 7:10 8:1,4
8:7,18 9:10,21
11:3 12:13
113:12 141:5,6
141:15,16
fill 38:9 55:21
146:10,13,14
filled 39:17,22
55:17 138:10
filling 28:16
financial 66:17
70:21 71:20
financially 9:14
180:12
find 46:4 90:5
fine 17:5 38:16
44:22 127:4
150:19 176:14
finished 170:4
firm 28:11 63:1
64:4 68:3,6,8
69:20 70:1,5
90:6 91:4
100:22 108:5,6
151:4,20
162:18 163:6
165:8 166:4
firm's 161:10
first 5:1,13 27:1

27:2,17 28:5
28:14 36:17
37:3 48:18
65:18 80:14
119:11 165:4
**five** 25:22
**Flexeril** 172:17
173:14
**flexibility** 25:16
**flexible** 23:12
25:19
**flip** 43:13 51:1,5
**floaters** 92:21
107:12
**floor** 124:6,8
**Florida** 70:4
76:18 77:2,9
77:15,19 78:7
**fluid** 173:4
**FMLA** 6:21
13:15,18 15:5
16:9,12,22
17:7,9,14,18
19:4 36:12
97:6 110:20
111:2 162:19
163:10,13,19
164:3,18,22
165:13,18
166:8,14 167:5
167:10,22
168:7
**focus** 129:5
**followed** 20:12
**following** 96:19
147:5 179:7
**follows** 4:8
**foreclosure**
67:21
**foregoing** 180:3
180:4,7
**forgot** 99:17
112:15
**forgotten** 12:3
69:7 118:5
145:9

**form** 28:16 33:3
33:4 38:9
54:17 55:21
56:5 57:14
58:1 132:8
138:8 142:11
145:19 146:3
146:11 147:19
161:17 166:15
178:9,11,11
**Forman** 15:8,17
18:19 19:13
28:14,19 40:5
73:8,17 74:18
74:20 83:6
138:7 154:2
159:11 163:3,9
164:20 165:22
166:2 167:3,6
**Forman's**
168:13
**forth** 20:6 80:1
83:5
**forward** 38:7
**forwarded**
178:11
**found** 72:15
82:3
**foundation**
147:19 155:5
161:17 166:15
**four** 7:20 10:21
13:1,17 74:16
85:6 100:8
177:6
**Fourteen** 44:15
**fourth** 46:16,21
**frame** 106:20
167:10
**Friday** 7:10
**friends** 78:18
85:9 102:18
169:7,10
**front** 50:19 59:9
158:14
**full-time** 54:10

56:9 57:9
**function** 149:8
149:15
**functioned**
156:1
**functioning**
150:2
**functions** 149:2
152:1
**funeral** 155:19
**Furosemide**
173:3
**further** 1:12 4:4
4:7 100:16
144:11 169:20
169:22 176:17
180:10
**furthermore**
169:11
**future** 60:11

**G**
**G** 4:1
**game** 75:1
**gas** 79:2
**gathered** 137:15
**general** 43:11
60:1 74:8
**generally** 125:21
**generate** 66:13
**generated** 69:1
**getting** 8:22
14:10 70:11
72:21 75:11,21
100:3 118:13
127:1,20 129:6
129:6 157:15
**GINSBERG**
1:15 2:11
**give** 50:15 53:6
53:21 55:8
69:16 70:14
161:1,6,15
**given** 18:13,14
20:7 57:21
60:15,16 61:5

63:10 99:15
116:5 148:1
150:16 152:15
154:10 156:20
159:6,14,21
180:8
**giving** 44:12
46:7
**go** 7:19 10:13,20
11:13,16 21:11
23:7,8 28:4
43:13 51:4
53:8 59:4,16
60:21 64:22
71:14 79:11
81:6 88:14
91:5 92:20
101:15 104:1
109:2 125:9
131:10 150:9
150:12,14,17
162:6 170:3
**God** 127:3,19,21
**goes** 125:8
**going** 6:21 17:3
27:4 36:17
37:1 38:12
41:18 43:5
45:1 47:22
49:20 63:15
88:10 90:19
95:7 119:7,22
121:21 122:17
125:11 127:17
139:14 140:6
145:13 150:18
**gold** 169:15
**good** 45:19 47:1
47:8 106:11
127:4
**Google** 21:11
**gotten** 60:12
63:8 67:19
70:15 115:15
118:6 128:13
**grant** 69:15

**Griffin** 145:8,19
**Griffin's** 51:21
146:9
**guard** 135:20
**guess** 18:7,8
27:19 59:5
67:8 126:1
128:1 130:15
137:1,18,20
157:13
**guessing** 4:18
106:19 173:9

**H**
**H** 3:9
**Hahn** 21:19 23:6
153:5,22
155:10
**Hahn's** 154:8
**half** 33:1 107:19
**hallway** 125:8
127:17 128:19
**handed** 26:22
**handling** 23:19
**handwriting**
37:22
**handwritten**
38:18 134:18
142:1
**Hanna** 87:13
**happen** 9:2
83:14,19 93:19
**happened** 7:9
89:20,22
123:10 130:21
131:1
**happy** 46:17
47:12 52:3
**haranguing** 94:4
94:18
**harass** 113:21
**harassed** 63:12
99:21
**harassing** 81:6
82:3,11,12,13
83:4 114:4,19

harassment
113:13,19,20
114:3,11,12,16
160:4,5,15
161:15 162:9
Harriette 90:12
90:13
HCP 45:17
46:20
headpiece
148:10,14,16
health 124:20
127:9 165:11
168:10
hear 12:20 63:14
hearing 123:2
178:21
heart 7:16 8:16
10:1
held 148:9,15
help 41:19 45:14
51:2 68:3
75:11,15 76:4
78:17 85:10
101:11 102:18
107:7,12,22
112:1 121:22
139:16
helped 55:21
70:6 134:22
141:9
helpful 123:19
helping 169:8
Henck 7:10,11
8:10 9:18 11:5
11:18 12:6
20:4,18 24:7,9
24:11,19 25:18
25:22 26:3
32:22 68:9
73:5,17 76:3
80:13,18 81:10
82:6 84:11,21
92:2,4,16,19
95:10 96:8
102:16 103:20

104:3 106:3
107:4 112:13
112:14 113:2,4
117:9 119:10
119:11,17
120:20 121:2
122:3,9 124:13
124:14 131:8
141:20 160:18
161:9 162:21
166:1,1 167:13
169:15
Henck's 8:7 25:8
he/she 178:7
high 174:17
his/her 178:8
hit 114:8
hold 148:6,7
holding 148:11
148:17
hollering 90:16
home 8:21 11:13
11:17 26:6
31:5,8 32:10
33:3 34:8
35:19 36:1
76:11 92:13
119:18 128:12
Homer 8:9
honest 70:14
honestly 152:11
hospice 80:4,21
81:22 82:18
83:10 85:7
92:13 102:16
hospital 6:22 7:2
7:7 8:14 10:7
10:11,12 11:9
33:6 126:4,5
hour 96:11
hours 25:22
103:12 174:20
house 66:10
77:15,19 78:7
78:8,11
HR 6:20 11:15

11:21 12:2
13:7,12
human 74:12
143:15
humiliating
128:6
husband 17:20
20:8 24:14
26:5 36:20
63:13 80:4,20
82:10,17 85:6
85:16 95:15
100:3 103:2,15
111:17,20
125:16 126:3,6
127:22 128:4
128:13 129:7
166:17 167:10
167:15 169:19
husband's 14:8
24:13 35:4
63:14 66:16
68:10 119:18
121:3 122:4
124:20 127:9
168:11
Hydrocodone
172:1,5 173:13

**I**

ibuprofen 156:9
156:11 170:21
iden 34:7 87:10
identification
3:11 4:12 14:3
14:17 19:10
20:1 26:13
29:21 35:13
identified
147:16 162:2
identify 42:18
43:14
identifying
104:15
illness 130:2,3
illnesses 63:6

64:3
impede 54:13
56:17 57:12
inability 147:17
incident 89:20
include 135:6
includes 114:19
including 176:9
income 12:10
65:7,10 97:16
169:7,16,19
incorporate
40:19 178:13
incorporating
52:12
incorrect 34:6
165:4
increased 47:3
174:1,3
indicate 154:9
163:12
indicated 52:16
179:8
indicating 9:6
56:21
individual
153:19
individuals
157:2
information
16:21 30:9
94:12,19 104:9
123:18 125:1
137:15
informed 29:1
INGERSOLL
1:6
injury 54:12
56:17 57:11
input 71:3
inquiry 53:12
instance 95:5
96:4,11 125:4
instruct 169:17
instructed 9:11
11:18 162:6

insult 127:6
insulting 127:6
insurance 68:10
75:10 119:19
121:3 122:4,11
interaction
93:18 124:11
interactions
124:14
interested
180:13
interfere 73:12
156:12
interfering
102:10
interim 7:22
intermittent
102:10 111:3
163:10
intermittently
163:14
internal 7:11 8:5
8:8 145:11
Internet 152:7
Internet-type
21:10
interrogatory
122:22 124:16
involved 11:15
139:21 143:18
ironic 72:15
irrespective
147:13
irritated 103:1
irritating 126:2
IRS 11:3
issue 13:7 16:4
33:5 38:4
101:4 122:10
issues 124:20
153:11
Iversen 90:2,5
126:13 131:19
131:22

