Charles Henck                                    October 31, 2006
                      Silver Spring, MD

Page 1

                UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MARYLAND

        ---------------------------X

        VANESSA A. McFADDEN,            :

                Plaintiff,              :

            v.                          :  Civil Case No.

        BALLARD SPAHR ANDREWS &,        :    05cv2401 (RJL)

        INGERSOLL, LLP, et al.,         :

                Defendants.             :

        ---------------------------X


                          Silver Spring, MD

                          October 31, 2006


                Deposition of CHARLES S. HENCK, a

        witness herein, called for examination by counsel

        for Plaintiff in the above-entitled matter, taken

        at The Law Offices of T. W. Murray, 1111 Bonifant

        Street, Silver Spring, Maryland 20910, at 3:00

        p.m., on Tuesday, October 31, 2006, reported by

        Ray Heer III and transcribed under his direction.


                Alderson Reporting Company
                    1-800-FOR-DEPO

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                    October 31, 2006
                      Silver Spring, MD

1    both, as a practice?

2         A    As best I can recollect, both.

3         Q    Were you involved in any decisions

4    whether to grant Ms. McFadden any pay increases?

5         A    No, not directly.

6         Q    Indirectly?

7         A    Well, we do employee evaluations, and

8    those get put into the administrative operation.

9    Those are areas outside my purview.

10        Q    And how long did Ms. McFadden work for

11   you?

12        A    I can't say, precisely.  I can -- it was

13   over 10 years.

14        Q    How would you characterize her

15   performance as your legal secretary?

16        A    She was generally okay for the things I

17   used her for, given the way I work.  There were

18   other aspects that -- I just made the judgment to

19   not use her for certain things.

20        Q    Were you involved in the hiring decision

21   with respect to Ms. McFadden?

22        A    Yes.

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                    October 31, 2006
                        Silver Spring, MD

1    Q    Were others involved, or were you the

2  only person?

3    A    Yes.  Yes.

4    Q    Yes, there were others?

5    A    Yes.

6    Q    Who were the other individuals?

7    A    I have no idea.

8    Q    Did you have a vote, or a say, in

9  whether to hire her?

10   A    The firm would -- anytime we're hiring a

11 secretary for a lawyer, the lawyer would be among

12 the people that would interview the secretary.

13   Q    Did you recommend the firm hire Ms.

14 McFadden?

15   A    Yes.

16   Q    Did you find her to be qualified for the

17 job?

18        MR. DiMURO:  What timeframe?

19        MS. MURRAY:  When she was hired.

20        THE WITNESS:  Yes.  Based upon my

21 understanding of her credentials and so forth,

22 yes.

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                October 31, 2006
                        Silver Spring, MD

1          BY MS. MURRAY:

2          Q     Throughout her tenure at the firm, and

3    working for you, as well, was there any time in

4    which you believed she was not qualified for the

5    legal secretary position?

6          A     There were times that I believe she was

7    not qualified to serve as a legal secretary for

8    some people.  I thought she was qualified to do

9    the things that I asked her to do.

10         Q     And the "some people" that you're

11   referring to are lawyers?

12         A     Other lawyers, yes.

13         Q     To your knowledge, was she ever informed

14   of any performance deficiencies that she had that

15   rendered her unqualified for some of these other

16   individuals?

17         A     I don't know. I have no knowledge of

18   that.

19         Q     While working for you, did Ms. McFadden

20   meet your performance expectations?

21         A     She met my performance expectations.

22         Q     Were your performance expectations any

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                    October 31, 2006
                        Silver Spring, MD

1    different than the firm's performance

2    expectations?  "The firm," meaning Ballard Spahr.

3          A     As a general matter, I believe, yes.

4          Q     You mentioned that you conducted

5    performance evaluations of Ms. McFadden, correct?

6          A     Correct.

7          Q     And without identifying specifically

8    which years -- you said "over 10 years" -- do you

9    recall whether the evaluations were administered

10   by you on an annual basis?

11         A     Yes.  They would have been administered

12   annually with, often, some tardiness in getting it

13   done right on some deadline or another, but --

14   because I had to be reminded of it.  But I'm sure

15   that's -- let me rephrase that.

