Page 1

```
          UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MARYLAND
----------------------------X
VANESSA A. McFADDEN,         :

      Plaintiff,             :

   v.                        : Civil Case No.

BALLARD SPAHR ANDREWS &,     :   05cv2401 (RJL)

INGERSOLL, LLP, et al.,      :

      Defendants.            :
----------------------------X


                             Silver Spring, MD

                             October 31, 2006


      Deposition of MARGARET RILEY-JAMISON, a
witness herein, called for examination by counsel
for Plaintiff in the above-entitled matter, taken
at The Law Offices of T. W. Murray, 1111 Bonifant
Street, Silver Spring, Maryland 20910, at 10:12
a.m., on Tuesday, October 31, 2006, reported by
Ray Heer III and transcribed under his direction.
```

Page 66

1  Q   What were those conversations, as best
2  you can recall?
3  A   I wouldn't remember specifics.  I can
4  tell you that Vanessa would come to my office
5  frequently, or would stop me frequently, to
6  discuss her husband's health.
7  Q   Did that irritate you?
8  A   No.  I felt awful for her.
9  Q   Did you recommend that she put her
10 husband in hospice care?
11 A   No.
12 Q   Did you ask her to get family or church
13 members to help take care of him?
14 A   No.
15 Q   Did you have any discussions with any
16 partner in the firm regarding Ms. McFadden's
17 request for leave due to her husband's condition?
18 A   Probably Charlie Henck.
19 Q   What discussions did you have with Mr.
20 Henck?
21 A   I don't remember particulars, absolutely
22 not, but I would say that Charlie was very

Page 79

1  desk or he would say he needed no coverage.
2      Q    You thought that Ms. McFadden's modified
3  schedule was a problem, didn't you?
4      A    No.
5      Q    Did you tell her that, that you thought
6  it was a problem?
7      A    No.
8      Q    Did you instruct Ms. -- or advise Ms.
9  McFadden to take her daughters out of college so
10 that they could care for her husband instead of
11 her?
12     A    No.
13     Q    Did you dock her pay when she was
14 working during this time period, 2003?
15     A    Yes.
16     Q    Why?
17     A    She had exhausted all leave.
18     Q    How much pay did you dock her in 2003?
19     A    I would have to count up the days, but
20 we tried to string it along.
21     Q    If you were to count the days, what
22 documents would refer to, to do that?

Page 80

1   A    This document right here, the attendance
2   record.
3        MS. MURRAY:  Let the record reflect that
4   the witness is referring to page 2 of Jamison
5   Exhibit 2.
6        BY MS. MURRAY:
7   Q    Would there be any other records which
8   would indicate pay that Ms. McFadden was docked in
9   2003?
10  A    There should be a notice from payroll.
11  Once a docking -- once you enter a docking --
12  docking into the system online, the employee would
13  receive a notice, and then eventually the person
14  -- the supervisor who entered it would get a
15  report back from payroll that someone had been
16  docked.
17  Q    Did Ms. McFadden object in any way to
18  her pay being docked in 2003?
19  A    I don't remember objections.  I would
20  give her heads-up that there's no more leave to
21  apply, and then, you know, give her a heads-up
22  before the docking went in, generally, so that she

Page 81

1    didn't take too many days docked in one pay
2    period.
3        Q    On a day in 2003, did you send Ms.
4    McFadden several e-mails in one day telling her
5    that she would not be paid for a day that she was
6    present at work?
7        A    Did I send her e-mails?  I don't believe
8    -- I don't know what that's referring to.
9        Q    Did you ever make any comment that the
10   firm -- meaning Ballard Spahr -- should hire more
11   healthy people?
12       A    No.
13           MR. DiMURO:  Okay, you heard the
14   question; I didn't.  More healthy people?
15           MS. MURRAY:  Healthy people.
16           MR. DiMURO:  Okay.  Thank you.
17           BY MS. MURRAY:
18       Q    Did you require Ms. McFadden to call in
19   to report her absences on Mondays and Wednesdays
20   when she had a set modified schedule?
21       A    No.
22       Q    Did you ever make a comment to Ms.

937bfacb-5a54-4051-ab5e-651019777a34

Page 82

1   McFadden that she should put her husband in
2   hospice since he only had 4 to 6 months to live?
3       A    No.
4       Q    Did Ms. McFadden ever express to you
5   that she felt you were harassing her?
6       A    No.
7       Q    Did she ever express to anyone, to your
8   knowledge, that she felt she was being harassed by
9   you for taking leave for her husband's condition?
10      A    No.
11      Q    Are you aware of any complaints that Ms.
12  McFadden made to a firm partner regarding the
13  trouble she was having using her leave for her
14  husband's condition?
15      A    She had no trouble -- I'm sorry, I might
16  be misunderstanding your question -- she had no
17  trouble using leave.
18      Q    Did Ms. McFadden ever express to you
19  that she needed more time off for her husband's
20  condition?
21      A    No.
22      Q    Are you aware of any complaints that Ms.

