UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
**VANESSA A. MCFADDEN**        )
                                            )
      Plaintiff,              )
                                            )
   v.                                 )    **Civil Case No. 05cv2401  (RJL/JMF)**
                                            )
**BALLARD SPAHR ANDREWS &**  )
**INGERSOLL, LLP et al.**         )
                                            )
      Defendants.           )
_____)

## DECLARATION OF CASSANDRA BRISCOE

I, Cassandra Briscoe, do declare and say as follows:

1. My name is Cassandra Briscoe and I am an African-American woman, 58 years of age. My home address is 5610 14th Street, N.W. Washington, D.C. 20011.

2. I was formerly employed at Ballard Spahr Andrews & Ingersoll, LLP as a Support Services Supervisor. The firm hired me on October 26 or 28 of 1984. While working for Ballard Spahr I entered timesheets, would take care of the leave, managing pantry supplies, stocking the kitchen, maintaining the conference room, distributing the office key cards, allocate the fair cards (for transportation), maintaining the leave balances, providing coverage for the secretary desks and the reception desks, and assistant to Meg Riley-Jamison, and Wendy Iversen. I kept track of leave for employees by entering the timesheets, motoring leave, and updating leave.

3. I worked with Vanessa McFadden since her hire in 1989. When she came on board I worked as a Legal Secretary, like Ms. McFadden.

4. One day, while standing at the receptionist desk with Vanessa McFadden and another employee Betty Anne Hahn, Human Resources Manager, Margaret Riley-Jamison stated that the firm "needed to start hiring healthier people."

5. Ms. McFadden told me that Ms. Riley-Jamison advised her to pull her daughters out of college so that they could care for their father and so Ms. McFadden could come to work. Ms. McFadden also told me that she believed that Ms. Riley-Jamison was prejudiced.

6. When support staff employees wanted a day off the practice had been for them to report their absence me or the front desk. This practice changed when it came to Ms. McFadden. Ms. Riley-Jamison informed me that Ms. McFadden should call her to report her absences instead.

7. When Ms. McFadden's husband was ill I witnessed Ms. McFadden's receipt of 7 emails that notified her that she would be docked pay - all for the same dates.

8. Ms. McFadden was a dedicated employee and I could always call on her to provide desk coverage and to provide word processing help if we were backup, particularly with billing assignments. Ms. McFadden came into work to do a filing for Mr. Henck, while she was sick and had been in the hospital that weekend before.

9. Before taking leave for my disability during my review in October of 2003, I was offered other positions in the Firm which included; library copy center, pantry working, and word processing.

10. In early 2003, I began to observe Ms. McFadden having health problems. I noticed swelling in her – hands, feet and ankles, and she would loose her balance. After urging her for a long time to see a doctor, she finally went to her physician, who diagnosed problems with her thyroid and later diagnosed her with Grave's Disease.

11. After October 30, 2003, I took a leave of absence from Ballard Spahr, due to medical reasons and received short-term disability benefits in late January or early February 2004. I received correspondence from John DiBittista stating that I no longer had a position, with the firm. The letter indicated that I had been on FMLA leave and that all of my leave expired. At no time before notifying me of this did Ballard Spahr offer me the opportunity to come back to work in any position.

12. Rhea Mahr was a Legal Secretary who had cancer. The firm granted her an adjusted of schedule, 4 days week.

13. Every year, Judy Mintz, another Legal Secretary, took a leave of absence for 1-2 weeks in March to go skiing and to travel to Europe. Every summer she was resigned from position from late June until the week after Labor Day. This arrangement had nothing to do with any medical condition or disability.

14. Betty Anne Hahn worked as the Firm's full-time Receptionist. She was diagnosed with cancer, and as an accommodation, the firm modified her duties to exclude entering timesheets, and monitoring medical supplies, and performing back-up typing. She essentially answered telephones and maintained the conference room schedule. At some point in time, Ms. Hahn went out on disability, and I understand that she returned for a couple days in December but went out again on disability, until she passed away. During her absence, the firm hired one temporary worker to serve as Receptionist.

15. Kathy Hannah was also a Legal Secretary at the firm. She suffered a stroke and worked a part-time schedule for approximately two years and resumed full-time schedule in 2003.

16. Elaine Wilbur was a Senior Legal Secretary in the Litigation department who performed billing work for the litigation department. During two of her pregnancies, the firm

3

granted her maternity work from home, before and after giving birth to her children. Also, when Ms. Wilbur resigned and moved to New Mexico, the firm replaced her with a permanent hire. Yet, when Ms. Wilbur returned to Washington D.C. a month or so later after being unable to find comparable employment, the firm fired the replacement and rehired Ms. Wilbur. Finally, after 9/11, the Firm permitted Ms. Wilbur to work a part-time schedule (4-days/wk) for two years because her son was "afraid" that when she left home and went to work, she wouldn't be returning home.

17. Mahr, Mintz, Hahn, Hannah, and Wilbur are all Caucasian women.

18. I have personal knowledge of these events and work schedules because my responsibility as a Support Services Supervisor included finding coverage for the secretaries while they are out.

19. I also prepared a statement dated August 1, 2004 which is attached to this declaration.

I declare under penalty of perjury under 28 U.S.C. 1746 that the above statement is true and correct.

_____/s/_____                Date: October 9, 2007
Cassandra Briscoe

CASSANDRA E. BRISCOE<br>
5610 14TH STREET, NW.<br>
WASHINGTON, DC 20011<br>
202-882-0741

August 1, 2004

Dear Sir or Madam:

I have known Vanessa McFadden for more than 15 years, during our employment at Ballard Spahr Andrews & Ingersoll, LLP and personally. I am writing this letter as a former co-worker and personal friend.