**J**

**J** 2:9
**Jamison** 31:9
  87:18 96:6
  117:5 120:15
  154:3 159:12
**Janet** 82:4 89:22
  90:22
**January** 6:1
  18:17 27:15
  67:7 111:3
  166:9,20
  167:18
**Jeffrey** 114:17
  162:6
**JENNIFER** 2:10
**Jo** 82:22 131:9
**job** 9:17,17
  22:13,21 23:11
  23:16,18 26:18
  58:19 59:21
  60:4,4,6,13
  61:5,8 62:3,13
  64:7,19 97:15
  101:2 108:21
  109:8,16 110:4
  110:9,15,17,17
  110:18 111:18
  129:5,5 142:19
  147:18,22
  148:2,4 149:3
  149:15 150:3
  150:21 151:1
  152:1,3,22
  154:8,12,16,22
  155:16,17
  156:19 169:1
  174:19
**jobs** 151:3
**jog** 32:1
**John** 71:7
  139:19,20
  140:9 163:5
**Jones** 129:8
**Julia** 129:8
**July** 5:10 170:17
**jump** 41:22 42:7

**jumping** 21:2
  79:22
**June** 5:9,10 67:8
  106:19 178:1

**K**
**Kathy** 87:12
**keep** 13:5 38:15
  49:20 78:14
  111:21 121:10
**keeping** 35:6
**keeps** 100:9
**kept** 62:3 131:18
  152:9
**KESSLER** 2:10
**kind** 118:1
**King** 1:16 2:12
**kitchen** 90:14
**knew** 8:1,18
  23:17 125:2,3
  125:5 138:7
**know** 4:18 7:4
  8:11 9:14 13:6
  13:8,17 18:21
  20:15 21:11
  22:7 24:2,4,18
  29:3 30:8
  31:11,18 34:15
  36:8,8 51:6
  53:2 57:15
  59:6 63:15
  71:5 73:6,14
  77:21 81:19,20
  82:17 83:8
  85:11 86:16
  87:6 88:17
  90:4,7,19 91:2
  91:8,9,16 92:9
  106:7,7,15
  107:6,7 112:20
  113:9 116:7,8
  117:3 120:9,15
  122:6,12,13
  126:22 127:3,5
  127:19 129:8
  129:17,20

**l** 31:19,19
  134:1 139:20
  148:12 150:12
  150:18 152:5
  153:13 160:8
  162:12 169:9
  173:9
**knowing** 9:21
  34:19 106:17
**knowledge**
  21:16 45:9
  71:7 123:9
  130:6,8,10
  136:3 160:16
**known** 125:22
  127:11
**Kristen** 42:5
  125:11

**L**
**lab** 43:22
**Labor** 165:10,21
  170:16
**lack** 174:13
  175:5,11,18
**lady** 86:22 88:11
**Large** 1:20
  180:19
**Larocca** 162:6
**Larroca** 114:17
**late** 17:18 25:17
  28:3 67:14,18
  69:4 103:6,15
  103:21 110:14
**law** 1:15 2:3
  69:20 100:22
  108:5 162:9
  163:6 165:8
  168:8
**laws** 114:15
  160:15 165:13
**lawsuit** 79:17,18
**lawyers** 25:9,10
  25:11,20
  175:21
**lawyer's** 46:18

**leading** 47:3
  148:19 161:18
  166:16
**leave** 14:6 15:5
  16:10 17:1,9
  17:18 19:2
  25:17 26:7
  30:2,16,16
  32:11,12,18
  33:1 36:18
  37:4,7,10 88:9
  93:11,13 95:4
  95:6,11 96:5,6
  96:13,21 97:1
  97:2,18,20
  98:2,6,7 101:2
  102:10 105:5
  111:3,5,13
  112:1,3 123:12
  127:22 129:12
  129:17 131:18
  131:20 132:2
  142:10 163:10
  163:13,19
  164:18 165:18
  166:8,14 167:5
  168:8 169:18
**led** 121:4
**leeway** 63:10
**left** 86:12 93:16
  129:14 131:4
  151:4
**legal** 40:21
  58:16 59:1,2
  62:16 84:11
  92:21 104:8
  105:11
**letter** 49:6,18
  71:4,5 134:3,5
  134:7,9,11,13
  135:7,12,14,16
  135:18 136:4,6
  136:8,10
  139:22 140:1
  140:16,20,22
  142:2,16,18

  143:3,7 144:8
**letters** 138:19
  139:1
**let's** 4:22 5:17
  10:3 13:20
  19:6 33:14
  49:20 58:12
  66:9 71:14
  84:22 87:14
  148:3 158:21
  159:19
**level** 175:6,7,15
**library** 23:3
**life** 33:10,13
  68:10 119:18
  121:3 122:4,10
  127:7
**light** 30:22
**limitations**
  148:1 154:10
  156:20
**limited** 59:11
**line** 126:10
  179:9
**list** 3:11 99:18
  101:17,20
  102:3
**listed** 152:1
**listen** 104:2
  109:21
**listening** 109:22
**lists** 146:4
**litigation** 25:10
  25:13,20
**little** 8:12 97:14
  127:11
**live** 85:7 165:17
**lived** 61:12
  78:22
**living** 78:2,20
**LLP** 1:6
**loading** 131:2
**loan** 66:19
**loans** 67:12
**log** 24:1 153:7
**long** 38:15 66:7

94:1 106:8,13
126:12 129:11
155:1
**long-term** 29:8
39:4 40:2,8
135:9
**look** 5:17,19
8:13 46:13
50:16,17 53:12
53:17 54:6
55:16 57:1
73:2 122:18
135:8 158:21
159:19
**looked** 57:5,6
**looking** 9:4 27:9
31:3 32:6
37:12 45:20
79:12 127:18
**looks** 10:5 19:16
35:22 36:4,5
56:1,2 133:9
**loss** 169:1
**lost** 62:11 65:6
71:1 169:16
**lot** 31:1 82:19
91:16 152:14
**loved** 92:1
**low** 172:11
173:18
**lower** 172:6
**lunch** 150:9

**M**

**M** 66:3,21
**Mack** 82:1 83:9
120:2 127:3,19
128:18
**mail** 23:22
140:15 164:9
**making** 24:6
41:11 59:13
117:15 127:3,8
**male** 114:21
**manage** 148:17
**management**

126:13 149:1,6
152:22 159:3
159:20 162:17
163:17
**manager** 74:13
84:19 90:1
131:13
**managing** 95:9
**manipulate**
21:15 148:7
**manner** 94:14
94:17
**manual** 132:22
**March** 49:6
51:22 73:6
76:19 83:15,15
83:16,17,19
84:10,19 85:4
93:7 112:8
113:1 115:6
117:5 141:19
142:1,15,18
143:3,6 180:20
**MARGARET**
1:7
**mark** 13:20
14:12 19:6
56:19
**marked** 4:10,16
14:1,15 19:8
19:21 26:11
29:19 35:11
46:8 50:20
57:10 151:8
163:22
**market** 171:18
**markings** 31:2
34:5
**married** 88:13
**Mary** 82:22
**Massachusetts**
66:11 78:8,12
78:15 79:4,7
**maternity** 93:11
93:13
**matter** 168:16

174:19 178:21
**matters** 161:11
**ma'am** 33:19
79:8,12 86:18
89:5 98:15
109:21 115:12
120:11 121:8,8
134:11 139:3
175:10
**McFADDEN**
1:3,11 3:3 4:3
4:16 40:22
42:10 43:6
45:8,18 46:10
47:8 48:11
50:8 51:2
52:11 53:1,22
54:9 60:19
84:10 95:3
96:21 99:11
116:14 145:21
146:2 151:8
158:19 178:2,3
179:2,3
**mean** 7:2 9:16
13:4 21:16,17
25:12,13 30:8
32:16 37:12
65:3 68:13
73:2 77:10
85:13 86:15
88:12,17 89:3
90:20 95:13
97:6,8 102:12
106:16 109:8
111:15 114:1
122:2 127:2
131:17 137:18
140:5 148:13
150:6 164:17
169:7 171:2
173:22 174:15
174:17 175:15
**meaning** 66:18
**means** 31:18,22
114:6,11