16               I don't recall ever not submitting an

17   evaluation.

18         Q     Were all of your evaluations written

19   evaluations?

20         A     All of the evaluations that I have any

21   recollection of, which is a very general

22   recollection, would have been in writing, either

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                              October 31, 2006
                    Silver Spring, MD

Page 14

1    on a form specific for that purpose, a

2    computerized form in later years, or in an e-mail.

3                    [Whereupon, a document was marked

4                    as Henck Exhibit Number 1 for

5                    purposes of identification.]

6            BY MS. MURRAY:

7        Q    The court reporter has handed you a

8    document that has been marked as Henck Exhibit 1.

9    It's a multipage document.  If you would like to

10   review it, I will certainly afford you time to do

11   that.  And if you would tell me when you've

12   finished perusing it.

13       A    I'm ready.

14       Q    Can you identify Henck Exhibit 1 for the

15   record, please?  Can you state what the document

16   is?

17       A    It appears to be a printed-out version

18   of an electronic evaluation form.

19       Q    This is an evaluation that you conducted

20   for Ms. McFadden.  Is that correct?

21       A    It appears to be, yes.

22       Q    Is it fair to say this covers a period

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                    October 31, 2006
                         Silver Spring, MD

Page 15

1    of 2001, or some other period?

2         A    Well, according to the document, it was

3    submitted on November 5th, which -- the normal

4    pattern is that it's done every year, so it would

5    have covered the prior year or some period in --

6    roughly.  I don't know specifically, but it would

7    have covered, quote, "the last year," close quote,

8    probably in the late summer, or September/October.

9         Q    You mentioned this is a printout of a

10   document that you can manipulate on a computer.

11   Is that right?

12        A    Apparently.  It does not -- it does not

13   look like the written forms I used to submit,

14   years ago.  And I -- there is -- these things are

15   now done on a computer.  A form comes up, you type

16   in whatever you're going to type in, and you check

17   whatever boxes you're going to check.  When you're

18   done, you hit submit, and it goes away.

19        Q    For example, let's look at the first

20   page, number 1.  The question is, "Does your

21   secretary have the appropriate skills to fill his

22   or her job requirements?"  Did I read that

Alderson Reporting Company
1-800-FOR-DEPO

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                    October 31, 2006
                        Silver Spring, MD

Page 16

1    question correctly?

2         A    Yes, you did.

3         Q    And there's a box under there in which

4    the text "exceeds expectations" is delineated.  Do

5    you see that there?

6         A    Yes.

7         Q    Can you tell me whether that is

8    something you typed in, or did you select from

9    some pre-formed categories?

10        A    As I recollect, it is one of several

11   categories.  You put an X in a box, or something

12   like that, and that then tells the computer that's

13   the answer to that question.

14        Q    Just in reviewing the document, I see

15   there is "exceeds expectations" and there's "meets

16   expectations."  Was there another evaluation

17   category that was available?

18        A    Yes, there were several -- there are

19   several.  It goes down to "definitely doesn't

20   meet."  I mean, I don't know -- I don't know the

21   labels, but it definitely goes from "isn't doing

22   the job" to "exceeds expectations," on a range of

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                          October 31, 2006
                    Silver Spring, MD

1   five or six, I suppose.  That I don't know,

2   specifically.

3        Q    In the year prior to this, you're

4   saying, the period that covers from, let's say,

5   November 5th, 2000, until November 5th, 2001,

6   roughly, did you have any reason to believe that

7   Ms. McFadden was unreliable?

8            MR. DiMURO:  Objection to the form of

9   that question.

10           Go ahead.

11           THE WITNESS:  No specific reasons.  It

12  was always my impression that Vanessa met my

13  needs, which were, as I say, were, in some

14  respects, notably different from those of other

15  lawyers.

16           BY MS. MURRAY:

17       Q    Did you experience, at any time when she

18  was your secretary, any instance in which she was

19  unreliable?