Page 102

1   2004.  How was that termination communicated to
2   Ms. McFadden?
3        A    By John DiBattista, when he asked her if
4   she could return to work.
5        Q    And how do you know that?
6        A    Because it was a conference call.
7        Q    Did you participate on that call?
8        A    I sat in on the call.
9        Q    Who all participated on the call?
10       A    Wendy Iversen, Fern Forman, John
11  DiBattista, myself.
12       Q    Who made the decision to terminate Ms.
13  McFadden?
14       A    Vanessa.  When she was asked to return
15  -- she was told that we had a position for her,
16  and she said -- I don't remember specifics, but --
17  "I can't return to work.  I'm disabled.  I'm not
18  coming back."
19       Q    Who, at Ballard Spahr, made the decision
20  to terminate Ms. McFadden?
21       A    The policy, because she was unable to
22  return to work.  So, John DiBattista, who would

Page 103

1   administer the policies.
2       Q    To your knowledge, did Charles Henck
3   have any involvement in the decision to terminate
4   Ms. McFadden?
5       A    Charlie -- I -- to my knowledge, no.
6   Was he aware of the situation?  Yes.
7       Q    Are you aware of whether he was
8   consulted with respect to whether to terminate Ms.
9   McFadden?
10      A    I would -- I mean, you're asking
11  specifics.  I don't -- it wouldn't have been me
12  that went in to him, no.  But would someone have?
13  Probably yes.  I'm sure someone did.  Wendy --
14           MR. DiMURO:  The question was, "Do you
15  know?"
16           THE WITNESS:  No.  It wasn't me.  I
17  didn't consult with him.
18           BY MS. MURRAY:
19      Q    Are you aware of anyone else consulting
20  with him?
21      A    I don't know.
22      Q    As best as you recall, tell me

Page 104

1   everything you recall -- you remember being said
2   at that conference call that you discussed with
3   John DiBattista, Iversen, Forman, and Ms.
4   McFadden, in May of 2004.
5       A    I do not recall many details of the
6   conversation.  I made notes of the conversation.
7       Q    What do you recall?
8       A    Of that conversation?  I recall that we
9   called Vanessa, because she wanted to discuss when
10  she was "going to be terminated."  Those were her
11  words.  So, I called John.  John, I believe -- I
12  mean, John -- I don't remember the conversation.
13  I'd have to look at my notes.
14      Q    How do you know Ms. McFadden wanted to
15  have this discussion?
16      A    She called me and said, "Where's my
17  termination letter?"  That's how she started the
18  conversation.
19      Q    Did you know what she was referring to?
20      A    I asked her what she was talking about.
21      Q    What did she say?
22      A    She said, "I" -- from my notes, I would

Page 105

1   know it, but from what I remember, of looking at
2   my notes, she said, "Where's my letter of
3   termination?  By my calculation, my Family Medical
4   Leave should have ended May 6th, or something like
5   that.  It's May 13, May 14, whatever.  I should
6   have had a letter.  The employee manual says I
7   need a letter of termination."  And I said,
8   probably back -- I must have said, "I'll have to
9   get with John on that, Vanessa."
10       Q    Sometime between October 2003 and the
11  time of this conversation, were you aware of what
12  periods of time Ms. McFadden was entitled to FMLA
13  leave?
14       A    I was aware she was eligible for 16
15  weeks of Family Medical Leave.
16       Q    Did you perform any calculations of when
17  the leave would start or end?
18       A    Well, I probably did, myself, but I
19  wasn't the one administering it.  It would have
20  come out of benefits, and they would have sent me
21  something saying when the leave started and ended.
22       Q    What responsibility, if any, did you

Page 106

1   have to notify legal secretaries regarding the --
2   their FMLA period of time?
3        A    If someone came to me with a situation,
4   I would report it up to benefits, and I would let
5   them send the official paperwork -- the forms, the
6   policy.
7        Q    Was it your understanding that someone
8   in Philadelphia was to notify the employee of
9   their FMLA leave entitlement start and end date?
10       A    Absolutely.
11       Q    What, if anything, is your understanding
12  of what occurs after an employee's FMLA leave
13  expires at Ballard Spahr?
14       A    My understanding is -- I'm not going to
15  quote policy, because I don't know it, exactly --
16  but I believe it's that they're entitled to an
17  additional 3 months leave of absence, and then
18  there's an additional month or something in there;
19  that they're entitled to request an additional
20  leave of absence.  So, it's -- maybe it's up to
21  the 3 months.  I don't have the policy in front of
22  me.  And that would be handled from John

Page 107

1  DiBattista.  I would have notified him.  He got
2  the forms to her.  She completed the form.
3       Q    So, it's your testimony that it's
4  Philadelphia's responsibility to notify Ms.
5  McFadden when her FMLA leave expired?
6       A    They administered Family Medical Leave,
7  yes.
8       Q    So, just to be clear, the "they" you're
9  referring to is John DiBattista and Fern Forman,
10  in 2004.
11       A    Yes.
12            [Whereupon, a document was marked
13             as Jamison Exhibit Number 5 for
14             purposes of identification.]
15       BY MS. MURRAY:
16       Q    You've been handed a document that has
17  been marked as Jamison Exhibit 5, which is a 3-
18  page document.  Please review the document and let
19  me know when you have completed your review.
20       A    I'm done.
21       Q    Can you identify the first two pages of
22  Exhibit 5 for the record?