As an employee, Vanessa was in early (between 7:30 and 8:00 am) and usually left late. Because her husband dropped her off in the morning, and picked her up at night, over the years he spent many evenings waiting for her while she completed assignments given to her by Mr. Charles Henck, whom she has worked for going on 15 years or assisting another secretary with a project to get out. When requested, she would help attorneys in the mornings. During these years of early arrivals and late departures, Vanessa rarely, if at all, put in for the overtime.

Vanessa got the nickname "Clean Up Woman" because she was often assigned to new attorneys coming into the DC office and once she got their files in order the attorney was then assigned to another secretary. This became the practice for many years and Vanessa always handled the challenge.

She was often the one who handled office collections for gifts, purchased birthday and get-well cards, collected signatures and set up many farewell luncheons.

I could usually count on getting help from Vanessa if I needed additional help with document production or coverage on the front desk. Even when she was working on something, she would estimate her time and call me when she was free and able to help out. There was a time when we had an evening word processor out for medical reasons and I needed to set up a temporary schedule for evening coverage. Vanessa was the first to accept one evening a week to help with that coverage. She also took on more evenings when it was needed.

As far as loyalty is concerned, I remember an occasion when Mr. Henck was out of the office and although Vanessa knew his location, she refused to share that information with several attorneys, both in our office and from our other offices, who had asked her about Mr. Henck's whereabouts. This included a request from the then Managing Partner, Mr. Frederic Ballard.

Personally, I admire many of her accomplishments. All three of her children have attended college. They are all either attending or planning to attend graduate school as well. Over the past few years, I've watched Vanessa get involved with many projects. She got a personal trainer, was regularly going to the gym and lost

065

an amazing amount of weight. I believe, however, her most exhilarating effort was preparing for and taking part in the Marine Corps Marathon.

Vanessa was always on the go and active, traveling with her kids and decorating her new home. Not long after the Marathon, I saw a change come over her. She was slowing down, frequently mentioning headaches, numbness in her hands and toothache like pains in her joints. After a while, we both thought that her headaches were from stress. I noticed her hands were blistering and asked her about it and she confided that when she gets upset, her hands blister. I didn't know whether the stress was coming from home or concerns about her own health. She started having trouble breathing and her ankles seemed to be swollen most of the time. I tried to encourage here to stay off of her feet as much as possible in the office, but she continued to make the trips necessary to get her daily tasks done, which often included going the copy center several times a day.

Once her husband's health issues were known, shortly after, she finally went to the doctor for herself and, after many tests, was diagnosed with Graves Disease. She was prescribed medications and had an allergic reaction to one medication prescribed by one of the specialists she was seeing. This medication aggravated her feet greatly and she broke out with blisters all over, especially on the bottoms of her feet. Some of the secretaries on her corridor and I were able to help her with some of her daily running around the office, but through her pain, Vanessa came to work, until she was ordered off her feet, by her doctor.

When Mr. McFadden was ordered to have chemo treatments, I watched Vanessa go to another level of stress. Although she knew being off of her feet was for her benefit, she was concerned about her job security and leave issues. She did not know what kind of time she would have to take off with her husband nor did she know what her own health issues would require with regards to time off from work. Taking Mr. McFadden to several of his chemo appointments and seeing his reaction to the chemo (it became a two day process, once he had the chemo, he was very ill the next day) Vanessa really became concerned about her leave issues. Because of these concerns, she called on her sister and a cousin to help her out with Mr. McFadden's chemo appointments. This, I know, was very difficult for her. She is not used to asking for help, but is usually providing help necessary for others. With the added stress, Vanessa's own health became even more of an issue. She was coming to work in pain on a regular basis and only took off for herself when she could no longer stand the pain. My heart went out to her during this time.

Several times Vanessa was upset on the job by comments made to her by Meg Riley-Jamison, our HR Manager. When Vanessa had a crying jag at her desk, she told me that Ms. Riley-Jamison came to her and told her she could not sit at her desk crying. That was one of the many times Vanessa called me and I went to her desk to escort her to the ladies' room or out of the building for air. I do not know of all the issues with Ms. Riley-Jamison, but from that point on, it seems that she made several comments to Vanessa, which required Vanessa having to leave the office for air. My personal opinion is that Ms. Riley-Jamison was fairly new to the office and did not know the relationship Vanessa and Mr. Henck had formed over the 14+ years they had been working together, nor did she know the many times Vanessa had helped some of our co-workers who were in need and were willing to help her. Ms Riley-Jamison was going by

066

the book and sometimes there are instances when the person involved and the circumstances should have a little more consideration.

There were a few weekends when Vanessa was asked to come in to enter timesheets for Mr. Henck. I know there were two times, while Vanessa was not feeling well, that she arrived only to find out there were no timesheets left for her to enter. I remember talking with her one Saturday morning before she left for the office and she was really not feeling well. I suggested she try going in on Sunday when she might feel better. She said she did not know how she would feel on Sunday and would rather go then and get it over with.

I know there was also a time when Vanessa had gone to the emergency room on a Saturday with breathing difficulties, yet that Monday she still went to the office to deliver a filing that was denied delivery on the previous Friday.

Overall, Vanessa has been a dedicated employee. I think that only one other time during my 19+ years with the firm have I seen anyone as dedicated, treated as unfairly and stressed as much. The past 2+ years have really been an eye opener for me. On a personal note, Vanessa is a dear friend and did not deserve the additional stress put on her by Ms. Riley-Jamison with regards to her leave.

Thank you for your time and concern.

Very truly yours,

*Cassandra E. Briscoe*

Cassandra E. Briscoe

067