**meant** 94:11
**Medicaid** 144:5
**medical** 20:16
39:13 42:5
47:4 50:3
51:21 52:22
78:5 105:6
**Medicare** 141:2
**medication**
90:10,14
106:21 107:16
170:19 171:6
173:15
**medications**
143:22
**medicine** 145:11
**meet** 7:12
**meeting** 114:2
114:17 160:3
160:11,13,15
**meetings** 23:5
23:10 152:21
153:3
**Meg** 2:17 162:13
163:3
**member** 148:22
159:3
**members** 85:10
125:14 126:21
127:14,18
128:3
**memo** 14:5,19
15:16,22 19:12
19:14 37:16
38:8 141:22
142:1
**memorandum**
132:17
**Memorial**
170:16
**memory** 5:7
16:2 28:12
32:2 45:19
46:22 47:8
**mentally** 63:12
**mention** 102:8

124:22 140:20
**mentioned** 101:8
106:18 125:12
125:22 126:1
150:5
**mentions** 140:2
140:3
**merger** 25:10
**Mia** 23:10
152:20
**middle** 46:14,17
56:5 142:7
164:13
**midway** 46:21
164:1
**milligrams**
156:10 170:21
**mind** 48:16
156:11
**mine** 31:20
169:15
**miniscript** 177:6
**minorities** 86:10
86:14 87:18,19
**minority** 88:7
**minute** 46:3
149:11 152:5
**minutes** 148:4
**miscalculated**
137:4
**misinformation**
94:4
**missing** 133:10
**mistake** 74:17
104:1 137:11
**mistakes** 47:3
**mistreated** 91:1
91:7 93:20
114:20 162:8
**mistreating**
84:13 89:19
90:20 91:18
160:21
**mistreatment**
85:18 93:9
161:5

Mitchell 82:14
157:9,10,18
modification
95:4 96:22
99:11,12,15,21
100:1,7,12
modified 19:2
84:4 88:9
95:11,17
100:18 157:3,5
158:5
moment 16:4
Monday 7:13
11:1 16:13,16
16:18 128:16
168:12
money 58:10
77:4,5,6,13,14
137:19 138:4
138:22 139:15
140:19
monies 78:1
month 22:6
27:20 29:7,11
79:15 88:14
101:15
monthly 78:19
79:6 137:17
139:15 169:19
months 28:10
61:11,12,16
69:18 85:6
88:13 101:12
107:2,19 174:4
174:6
Morgan 45:17
47:7
morning 11:2
74:15 150:10
mortgage 78:6
78:14 79:5
mortgages 68:4
motion 52:14,14
mouth 89:6
102:13
move 45:1 46:11

moved 66:10
moving 115:5
Murray 2:2,3
3:5 40:16 41:3
41:4,16,20
42:1,8 43:10
43:13 44:1
45:5,11,15
46:3,11,15,19
47:14,18 48:1
48:3,15,21
49:2,7,12,17
49:22 50:11,15
50:18 51:7,10
51:17 52:5
53:4,18 54:7
54:18,21 55:6
55:10 57:18
58:22 59:14
62:15 65:1
98:16,21
101:21 116:5,8
116:10 147:1
147:21 148:21
155:7,21
161:20 166:18
169:20 176:20
177:3,5
Mussenden
38:19 39;3,18
40:1 54:1
143:14 174:10
Mussenden's
52:22

N

N 3:1,1 4:1
name 82:22
88:11 123:1,2
140:2,3 179:8
names 83:12
Nasonex 173:9
nature 7:21
128:9 160:7
near 24:13
nearly 94:3

necessary 97:10
113:15 115:3
162:14 165:1
need 10:13 11:2
20:8 24:19,19
26:4 51:8 53:2
87:2,5,7,7,8
91:5 98:14
99:3,19 107:22
122:12,13
138:3 150:14
174:21
needed 77:7,12
77:22 95:6
96:5,13 97:3
150:8
needs 25:8 73:9
83:9 103:17
negative 106:20
negatively
112:10
neither 180:8
never 26:8,20
30:6 33:10,12
33:16,18 34:2
34:14 38:10,11
42:10,16 44:21
45:9 50:9 54:9
56:9,9 57:8
92:10 116:21
118:20 121:14
126:15 134:2
136:17 142:8
149:10 155:16
155:17 157:21
169:13 176:4
nickname 81:17
night 23:14
129:19
nine 25:22 44:3
66:11 103:10
104:4
Ninety 149:17
nobody's 129:4
Northeast 66:3
nose 173:10

notary 1:19 4:7
180:1,17
notation 38:3
notations 116:15
note 38:18,22
133:12,12
134:18 142:5
142:21 143:3
notes 52:6 76:8
76:12,19
115:21 117:16
117:20 122:18
141:18 143:14
notice 1:14
110:21
noting 47:1
notwithstandi...
57:19
November 14:19
15:1 19:13
27:6,15 28:1
30:14 84:9
85:4 112:8,22
155:9 162:18
164:7,9 167:12
number 22:9
38:16 45:17
48:10,22 49:3
50:4 51:19
52:20 54:4,18
57:2,15 59:10
79:13 80:6
88:22 137:17
numbers 16:6
34:4 176:2
N.W 2:4

O

O 3:1 4:1
oath 42:18
object 41:11
58:22 62:15
objected 41:10
objection 40:17
40:17,20 42:9
59:14 65:1

objections 54:22
observe 149:14
150:2
observed 151:18
153:19
obtained 178:7
obviously 30:2
144:4
occasion 21:18
22:4,5 149:14
150:1
occasions 103:19
112:7,19
151:18
occupational
54:14 56:18
57:13 165:10
occur 33:7
160:11
occurred 73:15
October 14:6
17:7,10 18:16
39:18,19 69:12
69:13 93:15,16
134:13,19
135:13 151:5
155:18 159:2
166:20 168:1
odd 118:1
offer 121:4
offered 60:5
109:12,20
121:1
office 2:3 3:12
9:11 12:17,17
43:22 59:9
90:1 106:12
110:16 126:15
131:13 178:12
178:15
officer 180:2
offices 1:15 23:1
officials 112:9
112:11
oh 21:11 24:11
32:5 33:10

36:22 56:15
63:14 70:15
74:14,16 78:13
93:1 99:1
101:14 103:16
104:1 120:1
125:8 129:1
146:19 174:15
okay 7:18 9:1
10:3,4,10,13
10:15,15,18
12:3 15:18
17:15 18:10
20:21,22 26:4
27:11,21 28:18
30:7 33:11,20
34:17,18 37:14
38:6,12,14
39:8 40:7 41:2
41:15 42:1
43:3,8 44:22
45:2 47:14
48:15 49:22
50:18 51:15,17
52:18 53:18
55:5,8,14
56:13,15 57:18
62:7,7,9 65:13
65:21 67:6
69:7,18 71:16
73:5 74:21,22
75:6,7 76:15
76:17 80:8,8
82:8 84:1 85:2
86:20 87:2,16
88:15 89:7,9
89:10 91:15
97:9 99:1
100:6 102:1
104:13 105:2
107:1,21
108:20 109:22
112:2 114:10
114:14 115:7
115:10 117:22
119:12 120:4

120:11 121:9
121:12,13,17
121:18 130:13
132:8,16
136:18 137:1
138:5,16 139:4
139:6,7 140:13
141:14 143:2
143:13 146:16
149:12,20
150:17 153:18
163:1 174:22
176:2,6,12,18
old 93:10
once 22:5 72:15
85:5 107:15,15
ones 53:9 92:1
opened 153:15
opens 110:16
opposed 59:12
91:19 130:8
option 28:15
order 75:20
ordering 176:22
177:4
organized 152:8
original 20:17
53:22 177:1
178:9,13,17,20
179:10
originally 79:18
outcome 180:13
Outlook 152:6
outrage 90:15
outside 26:5
overnight 164:8
overpaid 139:12
overpayment
138:3
overtime 23:12
23:15 26:9
owed 137:19
owned 65:19,20
66:7 144:1
o'clock 1:18
26:8 74:16