20       A    There were occasions -- and I cannot

21  recall specifically -- when I would ask her to do

22  something, that, in retrospect, was a reach, given

Alderson Reporting Company
1-800-FOR-DEPO

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                    October 31, 2006
                        Silver Spring, MD

Page 18

1    the skills that she had.  I would end up doing it

2    myself.  And then, that was simply a task that I

3    wouldn't assign in the future.  In most other

4    respects, the things that had become routine as a

5    part of my expectations, she, as far as I can

6    recall, met the requirements.

7                    [Whereupon, a document was marked

8                    as Henck Exhibit Number 2 for

9                    purposes of identification.]

10          BY MS. MURRAY:

11          Q    You've been handed a document that has

12   been marked as Henck Exhibit 2, which, again, is

13   another multipage document.  If you can review

14   that and let me know when you've completed your

15   review.

16          A    Okay.

17          Q    Would you please identify the document

18   for the record?

19          A    The first part is a document I don't

20   think I've ever seen.  It appears to be a summary

21   of what's in the printed-out version of the

22   electronic -- what I believe to be an electronic

Alderson Reporting Company
1-800-FOR-DEPO

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                October 31, 2006
                    Silver Spring, MD

Page 19

1    form to which it is attached.  It's apparently an

2    evaluation submitted, according to the document,

3    on August 30, 2002.

4          Q    Save the first 2 pages, the remainder of

5    Exhibit 2 represents the performance evaluation

6    that you conducted for Ms. McFadden?

7          A    Yes.  I don't remember it specifically,

8    but it appears to be, yes.

9          Q    I direct your attention to the last page

10   of Exhibit 2, under "Overall Comments," number 1,

11   "Please identify your secretary's greatest

12   strengths."  Answer, "A loyal, hardworking,

13   knowledgeable member of the team."  Did I read

14   that correctly?

15         A    You did.

16         Q    And you found Ms. McFadden to be that

17   "loyal and hardworking member of the team"?

18         A    Yes.

19         Q    What would you say were the essential

20   functions of Ms. McFadden's job as legal secretary

21   working for you?

22         A    Working for me, it was basically to do

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                October 31, 2006
                        Silver Spring, MD

Page 24

1    Q    Who has the firm provided Family Medical

2  Leave Act -- or I'll use the acronym FMLA -- to,

3  in the past 5 years, to your knowledge?

4    A    I have no specific personal firsthand

5  knowledge of anybody getting that leave, with the

6  exception of Vanessa -- or Ms. McFadden.

7    Q    How well did you know Ms. McFadden?

8    A    She was my secretary for -- I said over

9  10 years; it may have been 13 or 14 or 12,

10  somewhere in there.  She and I had kids that were

11  about the same age.  We would talk about them,

12  talk about them going to school, talk about

13  colleges.  You know, the fact that she was outside

14  of my office for umpteen years --

15    Q    Did you know her husband?

16    A    I think I met her husband only one time.

17  I certainly knew of him, but I did not know him

18  directly.  Did not -- as far as I know, I don't

19  think he was ever in our office.

20    Q    Did you have any occasion to meet her

21  children?

22    A    I've met all of her kids, on multiple

Alderson Reporting Company
1-800-FOR-DEPO

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                               October 31, 2006
                        Silver Spring, MD

Page 25

1    occasions.

2         Q     Did you come to learn anything about her

3    husband, Cornelius McFadden's, medical condition

4    in the year 2002?

5         A     I can't be certain as to the specific

6    time.  I'll take your word for it that it's 2002.

7    But, yes, Vanessa did tell me that her husband was

8    ill.  She, from time to time, sometimes fairly

9    often, would keep me posted, or tell me what was

10   going on with him.  It was a very distressing

11   situation.

12        Q     What did she tell you about his medical

13   condition?

14        A     There was a lot of conversations.  She

15   told me that he had colon cancer, and she told me

16   that he had diabetes.  And, insofar as I can

17   remember, the other conversations tended to

18   revolve around where things were as they relate to

19   those two illnesses.

20        Q     She discussed treatment of those

21   conditions with you, is that fair to say?