Page 121

1           When you had the conference call with
2   Ms. McFadden on May 13th, 2004, who was working as
3   the firm's receptionist?
4        A   I don't know if -- I believe we had a
5   temp in place.
6        Q   Who was the incumbent -- the permanent
7   employee?
8        A   Betty Ann Hahn was also out on long-term
9   disability. We filled her position with a temp
10  until we knew whether she could return to work or
11  not.
12       Q   When did Ms. Hahn go out on disability?
13       A   I don't recall exact dates. I believe
14  she went out when I was on maternity leave. She
15  went back, so -- I don't remember. She was out
16  twice. She went out, then, when -- after I went
17  back. And then she went back out again. I don't
18  remember.
19       Q   What are the essential functions of the
20  receptionist job?
21       A   Greet visitors, answer phones, keep
22  track of courier, visitors, sign-in sheets for

Page 135

1    that seminar?
2         A    Possibly.  I don't know.
3         Q    Did you review any FMLA materials in
4    connection with Ms. McFadden's need for leave in
5    2002 and 2003 for her husband's medical condition?
6              MR. DiMURO:  Because of the speaker, I
7    actually lost the first half of the question.
8    What -- if you could restate it, please.
9              MS. MURRAY:  Why don't we have the court
10   reporter read it back.
11             COURT REPORTER:  "Did you review any
12   FMLA materials in connection with Ms. McFadden's
13   need for leave in 2002 and 2003 for her husband's
14   medical condition?"
15             THE WITNESS:  I don't recall whether it
16   was during her husband's medical condition or not,
17   but I know at one point I pulled the D.C. Family
18   Medical Leave Act.
19             BY MS. MURRAY:
20        Q    After pulling the -- that statute, did
21   you have any discussions with anyone about it?
22        A    I probably forwarded it up.  I -- my

Page 136

1    recollection is I may have forwarded it up to -- I
2    don't know who -- Fern Forman, John DiBattista.
3        Q   While at Ballard Spahr, do you recall
4    receiving any training in retaliation?
5        A   That would be -- yes, when we do our
6    antiharassment training.
7        Q   Next question, whether you received any
8    harassment training while at Ballard Spahr.
9        A   Yes.
10       Q   Was that harassment training that you
11   received focused on sexual harassment or on other
12   forms of harassment?
13       A   Both.
14       Q   Are you aware of any of the following
15   individuals making any statements which you
16   consider biased based on disability -- exhibit a
17   bias: Allan Winn?
18       A   I'm not aware.
19       Q   John DiBattista?
20       A   I'm not aware.
21       Q   Fern Forman?
22       A   I'm not aware.

937bfacb-5a54-4051-ab5e-651019777a34

Page 154

1    Q   Did she inform you that Dr. Armstrong
2  had been treating her for asthma condition?
3    A   That is what it says.
4    Q   I'm asking you what she informed you of,
5  not what the document says.
6    A   I would have written down what she
7  informed me of, yes.
8              [Whereupon, a document was marked
9               as Jamison Exhibit Number 20 for
10              purposes of identification.]
11         BY MS. MURRAY:
12   Q   I'm handing you a document that has been
13 marked as Jamison Exhibit 20.  Can you identify
14 that document for the record?
15   A   It's an e-mail trail.  I sent an e-mail
16 to Allan and Wendy, and copied Charlie Henck,
17 because we were notified by Fern Forman that UNUM
18 was not, as it says here, inclined to approve
19 Vanessa's disability.  Wendy replies back to it,
20 and then I replied back to Wendy, saying, "I know
21 it's hard to believe that any of these doctors
22 would say she could come back."

937bfacb-5a54-4051-ab5e-651019777a34

Page 155

1      Q    Your next sentence says, "Have they not
2  seen her struggle to walk?"  Did I read that
3  correctly?
4      A    That's exactly right.
5      Q    Had you seen her struggle to walk?
6      A    It was very hard.  Yes, Vanessa had a
7  very difficult time walking.  She was in a lot of
8  pain.
9      Q    And this e-mail was drafted April 13th,
10 2004.
11     A    Yes.
12     Q    So, is it fair to say that, before April
13 13th, 2004, you had observed Ms. McFadden have
14 difficulty walking?
15     A    Yes.
16     Q    The next sentence, "Also, there are
17 physical and mental issues, and either could kill
18 her, from what we understand."  Did I read that
19 right?
20     A    Yes, that's what she would tell us.  The
21 panic attacks -- she would tell me those things in
22 conversations, that the doctors would say to her