103:9,11 104:5
177:10

**P**

P 4:1
package 19:17
19:18 23:20
pad 76:10 79:9
page 3:2,13 4:22
4:22 5:17,22
9:7 44:14,18
46:1,2,13,14
51:5 54:5,8
55:17,17 57:5
105:16 115:11
132:2,10,11,12
132:21 133:2
145:16 164:2
164:14 177:6
pages 44:1,6,16
48:18 133:8,15
Page/Line
179:11
paid 8:22,22
9:19 10:2 12:7
12:14 24:3,5
25:4,6 29:4,10
32:22 59:8
73:10,10 75:19
119:19 120:2
127:1 157:15
pain 144:21,22
156:4 170:19
171:1,2,4
173:22 174:17
174:20 175:16
Pamela 82:14
157:9
Panagopoulos
81:14 113:11
114:22 124:21
125:7 161:14
162:5,7,10
panic 7:8
pantry 109:17
153:1

paper 35:5
paperwork
11:12 17:17
58:14
paragraph 38:1
46:16,21 79:22
81:1 82:12
83:5,22 84:9
85:1 92:17
93:22 94:20
95:1,2 99:9
100:21 102:8
104:7 105:3,10
105:16 108:4
111:1 112:5,6
153:11
paralegals
176:10
paramedics 10:8
Parker 157:9
158:2,4
part 12:2 36:14
39:4 40:21
53:14 56:5,8
107:8 138:10
143:5,19
145:15 148:8
partially 124:18
participated
72:20
participation
122:7
parties 1:22
180:9,12
partner 82:22
84:11,18 95:9
95:10 112:17
149:1,6 159:21
162:17 163:17
partners 80:16
81:12
partnership
159:4
partners/empl...
81:5
parts 146:5

part-time 54:10
57:9 81:3
passed 10:9
155:18 160:2
Pat 130:13
Patricia 1:18
180:2,16
pay 13:1 27:12
27:18 28:11,18
32:11,13,18
33:2 58:12,15
58:19 62:11
69:20 79:1
120:7,9 121:5
121:14 157:5
169:10
paycheck 12:22
paying 25:1
78:14 127:8
137:3
payment 77:8,14
77:19 78:7
payments 67:14
payroll 13:7,10
pays 137:17
pending 52:14
98:16 115:8,9
178:18
people 13:7
22:22 73:3
91:6 101:17
102:4 104:16
104:18,22
105:7,13
121:20 125:2
125:20 127:11
128:17 158:7
175:21 176:5,8
176:11
percent 27:12
28:11,17,20
29:1,5,5,11,12
149:17
perform 54:13
56:18 57:13
110:8 151:3,19

152:3 154:11
154:15 156:20
performed
148:1 156:13
performing
150:21 151:1
152:3 153:20
period 17:10,19
21:2,3 27:9
56:12,13 84:17
96:12 98:8
115:6 123:11
155:11 166:12
166:13,19,22
167:7,22 174:5
periods 27:5
permanent
155:20
permission
44:13
person 22:18
24:10 37:4
101:16,19
102:3 125:5,12
135:20 162:20
personal 123:9
127:7 130:5,7
130:10 153:9
personally 78:16
89:14
persuade 76:5
pertained 168:5
Pertaining 17:20
Phan 152:20
Philadelphia-...
15:13 163:6
165:8 166:4
Phillip 174:10
phone 119:1
148:6,7,10,11
148:18 163:4
phrase 104:15
physical 11:6
38:9
physicians 42:21
picked 10:8

picking 92:7
piece 35:5
pill 172:15 173:4
place 66:6 81:22
109:11,14
129:4 158:14
placed 105:4
110:3 168:7
placing 163:21
plaintiff 1:3,12
2:1 4:4 146:22
plaintiff's 42:4
Plater-Fox
123:1 131:4
playing 75:1
please 33:19
48:8 105:16
176:21 178:15
pleasure 24:16
pneumonia 7:16
8:15 9:22
11:11
point 7:14 12:1
38:3 59:19
61:20 67:20
73:5 74:5 96:7
96:8 107:3
108:2 122:2,3
137:18 169:8
pointing 49:11
points 117:14
policies 133:15
policy 68:10
132:2,22 133:6
159:3,6,12,14
159:16 160:15
161:2,7,10,16
161:21 162:1
165:3
portion 58:13
77:10
posed 41:13 55:7
147:7,11
position 17:21
20:19 21:5,9
22:17 24:3

26:17,19,21
64:3 82:20
85:14 108:7
109:4,11,12,15
110:4,9,10
126:5 139:17
139:18 153:20
154:6,20 155:3
156:7,14
possible 97:14
111:22 117:10
Post-It 133:11
133:12
practice 146:9
146:11
practices 131:7
131:17
precise 69:8
precisely 72:10
86:7
prepared 42:20
presence 89:15
present 1:21
2:16 130:21
presented 8:19
99:16 114:2
120:5 151:14
presenting
151:10
presume 79:19
140:19 141:9
pretty 20:12
86:19 106:11
previously 4:6
46:8 167:20
pre-marked
3:10
probably 109:7
problem 111:17
117:21 150:19
158:9,11
problems 20:16
24:12 70:10
procedures
101:2
proceeding

117:7 119:2
proceeds 76:22
process 11:16
75:21
processing 60:5
90:11 109:13
124:4,5
processor
130:14
produce 116:6
produced 116:9
production
40:19
profit 66:14 69:2
program 28:7,9
28:12 75:10
82:18 143:20
144:3
proof 94:21
proper 8:6
properties 65:15
65:17 66:13,17
67:13 68:16
69:1,21 70:3
71:2,22 77:1,8
78:2 168:20
169:3,14,17
property 65:14
66:22 67:4
76:19 77:2,9
77:13 78:15
79:4 144:1,6
protection 101:3
142:20
prove 89:18
91:11
proves 73:21
74:5 75:3
provide 108:5
131:15
provided 3:12
94:4,19
Providence 7:7
7:15 8:14 10:6
10:11,12 33:5
psychiatrist

37:21 38:7
public 1:19 4:7
180:1,17
pulling 19:2
pulmonary
118:4
punctual 22:14
purports 45:4
134:17
purpose 39:10
purposes 37:11
39:8,9 40:1
54:1 135:9
141:5,14
pursuant 1:14
put 8:20 11:20
16:4,9,10 17:1
18:20 19:3
26:8 63:3 64:4
70:20 77:1,8
80:4,20 82:18
83:10 85:7
89:5 102:13
121:10 131:20
133:11 143:6
Putting 16:3
P.C 1:15 2:11
p.m 177:10

**Q**
qualify 144:7
quarter 26:1
119:20
question 18:8
41:17 42:7
47:6,10,15
48:17 54:11
55:7,13 56:11
56:20 57:11
59:1 62:16,19
68:17 70:13
91:14 96:2,2
96:14,17 98:13
98:17,17,20
101:22 108:9
109:6,21 110:1

McFadden

133:18 134:1
137:7,13
144:16,20
146:18 148:5
152:15 158:1
160:10 174:21
questioned
16:17 18:19
103:9
questions 16:5
89:8 92:12
128:18 144:12
147:3,7,11
155:22 157:1
168:18 170:5
176:17
quickly 38:13
quit 80:3
quote 130:15
158:10

**R**
R 4:1
race 63:2,21
74:7 84:13
85:22 89:19
91:12,18 95:1
111:7 160:21
161:5
Rachel 135:21
racial 88:3 89:1
89:4,11
racism 124:1
racist 86:6,18
87:1,19 89:12
reaction 106:21
read 46:19 79:19
104:4 117:16
132:5 164:4
176:19,20
178:6,16,19
179:5,6
reading 46:19
116:17 117:21
164:16
reads 46:22

ready 127:20
realize 125:16
125:19 129:2
really 24:11 48:5
55:6 56:14
97:12 150:14
reason 42:6,8
45:8 62:21
64:21 68:8
91:19 179:11
reasonable
53:11 105:18
108:5
reasons 78:5
168:19 179:8
reassign 108:7
recall 5:4 6:19
14:10,21 21:18
23:3,15 36:16
47:19 51:14
57:17 60:1,8
60:19,22 68:22
82:13,21 83:13
99:2 109:10,14
111:5 112:20
115:19,22
116:10,17,22
117:4 119:3,5
119:9,14 123:1
126:17,20
129:14 141:11
147:7,10
151:10,13
155:1 164:11
164:13 170:12
170:13 176:3,8
recalled 1:12 4:4
receive 17:22
19:14 27:22
134:4,9,11,15
135:14,18
164:6
received 15:7
18:15 27:17
95:12 118:9,20
139:10 142:9

142:19 164:8
164:12
receiver 148:15
receiving 14:21
77:16
receptionist
20:20 21:5,9
21:21 22:3,13
22:14,17,21,22
23:11,14,18
24:2 26:18
58:19,20 59:7
59:12 60:13
61:5,8 62:3
64:7 104:10
105:12,21
108:8,11 109:4
109:16 110:4,9
110:18 129:9
129:10,16,19
148:2,3,7
149:3,15,16
150:2,3,18,22
151:2,18,19
152:3 153:20
154:6,11 155:2
156:7,15,16
174:18
recess 29:16
58:5 99:6
122:19
recognition 43:1
recognize 43:7
44:8 51:3
recollection
20:11 49:12
50:12 51:11,12
52:9 148:9
155:19 167:17
reconsider 49:16
49:17 53:9
reconsidered
57:21
reconsidering
135:9
record 30:2,3,4