22        A     She would describe that -- she would say

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                           October 31, 2006
                    Silver Spring, MD

1   things like, "Mack is going to -- he's going for

2   chemotherapy," or Mack's having this problem with

3   his leg because of the diabetes.  And she would

4   often get into details that, I confess, I was not

5   following, other than I understand chemotherapy,

6   and I -- you know, but beyond that, it was -- I

7   listened.

8       Q    And Mack, just so the record is clear,

9   is her husband, Cornelius McFadden.

10      A    Yes.  That's what she always referred to

11  me him to me as Mack.

12      Q    When she informed you that her husband

13  had colon cancer, during that discussion did she

14  request any leave of absence?

15      A    She did not, as far as I can recall,

16  say, "I need a leave of absence.  I need this."

17  She said that she was going to have to be spending

18  -- she was going to have to make trips to take him

19  to the doctor and so forth.  And my standard

20  answer anytime she would say something like that

21  was, "Well, you've got to take care of that.

22  Don't worry about me," because she would express,

Alderson Reporting Company
1-800-FOR-DEPO

Charles Henck                                    October 31, 2006
                        Silver Spring, MD

Page 33

1    connection with her husband's medical condition?

2          A    No.

3          Q    At any time, did Ms. McFadden come to

4    you and complain about having problems with taking

5    leave associated with her husband's condition?

6          A    There were occasions on which she would

7    indicate to me that there was some problem.  I

8    would listen.  I would ask her to try to explain

9    it.  And then I would -- if it seemed like

10   something I ought to at least ask about, I would

11   ask about it.  That happened a couple of times,

12   I'm sure, that I'm aware of.

13         Q    As best as you can recall, what were the

14   problems that she discussed with you?

15         A    I can only characterize them by type.

16   It was, you know, "I'm not getting this kind of

17   leave, I'm not getting that kind of benefit, I'm

18   not getting" some thing that she felt was entitled

19   to, or somebody was not doing something they were

20   supposed to do.  And on the -- I cannot remember

21   specific instances, but I do remember that every

22   time I checked into one of these things, I would

Alderson Reporting Company
1-800-FOR-DEPO

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                          October 31, 2006
                    Silver Spring, MD

Page 34

1    find that the facts were not as she was describing

2    them.

3        Q    Did Ms. McFadden ever complain to you

4    specifically about Ms. Riley-Jamison?

5        A    Yes.

6        Q    What complaints did Ms. McFadden

7    register with you regarding Ms. Riley-Jamison?

8        A    I can only characterize those by general

9    type, not by specifics, that Ms. Riley-Jamison was

10   docking her for time, or was checking on her leave

11   or -- and that's by way of general

12   characterization; in other words, that there were

13   issues with leave.  I was aware that Vanessa had

14   long -- at the time that these conversations that

15   I can recall were taking place, that Vanessa was

16   long past any actual leave she had coming, and I

17   would -- every time I checked, which was two or

18   three, four times, something like that, I would

19   find out what was going on, and it was clear to me

20   that we were doing -- "we," the firm -- were doing

21   exactly what we should have.

22       Q    Did Ms. McFadden ever complain to you

Alderson Reporting Company
1-800-FOR-DEPO

Charles Henck                                    October 31, 2006
                        Silver Spring, MD

Page 35

1    about receiving an excessive amount of e-mails

2    from Ms. Riley-Jamison?

3         A    I never heard any such complaint.

4         Q    Did Ms. McFadden ever show you a series

5    of e-mails from Ms. Riley-Jamison?

6         A    I have no recollection of seeing any e-

7    mail from Ms. Riley-Jamison to Vanessa.

8         Q    Did Ms. McFadden ever complain to you

9    that she believed she was being discriminated

10   against?

11        A    The closest she would come to saying

12   things that -- along those lines is, she would say

13   something to the effect that, "There are things

14   going on here that you just don't know about."

15   That was, sort of, the general characterization,

16   "I know it, but you don't.  And everybody else

17   knows it, but you don't."

18        Q    Did she ever say that she was being

19   treated differently with respect to leave than

20   other legal secretaries?