33:22 35:16
41:6,11 44:19
47:16 48:14,17
50:18 55:10
59:21 145:14
158:15 179:8
180:7
records 40:13
41:12 42:5,10
42:16 43:9,11
44:8 45:5,10
50:4,9 51:21
52:22 53:14,16
115:14 118:13
129:17,18
135:8
reduced 180:6
refer 94:20
reference 104:8
referring 4:19
35:1 43:10
44:2 49:2
54:19 108:14
112:12 141:2
147:17 159:10
refers 113:9
reflect 50:19
55:10 59:21
158:15
regard 101:2
157:12
regarding 149:7
157:5
regardless
114:21 138:20
160:5 165:15
165:16 167:8
related 180:9
relating 132:22
relative 180:11
relied 152:18
relief 149:18
150:6,7,20
151:3
relieve 150:18
religion 63:2

64:2 74:7
relocated 70:3
relying 51:11
52:12
remember 7:6
37:13 41:17
44:12 48:5
69:11 91:4
156:2 168:20
170:11
reminded
144:18
rental 65:6,15
65:17 69:21
70:2 71:2,21
77:1,8,13 78:1
168:19 169:3
renters 169:18
repay 139:16
repeat 110:22
125:2
rephrase 110:12
replacement
155:20
report 48:12
Reporter 1:19
176:22 177:3
reporting 105:5
represent 36:9
representation
50:5 51:8,14
52:4 53:3
representations
147:3,15
represented
178:7
request 14:6
17:1 40:19,21
41:8 42:12
45:6,15,16
46:4,7 47:6,19
48:5,10,22
49:3 50:4,6
51:18 52:19
54:4,8,18,20
57:2,15 98:22

105:20 110:2,3
118:6 142:11
178:20 179:7
requested 30:20
105:18 111:6
111:22 112:3
156:6
requesting 105:5
requests 38:17
55:2 75:20
require 22:13,18
22:21 23:18
53:11
required 84:3
requirements
21:6,10,15
23:12,16 105:4
reservation
138:20
resident 15:11
165:14
residents 162:22
resources 74:13
respect 43:1
49:5 94:6
158:1 164:18
respective 1:22
respond 41:7
46:4
response 17:3
29:3 40:18
42:12 46:18
47:13 53:5,6
54:11 57:10,21
60:18 104:20
134:10 142:9
162:11 168:13
responses 52:13
responsibilities
154:5 169:10
responsibility
57:20 72:4
rest 8:21 33:1
77:22 153:10
retaliation 74:6
112:6 124:1

160:6
return 18:12
54:9 56:8 57:9
returned 56:7
155:16,17
Revenue 7:11
8:5,8
reversed 176:6
review 75:16
76:6 115:16
116:20 151:22
178:6,8,15,17
reviewed 43:18
166:6
reviewing
164:13
rewriting 117:15
re-ask 96:2
rheumatoid
171:7
rheumatology
145:10,11
ridiculous 95:18
right 8:13 11:7
11:11,13,19
12:5 15:2
18:18 22:2,4
24:7 27:4 29:2
30:17 31:12,19
32:20 33:14
34:13 36:1,10
37:8 42:8
44:10 45:21
46:13,17 48:2
48:13 49:1,10
50:14 53:7,19
54:17 55:20,22
56:9 57:14
58:9 60:17
63:7 65:7 66:4
67:19,22 69:5
70:12 71:12
72:16 75:2
76:20 77:7,9
77:12,18 78:7
78:10,13 79:16

80:11 81:18,22
82:2 83:7,22
84:17,22 85:12
85:15 86:13
87:22 88:5,16
89:2,13 94:15
95:20 96:1,18
97:13 99:18
103:4 106:4,22
110:20 111:14
112:3,15 115:5
115:18 117:18
118:11 119:21
120:4,21 121:1
121:6,15 135:1
135:1,10
136:11,20
137:8,15 140:7
140:11 141:20
142:12,21,22
146:12 148:18
150:22 168:1
171:5 173:12
173:17 175:5
175:17,22
178:5,18
rights 138:20
162:19
Riley 16:22 17:4
18:9 20:18
31:8 63:18
87:17 90:6
96:5 101:10
103:18,19
107:11,11
113:13 115:4
117:4 120:14
122:5,6 125:13
126:13 127:21
154:2 159:11
165:22 167:3,7
168:6
Riley-Jamison
1:7 2:17 20:4
30:12 80:2,11
80:12,15,18

81:4,10 84:2
84:12,19 85:19
89:12,18 92:5
93:8 94:9 95:3
95:12 96:20
99:10 100:22
102:9,15 105:4
112:9 113:5
117:12 118:3
118:12,22
124:10,19
125:3 128:8
130:17 157:3,4
157:11,19,21
158:3,8 160:19
161:6 163:9,12
178:2 179:2
room 7:15 23:7
rooms 23:1,5
152:21 153:3
rough 79:13
170:16
roughly 5:5,8
27:15 66:7,8
67:4 79:3
123:12 129:12
routine 22:1,3
rude 148:13
rules 53:11
178:5,17
running 103:5
103:14,21

**S**

S 2:10 3:1,9 4:1
Safety 165:11
salary 58:16,21
68:3,5,7,14,18
68:20 119:16
120:6,18 121:4
121:10,15
122:8
sale 77:1,7,11
78:1
sales 75:9,10
77:13 116:18

sarcastic 18:8
sat 137:14
Saturday 7:15
10:5
saved 77:4,5
saw 11:5 146:10
149:9
saying 8:15
17:17 48:5
62:6,8 63:7
70:16 81:19
83:8 84:2 86:8
87:12 90:18
91:13 118:5,6
126:22 142:19
144:19 174:11
says 28:7,9,12
45:16 48:4
56:16 57:4
81:1 96:18
99:9 108:4
111:1 112:6
143:3
scale 144:20,21
144:22
scenario 93:10
schedule 19:2
20:7,17 25:19
84:5 95:4,11
95:17 96:21
99:11,12,15,20
100:1,7,11,17
128:16 157:3,6
157:14 158:6
158:11
schedules 88:9
school 85:9
88:10 102:17
scratched 31:10
31:15 36:7
screaming 90:16
search 21:12
second 5:17 29:6
29:11 38:1
96:10 165:5
secretaries

92:22 104:9
105:11
**secretary** 24:6
58:16 59:9
83:1,3 84:11
**section** 39:13
124:16
**Security** 30:20
39:7 44:12
136:16,20
137:5 138:2,8
139:10 140:17
141:1 143:19
144:3
**see** 3:11 9:3 13:1
18:10 29:6
31:4 32:14
36:1 38:20,22
43:20 56:19
58:14 66:9
80:5 84:15
92:8 122:17,22
126:6 129:1
130:2,4 132:17
133:11 137:6
142:7 143:8
146:3,13,14
152:2 164:2
**seeing** 37:13
116:10
**seek** 47:4
**seen** 7:7 10:6,10
26:18 27:1,2
30:1,5,6 33:10
33:13,16,18,22
34:14 38:17
39:14 41:1
42:10,11,16,19
43:9,15 44:9
44:21 45:9
48:18 49:13
50:9 52:11
57:22 90:12
125:7 132:19
134:2 136:2
149:10 151:14

158:18
**sell** 66:21 67:3
71:21 169:2,13
**selling** 70:4
**send** 116:2
**sends** 127:21
**sense** 25:7 32:7
**sent** 20:4 38:10
38:11 39:2
40:4,11 116:3
118:14 119:15
120:18
**sentence** 46:15
46:22 80:14
**separate** 124:6
**September** 5:13
7:7 10:5 32:19
33:6 36:2
69:10,17 94:2
135:17 136:5,9
**series** 4:17
**serious** 86:19
**Seriously** 96:16
**Service** 7:11 8:5
8:9
**Services** 143:16
**serving** 155:2
**set** 20:13 23:4
83:5 152:20
**sets** 20:6 80:1
116:4
**setting** 23:9
151:7
**seven** 4:19 5:15
5:20 6:10,14
26:7 100:12
101:4
**Sevonne** 157:9
158:2
**sexual** 113:13,19
113:20 114:3,5
114:7,11,16
160:4,5,7
162:8
**sexually** 113:21
**shape** 63:4

**share** 78:19
**sharing** 78:21
**sheet** 16:7 37:12
118:18
**sheets** 153:14
**shelves** 109:17
**She'd** 150:13
**she'll** 123:20
**shift** 17:13 27:4
**shifting** 20:19
**short** 58:2
107:12,12
126:12 151:11
**shorten** 51:7
**shortly** 95:8
119:14 120:14
120:17
**short-term** 29:8
36:18 40:5
**show** 31:2 32:14
32:16 35:15
37:16 46:6
72:20 74:9
91:17 145:13
**showed** 8:13
11:12 118:8
138:9 158:13
168:14
**showing** 19:12
26:15 52:18
132:1
**shows** 31:22
36:12
**sick** 14:20 22:19
36:13 73:9
106:17 125:19
128:14 129:3
168:6
**sickness** 54:12
56:17 57:12
**side** 106:6
**sign** 44:17
176:20 178:10
**signature** 178:21
179:9,21
**signed** 15:1,19