21        A    She said, on at least one occasion, that

22   -- I don't remember the subject, whether it was

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                October 31, 2006
                         Silver Spring, MD

Page 36

1     leave or some other related issue with the firm --
2     but that she was being treated differently from --
3     actually, I do remember.  It related to the
4     disability claim, not to leave, that I recall, and
5     that we were doing for others what we wouldn't do
6     for her.  She gave me some specifics, on that one
7     case.  I checked, and she was completely wrong.
8     We had done absolutely nothing remotely like what
9     she was describing.
10         Q     Do you recall the name of the other
11    employee, or employees, she referred to?
12         A     She alluded, generally, to two or three
13    other employees, who, at various points, had
14    gotten -- whose names I cannot recall right now.
15    There was a former word-processor -- her name was
16    Wanda Payton -- who had to move to the
17    Philadelphia office, and, I heard later, had gone
18    on disability.  And I remember Vanessa telling me
19    that an employment lawyer in -- one of our
20    partners -- I think, Maureen Rayborn -- had
21    intervened with UNUM, the disability carrier, to
22    get Ms. Payton her disability claim.  I contacted

Alderson Reporting Company
1-800-FOR-DEPO

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                              October 31, 2006
                    Silver Spring, MD

Page 43

1   2003, thereabouts.

2       Q    Prior to the time that she went out on

3   disability, in the fall of 2003, at any time

4   during that year before that did you have any

5   discussions with human resources regarding her

6   attendance?

7       A    Yes.  What had happened is that Vanessa

8   was becoming, to my observation, increasingly

9   unable to get around, to move, to, sort of, handle

10  the even fairly modest impositions I make on a

11  secretary.  She looked like she was in pain.  She

12  was often unable to be there for, what I was told,

13  medical reasons, either because she was not

14  feeling well enough to come to work -- and it was

15  -- it seemed to me that she should not be coming

16  to work, not because I was worried about my stuff

17  getting done, but I was concerned about her.  And

18  I know that I had -- that I did discuss that with

19  -- at least I believe I discussed that with Ms.

20  Riley-Jamison.

21      Q    What do you recall Ms. Riley-Jamison's

22  response being?

Alderson Reporting Company
1-800-FOR-DEPO

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                              October 31, 2006
                          Silver Spring, MD

Page 44

1        A    I don't recall.  Let me come -- let me -

2    - let me come back to that.  I do recall that we

3    shared a view that Vanessa should not have been

4    working.

5        Q    Do you recall when that was?

6        A    No.

7        Q    Was it prior to her going out on

8    disability?

9        A    Well, yes.  She was -- it was when she

10   was still coming in to work, and, in my view,

11   should not have been.

12       Q    You said you observed that it was --

13   strike that.

14            You testified that you observed that Ms.

15   McFadden was "increasingly unable to move and get

16   around."  Do you recall saying that?

17       A    Yes.

18       Q    What did you observe?

19       A    She seemed to have trouble walking.

20       Q    Did you observe any other physical

21   limitations on her part?

22       A    Not specifically.  She just -- no other

05f06fc4-a7b3-4145-ab25-a77b13d903dc

Charles Henck                                    October 31, 2006
                    Silver Spring, MD

1    physical limitations that I was specifically aware

2    of, but I think she clearly was having difficulty

3    walking, moving around.

4         Q    Did you share your view, that she should

5    not be working, with Ms. McFadden?

6         A    I believe there was a point, fairly late

7    in the situation, where I said -- I told her that

8    I was very concerned about her, and I thought this

9    was taking a terrible -- trying to come to work

10   was taking a terrible toll on her, and her

11   response back was that she needed the money to

12   cover bills and the like.  And I said -- I'm

13   speculating -- I was concerned about it.  I told

14   her I was concerned about it, and I hoped there

15   was something we could do about it, because it was

16   -- that I -- I know I told her I didn't think it

17   was doing her any good to be coming in.

18        Q    Did Ms. Riley-Jamison share with you any

19   discussions that she had with Ms. McFadden

20   regarding Ms. McFadden's health condition?

21        A    Not that I recall.

22        Q    Prior to Ms. McFadden going out on

05f06fc4-a7b3-4145-ab25-a77b13d903dc