39:18 40:1
54:1 55:2,22
56:4 135:1,4
141:10 179:8
**signing** 44:12
**similar** 147:4
**similarly** 45:6
**simple** 68:17
111:22 143:4
**simply** 129:17
**sinuses** 173:11
**sir** 29:12 60:20
76:21 79:14
99:20 108:18
110:1 115:9
141:17 145:3
**sister** 8:3
**sitting** 86:22
87:4 131:2
**situation** 9:14
24:13 63:17
111:15
**six** 85:6 101:4
172:12
**Sixty** 29:12
**skills** 152:7
**sleep** 173:6,21
**sleeping** 171:8
171:10,11
**sleeve** 41:3
**slips** 21:19,21
22:4,7,8
103:11
**slur** 89:11
**small** 29:13
**Smith** 131:9
**Social** 30:20
39:6 44:11
136:16,19
137:4 138:2,7
139:10 140:17
141:1 143:19
144:3
**software** 153:16
**sold** 65:16 69:21
78:10 168:19

**solely** 72:5
**solicited** 157:1
**Solitaire** 153:16
**somebody** 18:11
55:20 64:12,18
86:18 101:8
120:22 133:11
141:9 145:22
**son** 134:22 135:2
**sorry** 12:4 33:20
60:7 65:12
68:12 78:13
123:5
**sort** 10:17 78:21
144:21 177:6
**sorts** 146:4,5
**sound** 76:20
133:17 148:13
**Southeast** 66:6
**Spahr** 1:5 5:1,18
5:22 6:4,8,12
6:20 22:8
39:14 72:6,11
72:20 73:21
74:10 75:3,9
75:15,19 80:15
81:4,12 94:5,6
94:19 96:20
98:6 99:10
102:9 105:3
109:1 110:7,15
112:8,11
116:18 120:18
120:22 121:20
124:7 130:6,14
133:7 139:19
142:9 144:9
149:1,7,14,21
159:4,21
162:17 163:17
165:20 175:22
178:2 179:2
**specialist** 145:11
**specialty** 145:9
**specific** 48:12
65:12

specifically 7:6
35:6 111:14
Spellman 75:15
115:14,20
116:19 117:17
118:9,18
135:20
spend 101:15
spoke 107:10
113:2 157:2
162:11 165:10
spoken 115:4
staff 28:22
114:18 125:14
126:21 127:13
127:15,18
128:2 130:16
145:22 146:6
157:7,17
175:21 176:5
176:10
Staffa 1:18
180:2,16
Stamp 46:20
Stamped 50:21
start 33:14 47:2
87:14 153:3
started 16:12,22
20:15 30:15
123:16 155:20
167:18 168:1,4
170:14
starting 18:16
168:11
state 40:16
42:21 43:2
54:21 57:8
stated 40:18
42:9 60:4
167:20,21
statement 40:14
47:9 48:12
89:12 141:4
143:16
statements 80:1
80:5,19 82:3

87:14 92:3
94:9 102:15
states 1:1 45:18
47:7,16 54:9
stating 41:5
stay 8:21 128:12
139:5 173:17
174:21
stayed 93:21
staying 139:8
steno 76:10
stenographica...
180:6
steps 76:4
stick 84:22
stocking 109:17
story 126:12
straight 121:11
strange 117:19
Street 1:16 2:12
66:3,21 67:4
178:12
stress 63:3,5,16
63:16 64:2
Strike 17:8 39:2
71:17 97:18
100:16 132:5
164:5
strong 174:2
stuff 10:17 30:6
125:15
stupid 133:18
subjected 81:5
submission 39:4
submitted 94:12
94:13,16
143:15
submitting 40:2
54:2
subsequent
160:13
sudden 72:17
135:21
sue 72:16
suffered 96:18
sufficiency

52:15
suggest 31:21
Suite 1:16 2:5,13
supervisor
152:17
support 157:7
157:16 176:5
176:10
supposed 7:19
sure 7:5 10:1
12:13 13:19
25:4 29:15
37:15 38:14
41:20 43:20
51:2 58:4 67:5
67:10 71:14
76:14 81:21
84:17 108:19
110:13 111:8
113:17 123:13
132:18 133:19
136:10 152:6
155:14 160:1
170:7,8,18
switchboard
21:17
switched 27:20
swollen 106:10
sworn 4:7 180:5
symbols 34:5
symptoms 146:4
systems 104:11
104:13 105:11
126:7

T
T 3:1,1,9
table 151:7
158:14
Tabata 116:22
take 7:13 9:15
11:19 25:1
26:6 29:13
47:21 50:5
53:17 58:2
81:20 82:19

85:8 88:12,14
88:18 97:18
98:9,14 120:8
122:16 140:6
146:8 153:1
167:13 171:13
172:11,14
taken 1:14 7:14
29:17 58:6
76:5 81:21
99:7 122:20
139:17 163:13
179:6 180:3,6
180:10
takes 10:17
talk 11:21 58:12
73:9 93:3,22
96:7 104:21
105:10 148:3
162:13,16
talked 13:6 17:6
17:9 59:18
71:10 100:21
101:5 104:18
105:8,13
119:10,11
120:10 123:17
124:17 154:3
154:16 162:20
163:2
talking 61:11,19
65:9,14 87:10
90:21 91:3,9
91:10 94:6,8
100:2,8 102:5
102:19 105:20
106:19 117:8
117:12 125:10
142:15 146:20
talks 142:5
tax 24:18 25:12
25:15
taxi 8:20 9:12
teary 125:15
technology
104:9

tedious 122:14
telephone
115:21 175:9
tell 25:7 31:3
34:3 36:5
40:15 42:2,6
51:3,5 52:2
54:15 72:10
74:4 86:21
87:2,4,17 88:5
89:17 92:4,16
92:18 95:5
96:4,11 97:1,2
99:12 103:18
103:21 110:7
112:18 113:3
126:14 127:11
128:7 131:19
131:22 133:14
140:5,14 149:2
152:1 157:19
158:4,10
163:18 165:19
telling 91:6 97:7
97:11 106:7
117:5 118:11
118:14,22
119:5,9 127:15
128:2 138:6
tells 127:22
temp 154:21
155:2,8
ten 18:1,5 37:7
44:3 100:12
144:21
tend 110:22
tension 86:17
TERESA 2:2,3
term 88:3 94:2
terminated
123:15 130:18
terms 25:16
112:3
test 52:14
176:14,15
testified 4:8

McFadden

| | | | | |
|---|---|---|---|---|
| 151:17 | 83:9 85:14 | 27:1,2,4,9,19 | 90:22 104:3 | triggered 145:6 |
| testify 43:16 | 86:1,4 87:9 | 40:4 56:9,11 | 107:10 111:7 | true 40:3 42:4 |
| testifying 55:3 | 88:2,11 89:3 | 56:13 59:19 | 111:18 112:19 | 50:2,6 51:20 |
| testimony 49:13 | 89:11 90:13 | 61:2,2,17,21 | 113:4,14 115:2 | 52:21 55:18 |
| 131:16 180:4,5 | 91:20 95:7 | 62:5,6 74:12 | 115:14 116:21 | 78:4 120:19 |
| 180:8 | 101:7 102:12 | 84:17 90:9 | 119:22 120:14 | 124:6 143:16 |
| text 164:16 | 106:11 108:9 | 96:12 97:4,14 | 122:14 127:20 | 175:12 180:7 |
| 166:6 | 115:3 126:4 | 97:17,19 98:1 | 128:10 130:11 | trusted 25:1,6 |
| Thank 44:22 | 128:17 135:19 | 98:5,8 103:11 | 130:18 136:17 | truth 174:19 |
| 48:2 49:19 | 136:2 146:18 | 106:11,20 | 138:1,9 139:9 | try 76:5 89:5 |
| 53:7,19 132:15 | 155:13 160:1 | 108:2,22 115:6 | 154:7,21 | 116:19,19 |
| 143:10 144:12 | 162:14 | 115:13 122:14 | 157:21 158:8 | 121:21 |
| 144:13 153:17 | thinking 85:13 | 123:11 127:22 | 165:2,3,5,22 | trying 21:1 |
| 178:22 | 88:19 | 129:11 130:14 | 165:22 166:1 | 46:10 49:9 |
| Thanks 146:16 | third 5:22 29:6 | 131:18 135:21 | 167:6,13 168:6 | 51:7 60:20 |
| 176:12,16 | 29:11 | 136:22 137:21 | tolerance 174:17 | 66:9 70:14 |
| Thanksgiving | Thirty-four 49:4 | 138:6 143:21 | top 143:3 145:22 | 79:14 80:21 |
| 27:18 167:14 | Thomas 40:11 | 146:8,10 | topic 37:1 118:2 | 95:7 102:13,14 |
| thereto 180:12 | 40:13 42:5,15 | 147:13 149:17 | 123:22 147:11 | 114:8 120:11 |
| thing 8:6 16:8 | 43:9,17 44:8 | 151:4,11 | 147:12 | 121:17 129:4 |
| 34:11 59:5 | 44:18 125:5,11 | 152:10,11,17 | topics 125:1 | 139:6 142:16 |
| 72:14 79:1 | thought 33:12 | 153:13 154:4,9 | track 35:6 | 143:21 144:5 |
| 126:2,18 | 50:2 62:22 | 155:3,11,12 | transcript 177:1 | Tuesday 103:2 |
| 128:21 145:1 | 93:8 95:17 | 156:3,5,18 | 178:6,8,13,14 | 128:15 |
| 154:18 173:10 | 101:9 106:15 | 159:7 166:12 | 178:19 179:5 | turn 118:19 |
| things 23:1 | 118:1 162:7 | 167:7,9,12,17 | 179:10 | turned 117:20 |
| 24:17 25:5 | 164:22 170:4 | 172:4 173:19 | transcription | 144:1 |
| 31:10 35:3 | three 13:1,17 | 174:5 176:9 | 178:10 | twelve 8:2 44:4 |
| 36:7 46:11 | 44:2 48:18 | 178:21 | travel 25:2 | twice 22:5 27:20 |
| 60:15 86:11 | 93:19 100:2,8 | timely 94:13,16 | 153:5 | 171:15 |
| 87:3 88:10 | 104:16,21 | times 21:22 | trented 62:22 | two 18:6 28:10 |
| 91:22 92:14 | 168:7 170:21 | 67:18 118:10 | 63:9,18,19 | 39:8,9 44:15 |
| 94:16 99:19 | 171:13 | 152:14 170:22 | 65:11 69:22 | 65:15,17 71:2 |
| 110:21 113:4 | throwing 103:6 | 175:3 | 88:6 102:6 | 71:21 88:13 |
| 118:21 125:20 | 127:9 | timing 120:12 | 104:22 129:21 | 93:19 94:3 |
| 126:15 127:6 | throw-up | title 39:14 | 169:12 | 95:21 101:12 |
| 128:7 152:9 | 125:18 | today 26:22 63:5 | treating 90:6 | 103:12 107:2 |
| think 6:9,13 | Thursday 1:9 | 101:8 103:15 | 92:10,19 101:1 | 107:18 116:3 |
| 7:20 18:17 | time 6:19,22 8:7 | 123:3 149:10 | 112:9 | 141:12 150:16 |
| 21:4 27:20 | 10:17,20 14:7 | 158:19 | treatment 105:7 | 155:15 158:7 |
| 43:8 45:21 | 14:20 15:16 | told 6:20 7:12 | treatments 20:9 | 158:13 |
| 53:10,13 56:10 | 17:10,19 18:11 | 8:11 9:18 | 20:10 | two-part 137:6 |
| 57:19 60:14,20 | 18:14,16 19:3 | 10:19 11:9,13 | trial 178:21 | type 24:17,21 |
| 63:4 66:10 | 21:2,2,19,20 | 17:4,5 38:6 | trick 41:2,5 | 30:2 92:14 |
| 67:1,9 72:14 | 22:4,7,8,10,14 | 50:8 59:8 61:7 | tried 75:10 | 143:18 144:2 |
| 76:12 79:14 | 24:15,22 25:14 | 73:11 74:18,19 | 111:21 163:3 | 145:14,18 |

152:4 172:8
**types** 25:9 85:17
  104:22 118:21
  160:4
**typewriting**
  180:7
**typing** 21:6 25:8

**U**
**uh-huh** 172:21
**unable** 147:6
**understand** 7:1
  20:20 32:5
  38:4 41:4 43:5
  55:20 56:13
  71:15 74:18
  80:21 96:14,16
  100:5 106:14
  107:20 111:12
  114:9 129:22
  130:1 137:13
  137:21 138:15
  138:17,18
  152:16 164:17
  164:21 165:5
  171:19
**understanding**
  37:18,20 59:7
  90:3,10 98:3
  114:1,16 155:9
  167:9
**understands**
  42:20
**understood** 28:3
**unfair** 106:16
**Unfortunately**
  30:22
**UNITED** 1:1
**unpaid** 28:5
  37:3
**unquote** 130:15
**Unum** 37:19
  39:5 50:21
  53:15 54:2
  55:12 69:13
  70:2,16,19

71:8,17,18
72:3,8,12,22
73:9,12,22
74:10 75:3,21
76:6 94:5,12
115:7 116:18
117:6 118:12
119:2 120:16
134:3,8,14,18
135:8,12,16
136:4,8,14,19
137:3,10,16
138:1,19 139:9
139:11,14,18
141:3 169:11
**Unum's** 72:3
**UPS** 24:1 153:8
**upset** 117:6,11
  118:4 119:1
  120:15
**upstairs** 8:4
**urge** 75:16
  116:19
**urging** 122:7
**use** 31:1 76:22
  78:2 79:11
  148:11 164:22
**uses** 145:19
**usually** 124:5
**U.S** 165:9

**V**
**v** 81:16 150:13
  178:2 179:2
**vacation** 14:20
  22:19 31:22
  88:15
**Valentine's**
  129:13,15
**valued** 63:19
**Vanessa** 1:3,11
  3:3 4:3 12:10
  15:12 28:21
  74:14 90:13
  145:21 146:2
  178:3 179:3

**various** 22:22
  135:8 147:3
**vehicle** 130:20
**vein** 32:15
**verbatim** 1:19
  58:1
**verification**
  52:20
**verify** 41:12
  42:14 45:12
  48:4
**versus** 16:3 35:7
  86:3 130:7
**Vicodin** 144:17
  156:2,3,8
  170:3 172:4,8
  173:19 174:9
**violated** 111:2
**Vioxx** 171:16
**Virginia** 1:8,17
  1:20 2:14
  178:12 180:19
**virtually** 57:22
**visit** 11:10
**visits** 6:22 7:2
**voicemail** 104:2
**Voss** 37:17,19
  38:6
**VO3** 31:18,21
  32:6
**vs** 1:4

**W**
**W** 2:2,3
**wage** 59:11
**wages** 58:15
  62:11
**wait** 33:19 96:10
**waiting** 26:6
**Waive** 176:19
**walked** 8:8
**walking** 7:16
  8:15 9:22
  11:10 107:8
**want** 7:4 8:20
  17:13 50:15

51:1 57:15
84:17 98:12
107:4 111:8
120:8 144:17
170:6
**wanted** 88:19
  96:5 117:1
  135:8 145:1
  161:14
**Washington** 2:6
**wasn't** 5:14 22:1
  28:22 31:20
  34:22 37:21
  42:6 60:7 63:3
  70:17 71:10
  77:16 85:9
  89:21 94:13
  96:9 103:10
  111:19 114:7
  117:2 140:12
  144:14 150:19
  152:6,8 156:3
  172:6 173:19
  173:20 176:7
  176:14,15
**water** 79:2
**way** 5:2 8:19
  34:3,17 51:13
  65:10 90:7
  92:10 93:21
  100:18 106:12
  111:15 114:15
  116:8 120:5
  121:21 131:15
  142:10 156:12
  159:2 169:2
**ways** 160:4
**weather** 8:12
**wedding** 101:13
  101:14
**Wednesday**
  128:16 167:13
**week** 8:21 12:7
  12:14 13:14
  16:4 36:2
  72:17 85:5

100:8 155:14
155:14
**weeks** 15:12,14
  17:7 18:2,5,6
  19:5 111:16,19
  141:12 163:1
  163:19 164:20
  165:9,17 166:5
**well-being** 11:6
**Wendy** 90:2,22
**went** 8:4,5 29:1
  40:5 61:2,11
  61:16 70:9
  73:3 88:11
  90:5,10,22
  93:11 107:14
  113:11 114:22
  120:1 125:4
  155:15 159:1
  162:4
**weren't** 63:11
  94:16 176:4
**we'll** 14:12
  59:21 127:4
  149:11
**we're** 21:1 38:12
  45:1 75:1
  100:1,7 115:5
  139:14 165:7
  166:4
**we've** 41:10 53:9
**whacking** 25:14
**white** 70:9,17
  87:8 88:6,20
  88:22 91:21
  92:20 101:18
  131:21 138:10
**willing** 123:20
**Winn** 84:21
  112:14,16,18
  113:3 124:15
  131:7 161:4,6
  161:9
**Winn's** 112:17
**witness** 3:2
  29:13 43:18,20

44:3 46:1
48:20 50:19
51:12 55:2,11
58:2 65:3
98:19 99:1,5
102:1 123:21
144:13,17
145:3 146:19
147:20 148:20
155:6,8 158:16
161:19 166:17
176:18 180:4,5
180:8
**woke** 10:16
**woman** 114:12
**word** 13:5 60:5
90:11 95:8
109:13 124:4,5
130:13 152:5
153:15
**words** 36:2
54:16 74:8
89:5 102:13
152:4
**work** 7:20 10:20
11:1 18:3,12
18:22 19:1
24:10 34:9,10
34:21 35:7,8
46:10 47:3
49:10 54:10
56:7,8 57:9
59:20 60:3
81:17 84:4
103:8 104:5
106:17 107:3
109:3,3 123:8
123:14 124:3
126:10 147:6
147:17 148:12
154:20 155:10
156:6 165:15
166:21 167:8
167:11
**worked** 24:15
25:21 37:19

82:21 149:21
151:20 155:13
157:6 165:3
167:4 174:18
**working** 18:4
81:3 95:10
**worry** 8:22 12:8
12:11,14 87:5
120:1,7
**worse** 64:3
174:1,7
**wouldn't** 63:4
70:20 76:3
111:18 148:15
169:13 173:20
**write** 56:6,8
134:21 141:9
141:12 145:21
145:22
**writing** 41:9
**writings** 34:9
**written** 36:15
38:19 39:3
94:21 142:21
**wrong** 8:10 25:8
**wrote** 48:11
141:14 143:1,9
146:2

**X**

**X** 1:2,8 3:9

**Y**

**year** 37:8 47:2
66:14 123:13
129:14
**years** 25:21 26:1
28:22 65:20
66:12 67:16
94:3 131:12
160:8 162:3
**yesterday** 17:6,9
48:9 49:8
59:18 60:9,14
61:1 62:4
88:21 91:21

92:22 101:5
102:4 104:19
105:8,14
124:18,19
147:2 156:22
167:21
**young** 88:11

**Z**

**Zoloft** 171:2
173:14

**$**

**$1,300** 119:15
**$1,350** 119:19
**$1,400** 119:15
**$1,500** 119:16
**$40** 117:1
**$850** 79:15

**0**

**02** 15:2 17:18
18:12 85:4
112:8,22
**03** 5:11,14,19
6:1,5,9,13 7:8
17:10,19 18:12
27:15 28:3
32:1 67:17
69:2 83:15,15
83:16,17,20
85:4 93:7
106:19 110:14
111:4,4 112:8
113:1,12,18
132:6,13 133:2
133:8,16
**04** 17:11 27:16
58:18 59:19
60:10 67:17
68:8 69:2,4,12
69:14 71:19
73:6 108:11,13
108:14 110:14
115:7 117:5
121:21 132:7

132:13 133:2,8
133:16 136:13
170:9,20
171:20,22
172:16,19
173:2,15 174:6
174:12 175:2,5
175:11,20
**05** 67:1,2,5,9
69:10,17 76:20
136:13
**06** 67:5 132:18

**1**

**1** 3:10 14:20
19:13 37:16
164:7 178:1,8
**1st** 167:12
**1:05CV02401**
1:5
**10** 44:7 50:1,4
50:16,21 172:6
174:1
**10th** 33:6
**10:13** 1:17
**100** 112:5,6
175:21 176:5
**1000** 2:5
**1010** 178:12
**1025** 2:4
**107** 50:22
**11** 44:7 51:18,19
51:20 52:10
53:5
**11th** 33:7 134:4
**12** 15:14 16:3
19:4 44:7
52:19,20,21
53:6 164:19
165:8 166:5
**12th** 33:7
**122** 50:22
**13** 48:8 49:5
**13th** 93:15
**1302** 5:1 9:7
**1303** 5:18

**1304** 6:1
**1305** 6:4
**1306** 6:8
**1307** 6:13
**14** 44:16 145:15
**14th** 26:19 39:19
60:10,17 61:6
61:10,13,20
136:5 142:5,8
142:12,22
143:1,9 147:9
**15** 44:16 105:16
**15th** 17:7,10
27:15,15 93:16
134:19 155:10
**16** 15:11 16:3
17:6 44:18
111:16,19
162:22 163:19
165:17
**16-week** 163:7
**17** 1:9 49:6
178:4 179:4
**17th** 16:9,11,18
17:1 18:16
166:20 168:1,9
179:6
**18th** 16:11
168:10
**1815** 66:3
**19** 53:21 54:6
55:9,11,16
57:4
**19th** 16:14 134:8

**2**

**2** 38:18 39:13
178:10
**2nd** 164:9
**2:04** 177:9
**20th** 16:14
**200** 1:16 2:13
**2001** 160:12
**2002** 14:6,20
17:14 19:14
30:3 33:9,22

34:10,16,21
37:8 84:9
160:12 162:3
162:19 163:16
164:7,10
**2003** 10:6 17:14
27:6 30:14
33:7,8,12
35:16 36:22
37:8,11 38:20
38:22 39:18,19
67:11 68:21
84:10,20
129:15 151:5
157:6 159:2
163:16 166:9
166:21 167:19
**20036** 2:6
**2004** 20:21 21:4
24:3 26:19
37:11 51:22
61:18,20 64:6
65:18 67:11
68:18 134:4,8
134:14,19
135:13 141:19
147:9,22
155:18 159:17
162:3 170:7
**2005** 56:10 64:6
67:11 94:3
135:17 136:5,9
**2007** 1:9 66:11
170:10 178:1,4
179:4,6
**2008** 180:20
**202** 2:7
**21** 178:17
**21st** 155:18
**22** 38:19 136:9
**22nd** 94:3
134:14
**22314** 2:14
178:12
**23** 5:14
**24** 174:20

**26** 54:4,20 57:2
57:16
**29th** 135:13

**3**

**30** 14:6 27:7
28:5 37:3
**31** 46:9 55:12
57:2 180:20
**31st** 27:13 28:9
**32** 45:16 48:22
79:22 80:6
81:1 83:5
**326** 3:4,14
**327-5477** 2:7
**33** 83:22
**3345** 66:5
**335** 3:15
**336** 3:16
**34** 48:10 84:9
85:1 92:17
**340** 3:17
**341** 3:18
**347** 3:19
**350** 3:20
**356** 3:21
**36** 132:1
**37** 132:17
**38** 132:21
158:16,21
**389** 145:16
**39** 133:6 158:16
159:19 162:2

**4**

**4** 39:12
**4th** 170:17
**463** 3:5
**485** 3:4
**49** 93:22 94:20

**5**

**5** 42:3 43:11,12
43:14
**5th** 15:1 141:19
167:16

**5:15** 26:3
**50** 175:21
**53** 45:17 46:2,20
95:1,2 99:9
100:21 134:3
**54** 134:7
**55** 134:13
**56** 102:8 104:7
134:17
**57** 105:3 135:12
**58** 135:16
**59** 105:10 136:4

**6**

**6** 45:3
**6th** 10:5 30:14
135:17
**60** 27:12 28:11
28:20 29:1,5
29:10 136:8
152:4
**63** 140:16
**64** 140:22
**65** 141:4
**650** 172:6 174:2
**66** 141:18
**67** 141:22
**684-4333** 2:15
**69** 143:14

**7**

**7** 45:16,17 46:20
48:18
**7/15** 56:2
**7/15/05** 56:2
**7/18/05** 56:3
**7:30** 152:13
**70** 28:17 29:1,4
**703** 2:15 178:16
**71** 144:8
**76** 105:16 108:4
**77** 3:10 108:4
**78** 3:14 4:11,17
9:7
**79** 3:15 13:21
14:2,5

**8**

**8** 46:13
**8th** 32:21 33:6
36:2 51:22
166:9,21
**80** 3:16 14:13,16
14:19 15:22
19:18
**800** 156:9
170:21
**81** 3:17 19:6,9
19:12 163:22
164:6 166:7,13
**82** 3:18 19:22
20:3
**828** 54:5,6,8
55:12,17 57:5
**83** 3:19 26:12.15
151:9
**837-0076** 178:16
**84** 3:20 29:20
30:1 31:9
32:15 33:17,21
**85** 3:21 35:12,15

**9**

**9** 44:6
**9th** 33:6 142:2
142:15,18
143:4,6
**9/10** 9:8
**9/11** 9:8
**9/12** 9:8
**9/8** 9:10
**9/9** 9:7
**9:20** 104:5
**9:30** 104:6
**90** 36:17
**90th** 27:14 28:10
**908** 1:15 2:12
**91** 111:1
**95** 131:4
**96** 131:5
**98** 176:11